# 18-105-cr

---

UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT

---

UNITED STATES OF AMERICA,

Appellee,

-v-

STACEY J. LAPORTE, JR.,

Defendant-Appellant.

---

On Appeal from the United States District Court
for the Northern District of New York

---

**APPENDIX**
**DEFENDANT-APPELLANT**
**STACEY J. LAPORTE, JR.**

---

Lisa A. Peebles
Federal Public Defender
James P. Egan
Assistant Federal Public Defender

Federal Public Defender's Office
4 Clinton Square, 3rd Floor
Syracuse, New York 13202
315.701.0080

# Table of Contents[1]

District Court Docket Sheet .......................................................... 1

Defendant's Memorandum of Law in Support of his Pretrial Motions
................................................................................................... 29

Defendant's Affidavit in Support of Motion to Suppress Statement
................................................................................................... 44

Second Superseding Indictment ............................................... 46

Government's Responsive Memorandum of Law in Opposition to
Defendant's Pretrial Motions with Exhibits ........................... 51

Defendant's Reply Memorandum of Law in Support of Pretrial Motions
................................................................................................. 102

Pretrial Motion Hearing........................................................... 113

District Court's Order Denying Pretrial Motions ................... 140

Excerpts of Trial Transcript
      Dewayne Baillargeon ................................................... 142
      Paul Fregoe................................................................... 174
      Stacey LaPorte ............................................................. 177
      Summations .................................................................. 182

Judgment .................................................................................. 247

Notice of Appeal....................................................................... 254

Clerk's Certification of the Record.......................................... 255

---

[1] The Presentence Report (PSR) has been filed under seal.

i

APPEAL

# U.S. District Court
## Northern District of New York - Main Office (Syracuse) [NextGen CM/ECF Release 1.2 (Revision 1.2)] (Syracuse)
### CRIMINAL DOCKET FOR CASE #: 5:16-cr-00320-DNH All Defendants

Case title: USA v. LaPorte et al

Date Filed: 10/27/2016
Date Terminated: 02/23/2018

---

Assigned to: Judge David N. Hurd

**Defendant (1)**

**Stacey J. LaPorte, Jr.**
*TERMINATED: 01/10/2018*

represented by **Randi Juda Bianco**
Office of the Federal Public Defender -
Syracuse Office
Northern District of New York
4 Clinton Square, 3rd Floor
Syracuse, NY 13202
315-701-0080
Fax: 315-701-0081
Email: randi_bianco@fd.org
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*
*Designation: Public Defender or*
*Community Defender Appointment*

**Martin P. Wolfson**
Office of the Federal Public Defender -
Syracuse Office
Northern District of New York
4 Clinton Square, 3rd Floor
Syracuse, NY 13202
315-701-0080
Fax: 315-701-0081
Email: martin_wolfson@fd.org
*ATTORNEY TO BE NOTICED*
*Designation: Public Defender or*
*Community Defender Appointment*

| **Pending Counts** | **Disposition** |
| --- | --- |
| 18:2251.F SEXUAL EXPLOITATION OF CHILDREN; and FORFEITURE ALLEGATION (1-4) | Superseded |

A 1

18:2251.F= SEXUAL EXPLOITATION OF CHILDREN with Forfeiture Allegations
(1s-4s)

Superseded

Defendant Stacey J. Laporte, Jr having been found guilty of Counts 1 through 6 of the Second Superseding Indictment 5:16-CR-320 ,defendant is hereby committed to the custody of the Bureau of Prisons to be imprisoned for a term of 1,140 months (or 95 years). This term consists of 360 months on Counts 1, 3, and 4 to run concurrently with each other but consecutively to all other counts; 360 months on Count 2 to run consecutively; 360 months on Count 5 to run consecutively; and 60 months on Count 6 to run consecutively. The Court imposed consecutive sentences to account for the separate and distinct crimes against different victims and to adequately account for the harms caused to these victims. The sentence represents the maximum sentence on Counts 1, 3, and 4 involving the sexual exploitation of infant V-1; the maximum sentence on Count 2 involving the sexual exploitation of infant V-4; the maximum sentence on Count 5 involving the sexual exploitation of minors V-2 and V-3; and the mandatory minimum sentence on Count 6, which involves an unidentified infant. Court imposed a sentence with the understanding that defendant will not be released from prison. However, in the event that he is released, defendant Stacey J. Laporte, Jr. shall be placed on Supervised Release for a term of life on each count to run concurrently. $600.00 Special Assessment due and payable immediately. No Fine or additional special assessment ordered. Defendant shall forfeit to the United States the items outlined in the Preliminary Order of Forfeiture dated July 7, 2017.

18:2251.F - CONSPIRACY TO SEXUALLY EXPLOIT A CHILD
(1ss)

18:2251.F - CONSPIRACY TO SEXUALLY EXPLOIT A CHILD
(2ss)

Defendant Stacey J. Laporte, Jr having been found guilty of Counts 1 through 6 of the Second Superseding Indictment 5:16-CR-320 ,defendant is hereby committed to the custody of the Bureau of Prisons to be imprisoned for a term of 1,140 months (or

A 2

95 years). This term consists of 360 months on Counts 1, 3, and 4 to run concurrently with each other but consecutively to all other counts; 360 months on Count 2 to run consecutively; 360 months on Count 5 to run consecutively; and 60 months on Count 6 to run consecutively. The Court imposed consecutive sentences to account for the separate and distinct crimes against different victims and to adequately account for the harms caused to these victims. The sentence represents the maximum sentence on Counts 1, 3, and 4 involving the sexual exploitation of infant V-1; the maximum sentence on Count 2 involving the sexual exploitation of infant V-4; the maximum sentence on Count 5 involving the sexual exploitation of minors V-2 and V-3; and the mandatory minimum sentence on Count 6, which involves an unidentified infant. Court imposed a sentence with the understanding that defendant will not be released from prison. However, in the event that he is released, defendant Stacey J. Laporte, Jr. shall be placed on Supervised Release for a term of life on each count to run concurrently. $600.00 Special Assessment due and payable immediately. No Fine or additional special assessment ordered. Defendant shall forfeit to the United States the items outlined in the Preliminary Order of Forfeiture dated July 7, 2017.

Defendant Stacey J. Laporte, Jr having been found guilty of Counts 1 through 6 of the Second Superseding Indictment 5:16-CR-320 ,defendant is hereby committed to the custody of the Bureau of Prisons to be imprisoned for a term of 1,140 months (or 95 years). This term consists of 360 months on Counts 1, 3, and 4 to run concurrently with each other but consecutively to all other counts; 360 months on Count 2 to run consecutively; 360 months on Count 5 to run consecutively; and 60 months on Count 6 to run consecutively. The Court imposed consecutive sentences to account for the separate and distinct crimes against

18:2251.F - SEXUAL EXPLOITATION OF A CHILD
(3ss)

CM/ECF LIVE - U.S. District Court - NYND                    https://ecf.nynd.uscourts.gov/cgi-bin/DktRpt.pl?112581314996379-L_1_0-1

different victims and to adequately account for the harms caused to these victims. The sentence represents the maximum sentence on Counts 1, 3, and 4 involving the sexual exploitation of infant V-1; the maximum sentence on Count 2 involving the sexual exploitation of infant V-4; the maximum sentence on Count 5 involving the sexual exploitation of minors V-2 and V-3; and the mandatory minimum sentence on Count 6, which involves an unidentified infant. Court imposed a sentence with the understanding that defendant will not be released from prison. However, in the event that he is released, defendant Stacey J. Laporte, Jr. shall be placed on Supervised Release for a term of life on each count to run concurrently. $600.00 Special Assessment due and payable immediately. No Fine or additional special assessment ordered. Defendant shall forfeit to the United States the items outlined in the Preliminary Order of Forfeiture dated July 7, 2017.

Defendant Stacey J. Laporte, Jr having been found guilty of Counts 1 through 6 of the Second Superseding Indictment 5:16-CR-320 ,defendant is hereby committed to the custody of the Bureau of Prisons to be imprisoned for a term of 1,140 months (or 95 years). This term consists of 360 months on Counts 1, 3, and 4 to run concurrently with each other but consecutively to all other counts; 360 months on Count 2 to run consecutively; 360 months on Count 5 to run consecutively; and 60 months on Count 6 to run consecutively. The Court imposed consecutive sentences to account for the separate and distinct crimes against different victims and to adequately account for the harms caused to these victims. The sentence represents the maximum sentence on Counts 1, 3, and 4 involving the sexual exploitation of infant V-1; the maximum sentence on Count 2 involving the sexual exploitation of infant V-4; the maximum sentence on Count 5 involving the sexual exploitation of minors V-2 and V-3; and the mandatory minimum sentence on Count 6,

18:2251.F - SEXUAL EXPLOITATION OF A CHILD
(4ss)

A 4

which involves an unidentified infant. Court imposed a sentence with the understanding that defendant will not be released from prison. However, in the event that he is released, defendant Stacey J. Laporte, Jr. shall be placed on Supervised Release for a term of life on each count to run concurrently. $600.00 Special Assessment due and payable immediately. No Fine or additional special assessment ordered. Defendant shall forfeit to the United States the items outlined in the Preliminary Order of Forfeiture dated July 7, 2017.

18:2252A.F=ACTIVITIES RE MATERIAL CONSTITUTING/CONTAINING CHILD PORNO with Forfeiture Allegations (5s)

Superseded

18:2251.F - SEXUAL EXPLOITATION OF A CHILD (5ss)

Defendant Stacey J. Laporte, Jr having been found guilty of Counts 1 through 6 of the Second Superseding Indictment 5:16-CR-320 ,defendant is hereby committed to the custody of the Bureau of Prisons to be imprisoned for a term of 1,140 months (or 95 years). This term consists of 360 months on Counts 1, 3, and 4 to run concurrently with each other but consecutively to all other counts; 360 months on Count 2 to run consecutively; 360 months on Count 5 to run consecutively; and 60 months on Count 6 to run consecutively. The Court imposed consecutive sentences to account for the separate and distinct crimes against different victims and to adequately account for the harms caused to these victims. The sentence represents the maximum sentence on Counts 1, 3, and 4 involving the sexual exploitation of infant V-1; the maximum sentence on Count 2 involving the sexual exploitation of infant V-4; the maximum sentence on Count 5 involving the sexual exploitation of minors V-2 and V-3; and the mandatory minimum sentence on Count 6, which involves an unidentified infant. Court imposed a sentence with the understanding that defendant will not be released from prison. However, in the event that he is released, defendant Stacey

CM/ECF LIVE - U.S. District Court - NYND                    https://ecf.nynd.uscourts.gov/cgi-bin/DktRpt.pl?112581314996379-L_1_0-1

J. Laporte, Jr. shall be placed on Supervised Release for a term of life on each count to run concurrently. $600.00 Special Assessment due and payable immediately. No Fine or additional special assessment ordered. Defendant shall forfeit to the United States the items outlined in the Preliminary Order of Forfeiture dated July 7, 2017.

18:2252A.F - RECEIPT OF CHILD PORNOGRAPHY with Forfeiture Allegation
(6ss)

Defendant Stacey J. Laporte, Jr having been found guilty of Counts 1 through 6 of the Second Superseding Indictment 5:16-CR-320 ,defendant is hereby committed to the custody of the Bureau of Prisons to be imprisoned for a term of 1,140 months (or 95 years). This term consists of 360 months on Counts 1, 3, and 4 to run concurrently with each other but consecutively to all other counts; 360 months on Count 2 to run consecutively; 360 months on Count 5 to run consecutively; and 60 months on Count 6 to run consecutively. The Court imposed consecutive sentences to account for the separate and distinct crimes against different victims and to adequately account for the harms caused to these victims. The sentence represents the maximum sentence on Counts 1, 3, and 4 involving the sexual exploitation of infant V-1; the maximum sentence on Count 2 involving the sexual exploitation of infant V-4; the maximum sentence on Count 5 involving the sexual exploitation of minors V-2 and V-3; and the mandatory minimum sentence on Count 6, which involves an unidentified infant. Court imposed a sentence with the understanding that defendant will not be released from prison. However, in the event that he is released, defendant Stacey J. Laporte, Jr. shall be placed on Supervised Release for a term of life on each count to run concurrently. $600.00 Special Assessment due and payable immediately. No Fine or additional special assessment ordered. Defendant shall forfeit to the United States the items outlined in the Preliminary Order of Forfeiture dated July 7, 2017.

A 6

**Highest Offense Level (Opening)**

Felony

| **Terminated Counts** | **Disposition** |
|---|---|
| None | |

**Highest Offense Level (Terminated)**

None

| **Complaints** | **Disposition** |
|---|---|
| None | |

---

Assigned to: Judge David N. Hurd

**Defendant (2)**

**Mackenzie L. Bailey**    represented by   **Kimberly M. Zimmer**
*TERMINATED: 02/23/2018*                      Zimmer Law Office PLLC
                                              The University Building
                                              120 E. Washington Street, Suite 815
                                              Syracuse, NY 13202
                                              315-422-9909
                                              Fax: 315-422-9911
                                              Email: kmz@kimzimmerlaw.com
                                              *LEAD ATTORNEY*
                                              *ATTORNEY TO BE NOTICED*
                                              *Designation: CJA Appointment*

**Pending Counts**

**Disposition**

Upon Defendant Mackenzie Baileys plea of guilty to Counts1, 2 and 3 of the Indictment 5:16-CR-320 defendant is hereby committed to the custody of the United States Bureau of Prisons to be imprisoned on Counts 1, 2, and 3 for a total term of 180 months on each count to run concurrently. Court recommends defendant participate in mental health and sex offender treatment program and be placed in a facility close to St. Lawrence County, NY. 15 YEARS Supervised Release on Counts 1, 2 and 3 to run concurrently, with standard and special conditions. $300.00 Special Assessment due and payable immediately. No Fine or additional special assessment ordered. Defendant shall forfeit

18:2251.F SEXUAL EXPLOITATION OF CHILDREN; and FORFEITURE ALLEGATION
(1-3)

A 7

to the United States the items listed in the
Preliminary Order of Forfeiture dated April
28, 2017.

**Highest Offense Level (Opening)**

Felony

| **Terminated Counts** | **Disposition** |
|---|---|
| None | |

**Highest Offense Level (Terminated)**

None

| **Complaints** | **Disposition** |
|---|---|
| None | |

---

**Plaintiff**

| **USA** | represented by | **Lisa M. Fletcher** |
|---|---|---|

Office of the United States Attorney -
Syracuse
P.O. Box 7198
100 South Clinton Street
Syracuse, NY 13261-7198
315-448-0672
Fax: 315-448-0658
Email: lisa.fletcher@usdoj.gov
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*
*Designation: Assistant US Attorney*

**Sahar L. Amandolare**
U.S. Attorney's Office - Syracuse, NY
100 South Clinton Street, Room 900
Syracuse, NY 13261
315-448-0672
Fax: 315-448-0658
Email: sahar.amandolare@usdoj.gov
*ATTORNEY TO BE NOTICED*
*Designation: Assistant US Attorney*

**Tamara Thomson**
Office of United States Attorney -
Syracuse Office
100 South Clinton Street
P.O. Box 7198
Syracuse, NY 13261

A 8

CM/ECF LIVE - U.S. District Court - NYND        https://ecf.nynd.uscourts.gov/cgi-bin/DktRpt.pl?112581314996379-L_1_0-1

315-448-0672
Fax: 315-448-0658
Email: tamara.thomson@usdoj.gov
*ATTORNEY TO BE NOTICED*
*Designation: Assistant US Attorney*

| Date Filed | # | Docket Text |
|---|---|---|
| 10/27/2016 | 1 | INDICTMENT as to Stacey J. LaPorte, Jr (1) count(s) 1-4, Mackenzie L. Bailey (2) count(s) 1-3. (sal) (Entered: 10/27/2016) |
| 10/27/2016 | | TEXT Minute Entry for proceedings held before Magistrate Judge David E. Peebles: GRAND JURY makes a partial report and returns Indictment. Application is made by Gov't. to seal the Indictment. Indictment is authorized for filing under seal. Sealing Order and Public Sealing Order are signed. Arrest Warrants and Writ are signed. Tally Sheet is ordered sealed. APP: Lisa Fletcher, AUSA, Grand Jury Foreperson, Steno: Sue Byrne, and Clerk: Shelly Muller. (sal) (Entered: 10/27/2016) |
| 10/27/2016 | | MOTION for Writ of Habeas Corpus ad prosequendum by USA as to Stacey J. LaPorte, Jr. (sal) (Entered: 10/27/2016) |
| 10/27/2016 | 3 | ORDER granting [] Motion for Writ of Habeas Corpus ad prosequendum as to Stacey J. LaPorte Jr. (1). Initial Appearance and Arraignment set for 10/28/2016 at 1:00 PM in Syracuse, 10th floor, before Magistrate Judge David E. Peebles. Signed by Magistrate Judge David E. Peebles on 10/27/2016. (sal) (Entered: 10/27/2016) |
| 10/27/2016 | 4 | APPLICATION/MOTION to Seal 1 Indictment and 2 Arrest Warrants by USA as to Stacey J. LaPorte, Jr, Mackenzie L. Bailey. (sal) (Entered: 10/27/2016) |
| 10/27/2016 | 5 | ORDER granting 4 Application/Motion to Seal 1 Indictment and 2 Arrest Warrants as to Stacey J. LaPorte Jr. (1), Mackenzie L. Bailey (2). Signed by Magistrate Judge David E. Peebles on 10/27/2016. (Attachments: # 1 Public Sealing Order) (sal) (Entered: 10/27/2016) |
| 10/28/2016 | 6 | TEXT ORDER: Per the Government's request, this case is unsealed as to Stacey J. LaPorte, Jr, Mackenzie L. Bailey. Authorized by Magistrate Judge David E. Peebles on 10/28/16. (sal) (Entered: 10/28/2016) |
| 10/28/2016 | | Set Hearings as to Stacey J. LaPorte, Jr, Mackenzie L. Bailey: Initial Appearances and Arraignments set for 10/28/2016 at 2:30 PM in Syracuse, 10th floor, before Magistrate Judge David E. Peebles. (sal) (Entered: 10/28/2016) |
| 10/28/2016 | | TEXT Minute Entry for proceedings held before Magistrate Judge David E. Peebles: Initial Appearances and Arraignments as to Stacey J. LaPorte Jr. (1) Count 1-4 and Mackenzie L. Bailey (2) Count 1-3 held on 10/28/2016. Copies of the Indictment and Arrest Warrants are provided to each of the defendants. The defendants are advised of their rights. Maximum penalty of charges is stated. Financial Affidavits are reviewed and Magistrate Judge Peebles finds both defendants eligible for appointment of counsel. Judge Peebles appoints the OFPD as counsel for defendant LaPorte and Kimberly Zimmer, Esq. as counsel for defendant Bailey. The defendants waive formal reading of the Indictment and each enter a not guilty plea to the offenses charged. A scheduling order will be issued shortly. The Government moves for detention of defendants LaPorte and Bailey. Defendant LaPorte waives his right to a detention hearing at this time. With respect to defendant Bailey, a detention hearing is set for |

A 9

CM/ECF LIVE - U.S. District Court - NYND                    https://ecf.nynd.uscourts.gov/cgi-bin/DktRpt.pl?112581314996379-L_1_0-1

| | | |
|---|---|---|
| | | 11/2/2016 at 2:45 PM in Syracuse before Magistrate Judge David E. Peebles. Defendants LaPorte and Bailey are remanded to the custody of the USMS. APP: Lisa Fletcher, AUSA, Randi Juda Bianco, Asst. FPD, Kimberly Zimmer, Esq., and USPO: Ellen Phillips. Time: 2:40 PM - 2:53 PM. (Court Reporter Jodi Hibbard). (sal ) (Entered: 10/28/2016) |
| 10/28/2016 | 7 | TEXT ORDER APPOINTING FEDERAL PUBLIC DEFENDER as to Stacey J. LaPorte, Jr.. Because the defendant has testified under oath or has otherwise satisfied this court that he or she (1) is financially unable to employ counsel and (2) does not wish to waive counsel, and because the interests of justice so require; It is hereby ORDERED that: The Office of the Federal Public Defender for the Northern District of New York is assigned representation of the above-named defendant and shall file a notice of appearance with the Clerk of Court. Authorized by Magistrate Judge David E. Peebles on 10/28/2016. (sal ) (Entered: 10/28/2016) |
| 10/28/2016 | | Set Hearings as to Mackenzie L. Bailey: A Detention Hearing is set for 11/2/2016 at 2:45 PM in Syracuse, 10th floor, before Magistrate Judge David E. Peebles. (sal ) (Entered: 10/28/2016) |
| 10/28/2016 | 8 | CRIMINAL PRETRIAL SCHEDULING ORDER as to Stacey J. LaPorte, Jr, Mackenzie L. Bailey. Motions to be filed by 11/25/2016. Jury Trial set for 12/27/2016 at 9:30 AM in Utica before Judge David N. Hurd. Signed by Magistrate Judge David E. Peebles on 10/28/2016. (sal ) (Entered: 10/28/2016) |
| 10/28/2016 | 9 | ORDER Approving Waiver of Detention Hearing as to Stacey J. LaPorte, Jr. Signed by Magistrate Judge David E. Peebles on 10/28/2016. (sal ) (Entered: 10/28/2016) |
| 10/28/2016 | 10 | CJA 20 appointing Kimberly Zimmer, Esq. as CJA counsel for defendant Mackenzie L. Bailey. Refer to the Court's website: http://www.nynd.uscourts.gov/cja.cfm for comprehensive information relating to court appointed representation. Attorneys are reminded that CJA vouchers are to be submitted to the court no later than 45 days after the final disposition of the case, unless good cause is shown. Please refer to Appendix II of the CJA Plan (Guidelines for Submitting Claims for Reimbursement Pursuant to the Criminal Justice Act of the Northern District of New York). Signed by Magistrate Judge David E. Peebles on 10/28/2016. (sal ) (Entered: 10/28/2016) |
| 11/01/2016 | 11 | WAIVER of Detention Hearing by Mackenzie L. Bailey (Zimmer, Kimberly) (Entered: 11/01/2016) |
| 11/01/2016 | 12 | ORDER Approving Waiver of Detention Hearing as to Mackenzie L. Bailey. Signed by Magistrate Judge David E. Peebles on 11/1/2016. (sal ) (Entered: 11/01/2016) |
| 11/03/2016 | 13 | NOTICE OF ATTORNEY APPEARANCE: Randi Juda Bianco appearing for Stacey J. LaPorte, Jr (Bianco, Randi) (Entered: 11/03/2016) |
| 11/04/2016 | 14 | NOTICE OF ATTORNEY APPEARANCE: Tamara Thomson appearing for USA as co-counsel with Attorney Lisa M. Fletcher *for the forfeiture aspects of the case*. (Thomson, Tamara) (Entered: 11/04/2016) |
| 11/18/2016 | 15 | STIPULATION by USA to 90 Day Extension of Time (Fletcher, Lisa) (Entered: 11/18/2016) |
| 11/22/2016 | 16 | STIPULATION & ORDER TO CONTINUE - Ends of Justice as to Stacey J. LaPorte, Jr. and Mackenzie L. Bailey. Time excluded from 11/22/2016 until 2/14/2017. Motions to be filed by 1/13/2017. Deadline to complete Discovery is extended to 2/14/2017. |

A 10

CM/ECF LIVE - U.S. District Court - NYND                    https://ecf.nynd.uscourts.gov/cgi-bin/DktRpt.pl?112581314996379-L_1_0-1

|            |    |                                                                                                                                                                                                                                                                                                                                                                                                          |
|------------|----|--------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------|
|            |    | Any Change of Plea shall be scheduled upon request. Jury Trial set for 2/27/2017 at 9:00 AM in Utica before Judge David N. Hurd. Signed by Judge David N. Hurd on 11/22/2016. (jmb) (Entered: 11/22/2016)                                                                                                                                                                                                  |
| 01/11/2017 | 17 | STIPULATION by USA to 90 Day Extension of Time (Fletcher, Lisa) (Entered: 01/11/2017)                                                                                                                                                                                                                                                                                                                     |
| 01/13/2017 | 18 | ORDER TO CONTINUE - Ends of Justice as to Stacey J. LaPorte, Jr, and Mackenzie L. Bailey. Time excluded from 1/13/2017 until 4/9/2017. Motions to be filed by 3/10/2017. The deadline for the completion of discovery and reciprocal discovery is extended to 4/9/2017. Jury Trial set for 4/10/2017 at 9:00 AM in Utica before Judge David N. Hurd, or in the alternative, a change of plea shall be scheduled upon request. Signed by Judge David N. Hurd on 1/13/2017. (jmb) (Entered: 01/17/2017) |
| 01/24/2017 | 19 | NOTICE OF ATTORNEY APPEARANCE: Martin P. Wolfson appearing for Stacey J. LaPorte, Jr as co-counsel with/for Attorney: Randi J. Bianco, Esq. (Wolfson, Martin) (Entered: 01/24/2017)                                                                                                                                                                                                                       |
| 02/06/2017 |    | TEXT NOTICE SCHEDULING CHANGE OF PLEA HEARING: Set Hearing as to Mackenzie L. Bailey : Change of Plea Hearing set for Thursday, March 2, 2017 at 12:00PM in Utica, NY pursuant to request by Counsel and the verbal Order of Judge David N. Hurd. Appearances required in Court in Utica. Please adjust your calendars accordingly. (ptm) (Entered: 02/06/2017)                                             |
| 02/09/2017 | 20 | NOTICE OF ATTORNEY APPEARANCE: Sahar L. Amandolare appearing for USA as co-counsel with Attorney Lisa Fletcher (Amandolare, Sahar) (Entered: 02/09/2017)                                                                                                                                                                                                                                                  |
| 03/07/2017 | 21 | Letter from Randi Bianco as to Stacey J. LaPorte, Jr, Mackenzie L. Bailey requesting additional 30 days to file motions (Bianco, Randi) (Entered: 03/07/2017)                                                                                                                                                                                                                                             |
| 03/07/2017 |    | TEXT NOTICE SCHEDULING CHANGE OF PLEA HEARING: Set Hearing as to Mackenzie L. Bailey : Change of Plea Hearing set for Thursday, March 16, 2017 at 2:00PM in Utica, NY pursuant to request by Counsel and the verbal Order of Judge David N. Hurd. Appearances required in Court in Utica. Please adjust your calendars accordingly. (ptm) (Entered: 03/07/2017)                                             |
| 03/07/2017 |    | TEXT NOTICE OF TELEPHONE STATUS CONFERENCE: Set Hearings as to Stacey J. LaPorte, Jr : Pursuant to the verbal Order of the Hon. David N. Hurd, USDJ a Telephone Status Conference is set for Wednesday, March 8, 2017 at 1:00PM. Counsel shall contact Chambers at (315)266-1177 at 1:00pm. (ptm) (Entered: 03/07/2017)                                                                                    |
| 03/10/2017 |    | TEXT MINUTE ORDER - SETTING MOTION AND PRETRIAL PAPERS FILING DEADLINES; TRIAL DATE AND JURY SELECTION: Telephone Conference as to Stacey J. LaPorte, Jr. held on 3/10/2017. Court and counsel review progress and agree upon motion schedule and trial date certain. All motions shall be filed by Friday, March 31, 2017 and responses are to be filed by April 21, 2017, with any replies, filed by Friday, April 28, 2017. Judge Hurd further directs the parties to submit all necessary pretrial papers and any motions in limine on or before 5:00pm on FRIDAY, June 2, 2017 and that this matter shall NOW be set for jury trial on Monday, June 12 2017, in Utica, NY. with Jury Selection to commence at 9:30am. Parties to review and submit appropriate Speedy Trial Act Stipulation. (Motions to be filed by 3/31/2017, Pretrial Submissions due by 6/2/2017, Jury Selection and Jury Trial set for 6/12/2017 09:30 AM in Utica before Judge David N. Hurd.) (ptm) Appearances: Lisa M. Fletcher, AUSA for Government; Randi J. Bianco, AFPD for defendant Stacey J. LaPorte, Jr. |

A 11

| | | |
|---|---|---|
| | | (ptm) (Entered: 03/10/2017) |
| 03/16/2017 | | TEXT Minute Entry for proceedings held before Judge David N. Hurd in Utica, NY. Change of Plea Hearing as to Mackenzie Bailey held on 3/16/2017. Defendant Mackenzie Bailey appears with attorney Kimberly M. Zimmer, Esq. Lisa M. Fletcher, AUSA advises Court of charges contained in Counts 1, 2 and 3 of Indictment 5:16-CR-320, and change of plea to Counts 1, 2, and 3 of Indictment 5:16-CR-320 with plea agreement. Judge Hurd advises defendant of her constitutional rights. Defendant waives reading of 5:16-CR-320, pleads guilty Counts 1, 2, and 3 of Indictment 5:16-CR-320 and is sworn in. After extensive interrogation by the Court, Judge Hurd directs the entry of a plea of guilty to Counts 1, 2, and 3 of Indictment 5:16-CR-320, orders the Probation Office to complete a presentence report and sets sentencing for Thursday, July 13, 2017, in USDC Utica, NY, at 11:00am. Defendant Mackenzie Bailey is ordered remanded pending sentencing. Appearances: Lisa M. Fletcher, AUSA; Kimberly M. Zimmer, Esq. for Defendant Mackenzie Bailey (2:00pm - 3:00pm) (Court Reporter Nancy Freddoso) (ptm) (Entered: 03/21/2017) |
| 03/16/2017 | 22 | PLEA AGREEMENT as to Mackenzie L. Bailey. (ptm) (Entered: 03/21/2017) |
| 03/21/2017 | 23 | GUIDELINE ORDER as to Mackenzie L. Bailey. Sentencing set for 7/13/2017 11:00 AM in Utica before Judge David N. Hurd. Government and Defendant Sentencing Memo Deadline 6/22/2017. Signed by Judge David N. Hurd on 3/16/2017. (ptm) (Entered: 03/21/2017) |
| 03/23/2017 | 24 | STIPULATION by USA to 90 Day Extension of Time (Fletcher, Lisa) (Entered: 03/23/2017) |
| 03/23/2017 | 25 | SUPERSEDING INDICTMENT as to Stacey J. LaPorte, Jr. (1) count(s) 1s-4s, 5s. with Forfeiture Allegation. (sg) (Entered: 03/23/2017) |
| 03/23/2017 | | TEXT Minute Entry for proceedings held before Magistrate Judge Therese Wiley Dancks on 3/23/2017: GRAND JURY makes a partial report and returns Superseding Indictment as to defendant Stacey J. LaPorte, Jr. No special requests. Court accepts Superseding Indictment for filing. Tally Sheet is ordered sealed. (Court Reporter S. Byrne) (sg) (Entered: 03/23/2017) |
| 03/23/2017 | 26 | TEXT NOTICE to Counsel for Defendant Stacey J. LaPorte, Jr.: A Superseding Indictment as to defendant Stacey J. LaPorte, Jr. (Dkt. No. 25 ) was filed on 3/23/2017. Should the Defendant wish to waive appearance for an arraignment on the Superseding Indictment both the Defendant and Defendant's counsel must complete and electronically file with the Court the attached waiver of appearance at arraignment form by 3/30/2017. If the Court does not receive the form by the above date the Court will IMMEDIATELY schedule the arraignment of defendant Stacey J. LaPorte, Jr. Because of Speedy Trial issues, the Court appearance for arraignment may be scheduled with very little advanced notice. (sg) (Entered: 03/23/2017) |
| 03/24/2017 | 27 | ORDER TO CONTINUE - Ends of Justice as to Stacey J. LaPorte, Jr. Time excluded from 3/24/2017 until 6/19/2017. Motions to be filed by 3/31/2017. Response due by 4/21/2017. Reply due by 4/28/2017. Jury Trial set for 6/12/2017 at 9:00 AM in Utica before Judge David N. Hurd. Signed by Judge David N. Hurd on 3/24/2017. (jmb) (Entered: 03/24/2017) |
| 03/27/2017 | 28 | WAIVER of Personal Appearance at Arraignment and Entry of Plea of Not Guilty by Stacey J. LaPorte, Jr (Bianco, Randi) (Entered: 03/27/2017) |

| | | |
|---|---|---|
| 03/31/2017 | 29 | MOTION for Omnibus Relief by Stacey J. LaPorte, Jr. (Attachments: # 1 Memorandum of Law, # 2 Affidavit)(Bianco, Randi) (Entered: 03/31/2017) |
| 04/03/2017 | 30 | AFFIDAVIT in Support by Stacey J. LaPorte, Jr as to Stacey J. LaPorte, Jr, Mackenzie L. Bailey re 29 MOTION for Omnibus Relief (Bianco, Randi) (Entered: 04/03/2017) |
| 04/04/2017 | 31 | Letter from Tamara B. Thomson as to Mackenzie L. Bailey requesting that the proposed Preliminary Order of Forfeiture be signed and filed and a copy returned; (Attachments: # 1 Proposed Order/Judgment Preliminary Order of Forfeiture) (Thomson, Tamara) (Entered: 04/04/2017) |
| 04/20/2017 | 32 | Letter from Lisa M. Fletcher as to Stacey J. LaPorte, Jr requesting permission to file an oversized response (Fletcher, Lisa) (Entered: 04/20/2017) |
| 04/20/2017 | | Text Minute Entry for proceedings held before U.S. Magistrate Judge Andrew T. Baxter: GRAND JURY makes a partial report and returns Second Superseding Indictment as to Stacey J. LaPorte, Jr. Tally Sheet is ordered sealed. No special requests. Appearances: Lisa Fletcher, AUSA; Grand Jury Foreperson. (Steno: Sue Byrne. Time: 2:20PM-2:21PM.) (mae) (Entered: 04/20/2017) |
| 04/20/2017 | 33 | SECOND SUPERSEDING INDICTMENT as to Stacey J. LaPorte, Jr (1): Counts 1ss-2ss, 3ss-5ss, 6ss with a forfeiture allegation. (mae) (Entered: 04/20/2017) |
| 04/20/2017 | 34 | COURT NOTICE: Advising defense counsel of the option for Stacey J. LaPorte, Jr to waive appearance at arraignment on the 33 Superseding Second Indictment. If the attached form is not received by 5/1/2017 an arraignment will immediately be scheduled. (Attachment: # 1 Waiver of Arraignment Form) (mae) (Entered: 04/20/2017) |
| 04/21/2017 | 35 | RESPONSE in Opposition by USA as to Stacey J. LaPorte, Jr re 29 MOTION for Omnibus Relief (Attachments: # 1 Exhibit(s) Affidavit, # 2 Exhibit(s) Affidavit, # 3 Exhibit(s) Search Warrant)(Fletcher, Lisa) (Entered: 04/21/2017) |
| 04/25/2017 | 36 | WAIVER of Personal Appearance at Arraignment and Entry of Plea of Not Guilty by Stacey J. LaPorte, Jr (Bianco, Randi) (Entered: 04/25/2017) |
| 04/26/2017 | 37 | ORDER APPROVING WAIVER OF APPEARANCE AT ARRAIGNMENT and entry of plea of not guilty as to Stacey J. LaPorte, Jr. Signed by U.S. Magistrate Judge Andrew T. Baxter on 4/26/2017. (mae) (Entered: 04/26/2017) |
| 04/26/2017 | | CLERK'S CORRECTION OF DOCKET ENTRY: The scheduling order issued on 4/26/2017 at Dkt. No. 38 was entered in this case in error and has been deleted from the docket. The parties are to proceed in accordance with the previously established schedule. (mae) (Entered: 04/26/2017) |
| 04/28/2017 | 38 | PRELIMINARY ORDER OF FORFEITURE FOR SPECIFIC PROPERTY as to Mackenzie L. Bailey. Signed by Judge David N. Hurd on 4/28/2017. (ptm) (Entered: 04/28/2017) |
| 04/28/2017 | 39 | REPLY TO RESPONSE to Motion by Stacey J. LaPorte, Jr re 29 MOTION for Omnibus Relief (Attachments: # 1 Exhibit(s))(Bianco, Randi) (Attachment 1 replaced on 5/3/2017) (jmb, ). (Entered: 04/28/2017) |
| 05/03/2017 | | CLERK'S CORRECTION OF DOCKET ENTRY: The Clerk replaced Exhibit A attached to the # 39 Reply to Response, with a fully redacted copy. (jmb) (Entered: 05/03/2017) |

CM/ECF LIVE - U.S. District Court - NYND                    https://ecf.nynd.uscourts.gov/cgi-bin/DktRpt.pl?112581314996379-L_1_0-1

| 05/05/2017 | | TEXT NOTICE OF IN-CHAMBERS STATUS CONFERENCE: Set Hearing as to Stacey J. LaPorte, Jr. In Chambers Status Conference set for Monday, May 8, 2017 AT 11:00AM in Utica, NY pursuant to request by Counsel and verbal Order of Judge David N. Hurd. Appearances of counsel required in Utica, NY. Please adjust your calendars accordingly. (ptm) (Entered: 05/05/2017) |
|---|---|---|
| 05/08/2017 | | TEXT Minute Entry for proceedings held before Judge David N. Hurd in Utica, NY. In Chambers Status Conference as to Stacey J. LaPorte, Jr. held on 5/8/2017. Court and Counsel meet and review agreed upon juror questionnaire, pending motions, trial scheduling and procedure. Judge Hurd receives the proposed questionnaire for review, sets argument on pending motion for Wednesday, May 17, 2017 at 11:00am in USDC Utica, with Defendant Stacey J. Laporte, Jr. to be produced for the argument and further orders all pretrial papers to be filed by Friday, June 2, 2017. Appearances: Lisa M. Fletcher, AUSA and Sahar L. Amandolare, AUSA for the Government; Randi J. Bianco, AFPD and Martin P. Wolfson, AFPD. for defendant Stacey J. LaPorte, Jr. (ptm) (Entered: 05/08/2017) |
| 05/11/2017 | | Set Deadlines as to Stacey J. LaPorte, Jr : Pursuant to the verbal Order of the Hon. David N. Hurd, USDJ the 29 MOTION for Omnibus Relief . Motion Hearing is set for Wednesday, May 17, 2017 at 11:00 AM in Utica, NY before Judge David N. Hurd, with defendant Stacey J. Laporte, Jr. to be produced for the argument. (ptm) (Entered: 05/11/2017) |
| 05/16/2017 | 40 | Letter from AUSA Fletcher Enclosing Two Cases in Support of Government's Opposition to Severance as to Stacey J. LaPorte, Jr (Attachments: # 1 Case, # 2 Case)(Fletcher, Lisa) (Entered: 05/16/2017) |
| 05/17/2017 | | TEXT Minute Entry for proceedings held before Judge David N. Hurd in Utica, NY. :Motion Hearing as to Stacey J. LaPorte, Jr held on 5/17/2017. Judge Hurd hears argument from counsel on 29 MOTION for Omnibus Relief filed by Stacey J. LaPorte, Jr. and in a decision from the bench rules on the omnibus motion, denying defendant's motions in all respects and granting the Government's cross motion for discovery, to theextent it has not already been complied with. Summary Order to follow. Appearances: Lisa M. Fletcher, AUSA and Sahar L. Amandolare, AUSA for the Government; Randi J. Bianco, AFPD with defendant Stacey J. LaPorte, Jr. present in Court. (Court Reporter Nancy Freddoso)(11:00am - 12:00pm) (ptm) (Entered: 05/17/2017) |
| 05/17/2017 | 41 | SUMMARY ORDER Granting in part and denying in part 29 Motion for Omnibus Relief as to Stacey J. LaPorte Jr. (1): Pursuant to the oral decision of the court, entered into the record after hearing oral argument on May 17, 2017, in Utica, New York, it is hereby ORDERED that 1. Defendant Stacey J. LaPorte, Jr.'s motion to sever counts of the Second Superseding Indictment for trial is DENIED; 2. Defendant Stacey J. LaPorte, Jr.'s motion to suppress the statements he made on May 17, 2016 is DENIED; 3. Defendant Stacey J. LaPorte, Jr.'s motion to suppress evidence retrieved from an LG cell phone is DENIED as moot; 4. Defendant Stacey J. LaPorte, Jr.'s motion to exclude uncharged crime evidence is DENIED without prejudice to renew; and 5. The United States of America's cross-motion for discovery is GRANTED to the extent it has not already been complied with. IT IS SO ORDERED.Signed by Judge David N. Hurd on 5/17/2017.(ptm) (Entered: 05/17/2017) |
| 05/18/2017 | 42 | SEALED ORDER. Document maintained in Clerk's Office and not available for electronic viewing. Signed by Judge David N. Hurd on 5/18/2017. (see) (Entered: |

A 14

CM/ECF LIVE - U.S. District Court - NYND                    https://ecf.nynd.uscourts.gov/cgi-bin/DktRpt.pl?112581314996379-L_1_0-1

| | | |
|---|---|---|
| | | 05/18/2017) |
| 05/29/2017 | 43 | MOTION in Limine *In Support of (1) The Admission of Defendant's Similar Crimes and Other Acts, Pursuant to Fed.R.Evid. 414 and 404(b), and (2) The Exclusion of any Victim's Other Sexual Conduct, Pursuant to Fed.R.Evid. 412* by USA as to Stacey J. LaPorte, Jr. (Attachments: # 1 Exhibit(s), # 2 Exhibit(s))(Fletcher, Lisa) (Entered: 05/29/2017) |
| 05/30/2017 | 44 | Order to Seal Document: Exhibit A to the Government's Motion in Limine, as to Stacey J. LaPorte, Jr. Signed by Judge David N. Hurd on 5/30/2017. (ptm) (Entered: 05/30/2017) |
| 06/01/2017 | | TEXT NOTICE OF ORAL ARGUMENT ON MOTION IN LIMINE as to Stacey J. LaPorte, Jr.Pursuant to the verbal Order of the Hon. David N. Hurd, USDJ oral argument as to 43 MOTION in Limine In Support of (1) The Admission of Defendant's Similar Crimes and Other Acts, Pursuant to Fed.R.Evid. 414 and 404(b), and (2) The Exclusion of any Victim's Other Sexual Conduct, Pursuant to Fed.R.Evid. 412 by USA as to Stacey J. LaPorte, Jr. shall be heard on June 7, 2017 at 10:00am in USDC / Utica, NY. A pretrial conference shall take place in Chambers immediately thereafter. (Oral Argument on Motions in Limine / Pretrial Conference set for 6/7/2017 10:00 AM in Utica before Judge David N. Hurd.) (ptm) (Entered: 06/01/2017) |
| 06/02/2017 | 45 | Proposed Jury Instructions by Stacey J. LaPorte, Jr (Wolfson, Martin) (Entered: 06/02/2017) |
| 06/02/2017 | 46 | MOTION in Limine by Stacey J. LaPorte, Jr. (Bianco, Randi) (Entered: 06/02/2017) |
| 06/02/2017 | 47 | RESPONSE in Opposition by Stacey J. LaPorte, Jr re 43 MOTION in Limine *In Support of (1) The Admission of Defendant's Similar Crimes and Other Acts, Pursuant to Fed.R.Evid. 414 and 404(b), and (2) The Exclusion of any Victim's Other Sexual Conduct, Pursuant to Fed.R.Evid. 412* (Bianco, Randi) (Entered: 06/02/2017) |
| 06/02/2017 | 48 | Court Ordered Questionnaire as to Stacey J. LaPorte, Jr (Fletcher, Lisa) (Entered: 06/02/2017) |
| 06/02/2017 | 49 | Proposed Jury Instructions by USA as to Stacey J. LaPorte, Jr (Fletcher, Lisa) (Entered: 06/02/2017) |
| 06/02/2017 | 50 | TRIAL BRIEF by USA as to Stacey J. LaPorte, Jr (Fletcher, Lisa) (Entered: 06/02/2017) |
| 06/02/2017 | 51 | WITNESS LIST by USA as to Stacey J. LaPorte, Jr (Fletcher, Lisa) (Entered: 06/02/2017) |
| 06/02/2017 | 52 | Certificate of Service by USA as to Stacey J. LaPorte, Jr re 51 Witness List, 49 Proposed Jury Instructions, 48 Court Ordered Questionnaire, 50 Trial Brief (Fletcher, Lisa) (Entered: 06/02/2017) |
| 06/02/2017 | 53 | Court Ordered Questionnaire as to Stacey J. LaPorte, Jr (Wolfson, Martin) (Entered: 06/02/2017) |
| 06/02/2017 | 54 | WITNESS LIST by Stacey J. LaPorte, Jr (Bianco, Randi) (Entered: 06/02/2017) |
| 06/02/2017 | 55 | EXHIBIT LIST by Stacey J. LaPorte, Jr (Bianco, Randi) (Entered: 06/02/2017) |
| 06/02/2017 | 56 | EXHIBIT LIST by USA as to Stacey J. LaPorte, Jr (Attachments: # 1 Certificate of Service)(Fletcher, Lisa) (Entered: 06/02/2017) |

A 15

CM/ECF LIVE - U.S. District Court - NYND | https://ecf.nynd.uscourts.gov/cgi-bin/DktRpt.pl?112581314996379-L_1_0-1

| 06/05/2017 | 57 | Proposed Jury Instructions *on Forefeiture* by USA as to Stacey J. LaPorte, Jr (Fletcher, Lisa) (Entered: 06/05/2017) |
|---|---|---|
| 06/05/2017 | 58 | PROPOSED VERDICT FORM *ON FORFEITURE* by USA as to Stacey J. LaPorte, Jr (Fletcher, Lisa) (Entered: 06/05/2017) |
| 06/05/2017 | 59 | TRIAL BRIEF by USA as to Stacey J. LaPorte, Jr (Fletcher, Lisa) (Entered: 06/05/2017) |
| 06/05/2017 | 60 | Certificate of Service by USA as to Stacey J. LaPorte, Jr re 57 Proposed Jury Instructions, 58 Proposed Verdict Form, 59 Trial Brief (Fletcher, Lisa) (Entered: 06/05/2017) |
| 06/05/2017 | | TEXT RE-NOTICE OF ORAL ARGUMENT ON MOTION IN LIMINE- TIME CHANGE ONLY: NOW AT 11:00AM as to Stacey J. LaPorte, Jr. Pursuant to the verbal Order of the Hon. David N. Hurd, USDJ oral argument as to 43 MOTION in Limine In Support of (1) The Admission of Defendant's Similar Crimes and Other Acts, Pursuant to Fed.R.Evid. 414 and 404(b), and (2) The Exclusion of any Victim's Other Sexual Conduct, Pursuant to Fed.R.Evid. 412 by USA as to Stacey J. LaPorte, Jr. and 46 MOTION in Limine shall be heard on WEDNESDAY June 7, 2017 - NOW AT 11:00AM USDC / Utica, NY. A pretrial conference shall take place in Chambers immediately thereafter. (ptm) (Entered: 06/05/2017) |
| 06/06/2017 | 61 | REPLY TO RESPONSE to Motion by USA as to Stacey J. LaPorte, Jr re 43 MOTION in Limine *In Support of (1) The Admission of Defendant's Similar Crimes and Other Acts, Pursuant to Fed.R.Evid. 414 and 404(b), and (2) The Exclusion of any Victim's Other Sexual Conduct, Pursuant to Fed.R.Evid. 412 THAT WAS FILED BY DEFENDANT ON 6/2/2017* (Fletcher, Lisa) (Entered: 06/06/2017) |
| 06/07/2017 | | TEXT Minute Entry for proceedings held before Judge David N. Hurd in Utica, NY. Motion Hearing as to Stacey J. LaPorte, Jr held on 6/7/2017. Judge HUrd hears agrgument as to 43 MOTION in Limine *In Support of (1) The Admission of Defendant's Similar Crimes and Other Acts, Pursuant to Fed.R.Evid. 414 and 404(b), and (2) The Exclusion of any Victim's Other Sexual Conduct, Pursuant to Fed.R.Evid. 412* filed by USA, and 46 MOTION in Limine filed by Stacey J. LaPorte, Jr., and in a decision from the bench GRANTS the Government's 43 motion in limine in its entirety and GRANTS IN PART, DENIES IN PART the defendant's 46 motion in limine. Judge Hurd further directs the filing of the transcript of this proceeding with a summary order to follow. In Chambers: Court reviews trial schedule and jury selection with counsel and directs parties to submit all necessary trial stipulations. Government may file a request for reconsideration of ruling on the authentication issue by 12:00pm on 6/8/2017, with the defendant to respond by 12:00pm on 6/9/2017. Appearances: Lisa M. Fletcher, AUSA and Sahar Amandolare, AUSA for Government, Randi J. Bianco, AFPD and Martin P. Wolfson, AFPD for defendant Stacey J. LaPorte, Jr., (Court Reporter Nancy Freddoso) (11:00am - 12:00pm) (ptm) (Entered: 06/07/2017) |
| 06/07/2017 | 62 | ORDER: It is Ordered that the Government's # 43 Motion in Limine is GRANTED in its entirety as to Stacey J. LaPorte Jr. (1); further it is Ordered that Defendant's # 46 Motion in Limine as to Stacey J. LaPorte Jr., (1) is GRANTED IN PART AND DENIED IN PART as noted herein. Signed by Judge David N. Hurd on 6/7/2017. (jmb) (Entered: 06/07/2017) |
| 06/08/2017 | 63 | MOTION in Limine *to assert Fifth Amendment rights outside the presence of the jury* by Stacey J. LaPorte, Jr. (Wolfson, Martin) (Entered: 06/08/2017) |

A 16

| | | |
|---|---|---|
| 06/08/2017 | 64 | RESPONSE to Motion by USA as to Stacey J. LaPorte, Jr re 46 MOTION in Limine (Fletcher, Lisa) (Entered: 06/08/2017) |
| 06/08/2017 | 65 | MOTION in Limine *responding to the government's motion regarding the authentication of Kik chats* by Stacey J. LaPorte, Jr. (Bianco, Randi) (Entered: 06/08/2017) |
| 06/08/2017 | 66 | Court Ordered Questionnaire as to Stacey J. LaPorte, Jr (Fletcher, Lisa) (Entered: 06/08/2017) |
| 06/08/2017 | 67 | WITNESS LIST by USA as to Stacey J. LaPorte, Jr (Fletcher, Lisa) (Entered: 06/08/2017) |
| 06/08/2017 | 68 | Certificate of Service by USA as to Stacey J. LaPorte, Jr re 67 Witness List, 66 Court Ordered Questionnaire *Amended* (Fletcher, Lisa) (Entered: 06/08/2017) |
| 06/09/2017 | 69 | TRANSCRIPT REQUEST *EXPEDITED* by USA as to Stacey J. LaPorte, Jr for proceedings held on 6/7/17 before Judge Hon. David N. Hurd. (Fletcher, Lisa) (Entered: 06/09/2017) |
| 06/09/2017 | 70 | DECISION & ORDER: Denying the 63 Motion in Limine as to Stacey J. LaPorte Jr. (1); granting the # 64 Motion for Reconsideration, it is Ordered that the portion of the # 62 Order precluding the United States of America from any mention of the Kik communications in its opening statement and requiring initial proof of authentication for a ruling on a renewal motion to be offered outside the presence of the jury is REVERSED. Stacey J. LaPorte's request to assert his Fifth Amendment rights will be DENIED without prejudice to renew at the appropriate time at trial. Signed by Judge David N. Hurd on 6/9/2017. (jmb) (Entered: 06/09/2017) |
| 06/11/2017 | 71 | EXHIBIT LIST by USA as to Stacey J. LaPorte, Jr (Attachments: # 1 Certificate of Service)(Fletcher, Lisa) (Entered: 06/11/2017) |
| 06/11/2017 | 72 | RESPONSE in Opposition by USA as to Stacey J. LaPorte, Jr re 63 MOTION in Limine *to assert Fifth Amendment rights outside the presence of the jury* (Fletcher, Lisa) (Entered: 06/11/2017) |
| 06/12/2017 | | TEXT Minute Entry for proceedings held before Judge David N. Hurd in Utica, NY. Final Pretrial Conference as to Stacey J. LaPorte, Jr held on 6/12/2017, Jury Selection as to Stacey J. LaPorte, Jr held on 6/12/2017, Jury Trial as Stacey J. LaPorte, Jr commenced on 6/12/2017. 9:00am: Final Pretrial Conference in Chambers. Judge Hurd reviews pending evidentiary issues, schedule and procedures for jury selection and trial with counsel and directs parties to proceed. 9:30am: Jury Panel Sworn, Jury Selection Commenced. 2:20pm: After extensive examination of potential jurors by Court and counsel, a jury was selected and sworn. Jury Exits Court. 2:40pm: Jury Enters Court. Upon stipulation at sidebar parties agreed to release Juror No. 5. Jury Seat No. 5 is filled and upon further voir dire Juror No. 5 is selected and sworn. 3:45pm: 4 Alternates Jurors are selected and sworn. Jury Exits Court. 4:00pm: Jury Enters Court. Judge Hurd gives preliminary charge to the jury, (Court Exhibit No. 1). 4:30pm: Court admonishes Jury and continues jury trial to 9:30am on June 13, 2017. Jury Exits Court. 4:35pm: In Chamber Court reviews trial schedule with counsel. 4:45pm: Court Adjourned. Appearances: Lisa M. Fletcher, AUSA and Sahar L. Amandolare, AUSA for the Government; Randi J. Bianco, AFPD and Martin P. Wolfson, AFPD for Defendant for Stacey J. LaPorte, Jr. (Court Reporter Nancy Freddoso) (9:00am-4:45pm) (Entered: 06/19/2017) |

A 17

| | | |
|---|---|---|
| 06/13/2017 | 73 | TRANSCRIPT REQUEST *EXPEDITED* by USA as to Stacey J. LaPorte, Jr for proceedings held on 6/12/17 before Judge Hon. David N. Hurd. (Fletcher, Lisa) (Entered: 06/13/2017) |
| 06/13/2017 | | TEXT Minute Entry for proceedings held before Judge David N. Hurd in Utica, NY. Jury Trial as Stacey J. LaPorte, Jr on 6/13/2017. 9:30am: Without Jury: Court and counsel review certain evidentiary matters and place Stipulations on record as to Government Exhibit Nos. 3 and 42. Judge Hurd directs that case shall proceed with amended preliminary charge by the Court, openings and proof. 9:45am: Jury Enters Court. Judge Hurd gives initial charge to the jury, (Court Exhibit No. 1 Amended). 9:50am Opening remarks for the Government by Sahar L. Amandolare, AUSA. 10:10am. Opening remarks for Defendant for Stacey J. LaPorte, Jr. by Martin P. Wolfson, AFPD. 10:25am: Witnesses for Government: DeWayne Baillargeon, Brandi LaPorte. Jason Olson, Corey Francis, Paul Fregoe, Nicolas Arcadi, Todd Svarczkopf. 4:30pm: Judge Hurd admonishes Jury and continues jury trial to 9:30am on June 14, 2017. Jury Exits Court. 4:35pm: In Chamber Court reviews trial schedule with counsel 4:45pm: Court Adjourned. Appearances: Lisa M. Fletcher, AUSA and Sahar L. Amandolare, AUSA for the Government; Randi J. Bianco, AFPD and Martin P. Wolfson, AFPD for Defendant for Stacey J. LaPorte, Jr. (Court Reporter Nancy Freddoso) (9:00am-4:45pm) (ptm) (Entered: 06/19/2017) |
| 06/14/2017 | | TEXT Minute Entry for proceedings held before Judge David N. Hurd in Utica, NY. Jury Trial as Stacey J. LaPorte, Jr on 6/14/2017. 9:30am: Witnesses for Government: Deborah Jasinski, Mackenzie Bailey. 5:05pm: Judge Hurd admonishes Jury and continues jury trial to 9:30am on June 16, 2017. Jury Exits Court. 5:15pm: In Chamber Court reviews trial schedule with counsel 5:25pm: Court Adjourned. Appearances: Lisa A. Fletcher, AUSA and Sahar L. Amandolare, AUSA for the Government; Randi J. Bianco, AFPD and Martin P. Wolfson, AFPD for Defendant for Stacey J. LaPorte, Jr. (Court Reporter Nancy Freddoso) (9:30am-5:25pm) (ptm) (Entered: 06/19/2017) |
| 06/15/2017 | 74 | TRANSCRIPT REQUEST *EXPEDITED* by USA as to Stacey J. LaPorte, Jr for proceedings held on 6/12/17 before Judge Hon. David N. Hurd. (Fletcher, Lisa) (Entered: 06/15/2017) |
| 06/16/2017 | | TEXT Minute Entry for proceedings held before Judge David N. Hurd in Utica, NY. Jury Trial as Stacey J. LaPorte, Jr on 6/16/2017. 9:30am: Witnesses for Government: Jean Merriam, Jacob Merriam, Cheyene Star Fortier, Hillary Trimm, 4:00pm: Judge Hurd admonishes Jury and continues jury trial to 9:30am on June 16, 2017. Jury Exits Court. 4:15pm: In Chamber Court reviews trial schedule with counsel and possible 5th Amendment issue. 4:45pm: Court Adjourned. Appearances: Lisa M. Fletcher, AUSA and Sahar L. Amandolare, AUSA for the Government; Randi J. Bianco, AFPD and Martin P. Wolfson, AFPD for Defendant for Stacey J. LaPorte, Jr. (Court Reporter Nancy Freddoso) (9:30am-4:45pm) (ptm) (Entered: 06/19/2017) |
| 06/19/2017 | | TEXT Minute Entry for proceedings held before Judge David N. Hurd in Utica, NY. Jury Trial as Stacey J. LaPorte, Jr on 6/19/2017. 9:30am: Witness for Government: Chad Willard. 10:52am GOVERNMENT RESTS. Jury Exits Court. Court in Session without JuryJudge Hurd hears argument and DENIES defendant Stacey J. LaPorte, Jr.'s Rule 29 motion and directs defendant to proceed. 11:15am : Court in Session without Jury: Judge Hurd rules on defendant's Fifth Amendment motion and advises defendant that should he testify and fail to answer relevant questions by asserting his Fifth Amendment rights, the Court shall direct him to respond and shall issue a limiting instruction to the jury should he fail to do so. Judge Hurd further denies Defendant's |

| | | |
|---|---|---|
| | | motion to narrow the scope of limiting instruction. 11:30am Jury Enters Court. Witnesses for defendant: Michelle M. Hirst. Stacey J. Laporte, Jr. 12:20pm. DEFENDANT RESTS. Jury Exits Court. Judge Hurd hears argument and DENIES Defendant Stacey J. LaPorte, Jr.'s renewed Rule 29 motion and directs parties to proceed with closing remarks. 1:35pm. Closing Remarks for the Government by Lisa M. Fletcher, AUSA. 2:30pm Closing Remarks for Defendant Stacey J. Laporte, Jr. by Randi J. Bianco, AFPD. 3:35pm. Rebuttal Closing by Government by Lisa M. Fletcher, AUSA. 4:05pm. Judge Hurd admonishes Jury and continues jury trial to 9:30am on June 20, 2017. Jury Exits Court. 4:15pm- Judge Hurd supplies parties with Charge (Court Exhibit No. 3), and Verdict Form, (Court Exhibit No. 4): 4:20pm: Court Adjourned. Appearances: Lisa M. Fletcher, AUSA and Sahar L. Amandolare, AUSA for the Government; Randi J. Bianco, AFPD and Martin P. Wolfson, AFPD for Defendant for Stacey J. LaPorte, Jr. (Court Reporter Nancy Freddoso) (9:00am-4:45pm) (ptm) (Entered: 06/19/2017) |
| 06/20/2017 | | TEXT Minute Entry for proceedings held before Judge David N. Hurd in Utica, NY. Jury Trial as to Stacey J. LaPorte, Jr. held on 6/20/2017. 9:30am: Court in Session: Judge Hurd hears objections and requests from counsel and rules on jury instructions. 9:45am: Jury Enters Court. JUDGE HURD CHARGES JURY. 10:50am: Marshal Sworn, Jury exits Court and commences deliberations. Judge Hurd directs that Preliminary Charge, and amendment, Second Superseding Indictment, Final Jury Instructions and Verdict Form be marked as Court Exhibit Nos. 1, 1A, 2, 3 and 4 respectively, further reviews exhibits and submits same to jury. 10:58am: Jury Note No. 1 marked (Court Exhibit No. 5). Court and counsel agree no action required as to Jury Note No.1. 1:00pm: Jury Note No. 2 marked (Court Exhibit No. 6). Court and parties review Jury Note No. 2 and agree upon response to request. Judge Hurd directs the response to the request in Jury Note No. 2 be answered on the same page and returned to the Jury (Response marked as Court Exhibit No. 7). 4:07pm: JURY VERDICT (Court Exhibit No. 8): 4:20pm: Jury Enters Court. Clerk takes Jury Verdict. Jury finds that Defendant Stacey J. LaPorte, Jr. is GUILTY as to Counts 1-6 of Second Superseding Indictment, 5:16-CR-320. Upon request of counsel the jury is polled and ALL JURORS CONCUR WITH THE VERDICT AS GIVEN BY JURY FOREPERSON AND HAVE SIGNED THE JURY VERDICT SHEET. Verdict Form is handed up and Jury Verdict is accepted by the Court. Judge Hurd discharges Jury with the thanks of the Court. 4:25pm: Jury Exits Court. Judge Hurd sets deadlines for Motion for Judgment of Acquittal, to be filed by July 5, 2017, response by July 19, 2017, reply by July 26, 2017 made returnable at 11:00am on July 31, 2017 Presentence Investigation is ordered and sentencing date is set for Thursday, October 19, 2017 at 11:00am in Utica, New York. Defendant is ordered remanded to the custody of the USMS pending sentencing. 4:45pm. Court Adjourned. Appearances: Lisa M. Fletcher, AUSA and Sahar L. Amandolare, AUSA for the Government; Randi J. Bianco, AFPD and Martin P. Wolfson, AFPD for Defendant for Stacey J. LaPorte, Jr. (Court Reporter Nancy Freddoso) (9:30am-4:45pm) (ptm) (Entered: 06/20/2017) |
| 06/20/2017 | [75](#) | GUIDELINE ORDER as to Stacey J. LaPorte, Jr. Sentencing set for 10/19/2017 11:00 AM in Utica before Judge David N. Hurd. Government and Defendant Sentencing Memo Deadline 9/28/2017. Signed by Judge David N. Hurd on 6/20/2017. (ptm) (ptm, ). (Entered: 06/20/2017) |
| 06/20/2017 | [76](#) | JURY VERDICT as to Stacey J. LaPorte Jr. (1) Guilty on Count 1ss-2ss,3ss-5ss,6ss. (ptm) (Entered: 06/21/2017) |

A 19

CM/ECF LIVE - U.S. District Court - NYND      https://ecf.nynd.uscourts.gov/cgi-bin/DktRpt.pl?112581314996379-L_1_0-1

| 06/20/2017 | 77 | Jury Notes as to Stacey J. LaPorte, Jr (ptm) (Entered: 06/21/2017) |
|---|---|---|
| 06/20/2017 | 78 | COURT EXHIBIT(s) Court Ex. 1 (Attachments: # 1 Court Ex. 1a, # 2 Court Ex. 2, # 3 Court Ex. 3, # 4 Court Ex. 4)(ptm) (Entered: 06/21/2017) |
| 06/20/2017 | 79 | EXHIBIT TRIAL LIST by USA as to Stacey J. LaPorte, Jr. (ptm) (Entered: 06/21/2017) |
| 06/20/2017 | 80 | EXHIBIT TRIAL LIST by Stacey J. LaPorte, Jr. (ptm) (Entered: 06/21/2017) |
| 06/21/2017 | 81 | Letter from Tamara B. Thomson as to Stacey J. LaPorte, Jr requesting that the proposed Preliminary Order of Forfeiture be signed and filed and a copy returned; (Attachments: # 1 Proposed Order/Judgment Preliminary Order of Forfeiture) (Thomson, Tamara) (Entered: 06/21/2017) |
| 07/10/2017 | 82 | PRELIMINARY ORDER DIRECTING FORFEITURE OF SPECIFIC PROPERTY noted herein as to Stacey J. LaPorte, Jr. Signed by Judge David N. Hurd on 7/7/2017. {Certified Copy sent electronically to Tamara B. Thomson, AUSA} (jmb) (Entered: 07/10/2017) |
| 07/11/2017 | | TEXT NOTICE RESCHEDULING SENTENCING HEARING / SENTENCING MEMORANDA DEADLINE: Reset Hearing as to Mackenzie L. Bailey. Sentencing IS NOW set for Thursday, December 7, 2017 at 11:00AM in Utica, NY pursuant request of counsel and the verbal Order of Judge David N. Hurd. Appearances required in Court in Utica. Please adjust your calendars accordingly. Sentencing Memos are now DUE by 12:00pm on Friday, November 17, 2017. (ptm) (Entered: 07/11/2017) |
| 07/13/2017 | 83 | SERVICE by Publication of Notice of Forfeiture; Last publication date 6/9/17 in the government internet website: www.forfeiture.gov; *Claim deadline: 7/10/17;* filed by USA (O'Dowd, Sean) (Entered: 07/13/2017) |
| 09/14/2017 | 84 | PRESENTENCE INVESTIGATION REPORT - INITIAL DISCLOSURE [LODGED] as to Stacey J. LaPorte, Jr. The Presentence Investigation Report in this matter is now available for review. Any objections to the report shall be served on the Probation Office within 14 days of this notice, by mailing a hard copy to the Probation Officer. Please contact the probation officer who prepared the report if you have any questions.**[This document has been electronically lodged with the Court and is viewable by ONLY the attorney for the government, the attorney for the defendant, and the presiding judge. It is not a filed document, therefore is not available for public inspection. Any further distribution or dissemination is prohibited.]** (bjw, ) (Entered: 09/14/2017) |
| 09/20/2017 | 85 | PRESENTENCE INVESTIGATION REPORT - INITIAL DISCLOSURE [LODGED] as to Mackenzie L. Bailey. The Presentence Investigation Report in this matter is now available for review. Any objections to the report shall be served on the Probation Office within 14 days of this notice, by mailing a hard copy to the Probation Officer. Please contact the probation officer who prepared the report if you have any questions.**[This document has been electronically lodged with the Court and is viewable by ONLY the attorney for the government, the attorney for the defendant, and the presiding judge. It is not a filed document, therefore is not available for public inspection. Any further distribution or dissemination is prohibited.]** (bjw, ) (Entered: 09/20/2017) |
| 09/25/2017 | 86 | TRANSCRIPT REQUEST *EXPEDITED* by USA as to Stacey J. LaPorte, Jr for proceedings held on 5/17/2017 before Judge Hon. David N. Hurd. (Fletcher, Lisa) |

A 20

| | | |
|---|---|---|
| | | (Entered: 09/25/2017) |
| 09/26/2017 | 87 | Letter from Randi J. Bianco, Esq. as to Stacey J. LaPorte, Jr requesting permission to file oversized Sentencing Memorandum (Bianco, Randi) (Entered: 09/26/2017) |
| 09/26/2017 | 88 | SENTENCING MEMORANDUM by USA as to Stacey J. LaPorte, Jr (Attachments: # 1 Exhibit)(Fletcher, Lisa) (Entered: 09/26/2017) |
| 09/28/2017 | 89 | SENTENCING MEMORANDUM by Stacey J. LaPorte, Jr (Attachments: # 1 Exhibit(s))(Bianco, Randi) (Entered: 09/28/2017) |
| 09/28/2017 | 90 | Letter from the Government Requesting Permission to File its Reply Memorandum to Defendant's Sentencing Memorandum on October 12, 2017 as to Stacey J. LaPorte, Jr (Fletcher, Lisa) (Entered: 09/28/2017) |
| 09/28/2017 | 91 | Letter from Randi J. Bianco, Esq. as to Stacey J. LaPorte, Jr requesting permission to file reply to Government's Sentencing Memorandum (Bianco, Randi) (Entered: 09/28/2017) |
| 10/04/2017 | 92 | PRESENTENCE INVESTIGATION REPORT - FINAL DISCLOSURE [LODGED] as to Stacey J. LaPorte, Jr. The final version of the Presentence Investigation Report, including all revisions and the most recent Addendum is now available for review. This version of the report will be used by the Court at the time of sentencing. **[This document has been electronically lodged with the Court and is viewable by ONLY the attorney for the government, the attorney for the defendant, and the presiding judge. Any further distribution or dissemination is prohibited.]** (dct, ) (Entered: 10/04/2017) |
| 10/05/2017 | 93 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT of Proceedings as to Stacey J. LaPorte, Jr: Motion held on May 17, 2017 before Judge David N. Hurd, Court Reporter/Transcriber: Nancy L. Freddoso,Telephone number: 315 793 8114. **IMPORTANT NOTICE - REDACTION OF TRANSCRIPTS:** In order to remove personal identifier data from the transcript, a party must electronically file a Notice of Intent to Request Redaction with the Clerk's Office within 5 business days of this date. The policy governing the redaction of personal information is located on the court website at www.nynd.uscourts.gov. Read this policy carefully. If no Notice of Intent to Redact is filed within 5 business days of this date, the court will assume redaction of personal identifiers is not necessary and the transcript will be made available on the web 90 days from today's date. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Redaction Request due 10/26/2017. Redacted Transcript Deadline set for 11/6/2017. Release of Transcript Restriction set for 1/3/2018. Notice of Intent to Redact due by 10/10/2017 (nlf, ) (Entered: 10/05/2017) |
| 10/05/2017 | 94 | Letter from Martin Wolfson as to Stacey J. LaPorte, Jr requesting adjournment of sentencing (Wolfson, Martin) (Entered: 10/05/2017) |
| 10/10/2017 | | TEXT NOTICE RESCHEDULING SENTENCING HEARING / SENTENCING MEMORANDA DEADLINE: Reset Hearing as to Stacey J. LaPorte, Jr: Sentencing IS NOW set for Thursday, December 14, 2017 at 11:00AM in Utica, NY pursuant request of counsel and the verbal Order of Judge David N. Hurd. Appearances required in Court in Utica, NY. Please adjust your calendars accordingly. Any further replies to the Sentencing Memoranda filed are now DUE by Friday, November 24, 2017. (ptm) |

|  |  |  |
|---|---|---|
|  |  | (Entered: 10/10/2017) |
| 11/14/2017 | 95 | SENTENCING MEMORANDUM by USA as to Stacey J. LaPorte, Jr (Fletcher, Lisa) (Entered: 11/14/2017) |
| 11/17/2017 |  | TEXT NOTICE RESCHEDULING SENTENCING HEARING: Reset Hearing as to Stacey J. LaPorte, Jr: Sentencing IS NOW set for Thursday, January 4, 2018 at 11:00AM in Utica, NY pursuant request of counsel and the verbal Order of Judge David N. Hurd. Appearances required in Court in Utica, NY. Please adjust your calendars accordingly. (ptm) (Entered: 11/17/2017) |
| 11/17/2017 |  | TEXT NOTICE RESCHEDULING SENTENCING HEARING: Reset Hearing as to Mackenzie L. Bailey. Sentencing IS NOW set for Thursday, February 15, 2018 at 11:30AM in Utica, NY pursuant request of counsel and the verbal Order of Judge David N. Hurd. (Entered: 11/17/2017) |
| 11/22/2017 | 96 | Supplemental SENTENCING MEMORANDUM by Stacey J. LaPorte, Jr (Wolfson, Martin) (Entered: 11/22/2017) |
| 11/22/2017 | 97 | FINAL PRESENTENCE INVESTIGATION REPORT (AMENDED) [LODGED] as to Stacey J. LaPorte, Jr. The Presentence Investigation Report and/or Addendum have been AMENDED and supersede any previously submitted versions. This final version includes all revisions and the most recent Addendum, and will be used by the Court at the time of sentencing. **[This document has been electronically lodged with the Court and is viewable by ONLY the attorney for the government, the attorney for the defendant, and the presiding judge. It is not a filed document, therefore is not available for public inspection. Any further distribution or dissemination is prohibited.]** (dct, ) (Entered: 11/22/2017) |
| 12/21/2017 | 98 | SEALED DOCUMENT - maintained in Clerk's Office and not available for electronic viewing. (Attachments: # 1 (ptm) (Entered: 12/21/2017) |
| 12/22/2017 | 99 | FINAL PRESENTENCE INVESTIGATION REPORT (AMENDED) [LODGED] as to Stacey J. LaPorte, Jr. The Presentence Investigation Report and/or Addendum have been AMENDED and supersede any previously submitted versions. This final version includes all revisions and the most recent Addendum, and will be used by the Court at the time of sentencing. **[This document has been electronically lodged with the Court and is viewable by ONLY the attorney for the government, the attorney for the defendant, and the presiding judge. It is not a filed document, therefore is not available for public inspection. Any further distribution or dissemination is prohibited.]** (dct, ) (Entered: 12/22/2017) |
| 01/04/2018 |  | TEXT Minute Entry for proceedings held before Judge David N. Hurd, in Utica, NY. Sentencing held on 1/4/2018 for Stacey J. Laporte, Jr., (1), Count(s) 1ss,2ss,3ss,4ss,5ss,6ss. Defendant Stacey J. Laporte, Jr. appears with Attorney Randi J. Bianco, AFPD. Court rules on Guideline application and advises of defendant of rights. Defendant's Attorney speaks and moves for non-guideline sentence. Court GRANTS imposition of non-guideline sentence. Victim Impact Statement heard. Defendant advised of right to speak. Defendant and Attorney decline to speak. Lisa M. Fletcher, AUSA moves sentence. Defendant Stacey J. Laporte, Jr.,having been found guilty of Counts 1 through 6 of the Second Superseding Indictment 5:16-CR-320,defendant is hereby committed to the custody of the Bureau of Prisons to be imprisoned for a term of 1,140 months (or 95 years). This term consists of 360 months on Counts 1, 3, and 4 to run concurrently with each other but consecutively to all other counts; 360 months |

| | | |
|---|---|---|
| | | on Count 2 to run consecutively; 360 months on Count 5 to run consecutively; and 60 months on Count 6 to run consecutively. The Court imposed consecutive sentences to account for the separate and distinct crimes against different victims and to adequately account for the harms caused to these victims. The sentence represents the maximum sentence on Counts 1, 3, and 4 involving the sexual exploitation of infant V-1; the maximum sentence on Count 2 involving the sexual exploitation of infant V-4; the maximum sentence on Count 5 involving the sexual exploitation of minors V-2 and V-3; and the mandatory minimum sentence on Count 6, which involves an unidentified infant. Court imposed a sentence with the understanding that defendant will not be released from prison. However, in the event that he is released, defendant Stacey J. Laporte, Jr. shall be placed on Supervised Release for a term of life on each count to run concurrently. $600.00 Special Assessment due and payable immediately. No Fine or additional special assessment ordered. Defendant shall forfeit to the United States the items outlined in the Preliminary Order of Forfeiture dated July 7, 2017. Both parties advised of right to appeal. Defendant Stacey J. Laporte, Jr. is remanded to the custody of the USMS in accordance with the sentence imposed. Court recommends defendant be placed in USP Tucson, AZ. Appearances: Lisa M. Fletcher, AUSA for Government; Randi J. Bianco, AFPD for Defendant Stacey J. Laporte, Jr. Janna A. Kulakowski, Senior USPO. (11:00am -12:30pm) (Court Reporter Nancy Freddoso) (ptm) (Entered: 01/08/2018) |
| 01/10/2018 | 100 | STATEMENT OF REASONS [LODGED] as to Stacey J. LaPorte, Jr **[This document has been electronically lodged with the Court and is viewable by ONLY the attorney for the government, the attorney for the defendant, and the presiding judge. It is not a filed document, therefore is not available for public inspection. Any further distribution or dissemination is prohibited.]** (dictamt) (Entered: 01/10/2018) |
| 01/10/2018 | 101 | JUDGMENT: as to Stacey J. LaPorte, Jr. (1), Counts 1-4, and 1s-4s, 5s, were Superseded; Counts 1ss-2ss, Defendant Stacey J. Laporte, Jr having been found guilty of Counts 1 through 6 of the Second Superseding Indictment 5:16-CR-320, defendant is hereby committed to the custody of the Bureau of Prisons to be imprisoned for a term of 1,140 months (or 95 years). This term consists of 360 months on Counts 1, 3, and 4 to run concurrently with each other but consecutively to all other counts; 360 months on Count 2 to run consecutively; 360 months on Count 5 to run consecutively; and 60 months on Count 6 to run consecutively. The Court imposed consecutive sentences to account for the separate and distinct crimes against different victims and to adequately account for the harms caused to these victims. The sentence represents the maximum sentence on Counts 1, 3, and 4 involving the sexual exploitation of infant V-1; the maximum sentence on Count 2 involving the sexual exploitation of infant V-4; the maximum sentence on Count 5 involving the sexual exploitation of minors V-2 and V-3; and the mandatory minimum sentence on Count 6, which involves an unidentified infant. Court imposed a sentence with the understanding that defendant will not be released from prison. However, in the event that he is released, defendant Stacey J. Laporte, Jr. shall be placed on Supervised Release for a term of life on each count to run concurrently. $600.00 Special Assessment due and payable immediately. No Fine or additional special assessment ordered. Defendant shall forfeit to the United States the items outlined in the Preliminary Order of Forfeiture dated July 7, 2017.; Counts 3ss-5ss, Defendant Stacey J. Laporte, Jr having been found guilty of Counts 1 through 6 of the Second Superseding Indictment 5:16-CR-320, defendant is hereby committed to the custody of the Bureau of Prisons to be imprisoned for a term of 1,140 months (or |

| | | |
|---|---|---|
| | | 95 years). This term consists of 360 months on Counts 1, 3, and 4 to run concurrently with each other but consecutively to all other counts; 360 months on Count 2 to run consecutively; 360 months on Count 5 to run consecutively; and 60 months on Count 6 to run consecutively. The Court imposed consecutive sentences to account for the separate and distinct crimes against different victims and to adequately account for the harms caused to these victims. The sentence represents the maximum sentence on Counts 1, 3, and 4 involving the sexual exploitation of infant V-1; the maximum sentence on Count 2 involving the sexual exploitation of infant V-4; the maximum sentence on Count 5 involving the sexual exploitation of minors V-2 and V-3; and the mandatory minimum sentence on Count 6, which involves an unidentified infant. Court imposed a sentence with the understanding that defendant will not be released from prison. However, in the event that he is released, defendant Stacey J. Laporte, Jr. shall be placed on Supervised Release for a term of life on each count to run concurrently. $600.00 Special Assessment due and payable immediately. No Fine or additional special assessment ordered. Defendant shall forfeit to the United States the items outlined in the Preliminary Order of Forfeiture dated July 7, 2017.; Count 6ss, Defendant Stacey J. Laporte, Jr having been found guilty of Counts 1 through 6 of the Second Superseding Indictment 5:16-CR-320, defendant is hereby committed to the custody of the Bureau of Prisons to be imprisoned for a term of 1,140 months (or 95 years). This term consists of 360 months on Counts 1, 3, and 4 to run concurrently with each other but consecutively to all other counts; 360 months on Count 2 to run consecutively; 360 months on Count 5 to run consecutively; and 60 months on Count 6 to run consecutively. The Court imposed consecutive sentences to account for the separate and distinct crimes against different victims and to adequately account for the harms caused to these victims. The sentence represents the maximum sentence on Counts 1, 3, and 4 involving the sexual exploitation of infant V-1; the maximum sentence on Count 2 involving the sexual exploitation of infant V-4; the maximum sentence on Count 5 involving the sexual exploitation of minors V-2 and V-3; and the mandatory minimum sentence on Count 6, which involves an unidentified infant. Court imposed a sentence with the understanding that defendant will not be released from prison. However, in the event that he is released, defendant Stacey J. Laporte, Jr. shall be placed on Supervised Release for a term of life on each count to run concurrently. $600.00 Special Assessment due and payable immediately. No Fine or additional special assessment ordered. Defendant shall forfeit to the United States the items outlined in the Preliminary Order of Forfeiture dated July 7, 2017. Signed by Judge David N. Hurd on 1/10/2018. (jmb) (Entered: 01/11/2018) |
| 01/12/2018 | 102 | NOTICE OF APPEAL by Stacey J. LaPorte, Jr No fee paid. (Bianco, Randi) (Entered: 01/12/2018) |
| 01/12/2018 | 103 | ELECTRONIC NOTICE AND CERTIFICATION: as to Stacey J. LaPorte, Jr., sent to US Court of Appeals, regarding the # 102 Notice of Appeal - Final Judgment. (jmb) (Entered: 01/12/2018) |
| 01/24/2018 | | TEXT NOTICE RESETTING SENTENCING MEMORANDA DEADLINE as to Mackenzie L. Bailey: Pursuant to request of Counsel and verbal Order of Judge David N. Hurd, Sentencing Memos are now DUE by 12:00pm on Friday, February 2, 2018. Sentencing remains set for Thursday, February 15, 2018 at 11:30AM in Utica, NY. Appearances required in Court in Utica. Please adjust your calendars accordingly. (ptm) (Entered: 01/24/2018) |

CM/ECF LIVE - U.S. District Court - NYND                    https://ecf.nynd.uscourts.gov/cgi-bin/DktRpt.pl?112581314996379-L_1_0-1

| | | |
|---|---|---|
| 01/25/2018 | 104 | PRESENTENCE INVESTIGATION REPORT - FINAL DISCLOSURE [LODGED] as to Mackenzie L. Bailey. The final version of the Presentence Investigation Report, including all revisions and the most recent Addendum is now available for review. This version of the report will be used by the Court at the time of sentencing. **[This document has been electronically lodged with the Court and is viewable by ONLY the attorney for the government, the attorney for the defendant, and the presiding judge. Any further distribution or dissemination is prohibited.]** (dct, ) (Entered: 01/25/2018) |
| 01/26/2018 | 105 | TRANSCRIPT REQUEST by Stacey J. LaPorte, Jr for proceedings held on 5/17/17, 6/7/17, 6/12/17, 6/13/17, 6/14/17, 6/16/17, 6/19/17, 6/20/17 & 1/4/18 before Judge Hurd. (Egan, James) (Entered: 01/26/2018) |
| 01/29/2018 | 106 | SENTENCING MEMORANDUM by USA as to Mackenzie L. Bailey (Fletcher, Lisa) (Entered: 01/29/2018) |
| 02/02/2018 | 107 | Letter from Kimberly M. Zimmer as to Mackenzie L. Bailey requesting Extension of Time to File Sentencing Memorandum (Zimmer, Kimberly) (Entered: 02/02/2018) |
| 02/02/2018 | 108 | TEXT ORDER granting the 107 Letter Requesting Extension of Time to File Sentencing Memorandum as to Mackenzie L. Bailey. Defendant's Sentencing Memorandum is now due by 9:00 AM on Monday, 2/5/2018. Sentencing remains set for Thursday, 2/15/2018 at 11:30 AM in Utica, NY. Appearances required in Utica for the Sentencing. So Ordered by Judge David N. Hurd on 2/2/2018. (see) (Entered: 02/02/2018) |
| 02/02/2018 | 109 | FINAL PRESENTENCE INVESTIGATION REPORT (AMENDED) [LODGED] as to Mackenzie L. Bailey. The Presentence Investigation Report and/or Addendum have been AMENDED and supersede any previously submitted versions. This final version includes all revisions and the most recent Addendum, and will be used by the Court at the time of sentencing. **[This document has been electronically lodged with the Court and is viewable by ONLY the attorney for the government, the attorney for the defendant, and the presiding judge. It is not a filed document, therefore is not available for public inspection. Any further distribution or dissemination is prohibited.]** (dct, ) (Entered: 02/02/2018) |
| 02/04/2018 | 110 | SENTENCING MEMORANDUM by Mackenzie L. Bailey (Zimmer, Kimberly) (Entered: 02/04/2018) |
| 02/05/2018 | 111 | DEFT Mackenzie L. Bailey: CHARACTER LETTER(S) RE: SENTENCING (Zimmer, Kimberly) (Entered: 02/05/2018) |
| 02/08/2018 | 112 | DEFT Mackenzie L. Bailey: CHARACTER LETTER(S) RE: SENTENCING (Zimmer, Kimberly) (Entered: 02/08/2018) |
| 02/08/2018 | | TEXT NOTICE RESCHEDULING SENTENCING HEARING: Reset Hearing as to Mackenzie L. Bailey. Pursuant to the verbal Order of the Hon. David N. Hurd, USDJ: Sentencing Hearing IS NOW set for Thursday, March 15, 2018 at 11:00AM in Utica, NY. Appearances required in Court in Utica, NY. Please adjust your calendars accordingly. (ptm) (Entered: 02/08/2018) |
| 02/09/2018 | | TEXT NOTICE RESCHEDULING SENTENCING HEARING: Reset Hearing as to Mackenzie L. Bailey. Pursuant to the verbal Order of the Hon. David N. Hurd, USDJ: Sentencing Hearing IS NOW set for Thursday, February 15, 2018 at 11:00AM in Utica, NY. Appearances required in Court in Utica, NY. Please adjust your calendars |

A 25

| | | |
|---|---|---|
| | | accordingly. (ptm) (Entered: 02/09/2018) |
| 02/12/2018 | 113 | DEFT Mackenzie L. Bailey: CHARACTER LETTER(S) RE: SENTENCING (Zimmer, Kimberly) (Entered: 02/12/2018) |
| 02/12/2018 | 114 | DEFT Mackenzie L. Bailey: CHARACTER LETTER(S) RE: SENTENCING (Zimmer, Kimberly) (Entered: 02/12/2018) |
| 02/14/2018 | 115 | DEFT Mackenzie L. Bailey: CHARACTER LETTER(S) RE: SENTENCING (Zimmer, Kimberly) (Entered: 02/14/2018) |
| 02/15/2018 | | TEXT Minute Entry for proceedings held before Judge David N. Hurd, in Utica, NY. Sentencing held on 2/15/2018 for Mackenzie L. Bailey, (2), Count(s)1, 2, 3. Defendant Mackenzie Bailey appears with Attorney Kimberly M. Zimmer, Esq. Court rules on Guideline application and advises of defendant of rights. Defendant advised of right to speak. Defendant declines to speak. Lisa M. Fletcher, AUSA moves sentence. Upon Defendant Mackenzie L. Bailey's plea of guilty to Counts 1, 2 and 3 of the Indictment 5:16-CR-320 defendant is hereby committed to the custody of the United States Bureau of Prisons to be imprisoned on Counts 1, 2, and 3 for a total term of 180 months on each count to run concurrently. Court recommends defendant participate in mental health and sex offender treatment program and be placed in a facility close to St. Lawrence County, NY. 15 YEARS Supervised Release on Counts 1, 2 and 3 to run concurrently, with standard and special conditions. $300.00 Special Assessment due and payable immediately. No Fine or additional special assessment ordered. Defendant shall forfeit to the United States the items listed in the Preliminary Order of Forfeiture dated April 28, 2017. Both parties advised of right to appeal. Defendant Mackenzie L. Bailey is remanded to the custody of the USMS in accordance with the sentence imposed. Appearances: Lisa M. Fletcher, AUSA for Government; Kimberly M. Zimmer, Esq for Defendant Mackenzie L. Bailey. Janna A. Kulakowski, Senior USPO. (11:00am -12:00pm) (Court Reporter Nancy Freddoso) (ptm) (Entered: 02/16/2018) |
| 02/23/2018 | 116 | JUDGMENT as to Mackenzie L. Bailey (2), Count(s) 1-3, Upon Defendant Mackenzie Baileys plea of guilty to Counts1, 2 and 3 of the Indictment 5:16-CR-320 defendant is hereby committed to the custody of the United States Bureau of Prisons to be imprisoned on Counts 1, 2, and 3 for a total term of 180 months on each count to run concurrently. Court recommends defendant participate in mental health and sex offender treatment program and be placed in a facility close to St. Lawrence County, NY. 15 YEARS Supervised Release on Counts 1, 2 and 3 to run concurrently, with standard and special conditions. $300.00 Special Assessment due and payable immediately. No Fine or additional special assessment ordered. Defendant shall forfeit to the United States the items listed in the Preliminary Order of Forfeiture dated April 28, 2017. Signed by Judge David N. Hurd on 2/22/2018. (mgh) (Entered: 02/23/2018) |
| 02/23/2018 | 117 | STATEMENT OF REASONS [LODGED] as to Mackenzie L. Bailey **[This document has been electronically lodged with the Court and is viewable by ONLY the attorney for the government, the attorney for the defendant, and the presiding judge. It is not a filed document, therefore is not available for public inspection. Any further distribution or dissemination is prohibited.]** (amt) (Entered: 02/23/2018) |
| 09/05/2018 | 118 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT of Proceedings as to Stacey J. LaPorte, Jr, Mackenzie L. Bailey: Jury Trial held on June 12, 13, 14, 16, 19, 20, 2017 before Judge David N. Hurd, Court Reporter/Transcriber: Nancy L. Freddoso,Telephone number: 3157938114. **IMPORTANT NOTICE - REDACTION** |

A 26

CM/ECF LIVE - U.S. District Court - NYND          https://ecf.nynd.uscourts.gov/cgi-bin/DktRpt.pl?112581314996379-L_1_0-1

| | | |
|---|---|---|
| | | **OF TRANSCRIPTS:** In order to remove personal identifier data from the transcript, a party must electronically file a Notice of Intent to Request Redaction with the Clerk's Office within 5 business days of this date. The policy governing the redaction of personal information is located on the court website at www.nynd.uscourts.gov. <u>Read this policy carefully.</u> If no Notice of Intent to Redact is filed within 5 business days of this date, the court will assume redaction of personal identifiers is not necessary and the transcript will be made available on the web 90 days from today's date. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Redaction Request due 9/26/2018. Redacted Transcript Deadline set for 10/9/2018. Release of Transcript Restriction set for 12/4/2018. Notice of Intent to Redact due by 9/10/2018 (Attachments: # <u>1</u> Trial - Day 2, # <u>2</u> Trial - Day 3, # <u>3</u> Trial - Day 4, # <u>4</u> Trial - Day 5, # <u>5</u> Trial - Day 6) (nlf, ) (Entered: 09/05/2018) |
| 09/06/2018 | <u>119</u> | NOTICE OF FILING OF OFFICIAL TRANSCRIPT of Proceedings as to Stacey J. LaPorte, Jr, Mackenzie L. Bailey: Motion in Limine held on June 7, 2017 before Judge David N. Hurd, Court Reporter/Transcriber: Nancy L. Freddoso,Telephone number: 3157938114. **IMPORTANT NOTICE - REDACTION OF TRANSCRIPTS:** In order to remove personal identifier data from the transcript, a party must electronically file a Notice of Intent to Request Redaction with the Clerk's Office within 5 business days of this date. The policy governing the redaction of personal information is located on the court website at www.nynd.uscourts.gov. <u>Read this policy carefully.</u> If no Notice of Intent to Redact is filed within 5 business days of this date, the court will assume redaction of personal identifiers is not necessary and the transcript will be made available on the web 90 days from today's date. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Redaction Request due 9/27/2018. Redacted Transcript Deadline set for 10/9/2018. Release of Transcript Restriction set for 12/5/2018. Notice of Intent to Redact due by 9/11/2018 (nlf, ) (Entered: 09/06/2018) |
| 09/06/2018 | <u>120</u> | NOTICE OF FILING OF OFFICIAL TRANSCRIPT of Proceedings as to Stacey J. LaPorte, Jr, Mackenzie L. Bailey: Sentencing held on January 4, 2018 before Judge David N. Hurd, Court Reporter/Transcriber: Nancy L. Freddoso,Telephone number: 3157938114. **IMPORTANT NOTICE - REDACTION OF TRANSCRIPTS:** In order to remove personal identifier data from the transcript, a party must electronically file a Notice of Intent to Request Redaction with the Clerk's Office within 5 business days of this date. The policy governing the redaction of personal information is located on the court website at www.nynd.uscourts.gov. <u>Read this policy carefully.</u> If no Notice of Intent to Redact is filed within 5 business days of this date, the court will assume redaction of personal identifiers is not necessary and the transcript will be made available on the web 90 days from today's date. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Redaction Request due 9/27/2018. Redacted Transcript Deadline set for 10/9/2018. Release of Transcript Restriction set for 12/5/2018. Notice of Intent to Redact due by 9/11/2018 (nlf, ) (Entered: 09/06/2018) |

**PACER Service Center**

A 27

CM/ECF LIVE - U.S. District Court - NYND                    https://ecf.nynd.uscourts.gov/cgi-bin/DktRpt.pl?112581314996379-L_1_0-1

| Transaction Receipt | | | |
|---|---|---|---|
| 11/29/2018 09:59:35 | | | |
| **PACER Login:** | jpe515300 | **Client Code:** | |
| **Description:** | Docket Report | **Search Criteria:** | 5:16-cr-00320-DNH |
| **Billable Pages:** | 30 | **Cost:** | 3.00 |
| **Exempt flag:** | Exempt | **Exempt reason:** | Always |

A 28

UNITED STATES DISTRICT COURT
NORTHER DISTRICT OF NEW YORK
_____

UNITED STATES OF AMERICA,


               -v-                                    CASE NO. 16-CR-320 (DNH)

STACEY LAPORTE,

                         Defendant.
_____


### MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT STACEY LAPORTE'S PRETRIAL MOTIONS


DATED:          March 31, 2015                 Respectfully submitted,
                Syracuse, New York
                                               Lisa Peebles
                                               Federal Public Defender


                              By:
                                    Randi Bianco, Esq.
                                    Assistant Federal Public Defender
                                    Bar Roll No. 507514
                                    Office of the Federal Public Defender
                                    4 Clinton Square, 3rd Floor
                                    Syracuse, New York 13202
                                    (315) 701-0080


A 29

Defendant Stacey LaPorte, Jr., ("Mr. LaPorte") is charged in a five-count superseding indictment with conspiracy to sexually exploit a child, three counts of sexual exploitation of a child, and one count of receipt of child pornography. (Dkt. No. 25). Mr. LaPorte was interviewed in connection with this case and provided a statement during an improperly Mirandized and impermissibly coercive custodial interrogation. The Government also intends to offer evidence retrieved from a cellphone attributed to Mr. LaPorte that was searched without a warrant after a third-party turned it into the police. Finally, the government has averred, through correspondence regarding discovery, that other alleged victims of molestation exist and has declared that it intends to introduce evidence of those alleged acts at trial under Federal Rules of Evidence 404(b) and 414. These issues are the subject of Mr. LaPorte's pretrial motions.

In this motion, Mr. LaPorte asks the Court to (1) sever the five counts for trial, and grant three trials, one for the first three counts of the indictment, one for the fourth, and one for the fifth count of the indictment; (2) suppress the statements he allegedly made to officers; (3) suppress any evidence retrieved from LG cellphone which was turned over to police by Tiffany Matthie and searched without a warrant, and (4) exclude uncharged crime evidence as a means of proving that he exploited the minor who is the subject of the first three counts of the indictment, and the victims who are the subjects of count four of the indictment, and as a means of proving Count 5, pursuant to Federal Rules of Evidence 404(b) and 414. If the Court is not inclined to outright grant Mr. LaPorte's motions, he requests an evidentiary hearing in the alternative.

1

A 30

## I.    FACTUAL AND PROCEDURAL BACKGROUND

### A.  The officers interrogate Mr. LaPorte using a two-step interrogation technique to subvert the requirements of *Miranda*

On January 29, 2016, Investigator Dewayne Baillargeon of the New York State Police interviewed B.L., the sixteen-year-old sister of the defendant.[1] B.L. claimed that Stacey LaPorte had been sexually abusing her since she was eight.

On March 7, 2016, Investigator Jason Olson, of the Massena Police Department, interviewed C.F., a female friend of B.L.. C.F. alleged that on March 6, 2016, she had been raped by Mr. LaPorte at his home in St. Lawrence County. C.F. told the investigator that she had been engaging in sexual activity with Mr. LaPorte  and his girlfriend Mackenzie Bailey for several months but added that it was never consensual.

After C.F.'s interview, Massena police applied for a search warrant. The warrant was issued and authorized a search of Mr. LaPorte's residence for nude electronic images of C.F. or any other individuals under the age of 18 which would support violations of child sex crimes. The warrant was executed that day and law enforcement recovered a Lenovo laptop, a Samsung Galaxy S4 cellphone, and an Apple iPhone 4s. The search warrant was Amended June 20, 2016, at the request of the New York State Police Computer Crimes Unit to allow for forensic analysis of the devices.

On May 17, 2017, Mr. LaPorte was located and picked up by Massena police. Mr. LaPorte had been drinking alcohol and smoking marijuana before he was picked up. He was brought by police vehicle to the New York State Police barracks in Massena. Once at the barracks, Mr. LaPorte was escorted into an interrogation room and was told to sit in the corner.

---

1 Affidavit in Support of Search Warrant

The investigator sat very close to Mr. LaPorte, and positioned himself between him and the door.

The investigator began interrogating Mr. LaPorte before reading him his *Miranda* rights. For at least twenty-minutes the investigator asked Mr. LaPorte questions about his involvement with the alleged victims. The investigator placed a file and DVD's in front of Mr. LaPorte and told him he "had everything [he] needed in [these] files."[2] While in the interview room the investigator told Mr. LaPorte "you know why you are here" and then detailed the sex crimes he was accused of. The investigator told Mr. LaPorte that he already had enough in his file to "put [him] away for life". [3] Without advising Mr. LaPorte of his rights, the investigator continued and claimed if Mr. LaPorte cooperated there would be "less charges."[4] Mr. LaPorte asked what would happen if he asked for a lawyer and the investigator responded that he would make sure he brought a "shit ton" more charges against him. During the course of the interrogation the investigator gave Mr. LaPorte the option of proceeding the "easy way or the hard way," and explained that he can be a "nice guy" if Mr. LaPorte  cooperated, but he could also be an "asshole" if Mr. LaPorte chose to remain silent.

Finally, the investigator read Mr. LaPorte his *Miranda* rights. Mr. LaPorte asked if he could go home if he spoke with him, and the investigator responded that it "depends on what you say." At this point the investigator handcuffed Mr. LaPorte to the chair and left for a few hours. When he returned, he had a typed statement. Hoping that he would be if he just did what the police told him, Mr. LaPorte signed the statement without reading it. Mr. LaPorte felt like he was not free to leave when he was picked up by the police, but became certain he could not leave

---

2 Stacey LaPorte Affidavit in Support of Motion to Suppress
3 Id.
4 Id.

after the investigator showed him the file and DVD's and claimed he had everything he needed
to put him away for life.

   **B. Counts One, Two, And Three, Should be Severed and Tried Separately, and
      Count Four and Count Five Should Each be Tried Individually  Pursuant To
      Rule 14**

On October 27, 2016, Mr. LaPorte was charged in a four-count indictment, (Dkt. No. 1) on

March 23, 2017, he was charged with an additional count by way of a superseding indictment.

(Dkt. No. 25). Counts One, Two, and Three of the indictment charge conspiracy to sexually

sexual exploit a child in violation of 18 U.S. C. § 2251(a) & (e) and the sexual exploitation of

that child on March 2, and March 3, 2016, in violation of 18 U.S. C. § 2251(a) & (e) and 2(a),

respectively. These three counts stem from Mr. LaPorte's alleged communications with his co-

defendant Mackenzie Bailey, whereby he conspired with her to sexually exploit V-1, who was a

two-year old at the time of the alleged offenses.

Counts Four  involves Mr. LaPorte allegedly engaging in sexual conduct with two teenagers,

V-1 a male born in 2003, and V-3, C.F., a seventeen-year old female. Count Five charges

Receipt of Child Pornography in violation of 18 U.S. C. § 2252A(a)(2)(A). The conduct giving

rise to this count is alleged to have occurred on March 25, 2016. According to government,

"Count 5 is unrelated to any of the other counts."[5]

---

5 March 27, 2017, e-mail from AUSA Sahar Amondolare in response to defense counsel's inquiry as to whether the
newly charged conduct was related to any other count.

**C. Evidence retrieved from the LG cellphone turned into police by Tiffany Matthie is inadmissible because Mr. LaPorte had a reasonable expectation of privacy in and it was searched without a warrant**

On June 18, 2016, Investigator Arcadi interviewed Mr. LaPorte's current girlfriend Tiffany Matthie. Ms. Matthie had previously had her home searched by police who told her they were looking for an item belonging to Mr. LaPorte.[6] During the interview she turned over an LG cellphone with serial number 503CYWC0079417 to Investigator Arcadi and claimed it was Mr. LaPorte's phone. Investigators then conducted a search of this phone without obtaining a search warrant or Mr. LaPorte's consent. Mr. Matthie had been asked by Mr. LaPorte to safeguard his cellphone while he was in jail.[7]

## II.    Argument

### A.  TO PREVENT SUBSTANTIAL PREJUDICE, THE CHARGES AGAINST MR. LAPORTE SHOULD BE TRIFURCATED FOR TRIAL PURSUANT TO RULE 14

The five counts alleged in the superseding indictment should be tried in three separate proceedings; Counts One, Two, and Three should be tried together, while Counts Four and Five should each be tried individually to prevent substantial prejudicial spillover.

Rule 14 of the Federal Rules of Criminal Procedure permits the Court to order separate trials of multiple counts if it appears that a defendant is prejudiced by the joinder of offenses. *Fed. R. Crim. P.* 14. Even when multiple offenses are properly joined under Rule 8, the court may order separate trials or grant a severance under Rule 14 to avoid prejudice. *Werner,* 620 F.2d at 928.

---



6 Matthie Affidavit
7 *Id.*

5

A 34

However, "[i]n order to prevail, the defendant must show not simply some prejudice but *substantial* prejudice." *Id.* The Second Circuit Court of Appeals has explained that "[g]ranting separate trials under Rule 14 simply on a showing of some adverse effect, particularly solely the adverse effect of being tried for two crimes rather than one, would reject the balance struck in Rule 8(a), since this type of 'prejudice' will exist in any Rule 8(a) case." *Id.* at 929. Although some prejudice may be inherent in any case with multiple joined offenses, the prejudice in Mr. LaPorte's case would create substantial prejudice tantamount to a miscarriage of justice.

The Second Circuit recognizes that evidence of possession of child pornography carries a "substantial risk of inflaming the jury." *U.S. v. Harvey*, 991 F.2d 981 (2d Cir. 1993). Furthermore, the Circuit has held that a presentation of irrelevant evidence related to pornographic material deprives defendants of their fundamental right to a fair trial. *Id.* at 997. The presentation of "shocking or inflammatory" evidence creates the risk of a "spillover" effect. *U.S. v. Alessi*, 638 F.2d 466, 475 (2d Cir. 1980). Federal Courts have cautioned that evidence of child pornography is "dangerously prejudicial*"* and "[p]erverse sexual fantasies generate ... intense disgust." *United States v. Curtin*, 489 F.3d 935, 957 (9th Cir. 2007)( (Kleinfeld, J., concurring). The presentation of such inflammatory evidence—where it is not relevant—is reversible error which cannot be mitigated through instruction. *United States v. Loughry*, 660 F.3d 965, 972 (7th Cir. 2011).

Recognizing the inherent prejudice in child pornography cases, Second Circuit courts have severed child pornography counts from other sex crimes to avoid prejudicial spillover pursuant to Rule 14. In *United States v. Caraway*, a Western District of New York court ordered separate trials for a defendant accused of possession of child pornography and failure to register as sex offender. *United States v. Caraway*, No. 08-CR-117A(SR), 2010 WL 275084, at *3

(W.D.N.Y. Jan. 20, 2010) The court held that if "these two charges tried together before a single jury, the defendant would suffer substantial prejudice." *Id* at *3. The court recognized that "if the jury learned that the defendant is a convicted sex offender in connection with the government's case-in-chief on the failure to register charge; such evidence would substantially prejudice the jury with respect to the possession of child pornography charge." *Id*. Ultimately, the court found that he would suffer substantial prejudice if the counts were joined for trial and granted the defendant's motion to sever. *Id*.

Other federal courts have used their discretion pursuant to Rule 14 to sever child pornography charges. In *United States v. Sturm*, the court severed child pornography charges from firearms possession charges, noting: "the charge of child pornography possession, particularly detestable and inflammatory conduct, creates a real danger both that [the defendant] may be confounded in presenting defenses and that the jury might decide to convict [him] of both crimes based upon a perceived criminal disposition." *United States v. Sturm*, No. CRIM 06-CR-00342-LTB, 2007 WL 601976, at *4 (D. Colo. Feb. 22, 2007). The court exercised discretion pursuant to Rule 14 to sever the weapons count from the child pornography count. *Id*.

In Mr. LaPorte's case, evidence which supports the alleged conspiracy and abuse of V-1 which underlies Counts One, Two, and Three is not relevant to Counts Four or Five—but would be incredibly prejudicial. These counts involve the alleged sexual abuse of infants, which is perhaps the most inflammatory criminal conduct conceivable. This evidence would undoubtedly inflame the jury and deprive Mr. LaPorte of his right to a fair trial on Count Four which alleges sexual misconduct with teenage victims. Likewise, this evidence would prejudice the jury's consideration of Count Five. The nature of the evidence which would be used to prove Counts

One, Two, and Three will create a prejudicial "spillover" effect and requires the severance of counts for separate trials to prevent a miscarriage of justice.

### B.  The Court should exclude evidence of Mr. LaPorte's alleged misconduct with another minor under Federal Rules of Evidence 404(b) and 414 because it is more prejudicial than probative

The government intends to introduce evidence regarding Mr. LaPorte's alleged sexual misconduct with D.B., the teenage brother of Mackenzie Bailey. Mr. LaPorte has not been charged with any crimes arising from these alleged interactions with D.B.. The government stated in its February 10, 2017, discovery letter that it "intends to offer evidence of [Stacey LaPorte's] involvement in the sexual abuse of D.B., as recounted in the previously-disclosed statement of Mackenzie Bailey." Mackenzie Bailey's statement regarding the alleged abuse of D.B. is incredibly graphic. She claims that, on two occasions weeks apart, Mr. LaPorte forced her to have sexual relations with her younger brother. In the first incident she claimed that Mr. LaPorte threatened to kill her and her brother if they did not have sex, and that he watched them have sex while he sat on the bed hitting her. Bailey claims Mr. LaPorte said things like "fuck him again," "suck it," and to "stroke [her] brother's dick." In the second incident, Bailey claims that Mr. LaPorte "made me jerk my brother off." Bailey claims that Mr. LaPorte became angry when she told him it was not working because he wanted her to make her brother ejaculate and eat it. These claims are the epitome of prejudicial. Accordingly, Mr. LaPorte moves to exclude the admission of any such evidence at trial as more prejudicial than probative.

"Propensity" evidence, such as that the government seeks to introduce, is generally inadmissible. Fed. R. Evid. 404(b). Mr. LaPorte acknowledges that an exception exists for "child molestation" cases and that all of the charges against Mr. LaPorte constitute "child molestation"

8

for the purposes of Rule 414. Fed. R. Evid. 414(d). Under Rule 414, evidence that a defendant engaged in "child molestation" (as defined by the Rule) in the past is admissible to prove that the defendant has a propensity to commit, or a disposition of character that makes it more likely that he did commit, the act of child molestation charged in the present case. *United States v. Levy*, 594 F. Supp. 2d 427, 438-39 (S.D.N.Y. 2009).

However, the evidence that the government seeks to introduce regarding uncharged conduct with D.B. is inadmissible because it is vastly more prejudicial than probative. Evidence that may be admissible under Rule 414 still must meet the other requirements of the Federal Rules of Evidence, including Rule 403. *See, e.g.*, *United States v. Larson*, 112 F.3d 600, 604 (2d Cir. 1997). Such evidence may be admitted only if its probative value outweighs the danger of unfair prejudice. Fed. R. Evid. 403 ("Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury. . . ."). References to the conduct alleged by Bailey, if allowed to be aired before a jury, would create an overwhelming danger of unfair prejudice, confusion of the issues, and misleading the jury. Therefore, the Court should exclude the evidence.

C. **The Court should suppress the statements made on May 17, 2016, because Mr. LaPorte was "in custody" and officers did not read him his *Miranda* rights until after he had already made incriminating statement**

Mr. LaPorte moves to suppress the statements he made to officers on May 17, 2016, as well as any, and all, evidence derived therefrom as fruit of the poisonous tree. In the alternative, Mr. LaPorte requests an evidentiary hearing to resolve any factual disputes regarding this issue.[8]

---

[8] A defendant challenging the constitutionality of a confession has the right to "a fair hearing and a reliable determination on the issue of voluntariness." *Jackson v. Denno*, 378 U.S. 368, 377 (1964).

9

A 38

The Fifth Amendment provides that "[n]o person ... shall be compelled in any criminal case to be a witness against himself." U.S. CONST. amend. V. To counteract the coercive pressure inherent in custodial interrogations, police officers are required to warn a suspect prior to questioning that he has a right to remain silent, and a right to the presence of an attorney. *Miranda v. Arizona*, 384 U.S. 436, 444 (1966). "*Miranda* warnings must be given when a person is interrogated while 'in custody.'" *United States v. Badmus*, 325 F.3d 133, 138 (2d Cir. 2003) (quoting *Miranda*, 383 U.S. at 444).

"Determining whether a defendant is 'in custody' involves 'two discrete inquiries . . . first, what were the circumstances surrounding the investigation; and second, given those circumstances, would a reasonable person have felt he or she was not at liberty to terminate the interrogation and leave.'" *Badmus*, 325 F.3d at 138 (quoting *Thompson v. Keohane*, 516 U.S. 99, 112 (1995)). Relevant circumstances include, among other factors, the interrogation's duration, its location, whether the defendant volunteered for the interview, whether the officers used restraints, whether weapons were present and especially whether they were drawn, and whether the officers told the defendant he was free to leave or was under suspicion. *United States v. FNU LNU*, 653 F.3d 144, 153 (2d Cir. 2011).

The Second Circuit has articulated a list of factors which bear on the determination of custody, including (1) whether a suspect is told they are free to leave, (2) the setting and conditions of the interrogation, (3) the language and tone of the interrogators, (4) the length of the interrogation, and (5) whether the suspect was frisked, searched or patted down prior the interrogation. *Tankleff v. Senkowski*, 135 F.3d 235, 244 (2d Cir. 1998). The fact that "a suspect is told they are free to leave" does not conclude the inquiry because it is just one of several factors listed in determining whether an individual is in custody. *Id.* Such a remark is not singularly

10

A 39

dispositive of custody, instead it must be viewed in light of the totality of the circumstances. *Id.*
Courts must also consider the extent to which an interrogation was conducted under a police-
dominated atmosphere. *United States v. Revels*, 510 F.3d 1269, 1275 (10th Cir. 2007); *United
Griffin*, 922 F.2d 1343, 1354-55 (8th Cir. 1990).

In *Tankleff*, the court found custody where a suspect voluntarily went with officers to the
police station for questioning. Once there, he was placed in small office at the police station and
subjected to questioning. *Tankleff*, 135 F.3d at 241. During the interrogation a detective informed
the defendant that he had been named as the attacker by an eye-witness. *Tankleff*, 135 F.3d at
244.  The court held that, at the very latest, the defendant was in custody—and entitled to a
*Miranda* warning—as soon as the police confronted him with the evidence against him. *Id.* at
243. The Court reasoned that given the "totality of the circumstances . . . no reasonable person in
the [defendant`s] position would have felt free to leave," especially after being confronted with
evidence against him. *Id.* at 244. Custody was at the very latest, established once Mr. LaPorte
was confronted with the files and DVD's which the investigator claimed was enough to put him
away.

Here, a reasonable person would not have felt that he was at liberty to terminate the
interrogation. Mr. LaPorte was picked up by police who had tracked him down and was brought
to the state police barracks in a police car. (Stacey LaPorte Affidavit, ¶ 2). He felt intimidated and
believed he had no choice but to come to the police station. *Id.* Once at the police station, Mr.
LaPorte was escorted to an interrogation room and made to sit in the corner. *Id.* The investigator
sat between Mr. LaPorte and exit. *Id.*

During the interrogation, and before Mr. LaPorte was given a *Miranda* warning, the
investigator began questioning him aggressively. *Id.* ¶ 3. The investigator placed a file and two

DVD's in front of Mr. LaPorte and said he had told me he had everything he needed in those files to put him away. *Id*. The investigator questioned Mr. LaPorte for at least twenty minutes before he read him his *Miranda* rights. After finally advising Mr. LaPorte of his rights, the investigator handcuffed Mr. LaPorte to the table and left for two hours. Id. ¶6. The investigator returned with a typed statement, Mr. LaPorte—worn down from the interrogation—then signed the statement without reading it or having it read to him. *Id*.

    *Miranda* warnings given mid-interrogation, like the one in this case, are ineffective and, thus, confessions repeated after these warnings are given are inadmissible at trial. *Missouri v. Seibert*, 542 U.S. 600, 609 (2004).  The object of the "two-step interrogation" technique is to render *Miranda* warnings ineffective by waiting for a particular opportune time to give them, after a suspect has already confessed. *Id*. at 620.

    In the present case, because *Miranda* warnings were never given during the first interrogation where Mr. LaPorte made his initial statements, that custodial interrogation functioned as the first step of an illegal two-step interrogation technique.

    If the Court is not inclined to grant the motion to suppress on the papers, it should conduct an evidentiary hearing on the *Miranda* issue. Factual disputes about circumstances of interrogation cannot be resolved without an evidentiary hearing. *United States v. Mathurin*, 148 F.3d 68, 69 (2d Cir. 1998) ("An assertion that *Miranda* warnings were not given, when the government asserts the contrary, . . .creates a specific factual dispute [that] cannot properly be resolved without an evidentiary hearing.").

**D. The Warrantless Search of Mr. LaPorte's LG Cellphone Violated the Fourth Amendment**

The investigators did not have a warrant to search Mr. LaPorte's which they retrieved from Tiffany Matthie and any evidence recovered from it must be suppressed. Searches conducted outside the judicial process, without prior approval by judge or magistrate, are per se unreasonable under the Fourth Amendment. *Katz v. United States*, 389 U.S. 347, 357 (1967). Mr. LaPorte enjoyed a reasonable expectation of privacy in his cellphone, and therefore a warrant was needed to search it.

A person has a reasonable expectation of privacy in his or her personal cell phone, including call records and text messages, and images. *United States v. Finley,* 477 F.3d 250, 259–60 (5th Cir.2007); *see also City of Ontario, Cal. v. Quon,* 130 S.Ct. 2619, 2630 (2010) ("Cell phone and text message communications are so pervasive that some persons may consider them to be essential means or necessary instruments for self-expression, even self-identification."). The Second Circuit has concluded that "[i]f anything, *even greater protection is warranted*" for cellphones than any mail or paper.[9] *United States v. Ganias*, 755 F.3d 125, 133 (2d Cir. 2014), *See also, e.g., Galpin*, 720 F.3d at 446 ("[A]dvances in technology and the centrality of computers in the lives of average people have rendered the computer hard drive akin to a residence in terms of the scope and quantity of private information it may contain."). "If the defendant succeeds in showing that the officers conducted a warrantless search, the burden shifts . . . to the government to show that the search fell within one of the exceptions to the warrant

---

[9] The Second Circuit was specifically referencing computers in *Ganias*, but the Supreme Court has recognized that "The term 'cell phone' is itself misleading shorthand; many of these devices are in fact minicomputers that also happen to have the capacity to be used as a telephone." *Riley v. California*, 134 S. Ct. 2473, 2488–89 (2014).

13

A 42

requirement." *Gagnon*, 230 F. Supp. 2d at 267-68. Here, there are no exceptions to the warrant requirement that justify the search of Mr. LaPorte's cellphone.

Therefore, the warrantless search of Mr. LaPorte's cellphone violated the Fourth, and Fourteenth, Amendment. Law Enforcement did not seek a warrant, and they did not seek Mr. LaPorte's consent. Accordingly, any evidence recovered from this cellphone must be suppressed. In the event the Court is not inclined to grant this motion outright, an evidentiary hearing is requested to determine exactly how law enforcement came into possession of the phone and conducted the search.

## <u>CONCLUSION</u>

For the foregoing reasons, this Court grant Mr. LaPorte's motion to (1) trifurcate his counts for trial to prevent substantial spillover prejudice, (2) suppress the un-mirandized statements he made while in custody, (3) exclude unfairly prejudicial evidence of prior bad acts, and (4) suppress evidence recovered from the warrantless search of Mr. LaPorte's cellphone.

DATED: March 31, 2017                                Respectfully Submitted,
                                                     Lisa Peebles, Federal Public Defender

                                                     By: Randi Bianco

                                                       /s/Randi Bianco
                                                     Asst. Federal Public Defender

                                                     Bar Roll No. 507514
                                                     Office of the Federal Public Defender
                                                     4 Clinton Square, 3rd Floor
                                                     Syracuse, New York 13202
                                                     (315) 701-0080

CC:    Lisa Fletcher, Esq., AUSA
       Sahar Amondolare, AUSA
       Stacey LaPorte

A 43

UNITED STATES DISTRICT COURT
NORTHER DISTRICT OF NEW YORK
_____

UNITED STATES OF AMERICA,

                                       **AFFIDAVIT**

    -v-                                   CASE NO. 5:16-CR-320 (DNH)

STACEY J. LAPORTE, JR,

                      Defendant.
_____

State of New York       )
County of Onondaga    )

       I, Stacey J. Laporte Jr., being duly sworn, depose and say that:

1.      On May 17, 2016, I was questioned by an Investigator with the New York State Police at the police station. Before I was picked up by the police, I had been drinking alcohol and smoking marijuana.

2.      After I was transported to the police station by the investigator, I was put in an interview room. While in the interview room, I did not feel I was free to leave because of where I was sitting. The investigator had me sitting in the corner of the room and he was sitting very close to me blocking the door.

3.      Before I was ever read my Miranda warnings the investigator started questioning me. The investigator had a file and two DVD's that he put in front of me. I never saw what was inside. He had told me he had everything he needed in those files. He talked to me for at least twenty minutes before he ever read me my rights.

4.      While in the interview room the investigator said, "you know why you are here" and then told me about some sex crimes I was being accused of. He told me that he already had enough in his file to "put me away for life". The investigator said if I cooperated then there would be "less charges." I asked what would happen if I asked for a lawyer and he said he would make sure he brought a "shit ton" more charges against me.

5.      During the course of the interview the investigator talked about how we can do things the "easy way or the hard way".   He also said that he can be a "nice guy" if I cooperated, but he could also be an "asshole" if I didn't.

6.      I asked if I could go home if I talked to him, he said that "depends on what you say". After I spoke to the investigator for a little while, he read me my Miranda warnings and then handcuffed me to a chair.

A 44

7.      The investigator then left the room and came back a few hours later with a typed statement. I then signed it without reading it or having it read to me. I have since read the statement and there are many things in it that are not true.


I declare under penalty of perjury that the foregoing is true and correct.


_Stacey LaPorte Jr_
Stacey J. LaPorte, Jr.                                              4/3/17
                                                                    Date

_Wendy S. Tiffin_
Witness

A 45

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| **UNITED STATES OF AMERICA** | Criminal No.    5:16-CR-320 (DNH) |
| **v.** | **Second Superseding Indictment** |
| **STACEY J. LAPORTE, JR.** | Violations:    18 U.S.C. § 2251(a) and (e) [Conspiracy to Sexually Exploit a Child] |
| | 18 U.S.C. § 2251(a) [Sexual Exploitation of Children] |
| | 18 U.S.C. § 2252A(a)(2)(A) [Receipt of Child Pornography] |
| | 6 Counts & Forfeiture Allegation |
| **Defendant.** | County of Offense:    St. Lawrence |

## THE GRAND JURY CHARGES:

### COUNT 1
### [Conspiracy to Sexually Exploit a Child]

From in or about 2014 through in or about May, 2016, in St. Lawrence County in the Northern District of New York, defendant **STACEY J. LAPORTE, JR.** conspired with Mackenzie Bailey to use V-1, a minor female child born in 2014 whose identity is known to the grand jury, to engage in sexually explicit conduct for the purpose of producing visual depictions of such conduct, knowing and having reason to know that such visual depictions would be transported and transmitted using a means and facility of interstate and foreign commerce and in and affecting such commerce, and where the visual depictions were produced using materials that had been mailed, shipped, and transported in and affecting interstate and foreign commerce by any means, including by computer, and where such visual depictions were actually transported and

A 46

transmitted using a means and facility of interstate and foreign commerce and in and affecting such commerce, in violation of Title 18 United States Code, Sections 2251(a) & (e).

## COUNT 2
### [Conspiracy to Sexually Exploit a Child]

From in or about April through June, 2015, in St. Lawrence County in the Northern District of New York, defendant **STACEY J. LAPORTE, JR.** conspired with Hillary Trimm to use V-4, a minor female child born in 2014 whose identity is known to the grand jury, to engage in sexually explicit conduct for the purpose of producing visual depictions of such conduct, knowing and having reason to know that such visual depictions would be transported and transmitted using a means and facility of interstate and foreign commerce and in and affecting such commerce, and where the visual depictions were produced using materials that had been mailed, shipped, and transported in and affecting interstate and foreign commerce by any means, including by computer, and where such visual depictions were actually transported and transmitted using a means and facility of interstate and foreign commerce and in and affecting such commerce, in violation of Title 18 United States Code, Sections 2251(a) & (e).

## COUNTS 3 - 4
### [Sexual Exploitation of a Child]

On or about the dates listed below, in St. Lawrence County, in the Northern District of New York, defendant **STACEY J. LAPORTE, JR.**, acting with Mackenzie Bailey, did use V-1, a minor female child born in 2014 whose identity is known to the grand jury, to engage in sexually explicit conduct for the purpose of producing visual depictions of such conduct, knowing and having reason to know that such visual depictions would be transported and transmitted using a means and facility of interstate and foreign commerce and in and affecting such commerce, and where the visual depictions were produced using materials that had been mailed, shipped, and

2

A 47

transported in and affecting interstate and foreign commerce by any means, including by computer, and where such visual depictions were actually transported and transmitted using a means and facility of interstate and foreign commerce and in and affecting such commerce, in violation of Title 18, United States Code, Sections 2251(a) & (e), and 2(a).

| Count | Date |
|-------|-------------|
| 3 | March 2, 2016 |
| 4 | March 3, 2016 |

## COUNT 5
### [Sexual Exploitation of Children]

On or about February 28, 2016, in St. Lawrence County, in the Northern District of New York, defendant **STACEY J. LAPORTE, JR.** did use, persuade, induce, entice, and coerce V-2, a male child born in 2003, and V-3, a female child born in 1999, whose identities are known to the grand jury, to engage in sexually explicit conduct for the purpose of producing visual depictions of such conduct, knowing and having reason to know that such visual depictions would be transported and transmitted using a means and facility of interstate and foreign commerce and in and affecting such commerce, and where the visual depictions were produced using materials that had been mailed, shipped, and transported in and affecting interstate and foreign commerce by any means, including by computer, and where such visual depictions were actually transported and transmitted using a means and facility of interstate and foreign commerce and in and affecting such commerce, in violation of Title 18, United States Code, Sections 2251(a) & (e).

## COUNT 6
### [Receipt Of Child Pornography]

On or about March 25, 2016, in St. Lawrence County in the Northern District of New York, the defendant, **STACEY J. LAPORTE, JR.,** did knowingly receive child pornography using a means and facility of interstate and foreign commerce, shipped and transported in and affecting

3

A 48

such commerce by any means, including by computer, in that the defendant did receive, by way of the Internet and/or a cellular network, graphic image files depicting one or more minors engaged in sexually explicit conduct, in violation of Title 18, United States Code, Section 2252A(a)(2)(A).

## FORFEITURE ALLEGATION

The allegations contained in Counts 1 through 6 of this Indictment are hereby realleged and incorporated by reference herein for the purposes of alleging forfeiture pursuant to the provisions of Title 18, United States Code, Section 2253.

Pursuant to Title 18, United States Code, Section 2253, upon conviction of the charges alleged in Counts 1 through 6, the defendant, **STACEY J. LAPORTE, JR.**, shall forfeit to the United States of America:

a.   Any visual depiction described in Title 18, United States Code, Sections 2251 and 2252A (incorporating the definition of child pornography in 18 U.S.C. §2256(8)), or any book, magazine, periodical, film, videotape, or other matter which contains any such visual depiction, which was produced, transported, mailed, shipped or received in violation of Title 18, United States Code, Chapter 110;

b.   Any property, real or personal, constituting or traceable to gross profits or other proceeds obtained from the offense, and

c.   Any property, real or personal, used or intended to be used to commit or to promote the commission of the offense.

The property to be forfeited includes, but is not limited to:

a.   one Lenovo T61 laptop computer (S/N: L3-MF987 08/09);

b.   one Samsung Galaxy S4 Cell Phone (S/N: R31DB22PATH);

4

A 49

c.      one Apple IPhone 4s (S/N: C8PLFJFVFML3); and

d.      one LG Cell Phone (S/N: 503CYWC0079417).

If any of the property described above, as a result of any act or omission of the defendant:

a.      cannot be located upon the exercise of due diligence;

b.      has been transferred or sold to, or deposited with, a third party;

c.      has been placed beyond the jurisdiction of the court;

d.      has been substantially diminished in value; or

e.      has been commingled with other property which cannot be divided without difficulty,

the United States of America shall be entitled to forfeiture of substitute property pursuant to Title 21, United States Code, Section 853 (p), as incorporated by Title 18, United States Code, Section 2253(b) and by Title 28, United States Code, Section 2461(c).

Dated:    April 20, 2017

A TRUE BILL,

█████████████████████████

Grand Jury Foreperson

RICHARD S. HARTUNIAN
United States Attorney

By: _____
Lisa M. Fletcher
Assistant United States Attorney
Bar Roll No. 510186

5

A 50

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

_____

UNITED STATES OF AMERICA

      v.                              Crim. No. 5:16-CR-320 (DNH)

STACEY J. LAPORTE, JR.,            GOVERNMENT'S RESPONSE TO
                                          DEFENDANT'S OMNIBUS MOTIONS,
                                          AND CROSS MOTION FOR
                                          RECIPROCAL DISCOVERY

                         Defendant.

_____

Dated:  April 21, 2017

                                        Richard S. Hartunian
                                        United States Attorney

                                        */s/Lisa M. Fletcher*
By:    Lisa M. Fletcher
        Assistant U.S. Attorney
        Bar Roll No. 510187

A 51

TABLE OF CONTENTS

I.    STATEMENT OF THE CASE.............................................................1

II.   FACTUAL BACKGROUND ..............................................................2

      A.   The Initial Investigation:.........................................................2

           1.   Disclosure by B.L. ...........................................................2

           2.   St. Lawrence County CPS Investigation re: LaPorte's Children ..........................4

           3.   Disclosure by E.J. ...........................................................4

           4.   Interview and Arrest of LaPorte ......................................4

      B.   Parallel Investigation:  Massena PD and V-3 .........................6

      C.   Interview of Mackenzie Bailey .............................................7

      D.   Interview of Hillary Trimm ..................................................8

      E.   June 2016 Interview of B.L. ................................................10

      F.   Tiffany Matthie turns in the defendant's LG cellular telephone...................................11

      G.   Initial Forensic Examination of Lenovo Computer ...............12

      H.   Disclosure by V-2 ...............................................................12

      I.   Forensic Results:  The Lenovo Computer ............................14

           a.  March 2, 2016 ................................................................14

           b.  March 3, 2016 ................................................................15

      J.   Forensic Examination:  Samsung Cellular Telephone................16

      K.   Forensic Examination: LG Cellular Telephone .....................16

III.  ARGUMENT ....................................................................................17

      A.   The Defendant's Motion for Severance Should Be Denied.........................................17

           1. There is No Substantial Prejudice to the Defendant in Trying All of The
              Counts Together.................................................................18

           2. Evidence of the Defendant's Commission of Any One of the Charged
              Offenses is Nevertheless Admissible to Prove His Commission of the
              Others Pursuant to Fed. R. Evid. 414...............................21

      B.   Admission of Evidence Regarding the Defendant's Sexual Abuse of Others.............25

C.   The Defendant's Statements Should Not be Suppressed, And He Has Raised No Definite, Specific, Detailed, and Nonconjectural Issue of Fact Warranting a Hearing ...................................................................................................................... 25

D.   The Search of the Defendant's LG Cellular Telephone Was Authorized by a Federal Search Warrant, and Suppression Must Be Denied ........................................ 29

IV.   GOVERNMENT'S CROSS-MOTION FOR DISCOVERY ............................................. 29

V.   CONCLUSION .................................................................................................................. 30

The United States of America, by and through its counsel of record, the United States Attorney for the Northern District of New York, submits this memorandum in response to the defendant's motions, filed on March 31, 2017, in which the defendant requests (1) severance of counts, and three separate trials; (2) exclusion of evidence of uncharged bad acts committed against a specific minor; (3) suppression of statements he made to law enforcement; and (4) suppression of evidence obtained from an LG cellular telephone belonging to the defendant.

For the reasons set forth below, the Government maintains that all of the defendant's motions should be denied. The counts of the indictment are properly joined, and the defendant has failed to make a showing that this proper joinder results in substantial prejudice warranting severance. Fed. R. Crim. P. 8(a); Fed. R. Crim. P. 14. Regardless, evidence of each count of the indictment is admissible as to the others under Fed. R. Crim. P. 414 for *any* relevant purpose, making severance even less appropriate. Additionally, the defendant was properly *Mirandized* before his interview with law enforcement, after which he provided voluntary oral and written statements, and the search of the defendant's LG cell phone was not, as he maintains, a warrantless search.

As explained more fully below, the defendant's motions do not raise any issue of fact warranting a hearing.

Further, the Government requests that Court order the defendant to provide reciprocal discovery pursuant to Fed. R. Crim. P. 16(b).

## I.    STATEMENT OF THE CASE

Defendant Stacey J. LaPorte, Jr. was indicted by a grand jury in the Northern District of New York on October 27, 2016, and charged with four felony counts relating to his sexual exploitation of three different children: V-1, an infant female child born in 2014, V-2, a 12-year-

old male child born in 2003, and V-3, a 16 year old female child born in 1999, in violation of 18 U.S.C. § 2251(a) and (e).  Mackenzie Bailey was named as a co-defendant in the first three counts of that indictment relating to the exploitation of, and conspiracy to exploit, V-1.  LaPorte and Bailey were arrested on these charges on October 28, 2016, and detained.

On March 16, 2017, Bailey pled guilty to all three counts with which she was charged.

The indictment against LaPorte was superseded on March 23, 2017 to add a fifth count against LaPorte, charging him with receiving child pornography, in violation of 18 U.S.C. § 2252A(a)(2)(A).

LaPorte filed the instant motion on March 31, 2017.

On April 20, 2017 the grand jury returned a second superseding indictment (hereinafter referred to as "indictment,") adding a sixth count against LaPorte, charging him with conspiracy to sexually exploit a fourth child, V-4, an infant female child born in 2014.  As that indictment was returned after the filing of LaPorte's motion, the Government's response assumes that he would file the same motion to sever this count from the others.  It is worth noting that the facts of this newly-added count were disclosed to LaPorte on November 2, 2016, together with notice that the Government intended to produce this (then-uncharged) evidence in our case-in-chief pursuant to Fed. R. Evid. 414.   Accordingly, there is no reasonable argument that the addition of this count should delay the scheduled trial.

## II.     FACTUAL BACKGROUND

### A.     The Initial Investigation:

#### 1.     Disclosure by B.L.

On September 11, 2013, when B.L. was 14 years old, her mother died of breast cancer. After that, B.L. went to live with her father until, on March 19, 2014, he too passed away.  As a result, B.L. was placed with her closest living relative, the defendant, Stacey J. LaPorte, Jr.  She

was just shy of her 15th birthday.  Over the next two years, B.L. lived with LaPorte at several different locations in St. Lawrence County.  Other adults and children lived with B.L. and LaPorte during various time frames, including LaPorte girlfriends Mackenzie Bailey (and Bailey's infant daughter) and Hillary Trimm (and Trimm's infant daughter).  During the time that B.L. lived with LaPorte, she was raped and sexually abused by him, both alone and together with Mackenzie Bailey.[1]

In January, 2016, B.L. ran away from home, and went to the home of a couple she knew. She told the couple about her abuse by LaPorte.  The couple took her in and told her she needed to report the abuse, and on January 16, 2016 an initial report was made to the Massena Police Department.  When it was determined that the abuse of B.L. was not limited to the Village of Massena, but had also occurred in a number of other locations within St. Lawrence County, the investigation was turned over to the New York State Police (NYSP), and assigned to NYSP Inv. Dewayne Baillargeon.

Through interviews in January, February, and April of 2016, B.L. disclosed a pattern of rape and sexual abuse by LaPorte that began when she was about 11 years old, but which had become more frequent when she had to move in with LaPorte following her father's death when she was in the 9th grade.  She also disclosed that LaPorte had confided in her that he had also "done things" to a number of other children, including the children identified in the instant indictment as V-1 and V-4.

---

[1]      Both LaPorte and Bailey have been indicted by a St. Lawrence County grand jury on a number of sex crimes.  LaPorte is named in all 53 counts of the state indictment, relating to his abuse of B.L., E.J. (discussed below), and the children identified as V-2 and V-3 in the federal indictment.  Bailey is named in 8 of the 53 counts, relating to her participation in the abuse of B.L. and V-3.  The state charges against LaPorte and Bailey are pending in St. Lawrence County Court.

A 56

### 2.    St. Lawrence County CPS Investigation re: LaPorte's Children

On February 18, 2016, the NYSP was advised that St. Lawrence County Child Protective Services was investigating the possible sexual abuse of two of the biological children of Stacey J. LaPorte, Jr., ages 3 and 4.  The younger of the two children had been exhibiting inappropriate sexual behavior indicative of possible abuse.  The NYSP opened a case, and the children were forensically interviewed by NYSP Inv. Sarah Goodrow at the Child Advocacy Center in Franklin County.  No disclosures of abuse were made, but the older of the two children exhibited behavioral cues during the interview that indicated the child was not fully forthcoming when asked questions about LaPorte.

### 3.    Disclosure by E.J.

On March 13, 2016, the mother of then-10-year-old E.J. reported to the NYSP that E.J. disclosed to her that she had been sexually abused by Stacey LaPorte when she was younger, and at his residence.  On March 16, 2016, E.J. was interviewed by NYSP Inv. Leslie Loran at SP Massena.  E.J. detailed an event where LaPorte placed her hand on his penis, penetrated her vaginally with his fingers, and ejaculated.  Based upon information provided in her disclosure, E.J. would have been 5 or 6 years old at the time of the abuse.[2]

### 4.    Interview and Arrest of LaPorte

On May 17, 2016, given the disclosures of rape and sexual abuse by B.L., the suspected abuse of LaPorte's children, and the detailed disclosures of abuse by E.J., NYSP Inv. Dewayne Baillargeon, with Trooper Brian LaBarge, located Stacey LaPorte at a residence in Massena, NY and asked him to go to the NYSP barracks to discuss allegations that had been made against him. *See* Government Exhibit A, Affidavit of Inv. Dewayne Baillargeon.  LaPorte agreed, but stated he

---

[2]    As noted above, LaPorte is indicted in St. Lawrence County for this abuse of E.J.

did not have a ride. Trooper LaBarge provided a courtesy transport for LaPorte, and drove LaPorte

to the barracks.  LaPorte was not handcuffed at any time before or during the transport.   While

getting into the vehicle, LaPorte told Trooper LaBarge that he knew B.L. was making allegations

against him.  *Id*., ¶¶ 4, 7.

At the barracks, LaPorte was placed in an interview room and advised of his *Miranda*

rights.  He acknowledged that he understood the rights, and waived them before any interview

began.  Id. ¶¶ 5 - 6.  During the interview, LaPorte admitted having sexual intercourse with B.L.

as far back as when she was 11 (he would have been 20 years old at the time).  He also admitted

having sexual intercourse with B.L. a number of times after she moved in with him following the

death of her father.  After an interview that lasted less than 90 minutes, LaPorte accompanied Inv.

Baillargeon to a desk where together they worked on writing a written summary of LaPorte's

statements.  Inv. Baillargeon's Affidavit contains a more detailed accounting of the interview, and

the procedure by which the written statement was taken.  With that is copy of LaPorte's written

statement, attached as *Attachment 4* to Inv. Baillargeon's Affidavit.[3]

Also having been assigned to the investigations relating to the possible abuse of LaPorte's

children, and the abuse of E.J., Inv. Baillargeon asked LaPorte if he had sexually abused any

children other than B.L., and LaPorte denied any other victims.  Government Exhibit A, ¶ 9.

Thereafter, LaPorte was arrested and charged with state offenses relating to the rape of

---

[3]      The statement has been redacted in compliance with 18 U.S.C. § 3509(d)(2)(B) and Local Rule,
Criminal Procedure § 1.3.

B.L. and the sexual abuse of E.J.[4]  *Id*., ¶ 13.  LaPorte was arraigned and remanded, with bail set at $1,500 cash/ $2,500 secured bond.[5]  He has been incarcerated since.

**B.    Parallel Investigation:  Massena PD and V-3**

In March, 2016, then-16-year-old V-3 reported to the Massena Police Department that she had been raped by Stacey LaPorte.  She reported that LaPorte and his girlfriend Mackenzie Bailey had been having sexual relations with her for a couple of months, and it was never consensual.  Additionally, LaPorte had tattooed the word "kinky" above V-3's vagina (a tattoo matching one he had given Bailey).

The report to police came after V-2 (then-12-years old) alerted V-3's mother that he had witnessed LaPorte physically assault V-1 and V-3, and then rape V-3.  When she learned of this, V-3's mother took V-3 to the hospital to be examined, and reported the abuse.  The Massena PD opened an investigation.

On March 7, 2016, Hon. Gerald P. Sharlow, Massena Village Justice, issued a search warrant for the St. Lawrence County residence of Stacey LaPorte and Mackenzie Bailey.  The warrant authorized a search of the residence for bedding, electronics, and nude electronic images of V-3, or any children under the age of 18 that support violations of New York Penal Law Sections 130.35 (1) (Rape in the first degree), 260.10 (endangering the welfare of a child) and 235/263 (promoting and possessing a sexual performance by a child).  The search warrant was executed that same day by members of the Massena Police Department.  Recovered during the search warrant were a Lenovo T61 laptop computer (S/N: L3-MF987 08/09), a Samsung Galaxy S4 Cell Phone (S/N: R31DB22PATH ) and an Apple IPhone 4s (S/N: C8PLFJFVFML3).  The warrant

---

[4]    LaPorte did not implicate Bailey in the sexual abuse of B.L. during this statement.

[5]    On March 7, 2017, after LaPorte's arraignment on the 53-count indictment, the St. Lawrence County Court re-set his bail to $500,000 cash/$1,000,000 bond.

was amended on June 20, 2016, as requested by New York State Police Computer Crimes Unit, to specifically allow for the forensic analysis of the electronic devices and media seized from the residence.

Sometime after the March 7, 2016 search warrant execution, LaPorte abandoned the apartment where he and Bailey had been living.  He began dating Tiffany Matthie, and was staying with another couple in the Massena area at the time of his arrest on May 17, 2016.

On May 24, 2016, (a week after his arrest by the NYSP for the rape of B.L. and the sexual abuse of E.J.) LaPorte was arrested by the Massena PD for Rape in the Third Degree for the abuse of V-3.  As LaPorte was charged, and represented, on the NYSP charges, no interview was attempted in relation to the crimes involving V-3.

### C.      Interview of Mackenzie Bailey

On June 8, 2016, NYSP Inv. Dewayne Baillargeon interviewed Mackenzie Bailey.  In a *Mirandized*, recorded interview, and written statement, Bailey told Inv. Baillargeon that she began dating LaPorte in the summer of 2014, and moved in with him shortly thereafter.  B.L. and V-1 also lived with LaPorte and Bailey.  About a month into the relationship, LaPorte told Bailey that he had been sexually abused as a child, and as a result he "needed to do stuff" with V-1 to stop hurting.  Bailey stated that she told him no, several times, but later relented when LaPorte threatened her.  She stated that the first time LaPorte abused V-1, he rubbed the baby's vagina and pressed the tip of his finger inside her.  The baby screamed, LaPorte rubbed his penis on her vagina, and then made Bailey take her away because of the screaming.

Bailey stated that similar abuse of V-1 happened numerous times at each of the apartments where she lived with LaPorte (they were quite transient), and the abuse became more aggressive, with LaPorte attempting anal sex with the baby, until he was finally able to get the tip of his penis into her anus.

Bailey also admitted that she had sexual relations with LaPorte and B.L., and admitted to sexual relations between herself, LaPorte, and V-3. She stated that she was involved in sexual activity with LaPorte and V-3 twice, but that LaPorte had sex with V-3 about 8 or 10 times.

Bailey left LaPorte after the Massena Police executed the search warrant at their home in March, 2016. The recovered Lenovo computer, Samsung phone, and iPhone, belonged to her, but were also used by LaPorte. V-1 was put in the care of her grandmother, and Bailey found a separate place to live, away from LaPorte.

Bailey will be a witness in the Government's case-in-chief.

**D.      Interview of Hillary Trimm**

On June 10, 2016, in a *Mirandized*, recorded interview, Hillary Trimm provided a 5-page written statement admitting that she had allowed LaPorte to sexually abuse, and anally rape V-4, an infant female child, and that at LaPorte's request she had abused the child, and sent images of that abuse to LaPorte using Kik Messenger.[6]

Trimm and LaPorte were prior acquaintances, but became re-connected in 2015 when both were employed at the Massena Walmart.[7] Shortly thereafter, they began a relationship. LaPorte and Bailey were still living together, and still in a relationship, at the same time.

Trimm stated that about three weeks into their relationship LaPorte disclosed to her that he had been sexually abused as a minor and asked if he could do "sexual things" to V-4, as it would

---

[6]      Kik Messenger (Kik) is a free instant messenger application for mobile devices from Kik Interactive, available on iOS, Android, and Windows Phone operating systems. It uses a smartphone's data plan or Wi-Fi to transmit and receive messages, photos, videos, sketches, mobile webpages, and other content after users register a username.

[7]      Trimm, Bailey, and LaPorte were all employed at this Walmart for a short period of time. Trimm worked at the Massena Walmart from February 23, 2015, until she was fired on November 10, 2015. Bailey was hired by Walmart on March 2, 2015, followed by LaPorte, who was hired on March 23, 2015. Their employment was even more short-lived than Trimm's. LaPorte was fired on May 11, 2015, and Bailey was fired on May18, 2015.

bring them (LaPorte and Trimm) closer.  He also told Trimm that he felt physical pain if he went too long without doing sexual things with children.  Trimm stated that LaPorte persisted in this request until she gave in, and in April of 2015 LaPorte had anal sex with V-4 in her presence. Trimm further disclosed that in May of 2015 LaPorte came over to her apartment and had mouth to vagina contact and anal sex with V-4, after which he ejaculated on Trimm's chest.

Trimm stated that LaPorte used Kik to engage her in sexual stories with made-up children, and that LaPorte told Trimm he obtained explicit images of children from other Kik users.

Trimm stated that she used Kik to chat with LaPorte about the sexual abuse of V-4, and at LaPorte's direction, she produced sexually explicit images of V-4, and then sent them to LaPorte at his request.  These images included depictions of V-4's vagina spread open, Trimm licking V-4's vagina, Trimm's finger inserted into V-4's vagina, Trimm's vagina on V-4's face, and Trimm's breast in V-4's mouth.  Trimm stated that LaPorte used an LG cellular telephone.  Neither the chats, nor the images Trimm admits producing, have been recovered in this investigation.  The conspiracy between Trimm and LaPorte to engage V-4 in this activity for this purpose is charged in **Count 2** of the indictment.

Trimm further disclosed that in or about June, 2015 LaPorte told her that Bailey allowed him to "have sex" with V-1, and sent to Trimm a video depicting LaPorte engaged in anal sex with V-1.  Trimm stated that LaPorte sent this video to her by way of Kik messenger.

In or about August 2015 Trimm moved in with LaPorte and Bailey.  B.L. was also living there at the time, and LaPorte told Trimm that B.L. "used to make him do stuff with her."  Trimm lived with LaPorte, Bailey, and B.L. until September of 2015, when TRIMM's mother removed Trimm and V-4 from the situation.

After LaPorte's arrest in 2016 (for the St. Lawrence County charges), Trimm and Bailey had a conversation with one another. In her statement to police Trimm summarized that conversation as follows: "I asked her if she ever felt guilty that we let him do that to [V-1 and V-4]. Mackenzie said yes and we both started crying. I told her I feel like a shit parent right now, and she said 'I know the feeling.' We both weren't proud of it. We never went into detail, because I knew it bothered her as much as it bothered me. I would not wish this on my worst enemy, this is not something a single mother should have to go through."

Bailey corroborates this conversation.

Trimm will be a witness in the Government's case-in-chief.

**E.      June 2016 Interview of B.L.**

B.L. was re-interviewed on June 10, 2016, in relation to her sexual interactions with Mackenzie Bailey, and her knowledge of any abuse of V-1 and V-4. B.L. disclosed that LaPorte and Bailey had engaged her in "threesomes," and that Bailey had mouth to vagina contact with B.L., and had digitally penetrated her. B.L. discussed further the statements LaPorte had made to her regarding his abuse of other children, and stated that LaPorte had confided in her that he wanted to break up with Bailey and Trimm, but could not because they both had "dirt" on him. LaPorte told B.L. that he had "stuck his dick into [V-1] and [V-4]'s vagina." LaPorte also told B.L. "he could only fit the tip of his dick into one of the girls, but he could [fit] more of his dick into the other." B.L. also disclosed that during Christmastime of 2015 two of LaPorte's biological children were at the home where B.L. lived with LaPorte. She recalled that LaPorte took the children upstairs, and B.L. heard one of the children crying uncontrollably and saying "Daddy, no."[8]

B.L. will be a witness in the Government's case-in-chief.

---

[8]      Trimm reports that LaPorte admitted to her that he has abused one of these children. These are the two children discussed in Section II(A)(2), above.

**F.      Tiffany Matthie turns in the defendant's LG cellular telephone**

After learning from Hillary Trimm that LaPorte had used an LG cellular telephone, and knowing that no LG phone had been recovered during the execution of the Massena PD search warrant, on June 17, 2016 NYSP Invs. Nicholas Arcadi and Dewayne Baillargeon went to the home of LaPorte's then-girlfriend Tiffany Matthie to see if she had possession of that phone or any other electronic media belonging to LaPorte. *See* Government Exhibit B, Affidavit of Inv. Nicholas Arcadi. Matthie said that LaPorte had not left any electronics at her apartment. She consented to a search of her apartment for such electronic media, and signed a written consent to search, witnessed by her mother. *Id.*, ¶ 6. No media was discovered at Matthie's residence that day.

During continued investigation, a witness told Inv. Arcadi that he was sure that Matthie had the LG cellular phone. *Id.*, ¶ 7. As a result, on June 18, 2016, Inv. Arcadi went back to Matthie's apartment, told her he had information that she was in possession of the phone, and she turned over to Inv. Arcadi the defendant's LG cellular telephone, indicating that a person she did not know had appeared at her apartment after Invs. Arcadi and Baillargeon left the day before, and gave it to her. *Id.*, ¶ 8.

The phone was secured. *Id.*, ¶ 9. On August 23, 2016 a federal search warrant (discussed further, below) was issued by Hon. Thérèse Wiley Dancks authorizing, among other things, the search of that LG phone. Government Exhibit C, Federal Search Warrant. On August 24, 2016, the day after the warrant was issued by Judge Dancks, the LG phone was taken from the NYSP evidence vault in Raybrook, NY and delivered to the NYSP Forensic Investigation Center in Albany, where, in September, 2016, analysis of the data contained on the phone was begun, as authorized by the federal search warrant. Government Exhibit B, ¶ 9.

### G.      Initial Forensic Examination of Lenovo Computer

NYSP Inv. Todd Svarczkopf conducted an initial forensic examination of the Lenovo computer seized from the LaPorte and Bailey residence on March 7, 2016.  During that review, Inv. Svarczkopf recovered a Kik chat between LaPorte and Bailey in which LaPorte directed Bailey to perform certain sexual acts with V-1.  The chats show that Bailey performed the requested acts on the child, and sent images depicting those acts to LaPorte.  These images of abuse were recovered from the Lenovo computer.[9]  (Some of the acts are the same as those LaPorte had requested Trimm to perform on V-4.)

With this, the NYSP realized that they had at least one additional victim, and a federal case, and contacted HSI SA Chad Willard for assistance.  While the state warrant was clearly sufficient for the examination conducted by Inv. Svarckopf, further examination was halted pending application for a federal search warrant that would broaden the scope of the authorized search to include other relevant evidence.  Additionally, as described above, the warrant included a request to authorize forensic examination of the LG cellular telephone that had been turned in by Tiffany Matthie.  No examination of any item other than the preliminary review of the Lenovo computer had been conducted at the time of the federal warrant application.  It was only after the federal warrant authorized by Judge Dancks was issued that forensic examination of the Lenovo computer resumed, and examination of the other items seized, including the LG phone turned in by Tiffany Mattie, began. (This warrant was provided to defense counsel in discovery on January 25, 2017.)

### H.      Disclosure by V-2

V-2 is the brother of V-3.  In 2016 he was 12 years old.  While he initially disclosed his observations regarding the abuse of V-3, his demeanor made it clear to investigators that had

---

[9]      This information was not known to Inv. Baillargeon at the time he interviewed Mackenzie Bailey on June 8, 2016.

additional information he had yet to disclose.  On October 4, 2016, he was interviewed by Inv. Baillargeon.

In this interview, V-2 admitted that on occasion he went to LaPorte's apartment with V-3. Each time, LaPorte provided V-2 with alcohol.  On one occasion, LaPorte forced V-2 to watch LaPorte have sex with V-3.  On another occasion (February 28, 2016) LaPorte held V-2 down and took off his clothes, after which V-3 engaged in sexual activity with V-2.  V-2 related to Inv. Baillargeon that V-3 took pictures of the sexual activity, and sent the images to LaPorte.

Kik chats and images recovered from the Samsung phone seized from LaPorte's residence corroborates this event, which is charged as **Count 5**.  The chats show that while the activity between V-2 and V-3 was occurring, LaPorte was texting to V-3 and instructing her on what he wanted her to do to V-2.  In the chats, LaPorte (using the username fastfsmily25) tells V-3 to tell V-2 that he (LaPorte) will give him three cigarettes if he "does this."  V-3 asks if LaPorte wants to watch, and he says "No hehe."  V-3 then says "Ok he's going to do it," and LaPorte tells her "Tell me when he's in u."  They then exchange texts regarding what is happening between V-3 and V-2, including V-2 putting his fingers inside V-3, her reporting that V-2 is "so scared," and LaPorte instructing V-3 to take a hold of V-2's penis.  When V-3 tells LaPorte she is holding V-2's penis, LaPorte tells her: "Prove it without him knowing take a pic."  He insists on the picture: "Hurry and show fake like your texting and take a pic."  She does, and sends him a recovered image depicting her hand on V-2's penis.  The mother of V-2 and V-3 has identified both children in this image, and has turned over to the NYSP the distinctive neon green shorts worn by V-2 in the picture.  LaPorte then instructs V-3 to get V-2 "rock hard" and to get on top of him and insert V-2's penis inside her.  V-3 tells LaPorte "no pictures," but LaPorte insists, "one pic."  V-3 takes and sends an image to LaPorte depicting her naked body from the stomach down on top of and

straddling V-2.  This image is also recovered from the Samsung phone as a part of the chat with LaPorte.

V-2 and V-3 will be witnesses in the Government's case-in-chief.

**I.       Forensic Results:  The Lenovo Computer**

Forensic analysis of the Lenovo computer seized from LaPorte's residence has revealed Kik chats and images exchanged between LaPorte and others.  It also reveals that an iPhone, and an LG phone have been synched to the computer.  In relation to Bailey and V-1 in particular, two separate dates of chat, March 2 and March 3, 2016, show LaPorte instructing Bailey to commit specific sexual acts on V-1, and to send images to him.  The username under which these chats were conducted is also "fastfsmily25."  The conspiracy between Bailey and LaPorte to engage V-1 in this type of activity for this purpose is charged in **Count 1** of the indictment.

Witnesses will testify that fastfsmily25 was a username used by LaPorte, and is a reference to the movie series "Fast and Furious," of which LaPorte is a big fan.  Also, in another set of recovered chats, Bailey sends selfies to LaPorte, and he, in turn, using the fastfsmily username, sends a selfie of himself back to her.  In other recovered chats, LaPorte indicates that his three biological children are all named after "Fast and Furious:" the first two are named after cars, and his third biological child is named after a character in the series.  That child's mother, Hillary Trimm, confirms that fact.

**a.       March 2, 2016**

Recovered Kik chats from March 2, 2016 include 10 images produced by Bailey of V-1 during the course of chats between Bailey and LaPorte, including sexually explicit images of V-1, and show Bailey's distribution of the images to LaPorte via Kik.  They also show LaPorte instructing Bailey which acts of abuse he wanted her to perform on V-1.  For example, LaPorte tells Bailey "use her foot and rub," Bailey says "I am," he tells her "push it in," she says "ok," and

A 67

he says "Mmmm show me," and "show me foot in u." Bailey then sends to LaPorte an image of V-1's foot in Bailey's vagina. There are similar chats for the other images produced and distributed to LaPorte by Bailey, including a chat where LaPorte tells Bailey: "Mmmm eat that pussy," Bailey replies, "ok," and LaPorte says: "Show me pic." Bailey then sends to LaPorte two images that depict her licking V-1's vagina. The exploitation of V-1 to produce these images is charged in **Count 3** of the indictment.

### b.    March 3, 2016

Another series of chats and images recovered from the Lenovo computer relate to a separate event the following day, March 3, 2016. Again, under the username "fastfsmily25," these Kik chats include 7 images produced by Bailey of V-1 and distributed from her to LaPorte via Kik. The images include a nude image of V-1 where her hair, but not her face, is clearly visible, close-ups of the baby's vagina, and several of Bailey putting her finger into V-1's vagina. The chats show that the images were produced by Bailey at the direction of LaPorte. For example, after LaPorte tells Bailey "Spread that pussy," Bailey says "ok" and sends a close-up of V-1's vagina being spread open by Bailey's fingers. LaPorte instructs Bailey to "work that pussy open," tells her that her finger "needs to go at least to the second knuckle," and tells her to "show as you go." This is followed by a series of images of Bailey's finger inserted into V-1's vagina. The chats continue during this progression, with the apparent goal to get V-1 ready to have sex with LaPorte. LaPorte is clearly in the apartment when this is happening, as after Bailey tells him she is able to get her thumb into V-1's vagina, LaPorte instructs her: "Keep your thumb in her and bring her in here." After this, additional chat seems to confirm LaPorte's sexual abuse of V-1, as he tells Bailey: "Can't believe I made her cum." Bailey says: "Ikr [I know right] didn't think she could an

told you you could get it in her." LaPorte replies: "Lol," "Do that shit all day long lol." The exploitation of V-1 to produce these images is charged in **Count 4** of the indictment.

> **J.**      **Forensic Examination: Samsung Cellular Telephone**

As described above, the sexual exploitation of V-2 and V-3 at LaPorte's urging is corroborated and depicted in chats and images forensically recovered from the Samsung phone recovered from LaPorte and Bailey's residence. The exploitation of V-2 and V-3 to produce these images is charged in **Count 5** of the indictment.

> **K.**      **Forensic Examination: LG Cellular Telephone**

On March 25, 2016, using a Kik Messenger account under the username PROUDDADDY3_15_16, LaPorte engaged in a Kik chat with user banx75. This chat (or what may be a portion of the chat) was located on the defendant's LG cellular telephone turned in by Tiffany Matthie. The chat is in a place on the phone where it is accessible to the user, as are the images received by LaPorte during the chat.

In the chat, LaPorte told banx75 that he could provide live images of his "passed-out sister," and asked if banx75 has kids. Banx75 told LaPorte he does not have kids, but has been a great "step dad, buddy, father figure, and has friends with daughters…and that he has done some pretty extreme stuff." LaPorte then asked banx75: "so tell me a few short but detailed stories and I will share my pics live after," and specified that he "[o]nly want[s] extrem. Baby stories of u and them." In response, banx75 stated: "Choked, smacked, flicked, lightly (no Ipud marks) burned, scared, locked in closet with 7 foot Burmese python, cumchoked, choked out, more" and then sent to LaPorte two different image files, each depicting the face of an infant, one with an adult penis in the baby's mouth, the other with a hand holding an adult penis next to the baby's mouth.

After LaPorte received these images, banx75 asked "Still there" to which LaPorte responded: "Yes," and said: "If you can send my (sic) some extrem baby hard core pics and vids

I'm all yours with her."  Among other things, banx75 responded: "I send, you send.  Two way highway," to which LaPorte responded: "Ok then bye."  LaPorte's receipt of the sexually explicit infant images from banx75 is charged in **Count 6** of the indictment.

Information from witnesses confirms that LaPorte often used Kik to obtain child pornography from other people.  Other images of child pornography also recovered from LaPorte's LG phone originated through Kik, but no longer have saved chats associated with them.  Additionally, witness testimony and other evidence confirms LaPorte's identity as user PROUDDADDY3_15_16.  For example, in another recovered chat, LaPorte, using this account, sent selfie to Hillary Trimm.  Additionally, 3/15/16 is the date of birth of one of LaPorte's children.

## III.   ARGUMENT

The Government will respond to the defendant's motions in the order they were presented by him.

### A.   The Defendant's Motion for Severance Should Be Denied

LaPorte moves to sever the counts relating to V-1 from the count relating to V-2 and V-3, and all of those from the receipt count, requesting, pursuant to Fed. R. Crim. P. 14, that they be "trifurcated" into three separate trials.  Defendant's Motion, pp. 4, 5 – 8.  As the indictment was superseded (and the counts re-numbered) after the defendant filed his motions, the Government will assume that LaPorte would also move to sever the newly-added count regarding his conspiracy with Trimm to sexually exploit V-4, and request *four* separate trials.

As an initial matter, all of the counts of the indictment are properly joined under Rule 8(a), and LaPorte does not argue otherwise.  Instead, he maintains that the evidence on each count, or set of counts, would be overly prejudicial to the jury's consideration of the other counts, thereby depriving him of a fair trial as to each charged offense (or set of offenses).  *Id*. at 7 – 8.

A 70

For all of the reasons set forth below, the defendant's argument is without merit, and his motion for the severance, of any count, should be denied.

**1.      There is No Substantial Prejudice to the Defendant in Trying All of The Counts Together**

LaPorte argues that the proper joinder of the counts contained in the indictment creates a situation that is unfairly prejudicial.  Fed. R. Crim. P. 14.  The decision to grant relief for a claim of prejudicial joinder lies with the sound discretion of the Court.  *United States v. Werner*, 620 F.2d 922, 926 (2d Cir. 1980) ("the grant of relief under Rule 14 lies within the discretion of the trial judge and refusal to sever counts or defendants properly joined under Rule 8 will be reversed only if discretion was abused.")  However, as even LaPorte recognizes, "[i]n order to prevail, the defendant must show not simply some prejudice but substantial prejudice." *Id*., at 928, citing *United States v. Ochs*, 595 F.2d 1247, 1260 (2d Cir. 1979) ("We are reluctant to overturn a conviction for denial of a motion for severance unless there is a showing of substantial prejudice. . . . It is not sufficient merely to show that the accused would have had a better chance for acquittal at a separate trial.")

LaPorte bases his severance motion on the argument that child pornography crimes are, by their very nature, prejudicial, and generally maintains that trying the counts together would result in prejudicial "spillover."  Defendant's Motion, pp. 6 – 7.

Compelling the denial of LaPorte's motion to sever, and not mentioned in his motion, is the Second Circuit's decision in *United States v. Rivera*, 546 F.3d 245 (2d Cir. 2008) *cert. denied*, 555 U.S. 1204, (2009).  There, the district court denied the defendant's "motion to sever counts two (enticement of Brian) and three (interstate travel relating to Brian) from counts one (enticement of Garrett), four (production of child pornography depicting David) and five (possession of child pornography)." *Id.* at 253.  The Court of Appeals affirmed, holding not only

A 71

that joinder of the multiple counts involving multiple victims was proper under Rule 8(a), but also that the defendant's generalized claim of prejudicial "spillover" was insufficient to support a Rule 14 severance.  *Id.* at 254.  Moreover, and as is also the case here, the Court of Appeals noted that Fed. R. Evid. 414 "*specifically sanction[s]* the kind of showing that Rivera says is impermissible and conducive to spillover."  *Id.*  (emphasis added).  *See* Section III(A)(2), below.

The cases cited by LaPorte do not hold otherwise.  For example, *United States v. Harvey*, 991 F.2d 981 (2d Cir. 1993) does not hold, as LaPorte maintains, that "evidence of child pornography carries a 'substantial risk of inflaming the jury'."  Defendant's Motion, p. 6.  Instead, the case holds that it was erroneous and prejudicial to allow evidence of "*adult* X-rated videotapes, *which did not involve* either child pornography or simulated child pornography," and that it was *not* error to admit evidence of (otherwise legal) simulated child pornography to rebut an entrapment defense in a trial for receipt of child pornography.  *Id.* at 994 - 996 (emphasis added).[10]

Apparently recognizing that his battle is entirely uphill, the defendant's only support for this argument comes from two factually-dissimilar out-of-district district court opinions: one that granted severance of a SORNA offense from a count of possession of child pornography,[11] and

---

[10]     LaPorte's other cited cases fare no better in supporting his argument.  *United States v. Alessi*, 638 F.2d 466 (2d Cir. 1980) involved a multi-defendant credit card scheme; *United States v. Curtin*, 489 F.3d 935 (2d Cir. 2007) upheld the admission of testimony about the content of explicit stories, possessed by the defendant, that described sexual acts with children to show his intent, knowledge, or method in an enticement case; and *United States v. Loughry*, 660 F.3d 965 (7th Cir. 2011) held that it was error to admit *uncharged* hard core child pornography under Rule 414 because it was more disturbing than the images charged in the indictment.

[11]     LaPorte mischaracterizes this case as one that "severed child pornography counts from *other sex crimes*."  Defendant's Motion, p. 6 (emphasis added).  A violation of the Sex Offender Registration and Notification Act (SORNA) is a registration offense, and *not* a sex crime.  *See* 42 U.S.C. § 16911(5) (definition of sex offense); *see also*, U.S.S.G. § 5D1.2, App. n. 1 (same).

A 72

another that severed a firearms offense from a child pornography offense.  Neither case supports

his argument.[12]

In *United States v. Caraway*, 2010 WL 275084 *3 (W.D.N.Y. Jan. 20, 2010) the district

court found that a SORNA offense was improperly joined with possession of child pornography

under a Rule 8(a) analysis.[13]  Its finding, thereafter, that it would be prejudicial to the jury's

decision on the child pornography offense for it to also hear evidence that the defendant is a

convicted sex offender (in proving the failure to register count), is mere dicta.  Notably, the

*Carraway* court specifically acknowledged that a registration violation under SORNA is

fundamentally different from a sex abuse offense, and contrasted its facts with those in the Second

Circuit's controlling decision in *United States v. Rivera*, 546 F.3d 245, discussed above.

Equally unhelpful to LaPorte's motion is *United States v. Strum*, 2007 WL 601976 (D.

Colo. 2007), in which the district court severed a count charging the defendant as a felon in

possession of a firearm (18 U.S.C. § 922(g)), from a possession of child pornography charge.

Without deciding the defendant's motion that the counts were improperly joined under Rule 8(a),

the district court "exercised [its] discretion" to sever under Rule 14 because of the "dissimilarity

of the two counts," noting that child pornography, as opposed to the possession of a firearm, is

"particularly detestable and inflammatory conduct."  *Id*. at *4.  While the district court in *Strum*

did not rule on the defendant's Rule 8(a) joinder argument, which it should have, it did

acknowledge the Court of Appeals decision in *United States v. Smith*, 795 F.2d 841 (9th Cir 1986)

---

[12]     The defendant attempts to bolster the effectiveness of his argument by referring to each of these
two cases in the plural, rather than the singular, referring to the Western District of New York as "Second
Circuit courts," and the District of Colorado as "other federal courts." Defendant's Motion, pp. 6, 7.

[13]     While severance under Rule 14 is discretionary, improper joinder under Rule 8 is reversible error,
"unless the error was harmless."  *Werner*, 620 F.2d at 926.

which found that joinder of a firearms charge with child pornography counts was improper under Rule 8. Even so, because the defendant in *Smith* had not raised the Rule 8 motion below, the Ninth Circuit on appeal turned to a Rule 14 prejudice analysis, and, finding no substantial prejudice, *upheld* the district court's denial of the motion to sever. Ironically, the argument in *Smith* was that evidence of the presence of a firearm would prejudice the jury on the child pornography counts. *Id*. at 851.

Here, as in *Rivera*, the defendant's generalized claims fail to meet the "substantial prejudice" showing required for relief under Rule 14.

> **2.      Evidence of the Defendant's Commission of Any One of the Charged Offenses is Nevertheless Admissible to Prove His Commission of the OthersPursuant to Fed. R. Evid. 414.**

As noted by the Second Circuit in *Rivera*, Rule 414 "sanctions" the admission of evidence of each of the offenses charged against LaPorte as proof of his commission of the others. 546 F.3d at 254.

Fed. R. Evid. 414(a) provides that in a criminal case where, as here, a defendant is accused of "child molestation," evidence of the defendant's commission of "any other child molestation" is admissible, and "may be considered on any matter to which it is relevant." As relevant here, Rule 414 defines "child molestation" to include "any conduct prohibited by 18 U.S.C. chapter 110." Fed. R. Evid. 414(d)(1)(B). All of the crimes charged in the instant indictment are Chapter 110 offenses. Further, Rule 414(d)(1) defines "child" (for purposes of this rule) as a person below the age of 14. Here, each count involves a child who was under age 14 at the time of the offense.

Accordingly, Rule 414 allows, in the prosecution of any one of the counts of the instant indictment, admission of evidence - *for any relevant purpose* - of the defendant's commission of the crimes charged in any or all of the other counts. While propensity is of course one relevant purpose, here evidence of each of the charged offenses has other relevant applications to the others.

For example, identity.  The defendant maintains that he was not the participant in the March 2016 chats encouraging Mackenzie Bailey to sexually abuse V-1, nor was he the participant in the February, 2016 chat encouraging V-3 to take sexually explicit images of V-2.  However, all three of these chats, which occurred only days apart, were conducted using a Kik user account witnesses will tie to the defendant.  Likewise, Bailey will testify that LaPorte was the user of fastfsmily directing her to abuse V-1, while V-2 and V-3 will testify that LaPorte was the user of the fastfsmily Kik account directing their production of images as well.  Accordingly, proof that LaPorte was the participant "fastfsmily25" in any one of these crimes is proof that he was the participant in the other.

Additionally, the method by which the defendant encouraged the production of the child pornography involved in each count is sufficiently similar, and unique in its characteristics, to provide further proof of the defendant's identity.  As such, proof of LaPorte's conspiracy with Bailey toe exploit V-1, for which there are recovered images, provide evidence of LaPorte's similar conspiracy with Trimm to exploit V-4, a baby of similar age, for which there are no recovered images.

Further, the defendant's chat with banx75 (Count 6) is further proof of his identity and his commission of the other offenses.  In that chat, the defendant receives images of infants with penises in or near their mouths, and responds that he is, instead, looking for "extrem[e] baby hard core pics," evidence of his interest in babies (i.e. V-1 and V-4), and "extreme" conduct with them (i.e. the anal rape of V-1 and V-4).  Moreover, as the defendant denies he committed any of the acts alleged in the indictment, it is logical that his response to witness testimony naming him as a participant will be to attack their testimony as fabrication and/or collusion, only strengthening the argument that proof of each offense is relevant evidence of his commission of the others.

A 75

Together with Rules 413 and 415, Rule 414 was designed to "supersede in sex offense cases the restrictive aspects of Federal Rule of Evidence 404(b)" and to create a *presumption* that such evidence is "typically relevant and probative, and that its probative value is normally not outweighed by any risk of prejudice or other adverse effects." 140 Cong. Rec. H8992 (1994) (remarks by principal House sponsor, Rep. Molinari). Congress recognized and intended that this approach would make the admission of similar evidence in federal sex offense cases the norm, and its exclusion the exception. *See* 140 Cong. Rec. H8991 (statement by Rep. Molinari) ("In child molestation cases, for example, a history of similar acts tends to be exceptionally probative because it shows an unusual disposition of the defendant - a sexual or sado-sexual interest in children - that simply does not exist in ordinary people.")

As such, while evidence of other acts of child molestation may be prejudicial, even highly so, it is not automatically excluded for that reason.  Instead, where, as here, the evidence as to any one count is relevant and probative as to each of the other counts, it should be excluded only if *unfairly* prejudicial.  *United States v. Davis*, 624 F.3d 508, 512 (2d Cir. 2010).

While district courts have wide discretion in determining whether certain evidence would be *unfairly* prejudicial, that discretion "is necessarily informed by Congress's expectation that convictions within [Rule 414's] ambit would normally be admitted and that their prejudicial value would normally not be outweighed by the risk of prejudice, … an expectation normally to be honored unless application of the rule would offend the Due Process Clause." *United States v. Donaldson*, 577 F. App'x 63, 65 (2d Cir.) (summary order), *cert. denied* __ U.S. __, 135 S. Ct. 173 (2014), quoting *Davis*, 624 F.3d at 512. (internal quotation marks omitted); *United States v. Levy*, 594 F. Supp. 2d 427, 440 n.6 (S.D.N.Y. 2009), *aff'd* 385 F. App'x 20 (2d Cir.), *cert. denied* 562 U.S. 1051 (2010) ("Unfair prejudice means an undue tendency to suggest decision on an

improper basis commonly, though not necessarily, an emotional one.") (internal quotation marks omitted).

For example, the defendant in *United States v. Levy*, 594 F. Supp. 2d 427, was tried for production and distribution of child pornography based upon images he produced of his abuse of a 5 year old girl that he then distributed, along with other videos of child pornography, over the Internet. *Id*. at 429. Over the defendant's objection, the Government was allowed to admit evidence that Levy had had prior sexual contact with children, and had previously possessed child pornography, as the evidence was "relevant to show his sexual interest in children and his propensity or disposition of character to engage in sexual acts involving children." *Id*. at 440. This evidence included "immensely disturbing" videos depicting "young girls – some only six years old or even younger – being subjected to horrendous acts." *Id*. While "highly prejudicial," this evidence was not "*unfairly* prejudicial," as it was evidence "that showed, convincingly, that Levy *had a sexual interest in children and the intent and desire to commit the charged crimes*." *Id*. (second emphasis added). The same can be said here for LaPorte. As in *Levy*, and for all of the same reasons set forth therein, evidence of any one of the crimes charged in the instant indictment "tend[s] to prove that it [is] more probable that [LaPorte] committed the [other] act[s] charged." *Id*. *See also United States v. LeMay*, 260 F.3d 1018, 1028-29 (9th Cir. 2001), *cert. denied* 534 U.S. 1166 (2002) (testimony of prior acts of child molestation were "relevant to bolster the credibility of the [child] victims" who the defendant accused of fabricating the allegations.)

Accordingly, LaPorte's motion to sever, even if it did not pass a Rule 14 challenge, which it does, should nevertheless be denied, as evidence of each of the charged counts is admissible evidence as to his commission of all of the others under Rule 414. *See Rivera*, 546 F.3d at 254.

**B.      Admission of Evidence Regarding the Defendant's Sexual Abuse of Others**

Next, LaPorte moves to exclude uncharged sex crimes involving a minor identified as D.B. Defendant's Motion, pp. 8 – 9.  On February 10, 2017, the Government provided notice of our intent to elicit evidence of this abuse.  We no longer intend to use this evidence at trial. Accordingly, this motion is moot.

That being said, on November 2, 2016, the Government provided notice to counsel, pursuant to Fed. R. 414, that we intend to offer evidence of the defendant's hands-on sexual abuse of other children (including, B.L., E.J., and V-4), and provided him with written summaries of that abuse.  The defendant has not moved to preclude this testimony.  Regardless, the abuse of V-4 is now charged in the indictment, and is no longer uncharged conduct subject to a Rule 414 analysis. Accordingly, it will be tried with all of the other charged counts, as discussed above.

As the defendant has not challenged our intention to offer evidence of his abuse of B.L. and E.J., the Government will separately address the admissibility of that evidence, and our intentions to use it in our case in chief, in a pre-trial motion *in limine*.

**C.      The Defendant's Statements Should Not be Suppressed, And He Has Raised No Definite, Specific, Detailed, and Nonconjectural Issue of Fact Warranting a Hearing**

The defendant moves to suppress statements he made to NYSP Inv. Dewayne Baillargeon, as well as "any, and all, evidence derived therefrom."  Defendant's Motion, p. 9.  As there is no evidence that was "derived" from any of the defendant's admissions, that part of his request is moot.

A defendant's custodial confession is admissible so long as the defendant knowingly and voluntarily waived his Fifth Amendment rights after having been advised of them pursuant to *Miranda*. The Government must prove, by a preponderance of the evidence and under the totality of the circumstances, that a defendant voluntarily relinquished his rights, and did so with an

awareness of his rights and the consequences thereof.  *Moran v. Burbine*, 475 U.S. 412, 421 (1986);

*Colorado v. Connelly*, 479 U.S. 157, 168 (1986).  Here, the detailed affidavit of Inv. Baillargeon,

with the corroborating documents attached thereto, provides that proof.  Government Exhibit A.

While the defendant's grounds for suppression are somewhat difficult to divine from the

motion and accompanying affidavit, he has nevertheless failed to sufficiently raise any factual

issue that requires a hearing.

> "A defendant seeking the suppression of evidence is not automatically entitled to
> an evidentiary hearing on his claim; rather, the defendant must first 'state sufficient
> facts which, if proven, would [require] the granting of the relief requested.'" *United
> States v. Seijo*, No. 02 Cr. 1415, 2003 WL 21035245, at *4 (S.D.N.Y. May 7, 2003)
> (quoting *United States v. Kornblau*, 586 F.Supp. 614, 621 (S.D.N.Y.1984)). The
> defendant must show "that disputed issues of material fact exist before an
> evidentiary hearing is required." *United States v. Viscioso*, 711 F.Supp. 740, 745
> (S.D.N.Y.1989) (citation omitted). The defendant's allegations, moreover, must be
> "definite, specific, detailed, and nonconjectural." *United States v. Pena*, 961 F.2d
> 333, 339 (2d Cir.1992) (internal quotations and citations omitted).

*United States v. Younis*, 2011 WL 1485134 (S.D.N.Y. 2011).

First, LaPorte states that he had been drinking alcohol and smoking marijuana before he

was picked up by police, but does not give a time frame, allege that he had over-indulged to the

extent that he was incapacitated, or assert that his voluntary intoxication in any way affected his

ability to make a voluntary statement.  "Intoxication and fatigue do not automatically render a

confession involuntary; rather, the test is whether these mental impairments caused the defendant's

will to be overborne."  *United States v. Casal*, 915 F.2d 1225, 1229 (8th Cir. 1990).  As affirmed

in Inv. Baillargeon's affidavit, there were no objective signs of intoxication, nor was the defendant

unable to communicate in a lucid manner.  Government Exhibit A, ¶ 8.  Accordingly, LaPorte's

generalized statement that he had consumed an undisclosed amount alcohol and marijuana at some

unspecified time before his encounter with the police does not render his statement inadmissible,

nor does it provide a sufficient issue of fact to require a hearing.  *United States v. Gaddy*, 532 F.3d

A 79

783, 788 (8th Cir. 2008) ("For instance, we have upheld the conclusion that a suspect who recently used methamphetamine and had not slept for five days voluntarily waived his *Miranda* rights where police officers testified that they had no knowledge of these alleged impairments and the suspect did not act intoxicated. Similarly, we have upheld a district court's conclusion that a suspect who used methamphetamine the evening before and marijuana the day he waived his rights consented voluntarily because police officers testified he appeared sober and in control of his facilities.), citing *Casal*, 915 F.2d at 1229, and *United States v. Contreras*, 372 F.3d 974, 977 (8th Cir. 2004) (internal quotation marks omitted); *see also Linnen v. Poole*, 766 F. Supp. 2d 427, 451 (W.D.N.Y. 2011) ("Courts in this Circuit have held that "[a] statement may still be voluntarily given even when the speaker is intoxicated or under the influence of drugs, as there is no *per se* rule that a confession given under such circumstances is involuntary."), quoting *United States v. Wyche,* 307 F. Supp. 2d 453, 463 (S.D.N.Y. 2004), and collecting cases.

Second, LaPorte maintains that there was some infirmity in the advisement of his *Miranda* warnings by claiming that Inv. Baillargeon "talked to [him] for at least twenty minutes" before advising him of his rights.  Defendant's Affidavit, ¶ 3.  Not only is this allegation patently false, it is also irrelevant, as LaPorte does not maintain that he made any statements before being advised of his rights  - and even more importantly, he never alleges that he did not understand or waive his rights.[14]

As outlined in Inv. Baillargeon's affidavit, and as corroborated by the documents attached thereto, the defendant was provided a courtesy transport to the NYSP barracks beginning at 5:55

---

[14]     While the defendant's motion purports to attribute certain statements to the investigator before the *Miranda* rights were administered (under LaPorte's erroneous characterization of when that occurred), that version of events is not consistent with the timeline given in LaPorte's affidavit.  Regardless, *nowhere* is there an allegation that the defendant said anything before his rights were read to him, nor are there any allegations that he did not understand and waive those rights.

p.m., arrived there at 5:58 p.m., and was read his rights at 6:04 p.m., before any questioning took place.[15]  Government Exhibit A, ¶¶ 4, 5.  There was simply no 20-minute period of time in the entire interaction where *anything* happened with the defendant before he was advised of his rights. Additionally, whether LaPorte felt that he was free to leave during the interview that ensued thereafter, or whether he was handcuffed (he was not), is irrelevant.  As the defendant was properly advised of his rights and waived them, the Government need not prove that his was a non-custodial interview.

Third, LaPorte makes other false allegations regarding his statement.  Under no version of events was the defendant left in a room for "a few hours" and then asked to sign a statement he had not seen or did not read.  The *entire encounter* with the defendant, beginning with his courtesy transport at 5:55 p.m., lasted 2 ½ hours.  LaPorte's statements to the contrary are belied by the objective evidence attached hereto.  After *Miranda* was administered at 6:04 p.m., LaPorte spoke with Inv. Baillargeon for less than 90 minutes, following which a written affidavit was prepared, with the assistance of the defendant.  *Id.*, ¶¶ 8, 10.  As documented on the signed statement itself, the process of preparing, reviewing, and executing that statement took only one hour.  *Id.*, *Attachment 4*.  The defendant and Inv. Baillargeon began the written statement at 7:30 p.m., and it was completed, reviewed, and printed at 8:30 p.m. *Id.*, ¶ 10.  The defendant then took the printed statement form, read, initialed, and signed the rights on the first page, read the statement, and then signed each page, including the final signature under penalty of perjury.  *Id.*, 11, 12.

As LaPorte has raised no credible or "definite, specific, detailed, and nonconjectural" allegation bearing on the voluntariness of his statement, there is no factual dispute this Court need decide, and accordingly no evidentiary hearing is warranted.  *Pena*, 961 F.2d at 339.

---

[15]     A copy of the card from which Inv. Baillargeon read the *Miranda* rights to the defendant before the interview commenced is attached to his affidavit as Attachment 2.

D.     **The Search of the Defendant's LG Cellular Telephone Was Authorized by a Federal Search Warrant, and Suppression Must Be Denied**

Finally, the defendant moves to suppress evidence recovered from his LG cellular telephone, erroneously characterizing the analysis of the phone as a warrantless search. Defendant's Motion, pp. 13 – 14.  The motion is puzzling because the federal warrant authorizing the search of the LG cell phone was turned over to counsel in discovery on January 25, 2017.  A copy of that warrant is attached as Government Exhibit C.

As outlined in the attached affidavit of Inv. Nicholas Arcadi, the defendant's LG phone was turned over to the NYSP by Tiffany Matthie on June 18, 2016, and secured by the NYSP until after the federal warrant authorizing the search of the phone was obtained on August 23, 2016. Government Exhibit B, ¶ 9.  On August 24, 2016, the day after the federal warrant was issued, the phone was transferred to the NYSP Forensic Investigation Center in Albany, where it was examined, pursuant to the authority of the federal warrant.  *Id*.

As the search of the LG phone was conducted pursuant to a valid federal warrant, the defendant's motion to suppress evidence extracted from it must be denied.

IV.     **GOVERNMENT'S CROSS-MOTION FOR DISCOVERY**[16]

Pursuant to Rule 16(b) (1), the United States respectfully moves this Court for an order directing the defendant to:

(A)  Permit the United States to inspect and copy or photograph books, papers, documents, photographs, tangible objects, or copies of portions thereof, which are within the possession, custody, or control of the defendant, which the defendant intends to introduce as evidence in chief at the trial; and

---

[16]     Demand for this discovery was made by the Government on November 2, 2016, and no response has been received.

A 82

(B)  Permit the United States to inspect and copy or photograph any results or reports of physical or mental examinations and of scientific tests or experiments made in connection with the particular case, or copies thereof, within the possession or control of the defendant, which the defendant intends to introduce as evidence in chief at the trial or which were prepared by a witness whom the defendant intends to call at the trial when the results or reports relate to that witness' testimony.

(C)  Order the defendant to disclose to the government a written summary of testimony the defendant intends to use under Rules 702, 703 and 705 of the Federal Rules of Evidence as evidence at trial.  This summary must describe the opinions of the witnesses, the bases and reasons therefore, and the witnesses' qualifications.

## V.    CONCLUSION

For all of the reasons set forth above, the defendant's motions for severance, and for suppression of his statements and evidence obtained from the search of his cellular telephone should be denied, all without need for an evidentiary hearing.  Additionally, the Court should grant the Government's cross motion for discovery.

# GOVERNMENT

# EXHIBIT A

IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF NEW YORK

*AFFIDAVIT OF INV. DEWAYNE R. BAILLARGEON*

State of New York     )
County of Onondaga ) ss:
City of Syracuse        )

I, Dewayne R. Baillargeon, having been duly sworn, do hereby state and depose as follows:

1.     I am an Investigator with the New York State Police (NYSP).   I have been employed by the NYSP since June of 2001.   I was a uniform trooper before being promoted to investigator in March of 2013.   I am currently assigned to SP Massena.

2.     On January 29, 2016 I was assigned a case turned over from the Massena PD involving a report by a 16-year-old child, B.L.   B.L. disclosed that she had been raped by Stacey J. LaPorte, Jr.   Through interviews in January, February, and April of 2016, B.L. disclosed a pattern of rape and sexual abuse by LaPorte that began when she was about 11, but which had become more frequent when she had to move in with LaPorte following her father's death when she was in the 9th grade.

3.     On February 18, 2016 I received information that St. Lawrence County Child Protective Services was investigating the possible sexual abuse of two children, ages 3 and 4.   I recognized the children to be the biological children of Stacey J. LaPorte, Jr.   The children were forensically interviewed by NYSP Inv. Sarah Goodrow at the Child Advocacy Center in Franklin County.   No disclosures of abuse were made, but one of the children exhibited behavioral cues that indicated the child was not fully forthcoming when asked questions about LaPorte.

1

A 85

3.      On March 16, 2016, E.J., a 10-year-old female child was interviewed by Inv. Leslie Loran at SP Massena.  E.J. disclosed that she had been sexually abused by Stacey J. LaPorte. Based upon information provided in her disclosure, E.J. would have been 5 or 6 years old at the time of the abuse.

4.      As a result of these disclosures, on May 17, 2016 at approximately 5:50 p.m. NYSP Trooper Brian LaBarge and I located Stacey J. LaPorte, Jr. at a residence in Massena, NY.   I asked LaPorte to come to SP Massena to speak with me about allegations that had been made against him. LaPorte agreed, but stated that he did not have a ride.   I told him that Trooper LaBarge could provide a courtesy transport.   LaPorte rode in Trooper LaBarge's marked police vehicle.   He was not handcuffed.   The NYSP radio log confirms that the courtesy transport (CT) from the residence on Main Street[1] began at 5:55 p.m., with an arrival at SP Massena 5:58 p.m.   This log is attached hereto as *Attachment 1*.

5.      At the barracks, LaPorte was taken to our interview room.   He was still not handcuffed. There is a desk, a filing cabinet, and two chairs in the room.   LaPorte sat in one of the two chairs, and I sat in the other.   At 6:04 p.m., before any questioning began, I read to LaPorte his *Miranda* rights from a card issued to me by the NYSP.   A copy of the card I used to read the rights to LaPorte is made a part of this Affidavit as *Attachment 2*.   A copy of the notes I took during the interview, in which I recorded this time exactly, are *Attachment 3* to this Affidavit.[2]

6.      I read each of the rights on the *Miranda* card to LaPorte, verbatim.   The card

---

[1]      While the radio log indicates "2445" Main Street, this is an error.   The address was 245 Main Street.

[2]      For purposes of attachment, the notes have been redacted in compliance with 18 U.S.C. § 3509(d)(2)(B) and Local Rule, Criminal Procedure § 1.3.

2

A 86

includes two questions at the end: "Do you understand each of these rights I have explained to you?" and "Having these rights in mind, do you wish to talk to us now?"  LaPorte answered both: "Yeah." (*See Attachment 3*).  He was still not handcuffed.

7.      As I was taking pedigree information from LaPorte, Trooper LaBarge knocked on the door.  I stepped out of the room.  Trooper LaBarge told me that he needed to leave, but wanted me to know that when LaPorte was getting into the car at 5:55 p.m., he stated, without being questioned, "I know my sister is making allegations."  I recorded this in my notes, and began the interview of LaPorte.

8.      LaPorte and I spoke for less than 90 minutes.  We were sitting relatively close to one another during the interview.  At no time did I notice the smell of marijuana or alcohol. LaPorte did not slur his words or appear not to understand the conversation.  The interview was conversational, and LaPorte was cooperative.  His answers were responsive to the questions asked.  He never indicated that he was under the influence of alcohol or drugs, and never indicated or showed signs of any impairment.  He never asked to stop speaking with me or if he could go home.

9.      LaPorte made admissions about his abuse of B.L.  I asked him if he had abused any other children, and LaPorte responded: "No. I never touched any other kids."

10.     After the interview, LaPorte, still unhandcuffed, accompanied me to my desk area to draft and execute a written statement.  I began typing the statement at 7:30 p.m.  *See* "Statement Start Time" on *Attachment 4*, Voluntary Statement of Stacey J. LaPorte, Jr.[3]  LaPorte

---

[3]      This document has also been redacted in compliance with 18 U.S.C. § 3509(d)(2)(B) and Local Rule, Criminal Procedure § 1.3.

sat next to me while I typed the statement. We reviewed the information he had provided as we went through what was to be included in the written affidavit. Throughout the process, LaPorte and I discussed what he wanted the statement to say. I told him this was his statement, and wanted it to say what he wanted it to say. From 7:30 p.m. until 8:30 p.m. LaPorte and I discussed the content of the statement, and I confirmed with him all of the information to be included before it was typed into the document. We completed this process at 8:30 p.m., at which time I typed the time into the "Statement End Time" on the final page of the document, and then printed it.

11.     After the document was printed, I asked LaPorte if he could read and write. He said he could. I told him that the rights printed on the form were his rights, as we discussed before we began our interview. I asked LaPorte to read each of the rights, and initial to the left of each to indicate that he read and understood the rights. In my presence, LaPorte read each right one by one. He initialed after each right before reading the next one. When he finished reading and initialing all of the rights, LaPorte read the statement indicating that he understood the rights, agreed to give them up, and to give a statement. He then signed the line underneath that statement.

12.     After that, LaPorte read the entire statement in my presence. I asked him if there were any changes he wanted to make to the statement, and he said: "No." LaPorte and I then initialed the top of each page, and he initialed the end of page 1, signed to indicate the end of the narrative portion of the statement on page 2, and signed under penalty of perjury on page 3.

13.     Once the statement was executed by LaPorte, I told him he was under arrest for Rape in the First Degree in relation to B.L., and for Sexual Abuse in the First Degree in regard to the allegations made by E.J. Trooper LaBarge came to my desk, and I asked him to process LaPorte while I began writing the state felony complaints. LaPorte accompanied Trooper

4

A 88

LaBarge to the Patrol Room for processing.   He was still not handcuffed.

14.     On June 17, 2016, I accompanied Inv. Arcadi to the home of Tiffany Matthie.   Inv. Arcadi asked Matthie if LaPorte had left any electronic media at her residence.   She said no, and consented to a search of the apartment.   In my presence, Inv. Arcadi reviewed with Matthie a written Consent to Search.   He explained and read the form to her, including the statement that she had a right to refuse consent.   Matthie agreed to allow the search and signed the form.   Her mother was present at the time, and signed the consent as a witness.   Inv. Arcadi and I then searched the residence, and found no media belonging to LaPorte, and left.

Inv. Dewayne R. Baillargeon
New York State Police

Subscribed and sworn to before
me this 13th day of April, 2017
at Syracuse, New York

Notary Public
PAULA D. BRIGGS
Notary Public, State Of New York
No. 6068241
Qualified In Onondaga County
My Commission Expires 12/31/20 17

5

A 89

# Attachment 1

CB-6 (REV. 12/76)  NEW YORK STATE POLICE RADIO LOG SHEET

| | | | | | SHEET 6 OF 8 SHEETS |
|---|---|---|---|---|---|
| STA. CALL LETTERS | TROOP | STATION NAME | | | MONTH May  DAY 17  YEAR 16 |
| KED882 | B | | SP CANTON | | |

| TRANS. NO. | ITEM NO. | TIME SENT OR RECD. | STA. OR UNIT NO. | SUMMARY OF TRANSMISSION | ORIGINATED BY | ACKNOWLEDGED BY |
|---|---|---|---|---|---|---|
| 191 | | 4²⁷ | 2B49 | IS | 1009 | 9B25 |
| 192 | | 4³⁰ | 2B20 | GAR 9841 SH 68 Lisbon | 1944 | |
| 193 | | 4³⁵ | 2B24 | OS 41 New Rd | 372 | |
| 194 | | 4⁴⁴ | 2B30 | OS SP/SL | 1230 | |
| 195 | | 4⁴⁴ | 2031 | OSS | 2485 | |
| 196 | | 4⁴⁶ | 2B44 | OSS | 2827 | |
| 197 | | 4⁴⁶ | 2B26 | SJS Drug pass | 357 | |
| 198 | | 4⁵⁰ | 2B26 | IS | 357 | |
| 199 | | 5⁰⁰ | 2B20 | OSS | 1944 | |
| 200 | | 5⁰² | 2B31 | IS enroute Quarry Rd | 2794 | |
| 201 | | 5⁰³ | 2B80 | OS EOT | 2325 | |
| 202 | | 5¹⁰ | 2B42 | | 326 | |
| 203 | | 5¹¹ | 2B36 | IS | 3953 | |
| 204 | | 5¹⁴ | 2B35 | OSS | 1161 | |
| 205 | | 5¹⁵ | 2B33 | OSS | 1042 | |
| 206 | | 5²² | 2B42 | IS enroute V+T court SA | 2544 | |
| 207 | | 5²³ | 2B26 | OSS | 3953 | |
| 208 | | 5²⁶ | 2B20 | IS | 1944 | |
| 209 | | 5²⁹ | 2B22 | OSS | 3617 | |
| 210 | | 5³⁰ | 2B43 | IS | 2451 | |
| 211 | | 5³⁰ | 2B41 | IS | 2709 | |
| 212 | | 5³⁵ | 2B13 | OS Everything Electric | 4921 | |
| 213 | | 5³⁷ | 2B14 | OS Everything Electric | 728 | |
| 214 | | 5³⁸ | 5B12 | OS residence | 5308 | |
| 215 | | 5⁴⁰ | 2B43 | IS | 2451 | |
| 216 | | 5⁴⁴ | 2B13 | key holder update | 9B25 | 4921 |
| 217 | | 5⁴⁶ | 2B42 | OS Lawrence crt | 2544 | 9B25 |
| 218 | | 5⁴⁷ | 2B25 | OS SP Norfolk | 1429 | |
| 219 | | 5⁵⁰ | 2B41 | OS 9024 SH56 | 2709 | |
| 220 | | 5⁵¹ | 2B13 | IS | 4921 | |
| 221 | | 5⁵⁵ | 2B54 | Elm 67032 2445 main st crt | 3297 | |
| 222 | | 5⁵⁶ | 2B32 | IS | 2794 | |
| 223 | | 5⁵⁸ | 2B54 | Elm 67033 @ Station | 3297 | |
| 224 | | 6⁰⁰ | 2B27 | IS | 201 | |
| 225 | | 6⁰³ | 2B33 | OSS | 2794 | |
| 226 | | 6⁰⁵ | 2B48 | IS | 1861 | |
| 227 | | 6⁰⁷ | 2B20 | OSS | 1944 | |
| 228 | | 6¹¹ | 2B16 | OSS | 3538 | 9B24 |

A 91

# Attachment 2

GENL-5R2 (06/04)

## NEW YORK STATE POLICE
## MIRANDA WARNING

1.  You have the right to remain silent.

2.  Anything you say can and will be used against you in a court of law.

3.  You have the right to talk to a lawyer, and have a lawyer present with you while you are being questioned.

4.  If you cannot afford to hire a lawyer, one will be appointed to represent you free of charge before any questioning if you wish.

5.  You may decide at anytime to exercise these rights and not answer any questions or make any statements.

### WAIVER

1.  Do you understand each of these rights I have explained to you?

2.  Having these rights in mind, do you wish to talk to us now?

A 93

# Attachment 3

6:04 pm "yeah"
          "yeah"

Stacey J. Laporte, Jr     09/23/90
Main St
Massena NY 13662

5:55   I KNOW my sister is making allegations

- Got way of relationship McKenzie No longer together
move in two years ago ST. PATRICK DAY
DAD DIED
- MOVE INTO OTB 2 willow — w/ ⎯ ⎯ ⎯
                              / B.L.

sent away from home by case worker
when. — 12 when       16 when realsed.   2006 or 2007
           entered foster                came home
                 care

B.L.
Knew when born — mom-dad separate
sister stay w/ mom. live w/
9 years when released.
half brother was a few month old   when realesed
from hap home.
mom- was Auray old school build 2302 2a prospect
Street
    MOLESTED  GRANDFATHER

A 95

dont remember

- SISTER, B.L. SAID he TRIED to do stuff w/
her.
- one night she woke up and she was on top of her
- tried to do something to her butt and it hurt.
- was old enough to talk
- grandfather's kept abusing — made him touch
him really fuck my head up.
- little at grandfathers when you start doing
things to B.L. = told it was a game
both had pants down rub my dick over her puss
she was 2 or 3 I was 11 or twelve
abuse wasn't just w/ grandfather.
                                    my mom abuse me
at night she would smoke weed and drink
she would touch me and tell me to got to her room
- mom would make me have sex w/ her sister was
just born — made me dia put my dick in her puss.
until I 9 or 10 years old it happen 5 or 6.
she stopped because I told her my stomach hurt
or I had a headach.
- at 12 year old went to live w/ DAD
not going to school doing drug.
- B.L. wouldnt come over dad would and I
see her at DAD's.
BEFORE MOM DIE on grantville; 64 grantville ross
mom when to hospital kept mom over nigh
- me and B.L. were messaging back and forth

A 96

I asked her if she remember what happened when
were kids, we were using IPOO notes to text back and
she said "yep"

SHE WAS 13 or 14   I was 22

started talking about the thing that happen up gran
me a we both agree to have sex, nothing was forced.

No oral   I put my

We went in back bedroom and had sex, to
me sex is I put my DICK INSIDE of her. I
ejaculated on her or on the bed. —

This happened 15-20 TIMES over

it was a way we both cope with the abuse
by grandparfather / mother-

missionary few times she was on top other time
she was on her side, or best over from behind

A 97

# Attachment 4

*Page 16 of 3*
*x [signature]*
*x Ourg.*

# NEW YORK STATE POLICE

## VOLUNTARY STATEMENT

COUNTY OF _____ST. LAWRENCE_____      STATEMENT START TIME: __7:30__ AM/PM

OF _____NORFOLK_____      DATED: _____MAY 17, 2016_____

I, __STACEY J. LAPORTE JR.__, AGE: __25__ AND BORN ON: __SEPTEMPER 23, 1990__, AND RESIDING AT: __52 MAPLE STREET, APARTMENT 3, MASSENA, NEW YORK__, HAVE BEEN ADVISED BY: __INVESTIGATOR DEWAYNE R. BAILLARGEON__, OF THE __NEW YORK STATE POLICE__, OF THE FOLLOWING:

I HAVE THE RIGHT TO REMAIN SILENT AND I DO NOT HAVE TO MAKE ANY STATEMENT IF I DO NOT WANT TO.

IF I GIVE UP THAT RIGHT, ANYTHING I DO SAY CAN AND WILL BE USED AGAINST ME IN A COURT OF LAW.

I HAVE THE RIGHT TO HAVE A LAWYER PRESENT BEFORE MAKING ANY STATEMENT OR AT ANY TIME DURING THIS STATEMENT.

IF I SHOULD DECIDE THAT I DO WANT A LAWYER AND CANNOT AFFORD TO HIRE ONE, A LAWYER WILL BE APPOINTED FOR ME FREE OF CHARGE AND I MAY HAVE THAT LAWYER PRESENT BEFORE MAKING ANY STATEMENT.

I ALSO UNDERSTAND THAT I HAVE THE RIGHT TO STOP AT ANY TIME DURING THIS STATEMENT AND REMAIN SILENT AND HAVE A LAWYER PRESENT.

I FULLY UNDERSTAND THESE RIGHTS AND AT THIS TIME, I AGREE TO GIVE UP MY RIGHTS AND MAKE THE FOLLOWING STATEMENT;

I am at State Police Barracks, in Massena speaking with Investigator DeWayne Baillargeon of the New York State Police with regard to sexual intercourse I have had with my sister, **BL**. I am giving this statement of my own freewill.

When I was two or three olds, until I was five or six years old, my grandfather, DOUGLAS JUDWARE, abuse me.  He would make me touch his dick and he would touch mine.  He would make me "jerk him off".  It stopped when I was five or six years old because I told my mom and dad.   I think an investigation was done and he lost his job as a school bus driver, but no physical evidence and he didn't get charged, he kept living his life.   After my sister **BL** was born, I was nine or ten years old, my mother, MANDY L. LAPORTE started to abuse me.   She would always drink and smoke Marijuana at night.   She would

*END OF PAGE 2*
*x [signature]*

*Page 2 of 3*
*x DNB*

wake me up by like touching my dick.   She would tell me to get into her room and she would get undressed.   She would tell me to do stuff to her like finger her, and made me put my dick in her pussy. This would happen almost every night.   Especially, when she was drinking and smoking pot and this was for about a year.   I was about eleven years old, I went to live with my dad, in Brasher Falls.   I stopped going to school and I was drinking and smoking Marijuana.   Because of this I got taken away by the case workers.   I was sent to foster care in Ogdensburg, then Gouverneur and Heuvelton.   I gave everybody at the foster homes trouble.   They then sent me to Boy's Home, in Lake Placid and then to jail for beating up one of the staff at Tree Branch.   I was 16 years old when I was released from jail, I got accepted back into the boy's home.   I was there for a couple of more months, when I got released back to my mom. She lived 26 Prospect Street, in Norwood and I moved in with there with my mother, BL  and my little brother,            I was only there for about year and I got arrested for accessory to burglary.   I was sent back to jail, until I went to court.   I got release from jail and I went back to my mother's house. I was about 16 when I moved to Massena, with my mom, my sister and little brother.   We moved to Town Line Road.   We lived there until I was about 19 years old.   We moved from there to 2 Willow Street, Massena, after a house fire.   We lived there for a couple of months and then we moved to 64 Grantville Road, in Norfolk.   In 2010, my mom found out she had cancer and had to go to the hospital and they kept her overnight.   I stayed at the house with  BL  I think she was 11 or 12 years old.   We started texting on my sister's iPod, in the notes app.   I was asking her if she remember what Grandpa used to do to us when we were little and she said "yes".   We using the same IPod to text back and forth.   I would type something and hand it to her.   I asked her if she wanted to continue what grandpa started and she said "yes".   We back into the bedroom, she took off her own clothes.   I took off my clothes.   I had an erection, she laid down on the bed on her side.   I laid down behind her and put my it inside of her.   It was like five minutes, I pulled out of her and ejaculated.   I don't remember where it went, she went into the bathroom and cleaned herself up.   We got dress and went back out in the living room.   My mom, BL  and  moved to Felts Mills with my mother.   I never sex with  BL  when she was living in Felts Mills with my mother.     My mother died on September 11, 2013, my sister moved back to Brasher Falls with our father.   Six months later, my father died and my sister moved in with me and Sinclair Bab, at 2 Willow Street, Massena.   We had sex there once or twice, I don't remember the particulars.   I did happen a few times when I was drunk.   We moved from there to 52 Maple Street, Apartment 2, in the village of Massena.  BL  and I have sex there two or three more times, it was it always agreed upon by both of us, I never forced her.   We moved from Maple to Somerset Avenue.   I lived there with Mackenzie Bailey,  VI  me and  BL   BL  and I had sex two or three times when we lived there, I don't remember all the details, but each time, I stuck my dick in her pussy.   I never ejaculated inside of her, I always ejaculated on her or on the bed.   We moved to 18 Talcott Street, we had sex four more times, when we lived there.   We were there for about 8 months and we moved to the Cabin in Chase Mills.   I lived there with Mackenzie, BL  and  VI   Over the next two or three months, we had sex three or four more times.   It usually happened when we were alone and I was having a bad day, remembering my abuse and dealing with my parent's death.   We lived in the cabin for about two or three months and we moved to Glenn Street, in the Village of Massena.   I think we had sex twice, while I lived there.   That was when everything happened and she left and ran away. Nikolas Emens came to my house on Glenn Street, to get his Xbox, with my sister  BL  because I told him I needed to talk to her.   I thought she was going to run away.   We started talking and asking what was going on and what were her plans.   She told me she was not running away and we started arguing. I told her I had enough and we should just die and be with our parents, she took it as a threat.   After they left, I tried to get a hold of Nick by calling and texting him because he was supposed to be my best friend. He never answered me back after I text him.   I have not had sex with  BL  since she left my house on Glenn Street.

*END OF STATEMENT*

*(END OF STATEMENT)* ———————

*Page 3 of 3*

| N O T I C E | **Penal Law § 210.45** — IN A WRITTEN INSTRUMENT, ANY PERSON WHO KNOWINGLY MAKES A FALSE STATEMENT WHICH SUCH PERSON DOES NOT BELIEVE TO BE TRUE HAS COMMITTED A CRIME UNDER THE LAWS OF THE STATE OF NEW YORK PUNISHABLE AS A CLASS A MISDEMEANOR. |
|---|---|

AFFIRMED   UNDER PENALTY   OF
PERJURY

This __17th__ day of ___May___ 20 __16__

OR

SUBSCRIBED   AND SWORN TO BEFORE ME

This _____ day of _____ 20

SIGNATURE OF DEPONENT,

SIGNATURE OF WITNESS

| STATEMENT END TIME: | 8:30 | AM PM |
|---|---|---|

A 101

UNITED STATES DISTRICT COURT
NORTHER DISTRICT OF NEW YORK
_____

UNITED STATES OF AMERICA,


      -v-                               CASE NO. 16-CR-320 (DNH)

STACEY LAPORTE,


             Defendant.
_____


## MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT STACEY LAPORTE'S REPLY MOTIONS



DATED:     April 28, 2017         Respectfully submitted,
             Syracuse, New York

                                         Lisa Peebles
                                         Federal Public Defender


                   By:

                                         Randi Bianco, Esq.
                                         Assistant Federal Public Defender
                                         Bar Roll No. 507514
                                         Office of the Federal Public Defender
                                         4 Clinton Square, 3rd Floor
                                         Syracuse, New York 13202
                                         (315) 701-0080

Defendant Stacey Laporte, Jr., ("Mr. Laporte") is charged in a second superseding indictment with two counts of conspiracy to sexually exploit a child, three counts of sexual exploitation of a child, and one count of receipt of child pornography. (Dkt. No. 33). Mr. Laporte filed his initial Omnibus Motions to the first superseding indictment on March 31, 2017. On April 20, 2017, the grand jury returned the second superseding indictment adding count two, conspiracy to exploit a child involving a new victim V-4 and a new co-conspirator, Hillary Trimm. Thereafter, the government filed its response to Mr. Laporte's omnibus motion on April 21, 2017. Counsel for Mr. Laporte submits this reply to the Government's response.

## I.      Four Separate Trials are Necessary to Prevent Unfair Prejudice

Based on the addition of count two of the Second Superseding Indictment which charges conspiracy to exploit a child involving a new victim, V-4 and a new co-conspirator, Hillary Trimm, Mr. Laporte moves for a severance of this count from the remaining charges under Fed. R. Crim P. 14. Mr. Laporte is now requesting four separate trials.

Counts One, Three, and Four of the indictment charge conspiracy to sexually exploit a child and the sexual exploitation of that child in violation of 18 U.S.C. § 2251(a) & (e) and 2(a). The conduct underlying these three counts involve allegations of Mr. Laporte and co-defendant Mackenzie Bailey sexually exploiting V-1, who was a two-year old at the time of the alleged offenses. The time span encompassed in these three counts is from 2014 to "in or about May 2016."

Count Two involves the newest charge in the second superseding indictment filed on April 20, 2017 whereby Mr. Laporte is alleged to have conspired with Hillary Trimm to exploit a child

V-4, an infant at the time of the alleged offenses.  The time span encompassed in this count is from April through June 2015

Count Five charges Mr. Laporte with sexual exploitation of children on February 28, 2016 and the victims are identified as two teenagers, V-2 a male born in 2003, and V-3 a female born in 1999. These teenagers allegedly had sex with each other at Mr. Laporte's urging.

 Count Six charges Receipt of Child Pornography in violation of 18 U.S.C. § 2252A(a)(2)(A). The conduct giving rise to this count is alleged to have occurred on March 25, 2016. According to government, "Count 5 is unrelated to any of the other counts."[1]

The government has argued that Mr. LaPorte's motion for severance should be denied because:1) there is no substantial prejudice to Mr. Laporte in trying all of the counts together; and 2)  evidence of his commission of any one of the charged offenses is admissible to prove his commission of the other offenses pursuant to Fed. R. of Evid 414.

The government argues that Mr. Laporte would not suffer substantial prejudice if all of the counts against him were tried together. To support this claim, the government points to the Second Circuit's decision in in *United States v. Rivera*, 546 F.3d 245 (2d Cir. 2008), which they claim compels the denial of Mr. LaPorte's motion to sever. Gov't Motion, p.18. While *Rivera* did hold that "child molestation and child pornography . . . plainly represent acts of 'similar character' involving the extraordinary mistreatment of children." *United States* v. *Rivera,* 546 F.3d 245, 254 (2nd Cir. 2008) (citing *United States v. Hersh*, 297 F.3d 1233, 1242 (11th Cir. 2002)), the facts of Mr. LaPorte's case are distinguishable from those of *Rivera*. In *Rivera,* the

---

1 March 27, 2017, e-mail from AUSA Sahar Amondolare in response to defense counsel's inquiry as to whether the newly charged conduct was related to any other count.

defendant was accused in a four-count indictment of enticing four boys of a similar age (12, 15, 16 and 16) to engage in sexual encounters.  The period covered in the indictment was four months. *Rivera,* 546 F.3d at 253.  The manner in which the defendant targeted the victims was similar. He met all four boys in an internet chat room; exchanged sexually explicit messages and photographs with them and enticed them to meet for sexually explicit encounters. Some of the same exhibits were used to prove counts one two and three, specifically "the dossiers Rivera maintained of his sexual experiences, which listed Garrett and Brian; and the transcript of an Internet chat in which Rivera said that he had abused five boys, including Garrett and Brian." *Id*. at 254.  Thus, much of the same evidence was used to prove the different counts. *Id*. The Second Circuit ruled that the joinder was proper and that the defendant failed to demonstrate a prejudicial "spillover" to support a Rule 14 severance. *Id*. at 254.

The counts Mr. Laporte seeks to sever in the present case are more distinct from one another than the counts in *Rivera.* In our case, the ages of the victims vary much more than in *Rivera.* Here, the alleged victims are an infant, a 2 year old, a 13 year old and a 16 year old. There was no similarity whatsoever between the exploitation of the two teenagers and the younger two victims. Whereas the counts in *Rivera* merely featured different victims, the counts Mr. Laporte faces involve not only different victims, but different co-conspirators and different types of behavior. Additionally Count 6 charges the receipt of child pornography featuring subjects who are entirely unrelated to any of the parties associated with this case. These crimes are more dissimilar from each other than the crimes in *Rivera* which were effectively the same offense with different victims.

3

In *United States v. Lotsch*, 102 F.2d 35, 36 (2d Cir. 1939) the Court analyzed the "considerable" risk posed to the accused by the joinder of "similar" charged offenses, explaining:

> There is indeed always a danger when several crimes are tried together, that the jury may use the evidence cumulatively; that is, that, although so much as would be admissible upon any one of the charges might not have persuaded them of the accused's guilt, the sum of it will convince them as to all. This possibility violates the doctrine that only direct evidence of the transaction charged will ordinarily be accepted, and that the accused is not to be convicted because of his criminal disposition.

The Second Circuit applied these factors in *United States v. Halper*, 590 F. 2d 422 (2d Cir. 1978) and held that it was reversible error for a Medicaid fraud indictment and income tax evasion indictment to be joined for trial. The *Halper* court recognized that "both charges involved alleged attempts by [the defendant] to manipulate those whom he had employed in a way that would work to his profit." *Id*. at 431. Despite this apparent connection between the offenses, the court held that the "characterization of the essential nature of the charged offenses [was] entirely too broad to warrant the joint trial of two otherwise distinct indictments." *Id*. at 430. Ultimately the court remanded the case, finding that the "trying together of the two indictments against [the defendant] was prejudicial error." *Id*. at 431.

The *Halper* court adopted a three factor test for when joinder of offenses of the "same or similar" character pose a danger to the defendant which outweighs efficiency and economy considerations:

> (1) (the defendant) may become embarrassed or confounded in presenting separate defenses; (2) the jury may use the evidence of one of the crimes charged to infer a criminal disposition on the part of the defendant from which is found his guilt of the other crime or crimes charged; or (3) the jury may cumulate the evidence of the various crimes charged and find guilt when, if considered separately, it would not so find. A less tangible, but perhaps equally persuasive, element of prejudice may

4

A 106

reside in a latent feeling of hostility engendered by the charging of several crimes as
distinct from only one.

*Id.*at 430.

Here, all three of the *Halper* factors are implicated. Mr. Laporte's defense would be
confounded by having to defend against the charges associated with four different victims and
two different co-conspirators. There are literally hundreds (if not thousands) of individual text
type messages between multiple persons on several electronic devices. The parties use different
screennames and the chats occur over different dates, months and in some instances years. In
addition to the numerous text type messages, there are four different charged victims with the
conduct allegedly occurring on different dates in different places.  It would be difficult for
counsel to present a coherent defense in one trial that would not confound a jury. Secondly,
bases on the nature of the crime, the jury would likely rely on evidence of one crime to infer
guilt of the other. Finally, Mr. Laporte would be prejudiced because the jury would undoubtedly
be affected and improperly persuaded by the cumulative evidence of a uniquely inflammatory
nature.

In this case, the government hopes to bombard the jury with an overwhelming amount
of evidence of different, unrelated sex crimes. For example, the government hopes to prove the
conspiracy counts by using evidence from Count 6. In their words:

> Further, the defendant's chat with banx75 (Count 6) is further proof of his identity
> and his commission of the other offenses. In that chat, the defendant receives
> images of infants with penises in or near their mouths, and responds that he is,
> instead, looking for "extrem[e] baby hard core pics," evidence of his interest in
> babies (i.e. V-1 and V-4), and "extreme" conduct with them (i.e. the anal rape of
> V-1 and V-4).

Gov't motion p. 22

In essence, to prove that Mr. Laporte used a certain screenname during his interactions with his alleged co-conspirators, the government would like to offer evidence of Mr. Laporte receiving images of infants with penises in their mouths. This evidence, although technically allowable under Rule 414, is the type of unfairly prejudicial evidence that courts are entrusted to exclude. It is inconceivable that Mr. Laporte could have a fair trial on any single count when such inflammatory evidence from other counts is being presented against him. To proceed with one trial on all of the counts charged in the indictment would not only be confusing and prejudicial, but would eliminate any chance Mr. Laporte has of the jury being able to separately evaluate each of the counts.  The jury would undoubtedly be affected and improperly persuaded by the cumulative evidence of a uniquely inflammatory nature.

Even if this evidence is technically admissible under Rule 414, this is the type of evidence that Courts are entrusted to exclude as its probative value is substantially outweighed by its prejudicial effects. A trial with all of the listed counts would deprive Mr. Laporte of his right to due process of law and his right to a fair trial.

## II.     This Court Should Exclude Evidence Regarding Sexual Abuse of B.L., E.J. and C.F.

The government has withdrawn their intention to introduce evidence regarding Mr. Laporte's alleged sexual misconduct with D.B., the teenage brother of Mackenzie Bailey. However, the government continues to assert their intention to introduce evidence regarding Mr. Laporte's abuse of B.L, E.J and C.F [Dkt. 35, p. 28]. Mr. Laporte has not yet challenged the introduction of this evidence due to the lack of sufficient notice of what information the government intends to introduce. The defense is entitled to some specifics of the information the government seeks to

6

A 108

introduce under Fed. R. Crim. 414(b).[2]   In regards to B.L., in a letter to defense counsel dated November 2, 2016 (Exhibit 1) the governments' notice does not comport with the requirements of Fed. R. Crim. P. 414 as they state, "a summary of this child's [B.L.'s] abuse by your client is admitted by him in his written statement to police."  This "summary" the government references is from the written statement, which Mr. Laporte disputes and claims was involuntarily made. Moreover, Mr. Laporte is indicted in New York State Court on no less than 33 counts of sexual abuse regarding B.L. ranging from the years 2007 to 2015. The notice the government provided lacks any type of specificity for Mr. Laporte to challenge its admissibility or to defend against the allegation.

       Should this Court consider the government's notice to the defense adequate regarding the abuse of B.L, Mr. Laporte contends that the evidence should be excluded under Rule 414 analysis. Here is no allegation that the abuse against B.L. concerned any visual depictions OR that any interstate or foreign commerce is involved akin to the allegations alleged in the second superseding indictment. Forcing Mr. Laporte to defend against yet another uncharged crime in this indictment runs the risk of confusion of the issues at trial and creating a yet another large trial within an already large trial where there are already multiple victims. Simply put, the prejudicial effect of introducing evidence of B.L.'s abuse is clearly outweighed by its probative value. Additionally, the relevance of this evidence is highly questionable as seems to show only Mr. Laporte's propensity to engage in sex with minors.

---

2 "If the prosecutor intends to offer this evidence, the prosecutor must disclose it to the defendant, including witness statements or a summary of the expected testimony. The prosecutor must do so at least 15 days before trial or at a later time that the court allows for good cause".

7

A 109

Likewise, the notice regarding the alleged sex abuse against E.J. also lacks sufficient specificity in order for the defense to make a detailed challenge to its admissibility.  In its November 2, 2016 letter, with regards to E.J., the government states that "a brief summary of your client's abuse of this child is detailed in the attached summary of her forensic interview."  A review of that "forensic interview" reveals that E.J. does not know when the abuse allegedly happened, but the report stated that she and the interviewer "calculated about when it would have been based on her description of her brother at the time." Likewise, E.J. did not disclose where it happened other than stating "an apartment" and that "parts of the incident were hard to remember."  There is no allegation that the abuse against E.J., concerned any visual depictions OR that any interstate or foreign commerce is involved like the allegations alleged in the superseding indictment.  The admissibility of the evidence regarding E.J., like the evidence regarding B.L. forces Mr. Laporte to defend against yet another uncharged crime in this indictment,  runs the risk of confusion of the issues at trial and creates a yet another trial within a trial where there are already multiple victims.

The challenge to the admissibility of introducing evidence of abuse against C.F. has already been addressed in Mr. Laporte's severance motion and should be excluded on the same grounds as previously alleged.

"Propensity" evidence, such as that the government seeks to introduce, is generally inadmissible. Fed. R. Evid. 404(b). Mr. Laporte acknowledges that an exception exists for "child molestation" cases and that all of the charges against Mr. Laporte constitute "child molestation" for the purposes of Rule 414. Fed. R. Evid. 414(d). Under Rule 414, evidence that a defendant engaged in "child molestation" (as defined by the Rule) in the past is admissible to prove that the defendant has a propensity to commit, or a disposition of character that makes it more likely that

8

A 110

he did commit, the act of child molestation charged in the present case. *United States v. Levy*, 594 F. Supp. 2d 427, 438-39 (S.D.N.Y. 2009).

Here, the evidence that the government seeks to introduce regarding uncharged conduct with B.L and E.J. is inadmissible because it is vastly more prejudicial than probative.

### III.    An Evidentiary Hearing is Required to Resolve the Factual Dispute Surrounding the Voluntariness of the Statements Allegedly Made by Mr. Laporte On May 17.

The government has argued that Mr. Laporte's statements should not be suppressed because he made a knowing and voluntary waiver of his rights after he was Mirandized. (Dkt 35 at 28). The government further alleges that Mr. Laporte has "failed to sufficiently raise any factual issue that requires a hearing." (Dkt. 35 at 26). The government and the defense dispute the facts concerning the taking of the statement and its alleged voluntariness.

Contrary to the government's claims, Mr. Laporte has raised facts in his initial motion disputing the voluntariness of the waiver of his rights. He has also raised an issue as to whether he was questioned before he was Mirandized as well as to the method, language and threats used to extract the confession from him.  Furthermore, Mr. Laporte has challenged his ability to make a knowing and voluntary waiver of his rights in light of his consumption of alcohol and drugs immediately prior to being brought to the police station. (See Dkt. 29-1 at 3-5).  The government has disputed each of the facts alleged by Mr. Laporte (See Dkt. 29-31). Factual disputes about circumstances of an interrogation cannot be resolved without an evidentiary hearing. *United States v. Mathurin*, 148 F3d. 68, 69 (2d Cir. 1998). Since there are disputed issues of fact surrounding the issue of voluntariness, the Court should order an evidentiary hearing.

A 111

**IV.     The Defense Withdraws the Motion to Suppress Evidence Retrieved from the LG Cellphone.**

Mr. Laporte withdraws his motion to suppress the evidence retrieved from the LG cellphone based on production of the search warrant.

## **CONCLUSION**

For the foregoing reasons, the defense requests that this Court grant Mr. Laporte's motion to 1) sever the counts in his indictment and order four separate trials; (2) suppress the statements he made while in custody or grant an evidentiary hearing on the matter; and (3) render the Government's 414 notice of intent to offer evidence of B.L, E.J., and C.F.'s abuse inadequate and further exclude such evidence.

DATED: April 28, 2017                           Respectfully Submitted,
                                                Lisa Peebles, Federal Public Defender

                                                By: Randi Bianco

                                                  /s/Randi Bianco
                                                Asst. Federal Public Defender

                                                Bar Roll No. 507514
                                                Office of the Federal Public Defender
                                                4 Clinton Square, 3rd Floor
                                                Syracuse, New York 13202
                                                (315) 701-0080

CC:     Lisa Fletcher, Esq., AUSA
        Sahar Amondolare, AUSA
        Stacey LaPorte

10

A 112

UNITED STATES  DISTRICT COURT

NORTHERN DISTRICT OF NEW YORK
****************************************************
UNITED STATES OF AMERICA,

  vs.                              16-CR-320

STACEY J. LAPORTE, JR.,

                      Defendant.
****************************************************

        Transcript of a Motion held on May 17, 2017,

before the HONORABLE DAVID N. HURD, at the United

States Federal Courthouse, 10 Broad Street, Utica,

New York, stenographically recorded by

Nancy L. Freddoso, Registered Professional Reporter.

A P P E A R A N C E S

Government:      UNITED STATES ATTORNEY'S OFFICE
                 ROOM 900, HANLEY FEDERAL BLDG.
                 100 SOUTH CLINTON STREET
                 SYRACUSE, NEW YORK  13261-7198
           BY:   LISA M. FLETCHER, AUSA
                 SAHAR L. AMANDOLARE, AUSA

Defendant:       FEDERAL PUBLIC DEFENDER'S OFFICE
                 4 CLINTON SQUARE
                 SYRACUSE, NEW YORK 13202
           BY:   RANDI J. BIANCO, AFPD

NANCY L. FREDDOSO, R.P.R.
Official United States Court Reporter
10 Broad Street, Room 316
Utica, New York 13501
(315) 793-8114

2

Motion

1           COURT CLERK:  United States of America versus

2     Stacey J. LaPorte, 16-CR-320.

3           Attorneys please note their appearance for the

4     record.

5           MS. FLETCHER:  Lisa Fletcher and Sahar Amandolare

6     for the government.  Good afternoon, Your Honor.

7           THE COURT:  Good afternoon -- good morning.

8           MS. BIANCO:  Good morning, Your Honor.

9     Randi Bianco for Stacey LaPorte.

10          THE COURT:  Good morning.  We are here for oral

11    argument regarding the defendant's pretrial motions.  I have

12    reviewed all of the submissions and at this point at least

13    am prepared to make a decision from the bench regarding the

14    motions.  However, I will listen to oral argument, and if

15    something comes up that I maybe have not considered, I may

16    reserve decision and issue a written decision.

17          So at this time, Ms. Bianco, you may be heard.

18          MS. BIANCO:  Thank you, Your Honor.  With regards

19    to our motion to suppress his statement, the prosecutor has

20    argued that we should not be entitled to a hearing, and it

21    is our position that was there a factual dispute between the

22    parties surrounding the circumstances of the interrogation.

23    Specifically, the factual dispute -- the factual disputes

24    are as follows:

25          One, as to whether Mr. LaPorte accompanied the

3

Motion

1    police voluntarily to the station.  The government contends

2    that he went voluntarily.  We contend that he didn't.  He

3    was given the choice, you can go with cuffs or without

4    cuffs.

5            The second factual dispute is whether the

6    interrogation began before he was ever Mirandized.  The

7    government says no,that didn't happen, that he was picked up

8    at 5:50 p.m., and he was Mirandized at 6:04 p.m..

9    Mr. LaPorte says that the police spoke to him for at least

10   twenty minutes prior to being Mirandized about the case.

11           The third factual dispute is to whether

12   Mr. LaPorte was under the influence of drugs or alcohol so

13   he couldn't make a knowing intelligent and voluntarily

14   waiver.  The government contends that Mr. LaPorte was not

15   under the influence.  Mr. LaPorte contends he was and that

16   affected his ability to make a knowing, intelligent, and

17   voluntary waiver.

18           The fourth factual dispute is whether or not the

19   police used coercive tactics to get Mr. LaPorte to confess.

20   The government says no.  Mr. LaPorte says yes based on their

21   language, demeanor, and things that they said during the

22   course of the interrogation.

23           The factual dispute about the circumstances of the

24   interrogation can't be resolved without an evidentiary

25   hearing, and we have cited the case of United States versus

4

Motion

1    Mathurin, and in that particular case, the Court ordered an

2    evidentiary hearing merely when the defendant said he was

3    not Mirandized and the government said he was.  There are a

4    lot more factual disputes in this instance than there were

5    in that case.  And here, we can contend that at minimum we

6    should be entitled to a hearing because the statement at

7    issue is central to the case.

8            It is my understanding that the government is

9    going to try to introduce evidence under 414 that my client

10   had sex with his sister a number of times, and this alleged

11   confession would corroborate her testimony.  And it is very

12   significant and very important to determine whether or not

13   this was his words, that he knowingly voluntarily waived his

14   Miranda Warnings and whether or not he even could do that

15   based on his mental state.

16           Do you want me to address the severance of counts

17   issue now, Judge, or would you like to hear from the

18   government regarding the suppression issue?

19           THE COURT:  You may be heard.

20           MS. BIANCO:  Okay.  With regard to the suppression

21   of counts, we have moved to suppress certain counts in the

22   Indictment.  Specifically, Counts 1, 3, and 4 involved

23   coconspirator Mackenzie Bailey and Victim Number One who was

24   a toddler.  The dates of this -- these allegations are from

25   2014 to May of 2016.

A 116

Motion

1          We have asked to sever that from Count 2 which

2     involved a co-conspirator Hillary Trimm and Victim Four, who

3     was an infant.  The dates of that alleged encounter was

4     April 2015 to June of 2015.

5          We have also asked separation of trial for Count 5

6     which is Victims Two and Three.  These involve allegations

7     of a twelve and sixteen year old having sex on a specific

8     date, and the government is contending that Mr. LaPorte

9     persuaded, induced, enticed, and coerced them to engage in

10    sexually explicit conduct for the purpose of producing

11    visual depiction.  This fact pattern is entirely different

12    from the fact pattern of allegations one, two, three, and

13    four.  They are not infants.  This is occurring on a

14    specific date, and this occurring where my client is alleged

15    to have made them use force to engage in this activity.

16         Now Count 6, we have asked for severance, it was

17    receipt of child pornography by Mr. LaPorte on one specific

18    date, March 25, 2016, with a person who was unrelated to any

19    of the other accused in the indictment.  And this is the

20    case, quite frankly, with the least amount of evidence.  The

21    cumulative weight of the other charges coming in, just

22    looking at that, that would be enough to convict him if they

23    had any doubt or about his guilt on the receipt.

24         The government has cited United States versus

25    Reynolds, and Reynolds states specifically, "severe

6

Motion

1    prejudice occurs when a defendant is deprived of an

2    appreciable chance for an acquittal.  And with regards to

3    the receipt of child pornography, that is exactly what would

4    happen here if the charges were tried together.

5         We have moved to sever under Rule 14 to prevent

6    substantial prejudicial spillover, and it is our contention

7    that to allow a trial with all of these alleged victims

8    would create a mega trial and create a substantial potential

9    for prejudice.

10        Specifically here, there are multiple devices,

11   hundreds, if not thousands, of text chats, multiple screen

12   names, four different victims, different ages, the abuses

13   occurring on different dates and in different places.  The

14   count of receipt is completely unrelated to the other

15   charges.

16        Now, the government has cited United States versus

17   Rivera to support their argument on a joint trial, and our

18   case is distinguishable from Rivera.  In Rivera, the victims

19   were of similar ages, twelve, fifteen, sixteen, and sixteen.

20   All of the victims in that case were targeted in an internet

21   chat room.  All of the victims exchanged sexually explicit

22   messages and photos with the defendant, and the defendant

23   was alleged to have enticed each victim to meet them for a

24   sexual encounter, and, significantly, Rivera had overlapping

25   evidence covering all of the victims which would be used in

A 118

7

Motion

1    one trial.

2            Specifically, there were writings which the

3    defendant maintained of his sexual experiences, and he

4    listed two of the victims.  And there were also transcripts

5    of the defendant's chats in which he admitted abusing five

6    boys, including two of the victims.  This occurred over a

7    four-month period, not a two-year period like we have here.

8            Our facts are more distinct and more dissimilar,

9    and there is a real danger that if the jury hears all of the

10   evidence in one trial, they will be substantially prejudiced

11   and more likely to infer criminal disposition against

12   Mr. LaPorte.  Additionally, the jury would more likely use

13   the evidence cumulatively and be persuaded of the accused's

14   guilt simply by the sum of all of the evidence.  For those

15   reasons, Judge, we ask for a severance of counts.  Thank

16   you.

17           THE COURT:  Okay.  Thank you.

18           Ms. Fletcher, you may be heard.

19           MS. FLETCHER:  Yes, Your Honor.  In regards to the

20   defendants' motion for a suppression hearing on his

21   statement, I think we first have to look at the affidavit

22   that he presented in support of that motion, and that fails

23   to meet the standard required to gain a suppression hearing.

24   To order a hearing under these circumstances would be to

25   simply invite an unearned and unwarranted fishing

A 119

8

Motion

1    expedition.

2            The defendant, in order to gain a suppression

3    hearing, must show disputed issues of material fact that are

4    definite, specific, detailed, and not conjectural, and

5    frankly, everything about the defendant's affidavit requires

6    conjecture to get him to his hearing.  It requires the Court

7    to take a few meager and some patently false allegations of

8    fact and jump to a conclusion as to why they are relevant to

9    the issue at hand.

10            Surprisingly, after the government filed our

11    response to this, and the defendant filed a reply, I

12    expected to see perhaps a supplement to this affidavit, and

13    there was no supplement to the affidavit.  So what we are

14    left with are, again, meager and patently false allegations

15    of fact.  The defendant's allegation of fact in regard to

16    being intoxicated at the time he gave his statement is

17    simply:  Before I was picked up by police, I had been

18    drinking alcohol and smoking marijuana.  He does not say

19    when.  He does not say that he was intoxicated.  He does not

20    say that he was incapacitated, and he does not say that it

21    affected him in any way.

22            In response, the government now has filed an

23    affidavit of Investigator Baillargeon that says that he

24    smelled no marijuana or alcohol on the defendant.  The

25    defendant did not slur his words.  The defendant did not

9

Motion

1    appear to misunderstand the conversation and that

2    defendant's answers were responsive to the questions posed.

3    Under the law, there is no per se rule that statements of an

4    intoxicated person are involuntarily.  Therefore, even

5    accepting the defendant's single statement as true, there is

6    nothing about his use of drugs or alcohol, by itself, that

7    requires a suppression hearing at all in this case.

8          He says he wasn't free to leave.  Well, that --

9    the question of whether this was a custodial or

10   non-custodial interrogation, the government submit is

11   irrelevant as there are no non-Mirandized statements that we

12   seek to introduce.  For the first time this morning, I heard

13   Ms. Bianco argue that the defendant did not voluntarily

14   accompany the police to the station.  She said it was, you

15   can go with cuffs or without cuffs.  That's not in his

16   affidavit.  It's not in their papers.  There is no

17   allegation of fact by a person who was present that that at

18   all occurred.

19         Furthermore, the defendant alleges that the

20   investigator began to question him before he was read his

21   rights for at least twenty minutes.  But he does not assert

22   that he made any un-Mirandized statements.  His time frame

23   is countered by the objective evidence that is attached as

24   exhibits to Investigator Baillargeon's affidavit and the

25   affidavit, itself.  Those being the radio log with the

10

Motion

1    transport that began at 5:55 and then arrival at the

2    barracks at 5:58, and the notes of the interview showing

3    that his rights were read at 6:04.  There is simply no

4    twenty minute period in this case at all before the

5    defendant's rights were read.

6            And the defendant does not at all allege that he

7    made any un-Mirandized statements.  He doesn't allege that

8    he was not Mirandized.  He does not allege that he didn't

9    understand his Miranda Warnings, and he does not allege that

10   he invoked his Miranda Rights at all at any time during the

11   interrogation.  This is simply not -- there is simply no

12   sufficient issue of fact raised that there is a need for a

13   hearing in that regard.

14           The defendant also alleges that he was told that

15   the investigator, number one, had enough to put him away for

16   life and, number two, that if he cooperated, there would be

17   less charges.  There is -- however, even if that were

18   accepted to be true, which we do not concede, there is no

19   allegation by the defendant that either statement was false

20   or that it overbore his will leading to an involuntarily

21   statement.  The government submits there is no need to order

22   a hearing on those allegations since the statements, in and

23   of themselves, do not render the defendant's ultimate

24   statement involuntary.

25           The defendant also in his affidavit says that he

A 122

Motion

1    asked what would happen if I asked for a lawyer?  He does

2    not allege that he invoked his right to counsel, nor that

3    the alleged response, which we contest, dissuaded him from

4    invoking his right to counsel.  So there is no allegation of

5    fact that needs to be decided on that statement in the

6    affidavit as well.  The defendant further says that he

7    signed the statement without reading.  Well, that's belied

8    by the affidavit of Investigator Baillargeon.

9           The defendant alleges that he was left in a room

10   for a few hours while the statement was typed and that has

11   been proven false also by the objective evidence.  With the

12   time stamps on everything, from the time they got to the

13   barracks at 5:58 p.m., to the time that the statement was

14   completed at 8:30 p.m., that is a total of two and a half

15   hours from beginning to end.  There simply was no few hours

16   of time where the defendant was left in a room all alone

17   while Investigator Baillargeon typed some statement that the

18   defendant then signed without reading.

19          Regardless, the claimed accuracy of the written

20   statement is not relevant to the suppression hearing.  The

21   defendant said he signed it without reading it, and that

22   there are some things in it that are not accurate.  That is

23   not relevant to the suppression hearing.  The defendant does

24   not allege that he gave or signed involuntarily.  He said he

25   was signing things that were just not true because he signed

12

Motion

1    it without reading it.

2              In regard to the severance, Your Honor, there is

3    simply no authority to support severance of any count of

4    this indictment from any other.  The defendant here has put

5    every element of every crime in issue, including his

6    identity as the perpetrator of each and every crime alleged.

7              He makes his motion to sever under Rule 14.  We

8    start with a Rule 8(a) analysis, and under that, each and

9    every count of this indictment is properly joined.  The

10   defendant does not contest that.  Under Rule 14, it is the

11   defendant's burden to show substantial prejudice.  But we

12   need to do more than that in this kind of a case because it

13   is a child exploitation case that also invokes Rule 414.

14             So the admissibility of each count of this

15   indictment, as to each other count of the indictment at a

16   trial of any count, would be admissible.  So if we were

17   sever Counts 1, 2, and 3, testimony about Counts 4, 5, and 6

18   would be admissible at the trial of Counts 1, 2, and 3 under

19   Rule 414.  And that's what Rivera speaks to, and you simply

20   cannot analyze Rule 14 in a vacuum.  Even if you did, we

21   submit that it is properly joined, and the defendant has

22   failed to show a substantial prejudice.  He has a high

23   hurdle in making a Rule 14 showing of substantial prejudice,

24   whereas here, as we said, Rivera said, acknowledges that

25   Rule 414 sanctions the admission of each count in this case

13

Motion

1     in the trial of the others.

2            The defendant cites no authority that actually

3     supports his motion.  He attempts to distinguish Rivera by

4     relying on dissimilar cases involving a SORNA violation, a

5     firearms violation, and in his reply he cites a Rule 8(a)

6     issue in regard to the joinder of two separate indictments

7     charging Medicaid fraud and income tax evasion.

8            He also cites a 1939 case, and that is not

9     Section 1939, it is the year 1939 about receiving

10    commissions from borrowers from a national bank in which the

11    accused was an officer which, in fact, supported the joinder

12    of three separate transactions.

13           What we have here, Your Honor, is an indictment

14    where all counts were committed close in time, all involved

15    the same or similar conduct.  All involved many overlapping

16    witnesses.  Some who were the same or overlapping locations.

17    They all involved a common scheme and plan, and it is

18    heightened by the 414 considerations, including identifying

19    defendant as the perpetrator of each and every count in the

20    indictment.

21           I would make a note that Ms. Bianco's statement

22    that the least amount of evidence is on Count 6 of the

23    indictment regarding the defendant's receipt of child

24    pornography, and that's just not true.  The receipt of child

25    pornography is one of the more -- one of the most, if not

14

Motion

1    the host, solid of the counts of the indictment.  We have an

2    actual chat where the defendant is actually soliciting child

3    pornography from another person over Kik Messenger, and when

4    he gets the two images of infants with penises next to their

5    faces, he asks for more extreme pictures.  That is not at

6    all a weak count of this indictment.

7         But he attempts to bolster his argument by

8    alleging that there is no similarity between the

9    exploitation of two teens and the younger victims, and that

10   is not true.  They were all committed in same manner and

11   method.  The defendant used Kik Messenger for all of these

12   offenses.  He instructed in each of the counts charging the

13   2251 offenses and a conspiracy, he instructed the other

14   party what acts to commit and what pictures to take by using

15   Kik Messenger.  He used the same user name in each of those

16   counts, and he did it often while at the same residence as

17   the other party.

18        Also these were committed close in time.  The

19   crime involving Victims Two and Three was committed on

20   February 28th of 2016, while the substantive charges

21   regarding Victim Number One were committed on March 2nd and

22   March 3rd of 2016, while his receipt of child pornography on

23   Count 6 was committed on March 25th of 2016.  All but the

24   receipt charge, the defendant used the same user name, which

25   is important in identifying him as the person on the other

15

Motion

1    end of that chat.

2           And the receipt count is relevant to establishing

3    his identification as well in that it shows his interest in

4    children and using a user name that is specifically tied to

5    him on a phone that is specifically tied to him as well.

6           They allege that there are different

7    co-conspirators in this matter which requires severance.

8    Well, Mackenzie Bailey is a co-conspirator with Victim One

9    and Hillary Trimm is a co-conspirator with Victim Four, and

10   Victim Three and Two were victimized together by the

11   defendant.  Because all of the acts were close in time,

12   location, and because the participants are known to one

13   another, each is a witness to the offenses regarding the

14   others.

15          They allege that there are different types of

16   behavior.  It is not true.  Victim One and Victim Four

17   involve virtually identical behavior.  LaPorte, Bailey, and

18   Trimm lived together for a period of time.

19          With Victim Three and Victim Two, again, the

20   behavior in directing the activities and the images to be

21   produced and transmitted is virtually identical to how the

22   defendant committed the charged offenses with Victim One and

23   Victim Four.  That the receipt count involves the defendant

24   soliciting extreme baby pictures from another user, does not

25   separate this offense from the others.  Again, it is close

A 127

16

Motion

1    in time.  He is seeking out similar images to those he has

2    Bailey, Trimm, and Victim Three produce for him, and it is

3    also committed using Kik Messenger.

4         Bailey and Trimm would also testify in regard to

5    that count of the indictment that the defendant did solicit

6    child pornography from other Kik users and often told them

7    about it and showed them some of the pictures that he would

8    obtain from other Kik users.

9         The defense also implies that a trial of all of

10   the charged offenses would be overly cumbersome because they

11   maintain there are hundreds, if not thousands, of text

12   messages, and that's just simply not true.  There is an

13   extremely manageable number of relevant chats.  A handful

14   with Victim Three and Victim Two.  A short chat with the

15   defendant and banx75 for the receipt charge, and no chats

16   regarding the actual conduct with Victim Four except some

17   chats with Hillary Trimm that established the defendant's

18   identity as the user of the prouddaddy account involving

19   banx75.  There are more chats with Mackenzie Bailey, but

20   still a very manageable number.

21        They also allege that there are multiple persons

22   involved in these chats.  Well, there is a handful of

23   persons.  There is the defendant and Bailey, the defendant

24   and Victim Three, the defendant and banx75, and the

25   defendant and Hillary Trimm.  That is not anything that is

A 128

17

Motion

1    overly cumbersome.

2            The defendant alleges that there are different

3    dates, months, even years.  While all the chats recovered

4    and to be used in the trial are from just a few months in

5    2016.  The fact that the defendant is charged with

6    conspiring with Mackenzie Bailey as far back as 2014 does

7    not make this a years, years' long conspiracy or a case that

8    is overly cumbersome.  There will be no confusion.  This

9    case is not so complex that anyone could or would be

10   confounded.

11           This argument by the defense is simply a tactic to

12   attempt to compel severance where none is warranted.  They

13   say that the jury will rely on evidence of one crime to

14   infer guilt on another.  Well, in all cases in which such

15   evidence is produced, the courts endorse limiting

16   instructions where appropriate, and that would also be the

17   case here where appropriate.  But more importantly Rule 414

18   again sanctions propensity evidence, and the defendant even

19   concedes that this type of evidence is allowable under

20   Rule 414.

21           The government last night provided to the Court

22   and counsel, again, in support of our motion, two cases, one

23   from the Southern District of New York, United States versus

24   Gracesqui, in which the district court allow a joint trial

25   of two unrelated homicides committed fifteen months apart

18

Motion

1    finding that because some testimony regarding one would be

2    admissible at the trial of the other, that they were

3    properly joined and that there was no need to sever those

4    cases for trial.

5            Also in United States versus Reynolds, an Eighths

6    Circuit case, which involved child exploitation, they denied

7    a Rule 14 severance in a case that involved two different

8    children, the receipt of child pornography and enticement in

9    regard to one and sexual exploitation and production of

10   child pornography against the other.  And they specifically

11   noted that the testimony on one of the crimes or with one of

12   the victims would be admissible at the trial of the other.

13   Again, another nod for Rule 414.

14           There is clearly, Your Honor, a reason why there

15   are so few Rule 14 decisions relating to child exploitation

16   offenses, and that is probably Rule 414.  To sever any count

17   of this indictment will lead only to a Rule 414 analysis,

18   and proof of that offense is admissible on the trial of the

19   other counts.  Even as the defendant concedes Rule 414

20   allows such evidence, it presumes its admissibility.

21           The defendant's arguments in favor of severance,

22   Your Honor, falls short both on the facts and on the law.

23   There is solid, legal authority that permits the joinder of

24   all counts and a trial of all of the counts together.  Thank

25   you.

A 130

19

Motion

1                THE COURT:  Thank you.

2                Ms. Bianco, anything further?

3                MS. BIANCO:  No, Your Honor.

4                THE COURT:  I am prepared to enter a bench

5     decision at this time.

6                First, the introduction.

7                On April 20, 2017, a federal grand jury returned a

8     six-count Second Superseding Indictment charging the

9     defendant, Stacey J. LaPorte, Jr.,  with two counts of

10    conspiracy to sexually exploit a child, three counts of

11    sexual exploitation of a child, and one count of receipt of

12    child pornography.

13               Defendant now moves to, one, sever the six counts

14    for trial; two, suppress the statements he allegedly made in

15    violation of his Miranda rights; three, suppress evidence

16    retrieved from an LG cell phone; and four, exclude uncharged

17    crime evidence.  The Government opposes and cross-moves for

18    discovery.  In reply, defendant withdraws his motion to

19    suppress the cell phone evidence.

20               Further, the parties have agreed that decision on

21    the uncharged crime evidence is premature and will be

22    revisited at the time of trial.  Oral argument was just held

23    here today, on May 17, 2017, in Utica, New York.

24               First, discussion.

25               One, the severing of counts.

A 131

20

Motion

1          Defendant argues the six counts should be severed

2    and four trials should be granted, one for the first, third,

3    and fourth counts of the indictment; one for the second; one

4    for the fifth; and one for the sixth counts in the

5    indictment.  He maintains that the evidence on each count,

6    or set of counts, would be overly prejudicial to the jury's

7    consideration of the other counts, thereby depriving him of

8    a fair trial as to each charged offense.

9          Federal Rule of Criminal Procedure 14 permits a

10   court to order separate trials of multiple counts if it

11   appears that a defendant is prejudiced by the joinder of

12   offenses.  The decision to grant relief for a claim of

13   prejudicial joinder lies within the discretion of the court.

14   United States v. Werner, 620 F.2d 922, 926 (2d Cir. 1980).

15         In order to prevail, "the defendant must show not

16   simply some prejudice but substantial prejudice."  Id. at

17   928.

18         The case of United States v. Rivera, 546 F.3d 245

19   (2d Cir. 2008) is instructive.  There, the district court

20   denied the defendant's motion to sever counts of enticement

21   and interstate travel of two different minors, and a count

22   of production of child pornography.  The Second Circuit

23   affirmed, holding that the defendant's generalized claim of

24   prejudicial spillover was insufficient to support a Rule 14

25   severance and that Federal Rule of Evidence 414

21

Motion

1   "specifically sanctions the kind of showing that the

2   defendant says is impermissible and conducive to spillover."

3           Here, as in Rivera, LaPorte's generalized claims

4   fail to meet the substantial prejudice showing required for

5   severance under Rule 14 and his request to sever will be

6   denied.

7           Next, statements.

8           Defendant moves to suppress statements he made to

9   New York State Police Investigator Dewayne Baillargeon,

10  hereinafter referred to as Investigator B., on May 17, 2016.

11  He contends that he was drinking alcohol and smoking

12  marijuana before he was picked up by police and that

13  officers did not read him his Miranda rights until after he

14  already made incriminating statements.  Defendant has

15  submitted an affidavit and requests an evidentiary hearing

16  to resolve any factual disputes.  The Government has

17  submitted the affidavit of Investigator B., with

18  corroborating documents.

19          A defendant's custodial confession is admissible

20  so long as he knowingly and voluntarily waived his Fifth

21  Amendment rights after having been advised of them pursuant

22  to Miranda.  However, a confession is not voluntary when

23  obtained under circumstances that overbear the defendant's

24  will at the time it is given."  United States v. Taylor, 745

25  F.3d 15, 23 (2d Cir. 2014).

A 133

22

Motion

1          An individual's mental state should be considered

2     in the voluntariness inquiry to the extent it allowed law

3     enforcement to coerce the individual.  Colorado v. Connelly,

4     479 U.S. 157, 164-65 (1986).  "When a person is unconscious

5     or drugged or otherwise lacks capacity for conscious choice,

6     a confession cannot be voluntary."  Taylor, 745 F.3d at 24.

7          The Government must prove, by a preponderance and

8     under the totality of the circumstances, that defendant

9     voluntarily relinquished his rights, and did so with an

10    awareness of his rights and consequences thereof.  Connelly,

11    479 U.S. at 168.

12         A defendant is not automatically entitled to an

13    evidentiary hearing, rather, he must first "state sufficient

14    facts which, if proven, would [require] the granting of the

15    relief requested."  United States v. Seijo, 2003 WL

16    21035245, at 4 (S.D.N.Y. May 7, 2003).

17         He must show that disputed issues of material fact

18    exist before a hearing is required, and his allegations must

19    be "definite, specific, detailed, and nonconjectural."

20    United States v. Pena, 961 F.2d 333, 339 (2d Cir. 1992).

21         First, defendant gives no time frame as to when he

22    was drinking alcohol or smoking marijuana that day, nor does

23    he allege that he was incapacitated or that his alleged

24    intoxication in any way affected his ability to make a

25    voluntary statement.  According to Investigator B.'s

A 134

23

Motion

1    affidavit, defendant never indicated that he was under the

2    influence of alcohol or drugs, never showed any objective

3    signs of intoxication, and was able to communicate in a

4    lucid manner.  Defendant's vague statement regarding his

5    alcohol and drug use does not render his statement

6    inadmissible nor provide a sufficient basis on which to

7    conduct an evidentiary hearing.

8          Second, defendant alleges that Investigator B.

9    "talked to him for at least twenty minutes" before advising

10   him of his rights.  Investigator B.'s affidavit, as well as

11   the corroborating evidence, disputes this claim.  Defendant

12   was provided a courtesy transport from his home to the State

13   Police Massena station.  A New York State Police radio log

14   shows the transport began at 5:55 p.m. and defendant arrived

15   at the station at 5:58 p.m.

16         According to Investigator B., at 6:04 p.m. before

17   any questioning began, he read defendant his Miranda rights.

18   His interview notes begin with 6:04 p.m. written at the top

19   of the page.  He asserts that as he was taking pedigree

20   information from defendant, Trooper Brian LaBarge, who

21   assisted with the transport, knocked on the door of the

22   interview room.  Investigator B. stepped out and Trooper

23   LaBarge advised him that he needed to leave, but wanted him

24   to know that when defendant was getting into the police

25   vehicle at 5:55 p.m. for the transport, defendant stated,

A 135

24

Motion

1    without being questioned, "I know my sister is making

2    allegations."  This is memorialized in the interview notes,

3    with the time of 5:55 p.m., written after the interview

4    began at 6:04 p.m.

5           Investigator B. then began his interview of

6    defendant.  They spoke for less than ninety minutes.

7    Defendant made admissions and agreed to make a statement,

8    which the Investigator B. began typing at 7:30 p.m.  The

9    undisputed facts and evidence establish that there was

10   simply no twenty-minute period of time where anything

11   happened with the defendant before he was advised of his

12   rights.

13          Moreover, defendant does not allege that he made

14   any statements before being advised of his rights nor that

15   he did not understand or did not waive his rights.

16          Third and finally, any of defendant's other

17   allegations are irrelevant and/or patently false.  His

18   allegation that he was left in the interview room for "a few

19   hours" and then asked to sign a statement he did not see or

20   read is belied by the facts.  The entire encounter,

21   beginning with his courtesy transport at 5:55 p.m., lasted

22   two and a half hours.

23          As documented on the New York State Police

24   Voluntary Statement Form, Investigator B. began typing the

25   statement at 7:30 p.m. and completed it at 8:30 p.m.

A 136

25

Motion

1    Defendant sat next to the Investigator B. while he typed,

2    and they discussed what defendant wanted the statement to

3    say.  After it was printed, defendant was asked if he could

4    read and write, to which he responded in the affirmative.

5    He was asked to read the rights on the form, and initial

6    that he read, understood the rights, and agreed to give them

7    up and make a voluntary statement.  He then signed the

8    statement.  The entire process of preparing, reviewing, and

9    executing the statement took only one hour.

10           Defendant has raised no credible or definite,

11   specific, detailed, and nonconjectural allegation bearing on

12   the voluntariness of his statement, thus there is no factual

13   dispute to decide and an evidentiary hearing is not

14   required.  Instead, the undisputed facts show that defendant

15   was properly Mirandized, waived his rights, and gave a

16   voluntary statement.  His request to suppress any statements

17   will be denied.

18           The Government's request will be granted to the

19   extent it has not already been complied with.

20           For these reasons, defendant's motion will be

21   denied in its entirety and the Government's cross-motion

22   will be granted.

23           This is the decision of the Court, no written

24   decision will be issued.  A summary order will be filed

25   today.

26

Motion

1          Also, tomorrow morning a sealed order will be

2    filed tomorrow morning and, of course, copies will be

3    available to both counsel.  The sealed order will be

4    regarding the agreed-upon jury -- letter to the potential

5    jurors which will be issued tomorrow.  Also we will have

6    some other issues regarding the alleged victim.

7          The pretrial submission shall be filed on or

8    before June 2, 2017, and the trial is scheduled to start on

9    June 12th at 9:30 a.m. in Utica.

10          Is there any questions at this time, counselors?

11          MS. FLETCHER:  No, Your Honor.

12          MS. BIANCO:  Your Honor, I just want to point out

13    that my client has been moved to Delaware County and the

14    marshals were kind enough to tell me that if he had a

15    hearing, they would try to move him closer, but other than

16    that, he would have to stay there until the trial.  This is

17    going to cause a huge hardship for me because it is two and

18    a half to three hour drive each way for me to communicate

19    with my client, and I know that the marshals are doing

20    everything they can to try and get some space, but I need

21    the Court to be aware of the situation.

22          THE COURT:  Any problem with housing him in Oneida

23    County there, Mr. Marshal?

24          THE MARSHAL:  Your Honor, I --

25          THE COURT:  The trial may last a few days, and it

A 138

27

Motion

1    is going to be coming up.  I think he ought to be housed at

2    Oneida County for your convenience and everybody else's.

3            THE MARSHAL:  We can look into it, and I can get

4    back to you.  I just have to check the jail space out.

5            THE COURT:  Okay.  That's my request, that he be

6    at Oneida County.

7            THE MARSHAL:  Okay.

8            THE COURT:  Anything else?

9            MS. FLETCHER:  Nothing further.

10           MS. BIANCO:  Nothing, Your Honor.

11           THE COURT:  Mr. McBrearty.

12           COURT CLERK:  Court stands adjourned.

13

14

15

16

17

18

19

20

21

22

23

24

25

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

UNITED STATES OF AMERICA,

      v.

                                5:16-CR-320

STACEY J. LAPORTE, JR.,

               Defendant.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

APPEARANCES:                   OF COUNSEL:

HON. RICHARD S. HARTUNIAN     LISA M. FLETCHER, ESQ.
United States Attorney for the       SAHAR L. AMANDOLARE, ESQ.
   Northern District of New York    Ass't United States Attorneys
P.O. Box 7198
100 South Clinton Street
Syracuse, New York 13261

HON. LISA PEEBLES             RANDI J. BIANCO, ESQ.
Federal Public Defender for the     MARTIN P. WOLFSON, ESQ.
   Districts of Northern New York and Vermont  Ass't Federal Public Defenders
Attorneys for Defendant
4 Clinton Square, 3rd Floor
Syracuse, New York 13202

DAVID N. HURD
United States District Judge

**O R D E R**

    Pursuant to the oral decision of the court, entered into the record after hearing oral

argument on May 17, 2017, in Utica, New York, it is hereby

    ORDERED that

1. Defendant Stacey J. LaPorte, Jr.'s motion to sever counts of the Second Superseding Indictment for trial is DENIED;

2. Defendant Stacey J. LaPorte, Jr.'s motion to suppress the statements he made on May 17, 2016 is DENIED;

3. Defendant Stacey J. LaPorte, Jr.'s motion to suppress evidence retrieved from an LG cell phone is DENIED as moot;

4. Defendant Stacey J. LaPorte, Jr.'s motion to exclude uncharged crime evidence is DENIED without prejudice to renew; and

5. The United States of America's cross-motion for discovery is GRANTED to the extent it has not already been complied with.

IT IS SO ORDERED.

United States District Judge

Dated:  May 17, 2017
         Utica, New York.

- 2 -

A 141

242

DEWAYNE BAILLARGEON - Direct By Ms. Fletcher

1    Q.    What is a child forensic interview?

2    A.    A child forensic interview is a structured conversation

3    with a child to obtain or elicit detailed information with

4    regards to an event that the child either witnessed or

5    experienced.

6    Q.    Is that different than interviewing an adult?

7    A.    Yes, it is.

8    Q.    Why?

9    A.    It doesn't lead a child.  It allows a child to have a

10   conversation with somebody in a structured manner to elicit

11   information.

12   Q.    Was a child forensic interview conducted or arranged for

13   B.L.?

14   A.    It was.

15   Q.    Where was that conducted?

16   A.    It was conducted at the Children's Advocacy Center in

17   Plattsburgh, New York.

18   Q.    When was that?

19   A.    April of 2016.

20   Q.    Were you present for that?

21   A.    I was.

22   Q.    Did you continue your investigation thereafter?

23   A.    I did.

24   Q.    Did there come a time in that investigation into the

25   allegations brought forth by B.L. that you determined that

A 142

243

DEWAYNE BAILLARGEON - Direct By Ms. Fletcher

1   Stacey LaPorte should be interviewed regarding those

2   allegations?

3   A.   Yes, ma'am.

4   Q.   Did you make efforts to locate and interview him?

5   A.   Yes.

6   Q.   Did you find him?

7   A.   We did.

8   Q.   Where did you find him?

9   A.   The apartment of Paul Fregoe on North Main Street in

10  Massena.

11  Q.   What day was that?

12  A.   May 17, 2016.

13  Q.   Were you alone with or with another officer?

14  A.   I was not.  I was with a marked unit or uniformed police

15  officer.

16  Q.   As an investigator, do you wear this trooper uniform on a

17  day-to-day basis?

18  A.   No, I do not.  I wear business attire.

19  Q.   Who was the trooper that you were with?

20  A.   It was Trooper Brian Lamarch (phonetically).

21  Q.   What time was it when you arrived at the location at

22  Paul Fregoe's house on Main Street?

23  A.   5:50 p.m..

24  Q.   5-0, fifty?

25  A.   Yes, ma'am.

244

DEWAYNE BAILLARGEON - Direct By Ms. Fletcher

1    Q.    Can you explain to the members of the jury what happened

2    when you arrived?

3    A.    Absolutely.  We proceeded to a small hallway that goes up

4    a flight of stairs to a small landing.  I knocked on the door

5    of the apartment of Paul Fregoe.  Mr. Fregoe answered the door.

6    At that time I told him I was looking for Stacey LaPorte.  He

7    said just a minute.  He retreated back into the apartment, and

8    Mr. LaPorte appeared.

9    Q.    At the door?

10   A.    Yes, ma'am.

11   Q.    Did you have a conversation with Mr. LaPorte?

12   A.    I did, very brief conversation.

13   Q.    What did you tell him?

14   A.    I explained to him there was allegations made against him

15   and that I needed to speak with him.

16   Q.    Did you tell him who the allegations had been made by?

17   A.    I don't believe at that time, no.

18   Q.    Did you ask him to speak -- whether he was willing to

19   speak with you?

20   A.    I did.  I didn't feel the appropriate place to have this

21   conversation was at the top of a flight of stairs for safety

22   reasons.  So I asked him if he would come down to the station

23   to speak with me there.

24   Q.    What was his response?

25   A.    He said yes, but he did not have a ride.

A 144

245

DEWAYNE BAILLARGEON - Direct By Ms. Fletcher

1    Q.    Were you able to provide or was someone able to provide a

2    ride for Mr. LaPorte to the station?

3    A.    Yes.  Trooper Lamarch provided a courtesy transport from

4    the location we were at to the station.

5    Q.    How long did the conversation last at the top of the

6    stairs at Paul Fregoe's house?

7    A.    A minute to two minutes.

8    Q.    And did you drive separately from Trooper Lamarch?

9    A.    I did, yes.  I had my police vehicle.

10   Q.    Did you see the defendant go to Trooper Larmarch's

11   uniformed car?

12   A.    Yes.

13   Q.    Was he handcuffed?

14   A.    No, he was not.

15   Q.    Was he under arrest?

16   A.    No, not at that point.

17   Q.    Do you see Stacey LaPorte in the courtroom today?

18   A.    I do.

19   Q.    Could you identify him for the jury please?

20   A.    Yes.  He is sitting there.  He has a black shirt, his

21   glasses on the top of his head.

22         MS. FLETCHER:  Your Honor, may the record reflect

23   that he has identified the defendant?

24         THE COURT:  So noted.

25   BY MS. FLETCHER, CONTINUED:

A 145

246

DEWAYNE BAILLARGEON - Direct By Ms. Fletcher

1    Q.    What time was it that Trooper Lamarch provided the

2    transport for the defendant from Paul Fregoe's home to the

3    State Police barracks?

4    A.    It was 5:55 p.m..

5    Q.    When you left?

6    A.    Yes, ma'am.

7    Q.    How far is it from 245 North Main Street to SP Massena?

8    A.    Two to three miles maximum.

9    Q.    And what time then did the defendant arrive at SP Massena

10   with Trooper Lamarch?

11   A.    5:58 p.m..

12   Q.    Is there a reason you know specifically 5:58 p.m.?

13   A.    Yes, ma'am.  We are required to call the beginning and

14   ending mileage of courtesy transports and it is recorded on a

15   radio log.

16   Q.    You have reviewed reports in that regard?

17   A.    Yes.

18   Q.    Did you arrive back at SP Massena at about the same time?

19   A.    Yes, ma'am.

20   Q.    What happened next?

21   A.    We proceeded into the station.  I advised Trooper Lamarch

22   to have Mr. LaPorte enter into the interview room so I could

23   speak with him.

24   Q.    Did Mr. LaPorte go into the interview room?

25   A.    He did.

247

DEWAYNE BAILLARGEON - Direct By Ms. Fletcher

1    Q.    Was he handcuffed?

2    A.    No, he was not.

3    Q.    What did you do when Trooper Lamarch put the defendant

4    into the interview room?

5    A.    I had to grab a pad of paper, and I proceeded into the

6    interview room.

7    Q.    Can you describe the interview room?

8    A.    Yes, ma'am.  It is approximately eight feet wide with a

9    door on one end, twelve feet deep with a desk and two chairs.

10   Q.    I am going to hand you Government's Exhibit 30 for

11   identification?

12   A.    Thank you.

13   Q.    Do you recognize what is depicted in that exhibit?

14   A.    I do.

15   Q.    What is that?

16   A.    This is the interview room with two chairs and a desk.

17   Q.    Does that appear the same condition as it did on May 17th

18   of 2016 when you interviewed the defendant in that room?

19   A.    Yes, ma'am.

20   Q.    Same size, same desk, same chair?

21   A.    Yes, ma'am.

22         MS. FLETCHER:  Judge, I move Exhibit 30 into

23   evidence.

24         THE COURT:  Any objection?

25         MR. WOLFSON:  No objection, Your Honor.

A 147

248

DEWAYNE BAILLARGEON - Direct By Ms. Fletcher

1          THE COURT:  Received.

2          (Exhibit No. 30, received.)

3          MS. FLETCHER:  May we publish that?

4          THE COURT:  You may.

5   BY MS. FLETCHER, CONTINUED:

6   Q.   Exhibit 30 is now up on the monitors so the jury can see

7   it.  The chair to the right of the image is where Mr. LaPorte

8   would have sat?

9   A.   Yes, ma'am.

10  Q.   And you sat at that desk?

11  A.   I did.

12  Q.   How long did you speak with him in that room?

13  A.   Less than ninety minutes.

14  Q.   What time did your interview begin?

15  A.   My interview began at 6:04 p.m.

16  Q.   How did you begin your interview?

17  A.   Miranda.

18  Q.   What are the Miranda rights?

19  A.   They are his rights to remain silent if he wishes to.

20  Q.   Do you have a card from which you read Miranda rights to

21  targets that you are interviewing?

22  A.   Yes, ma'am.

23  Q.   Is that a card that you carry with you at all times?

24  A.   It is.

25  Q.   I am going to hand you Government's Exhibit 1 for

249

DEWAYNE BAILLARGEON - Direct By Ms. Fletcher

1    identification.

2    A.   Thank you.

3    Q.   Do you recognize that exhibit?

4    A.   Yes, ma'am, I do.

5    Q.   What is that?

6    A.   This is a copy of my Miranda card.

7    Q.   Is that a photograph?

8    A.   It is.

9    Q.   Did you take that photograph?

10   A.   I did.

11   Q.   Is that the exact Miranda card that you used in May of

12   2016 to advise the defendant of his rights?

13   A.   It is.

14          MS. FLETCHER:  Judge, I would move Exhibit 1 into

15   evidence.

16          THE COURT:  Any objection?

17          MR. WOLFSON:  No objection.

18          THE COURT:  Received.

19          (Exhibit No. 1, received.)

20          MS. FLETCHER:  May we publish that, please?

21   BY MS. FLETCHER, CONTINUED:

22   Q.   Investigator Baillargeon, looking at Exhibit 1, did you

23   read each right on this card to the defendant as it appears on

24   the card?

25   A.   I did.

250

DEWAYNE BAILLARGEON - Direct By Ms. Fletcher

1    Q.    Verbatim?

2    A.    Verbatim.

3    Q.    I am going to ask you to read to the jury the rights you

4    read to the defendant as you read them to him, please?

5    A.    Number one:  You have a right to remain silent.  Number

6    two:  Anything you can say will be used against you in a court

7    of law.  Number three:  You have the right to talk to a lawyer

8    and have a lawyer present with you while you are being

9    questioned.  If you cannot afford to hire a lawyer, one will be

10   appointed to represent you free of charge before any question

11   if you wish.  You may decide at any time to exercise these

12   rights and not answer any questions or make any statements.

13   The waiver was one, do you understand each of these rights I

14   have explained to you.  And having these rights in mind, do you

15   wish to talk to us now?

16   Q.    Did the defendant respond to the questions in the waiver?

17   A.    He did.

18   Q.    So when you read to him do you understand each of these

19   rights I have explained to you, did he respond after you read

20   that question?

21   A.    He did.

22   Q.    What was his response?

23   A.    Yeah, yeah.

24   Q.    Did you then read to him having these rights in mind, do

25   you wish to talk to us now?

251

DEWAYNE BAILLARGEON - Direct By Ms. Fletcher

1    A.    Yes.

2    Q.    What was his response to that question?

3    A.    Again, it was yeah.

4    Q.    After you read the rights to the defendant, what did you

5    do next?

6    A.    Engaged him in conversation.

7    Q.    Was anyone else present?

8    A.    There was not.

9    Q.    Where was Trooper Lamarch?

10   A.    Trooper Lamarch actually -- after I finished Miranda, he

11   knocked on the door and explained to me he had to leave to

12   engage another call.

13   Q.    Did he say something else to you at that time?

14   A.    He did.  He said that when he was getting in the car that

15   the defendant, Mr. LaPorte, stated that he knew his sister was

16   making allegations.

17   Q.    Was the defendant still unhandcuffed when you began your

18   questioning?

19   A.    Yes, ma'am.

20   Q.    And you indicated to him -- to the jury that you spoke to

21   him in the interview room for how long?

22   A.    Less than ninety minutes.

23   Q.    Was he cooperative?

24   A.    He was.

25   Q.    Were his answers responsive your questions?

252

DEWAYNE BAILLARGEON - Direct By Ms. Fletcher

1   A.   They were.

2   Q.   Did he appear to be intoxicated or under the influence of

3   drugs or alcohol?

4   A.   No, ma'am.

5   Q.   Did he ever say to you that he was under the influence?

6   A.   He did not.

7   Q.   Did he ever say to you that he had difficulty

8   understanding you?

9   A.   He did not.

10  Q.   Did he ever request an attorney?

11  A.   He did not.

12  Q.   Did he ever ask to stop speaking to you?

13  A.   He did not.

14  Q.   Did you record the interview?

15  A.   I did not.

16  Q.   Can you explain to the members of the Grand Jury (sic)

17  the recording system at the state police barracks at that time?

18  A.   Yes, ma'am.  It is a newly integrated system.  And

19  unfortunately I did not know how to run it, and I was the only

20  one at the station.

21  Q.   Was there anyone at the barracks to help you?

22  A.   There was not.

23  Q.   Did you need training before you were able to run it?

24  A.   Yes, ma'am.

25  Q.   You had not had that training?

A 152

253

DEWAYNE BAILLARGEON - Direct By Ms. Fletcher

1    A.    Not at the point of his interview.

2    Q.    We did you get the training?

3    A.    It was in June is when I received that training.

4    Q.    After speaking with the defendant, did you ask if he

5    would be willing to provide a written statement summarizing the

6    things that he had told you?

7    A.    Yes, ma'am.

8    Q.    Did he agree to that?

9    A.    He did.

10   Q.    How did you accomplish taking a written statement from

11   the defendant?

12   A.    Well, we moved from the interview room to my actual desk.

13   I have two monitors at my desk.  One would face the laptop,

14   which he was able to view.  And the larger one that I used as

15   we were typing it.

16   Q.    Was he still unhandcuffed?

17   A.    He was.

18   Q.    Could you explain to the members of the jury how you go

19   about condensing someone's oral statements into a written

20   statement?

21   A.    Yes, ma'am.  I would take my notes from the interview.  I

22   would use them as an outline to set up, type a bit, discuss it,

23   wouldn't move on to the next subject until he agreed that

24   everything in there was what he wanted to say.

25   Q.    Did you follow that procedure with Mr. LaPorte?

254

DEWAYNE BAILLARGEON - Direct By Ms. Fletcher

1    A.    I did.

2    Q.    Did you discuss the content of the statement as you were

3    typing?

4    A.    Yes, ma'am.

5    Q.    And did he agree with each sentence, each line that you

6    were writing as you were writing it?

7    A.    Yes, ma'am.

8    Q.    Did he ask to change, add or delete anything?

9    A.    He did not.

10   Q.    How long did this process take?

11   A.    An hour.

12   Q.    What time did you start taking the written statement?

13   A.    I began typing at 7:30.

14   Q.    Is that indicated on the statement form somewhere?

15   A.    It is.

16   Q.    Did you ask him his date of birth?

17   A.    I did.

18   Q.    What is his date of birth?

19   A.    09/23 of 1990.

20   Q.    What time did you finish typing the statement?

21   A.    8:30.

22   Q.    Is that indicated on the statement form as well?

23   A.    It is, yes.

24   Q.    So from the time you started typing to the time you

25   finished was an hour; is that correct?

A 154

255

DEWAYNE BAILLARGEON - Direct By Ms. Fletcher

1   A.   Finished typing was an hour, yes, ma'am.

2   Q.   What did you do after you stopped typing that written

3   statement?

4   A.   Stopped typing, I printed it so that he would have a hard

5   copy to read.

6   Q.   What did you do with the printed version?

7   A.   I brought it over to my desk, and at the top of the

8   printed version is his Miranda warnings again.

9   Q.   What did you do with that?

10   A.   I went through each one of them, and I explained to him

11   that he needed to read and initial next to each one to make

12   sure that he understood his rights.

13   Q.   Did he do that?

14   A.   He did.

15   Q.   And then what happened?

16   A.   There is a signature line at the bottom which allows him

17   to sign so at that he understands his Miranda Rights.

18   Q.   Did you read those out loud to him or did he read them to

19   himself?

20   A.   I did not read them aloud.  He read them to himself.

21   Q.   Did you ask him if he could read?

22   A.   I did.

23   Q.   What was his response?

24   A.   Yes, I read fine.

25   Q.   Did he appear to be reading them?

A 155

256

DEWAYNE BAILLARGEON - Direct By Ms. Fletcher

1    A.    He did.

2    Q.    Did he initial each right as he read them?

3    A.    Yes, ma'am, he did.

4    Q.    Did he read all of it and then initial all of it or did

5    he initial one by one?

6    A.    No.  He read the -- there is two lines to each one.  He

7    read those two lines, initialed it, read the two lines,

8    initialed it, read the two lines, initialed it.

9    Q.    After he initialed and signed the Miranda portion of the

10   statement form, what happened next?

11   A.    I allowed him to -- right where he was sitting I handed

12   it to him and allowed him to read the entire document at his

13   leisure, as fast or as slow as he needed to.

14   Q.    Had you read what you were typing out loud to him while

15   you were preparing the statement?

16   A.    Yes, ma'am.

17   Q.    So had he heard, sitting next to you, all of it read out

18   loud before you printed it?

19   A.    He had heard it read out loud before.  He was able to

20   view it on the second monitor to allow him to follow as I was

21   typing.

22   Q.    And then you gave him the printed version and asked him

23   to read that to himself?

24   A.    Yes, ma'am.

25   Q.    Did he appear to take the time to read it?

A 156

257

DEWAYNE BAILLARGEON - Direct By Ms. Fletcher

1    A.   He did.

2    Q.   Did you ask him if there was anything that he wanted to

3  change, add or delete after he read the printed version?

4    A.   I did.

5    Q.   What has his response?

6    A.   He said no.  It looks fine.

7    Q.   What happened next?

8    A.   The next thing I would do is explained the signature

9  process to him.  On the top of each page we initialed it

10  indicating the page number, one of two or two of two or one of

11  three.  I initialed it.  He initialed it.  Proceeded to the

12  bottom, made an indication that it was the end of the page.  He

13  was allowed to initial that as well.  The next page, we did the

14  same thing, initials, and on the signature page, he was allowed

15  to read through everything and again sign.

16    Q.   Did he do that?

17    A.   He did.

18    Q.   Was he handcuffed at that time?

19    A.   He still was not.

20    Q.   What happened next?

21    A.   At that time, while he was reading, Trooper Lamarch had

22  come by the door of my office and indicated that he was back.

23  So as soon as he was done reading and signing it, I advised

24  Trooper Lamarch to come take Mr. LaPorte into custody.

25    Q.   Was he arrested at that time?

A 157

258

DEWAYNE BAILLARGEON - Direct By Ms. Fletcher

1   A.   He was, yes.

2   Q.   What happened with him then?

3   A.   He was taken down and processed by Trooper Lamarch.

4   Q.   I am going to hand you Government's Exhibit 2 for

5   identification.

6   A.   Thank you.

7   Q.   Do you recognize that exhibit?

8   A.   Yes, ma'am, I do.

9   Q.   What is that?

10  A.   This is the New York State Police voluntary statement,

11  written statement that I took from Stacey LaPorte on May 17th.

12          MS. FLETCHER:  Judge, at this time I would move

13  Exhibit 2 into evidence.

14          THE COURT:  Any objection?

15          MR. WOLFSON:  No objection, Your Honor.

16          THE COURT:  Received.

17          (Exhibit No. 2, received.)

18          MS. FLETCHER:  I am going to ask to publish that at

19  this time starting with page one.

20  BY MS. FLETCHER, CONTINUED:

21  Q.   And, Investigator Baillargeon, first of all, looking at

22  page one you indicated that there were signatures and initials.

23  So let's start at the top, page one of three, and there are

24  some initials at the top right corner?

25  A.   Yes, ma'am.

259

DEWAYNE BAILLARGEON - Direct By Ms. Fletcher

1   Q.   Whose initials are they?

2   A.   Those are Stacey LaPorte's and mine.

3   Q.   And at the bottom it says end of page one and there is

4   initials, whose initials are they?

5   A.   Stacey LaPorte's.

6   Q.   And then I am going to have you read the document

7   starting -- read page one of the document right now starting at

8   I, Stacey J. LaPorte, Jr.

9   A.   I Stacey J. LaPorte, Junior, age twenty-five, and born on

10  September 23, 1990, and residing at 52 Maple Street, Apartment

11  3, Massena, New York have been advised by Investigator Dewayne

12  R. Baillargeon of the New York State Police of the following:

13       I have the right to remain silent, and I do not have to

14  make any statement if I do not want to.  If I give up that

15  right, anything I do say can and will be used against me in a

16  court of law.  I have the right to have a lawyer present before

17  making any statement or at any time during this statement.  If

18  I should decide that I do not want a lawyer and cannot afford

19  to hire one, a lawyer will be appointed for me free of charge

20  and I may have that lawyer present before making any statement.

21       I also understand that I have the right to stop at any

22  time during this statement and remain silent and have a lawyer.

23  I fully understand these rights and at this time I agree to

24  give up my rights and make the following statement.

25  Q.   Let me stop you there for a second.  I want to go up to

260

DEWAYNE BAILLARGEON - Direct By Ms. Fletcher

1   the very first paragraph.  It says residing at 52 Maple Street,

2   Apartment 3, Massena, New York.  Who gave you that information?

3   A.   He did.

4   Q.   That was what he indicated to you in May of 2016 was his

5   current address?

6   A.   Yes, ma'am.

7   Q.   Where did you find him on that day?

8   A.   245 North Main Street in Massena at the apartment of

9   Paul Fregoe.

10   Q.   If you could read the narrative portion starting after

11   his signature of the rights?

12   A.   I am at the state police barracks in Massena speaking

13   with Investigator Dewayne Baillargeon of the New York State

14   Police with regards to sexual intercourse I had with my sister

15   B.L..  I am giving this statement of my own free will.

16       When I two, three olds until I was five or six years old,

17   my grandfather, Douglas Judware abused me.  He would touch my

18   dick and he would touch mine.  He would make me jerk him off.

19   It stopped when I was five or six years old because I told my

20   mom and dad.  I think an investigation was done and he lost his

21   job as a school bus driver, but no physical evidence, and he

22   did not get charged and he kept living his life.  After my

23   sister was born I was --

24   Q.   I am going to stop you there.  Can you back up, please?

25   You skipped a part.

A 160

261

DEWAYNE BAILLARGEON - Direct By Ms. Fletcher

1    A.    I am sorry.  Where was I?

2    Q.    After my sister -- start with that.

3    A.    After my sister B.L. was born, I was nine or ten years

4    old, my mother, Mandy L. LaPorte, starting abusing me.  She

5    would always drink and smoke marijuana at night.  She would

6    wake me up --

7    Q.    Hang on.  We need to switch to page two, please.

8    A.    She would wake me up by touching my dick.  She would tell

9    me to get into her room and she would get undressed.  She would

10   tell me to do stuff like finger her and made me put my dick in

11   her pussy.  This would happen almost every night especially

12   when she was drinking or smoking pot.  This was for about a

13   year.  I was about eleven years old.  I went to live with my

14   dad in Brasher Falls.

15        I was about sixteen when I moved to Massena with my mom,

16   my sister, and my little brother.  We moved to Town Line Road.

17   We lived there until I was nineteen years old.  We moved from

18   there to 2 Willow Street, Massena, after a house fire.  We

19   lived there for a couple of months, and then we moved to 64

20   Grantville Road in Norfolk.

21        In 2010, my mom found out she had cancer and had to go to

22   the hospital and they kept her over night.  I stayed in the

23   house with B.L..  I think she was eleven or twelve years old.

24   We started texting on my sister's Ipod in the Notes app.  I was

25   asking her if she remembered what grandpa used to do us when we

262

DEWAYNE BAILLARGEON - Direct By Ms. Fletcher

1    were little, and she said yes.

2        We were using the same Ipod to text back and forth.  I

3    would type something and hand it to her.  I asked her if she

4    wanted to continue what grandpa started, and she said yes.  We

5    went into the bedroom and she took off her own clothes and I

6    took off mine.  I had an erection.  She laid down on the bed on

7    her side.  I laid down behind her, and I put my dick inside

8    her.  It was like five minutes.  I pulled out of her and

9    ejaculated.  I don't remember where it went.  She went into the

10   bathroom and cleaned herself up.  We got dressed and went back

11   out into the living room.

12       My mom, B.L., and Kyler moved to Felts Mills with my

13   mother.  I stayed with my friends on Grantville Road.  I never

14   had sex with B.L. when she was living in Felts Mills with my

15   mother.  My mother died on September 11, 2013.  My sister moved

16   back to Brasher Falls with our father.  Six months later my

17   father died, and my sister moved in with me and Sinclair Bab at

18   2 Willow Street, Massena.  We had sex there once or twice.  I

19   don't remember the particulars.  It did happen a few times when

20   I was drunk.

21       We moved from there to 52 Maple Street, Apartment 2 in

22   the Village of Massena.  B.L. and I had sex there two or three

23   more times.  It was always agreed upon by both of us.  I never

24   forced her.  We moved from Maple to Somerset Avenue.  I lived

25   there with Mackenzie Bailey, A.T., me, and B.L..  B.L. and I

A 162

263

DEWAYNE BAILLARGEON - Direct By Ms. Fletcher

1   had sex two or three times when we lived there.  I don't
2   remember all the details, but each time I stuck my dick in her
3   pussy.  I never ejaculated inside her.  I always ejaculated on
4   her or on the bed.
5       We moved to 18 Talcott Street.  We had sex four more
6   times when we lived there.  We were there for about 8 months
7   and we moved to the cabin in Chase Mills.  I lived there with
8   Mackenzie, B.L., and A.T..  Over the next two or three months,
9   we had sex three or four times.  It usually happened when we
10  were alone, and I was having a bad day remembering my abuse and
11  dealing with my parents' death.  We lived in the cabin for
12  about two or three months.
13      And we moved to Glenn Street in the Village of Massena.
14  I think we had sex twice while I lived there.  That was when
15  everything happened, and she left and ran away.  Nicholas Emens
16  came to my house on Glenn Street to get his XBox with my sister
17  B.L. because I told him I needed to talk to her.  I thought she
18  was going to run away.  We started talking and asking what was
19  going on, what were her plans.  She told me she was not running
20  away, and we started arguing.  I told her I had enough and we
21  should just die and be with our parents.  She took it as a
22  threat.
23      After they left, I tried to get ahold of Nick by calling
24  and texting him because he was supposed to be my best friend.
25  He never answered me back after I texted him.  I have not had

A 163

264

DEWAYNE BAILLARGEON - Direct By Ms. Fletcher

1  sex with B.L. since she left my house on Glenn Street.

2  Q.  And he signed on that line that says end of statement?

3  A.  Yes, ma'am, he did.

4  Q.  In the statement the defendant mentions a number of

5  locations where he had sexual intercourse with his sister B.L.?

6  A.  Yes, ma'am, he does.

7  Q.  Are you familiar with each of the locations mentioned in

8  his statement?

9  A.  I am.

10  Q.  How are you familiar with those locations?

11  A.  I have lived in the area a long time.  I have been a

12  police officer for seventeen years.  They are all very close to

13  where I work.

14  Q.  Behind you there is Government's Exhibit 3, which is a

15  map.  Do you recognize the map and the locations depicted on

16  the map?

17  A.  Yes, ma'am, I do.

18  Q.  Are each of those locations that were mentioned by the

19  defendant in his statement as to where he abused his sister

20  B.L.?

21  A.  Yes, ma'am.

22  Q.  Who took the pictures?

23  A.  Myself and Special Agent Willard (phonetically).

24  Q.  Does the map accurately depict each of the locations,

25  where they are and what they look like?

A 164

265

DEWAYNE BAILLARGEON - Direct By Ms. Fletcher

1    A.    Yes, ma'am, they do.

2    Q.    Did your investigation reveal approximate dates that the

3    defendant lived in each of those locations?

4    A.    Yes.

5    Q.    And are those dates on that map as well as the address?

6    A.    Yes, they are.

7    Q.    So I am going to have you, with the Court's permission,

8    have you come down to the map.

9            MS. FLETCHER:  If that is okay, Judge?

10           THE COURT:  You may.

11   BY MS. FLETCHER, CONTINUED:

12   Q.    First, the defendant stated that he and B.L. -- or that

13   B.L. moved in with him and Sinclair Bab at 2 Willow Street in

14   Massena.  Could you point that out to the jury, please?

15   A.    Yes, ma'am.  It is at this location in the center.

16   Q.    So the location is at the end of the arrow and the

17   picture is right there on the side; is that correct?

18   A.    That is correct.

19   Q.    2 Willow Street, does that have a name in the community

20   that people refer to it as?

21   A.    It is usually referred to as the OTB building.

22   Q.    Why is it referred to as the OTB?

23   A.    It was previously owned and used as an Off Track Betting

24   location.  It was bought by an individual at which time it was

25   converted into apartments.

276

DEWAYNE BAILLARGEON - Cross by Mr. Wolfson

1    A.   That's correct.

2    Q.   And you testified that she is under eighteen?

3    A.   Yes, I did.

4    Q.   And it is best practices to have a forensic interview

5    when someone is under eighteen, right?

6    A.   I am sorry.  I don't understand you.

7    Q.   You testified before the Grand Jury on September 19,

8    2016, right?

9    A.   Yes, sir.

10   Q.   And there you testified that it is best practices to have

11   a forensic interview when someone is under eighteen?

12   A.   Up to the age of eighteen.

13   Q.   When you were answering those questions, you said the

14   forensic interview was important because it doesn't lead a

15   child?

16   A.   That is correct.

17   Q.   But before you conducted the forensic, you interviewed

18   B.L., yourself?

19   A.   I did.

20   Q.   But you are not trained to conduct forensic interviews of

21   children?

22   A.   I am.

23   Q.   You testified that on sent 29th that you weren't?

24   A.   I wasn't at that point in time.  I have since been

25   trained.

277

DEWAYNE BAILLARGEON - Cross by Mr. Wolfson

1   Q.   Okay.  So when you were actually interviewing B.L. you

2  hadn't been trained?

3   A.   I had not at that point.

4   Q.   During this investigation you learned that C.F. was

5  involved in this case?

6   A.   I did.

7   Q.   And had you learned that C.F. would lie to her mother?

8         MS. FLETCHER:  Objection.

9         THE COURT:  Overruled.  Cross-exam.

10  BY MR. WOLFSON, CONTINUED:

11   Q.   The question was you learned that C.F. would lie to her

12  mother?

13   A.   Occasionally.

14   Q.   Specifically she would lie about hanging out with B.L.

15  when she was really going over to Mackenzie and Stacey's

16  apartment?

17   A.   I didn't interview C.F. at that point in time.

18   Q.   And you did take a statement from Stacey LaPorte, right?

19   A.   I did.

20   Q.   And you typed up this statement at the police barracks in

21  Massena?

22   A.   Yes, sir, I did.

23   Q.   He didn't write the statement, himself?

24   A.   He did not.

25   Q.   You didn't let him sit at the computer and type it up?

278

DEWAYNE BAILLARGEON - Cross by Mr. Wolfson

1    A.    He sat next to me.

2    Q.    And he was handcuffed to the floor at that point?

3    A.    He was not.

4    Q.    You testified at the State Grand Jury that you didn't

5    type up Stacey LaPorte's statement verbatim, right?

6    A.    It is not verbatim.

7    Q.    Instead you typed it up in sum and substance, correct?

8    A.    That's correct.

9    Q.    Did you also testify that you didn't have him read any

10   portion of that statement back to you?

11   A.    He did not read it back to me.  He read it to himself.

12   Q.    He did not have his glasses on at that point?

13   A.    He did not.

14   Q.    And Officer Lamarch is the one that brought Stacey to the

15   police barracks?

16   A.    He did.

17   Q.    When he was there he was friendly?

18   A.    Who was friendly?

19   Q.    Stacey?

20   A.    Yes.

21   Q.    And he was cooperative?

22   A.    He was.

23   Q.    And he spoke to you voluntarily even after you told him

24   he didn't have to?

25   A.    Yes, he did.

279

DEWAYNE BAILLARGEON - Cross by Mr. Wolfson

1    Q.   The apartment where he was picked up, he didn't own,

2    right?

3    A.   I am sorry, he didn't --

4    Q.   The apartment where Stacey was picked up wasn't owned by

5    Stacey, was it?

6    A.   No, it was not.

7    Q.   Paul Fregoe owned that apartment?

8    A.   I wouldn't be able to tell you who owns the apartment.  I

9    know Paul Fregoe is the person that was there when I picked him

10   up.

11   Q.   Okay.  Did you also have the opportunity to interview

12   Mackenzie Bailey?

13   A.   I did.

14   Q.   Did you learn that she was romantically involved with

15   Stacey?

16   A.   I did.

17   Q.   Did you also learn that she was romantically involved

18   with Hillary Trimm?

19   A.   I don't recall if she told me that or not at that point.

20   Q.   You also interviewed B.L.?

21   A.   Yes, sir, I did.

22   Q.   And that interview was recorded pursuant to New York

23   State Police guidelines?

24   A.   For B.L.?

25   Q.   Yes.

A 169

280

DEWAYNE BAILLARGEON - Cross by Mr. Wolfson

1    A.   At the time, yes.

2    Q.   And you interviewed J.M.?

3    A.   I did.

4    Q.   And that interview was also recorded?

5    A.   It was.

6    Q.   But Stacey LaPorte's was not?

7    A.   It was not.

8    Q.   And you said the equipment was available?

9    A.   The equipment was newly installed, but my training had

10   not been put in place yet.

11   Q.   And you had been an investigator for seventeen years?

12   A.   No, I was not an investigator for seventeen years.  I was

13   an investigator for four years.

14   Q.   And there was no one else in the police barracks that

15   could help you with the recording equipment?

16   A.   There was no one else.

17   Q.   And you couldn't wait for Trooper Lamarch to come back to

18   help you?

19   A.   I was unaware of how long it would take Trooper Larmarch

20   to get back to the station.

21   Q.   You couldn't call Trooper Lamarch or anyone else to help?

22   A.   Not when I was engaged in an interview.

23   Q.   You couldn't put it off for the five minutes it would

24   take to call someone and ask for help?

25   A.   Unfortunately at that point, no.

A 170

281

DEWAYNE BAILLARGEON - Cross by Mr. Wolfson

1    Q.    So long story short, there is no audio recording of

2    Stacey Laporte making his statement?

3    A.    There is not.

4    Q.    And there is no video recording?

5    A.    There is not.

6    Q.    As part of your investigation you made an unannounced

7    visit to the home where Stacey LaPorte was staying at 44 Glenn

8    Street on January 16, 2016?

9    A.    No, sir, I did not.

10   Q.    You did write in an e-mail to Toni Salerno that you

11   visited this house at 44 Glenn Street on January 16th, is that

12   not true?

13   A.    I don't recall going to Glenn Street.

14   Q.    Would you seeing your e-mail refresh your recollection?

15   A.    It may.

16         MR. WOLFSON:  May I approach?

17         THE COURT:  You may.

18   A.    This is actually Toni Salerno's notes.  This is written

19   by Toni Salerno.  She was the one that made an unannounced

20   visit to 44 Glenn Street.

21   BY MR. WOLFSON, CONTINUED:

22   Q.    Okay.  Understood.  My apologies.  Now, before you

23   interviewed Stacey LaPorte, you hadn't any allegations about

24   any abuse being committed against A.T.?

25   A.    B.L. had mentioned in her statement that she -- at the

A 171

282

DEWAYNE BAILLARGEON - Cross by Mr. Wolfson

1    very end of it she had said that there were things that he had

2    done to her as well other children, and she listed them.

3    Q.    And turning to Stacey's statement, you testified that it

4    began at 6:04 p.m.?

5    A.    That's correct.

6    Q.    But on the voluntary statement sheet it says the

7    statement start time was 7:30; is that not true?

8    A.    That is correct.

9    Q.    Okay.  And you testified during the first Grand Jury that

10   you arrived at Paul's apartment at 5:30?

11   A.    I may have.  I was unaware at the time, but after

12   checking the radio logs I was able to identify exactly what

13   time.

14           MR. WOLFSON:  I have no further questions.

15           THE COURT:  Redirect, if any.

16           MS. FLETCHER:  Thank you, Your Honor.

17

18   REDIRECT EXAMINATION BY MS. FLETCHER:

19   Q.    Investigator Baillargeon, could you just clarify the 6:04

20   and the 7:30, what the difference is in beginning the

21   defendant's statement at 6:04 and what happened then and what

22   happened at 7:30.

23   A.    Absolutely.  At 6:04 we were in the interview room and

24   began talking, engaged in conversation, getting through

25   everything we needed to get through.  It is a sensitive subject

A 172

283

DEWAYNE BAILLARGEON - Redirect by Ms. Fletcher

1   to talk about.  At 7:30 I began typing in my office.

2   Q.   So when Mr. Wolfson asked you about whether this typed

3   statement is verbatim, it isn't verbatim of the ninety

4   minute -- it isn't a transcription of that ninety minute

5   interview; is that correct?

6   A.   That's correct.

7   Q.   It is a summary of that ninety minute interview?

8   A.   Yes.

9   Q.   Who is Toni Salerno?

10  A.   Toni Salerno would be a Child Protective Services worker

11  who was tasked with the B.L. investigation on the CPS side.

12  Q.   So if B.L. reported the abuse by her brother in January

13  of 2016, was Toni Salerno, the CPS worker, assigned?

14  A.   Yes, she was.

15  Q.   And so the e-mail that Mr. Wolfson just showed you was

16  from Toni Salerno indicating her participation in the

17  multidisciplinary part of the investigation; is that correct?

18  A.   Yes it is.

19           MS. FLETCHER:  I have no further questions.

20           THE COURT:  Anything else Mr. Wolfson.

21           MR. WOLFSON:  No, Your Honor.  Thank you.

22           THE COURT:  Okay.  Thank you, Officer.  You may be

23  excused.

24           (Whereupon, the Witness is excused.)

25           THE COURT:  And, members of the jury, we will take

404

PAUL FREGOE - Direct By Ms. Fletcher

1    Q.   Did she come to your home when Joey was staying with you?

2    A.   She came once.

3    Q.   Did she visit him there?

4    A.   Yes, just once for a few hours and then she left.

5    Q.   Did there come a time that the police came to your home

6    looking for Stacey?

7    A.   Yes, two investigators.

8    Q.   Do you remember that?

9    A.   So, yes.

10   Q.   Okay.  Do you remember who the investigators were?

11   A.   Dewayne and some other guy.

12   Q.   This guy over here?

13   A.   Yes.

14   Q.   And did you answer the door or did somebody else answer

15   the door?

16   A.   I think I answered it or Amber.

17   Q.   Where was Joey when the police came to your door?

18   A.   Sitting on my couch.

19   Q.   What was he doing?

20   A.   Just sitting there.

21   Q.   Was Amber home?

22   A.   Yes.

23   Q.   What had you and Joey and Amber been doing before

24   Investigator Baillargeon came to the door?

25   A.   I don't know, just sitting around.  Watching TV shows.

A 174

405

PAUL FREGOE - Direct By Ms. Fletcher

1    Q.   Had you been drinking?

2    A.   No.

3    Q.   Had you been using drugs?

4    A.   No.

5    Q.   Do you have alcohol in your home?

6    A.   No.

7    Q.   Do you have drugs in your home?

8    A.   No.

9    Q.   Do you allow that?

10   A.   No.

11   Q.   Was Joey drinking before the police came?

12   A.   No.

13   Q.   Was Joey smoking marijuana before the police came?

14   A.   No.

15        MS. BIANCO:  Judge, she is leading the witness.  I

16   am going to object, continually leading.

17        THE COURT:  Overruled.

18   BY MS. FLETCHER, CONTINUED:

19   Q.   How do you know?

20   A.   I was there.

21   Q.   After the police came and asked for Joey what happened?

22   Or actually they asked for Stacey LaPorte, right?

23   A.   Yes.

24   Q.   What happened?

25   A.   I went inside and told him there was two people outside

406

PAUL FREGOE - Direct By Ms. Fletcher

1    looking for him, so he walked to the door.  They said you need

2    to come with us, and they walked down the stairs.  I looked out

3    the window.  He hopped in the car and that was the last I seen

4    of him.

5    Q.   Did he leave his belongings at your house?

6    A.   Yes, they were left there.

7    Q.   All of them?

8    A.   Yes.

9    Q.   Including his phone?

10   A.   Yes.

11   Q.   I am going to show you Government's Exhibit 15 for

12   identification?

13            THE COURT:  What number?

14            MS. FLETCHER:  Fifteen.

15   BY MS. FLETCHER, CONTINUED:

16   Q.   Do you recognize that phone?

17   A.   Yes.

18   Q.   What does it appear to be to you?

19   A.   An LG.

20   Q.   Is that the type of phone that Joey had?

21   A.   Yes.

22   Q.   Is that the type of phone that he left at your house?

23   A.   Yes.

24   Q.   Do you know whether or not this is that exact phone?

25   A.   If I seen a picture of the background.

998

STACEY J. LAPORTE, JR. - Cross by Ms. Fletcher

1    BY MS. FLETCHER, CONTINUED:

2    Q.   I am going to hand you Government Exhibit 2?

3           MS. FLETCHER:  If we could put that on the screen as

4    well.

5    BY MS. FLETCHER, CONTINUED:

6    Q.   Do you recognize that document?

7    A.   Yes, I do.

8    Q.   What is it?

9    A.   This is my statement.

10   Q.   It is a sworn statement you gave to

11   Investigator Baillargeon in this case, isn't it?

12   A.   Yes, it is.

13   Q.   And in that statement you admitted under penalty of

14   perjury that you had been raping your sister since she was

15   eleven years old; isn't that true?

16   A.   I plead the Fifth.

17          THE COURT:  Same charge, members of the jury.

18   BY MS. FLETCHER, CONTINUED:

19   Q.   You raped her when she was eleven and again when she came

20   to live with you; isn't that true?

21   A.   I plead the Fifth.

22   Q.   Look behind you, please at Exhibit 3.  You raped B.L. at

23   Maple Street, didn't you?

24   A.   I plead the Fifth.

25   Q.   You raped B.L. at the cabin?

A 177

999

STACEY J. LAPORTE, JR. - Cross by Ms. Fletcher

1   A.   I plead the Fifth.

2   Q.   You raped B.L. at Talcott Street?

3   A.   I plead the Fifth.

4   Q.   You actually had her pull her shirt up so you could take

5   pictures of her breasts before she went to school; isn't that

6   true?

7   A.   I plead the Fifth.

8   Q.   And you raped her at Glenn Street?

9   A.   I plead the Fifth.

10  Q.   What lines of this statement do you not agree with, any?

11       MS. BIANCO:  Objection, Judge.  He has already pled

12  the Fifth in regards to the allegations against B.L..

13       THE COURT:  Overruled.

14  BY MS. FLETCHER, CONTINUED:

15  Q.   Is there any part of this statement that you do agree

16  with?

17  A.   I plead the Fifth.

18  Q.   To the whole thing?  I am sorry.

19  A.   Yes.

20  Q.   But you were given your Miranda rights, correct?

21  A.   Yes, I was.

22  Q.   And you understood your Miranda rights?

23  A.   Yes, I did.

24  Q.   And you spoke with Investigator Baillargeon, correct?

25  A.   Yes, I did.

1000

STACEY J. LAPORTE, JR. - Cross by Ms. Fletcher

1    Q.    And you talked to him for about ninety minutes and then

2    you put your statement or summarized your statement into what

3    is Exhibit 2, that written document that is in evidence,

4    correct?

5    A.    Correct.

6    Q.    And he went through it with you line by line, correct?

7    A.    He did not.

8    Q.    He did not, what did he do?

9    A.    The statement, itself, was typed up on his computer and

10   then it was printed out.  He asked me to read it myself and

11   then asked me to sign it.

12   Q.    You were sitting next to him when he typed it; isn't that

13   true?

14   A.    I was not right next to him.

15   Q.    He took you to his desk where you sat next to him, where

16   he went line by line with you through the statement, and at the

17   end when you were satisfied that it was correct, he printed it

18   and asked you to read; isn't that true?

19   A.    That is not.

20   Q.    And you read it?

21   A.    Yes.

22   Q.    You read it, and you signed it?

23   A.    Yes.

24   Q.    As an accurate statement, correct?

25   A.    Yes.

1001

STACEY J. LAPORTE, JR. - Cross by Ms. Fletcher

1    Q.    And you initialed it and you signed each page, correct?

2    A.    Correct.

3    Q.    Because what is in here was true, correct?

4    A.    I plead the Fifth.

5    Q.    I can't hear you?

6    A.    I plead the Fifth.

7    Q.    You were not drunk or high when you talked to

8    Investigator Baillargeon, were you?

9    A.    I had consumed alcohol and marijuana that day.

10   Q.    Not at Paul Fregoe's house?

11   A.    The marijuana was at Paul Fregoe's house, yes.

12   Q.    Paul Fregoe is on probation, isn't he?

13         MS. BIANCO:  Objection as to what the status of Paul

14   Fregoe is.

15         THE COURT:  Overruled.

16   A.    Yes.

17   BY MS. FLETCHER, CONTINUED:

18   Q.    He doesn't allow alcohol or drugs in his house; isn't

19   that true?

20   A.    That is not true.

21   Q.    You stayed there with him, he has a year left on his

22   probation, doesn't he?

23   A.    Correct.

24   Q.    He is not going to screw that up by letting you smoke

25   marijuana in his house, is he?

A 180

1002

STACEY J. LAPORTE, JR. - Cross by Ms. Fletcher

1          MS. BIANCO:  Objection as to what Paul Fregoe is

2   going to let him do, Your Honor.

3          THE COURT:  Overruled.  Cross-exam.

4   A.   He is the one that had bought the marijuana for his

5   girlfriend, which is my cousin Amber Secor.

6   BY MS. FLETCHER, CONTINUED:

7   Q.   So it is your testimony that Paul Fregoe, who is on

8   probation with just a little time left, bought drugs and

9   brought them into that house?

10  A.   Yes.

11  Q.   You were not high when you gave that statement, were you?

12  A.   I had smoked before I left the house.

13  Q.   You were not high when you gave that statement, were you?

14  A.   Yes, I was.

15  Q.   You understood it?

16  A.   Not to the full extent.

17  Q.   You weren't drinking?

18  A.   I drank that morning.

19  Q.   You read it?

20  A.   Yes.

21  Q.   It is true?

22  A.   I plead the Fifth.

23  Q.   You said that Mackenzie Bailey was the person who was

24  interested in threesomes, is that true?

25  A.   Yes.

A 181

1010

Motion

1         COURT CLERK:  Court stands for the luncheon recess.

2         (Whereupon, the luncheon recess was taken.)

3         (Whereupon, the proceedings were held in open court

4         in the presence of the Jury.)

5         MS. FLETCHER:  I apologize, Your Honor.  We had a

6    printer malfunction.

7         THE COURT:  Okay.  Members of the jury, this is the

8    schedule.  We will have closing arguments by the government to

9    start with.  When the government is completed with their

10   closing argument, we will have a break.  Then the defense will

11   have its opportunity to make a closing argument.  And after

12   that, without a break, the government will have an opportunity,

13   as under the rules, to make a rebuttal statement.

14        We will then adjourn.  I anticipate it will be later

15   in the afternoon by the time we get to that.  Tomorrow, first

16   thing, I will charge you on the law and go over the verdict

17   sheet with you, and you can retire to deliberate with most, if

18   not all, of the exhibits that have been received in evidence.

19   And incidentally, we will also have lunch for you tomorrow.

20        So with that, the government may make its closing

21   argument.

22   SUMMATION BY MS. FLETCHER

23        MS. FLETCHER:  Thank you, Your Honor.

24        Good afternoon, ladies and gentlemen.  I am going to

25   start by thanking you for your time and your careful attention

A 182

1011

Summation - By Ms. Fletcher

1   to this case.  The nature of the crimes committed here, the
2   testimony, and the evidence needed to prove them make for an
3   exceptionally difficult subject to present.  Your careful
4   attention to every witness, every piece of evidence, every
5   word, every picture, every aspect of this case was necessary
6   and important, and we thank you for your service.
7          Now, you have spent the last several days learning
8   about things that happened behind the walls of the six houses
9   that you saw on the chart in the Village of Massena and the
10  cabin in Louisville over a span of two years from 2014 to 2016.
11  Some of those facts were almost too painful to listen to, but
12  all of the facts and all of the evidence come together to prove
13  the defendant's guilt of each and every crime charged against
14  him.
15         The facts and the evidence show a life of sloth, of
16  perversion, of control where others were engaged to meet the
17  defendant's relentless need for sex.  Sex with multiple
18  partners, sex with teenagers, and sex with babies.  Multiple,
19  multiple crimes were committed in these locations, but only six
20  of them are federal crimes.  And those are the six crimes that
21  you are here to decide.
22         So what does that mean?  Kik Messenger, an
23  application where truly nothing good happens, is what brings
24  this case here to federal court.  The rapes and the hands-on
25  abuse you heard about are relevant to your consideration of the

1012

Summation - By Ms. Fletcher

1    federal offenses.  But you are not here to render a verdict on

2    the rapes of B.L., the rapes of A.T. or even the rapes of C.T..

3            The Indictment charges six things.  First, the

4    conspiracy with Mackenzie Bailey to use A.T. for the purpose of

5    producing visual depictions of that sexually explicit conduct.

6    That's it.  There is an interstate nexus prong to that that we

7    will talk about in a minute, but really that is it.  The

8    conspiracy with Mackenzie Bailey, an agreement with Mackenzie

9    that we are going to take -- use A.T. to take sexually explicit

10   pictures.  That's Count 1.

11           Count 2 is a conspiracy with Hillary Trimm to do the

12   same thing to C.T., to take pictures, sexually explicit

13   pictures of C.T..  Again, what makes it federal?  The

14   interstate nexus.  What does that mean?  The pictures that you

15   conspire to take and to send were either produced using

16   materials not manufactured in the State of New York.  Okay.

17   The cell phones, iPhone, LG, Samsung, nothing is made in New

18   York, nothing.  Made in China, made in Singapore, made in

19   Thailand, made in New Jersey.  It doesn't matter, not made in

20   New York.  We have proven the interstate nexus on that.

21           But there is more.  The interstate nexus can also

22   mean the transmission of the images through the Internet,

23   through the cellular network, through Kik Messenger.  I could

24   be sitting next to you in the room, send you a text, send you

25   an e-mail, send you a chat, message with you.  It is going out

Summation - By Ms. Fletcher

1   on the Internet, and it is coming back in.  That is all we need

2   to prove, that it went through a message application.  So that

3   third part, that interstate nexus part of the case, is pretty

4   easy.  I submit -- or the government submits it is not

5   something that you really need to spend a lot of time on

6   because everything we have shown you, everything you have seen,

7   all of the chats, all of the images went through interstate

8   commerce, right.  They all went through Kik.

9           Well, the third count and the fourth count are what

10  we call substantive offenses.  And they charge the defendant

11  with what you saw, the March 2nd and the March 3rd abuse of

12  A.T., the chats within Exhibit 23.  The chat from March 2nd

13  where he is asking Mackenzie, fastfamily25, and we will get to

14  that in a minute, where he is asking Mackenzie to take pictures

15  and send them to him.  That is Count 3.

16          March 3rd where he does it again, that is Count 4.

17  It is the request and the pictures that make it a crime.  Using

18  A.T. for the purpose of producing visual depictions of that

19  abuse.

20          Count 5 is a J.M. and C.F. count where he is accused

21  of using both of those children to produce the sexually

22  explicit images that you saw and send them to him over Kik.

23  That simple.  He is not accused of having C.F. rape her

24  brother.  He is accused of asking for the pictures, asking that

25  they be produced.  Having them engage in conduct with one

1014

Summation - By Ms. Fletcher

1  another for the purpose of producing images.

2          And the thing about the federal law, and the thing

3  that the Judge will tell you when it is making the defendant's

4  purpose to have sexually explicit images produced, he doesn't

5  even have to be successful in order for him to be guilty of the

6  offense.  If you found that the images were an attempt, but

7  didn't really show sexually explicit conduct, that is enough.

8  What is his purpose?  The purpose is to show -- is for him to

9  get what he wants in this case, the pictures of the children

10  that he wants.

11          And the sixth count is the banx75 count that you

12  heard about this morning.  The defendant's chat with another

13  person on Kik.  You heard testimony from Mackenzie, and you

14  heard testimony from Hillary that that was a thing.  He liked

15  talking to other people who were "like him."  And what he

16  wanted from banx75 were extreme baby pics.  And you saw what he

17  got, little bitty infants with penises in their mouth.

18          Those are the counts in the Indictment.  Those are

19  the things that you have to find.  You have heard the chats.

20  You have seen the images.  And, ladies and gentlemen, there is

21  no serious dispute that the charged crimes were committed.  The

22  charged crimes were committed by fastfamily25 and by

23  prouddaddy3_15_16.

24          But by now you know who fastfamily25 is, and you

25  know who prouddaddy is.  That's Stacey LaPorte.  You know both

A 186

1015

Summation - By Ms. Fletcher

1    of these user names at the time they were used to commit these

2    offenses were the defendant.  The evidence that the crimes were

3    committed by the defendant is certain and undeniable.  So let's

4    talk about the crimes.

5              The conspiracy counts, Counts 1 and 2, are somewhat

6    different than substantive Counts 3, 4, and 5, but they all

7    involve the sexual exploitation of children.  So what is the

8    federal offense of sexual exploitation of a child?  The Judge

9    will charge you on the law, but we are here to give you some

10   guideposts as to how the government maintains that the facts

11   meet the law of those charges.

12             So I want to start with Counts 3 and 4, the

13   substantive offenses against A.T..  They charge the actual

14   sexual exploitation that you saw, that you heard, and pretty

15   much you relived with Mackenzie Bailey on the witness stand.

16   It was kind of like a crime scene photo, right, word for word,

17   line for line, what was going on in that house.  What he was

18   asking for, what her responses were, and what the pictures were

19   that were taken and sent at the time.  Both on March 2nd and

20   March 3rd, the pictures of A.T. that were sent at the

21   defendant's request, the defendant as fastfamily.

22             In those chats, the defendant, as fastfamily25,

23   tells Mackenzie what he wants her to do and the images he wants

24   to see.  Go back through the chats if you have any question.

25   He tells her to show me.  Show me, show me her foot in there.

1016

Summation - By Ms. Fletcher

1   Do you remember that?  Show me the pictures.  Show me what you

2   are doing.  And she sends him the picture.  She does what he

3   says and she sends it to him.  A.T. being digitally penetrated.

4   A.T. having her mother's mouth on her vagina.  Images sent to

5   the defendant over Kik as a part of some twisted form of sexual

6   gratification, his form of foreplay.

7              Count 5 charges the actual exploitation of J.M. and

8   C.F. that you saw, heard, and relived here through the chats

9   and images sent over KIK.  They were produced at the

10  defendant's request on February 28th of 2016.  You saw and you

11  heard all the chats from that day.  How it went from C.F. with

12  the phone, to Mackenzie with the phone, back to C.F. with the

13  phone, back to Mackenzie with the phone.  Everything this man

14  was pleading and begging for them to do.

15             The federal crime of sexual exploitation of a child

16  and a decision for you here requires us to prove only three

17  things.  One, well, we talked about already, the interstate

18  nexus part of it.  Kik is involved.  You are good to go.

19  Interstate nexus.  Phones are involved that were not made in

20  the State of New  York, you are good to go.  Interstate nexus.

21             So what are the other two things that you have to

22  find?  You have to find that the victim was under the age of

23  eighteen, right.  So that is all we have to prove, that the

24  victim was actually under the age of eighteen.  In March of

25  2016, A.T. was two.  In February of 2016.  J.M. was twelve.

1017

Summation - By Ms. Fletcher

1    And C.F. was sixteen, all under the age of eighteen.  What age

2    the defendant thought any child to be is irrelevant.  He is the

3    adult.  The law protects the children.  And sometimes from

4    themselves.  So even if C.F. told the defendant she was

5    seventeen, which is a fact in dispute, it is simple irrelevant.

6    First, because the law protects children under eighteen.

7          Second, because it doesn't matter what he thought

8    her age to be.  It only matters what her age actually was.  But

9    remember also for Count 5, it charges the exploitation of C.F.

10    and J.M..  J.M. was twelve.  There is no serious doubt that

11    Count 5 involved a child.

12          Second, we have to prove that the victim was used or

13    persuaded or enticed or coerced or induced to engage in

14    sexually explicit conduct, again, what I said, for the purpose

15    of producing visual depictions of the conduct.  The statute

16    uses the words used.  The child was used for this purpose.

17    Because you really cannot persuade or induce or entice an

18    infant, can you?  You can't really induce, persuade or entice

19    an incapacitated victim, right?  So the law protects these

20    children from these crimes just the same as it does a child who

21    has the ability to say no, who has the ability to be induced or

22    enticed into a crime.

23          And so here, not only was C.F. and J.M. intoxicated

24    because of the alcohol supplied by this defendant.  They

25    weren't playing beer pong with water.  But you saw and heard

1018

Summation - By Ms. Fletcher

1   how he bartered with them to persuade, induce, entice, and

2   coerce them to produce the images he requested.  Look at

3   Exhibit 16 when you get in the jury room if you have any

4   questions.  He was bartering cigarettes for incest between a

5   twelve year old and his older sister, promising her a tattoo

6   and threatening that he will freak out if they don't do it

7   because why would he freak out?  Well, he swore it on his

8   parents.

9            Who in this case swears things on their parents, on

10  their dead parents?  No one, but the defendant.  What does he

11  do if it doesn't happen?  He freaks out.  He says it in

12  Exhibit 16.  He says it in Exhibit 23.  He says it to Mackenzie

13  when he was trying to get her to do things.  I swear it on my

14  dad, but I swore it on my dad.  You heard that over and over.

15  It has got to happen.

16           This defendant used, persuaded, induced, and enticed

17  these children, all three of them, A.T., C.F., and J.M. to

18  engage in sexually explicit conduct, which are acts that

19  include, not only actual sex acts, but also the lascivious

20  exhibition of the genitals.  The focus of the pictures and what

21  he wanted to see, the child's genitals.  What did he want to

22  see with A.T.?  What did he tell Mackenzie?  Show me her opened

23  up.  Did you see the pictures?  Mackenzie opening up A.T.'s

24  vagina to show him how far she would stretch.  That's what he

25  wanted to see.  That is sexually explicit.  That is lascivious

1019

Summation - By Ms. Fletcher

1    exhibition of a child's genitals.  This is what he wanted in

2    these pictures.  That is sexually explicit conduct, and it is

3    child pornography.

4            What was the defendant's purpose in engaging the

5    children in this conduct?  His own words tell you.  Look at the

6    chats.  The purpose was for the production of images of that

7    conduct.  Take pictures, right.  He is telling C.F. get a pic.

8    Pretend you are not doing it.  Show me the pic.  Get a pic.

9    Quick do it.  Hold your phone so he doesn't see it.  Look

10   through Exhibit 16.  That's what he is telling C.F..  Get me a

11   pic.  That's his end game.  What does he tell Mackenzie?  Show

12   me, show me her in you.  Show me her opened up.  Show me, show

13   me, show me.

14           He is in the other room.  He can come in and look.

15   He doesn't want to come in and look.  He wants the picture.  He

16   wants the picture.  That makes him guilty of a federal offense.

17   That was clearly his end game.  This was his foreplay.  He is a

18   voyeur.  He wants others to do things at his bidding, and he is

19   relentless.  You heard the chats.  He does not stop.  How many

20   times did you hear in the chat, but babe, please, no, please,

21   no.  But on my dad.  No, I don't want to do it.  But you have

22   got to do it.  No.  I think we sat here for a half an hour of

23   back and forth, please, please, do it, do it.  I am getting

24   angry.  Do it, do it.  No, no, no.

25           And what did Mackenzie tell you?  February 28th, she

A 191

1020

Summation - By Ms. Fletcher

1    broke her phone.  She was so sick and tired on that day of

2    listening to him talk about it, she broke her phone.  But of

3    course she gets an iPhone from her mother later that day, and

4    he is back at it, back at it, that night February 28th.  And

5    that's in Exhibit 23.

6            He surrounded himself with people too weak to stand

7    up to him.  He surrounded himself with people too weak to leave

8    him, people who are willing to sacrifice themselves, their

9    morality, their children to make him happy, to feed his

10   perversions.  Yet, he would have you believe apparently this

11   morning that he was the voice of morality in that house.  He

12   was the one who wouldn't do anything inappropriate.  Really?

13           Ask B.L..  Ask B.L..  Look at his statement.  Look

14   at Exhibit 2.  He admitted in writing, signed, swore, told you

15   it was a true statement, signed, swore to

16   Investigator Baillargeon that he has been raping his sister

17   since she was a kid, but he is the voice of reason, the voice

18   of morality who would not do anything inappropriate except rape

19   his sister and tattoo children.  Great.

20           The fact that the defendant was not the person

21   engaging in the actual touching, that he was not the actual

22   photographer does not relieve him from culpability of his

23   crimes.  He brought each and every one of the charged crimes

24   about.  He orchestrated the abuse.  He directed the abuse, and

25   he was on the receiving end of the product of the crime.  The

1021

Summation - By Ms. Fletcher

1    images he so craved.  The law does not allow him to sit in the

2    other room and escape liability for offenses he brings about.

3    He is an accomplice.  He is as liable as if he had put his hand

4    on that child herself, taken a picture himself.

5           As to A.T. and the exploitation charged in Counts 2

6    and 3, you can find that Mackenzie Bailey was a willing or

7    unwilling participant.  It doesn't matter whether you like her,

8    whether you hate her, whether you think she had or would have

9    never done this but for the defendant.  She is an accomplice.

10   No holds barred.  She did it too, not instead of, also.  She

11   pled guilty to being an accomplice to the defendant in the

12   abuse of A.T..  A coconspirator in the abuse of A.T..

13          The defendant was as involved with her in the

14   commission of these crimes.  He is as guilty as if he had taken

15   those pictures, himself.  Look at their chats.  The crimes that

16   were put in front of you real time.  They prove his guilt, not

17   only beyond a reasonable doubt, but beyond any doubt

18   whatsoever.

19          Exhibit 23 is the entirety of the same chats from

20   Mackenzie iPhone.  All the chats that were recovered from her

21   iPhone that were synced to her computer are here in Exhibit 23.

22   All of her chats with fastfamily25, chats where he asks her for

23   cigarettes.  That is him, right.  Ask your mom for cigarettes.

24   I need a favor.  You know, can you ask your mom for cigarettes.

25   The chat where he says what is my phone number?  And she tells

1022

Summation - By Ms. Fletcher

1    him the phone number.  Just random chats in here messaging.

2    She is at work.  She is talking to him about work, things like

3    that.  There is role play in there.  All of that innocuous

4    stuff, his fastfamily25 is the defendant, as well all of the

5    criminal stuff.

6              Exhibit 23A are the March 2nd chats and the

7    production of the abuse images of A.T. charged in Count 3.

8    There is no rational reading of these chats that corresponds

9    with the defendant's absurd denials here today.  He is

10   fastfamily25.  Please baby, please.  I am begging you please.

11   I am begging you please.  She sends him the pictures.

12             Exhibit 23C are the March 3rd chats and the

13   production of the abuse images of A.T. charged in Count 4.

14   Babes, play with her.  Hello baby, pick up your phone, you have

15   a message, answer your phone, get her done.  Down here,

16   12:06:09, show me, right.  Show me the pictures.  And if we go

17   to the end of Exhibit 23C, what is he saying?  Keep your thumb

18   in her and bring her in here.  He is in the other room.  The

19   chats, the pictures were his foreplay.  Bring her in here.  I

20   am probably going to cum.  And two hours later, it was hot, you

21   came a lot, Mackenzie tells him.  And he says, it felt really

22   good, could do that shit all day long.

23             That is who this man is.  That is who fastfamily25

24   is, and that's who is sitting across the courtroom from you.

25   You heard what he said.  You saw what he wanted, and you know

A 194

1023

Summation - By Ms. Fletcher

1    it was him.

2            In regard to C.F. and J.M., you know he is

3    responsible.  He is responsible for that crime.  You saw it.

4    You heard it.  You heard from them, and you saw the chats word

5    for word again as if you were there.  Every disturbing detail,

6    bartering, begging, threatening to freak out.  You saw and

7    heard Exhibit 16.  You relived the abuse of C.F. and J.M.

8    through this exhibit.  Bartering for cigarettes.  Offering C.F.

9    another tattoo, and threatening to freak out if he doesn't get

10   his way.  She tells J.M. wants a cig.  He tells her, I will

11   give him one if he does.  I will give him three, right.  She

12   says he said five, okay.  We are bartering.  Yes.  Brother and

13   sister will take the pictures you want in exchange for

14   cigarettes to a twelve year old, a drunk twelve year old.

15   That's just rich.

16           The images that were produced at the urging or

17   pleading, the inducement, the enticement, the coercion by

18   fastfamily25 of C.F. and J.M. make him guilty of that count.

19   Because all of these were sent over Kik, the whole case comes

20   together, and defendant is guilty of Counts 3, 4, and 5.  The

21   substantive offenses committed against A.T. and C.F. and J.M..

22           Now, he says I am not fastfamily.  I am not

23   fastfamily25.  Okay.  Well, let's take a look at that, because

24   we know he is fastfamily25.  Look at the evidence connecting

25   him to that name.  First, every single witness that came in

A 195

1024

Summation - By Ms. Fletcher

1    here, except for the defendant, told you he is fastfsmily25.

2    Every single witness.

3         Second, we have the content of the chats.

4    Constantly swearing on his dead parents.  He is the only one.

5    He is the only one swearing on dead parents.  We have the chat

6    in Exhibit 23 where he talks to Mackenzie about he is drinking

7    his dad's alcohol.  He is down to his last sip of his dad's

8    alcohol.  The defendant's dad's alcohol, fastfamily is drinking

9    the kind of alcohol that the defendant's father liked.

10         He tells Mackenzie she is the best at getting him

11   the kind of pictures that he likes.  Of course she is.  Because

12   we have seen it over and over again.  We see him asking for his

13   phone number, and we see him sending Mackenzie a selfie.  We

14   have references to the Fast and Furious, itself.

15         Fastfamily25, what more do you need to know?  The

16   defendant was twenty-five when he opened the account.  He

17   opened it with an LG phone, his phone of choice, the same make

18   and model of the one that he had when he was arrested that

19   replaced the broken phone that he used to commit the offenses

20   charged in Counts 1 through 5.  He opened it using his own year

21   of birth.

22         And just look at the name and his obsession with the

23   Fast and Furious.  Exhibit 35B, his tattoos.  The names of his

24   children.  He tells C.F. in Exhibit 36 all my kids are Fast and

25   Furious names and cars.  He wanted to backtrack from that a

1025

Summation - By Ms. Fletcher

1  little bit when he was on the stand today, but Carson, Nova,

2  Bentley, and Mia are his kids, and they are all named after

3  Fast and Furious names and cars.  We also saw in the chats that

4  he wanted to name a son Dominick Van Diesel, the main character

5  in the Fast and Furious Dominick Joseph LaPorte, as a matter of

6  fact.

7          Remember the cross of C.F..  Remember Ms. Bianco's

8  questions of C.F. where she was messaging with the defendant

9  after she had gone home the morning -- or the evening of

10  March 6th when her mom said I need C.F. home right now, that

11  afternoon.  And there was messaging back and forth between C.F.

12  and fastfamily25.  It is a defense exhibit.  Fastfamily25, and

13  all the questioning was, well, you told the defendant A, and he

14  told you B.  And you told the defendant C, and he told you D,

15  isn't that true, on this day, on March 6th in these chats, this

16  defense exhibit?  Yes.  Well, guess what?  That was

17  fastfamily25.  He was fastfamily25 on March 6th when he is

18  talking to C.F..  But he is not fastfamily25 when he is

19  committing the crimes?  He told you this morning he is never

20  fastfamily25.  He is always fastfamily25.

21          The device name of the LG he was using at the time

22  of his arrest was fast8.  The profile picture, Exhibit 38, can

23  we put that up please?  He made this for Hillary.  Exhibit 38,

24  the rainbow.  Hillary wanted a rainbow.  This is what he made

25  for her and made it his profile picture.  Fastfamily25 is the

1026

Summation - By Ms. Fletcher

1  defendant.  This is the same number -- as fastfamily, again, we

2  just went over this a few minutes ago during his

3  cross-examination.  He asked Mackenzie what is my cell number.

4  She tells him 514-4814.  That's him as fastfamily in

5  Exhibit 23.  That is the same number on the LG he was using as

6  prouddaddy.  The number of the LG he was using at the time of

7  his arrest, the number that Paul Fregoe has in his contacts,

8  and last but not last is when he shows his face, Exhibit 23D.2.

9  Fastfamily25 sends this to Mackenzie Bailey.  There he is.

10  Fastfamily25.  She sends him a selfie, superman, he sends her

11  his picture back.  The defendant is fastfamily, and he is

12  guilty.

13          So knowing what the underlying crime, it is the

14  sexual exploitation of a child, and knowing that the defendant

15  is fastfamily25, let's consider the conspiracy charges,

16  Counts 1 and 2.  First, as to A.T. in Count 1.  Did the

17  defendant and Mackenzie Bailey at some time between 2014 and

18  2016 agree with one another to sexually exploit A.T. for the

19  purpose of producing visual depictions of that abuse?

20          Well, haven't we really already answered that

21  question?  What the government must prove for the conspiracy is

22  that there was a mutual understanding, either spoken or

23  unspoken, between the defendant and Mackenzie Bailey to

24  accomplish this unlawful act; the exploitation of A.T. for the

25  purpose of producing the images.  This is what they did.  It is

1027

Summation - By Ms. Fletcher

1    exactly what they did.  You have Count 3.  You have Count 4.

2    You have the chats.  You have the pictures.

3            And Mackenzie testified that it is what they did,

4    that this is what they agreed upon, going as far back as

5    Talcott Street the pictures were involved.  There was an

6    agreement.  Whether it was an agreement that she enjoyed, an

7    agreement that she consented to, an agreement that she

8    reluctantly went along with, it was an agreement between

9    Mackenzie Bailey and the defendant.  Take the pictures and send

10   them over Kik.

11           What we have recovered, what we have charged, and

12   what we have set forth before you as the substantive offenses

13   on March 2nd and 3rd is evidence of this unlawful agreement, an

14   agreement with Mackenzie, again, who told you it wasn't

15   isolated to those two events.  It went back further in time,

16   sometime before Glenn Street.  It is that simple.  The

17   conspiracy count was proven.  Count 1 against A.T..  The chats

18   in evidence couldn't be clearer that there was an agreement to

19   abuse A.T. and to take pictures of the abuse.  He is guilty of

20   Count 1.

21           So what about C.T.?  C.T. is Count 2.  There are no

22   recovered images of C.T..  We don't have a laptop backup,

23   iPhone backup from Hillary Trimm.  We don't have images on any

24   of the phones.  They got rid of them, right.  They got rid of

25   all of this.  The only reason we have pictures of A.T. and

A 199

1028

Summation - By Ms. Fletcher

1    chats of A.T. is because Mackenzie Bailey plugged her iPhone

2    into that laptop and it stayed there.  But of course she didn't

3    know.  And forensic analysis recovered it.  That is why we have

4    pictures of A.T..  We don't have that on C.T., but that doesn't

5    make him any less guilty.  We don't have to have pictures if

6    you believe the crime, the conspiracy happened.

7           And that is why the only crime charged in relation

8    to C.T. is the conspiracy.  The defendant's agreement with

9    Hillary Trimm to exploit C.T. for the purpose of producing

10   sexually explicit pictures.  What is the evidence that he

11   conspired with Hillary to do the same thing to C.T. that he had

12   Mackenzie do to A.T.?  Well, first, you have the evidence.  You

13   have the testimony of Hillary Trimm.  If you believe her, he is

14   guilty, period, end of story.  Move on to the next count.

15          Do you have any hesitation in believing Hillary

16   Trimm?  If you do, what is her motive to lie?  Her statements,

17   her admissions to the police included incriminating herself.

18   She is going to make this up.  She is going to fix his wagon,

19   get him arrested.  She is not implicating herself in this,

20   right?  She could have talked about the rape of C.T. without

21   the pictures that she produced, but she finally, after a while,

22   came forward and said yes, I participated also and this is what

23   I did.  And strikingly, horrifyingly, it was the pictures,

24   again.  Pictures that you know by now that he wants, that he

25   craves, that he requests.

A 200

1029

Summation - By Ms. Fletcher

1    Her admissions were the first step to proving that
2    C.T. was also a victim of the defendant's perverse and
3    insatiable lust for sexual conduct with children.  Her
4    statements landed her here.  Landed her into this courtroom and
5    convicted of a crime.  She has pled guilty.  She stands
6    convicted as a co-conspirator.  As a result of admitting her
7    participation in this crime with the defendant and that she was
8    a co-conspirator with him in this, her children have been taken
9    away from her.  And maybe that is all as it should be, right,
10   but it doesn't make him less culpable.  She didn't commit that
11   crime alone.  She had a co-defendant, a co-conspirator in
12   Stacey LaPorte.
13   Whether or not Hillary Trimm was a willing
14   participant is again irrelevant.  You can believe she did this
15   unwillingly.  You can find that she relented too easily.  You
16   can find she participated just as willingly as the defendant.
17   None of that matters.  None of it matters.  We are not here
18   with Hillary Trimm as the victim of a crime.  This is about
19   C.T..  Whether Hillary was whole hog into it or deadset against
20   it, it doesn't make it less of a crime.  It doesn't matter.
21   You have also not just Hillary's testimony.  There
22   are several other pieces of evidence that you can look at to
23   corroborate what Hillary Trimm says happened to C.T., what
24   Hillary Trimm testifies about as a conspiracy with the
25   defendant.  First, he didn't say anything to A.T., right?  Same

A 201

Summation - By Ms. Fletcher

1  exact thing.  It mirrors what he did to C.T. in many respects,

2  what he did with A.T..  And you can use that evidence as

3  evidence that he did it with C.T. as well.  You know through

4  Mackenzie that he raped C.T..

5          Independent of the pictures, independent of Hillary

6  Trimm, Mackenzie Bailey told you that when Hillary was at work,

7  he asked her to go get C.T. and bring C.T. to him.  She did and

8  he raped C.T. in front of Mackenzie.  Mackenzie Bailey's

9  testimony corroborates his desire for Hillary in his conspiracy

10  in that regard.

11          Third, you know from B.L. that the defendant made

12  admissions to her.  He told her that he couldn't leave either

13  Mackenzie or Hillary.  Wasn't so thrilled with either of them

14  at any given time, couldn't leave them though, and why?

15  Because they had dirt on him.  He told B.L. that they each had

16  videos of him doing things with their children so he couldn't

17  leave them.  And he told her one other thing.  He told her that

18  he could fit the tip of his penis further into one of the

19  children than the other.

20          You have also had the testimony from B.L. that she

21  was also a victim of his sexual abuse.  Again, you are not here

22  to render a verdict on the crimes relating to the defendant's

23  rapes of B.L..  That evidence was presented, however, as

24  relevant to your consideration of his guilt on the charged

25  offenses.  And he admits all of the acts in Exhibit 2, the rape

A 202

1031

Summation - By Ms. Fletcher

1    of B.L. at ever single location where they lived.  Every single

2    location.  The rape of B.L. when she was eleven.  The only

3    thing he leaves out is his first rape when she was eight.

4             B.L. testified that he abused her when she was eight

5    and eleven.  And you are allowed to consider that evidence and

6    his admissions to it for any relevant purpose, including

7    whether he has the propensity to commit other sex crimes

8    against young children.  B.L. also testified that he continued

9    to rape her when she moved in with him at age fourteen.  Again,

10   evidence that you can use to decide if he is the person

11   responsible for the crimes charged.

12            Remember, B.L. didn't run away from Mackenzie

13   Bailey.  B.L. didn't run away from Hillary Trimm.  B.L. ran

14   away from Stacey LaPorte, her abuser, the abuser of all of the

15   children in this case.

16            You can also consider the defendant's exploitation

17   of J.M. and his activities with banx75, looking for extreme

18   baby pics to determine whether or not he committed the crimes

19   against C.T..  There is just too much.  Hillary's testimony is

20   not presented in a vacuum.  The defendant's actions with C.T.

21   are part of an overall scheme, a plan, a character trait, if

22   you will, in his insatiable need, his perverse desire to molest

23   children.

24            What did he do all day long?  He slept, watched TV,

25   played video games, and had sex.  This defendant got his hands

A 203

1032

Summation - By Ms. Fletcher

1    every single child he could, and it only seemed to fuel his

2    needs more.  And that includes C.T..  Is there any scenario

3    under which you think the defendant did not abuse that child?

4           Is there any scenario under which you think he did

5    not get Hillary to go along with his need to see pictures of

6    her abusing her daughter?  She was a woman so far into him that

7    she continued to see him even after she got out.  She continued

8    to see him, to love him, if you will, even though he abused her

9    baby.  Is there any limit to what she would do for him?

10   Apparently not.  Whatever mysterious hold this man had over

11   those women may not be understandable.

12          But make no mistake, he is the one who held the

13   control.  He is the one who held the control.  That the women

14   chose his happiness, his wants, his needs.  That he bugged them

15   enough in order to help him abuse their babies is unforgivable.

16   But it does not make the evidence of his crimes less

17   compelling.  You know who he is.  You have seen all he is

18   capable of, and you have virtually heard it from his own mouth.

19          Stacey LaPorte is as guilty of conspiring to exploit

20   C.T. as he is guilty of conspiring to exploit A.T., and each

21   and every other crime charged in the Indictment, which leads to

22   Count 6, the receipt of child pornography, his chats with

23   Banx75.  Here again, the prouddaddy is guilty.  You have seen

24   the chat, Exhibit 21.

25          Can we put that up, please?

A 204

Summation - By Ms. Fletcher

1    He asks for pictures.  He wants to see extreme baby

2    pictures.  Go to the next page.  Look at the top line.  Only

3    want extreme baby stories of you and them.  Then he gets those

4    two pictures.  And we know he gets those two pictures because

5    banx75 says are you still there?  Yes, he is still there.  He

6    got those pictures.  What does he say?  If you could send me

7    some extreme baby hard core pics and vids, I am all yours with

8    her.  These aren't good enough.  This is not what he wants.  It

9    was pretty mild child pornography for a man like

10   Stacey LaPorte.

11   And the fact that he wants extreme baby pics relates

12   back to everything else in the case.  What he wanted of A.T.,

13   what he wanted of C.T., make that fantasy come true, he tells

14   them.  Sit on her face.  Take a picture of it.  These are the

15   extreme kinds of pictures he is asking for, and he is the

16   person asking banx75 for extreme baby pics.  The defendant is

17   prouddaddy.  He told you he was prouddaddy.  Apparently he is

18   prouddaddy except when something bad happens.  I am prouddaddy,

19   but there is no evidence to that effect.  There is no evidence

20   that it was anyone other than the defendant who is doing this.

21   The chat was on his phone, the LG, Exhibit 15.

22   Now, you heard a lot of cross-examination about what

23   is on the computer and what is on the phones.  This is the only

24   phone in evidence that has child pornography on it.  This is

25   the only phone in evidence that has beastiality.  This is the

Summation - By Ms. Fletcher

1    only phone in evidence that has adult pornography on it.  It

2    has Kik chats on it that are sexually explicit, this phone

3    only.  And you have seen him with this phone in his selfies

4    taking his picture as prouddaddy.

5              Mackenzie Bailey's Samsung, clean, clean.  The only

6    child pornography on this phone is the C.F. and J.M. pictures.

7    Clean, no adults, no beastiality, no child pornography.  The

8    same thing with her iPhone, nothing.  Nothing illegal on this

9    phone.  The illegal images all come back to the defendant.  So

10   he runs as far away from that LG as he can, but it is his

11   phone.  Mackenzie Bailey's mother bought it for him.  That

12   makes it Mackenzie's phone?  That makes it Jen Northrup's

13   phone?

14             On March 14th of 2016 after he broke the LG phone

15   that he used for Counts 1 through 5, he broke his phone.  We

16   don't have that phone.  We can't know whether there are

17   remnants of those crimes there because he broke it and got rid

18   of it.  But we have his new phone, and boy, he was off to the

19   races with this one, right?  We have got the banx75 chats.  We

20   have child pornography.  We have beastiality.  We have adult

21   pornography on this phone that he got on March 14th.  But boy,

22   it is not my phone because somebody else bought it.  Does

23   anyone here have a car registered to you that somebody else

24   drives?  Does anyone here have a phone registered to you that

25   somebody else uses?

Summation - By Ms. Fletcher

1      Make no mistake about it, somebody else may have

2  bought this for guy who sits home, sleeps, watches TV, plays

3  video games, and has sex all day long, but he used this phone,

4  and this is his phone.  He left it Paul Fregoe's house.  He put

5  the Superman wallpaper on there.  He put all the Superman logos

6  in there.  He put the pictures of cars in there.  He put the

7  swipe password in there.  He told Paul Fregoe to give it to

8  Tiffany Matthie.  He told Hillary to pick up his belongings

9  from Tiffany Matthie, but the police had already taken his

10  phone, his phone, that he talked to Amber Eagan on.

11      So let's talk about Amber Eagan.  Because he tells

12  you he doesn't know her, right.  He got on the stand this

13  morning, no idea who Amber Eagan is.  So let's put up 20J.

14  Here is Amber Eagan.  She is in the contacts of the LG phone.

15  Hillary Trimm told you she has seen this picture before because

16  Joey sent it to her and told her this is the new girl in my

17  life, right.  He has always got one on the hook, doesn't he?

18  This is the new girl in my life.  Amber.  Tells you, don't know

19  who she is, never seen her before.

20      In the contacts of his phone, and in the chat

21  messages, the text messages in his phone, we have 20I.  Amber

22  Eagan's phone number.  Amber Eagan's name in his contacts.

23  Hey, it is Joey.  Just added my card to my phone.  He is

24  reaching out to Amber Eagan.  He says it is Joey, like he is

25  using that phone, isn't he?  20E.  Again, to the Amber Eagan he

1036

Summation - By Ms. Fletcher

1   had never heard of, never seen, doesn't know anything about.

2   He says I lost a lot and went through a lot just to be with you

3   and I am sorry I fucked up, but I will do anything to fix it.

4   I swear on my, what, dead mom and dad and all my kids.  I am

5   not playing a game with you.  I want to be with you Amber.

6   Right.

7           What does Amber tell him in return?  You lost a lot.

8   You went through a lot to be with me, please don't swear on

9   your kids and parents.  And then Joey, who doesn't know Amber

10  Eagan, who uses the LG cell phone has this chat or this text,

11  sends this text to Tiffy, Exhibit 20D.  Listen, this is Joey,

12  and I am with Amber.  I love her, and I want you to leave me

13  alone for good.  Stop texting me.  Don't call me.  Just leave

14  me alone.  He doesn't know Amber Eagan.  He is in love with

15  her.  She apparently has a kid too.  You saw the picture of her

16  with her kid.

17          The last message from that LG you heard about this

18  morning was at 5:50 p.m. on May 17th of 2016, the very date and

19  time that the police came for him.  They came to Paul Fregoe's

20  house.  He left this phone behind.  He and Mackenzie weren't

21  together.  This is Mackenzie's phone.  He has still got it,

22  right.  She is long gone.  She is gone.  She is hiding out from

23  him.  She doesn't want anyone to know where she is.  She

24  doesn't take her phone.  He has it.  And he has it at Paul

25  Fregoe's house.  And he leaves it there with what?  All of his

1037

Summation - By Ms. Fletcher

1   worldly belongings.  What does he have at Paul Fregoe's house?

2   His backpack with some clothes, his father's ashes, and his

3   prized possession, his LG cell phone.  Leaves that behind at

4   Paul Fregoe's house.

5           There are no more messages sent from this phone

6   after he goes to the police station.  He is arrested.  He never

7   sees that phone again.  No one sends another message from that

8   phone.  It is locked.  No one can get into that phone.  There

9   are a few messages sent to that phone, all people looking for

10  Joey.  You must be with your other girlfriends.  Where are you?

11  He isn't answering because he is locked up.  That is his phone,

12  make no mistake about it.

13          So what we heard this morning is that

14  Mackenzie Bailey is the fall guy.  This is all on Mackenzie

15  Bailey.  Well, that's it.  Isn't that rich?  Comes in here and

16  blames all of this on Mackenzie.  I don't know who she is

17  chatting with fastfamily25 if it is not him.  She has got some

18  other boyfriend who is having her rape her child.  She has got

19  both sides of that conversation.  He is fastfamily25, and he is

20  up here to throw the blame at Mackenzie Bailey.  Mackenzie, who

21  has been with him since she was eighteen, who left home at

22  sixteen, had a rough life, got taken in, taken under the wing,

23  cared for, in some strange sense of that word, by the

24  defendant.  It is all she knew.

25          I am not making any excuses for Mackenzie Bailey.

A 209

1038

Summation - By Ms. Fletcher

1    What she did is reprehensible and inconceivable.  And she is

2    paying for it.  She is not the fall guy here.  She is not alone

3    in this.  It is not her and Hillary abusing babies.  This

4    defendant attempting to deflect blame from himself.  She was

5    under his control.  Everyone told you that.

6            Everyone told you about his temper tantrums, his

7    control.  B.L. told you about it.  B.L. didn't get an order of

8    protection from Mackenzie Bailey.  There was no court in

9    Massena that told Mackenzie Bailey that you have to stay away

10   from B.L..  It was Stacey LaPorte.  That is what was going on

11   in that house.  It was Stacey LaPorte.

12           Ladies and gentlemen, this case is just simply

13   overwhelming in so many respects.  The subject matter is

14   overwhelming.  Listening to description after description of

15   the rape and abuse of children is overwhelming.  But most of

16   all, the evidence of the defendant's guilt in this matter is

17   simply that, overwhelming.

18           You have in large part become eye witnesses to a

19   couple of years in the lives of Mackenzie Bailey and A.T., and

20   B.L. and Hillary Trimm, C.F. and J.M..  You have seen the

21   words.  The words the defendant used with them.  When one of

22   them tells you, he just wouldn't give up and he wouldn't stop

23   hounding me, you know that.  You know that for a fact.  You

24   have seen the chats.  Pages and pages and pages of begging and

25   bartering.  Words that were designed to accomplish his criminal

A 210

1039

Summation - By Ms. Fletcher

1   acts, and words that led to the commission of crimes, each and

2   every one of the crimes charged in the Indictment.

3           I am asking you, ladies and gentlemen, when you go

4   to deliberate, look at the evidence.  See what makes sense to

5   you.  You know he is fastfamily25.  And you know he is

6   prouddaddy3_15_16. And you know he is guilty.  I am asking you

7   to come back in this courtroom, stand up, and tell him again.

8   Thank you.

9           THE COURT:  Thank you.

10          Okay.  Members of the jury, we will take a break

11  before the defense argument.  Keep and open mind and do not

12  discuss the case.  We will be discussing the case tomorrow, and

13  we will see you shortly.

14          COURT CLERK:  Court stands for a short recess.

15          (Whereupon, a brief recess was taken.)

16          (Whereupon, the proceedings were held in open court

17          in the presence of the Jury.)

18          THE COURT:  Ms. Bianco, you may now make your

19  closing statement on behalf of the defendant.

20  SUMMATION BY MS. BIANCO

21          MS. BIANCO:  Thank you, Your Honor.

22          Good afternoon, ladies and gentlemen.  This is the

23  last time that I get to speak with you, and the prosecutor will

24  get another opportunity to talk after I am done.  So this is my

25  last time.  So I am trying to cover everything, but if I don't,

A 211

1040

Summation - By Ms. Bianco

1   I ask you when you go in the jury room to review the evidence
2   and to think about everything that we have said.
3          To start out, we all owe you a debt of gratitude for
4   sitting as jurors in this case because the evidence in this
5   case was not easy to see or hear, and it was incredibly
6   disturbing.  I think we can all agree on that.  But yet, you
7   all sat here, and you took your solemn oath as jurors, and you
8   took it very, very seriously.  For that, everyone here
9   appreciates your service.
10         Now, I would like to talk about the testimony and
11  the evidence you saw and heard.  The government has thrown in
12  numerous charges in this Indictment, and these indictments
13  cover different places, different times, different dates.  It
14  is almost like we are having multiple charges in one trial.
15  And the government is hoping that you are going to be so
16  disgusted with everything you saw and heard, that you will not
17  consider each count individually, but rather you will just look
18  at it and say this is terrible, guilty.
19         Make no mistake about it, Stacey did some disturbing
20  things.  He is certainly not a prince among men.  We are not
21  saying he is a hard worker.  We are not saying he wasn't living
22  off the system.  We are not saying he is a wonderful person.
23  What we are saying is he didn't do the things charged in this
24  Indictment.  As far as the thing B.L. is accusing him of doing,
25  that is for another jury at another time, for them to decide

1041

Summation - By Ms. Bianco

1   whether or not he did those things.

2        Now, the amount of material you heard over the last

3   week is a lot to digest.  We are going to try to simplify it a

4   little bit for you.  We are going to go over the evidence count

5   by count.  Why is it important to go over it count by count?

6   Because the Judge is going to explain to you that each count

7   charges Stacey with a different crime.  And you have to

8   consider each count separately and return a separate verdict of

9   guilty or not guilty on each particular count.

10       Now, I am going to start with what I believe is the

11   simplest count first.  And that is Count 2.  That is the count

12   that charges Stacey with conspiracy to sexually exploit C.T.

13   with her mother Hillary Trimm.  Now, in this count, the

14   prosecutor has to prove the case and every element of the case

15   beyond a reasonable doubt.

16       And I am going to date myself here.  I don't know if

17   you all remember the whopper commercial from way back.  What is

18   a whopper?  Two all beef patties, special sauce, lettuce,

19   cheese, pickles, onions on a sesame seed bun.  Well, if there

20   is no special sauce, it wouldn't be a whopper.  And that is

21   like the elements of a -- to prove the elements of a crime,

22   they have to prove every element.  If one of the ingredients or

23   elements is missing, then they haven't proven the crime.

24       So Count 2, the government has to prove that Stacey

25   conspired with Hillary to use C.T. to engage in sexually

1042

Summation - By Ms. Bianco

1   explicit conduct, and here is the important part, for the

2   purpose of producing a visual depiction to be sent in

3   interstate commerce.  Well, the government has not proven or

4   shown you any pictures or any videos, nothing.  They said that

5   Hillary said Stacey made her do it and made her do it by text.

6   And this is the way -- he forced her to do it by a text, but

7   where are the texts?  We don't see any of those.  Not on her

8   phone.  Not on the LG phone.  Not on the Lenovo laptop.  Not

9   one text.

10          Why did Hillary say she did this?  She said she

11   abused her daughter because she was making it up to Stacey

12   because she talked to another guy, and he was mad, and she was

13   going to fulfill his mother/daughter fantasy.  Who in the world

14   would molest their own child because their boyfriend was mad at

15   them?  Who would do such a thing?

16          Now, the government hasn't produced the videos,

17   hasn't produced the pictures, hasn't produced the texts.  What

18   do we have for the proof?  We have Hillary Trimm's word.  Let's

19   talk about what her word is worth.  She has lied to so many

20   people during the course of this investigation.  She lied to

21   the police when they first came to her to see if C.T. was

22   abused.  They asked her, and she said no.  She lied to Child

23   Protective Services when they came and said could your daughter

24   have been abused?  No, definitely not.

25          She was told to bring her daughter, C.T., to the

1043

Summation - By Ms. Bianco

1    doctor's for an examination, a physical examination.  She

2    brings her daughter to the doctor's, and she goes with Spencer,

3    C.T.'s father.  And the doctor asks a whole bunch of questions.

4    And once again, Hillary says no, she didn't witness any abuse.

5    She didn't see any abuse, nothing.  She tells C.T.'s father she

6    wasn't abused.  Lie after lie after lie.  She lies to her own

7    mother about the abuse, and this is a continuing and elaborate

8    lie.

9              Remember the dramatic testimony that she gave.  She

10   sat up on that stand, and she said, I fell to my knees and I

11   begged my mother get me out of here.  I can't get out.  That's

12   what she said.  Can you imagine her on her knees holding her

13   mother's legs, begging her?  Well, what does she do right after

14   this?  She meets with Stacey behind her mother's back for

15   months, and she keeps having sex with him.  She did this

16   numerous times.  She is going back and forth on the text with

17   her mom.  She tells her mom, I hope Stacey is raped in jail.

18   Meanwhile, she is actually visiting Stacey in jail.  She told

19   so many lies she is almost pathological.

20             Let's not forget about the lies she told her dead

21   grandmother on the Notes section of her phone.  Now, we have

22   all had people we have lost.  We all make think of them and

23   want to communicate with them in some way.  Well, her way of

24   communicating with her grandma was through these letters that

25   she would write on her Notes application.  So she is writing

1044

Summation - By Ms. Bianco

1  dear Grandma, right, somebody she loves and cares about.  Dear

2  Grandma.  She is telling her about C.T..  C.T. is going to be

3  one year old.  And what a wonderful daughter she has.

4           And what does she say in these private thoughts?

5  She met a wonderful man who is good to her and good to C.T.,

6  and she wished her grandma could meet him.  She admitted

7  writing this after she claims Stacey abused C.T..  Why would

8  you write in your private diary to your deceased grandmother

9  who you love more than anyone I want you to meet the love of my

10  life who is so good to my daughter?  Does that make sense to

11  you?  Maybe she was telling the truth to her grandmother.

12  Maybe Stacey was good to her and good to C.T..

13           Because remember, the only time that Hillary says

14  anything about Stacey molesting C.T. is when she is brought

15  down to the police station, herself.  And when she is there at

16  the police station, what does she do for the first forty-five

17  minutes?  For the first forty-five minutes, she looks this

18  police officer dead in the eye for forty-five minutes straight,

19  and says I didn't do anything.  Stacey didn't do anything.  And

20  continues and continues and continues.  Yet another lie.

21           Now, let's talk about whether Hillary's testimony

22  about Stacey sexually abusing C.T. is true.  Hillary testified

23  that Stacey anally penetrated C.T. on two different occasions,

24  two different times for several minutes at a time.  Now, you

25  are talking about a grown man penetrating a small child,

1045

Summation - By Ms. Bianco

1   penetrating a small child for several minutes at a time.

2   Wouldn't you think there would be some physical evidence?  Yet

3   there is no physical evidence to prove the claim.  Hillary

4   testified that she brought C.T. to the doctor.  They examined

5   her.  They found no evidence of sexual abuse, no anal tears, no

6   vaginal tears, no marks at all consistent with a grown man

7   sexually abusing a small child.

8           Do you think for one minute if there was physical

9   evidence the government wouldn't have brought a doctor right

10  here on the stand to testify, hey, this is what we found.

11  There is no doctor.  There is no physical evidence.  There is

12  nothing, but Hillary's word that this happened.  And I have got

13  to point out the corroboration by Mackenzie that the prosecutor

14  brought up on her closing argument.

15          Mackenzie said, yes, we both abused C.T., Stacey and

16  I, and took C.T. to the room, and we both abused her.  When she

17  first talked to the police, when she first gave her statement

18  on June 10th, there was not one word about molesting C.T. or

19  Stacey molesting C.T..  Not one word.  So that is where your

20  corroboration is.  This is a person who, one, didn't tell

21  anybody and, two, Mackenzie didn't even say anything to begin

22  with.

23          I want to talk to you about the claim that Hillary

24  and Mackenzie aren't talking to each other after Stacey's

25  arrest about these charges.  The only thing these two women

A 217

Summation - By Ms. Bianco

1    have in common is Stacey.  That is it.  They have nothing else

2    in common.  Yet, we hear that neither of them talked about the

3    charges.  Neither of them talked about Stacey's arrest.  They

4    first find out about Stacey's arrest while they are at

5    someone's house looking on a Facebook.  And apparently there is

6    some article or something about his arrest.  They are together

7    looking at some unknown person's Facebook account.  Apparently

8    this was a coincidence.  They just popped it up and there it

9    was.

10          What do these two do?  They don't talk about it, oh

11   my God, Stacey was arrested.  They say nothing, and they walk

12   away from each other.  Not one word is said.  Does that make

13   any sense to you?  And that's just one of the conversations

14   they had.

15          And I have got to point this out.  Hillary told us

16   about this Facebook thing where they were together.  Mackenzie,

17   when she was up there, did you hear her say one word about them

18   being together looking at the Facebook, finding out about

19   Stacey's arrest?  No.  Mackenzie didn't want you to know that

20   her and Hillary were talking about this.

21          Then there is this conversation.  Mackenzie says

22   there is a telephone conversation between her and Hillary where

23   they are taking about, right out of the blue, what shitty

24   parents they are.  Okay.  First of all, Hillary is saying she

25   is not talking to her on the phone, just by text.  Mackenzie is

1047

Summation - By Ms. Bianco

1    talking about this phone conversation.  They both say that they
2    are both shitty parents, and they want you to believe that they
3    left it at that.  No one said a word about why or anything
4    else.  We are both shitty parents.  That makes no sense.
5              Both Hillary and Mackenzie talked about not wanting
6    to lose their children.  Hillary told you in this courtroom
7    that she lied to everyone in order for her secret not to be
8    found out.  She lied to the police.  She lied to her mother.
9    She lied to the medical professionals.  She lied to Spencer.
10   Everyone.  Yet, given the opportunity to come up with a story
11   to protect herself and stop from losing C.T. by talking with
12   Mackenzie, well, that is just not something she would do.  She
13   would lie to everyone, but she won't talk with Mackenzie to
14   come up with a cover story.
15             It is more -- it makes more sense that Hillary and
16   Mackenzie, when Stacey got arrested, talked about what was
17   going on.  Stacey is already arrested for abusing B.L..  Who
18   are they going to point the finger at?  Stacey.  And who is
19   going to believe him after he is accused of molesting his
20   sister?
21             Now, keep in mind Mackenzie and Hillary have some
22   kind of relationship that they don't want you to know about.
23   How do we know this?  Well, Mackenzie was asked the question
24   about when they were in the house when they were living
25   together, okay, Mackenzie said yes, I sent some naked pictures

A 219

1048

Summation - By Ms. Bianco

1    to Hillary who was inside the house.  Hillary was -- they are

2    using the Kik account.  Hillary is inside the house sending

3    back naked pictures.  So they are trading naked pictures

4    amongst themselves.  When Hillary is asked this question, oh

5    that never happened.  Oh no.  Why in the world would Mackenzie

6    have lied about that?  I mean she may be a liar, but there is

7    no reason in the world for her to lie about trading naked

8    pictures with Hillary.

9           Hillary and Mackenzie have some kind of relationship

10   that none of us may ever understand.  One thing we do know is

11   that the abuse that they described is a little too similar.

12   Remember the details of their stories?  It is as if they

13   planned their stories together.  Even down to the point where

14   both claim Stacey kept pestering them and pestering them so

15   they just gave in.  Who would do that?  Someone keeps bothering

16   you and bothering you, well, okay.  I will just molest my

17   child.  Both of them said that, pestering, pestering, and

18   pestering, so we gave in.

19          Hillary tells you the only reason she continued to

20   see Stacey after the abuse was out of fear.  And she said that

21   in this courtroom to you people under oath.  And that was

22   perhaps the biggest lie yet.  Because if she was continuing to

23   see Stacey only out of fear, when she is living with her

24   mother, what is her fear then?  You are running off behind

25   mom's back to have sex with Stacey.  You are going to the jail

1049

Summation - By Ms. Bianco

1    to see Stacey.  You are doing everything you can to have a

2    relationship with this man behind your mother's back.  This is

3    not out of fear.

4              I want to change gears for a bit, and I want to talk

5    to you about the counts involving Mackenzie Bailey and her

6    daughter, A.T..  And that is Counts 1, 3, and 4.  Now, what is

7    the evidence the government has brought to you about this?

8    They brought you a very sad picture, a picture of A.T. being

9    molested by her own mother.  Horrible images that none of us

10   will soon forget, and very sad.  But who is in those images?

11   Stacey LaPorte isn't in them.  The images show only two people.

12   They show Mackenzie Bailey and they show poor little A.T..

13             Whose phone were they sent from?

14   Mackenzie Bailey's.  Whose electronic device were they

15   retrieved from?  The Lenovo computer.  Mackenzie Bailey's

16   Lenovo computer.  Did we hear any testimony at all that Stacey

17   had access to this Lenovo computer, the one found during the

18   search warrant when Mackenzie Bailey was the one at the house?

19   There is no question that Mackenzie took the pictures.  She

20   admitted it.  There is no question she abused her daughter.

21   She admitted that.  Mackenzie is no stranger to sexually

22   related activities and pornography.

23             When the police served -- searched that Lenovo

24   laptop, they found eighty-two images of child pornography.

25   This is from the government's computer.  They found eleven

A 221

1050

Summation - By Ms. Bianco

1    images of beastiality, and they found eleven images of child

2    pornography.  When they searched her Samsung cell phone, they

3    found that she had thirteen user accounts with some version of

4    her name.  One of them was like boobookenzie17, something

5    mackenzie10.  She has all those little ages or numbers attached

6    to it.  She was on these websites.  She admitted this.

7    Xdating, okaycupid.com, Livefreefun.net, and speeddate.

8              She also was on the website called Topix that had

9    pictures of beastiality and child porn, but she says I am doing

10   this for Stacey.  Well, she also said that she didn't want to

11   have other people involved in the relationship.  Yet, she is

12   the one looking for a new girlfriend for them by herself going

13   through the Internet.  Does that make any sense to you?  And

14   why isn't Stacey using his own phone for this?  He has the LG.

15   The government is saying he is using that LG for all kinds of

16   stuff, but where are those pictures, where is that website that

17   is being connected to?  That is her -- that specifically is

18   Mackenzie's phone.  Okay.  If Stacey was doing it, he would use

19   his own phone, not Mackenzie's phone.  Very convenient.

20             Now, Mackenzie is facing life in prison for what she

21   did to poor A.T..  But Mackenzie is hoping to escape from that

22   life sentence.  So she signed a Cooperation Agreement with the

23   government to testify against Stacey.  And that Cooperation

24   Agreement is in evidence.  You can take a look at what she

25   signed.  Ladies and gentlemen, testifying against Stacey is her

A 222

1051

Summation - By Ms. Bianco

1    only way out of serving a life sentence.  Mackenzie is
2    twenty-one years old.  She could live a really long time.
3    That's a lot of time.  What do you think she would be willing
4    to do to help herself?  Someone like her has no regards for
5    anyone but herself.  And she would be willing to do anything to
6    help herself.
7            Look at the pattern of how she treated people.
8    Let's take her high school sweetheart, Nathan.  This is
9    somebody she met in high school.  They had a baby together.
10   They moved to his grandmother's.  Then they moved to their own
11   apartment.  They have a daughter.  They have a little family.
12   Well, Nate apparently goes through some psychological problems
13   and tries to hang himself outside the front of the apartment
14   complex.  What does Mackenzie do?  Her high school sweetheart,
15   the father of her child, she runs off with Stacey within
16   twenty-four hours.  Bye, bye, Nate.  Who cares about you.  Who
17   is she out to help?  Her?  Or someone else?
18           The idea that she is testifying only because she
19   wants justice for A.T. is preposterous.  If this were true, she
20   would not have sexually abused A.T. so many times.  Now, she is
21   interested in justice for A.T. and it doesn't matter about the
22   Plea Agreement.  Really?  If that were the case, when you first
23   spoke to the police, why did you lie?
24           Part of her cooperation requires her to testify
25   truthfully.  And who decides if she testified truthfully?  The

1052

Summation - By Ms. Bianco

1  government decides whether she is testifying truthfully.  Has

2  Mackenzie -- ask yourself, has Mackenzie been truthful during

3  the course of this investigation?  Since the time the

4  investigation started, absolutely not.  Take a look at when she

5  first talks to the police.

6        When she first talks to the police, this is about

7  B.L..  And when they ask her do you know anything about the

8  abuse of B.L.?  Oh, no, that is a shock to me.  Well, she is

9  one of B.L.'s abusers.  That is the first lie.  Then when she

10  goes in to the police to talk to them, she gives a five-page

11  single-spaced statement to Investigators Baillargeon right

12  there.  And he explains to her, you have got to tell the truth.

13  You have got to be accurate.  You have got to be thorough.  You

14  can't hold any information back.

15        She looks him in the eye, and she tells him all

16  about what Stacey did to A.T..  Five pages, single spaced, not

17  one word, one word about her molesting A.T. and taking pictures

18  of it.  Not one word to him.  She says she was rarely present.

19  She tried to minimize her own involvement and point the finger

20  at someone else.

21        She tells you on the stand here, well, I wasn't

22  trying to protect myself.  I wasn't trying to minimize even

23  though I talked about B.L. and C.F. and Stacey and the abuse.

24  I had a lot going on.  So I didn't mean to leave it out.  Is

25  this some kind of accident?  You forgot you sexually abused

1053

Summation - By Ms. Bianco

1    your own child and took pictures multiple times?

2           The worst part about it is, she sat up here lying to

3    you all about lying to the police, giving you this lame excuse.

4    Oh, I forgot or I had a lot going on.  Is that even believable?

5    Think about the reason she didn't say anything about molesting

6    her child.  The government did not have her phone bill.  They

7    did not have her laptop.  She told you that she thought all of

8    the pictures were deleted.  She didn't know anything was backed

9    up on the laptop.

10          So when she is talking to the police, she is

11   assuming that there is no evidence.  It is him, him, him, not

12   me.  I am just there.  It is easy to point the finger at Stacey

13   and shift the blame.  He is already in jail.  He is already

14   accused of raping B.L..

15          One more thing I want to point out.  Remember when I

16   asked Hillary -- or excuse me, Mackenzie, she was up on the

17   stand.  Stacey is supposedly having me take all of these

18   pictures.  And yet, when he is abusing Mackenzie, he doesn't

19   want any pictures?  She said, well, that is ridiculous.  He is

20   in the room.  He wouldn't want pictures like that.  Yet,

21   Hillary comes in here and makes up some pictures and says there

22   are pictures that I saw of Stacey having sex with A.T. that

23   Mackenzie apparently sent her.  Where are these pictures?

24   Mackenzie didn't take them.  We don't see them.  Is this just

25   more pushing and pushing and pushing the evidence and trying to

A 225

1054

Summation - By Ms. Bianco

1   build up and point the finger away from them.  If there was a

2   picture of Stacey sexually abusing A.T., don't you think the

3   government would have brought it to you?

4          I want to talk to you a little bit about the B.L.

5   case a moment.  Remember, Stacey is not charged with any crimes

6   against B.L..  That is for another jury on another day.  The

7   government called B.L. in an effort to show you how terrible

8   Stacey is.  They also called B.L. for another reason.  B.L.

9   claims that Stacey confessed to her conveniently on the way

10  either to or from Wal-Mart.  I want to break up with Hillary

11  and Mackenzie, but they have dirt on me, by the way, I stuck my

12  penis in C.T. and A.T..  And that is the end of the

13  conversation.  Out of the blue.

14         So B.L. says this happened.  There was this

15  admission.  If this admission or confession happened, why

16  didn't B.L. tell the police about it the first two times she

17  was interviewed by them?  She said she only stayed in the house

18  because she cared about A.T..  Didn't want to leave her with

19  them.  Yet, when she leaves the house, she doesn't mention

20  anything about A.T. being abused.  Why make something like this

21  up?  Why would B.L. do that?  There is no question she is angry

22  at Stacey.

23         B.L. has some problems.  Not all of them were caused

24  by Stacey.  You heard a little bit from her aunt that there

25  were some issues with the family.  B.L. told you herself that

A 226

1055

Summation - By Ms. Bianco

1    when her parents died, she wasn't on speaking terms with any

2    member of her family.  That didn't have anything to do with

3    Stacey.  But there is no question that she has some animosity

4    toward Stacey.  Do you think she is capable of embellishing the

5    facts because of her hatred?

6           She said every time there was abuse between her and

7    Stacey, he would write it up on the Notes app.  Well, the

8    police seized the LG phone.  Did we see any evidence about B.L.

9    and Stacey communicating on the Notes about sexual abuse?  B.L.

10   talked about a tablet she had.  She had a tablet that had a Kik

11   account on it, but she said it got destroyed.  We don't know

12   when.  We don't know where, and we don't how the tablet, but

13   you better believe if Stacey destroyed it, she would have told

14   you.

15          B.L. is resentful and angry at Stacey, and maybe for

16   a very good reason.  But can you blame her for wanting to get a

17   little more against him to make sure he is arrested?

18          I want to talk to you about Stacey's confession to

19   Investigator Baillargeon.  Take a look at that statement.  He

20   said Stacey was cooperating.  He sat there, and he talked.

21   There is not one word in that statement about anything about

22   A.T. or C.T..  Investigator Baillargeon says I didn't ask him

23   about that.  He was there to ask Stacey about the B.L. rape

24   allegations, very, very serious charges.  And B.L. also told us

25   that she told Investigator Baillargeon in February that Stacey

A 227

1056

Summation - By Ms. Bianco

1    admitted to molesting C.T. and A.T..

2              Investigator Baillargeon has been with the New York

3    State Police seventeen years.  He is an incredibly experienced

4    investigator.  Do you really think he would just skip asking

5    those questions about whether Stacey had sexually abused two

6    babies when the person that he is interviewing is right in

7    front of him?

8              Now, we have the statement that Stacey signed.  Take

9    a look at it.  It has everything to do with B.L..  Why would

10   Stacey be there talking about an incestuous relationship with

11   his sister?  He is willing to admit all of that.  Yet, there is

12   nothing about anything else.  That is humiliating.  That is

13   embarrassing.  Why hold back?  Now, we will never know exactly

14   what questions were asked and answered during his interview.

15             This experienced investigator would have you believe

16   that he didn't know how to work the recording equipment and no

17   one was there to show him.  That he couldn't wait an extra five

18   minutes to get someone to turn it on.  This is his main suspect

19   in a rape case, and it wasn't important enough to record, but

20   everyone else has theirs recorded.  What went on with B.L. is

21   for another jury on another day.  But did B.L. embellish the

22   facts?  Yes, she did.  Stacey never made this admission on the

23   way to Wal-Mart.  By the way, I stuck my penis in C.T. and A.T.

24             I want to switch gears.  Thank you for being

25   patient.  I know I have a lot to cover, and I know it is hard

1057

Summation - By Ms. Bianco

1    to listen to.  I practiced with my husband last night.  He just

2    tuned me out after this point.  So thank you for listening.

3            Here in Count 5, this is where Stacey is charged

4    with sexual exploitation of a child.  This is the C.F. and

5    J.M..  Now, remember, he is not charged with having sex with

6    C.F..  That is not -- again, another jury, another day.  He is

7    charged with trying to make C.F. and J.M. -- entice and coerce

8    them to engage in sexually explicit conduct for the purpose of

9    producing pictures.  This is not a trial about whether he had

10   sex with C.F..

11           Let's start with the biggest discrepancy in the

12   testimony about C.F. and her brother, J.M..  Both agree, both

13   C.F. and J.M. said they were both really drunk.  But this is

14   when J.M. says.  He supposedly comes in.  C.F. is in the room.

15   Comes in, strips off all his clothing, holds him down and

16   makes -- and then C.F. jumps on top of him.  But he strips off

17   his clothes and holds him down.  C.F. never testified to any

18   such facts.  She said she was alone in the room with J.M..

19   Never mentioned one word about Stacey coming in, ripping J.M.'s

20   clothes off and holding him down.  Not one word.  And I submit

21   to you that is a huge discrepancy.

22           Both of them testified that Stacey was never in the

23   room.  We know they were both drunk.  We know that they didn't

24   actually have sex.  They were pretending and taking pictures.

25   And whose phone were they using?  They were using Mackenzie's

A 229

1058

Summation - By Ms. Bianco

1   phone to take the pictures.  And this is the same night that

2   Mackenzie is taking that picture -- do you remember that

3   picture where she is half clothed and she has got her mouth

4   open.  She is taking some kind of selfie of herself with her

5   mouth open.  She admitted that yes, I took that picture.  That

6   is at the same time with C.F. and J.M..

7           What did Stacey say?  I left.  I went over to Paul's

8   house to give him a tattoo.  Now, Paul might not be the

9   brightest tool in the shed, and that is probably giving him a

10  lot of credit.  But he sat up here and he said, yes, Stacey

11  came over and gave me tattoos, and he gave me a dragon tattoo,

12  and that's what Stacey was talking about.  He went over to give

13  him a dragon tattoo.

14          What about the picture?  Well, C.F. said yes, I had

15  fake sex with my brother and we took this picture.  But there

16  is something that is really troubling and doesn't make sense to

17  me and maybe you all can figure it out.  In the course of the

18  text conversation between C.F. and the other person, she is

19  saying something like maybe I will earn my tattoo.  And I asked

20  her specifically, you only have one tattoo?  And she said yes.

21  The kinky tattoo?  Yes.  And you didn't have it yet?  No.

22          When I brought out the picture.  There is a picture

23  of just a torso of two people.  The woman has a kinky tattoo.

24  I showed her the picture, and I said there is a kinky tattoo

25  here.  Because she supposedly didn't have the tattoo nyet.  Oh,

A 230

Summation - By Ms. Bianco

1    yes, I had it.  Well, who else has a kinky tattoo?  Mackenzie

2    Bailey in the exact same place, the exact same tattoo.

3         And I don't know what to make of it, but we know

4    that C.F. said at first I didn't have a tattoo when that went

5    on.  Only when she saw the picture did she change her time.

6    That is Exhibit 16.  I am not sure if it is A or B, but take a

7    look at that.

8         I also want to talk to you about the way it came out

9    that J.M. and C.F. had this sexual encounter.  C.F. reports a

10   rape after her mother finds out about her tattoo and about her

11   sexual relationship between Mackenzie and Stacey.  That's when

12   she first reports it.  Did she say the word rape?  No.  Her

13   mother got up there and said she is underage.  It is rape.  I

14   am taking her to the hospital.

15        So C.F. goes to the hospital.  Jean and C.F. report

16   these findings to the police that she is having sex with

17   Stacey.  There is not one word said about C.F. and J.M..  Not

18   one word.  So C.F. doesn't mention, by the way, Stacey, the

19   horrible man that he is, the one she is saying I love you to

20   that day, made me have sex with my bother.  She didn't say one

21   word about it.  She didn't say one word about it the next day

22   when her mother was calling the police for details.  And not

23   the next day after that when her mother was calling the police

24   for more details.

25        They brought J.M. in.  Does J.M. say anything about

1060

Summation - By Ms. Bianco

1    it?  No.  Not one word is said about them two having some kind

2    of sexual encounters or anything about pictures.  It wasn't

3    until J.M. gets in trouble with CPS, Child Protective Services,

4    does he mention it.  Now, I can't explain what happened.  Maybe

5    the two of them were drunk, joking around, and things got out

6    of hand.  And they are both so humiliated and embarrassed by

7    their behavior, when the picture surfaces they don't want to

8    take the blame.  He made us do it.

9            And I want to move on to the final charge.  In that,

10   the government is charging Stacey with receipt of child

11   pornography on March 25th from a person named banx75.  And this

12   conversation supposedly happened on March 25th, 2016, between

13   someone on the LG phone claiming that they are

14   prouddaddy3_15_16 and a person named banx.  Remember the

15   beginning of the conversation is something about my sister is

16   sleeping and if you give me some pictures or give me something,

17   I will take pictures of her.  B.L. is already long gone by now.

18   B.L. had moved out in January.  So this sister that is

19   supposedly there doesn't exit.

20           The government claims that it was Stacey using the

21   phone.  He wouldn't let anyone use his LG phone.  They are also

22   claiming that Mackenzie and Hillary actually saw him trading

23   child porn pictures on Kik.  Remember, Hillary testified that

24   she is sitting right next to Stacey and he is getting child

25   pornography pictures from Kik users.  Mackenzie apparently saw

A 232

1061

Summation - By Ms. Bianco

1    this too, but Hillary and Mackenzie don't ever speak about this

2    and they deny doing it themselves.  But both are supposedly

3    witnessing this.

4           Let's take a look at the claim that Mackenzie wasn't

5    was looking at child pornography.  Mackenzie had multiple user

6    names for social media accounts.  Hillary had multiple user

7    names.  When asked what their user names were, what did they

8    say?  They forgot.  I pushed and pushed and pushed, they

9    remembered maybe one.  Mackenzie remembered just a few more,

10   but they didn't remember how many user names they had or what

11   they were.  The only thing they remember was Stacey's user

12   name.  That's a little too convenient.

13          Mackenzie admitted she was on the site called Topix

14   looking at child porn and beastiality, but that was for Stacey.

15   We know from the government's computer expert that Mackenzie's

16   Lenovo computer had child pornography and beastiality on it.

17   And Hillary was adamant, I didn't view any porn.  Well, we

18   heard from the government's expert that someone on the LG phone

19   was using the name Hillary.

20          We also know that Mackenzie's phone was used by

21   everyone.  Mackenzie said B.L. used it.  Hillary used it.  She

22   used it.  Stacey used it.  B.L. even said she used it.  We know

23   C.F. was using it.  So these phones are being shared.

24          And by the way, the government is saying it is

25   ridiculous that Mackenzie is controlling Stacey's phone.  Well,

A 233

1062

Summation - By Ms. Bianco

1   she bought it for him.  He has got no job, no money.  He sits

2   around sleeping all day long.  That is the one thing she can

3   control with, is this phone because he has got nothing.  He

4   can't buy his own.

5           I want you to look at who is talking in that

6   paragraph.  Who is talking?  And I want to put up Exhibits 18

7   and 19, please.  Let's do 19 first.  Let's make that a little

8   clearer.  Okay.  A sexual conversation you see the top.  Nice

9   cock.  Who is being identified here?  Female, twenty, New York.

10  And then the person is asking you are a female, and she says

11  yes.  Female, twenty, New York.  Mackenzie is twenty, and she

12  is on some kind of a sexual site.  She admitted to being on

13  sexual sites.  And here she is talking about herself.

14          I want to take a look at the next exhibit.  I

15  believe this is 20.  Hi, female, twenty, New York.  It says:

16  Proud dad is your user name.  You know, so clearly someone is

17  using this phone, and it is not Stacey, to communicate with

18  people.  And I want to talk a little bit about this Kik program

19  and how they come up with the user names.  We heard the expert

20  testimony that you could make a Kik user name with anyone

21  else's name.  Anyone else's name.  You can use anyone else's

22  photo.  It is not verified.  Anyone else's date of birth.  You

23  don't have to be the same person who creates this account as

24  the one who uses the account.

25          We know that there is at least two fastfamily

A 234

1063

Summation - By Ms. Bianco

1    accounts, fastfamily25 and fastfamily1327.  Why is that

2    important?  Remember Stacey's tattoo, ride or die 1327.  That

3    is on his leg.  We didn't hear one word about 1327, the

4    fastfamily1327, not one word.  Has the government proven to you

5    beyond a reasonable doubt that it was Stacey on the other end

6    of that phone communicating with a person calling themself banx

7    and receiving child pornography?  And I submit the answer is

8    no.

9            Now, soon you are going to begin deliberations in

10   this case.  And we are asking you to view each charge

11   individually to make a determination count by count.  One thing

12   we would like you to do is listen carefully to the charge on

13   reasonable doubt, and ask yourself would you hesitate to rely

14   and act upon the testimony of any of these witnesses in one of

15   the most important decisions of your life?  Would you hesitate

16   to rely on the word of Hillary Trimm in one of your most

17   important decisions?  How about the word of Mackenzie Bailey?

18   Would you rely on that?  Think about what they have to gain

19   with their testimony.  Both of them face life.

20           Now, Stacey may not be someone you like or respect,

21   certainly not someone you want to hang out with, but has the

22   government really proven to you beyond every reasonable doubt

23   that he is guilty of these charges?  We ask you to find him

24   not guilty of the things in this Indictment because that's what

25   he is charged with here in this court.  Thank you.

1064

Summation - By Ms. Bianco

1          THE COURT:  Thank you.

2          Ms. Fletcher, you may submit a rebuttal.

3    REBUTTAL SUMMATION BY MS. FLETCHER

4          MS. FLETCHER:  Thank you, Your Honor.

5          Ladies and gentlemen, one word for you to keep in

6    mind when you are deliberating, perspective.  Whose perspective

7    are you hearing the testimony from?  Whose perspective is

8    giving you the evidence in this case?

9          Mackenzie Bailey's perspective in life may be

10   different from Ms. Bianco's perspective in life or your

11   perspective in life or someone else's perspective in life.

12   Mackenzie Bailey came in here, sat on that witness chair,

13   someone who ran away from home at sixteen, who had a bad home

14   life with an abusive boyfriend of her mother, got pregnant,

15   dropped out of school, had a crazy boyfriend, and then met up

16   with the defendant.  And then her life as you know was no

17   picnic from there.  She testified here with that perspective.

18         Hillary Trimm, no picnic either.  They come from a

19   depressed area.  They live the life they live.  They come to

20   you with their own perspective.  What they do, what they would

21   do, what they could do, and they could be pushed into doing,

22   whether they are willing to stand up for themselves, whether

23   they are willing to stand up for their babies, it is their

24   perspective at that point in their lives.

25         Ms. Bianco said who would do such a thing?  What

1065

Rebuttal Summation - By Ms. Fletcher

1    would it take for you to allow someone to molest your baby?

2    Not the same perspective that Mackenzie Bailey and Hillary

3    Trimm are coming from.  And welcome to criminal court.  Who

4    would do such a thing?  Here in criminal court everyday there

5    are people who do things that no one else would do.  People who

6    are convicted of things that no one else would dream of

7    committing.  That's why you are here, perspective.

8              Look at the chats.  Didn't hear an awful lot about

9    the chats during the defense summation because the chats prove

10   the crimes.  You don't have to rely on Hillary Trimm.  You

11   don't have to rely on Mackenzie Bailey.  I submit to you that

12   they are telling you the truth, that they don't have a motive

13   to lie.  And that we have proof positive out of his own mouth,

14   out of his own fingertips, out of his own chats of what he did,

15   what he wanted, and what was going on in those houses up in

16   Massena in 2014, 2015, 2016.

17             The defense, maybe except for Count 2, it is not

18   really that the crimes didn't happen, but that is it the

19   defendant who didn't do it.  Sat there on the witness stand and

20   told you oh, my goodness, that would be inappropriate.  Really?

21   Really?  You want to talk about who is lying in this case.

22   Take a look at the defendant's testimony this morning.

23             Who had a hold on who?  You see Mackenzie Bailey on

24   that witness stand?  Did you see her try to get through her

25   testimony?  Did you see her when the chats were being read,

Rebuttal Summation - By Ms. Fletcher

1   when the pictures were being shown?  Is she someone who has got

2   her thumb on the defendant, who is molesting her baby and then

3   coming in her and put the rap on him.  She was disgusted with

4   herself.  She has been away from him since he was arrested,

5   since before he was arrested, she got out of there.  Unlike

6   Hillary Trimm, Mackenzie Bailey never went back to the

7   defendant.

8           Her perspective has changed.  She is no longer under

9   his thumb.  She has been able to look back, been able to see

10  what it is she did, who it is she was, and come in here to you

11  now, a year later, and tell you I did some horrible things, and

12  I did them with him.  And I am ashamed of it, and I upset about

13  it.  I don't deserve to have my daughter anymore, and I don't

14  care how long I go to jail for.

15          Ms. Bianco wants you to think she doesn't really

16  mean that.  Mackenzie Bailey doesn't really mean that.  She

17  pulled some, you know, trick here, whatever, where she wants

18  her to rip up the Cooperation Agreement.  Mackenzie was willing

19  to do it.  You saw her.  Bring it on.  I don't care what

20  happens to me.  I am here because something really bad

21  happened, something I was a part of, something I want to make

22  right.  That's why Mackenzie Bailey is here.  That is her

23  perspective.  You can hate her.  You can feel sorry for her.

24  You can be indifferent to her.  It happened.  That is the only

25  thing you need to find.

1067

Rebuttal Summation - By Ms. Fletcher

1           And that is what the evidence shows, the chats, the

2    chats, the chats.  He is after them.  It is super annoying,

3    right.  Reading through those chats, please, no, please, no,

4    baby on my dead parents, no, please, no, for hours.  These

5    women told you after a while we gave in.  What did Mackenzie

6    do?  Remember the one chat where she was willing to take Nyquil

7    so the defendant and her brother could have sexual contact with

8    her while she was passed out.  That was the only way she was

9    going to do it.  And she relented because he wouldn't leave her

10   alone.

11          That is the type of living situation

12   Mackenzie Bailey was in.  She was not controlling him.  She was

13   not giving him, you know, a curfew with his phone, minutes on

14   his phone.  You can only use this for this and this for that.

15   He is the monster here and not her.

16          What makes sense?  What makes sense that you can

17   attribute to Mackenzie and Hillary?  They have a relationship

18   they don't want you to know about?  It was the defendant who

19   brought them together.  He saw Hillary at that Wal-Mart and

20   knew she had a baby, bingo, bongo, he is interested.  He has

21   got them both going at the same time.  He is on Talcott with

22   Mackenzie and A.T..  He is over at the projects with Hillary.

23   Maybe it is getting too much to go back and forth.  Hillary

24   starts going back on the rent.  She moves in.

25          He is big and hot.  He has two women.  He has got

A 239

1068

Rebuttal Summation - By Ms. Fletcher

1  their babies.  He has got B.L..  He can have his whole day set

2  for him, all the sex he wants, all the alcohol, all the TV, all

3  the video games.  He can watch Fast and Furious all day long.

4  And the women will go to work.  They will bring the money home,

5  and he can do what he wants with who he wants.  Who had a hold

6  on who?

7      Who kept going back to this guy?  He didn't have a

8  hold on Hillary Trimm?  She kept going back to him.  Why?  At

9  least Mackenzie didn't when she got out, but she stayed.  Why

10  would she stay?  Hillary says I can get you out.  She was too

11  afraid to leave.  That's who this man is.  That is who you are

12  considering in this case.

13      Talk about B.L. and what about, you know, her

14  testimony, and why did we bring it in here?  We brought it in

15  here to show you someone who rapes children.  Well, no.  B.L.'s

16  testimony shows you who he is and who he is capable of being.

17  It is not too inappropriate for him to have sex with his sister

18  when she is eight, when she eleven, and the entire time she

19  lives with him.  He admitted all these abuses to

20  Investigator Baillargeon.  He admitted incest.  He admitted

21  raping his sister.  Is that a guy for whom the other acts are

22  too inappropriate?  He would never do something like that.  Not

23  really.  That is him.  That's his thing.  That is who he is.

24      B.L. is not embellishing the facts.  B.L. came in

25  here to tell you exactly what you know, exactly what he told

A 240

1069

Rebuttal Summation - By Ms. Fletcher

1   Investigator Baillargeon, he is a rapist.  He is after

2   children.  He will have sex with whoever is in front of him,

3   and he has done it repeatedly.  That is who he is.

4          Let's talk about Hillary Trimm and Count 2.  There

5   is no lack of evidence for Count 2.  We talked about that,

6   remember?  You do not have to have pictures to convict of a

7   conspiracy to sexually exploit a child for the purpose of

8   producing pictures.  You heard testimony about the pictures

9   that were produced.  You heard testimony that there was an

10  agreement to produce that type of picture.

11         We do not have to prove that the picture that

12  Hillary Trimm took of herself abusing her child came out.  That

13  it was, you know, not blurry, that it showed exactly the

14  activity that the defendant wanted.  We don't have to show what

15  finger was put where on the baby.  We don't have to show her

16  mouth on that baby's vagina.  If we had pictures and they all

17  came out black or blurry, that is okay.  He doesn't have to be

18  successful.  The pictures don't have to come out.  It is the

19  purpose, take some pictures and send them to me.  Okay.  I will

20  do that.  That is the conspiracy.  That's the agreement they

21  had.  And you know that's what he wanted because you have seen

22  what he got.

23         C.F. and J.M., what isn't true about that?  Why

24  isn't this not the defendant, right?  Again, swear on my

25  parents, swear on my parents.  There is no one else in the

1070

Rebuttal Summation - By Ms. Fletcher

1    Village of Massena running around swearing on their parents
2    except for Stacey LaPorte, Junior.  I will freak out, babe.  I
3    swore on my dead parents.  This is what he is telling the
4    children in Exhibit 16.  This is what he is telling C.F..  You
5    have got to make this happen.
6            And then when C.F. gives the phone to Mackenzie, he
7    is after Mackenzie to take pictures of J.M., and she won't do
8    it.  If you read through Exhibit 16, you know that the phone
9    goes back and forth between C.F. and Mackenzie.  That he is
10   having sex with C.F., and he is telling Mackenzie to take
11   pictures of J.M., and she won't do it.  And he is telling her
12   she is in here doing X, Y, and Z sexual acts to me, please do
13   that out there.  And when Mackenzie won't do it, he tells
14   Mackenzie to give her your phone.  And C.F. takes the phone.
15   And C.F. takes the picture of J.M. sleeping in the defendant's
16   apartment.
17           You saw the striped blanket.  You saw the camo
18   blanket.  It is in evidence as 16D.  Those blankets were in
19   that house on March 7th when the police came and took the
20   search warrant photos.  They are in the search warrant photos.
21   C.F. takes that picture.  He is begging her to continue to
22   abuse J.M., and she won't do it.  There is nothing, nothing in
23   Exhibit 16 that is not Stacey LaPorte bringing this around,
24   begging for it to happen.
25           The picture of Mackenzie with her mouth open that

1071

Rebuttal Summation - By Ms. Fletcher

1 Ms. Bianco talked about, that's her effort of getting off the

2 subject.  I am not going to touch him, but here I am giving you

3 myself.  How many times did she do that act?  I will take

4 Nyquil and you can abuse me so I don't have to touch my bother.

5 I will give you my mouth.  You can come here.  This is what you

6 can have so you don't abuse the children.  That's who Mackenzie

7 Bailey was.  That's who Mackenzie Bailey is.  And that is who

8 Mackenzie Bailey was on that witness stand.

9        Great alibi, February 28th, he wasn't there.  This

10 isn't him.  Someone else  is swearing on his dead parents while

11 he is giving Paul Fregoe a dragon tattoo.  Paul Fregoe has a

12 tattoo.  There was no evidence that it was on February 28th at

13 4:58 a.m.  You were over there at four o'clock in the morning

14 giving Paul Fregoe a tattoo?  I don't think so.  That came out

15 through the defendant for the first time this morning, and I

16 submit to you that it is completely incredible to alibi a man

17 at the last minute.

18        It was never addressed with Paul Fregoe.  He was in

19 here.  He was on the stand.  Did he give you a dragon tattoo?

20 He has given me some tattoos.  How about was he there on

21 February 28th at 4:58 a.m.  Nope, not even a question.  He was

22 not over there.  C.F. had a tattoo.  He is going to give her

23 another tattoo.  Oh, you know this is the smoking gun.  He

24 tells her if you do this, I will give you that tattoo.  She had

25 a tattoo.  She wants another one.  He gave B.L. two or three.

1072

Rebuttal Summation - By Ms. Fletcher

1   He gave Mackenzie six or seven.  He has got seven or eight.  He

2   is tattooing children left and right.  He is not any shy about

3   giving C.F. yet another tattoo.  That's is just a distraction

4   over on that side.  It doesn't make any sense.

5           Ms. Bianco wants you to fault C.F. and J.M. for not

6   running to the police to say that they had sex with one another

7   at the defendant's request.  You saw those kids.  You saw J.M..

8   J.M. is broken kid because of this.  He is in a boys home

9   because of this.  He stopped going to school.  He doesn't want

10  anyone to touch him.  He was a kid with some issues beforehand,

11  sensory issues, and possibly on the spectrum.  And this broke

12  him.

13          The defendant gave him alcohol.  He told you he had

14  switched to the shorts the defendant gave him because he had

15  spilled beer all over himself.  This idea that it was, you

16  know, I don't know, water pong, is ridiculous.  J.M. was drunk.

17  If his perspective was a little off or different than CF's who

18  was also drunk when they had sexual contact with one another,

19  look to the defendant who fed them the alcohol.

20          You saw the picture.  You see the chats.  Do it, do

21  it, do it, I swore on my parents, do it.  And she sends the

22  picture.  C.F.'s fingers, her fingernail polish around her

23  brother's penis.  That is all you need.  I don't care about the

24  kinky tattoo in the other picture.  Although he wanted more,

25  right?  That was his purpose.  You have the picture of J.M.'s

A 244

1073

Rebuttal Summation - By Ms. Fletcher

1   penis with his sister's hand around it.  The defendant got what

2   he wanted, didn't he?  He is the one that wanted that.  Nobody

3   else.  You have all the evidence you need to convict of that

4   crime.

5          Banx75, first of all -- well, I guess I will go back

6   to this.  Ms. Bianco said something about two fastfamily

7   accounts.  She forgot the one fastfamily account.  Really,

8   right?  Fastfamily25, that is with crimes that we have evidence

9   of happened, fastfamily25.  Maybe there was a 1327 somewhere

10  along the line, I don't know.  Maybe it was his, maybe it

11  wasn't his.  But to come in here and say that everything

12  happened on 1327, but there is no 1327, right?

13         Do you remember Investigator Arcadi on the stand,

14  the question on cross was:  You subpoenaed Kik for 1327,

15  fastfamily1327, and it came back no record, isn't that true?

16  He said yes, there was no 1327.  So I don't know what that

17  reference was to earlier, but you have one fastfamily account,

18  fastfamily25 made while the defendant was twenty-five shortly

19  before the C.F. and J.M. event leading through the A.T. abuse.

20         He is prouddaddy.  We know he is prouddaddy.  He

21  said he was prouddaddy.  He is apparently prouddaddy when it is

22  good, but not prouddaddy when it is bad.  But he is always

23  himself as prouddaddy, but never someone else.  He likes to

24  role play.  He likes to role play about children being raped,

25  but he couldn't possibly role play as prouddaddy as a woman

A 245

1074

Rebuttal Summation - By Ms. Fletcher

1    looking for some other kind of deviant sex.  Because that isn't
2    who he is, is it, right?
3            The LG phone, the only phone with deviant sexual
4    content on it, the only phone.  It is not Mackenzie Bailey.  If
5    she was online looking for another girlfriend, she is trying to
6    control who their threesome is going to be with, not that she
7    loves threesomes, but because he does.
8            This entire case is about pleasing Stacey LaPorte.
9    He has grown up a rapist.  He raped his sister.  He has raped
10   these children.  He had the mothers rape their children.  And
11   he had the mothers bring the children to him.  He asked for
12   pictures, got more and more perverse.  He is into incest, C.F.
13   and J.M..  He loved that, right?  He was into incest with his
14   own sister.  What about Mackenzie and Dalton?  Right.  She is
15   going to take Nyquil because he is begging her to touch her own
16   brother.
17           Who is into incest here?  The defendant.  Who is
18   into sex with children here?  The defendant.  Who is
19   fastfamily25?  Who is prouddaddy asking Banx75 for extreme baby
20   pics?  The guy who is into that, the defendant.  Not the women
21   you saw up there.  They wouldn't have done this, but for him.
22   I think you know that.  He is fastfamily.  He is prouddaddy,
23   and he is guilty.  Thank you.
24           THE COURT:  Thank you.
25           All right.  Members of the jury, as I said, we will

A 246

# UNITED STATES DISTRICT COURT

## Northern District of New York

| | |
|---|---|
| UNITED STATES OF AMERICA | **JUDGMENT IN A CRIMINAL CASE** |
| **v.** | |
| | Case Number:  DNYN516CR000320-001 |
| **Stacey J. LaPorte, Jr.** | USM Number:  24477-052 |

Randi Juda Bianco, Assistant Federal Public Defender
4 Clinton Square, Third Floor
Syracuse, NY 13202
315-701-0080
_____
Defendant's Attorney

## THE DEFENDANT:

☐ pleaded guilty to count(s)

☐ pleaded nolo contendere to count(s)  which was accepted by the court.

☒ was found guilty on count(s) <u>1 through 6</u> of the Second Superseding Indictment on June 20, 2017 after a plea of not guilty.

The defendant is adjudicated guilty of these offenses:

| <u>Title & Section</u> | <u>Nature of Offense</u> | <u>Offense Ended</u> | <u>Count</u> |
|---|---|---|---|
| 18 U.S.C. § 2251(a) | Conspiracy to Sexually Exploit a Child | 05/31/2016 | 1 |
| 18 U.S.C. § 2251(a) | Conspiracy to Sexually Exploit a Child | 06/30/2015 | 2 |
| 18 U.S.C. § 2251(a) | Sexual Exploitation of a Child | 03/02/2016 | 3 |
| 18 U.S.C. § 2251(a) | Sexual Exploitation of a Child | 03/03/2016 | 4 |
| 18 U.S.C. § 2251(a) | Sexual Exploitation of Children | 02/28/2016 | 5 |
| 18 U.S.C. § 2252A(a)(2)(A) | Receipt of Child Pornography | 03/25/2016 | 6 |

The defendant is sentenced as provided in pages 2 through 7 of this judgment.  The sentence is imposed in accordance with 18 U.S.C. § 3553 and the Sentencing Guidelines.

☐ The defendant has been found not guilty on count(s)

☐ Count(s)  ☐ is  ☐ are  dismissed on the motion of the United States.

It is ordered that the defendant must notify the United States attorney for this district within 30 days of any change of name, residence, or mailing address until all fines, restitution, costs, and special assessments imposed by this judgment are fully paid.  If ordered to pay restitution, the defendant must notify the court and United States attorney of material changes in economic circumstances.

January 4, 2018
_____
Date of Imposition of Judgment

_____
David N. Hurd
United States District Judge

January 10, 2018
_____
Date

## IMPRISONMENT

The defendant is hereby committed to the custody of the United States Bureau of Prisons to be imprisoned for a total term of:

**1,140 months (or 95 years).  This term consists of 360 months on Counts 1, 3, and 4 to run concurrently with each other but consecutively to all other counts; 360 months on Count 2 to run consecutively; 360 months on Count 5 to run consecutively; and 60 months on Count 6 to run consecutively.**

☒ The court makes the following recommendations to the Bureau of Prisons:

**The defendant be designated to a facility in Tucson, Arizona.**

☒ The defendant is remanded to the custody of the United States Marshal.

☐ The defendant shall surrender to the United States Marshal for this district:

    ☐ at   ☐ a.m.  ☐ p.m. on.

    ☐ as notified by the United States Marshal.

☐ The defendant shall surrender for service of sentence at the institution designated by the Bureau of Prisons:

    ☐ before 2 p.m. on.

    ☐ as notified by the United States Marshal.

    ☐ as notified by the Probation or Pretrial Services Office.

## RETURN

**I have executed this judgment as follows:**

Defendant delivered on _____ to _____

at _____ with a certified copy of this judgment.

_____
UNITED STATES MARSHAL

_____
BY DEPUTY UNITED STATES MARSHAL

A 248

## SUPERVISED RELEASE

Upon release from imprisonment, you will be on supervised release for a term of:

### Life on each count to run concurrently.

### MANDATORY CONDITIONS

1.  You must not commit another federal, state, or local crime.

2.  You must not unlawfully possess a controlled substance.

3.  You must refrain from any unlawful use of a controlled substance.  You must submit to one drug test within 15 days of release from imprisonment and at least two periodic drug tests thereafter, as determined by the court.

    ☐  The above drug testing condition is suspended, based on the court's determination that you pose a low risk of future substance abuse. *(check if applicable)*

4.  ☐ You must make restitution in accordance with 18 U.S.C. § § 3663 and 3663A or any other statute authorizing a sentence of restitution. *(check if applicable)*

5.  ☒ You must cooperate in the collection of DNA as directed by the probation officer. *(deselect if inapplicable)*

6.  ☒ You must comply with the requirements of the Sex Offender Registration and Notification Act (42 U.S.C § 16901, *et seq.*) as directed by the probation officer, the Bureau of Prisons, or any state sex offender registration agency in the location where you reside, work, are a student, or were convicted of a qualifying offense. *(check if applicable)*

7.  ☐ You must participate in an approved program for domestic violence. *(check if applicable)*

If this judgment imposes a fine or restitution, it is a condition of supervised release that you pay in accordance with the Schedule of Payments sheet of this judgment.

You must comply with the standard conditions that have been adopted by this court as well as with any additional conditions on the attached page.

## STANDARD CONDITIONS OF SUPERVISION

As part of your supervised release, you must comply with the following standard conditions of supervision. These conditions are imposed because they establish the basic expectations for your behavior while on supervision and identify the minimum tools needed by probation officers to keep informed, report to the court about, and bring about improvements in your conduct and condition.

1. You must report to the probation office in the federal judicial district where you are authorized to reside within 72 hours of your release from imprisonment, unless the probation officer instructs you to report to a different probation office or within a different time frame.

2. After initially reporting to the probation office, you will receive instructions from the court or the probation officer about how and when you must report to the probation officer, and you must report to the probation officer as instructed.

3. You must not knowingly leave the federal judicial district where you are authorized to reside without first getting permission from the court or the probation officer.

4. You must answer truthfully the questions asked by your probation officer.

5. You must live at a place approved by the probation officer. If you plan to change where you live or anything about your living arrangements (such as the people you live with), you must notify the probation officer at least 10 days before the change. If notifying the probation officer in advance is not possible due to unanticipated circumstances, you must notify the probation officer within 72 hours of becoming aware of a change or expected change.

6. You must allow the probation officer to visit you at any time at your home or elsewhere, and you must permit the probation officer to take any items prohibited by the conditions of your supervision that he or she observes in plain view.

7. You must work full time (at least 30 hours per week) at a lawful type of employment, unless the probation officer excuses you from doing so. If you do not have full-time employment you must try to find full-time employment, unless the probation officer excuses you from doing so. If you plan to change where you work or anything about your work (such as your position or your job responsibilities), you must notify the probation officer at least 10 days before the change. If notifying the probation officer at least 10 days in advance is not possible due to unanticipated circumstances, you must notify the probation officer within 72 hours of becoming aware of a change or expected change.

8. You must not communicate or interact with someone you know is engaged in criminal activity. If you know someone has been convicted of a felony, you must not knowingly communicate or interact with that person without first getting the permission of the probation officer.

9. If you are arrested or questioned by a law enforcement officer, you must notify the probation officer within 72 hours.

10. You must not own, possess, or have access to a firearm, ammunition, destructive device, or dangerous weapon (i.e., anything that was designed, or was modified for, the specific purpose of causing bodily injury or death to another person such as nunchakus or tasers).

11. You must not act or make any agreement with a law enforcement agency to act as a confidential human source or informant without first getting the permission of the court.

12. If the probation officer determines that you pose a risk to another person (including an organization), the probation officer may require you to notify the person about the risk and you must comply with that instruction. The probation officer may contact the person and confirm that you have notified the person about the risk.

13. You must follow the instructions of the probation officer related to the conditions of supervision.

14. You must provide the probation officer with access to any requested financial information.

15. You must submit your person, and any property, house, residence, vehicle, papers, effects, computer, electronic communications devices, and any data storage devices or media, to search at any time, with or without a warrant, by any federal probation officer, or any other law enforcement officer from whom the Probation Office has requested assistance, with reasonable suspicion concerning a violation of a condition of probation or supervised release or unlawful conduct by you. Any items seized may be removed to the Probation Office or to the office of their designee for a more thorough examination.

**SPECIAL CONDITIONS OF SUPERVISION**

**No special conditions have been imposed due to the unlikeliness of the defendant's release.**

**DEFENDANT'S ACKNOWLEDGMENT OF APPLICABLE CONDITIONS OF SUPERVISION**

Upon a finding of a violation of probation or supervised release, I understand that the court may (1) revoke supervision, (2) extend the term of supervision, and/or (3) modify the conditions of supervision.

The conditions of supervision have been read to me. I fully understand the conditions and have been provided a copy of them. For further information regarding these conditions, see *Overview of Probation and Supervised Release Conditions*, available at: www.uscourts.gov.

| | |
|---|---|
| Defendant | Date |

| | |
|---|---|
| U.S. Probation Officer/Designated Witness | Date |

A 251

## CRIMINAL MONETARY PENALTIES

The defendant must pay the total criminal monetary penalties under the schedule of payments on Sheet 6.

| | **Assessment** | **JVTA Assessment \*** | **Fine** | **Restitution** |
|---|---|---|---|---|
| **TOTALS** | $ 600 | Waived | Waived | N/A |

☐   The determination of restitution is deferred until.  An *Amended Judgment in a Criminal Case (AO 245C)* will be entered after such determination.

☐   The defendant must make restitution (including community restitution) to the following payees in the amount listed below.

If the defendant makes a partial payment, each payee shall receive an approximately proportioned payment, unless specified otherwise in the priority order or percentage payment column below.  However, pursuant to 18 U.S.C. § 3664(i), all nonfederal victims must be paid before the United States is paid.

| **Name of Payee** | **Total Loss\*\*** | **Restitution Ordered** | **Priority or Percentage** |
|---|---|---|---|
| | $ | $ | |
| **Totals** | $ | $ | |

☐   Restitution amount ordered pursuant to plea agreement   $

☐   The defendant must pay interest on restitution and a fine of more than $2,500, unless the restitution or fine is paid in full before the fifteenth day after the date of the judgment, pursuant to 18 U.S.C. § 3612(f).  All of the payment options on Sheet 6 may be subject to penalties for delinquency and default, pursuant to 18 U.S.C. § 3612(g).

☐   The court determined that the defendant does not have the ability to pay interest and it is ordered that:

☐   the interest requirement is waived for the    ☐ fine  ☐  restitution.

☐   the interest requirement for the    ☐  fine    ☐  restitution is modified as follows:

*Justice for Victims of Trafficking Act of 2015, Pub. L. No. 114-22.
**Findings for the total amount of losses are required under Chapters 109A, 110, 110A, and 113A of Title 18 for offenses committed on or after September 13, 1994, but before April 23, 1996.

A 252

## SCHEDULE OF PAYMENTS

Having assessed the defendant's ability to pay, payment of the total criminal monetary penalties is due as follows:

A   ☒   In full immediately; or

B   ☐   Lump sum payment of $ due immediately; balance due

    ☐   not later than, or

    ☐   in accordance with   ☐ D,   ☐ E,   ☐ F,   or   ☐ G below; or

C   ☐   Payment to begin immediately (may be combined with   ☐ D,   ☐ E, or   ☐ G below); or

D   ☐   Payment in equal  installments of $ over a period of, to commence  after the date of this  judgment; or

E   ☐   Payment in equal  installments of $ over a period of, to commence  after release from     imprisonment to a term of supervision; or

F   ☐   Payment during the term of supervised release will commence within  after release from imprisonment.  The court     will set the payment plan based on an assessment of the defendant's ability to pay at that time; or

G   ☐   Special instructions regarding the payment of criminal monetary penalties:


Unless the court has expressly ordered otherwise, if this judgment imposes imprisonment, payment of criminal monetary penalties is due during imprisonment.  All criminal monetary penalties, except those payments made through the Federal Bureau of Prisons' Inmate Financial Responsibility Program, are made to **Clerk, U.S. District Court, Federal Bldg., 100 S. Clinton Street, P.O. Box 7367, Syracuse, N.Y. 13261-7367,** unless otherwise directed by the court, the probation officer, or the United States attorney.  If a victim cannot be located, the restitution paid to the Clerk of the Court for that victim shall be sent to the Treasury, to be retrieved when the victim is located.

The defendant shall receive credit for all payments previously made toward any criminal monetary penalties imposed.

☐   Joint and Several

    ☐   Defendant and Co-Defendant Names and Case Numbers *(including defendant number)*, Total Amount, Joint and Several Amount, and corresponding payee, if appropriate.


    ☐   The Court gives notice that this case involves other defendants who may be held jointly and severally liable for payment of all or part of the restitution ordered herein and may order such payment in the future.

☐   The defendant shall pay the cost of prosecution.

☐   The defendant shall pay the following court cost(s):

☒   The defendant shall forfeit the defendant's interest in the following property to the United States:

    **All right, title, and interest in the items listed in the Preliminary Order of Forfeiture signed by the Court on July 7, 2017.**

Payments shall be applied in the following order: (1) assessment, (2) restitution principal, (3) restitution interest, (4) fine principal, (5) fine interest, (6) community restitution, (7) JVTA Assessment, (8) penalties, and (9) costs, including cost of prosecution and court costs.

A 253

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

_____

| | |
|---|---|
| UNITED STATES OF AMERICA | ) |
| | ) |
| v. | ) |
| | ) |
| | ) |
| STACEY LAPORTE, | ) |
| | ) |
| Defendant | ) |

_____

CRIMINAL CASE NO. 16-CR-320 (DNH)

## NOTICE OF APPEAL

Notice is hereby given that the above-named Defendant hereby appeals to the United

States Court of Appeals for the Second Circuit from the Judgment entered on January 10, 2018.

Respectfully submitted,

LISA A. PEEBLES
FEDERAL PUBLIC DEFENDER

By:

*S/James P. Egan, Esq.*
Assistant Federal Public Defender
Bar Roll No. 515300
Office of the Federal Public Defender
4 Clinton Square, 3rd Floor
Syracuse, New York 13202
315-701-0080

TO:    United States Attorneys Office

A 254

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF NEW YORK

### ELECTRONIC NOTICE OF CRIMINAL APPEAL & CLERK'S CERTIFICATION

Dear Clerk of the Court,

Please take notice that on January 12, 2018 the court received a notice of appeal.  This notice serves to inform you of the pending appeal and provides you with the information needed to process the appeal.

I, LAWRENCE K. BAERMAN, CLERK, U.S. District Court for the Northern District of New York, DO, HEREBY CERTIFY that all the foregoing docket entries, are maintained electronically on the court's CM/ECF system and constitute the Record on Appeal in the below listed action.

IN TESTIMONY WHERE OF, I have hereunto set my hand and caused the Seal of said Court to be hereto affixed at the City of Syracuse, New York, this 12th day of January, 2018.

Lawrence K. Baerman, Clerk
U.S. District Court

s/

By:     Joanne Bleskoski
        Deputy Clerk

### Case Information

| | |
|---|---|
| Case Name & Case No. | USA v. Stacey LaPorte, Jr. - 5:16-CR-320 (DNH) |
| Docket No. of Appeal: | 102 - Notice of Appeal |
| Document Appealed: | 101 - Judgment |
| Fee Status: | Waived  X |
| Counsel: | OFPD  X |
| Time Status: | Timely  X |

A 255