# 18-105

*To be Argued by:* RAJIT S. DOSANJH

## United States Court of Appeals

### FOR THE SECOND CIRCUIT
### Docket No. 18-105

UNITED STATES OF AMERICA,

*Appellee,*

v.

MACKENZIE J. BAILEY,

*Defendant,*

STACEY J. LAPORTE, JR.,

*Defendant-Appellant.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF NEW YORK

## BRIEF FOR APPELLEE UNITED STATES OF AMERICA

GRANT C. JAQUITH
*United States Attorney for the
  Northern District of New York*
100 South Clinton Street
Syracuse, NY 13261-7198
Tele: 315-448-0672
Email: Rajit.S.Dosanjh@usdoj.gov

LISA M. FLETCHER
RAJIT S. DOSANJH
*Assistant United States Attorneys
  of Counsel*

# TABLE OF CONTENTS

PAGE

STATEMENT OF THE ISSUE
    PRESENTED ...................................................1

STATEMENT OF THE CASE ...........................2

STATEMENT OF FACTS ...................................5

    A.   Offense Conduct .....................................5

    B.   Indictment ................................................8

    C.   Evidence at Trial ....................................9

        1. The Government's Case ..................9

            a.   Testimony of
                Investigator Baillargeon .........10

            b.   Testimony of B.L. .....................12

            c.   Testimony of Bailey .................13

            d.   Testimony of V-2 and V-3 .......15

            e.   Testimony of Trimm .................16

            f.   Additional Evidence .................16

        2. Defense Case ...................................18

    D.   Sentencing ...............................................19

ii

SUMMARY OF ARGUMENT ...........................19

ARGUMENT
    The District Court Did Not Abuse Its
    Discretion by Denying LaPorte's
    Suppression Motion Without an
    Evidentiary Hearing, and,
    Regardless, Any Such Error Was
    Harmless. ......................................................21

    A.   Background ...........................................21

        1. LaPorte's Motion to
        Suppress His Statement to
        the NYSP...........................................21

    B.   Governing Law .....................................32

        1. Fifth Amendment Standards........32

        2. Discretion to Hold an
        Evidentiary Hearing on a
        Suppression Motion .......................34

    C.   Standard of Review .............................34

    D.   Discussion..............................................36

        1. LaPorte Failed to Establish
        the Need for a Suppression
        Hearing. ...........................................36

iii

2. Any Error by the District
Court in Denying LaPorte's
Suppression Motion Without
a Hearing was Harmless. ..............46

3. In the Event That the Court
Finds Reversible Error, the
Judgment of Conviction
Should Not Be Vacated. .................50

CONCLUSION ....................................................52

iv

# TABLE OF AUTHORITIES

**Cases:**

*Arizona v. Fulminante,*
  499 U.S. 279 (1991) ......................................... 35

*Berghuis v. Thompkins,*
  560 U.S. 370 (2010) ......................................... 37

*Brecht v. Ambrahamson,*
  507 U.S. 619 (1993) ......................................... 35

*Chapman v. California,*
  386 U.S. 18 (1967) ........................................... 35

*Dickerson v. United States,*
  530 U.S. 428 (2000) ......................................... 33

*In Re Terrorist Bombings of*
  *U.S. Embassies in E. Africa,*
  552 F.3d 177 (2d Cir. 2008) ............................ 33

*Lipton v. Nature Co.,*
  71 F.3d 464 (2d Cir. 1995) .............................. 38

*McMillon v. Culley,*
  380 F. App'x 63 (2d Cir. 2010) ........................ 41

*Miranda v. Arizona,*
  384 U.S. 436 (1966) ...................................passim

*Missouri v. Siebert,*
  542 U.S. 600 (2004) .............................. 33, 40, 41

v

*Moran v. Burbine*,
    475 U.S. 412 (1986) .................................... 32, 33

*Oregon v. Elstad*,
    470 U.S. 298 (1985) .................................... 32, 34

*Scott v. Fisher*,
    652 F. Supp. 2d 380 (W.D.N.Y. 2009) ............. 38

*United States v. Anderson*,
    929 F.2d 96 (2d Cir. 1991) ............................. 33

*United States v. Capers*,
    627 F.3d 470 (2d Cir. 2010) ........................... 33

*United States v. Gaddy*,
    532 F.3d 783 (8th Cir. 2008)........................... 37

*United States v. Getto*,
    729 F.3d 221 (2d Cir. 2013) ........................... 34

*United States v. Gillette*,
    383 F.2d 843 (2d Cir. 1967) ........................... 38

*United States v. Levy*,
    377 F.3d 259 (2d Cir. 2004) ........................... 34

*United States v. Mathurin*,
    148 F.3d 68 (2d Cir. 1998) ............. 41, 42, 50, 51

*United States v. Morrison*,
    153 F.3d 34 (2d Cir. 1998) ............................. 49

*United States v. Newton*,
    369 F.3d 659 (2d Cir. 2004) ...................... 32, 35

vi

*United States v. Plugh,*
   648 F.3d 118 (2d Cir. 2011) ............................ 32

*United States v. Stanley,*
   928 F.2d 575 (2d Cir, 1991) ............................ 49

*United States v. Taylor,*
   745 F.3d 15 (2d Cir. 2014) .............................. 36

*United States v. Trimm,*
   756 F. App'x 109 (2d Cir. 2019) ........................ 3

*United States v. Williams,*
   681 F.3d 35 (2d Cir. 2012) ........................ 34, 44

*Zappulla v. New York,*
   391 F.3d 462 (2d Cir. 2004) ............................ 35

**Federal Statutes, Rules and Other Authorities:**

18 U.S.C. § 2(a) ................................................. 3, 9

18 U.S.C. § 2251(a) ................................... 2, 3, 8, 9

18 U.S.C. § 2251(e) .................................... 2, 3, 8, 9

18 U.S.C. § 2252A(a)(2)(A) ............................... 3, 9

18 U.S.C. § 3731 ................................................. 51

N.D.N.Y. Local Civil Rule 7.1(a)(2) .................... 39

# United States Court of Appeals

## FOR THE SECOND CIRCUIT
### Docket No. 18-105

---

UNITED STATES OF AMERICA,
*Appellee,*

v.

MACKENZIE J. BAILEY,
*Defendant,*

STACEY J. LAPORTE, JR.,
*Defendant-Appellant.*

---

## BRIEF FOR THE
## UNITED STATES OF AMERICA

---

## STATEMENT OF THE ISSUE PRESENTED

Whether the district court abused its discretion by not holding an evidentiary hearing on defendant's motion to suppress a statement he made to police investigators, where defendant's affidavit in support of his motion failed to make sufficiently detailed, definitive, and nonconjectural assertions of fact relevant to the admissibility of the statement and, in any event, whether the admission of defendant's statement was harmless error, given that there was overwhelming evidence of guilt at trial and defendant did not admit in the statement to any of the conduct for which he was convicted.

2

## STATEMENT OF THE CASE

Defendant-appellant Stacey Joseph LaPorte, Jr. challenges the denial by the United States District Court for the Northern District of New York (Hurd, *J*.) of his motion to suppress a statement he made to police investigators. He contends that the district court erred by deciding his motion without holding an evidentiary hearing, and seeks remand for such a hearing.

On April 20, 2017, a federal grand jury in the Northern District of New York returned a second superseding indictment against LaPorte, charging him with six counts relating to his sexual exploitation of four children – two infant girls, a twelve-year-old boy, and a sixteen-year-old girl. A:46-50.[1] Specifically, the indictment charged LaPorte with two counts of conspiracy to sexually exploit a child, in violation of 18 U.S.C. § 2251(a) & (e) [Counts One and Two]; three counts of sexual exploitation of a child, in violation of 18 U.S.C.

---

[1] References to "A" are to pages in the appendix filed by LaPorte. References to "GA" are to the government appendix which the government has sought leave to file with this brief. References to "Dkt." are to the district court docket report, which is reproduced at A:1-28.

3

§§ 2251(a) & (e) [Counts Three, Four, and Five];[2] and one count of receipt of child pornography, in violation of 18 U.S.C. § 2252A(a)(2)(A) [Count Six].[3] A:46-50. On March 31, 2017, before the superseding indictment was returned, LaPorte filed an omnibus pretrial motion in which he sought, *inter alia*, suppression of statements he

---

[2] Counts Three and Four were also charged under 18 U.S.C. § 2(a).

[3] Two others were charged with related offenses. Mackenzie Bailey was named as a co-defendant in three counts of the original indictment in this case, relating to the sexual exploitation of one of the infant victims. Dkt. #1. In March 2017, Bailey pleaded guilty to all three counts, pursuant to a plea agreement. Dkt. Entry dated Mar. 16, 2017; Dkt. #22. Bailey testified at trial against LaPorte, and was sentenced principally to 180 months' imprisonment. Dkt. #116.

In May 2017, Hillary Trimm pleaded guilty to an information charging her with conspiring with LaPorte to sexually exploit another infant victim. *See United States v. Trimm*, 17-cr-90-DNH (N.D.N.Y.). Trimm is awaiting resentencing following a remand resulting from the government appeal of her sentence. *United States v. Trimm*, 756 F. App'x 109 (2d Cir. 2019).

4

made to police investigators. A:29-43. On May 17,
2017, after oral argument on the omnibus motion,
the district court denied LaPorte's suppression
motion on the papers, without holding an
evidentiary hearing. A:21-25.

On June 20, 2017, following a five-day trial, a
jury found LaPorte guilty on all counts. Dkt. #76.
On January 1, 2018, the district court sentenced
LaPorte principally to a total term of
imprisonment of 95 years. A:247-48. Judgment
was entered on January 10, 2018, A:247-53, and
LaPorte filed a timely notice of appeal on January
12, 2018, A:254.

5

## STATEMENT OF FACTS

### A. Offense Conduct[4]

In March 2014, LaPorte's fourteen-year-old sister, B.L., moved in with LaPorte after the death of their parents. GA:20. LaPorte, who was approximately twenty-four years old at the time, was B.L.'s closest living relative. GA:20-21, 23. Other adults and children lived at various residences with LaPorte and B.L. between 2014 and 2016, including LaPorte's girlfriends (and later co-defendants), MacKenzie Bailey and

---

[4] The following summary of LaPorte's offense conduct is based on the evidence presented at trial. The Presentence Investigation Report (PSR) in this case, whose factual statements the district court adopted at sentencing, *see* Dkt. #120, at 5, provides a lengthy account of LaPorte's criminal sexual conduct and the investigation into those crimes, including interviews with the victims and LaPorte's accomplices, Bailey and Trimm. PSR ¶¶ 12-60. The PSR has been filed separately with the Court.

The conduct described above concerns only those crimes for which LaPorte was charged and convicted in federal court. *See* PSR ¶ 145 (describing LaPorte's conviction in New York court for related conduct).

6

Hillary Trimm, as well as infants V-1 and V-4. GA:74-77. During this period, LaPorte raped several minors, including B.L., V-1, and V-4; and instructed others to sexually abuse the same or different minors and to produce images and videos of that abuse. GA:78-82, 85-89, 94-96, 127-28, 136-41, 151-54.

During the time that B.L. lived with LaPorte, from 2014 to 2016, she was raped and sexually abused by LaPorte alone, and by LaPorte and Bailey acting together. As B.L. later told police investigators, she had been raped and otherwise sexually abused by LaPorte when she was eight years old, again when she was eleven, and then more frequently after the death of her parents. GA:21-26, 79.

Bailey and V-1 lived with LaPorte from the summer of 2014 until March 2016. LaPorte and Bailey sexually exploited V-1 from the time that V-1 was four months old, until she was two years old. GA:78-85, 92-93. LaPorte sexually abused V-1 numerous times, including by subjecting her to vaginal and anal penetration. GA:78-85. Using Kik Messenger,[5] LaPorte also directed Bailey to perform certain sexual acts on V-1, take pictures of that abuse, and send those pictures to him over the

---

[5] Kik Messenger ("Kik") is a free instant messenger application for mobile devices.

7

internet – often as a precursor to him raping the infant. GA:79-80.

While LaPorte and Bailey were living together, LaPorte began a relationship with Trimm in March 2015. GA:150. In April 2015, LaPorte anally raped V-4 with Trimm's assistance. V-4 was eleven months old at the time. GA:151. At the end of April 2015, LaPorte directed Trimm via Kik to produce images of herself sexually abusing V-4. Trimm complied. In May 2015, LaPorte subjected V-4 to oral and anal sex, again with Trimm present in the room. GA:151-53, 161-62. In June 2015, LaPorte sent Trimm a video of him anally penetrating V-1. GA:153-54. Soon afterwards, Trimm moved in with LaPorte, Bailey, and B.L. GA:154.

V-3, aged sixteen, was a school friend of B.L. who would spend time at LaPorte's residence. GA:86. V-3's younger brother (twelve-year-old V-2) would spend time there, too. LaPorte began engaging in sexual activity with V-3 after B.L. ran away in January 2016. GA:86. LaPorte gave cigarettes and alcohol to V-2 and V-3, and forced V-2 to have sexual contact with V-3. LaPorte directed this activity over Kik, while he was in the next room, and V-3 sent him pictures of this activity over the internet. GA:127-28, 137-41.

8

LaPorte used two Kik usernames, "fastfamily25"[6] and "prouddaddy3_15_16," to engage in the charged conduct. GA:63, 81, 136-38, 177-78. On March 25, 2016, LaPorte used the latter username to solicit and receive images of the sexual abuse of an infant from another Kik user, unrelated to Bailey or Trimm. GA:178-79.

**B. Indictment**

On April 20, 2017, a second superseding indictment was returned against LaPorte, charging six counts against him. Count One charged LaPorte with conspiring with Bailey between 2014 and May 2016 to use V-1 to engage in sexually-explicit conduct for the purposes of producing visual depictions of that conduct, and transporting such depictions in interstate commerce, in violation of 18 U.S.C. § 2251(a) and (e). A:46-47. Count Two alleged that LaPorte conspired with Trimm between April and June 2015 to use V-4 in the same manner to produce and transport child pornography, in violation of 18 U.S.C. § 2251(a) and (e). A:47. Counts Three and Four alleged that on March 2, 2016 and March 3, 2016, respectively, LaPorte, acting with Bailey, produced and transported child pornography

---

[6] The actual username for this account contained a typo, and was spelled "fastfsmily." *See, e.g.*, A:66-68, 196. Witnesses at trial referred to this account as "fastfamily." *See, e.g.*, GA:81.

9

involving V-1, in violation of 18 U.S.C. § 2251(a) and (e), and 18 U.S.C. § 2(a). A:47-48.

Count Five alleged that on or about February 28, 2016, LaPorte used, persuaded, induced, enticed, and coerced V-2 and V-3 to engage in sexually explicit conduct for the purpose of producing and transporting child pornography, in violation of 18 U.S.C. § 2251(a) and (e). A:48. Finally, Count Six charged LaPorte with receipt of child pornography on March 25, 2016, in violation of 18 U.S.C. § 2252A(a)(2)(A).

None of the counts in the indictment charged LaPorte with offenses involving his illegal sexual conduct with B.L.

## C. Evidence at Trial

### 1. The Government's Case

Following a six-day trial, LaPorte was convicted of all charges. The government's evidence at trial included testimony from investigators, victims, and LaPorte's accomplices, Bailey and Trimm, both of whom pleaded guilty before trial. The government also presented numerous Kik exchanges recovered from electronic devices used by LaPorte, in which he directed Bailey or Trimm to abuse the victims and produce images of that abuse, and solicited child pornography from another Kik user.

10

### a. Testimony of Investigator Baillargeon

New York State Police (NYSP) Investigator Dewayne Baillargeon testified that the NYSP investigation into LaPorte's conduct began in January 2016, after B.L. informed police in Massena, New York, that LaPorte had raped and otherwise sexually abused her. GA:7-8. The Massena Police Department transferred the case to the NYSP, and Baillargeon twice interviewed B.L., in January 2016 and February 2016. GA:8. B.L. was interviewed again in April 2016. GA:8.

In the early evening of May 17, 2016, Investigator Baillargeon found LaPorte at an apartment in Massena rented by a friend. Baillargeon requested that LaPorte accompany him to the NYSP station to discuss unspecified allegations against him. LaPorte agreed and was interviewed by Baillargeon at the station. GA:8-9. As a result, LaPorte provided a written statement in which he first described the physical and sexual abuse he suffered as a child, and then admitted to having had sex with B.L. He stated that this conduct first occurred in 2011 (when B.L. was 11), and then more frequently after B.L. came to live

11

with him between March 2014 and March 2016.[7]
GA:8-14. LaPorte, however, did not disclose his
sexual abuse and exploitation of the victims
involved in this case. GA:15.

The NYSP interviewed Bailey on June 8, 2016,
because she had been identified during the
investigation as a possible witness to the sexual
abuse of B.L.[8] GA:14. As a result of this
interview, the NYSP first became aware of the
sexual abuse of V-1 (identified at trial as "A.T."),
although Bailey did not disclose that she and
LaPorte had produced child pornography involving
V-1. GA:15. On June 10, 2016, the NYSP
interviewed Trimm, and confirmed that V-4
(identified at trial as "C.T.") also had been the
victim of sexual abuse. GA:13-15. Agent
Baillargeon explained that the investigation later
expanded to cover the sexual abuse and
exploitation of V-2 and V-3 (identified at trial as
"J.M." and "C.F.," respectively). GA:15-16.

---

[7] LaPorte's statement was read to the jury and
entered into evidence. GA:12-13.

[8] In his written statement, LaPorte stated only
that he lived with Bailey at the various residences
where he had sexual contact with B.L., but did not
acknowledge that Bailey was involved in these
acts, or the sexual abuse of others. GA:13.

12

### b. Testimony of B.L.

B.L. described LaPorte's sexual abuse of her. She explained that it began when she was eight, when LaPorte subjected her to anal sex, and continued when she was eleven. GA:21. B.L. also testified that after she moved in with LaPorte in March 2014, after the death of her parents, LaPorte forced her into sexual conduct with himself and Bailey on numerous occasions. GA:20-26. B.L. explained that she took care of V-1, and came to suspect that LaPorte was sexually abusing V-1. GA:24. After Trimm also moved in with them, LaPorte admitted to B.L. that he had sexually abused both V-1 and V-4, and that there were "pictures" of him "doing things with the babies." GA:25. B.L. further testified that LaPorte expressed sexual interest in B.L.'s friend, V-3, who spent time at B.L.'s residence with LaPorte. GA:26.

B.L. testified that LaPorte would not communicate his sexual desires to her directly, but would send her electronic messages, even though they lived in the same residence. GA:21-22. B.L. also testified that LaPorte would sometimes communicate with her over Kik, and that one of his user names was "fastfamily." GA:27. She explained that this user name referred to the "Fast and Furious" movie series, of which LaPorte was

13

an ardent fan.[9]  GA:27.  B.L. also explained that LaPorte had four biological children, and that their names were references to the "Fast and Furious" movie series. GA:27.  B.L. identified tattoos on LaPorte's body, some of which also referenced "Fast and Furious." GA:28-29.

In addition, B.L. testified that LaPorte used an LG brand cellular telephone, kept it password protected, and did not like others using it. GA:29-30, 37.  B.L. testified that she ran away from LaPorte and reported her abuse to the police on January 16, 2016.  GA:30.

### c. Testimony of Bailey

Bailey admitted to assisting LaPorte in the sexual abuse of V-1 and V-4.  Bailey described these incidents in graphic detail, GA:77-79, 92, and confirmed that she also engaged in sexual contact with V-1 at LaPorte's direction and sent him images of this abuse over the internet, GA:94-96. She explained that LaPorte would use Kik to direct her on what conduct he wanted her to engage in with V-1, even though LaPorte was in the same residence. GA:79-80, 105.  Bailey further testified that after abusing V-1 herself and sending LaPorte images and descriptions of this abuse, she would

---

[9] This testimony was corroborated at trial by the testimony of Bailey, V-3, and Trimm. GA:81, 137, 156.

14

then bring the infant to LaPorte who was waiting in the next room. He then would subject V-1 to anal and vaginal penetration, with Bailey present. GA:80-81, 85. Bailey further recounted another instance when she and LaPorte sexually abused V-4, in the same manner, at LaPorte's direction. GA:82.

Bailey repeatedly confirmed that it was LaPorte who sent and received the text messages and images involved in the charged instances of abuse. GA:89, 92. She explained that this was obvious from the fact that after directing her to abuse V-1 through these text messages, he would direct her to bring V-1 to him in the next room. GA:81. Bailey also testified that LaPorte's Kik user names were "fastfamily" and "prouddaddy." GA:81. In addition, Bailey confirmed that LaPorte had sent Bailey a "selfie" image of himself, using the "fastfamily" Kik user account. GA95.

Bailey also testified that LaPorte admitted to having sexual contact with B.L. when she was younger, and that she and LaPorte engaged in sexual contact with B.L. while B.L. lived with them. GA:77, 79, 85. Bailey corroborated B.L.'s account that LaPorte frequently would communicate his sexual desires using electronic devices, even though he was in the same residence. GA:77. Bailey likewise corroborated B.L.'s testimony that LaPorte kept tight control over his cellular telephone. GA:89.

15

Bailey testified that she and LaPorte engaged in sexual activity with V-3, and that, on February 28, 2016, LaPorte repeatedly asked Bailey, via Kik, to have sexual contact with V-2, but she refused. GA:89-91.

### d.  Testimony of V-2 and V-3

The minor victims V-2 and V-3, who were the subject of the sexual exploitation alleged in Count Five, also testified at trial.  V-2 confirmed that LaPorte forced him to have sexual contact with V-3 on February 28, 2016, at LaPorte's residence, and confirmed that V-3 texted sexually-explicit pictures that she took during this event to LaPorte. GA:127-28.

V-3 testified that LaPorte texted her using Kik and his "fastfamily" user account on the evening of February 28, 2016, and insisted that V-3 have sexual contact with V-2.  She confirmed that LaPorte was in the residence at the time, and had directed her through Kik messages on what kind of sex acts she should perform with V-2.  She likewise confirmed that she sent sexually-explicit pictures of herself and V-2 to LaPorte using Kik. GA:139-41.

16

### e. Testimony of Trimm

Trimm testified that she agreed to allow LaPorte to rape V-4, and that LaPorte did so in her presence on more than one occasion. GA:151-52. Trimm sexually abused V-4 at LaPorte's behest, following directions he sent over Kik, and produced images and videos of that abuse, which she sent to him via Kik at his request. GA:152-53. Trimm also testified that LaPorte sent her videos of himself having sexual contact with V-1, and texted Trimm while he was engaged in these acts, describing them. GA:153-54. According to Trimm, LaPorte also admitted to obtaining child pornography from others over the internet. GA:158-59.

### f. Additional Evidence

The government presented additional testimony and evidence that connected LaPorte to an LG cellular telephone and other electronic devices from which were recovered the Kik messages involving the sexual abuse of the victims, pictures and videos of that abuse, and other child pornography. GA:52, 66-69. Likewise, the government established that the Kik usernames "fastfamily25" and "prouddaddy3_15_16" – which were involved in the charged sexual exploitation and child pornography conduct – were used by LaPorte. For example, LaPorte took and sent "selfies" of himself using the "prouddaddy3_15_16"

17

and "fastfamily25" user names, at least one of which was found on the LG cellular telephone. GA:183. In addition, "3_15_16" was the date of birth of one of LaPorte's children. GA:154.

Bailey testified that LaPorte would often use the phrase: "I swear on my dead parents," or words to that effect. The LG phone contained both text messages and Kik message exchanges in which this same phrase was used by the sender, including a text sent to a woman named A.E., asking her to renew their romantic relationship. GA:95, 175; A:196, 207-208. Pictures of A.E. were found on the LG phone, GA:174-75, including a picture of A.E. that LaPorte had sent to Trimm over Kik, GA:156.

Other texts found on the LG phone shortly before LaPorte's arrest in May 2016 addressed the recipient as "Joey" (which was LaPorte's preferred first name, GA:19). GA:174-75. No text messages were sent from the LG phone after LaPorte's arrest on May 17, 2016. GA:175-76.

The LG phone also had a number of "Superman" logo images on it, including one on the phone's "lock screen," and a number of witnesses testified that LaPorte was fascinated with the Superman character. GA:29-30, 49, 56, 65, 73, 157, 174. LaPorte also used the Superman logo as his profile picture on Kik, and had a Superman tattoo. GA:28, 157. In addition, witnesses testified that the telephone number associated with the LG phone

18

was the same number that LaPorte had given out as his own. GA:47, 49-50,73, 195.

Among the Kik exchanges recovered from the LG phone was a chat between "prouddaddy3_15_16" and another user, "banx75," on March 25, 2016, in which the latter sent sexually-explicit images of a child to "prouddaddy3_15_16" at his request. GA:178-79. This exchange formed the basis of Count Six of the indictment.

## 2. Defense Case

LaPorte testified in his own defense. On direct examination, he denied that he sexually abused the victims or directed Bailey or Trimm to sexually abuse victims; denied that he was the Kik user "fastfamily25" in the various message exchanges entered into evidence; admitted that "prouddaddy3_15_16" was his user name but denied receiving child pornography through that account; suggested that Bailey and Trimm traded child pornography on-line, despite his warnings that doing so was illegal and wrong; and claimed that the LG cellular telephone was Bailey's and that she kept close control over it. GA:191-93.

On cross-examination, LaPorte claimed that Bailey controlled him, despite the fact that he did not work or earn money. He acknowledged that he spent most of the day at home, while Bailey worked

19

a series of minimum-wage jobs. GA:193. He likewise admitted that he had added the Superman logo to the lock screen of the LG phone, despite his claim that Bailey controlled the use of that phone. GA:194. He also admitted that he liked the "Fast and Furious" movie franchise, and that his children's names were based on references to those movies. GA:194-95. LaPorte denied knowing A.E., despite the texts and pictures of her found on the LG phone. GA:195.

LaPorte repeatedly asserted his right against self-incrimination under the Fifth Amendment when asked about whether he had sexual contact with B.L., and when asked whether his May 17, 2016 statement to the NYSP admitting such contact was true. GA:196-99.

**D. Sentencing**

After LaPorte was found guilty on all charges, the district court sentenced LaPorte to a total term of imprisonment of 95 years.

### SUMMARY OF ARGUMENT

The district court did not abuse its discretion in refusing to hold an evidentiary hearing on LaPorte's suppression motion because his affidavit failed to present definitive and nonconjectural factual claims on key issues concerning the validity of his *Miranda* waiver and statement. In his

20

affidavit, LaPorte asserted that he had used alcohol and marijuana at some point before his interview with NYSP Investigator Baillargeon. LaPorte failed, however, to allege how long before the interview that use had occurred, or to claim that he did not understand the *Miranda* warnings as a result. Likewise, although LaPorte asserted that he had been interviewed for twenty minutes before receiving *Miranda* warnings – during which time he alleges that he was pressured into waiving his rights – LaPorte failed to identify any statements he made during this pre-*Miranda* period. Moreover, the uncontested facts established by the government's submissions belied LaPorte's claim about the timing of his *Miranda* warnings.

In any event, any error in the court's refusal to hold an evidentiary hearing, and the admission of LaPorte's statement – in which he admitted only that he sexually abused B.L. – was harmless, given that the charges here did not concern LaPorte's conduct with B.L, and the government's evidence concerning LaPorte's sexual exploitation of the victims identified in the indictment was overwhelming. That evidence included testimony from LaPorte's accomplices and his victims, numerous Kik messages sent and received by LaPorte in which he directed others to sexually abuse the victims and received images of that abuse, and testimony and forensic analysis

21

connecting LaPorte to the Kik user accounts and cellular telephone used in the charge offenses.

## ARGUMENT

**The District Court Did Not Abuse Its Discretion by Denying LaPorte's Suppression Motion Without an Evidentiary Hearing, and, Regardless, Any Such Error Was Harmless.**

### A. Background

#### 1. LaPorte's Motion to Suppress His Statement to the NYSP

On March 31, 2017, LaPorte filed an omnibus pretrial motion which sought, *inter alia*, to suppress the statement that he made to NYSP Investigator Baillargeon on May 17, 2016, and all evidence derived from that statement. A:38. In the alternative, LaPorte requested an evidentiary hearing on his suppression motion. A:38.

In his motion papers, LaPorte claimed while he was in custody, Investigator Baillargeon "aggressively" questioned him for "at least" twenty before providing *Miranda*[10] warnings, and argued that this "two-step" technique invalidated his later confession. A:40-41. In support of his motion to

---

[10] *See Miranda v. Arizona*, 384 U.S. 436 (1966).

22

suppress, LaPorte filed an affidavit in which he stated the following:

1. On May 17, 2016, I was questioned by an Investigator with the New York State Police at the police station. Before I was picked up by the police, I had been drinking alcohol and smoking marijuana.

2. After I was transported to the police station by the investigator, I was put in an interview room. While in the interview room, I did not feel I was free to leave because of where I was sitting. The investigator had me sitting in the corner of the room and he was sitting very close to me blocking the door.

3. Before I was ever read my Miranda warnings the investigator started questioning me. The investigator had a file and two DVD's that he put in front of me. I never saw what was inside. He had told me he had everything he needed in those files. He talked to me for at least twenty minutes before he ever read me my rights.

4. While in the interview room the investigator said, "you know why you are here" and then told me about some sex crimes I was being accused of. He told me that he already had enough in his file to "put me away for life". The investigator said if I

23

cooperated then there would be "less charges." I asked what would happen if I asked for a lawyer and he said he would make sure he brought a "shit ton" more charges against me.

5. During the course of the interview the investigator talked about how we can do things the "easy way or the hard way". He also said that he can be a "nice guy" if I cooperated, but he could also be an "asshole" if I didn't.

6. I asked if I could go home if I talked to him, he said that "depends on what you say". After I spoke to the investigator for a little while, he read me my Miranda warnings and then handcuffed me to a chair.

7. The investigator then left the room and came back a few hours later with a typed statement. I then signed it without reading it or having it read to me. I have since read the statement and there are many things in it that are not true.

A:44-45.

On April 21, 2017, the government filed its opposition to LaPorte's suppression motion. A:53-101. In support of its opposition, the government filed an affidavit from Investigator Baillargeon,

24

and supporting documentation. After recounting the steps in the investigation that led to LaPorte's interview, A85-86, Baillargeon stated:

[4.] . . . on May 17, 2016 at approximately 5:50 p.m. NYSP Trooper Brian LaBarge and I located Stacey J. LaPorte, Jr. at a residence in Massena, NY. I asked LaPorte to come to SP Massena to speak with me about allegations that had been made against him. LaPorte agreed, but stated that he did not have a ride. I told him that Trooper LaBarge could provide a courtesy transport. LaPorte rode in Trooper LaBarge's marked police vehicle. He was not handcuffed. The NYSP radio log confirms that the courtesy transport (CT) from the residence on Main Street began at 5:55 p.m., with an arrival at SP Massena 5:58 p.m. This log is attached hereto as *Attachment 1*.

5. At the barracks, LaPorte was taken to our interview room. He was still not handcuffed. There is a desk, a filing cabinet, and two chairs in the room. LaPorte sat in one of the two chairs, and I sat in the other. At 6:04 p.m., before any questioning began, I read to LaPorte his *Miranda* rights from a card issued to me by the NYSP. A copy of the card I used to read the rights to LaPorte is made a part of this Affidavit as *Attachment 2*. A copy of the notes I took during the interview,

25

in which I recorded this time exactly, are *Attachment 3* to this Affidavit.

6. I read each of the rights on the *Miranda* card to LaPorte, verbatim. The card includes two questions at the end: "Do you understand each of these rights I have explained to you?" and "Having these rights in mind, do you wish to talk to us now?" LaPorte answered both: "Yeah." (*See Attachment 3*). He was still not handcuffed.

7. As I was taking pedigree information from LaPorte, Trooper LaBarge knocked on the door. I stepped out of the room. Trooper LaBarge told me that he needed to leave, but wanted me to know that when LaPorte was getting into the car at 5:55 p.m., he stated, without being questioned, "I know my sister is making allegations." I recorded this in my notes, and began the interview of LaPorte.

8. LaPorte and I spoke for less than 90 minutes. We were sitting relatively close to one another during the interview. At no time did I notice the smell of marijuana or alcohol. LaPorte did not slur his words or appear not to understand the conversation. The interview was conversational, and LaPorte was cooperative. His answers were responsive to the questions asked. He never indicated that he was under the influence of

26

alcohol or drugs, and never indicated or
showed signs of any impairment. He never
asked to stop speaking with me or if he could
go home.

9. LaPorte made admissions about his abuse
of B.L. I asked him if he had abused any
other children, and LaPorte responded: "No.
I never touched any other kids."

10. After the interview, LaPorte, still
unhandcuffed, accompanied me to my desk
area to draft and execute a written
statement. I began typing the statement at
7:30 p.m. See "Statement Start Time" on
*Attachment 4*, Voluntary Statement of
Stacey J. LaPorte, Jr. LaPorte sat next to
me while I typed the statement. We reviewed
the information he had provided as we went
through what was to be included in the
written affidavit. Throughout the process,
LaPorte and I discussed what he wanted the
statement to say. I told him this was his
statement, and wanted it to say what he
wanted it to say. From 7:30 p.m. until 8:30
p.m. LaPorte and I discussed the content of
the statement, and I confirmed with him all
of the information to be included before it
was typed into the document. We completed
this process at 8:30 p.m., at which time I
typed the time into the "Statement End

27

Time" on the final page of the document, and then printed it.

11. After the document was printed, I asked LaPorte if he could read and write. He said he could. I told him that the rights printed on the form were his rights, as we discussed before we began our interview. I asked LaPorte to read each of the rights, and initial to the left of each to indicate that he read and understood the rights. In my presence, LaPorte read each right one by one. He initialed after each right before reading the next one. When he finished reading and initialing all of the rights, LaPorte read the statement indicating that he understood the rights, agreed to give them up, and to give a statement. He then signed the line underneath that statement.

.
12. After that, LaPorte read the entire statement in my presence. I asked him if there were any changes he wanted to make to the statement, and he said: "No." LaPorte and I then initialed the top of each page, and he initialed the end of page 1, signed to indicate the end of the narrative portion of the statement on page 2, and signed under penalty of perjury on page 3.

13. Once the statement was executed by LaPorte, I told him he was under arrest for

28

Rape in the First Degree in relation to B.L., and for Sexual Abuse in the First Degree in regard to the allegations made by [another minor victim]. Trooper LaBarge came to my desk, and I asked him to process LaPorte while I began writing the state felony complaints. LaPorte accompanied Trooper LaBarge to the Patrol Room for processing. He was still not handcuffed.

A:86-89 [footnotes omitted].

LaPorte submitted a reply, arguing that an evidentiary hearing was necessary on his suppression motion, A:111, but did not submit an additional sworn statement in support.

On May 17, 2017, the district court heard oral argument on LaPorte's pretrial motions. A:114-39. The court denied the suppression motion without an evidentiary hearing. The court explained its decision as follows:

First, defendant gives no time frame as to when he was drinking alcohol or smoking marijuana that day, nor does he allege that he was incapacitated or that his alleged intoxication in any way affected his ability to make a voluntary statement. According to Investigator B.'s affidavit, defendant never indicated that he was under the influence of alcohol or drugs, never showed any objective

29

signs of intoxication, and was able to communicate in a lucid manner. Defendant's vague statement regarding his alcohol and drug use does not render his statement inadmissible nor provide a sufficient basis on which to conduct an evidentiary hearing.

Second, defendant alleges that Investigator B. "talked to him for at least twenty minutes" before advising him of his rights. Investigator B.'s affidavit, as well as the corroborating evidence, disputes this claim. Defendant was provided a courtesy transport from his home to the State Police Massena station. A New York State Police radio log shows the transport began at 5:55 p.m. and defendant arrived at the station at 5:58 p.m.

According to Investigator B., at 6:04 p.m. before any questioning began, he read defendant his Miranda rights. His interview notes begin with 6:04 p.m. written at the top of the page. He asserts that as he was taking pedigree information from defendant, Trooper Brian LaBarge, who assisted with the transport, knocked on the door of the interview room. Investigator B. stepped out and Trooper LaBarge advised him that he needed to leave, but wanted him to know that when defendant was getting into the police vehicle at 5:55 p.m. for the transport,

30

defendant stated, without being questioned,
"I know my sister is making allegations."
This is memorialized in the interview notes,
with the time of 5:55 p.m., written after the
interview began at 6:04 p.m.

Investigator B. then began his interview
of defendant. They spoke for less than ninety
minutes. Defendant made admissions and
agreed to make a statement, which the
Investigator B. began typing at 7:30 p.m.
The undisputed facts and evidence establish
that there was simply no twenty-minute
period of time where anything happened
with the defendant before he was advised of
his rights.

Moreover, defendant does not allege that
he made any statements before being
advised of his rights nor that he did not
understand or did not waive his rights.

Third and finally, any of defendant's
other allegations are irrelevant and/or
patently false. His allegation that he was left
in the interview room for "a few hours" and
then asked to sign a statement he did not see
or read is belied by the facts. The entire
encounter, beginning with his courtesy
transport at 5:55 p.m., lasted two and a half
hours.

31

As documented on the New York State Police Voluntary Statement Form, Investigator B. began typing the statement at 7:30 p.m. and completed it at 8:30 p.m.

Defendant sat next to the Investigator B. while he typed, and they discussed what defendant wanted the statement to say. After it was printed, defendant was asked if he could read and write, to which he responded in the affirmative.

He was asked to read the rights on the form, and initial that he read, understood the rights, and agreed to give them up and make a voluntary statement. He then signed the statement. The entire process of preparing, reviewing, and executing the statement took only one hour.

Defendant has raised no credible or definite, specific, detailed, and nonconjectural allegation bearing on the voluntariness of his statement, thus there is no factual dispute to decide and an evidentiary hearing is not required. Instead, the undisputed facts show that defendant was properly Mirandized, waived his rights, and gave a voluntary statement. His request to suppress any statements will be denied.

A:134-37.

32

## B. Governing Law

### 1. Fifth Amendment Standards

Under *Miranda*, if police interrogate a suspect who is in custody without providing required warnings about the suspect's rights to remain silent and to counsel, resulting statements are inadmissible in the government's case-in-chief. *See, e.g., United States v. Newton*, 369 F.3d 659, 668 (2d Cir. 2004). "The Fifth Amendment prohibits use by the prosecution in its case in chief only of compelled testimony. Failure to administer *Miranda* warnings creates a presumption of compulsion. Consequently, unwarned statements that are otherwise voluntary within the meaning of the Fifth Amendment must nevertheless be excluded from evidence under *Miranda*." *Oregon v. Elstad*, 470 U.S. 298, 306-07 (1985).

To prove that a defendant waived his *Miranda* rights, the Government must make two showings: that the relinquishment of rights was knowing, and that the waiver was voluntary. *United States v. Plugh*, 648 F.3d 118, 127–28 (2d Cir. 2011). "Knowing" means that "the waiver must have been made with a full awareness of both the nature of the right being abandoned and the consequence of the decision to abandon it." *Id.* (citing *Moran v. Burbine*, 475 U.S. 412, 421 (1986)). "Voluntary" means "that it was the product of a free and deliberate choice rather than intimidation,

33

coercion, or deception." *Id.* (citing *Moran*, 475 U.S. at 421). The Government must prove waiver by a preponderance of the evidence. *United States v. Capers*, 627 F.3d 470, 480 (2d Cir. 2010).

"A confession is not voluntary when obtained under circumstances that overbear the defendant's will at the time it is given. Whether a confession is a product of coercion may only be determined after a careful evaluation of the totality of all the surrounding circumstances, including the accused's characteristics, the conditions of interrogation, and the conduct of law enforcement officials. The prosecution has the burden of establishing by a preponderance of the evidence that a suspect waived his *Miranda* rights, and that his confession is truly the product of free choice." *United States v. Anderson*, 929 F.2d 96, 99 (2d Cir. 1991) (citations omitted).

While the existence of a voluntary waiver does not "guarantee that all subsequent statements were voluntarily made," *In re Terrorist Bombings of U.S. Embassies in E. Africa*, 552 F.3d 177, 212 (2d Cir. 2008), "[c]ases in which a defendant can make a colorable argument that a self-incriminating statement was 'compelled' despite the fact that the law enforcement authorities adhered to the dictates of *Miranda* are rare." *Dickerson v. United* States, 530 U.S. 428, 444 (2000) (internal quotation marks omitted); *see also Missouri v. Siebert*, 542 U.S. 600, 608-609

34

(2004) ("[G]iving the warnings and getting a waiver has generally produced a virtual ticket of admissibility."); *United States v. Williams*, 681 F.3d 35, 45 (2d Cir. 2012) (stating that suspect's knowing and voluntary waiver of rights is "'highly probative' of voluntariness") (quoting *Elstad*, 470 U.S. at 318).

## 2. Discretion to Hold an Evidentiary Hearing on a Suppression Motion

An evidentiary hearing on a motion to suppress ordinarily is required if "the moving papers are sufficiently definite, specific, detailed, and nonconjectural to enable the court to conclude that contested issues of fact going to the validity of the search [or here, the admissibility of defendant's statements under *Miranda*] are in question." *United States v. Getto*, 729 F.3d 221, 227 (2d Cir. 2013).

## C. Standard of Review

On appeal, LaPorte's sole claim is that the district court erred by failing to hold an evidentiary hearing on his suppression motion. This Court reviews the denial of an evidentiary hearing on a suppression motion for abuse of discretion. *See, e.g.*, *United States v. Levy*, 377 F.3d 259, 264 (2d Cir. 2004).

35

The admission of evidence at trial in violation of *Miranda* is subject to harmless error review. *See, e.g.*, *United States v. Newton*, 369 F.3d 659, 679 (2d Cir. 2004). On direct appeal, the admission of such evidence will be found harmless "if it appears 'beyond a reasonable doubt that the error … did not contribute to the verdict obtained.'" *Id.* (quoting *Chapman v. California*, 386 U.S. 18, 24 (1967)); *see also Brecht v. Ambrahamson*, 507 U.S. 619, 622 (1993).

"When reviewing the erroneous admission of an involuntary confession, the appellate court, as it does with the admission of other forms of improperly admitted evidence, simply reviews the remainder of the evidence against the defendant to determine whether the admission of the confession was harmless beyond a reasonable doubt." *Arizona v. Fulminante*, 499 U.S. 279, 311 (1991) (Rehnquist, *C.J.*, writing for a majority as to harmless error analysis); *see also Zappulla v. New York*, 391 F.3d 462, 466 (2d Cir. 2004).

"The following (nonexclusive) factors bear on whether the erroneous admission of a confession was harmless: (1) the overall strength of the prosecution's case; (2) the prosecutor's conduct with respect to the improperly admitted evidence; (3) the importance of the wrongly admitted testimony; and (4) whether such evidence was cumulative of other properly admitted

evidence." *United States v. Taylor*, 745 F.3d 15, 27 (2d Cir. 2014) (internal quotations omitted).

## D. Discussion

### 1. LaPorte Failed to Establish the Need for a Suppression Hearing.

The district court correctly determined that LaPorte failed to carry his burden of showing the need for an evidentiary hearing concerning the validity of his *Miranda* waiver – *i.e.* that it was both knowing and voluntary – or the voluntariness of his statement.

LaPorte's affidavit was insufficient to raise a question of fact concerning the knowingness of his *Miranda* waiver. LaPorte contended in his affidavit that "[b]efore I was picked up by the police, I had been drinking alcohol and smoking marijuana." A:44. But, as the district court noted, LaPorte did not specify when he had consumed these substances or how much he had consumed, and never claimed his ability to understand the *Miranda* warnings that were given to him or his ability to provide a voluntary statement was impaired as a result. A:134. Indeed, LaPorte never alleged that he failed to understand the *Miranda* warnings he received.[11] "The lack of any

_____

[11] Moreover, LaPorte did not contest that, in addition to receiving Investigator's Baillargeon's oral recitation of the *Miranda* warnings, he went

37

contention that [defendant] did not understand his
rights indicates that he knew what he gave up
when he spoke." *Berghuis v. Thompkins*, 560 U.S.
370 (2010).

LaPorte's generalized statement that he had
consumed an undisclosed amount of alcohol and
marijuana at some unspecified time before his
encounter did not create a sufficiently definitive or
non-conjectural issue of fact to require an
evidentiary hearing. Indeed, courts have found
that even recent use of intoxicants does not
preclude a voluntary waiver of *Miranda*
rights. *See United States v. Gaddy*, 532 F.3d 783,
788 (8th Cir. 2008) ("For instance, we have upheld
the conclusion that a suspect who recently used
methamphetamine and had not slept for five days
voluntarily waived his *Miranda* rights where
police officers testified that they had no knowledge
of these alleged impairments and the suspect did
not act intoxicated. Similarly, we have upheld a
district court's conclusion that a suspect who used
methamphetamine the evening before and
marijuana the day he waived his rights consented
voluntarily because police officers testified he
appeared sober and in control of his facilities.")

---

over *another* set of *Miranda* warnings with
Baillargeon that were printed at the beginning of
the written confession, initialed each line of these
warnings, and signed the statement at the bottom
of the warnings, confirming that he understood his
*Miranda* rights and waived them. A:44, 99.

38

(internal citations and quotation marks omitted);
*see also Scott v. Fisher*, 652 F. Supp. 2d 380, 431
(W.D.N.Y. 2009) (noting that district courts in this
Circuit have held that "there is no *per se* rule that
a confession given under such circumstances is
involuntary") (collecting cases).

On appeal, LaPorte notes (Br. at 21) that during
oral argument on his motion, his attorney
explained to the district court that "LaPorte
contends that he was [under the influence of drugs
or alcohol] so he couldn't make a knowing
intelligent and voluntary waiver." A.115. It is well
established, however, that factual statements
made by defense counsel, as opposed to statements
by their clients under oath, do not create an issue
of fact. *See United States v. Gillette*, 383 F.2d 843,
848–49 (2d Cir. 1967) (holding that statement
submitted by attorney did not raise a factual issue
where it did not allege personal knowledge on the
part of the attorney); *see also Lipton v. Nature Co.*,
71 F.3d 464, 469 (2d Cir. 1995) ("[M]ere conclusory
allegations or denials in legal memoranda or oral
argument are not evidence and cannot by
themselves create a genuine issue of material fact
where none would otherwise exist." (citation and
internal quotation marks omitted)). LaPorte never
asserted in his affidavit that he was under the
influence of drugs or alcohol when he waived his
*Miranda* rights, or claimed that his ability to
understand and make decisions about his rights
was impaired. LaPorte's ambiguous contention

39

that he used alcohol and drugs at some unspecified time before his interview did not merit an evidentiary hearing.[12]

The district court also correctly determined that LaPorte failed to establish his entitlement to an evidentiary hearing on the voluntariness of his *Miranda* waiver. LaPorte argues that the district court erred "in rejecting [his] claim that he was questioned for twenty minutes prior to being provided any *Miranda* warnings," during which time he was pressured to waive his *Miranda* rights. Br. at 22. In his affidavit, LaPorte asserted that Investigator Baillargeon "started questioning me" without providing *Miranda* warnings, and "talked to me for at least twenty minutes before he ever read me my rights." A:44. By contrast, Investigator Baillargeon stated in his affidavit that he read LaPorte his *Miranda* rights before any questioning began, and thus there was no such twenty-minute period of pre-*Miranda*

---

[12] Although LaPorte notes on appeal that that the local rules of the Northern District of New York prohibit the inclusion of "legal arguments" in affidavits, *see* Br. at 20 (citing Local Civil Rule 7.1(a)(2)), LaPorte could have provided factual allegations sufficient to require a hearing without running afoul of this rule – by alleging, for example, that he was unable to focus, to understand, etc. Such claims are not "legal argument."

40

interrogation at all. A:86. Although this discrepancy created a factual dispute over *when* LaPorte received his first *Miranda* warnings, LaPorte failed to show how this fact was relevant to his suppression claim.

As the district court noted, A.136, LaPorte did not identify any statements that he made to Investigator Baillargeon during the alleged twenty-minute period, let alone *incriminating* statements that would raise concerns that the subsequent *Miranda* warnings were ineffective. *See generally Siebert*, 542 U.S. at 604 (holding that "midstream recitation of warnings after interrogation and unwarned confession could not effectively comply with *Miranda's* constitutional requirement," thus rendering repeated confession inadmissible).

On appeal, LaPorte now explains that he "claims not to have made *any* statement during the entire encounter." Br. at 23. Not only does this claim contradict his argument below, *see, e.g.*, A:41 (asserting that LaPorte did not receive *Miranda* warnings "during the first interrogation where Mr. LaPorte made his initial statements"), it appears to eliminate his *Miranda* claim concerning the voluntariness of his waiver. The *only* argument that LaPorte made in the district court concerning the voluntariness of his *Miranda* waiver was based on a claim under *Siebert* that he was subject to an improper "two-step interrogation" technique that

41

rendered his *Miranda* waiver involuntary. *See* A:38-41 (asserting that "officers did not read him his *Miranda* rights until after he had already made incriminating statement[s]"). If LaPorte now denies making any statements, his *Siebert* claim disappears. *See, e.g.*, *McMillon v. Culley*, 380 F. App'x 63, 66 (2d Cir. 2010) (finding no *Miranda* violation under *Siebert* where defendant "did not make an inculpatory statement before receiving *Miranda* warnings").

Even assuming, *arguendo*, that LaPorte has not waived his *Miranda* voluntariness claim on appeal, the district court nevertheless acted within its discretion by not holding a testimonial hearing. As recast on appeal, LaPorte's challenge to the voluntariness of his *Miranda* waiver now hinges on his claim that, during the purported twenty-minute pre-*Miranda* period, Investigator Baillargeon made certain statements to encourage LaPorte's cooperation, including telling LaPorte that he would face many more charges if he asked for an attorney. A:44. In light of the contemporaneous documentary evidence provided by the government showing that there was no such twenty-minute period, the district court did not err by finding LaPorte's affidavit was insufficient to warrant a testimonial hearing.

In arguing that the district court erred, LaPorte relies on *United States v. Mathurin*, 148 F.3d 68, 69 (2d Cir. 1998), which concluded that "[a]n

42

assertion that *Miranda* warnings were not given, when the government asserts the contrary, thus creates a specific factual dispute" that "cannot be properly resolved without an evidentiary hearing." In *Mathurin*, however, there was no indication that the district court had before it the kind of contemporaneous documentation that was submitted here.[13] Moreover, in this case, there is no dispute as to whether *Miranda* warnings were provided, but only whether LaPorte's affidavit was sufficient to require a hearing on the "more complex" issue of whether his *Miranda* waiver and subsequent statement were voluntary – the type of issue that the *Mathurin* court acknowledged places a higher burden on the defendant when seeking to obtain a testimonial hearing.  148 F.3d at 69-70.

In assessing LaPorte's request for a hearing, the district court was entitled to examine the supporting documentation submitted with Investigator Baillargeon's affidavit, and conclude that LaPorte's assertion that he was interrogated for twenty minutes before receiving his *Miranda* warnings was not credible, and did not warrant a testimonial hearing. This documentation included

---

[13] The Court in *Mathurin* noted that there had been extensive testimony at trial from law enforcement agents that they had provided the defendant with *Miranda* warnings, but the Court did not reference any documentary evidence. *Mathurin*, 148 F.3d at 70.

43

the NYSP "radio log" which established the precise time that LaPorte was transported to the NYSP station, 5:55 p.m., and the time he arrived there, 5:58 p.m. A:86, 91. In addition, the government submitted Ballargeon's handwritten notes from his interview, which, as he explained, recorded that he first read LaPorte his *Miranda* rights at 6:04 p.m., and that LaPorte confirmed that he understood his rights and wished to talk to the police, A:86, 95. The government also submitted a copy of LaPorte's written statement, which identified the "statement start time" as 7:30 p.m.,[14] and the "statement end time" as 8:30 p.m. – corroborating Ballargeon's account of his interview with LaPorte. A:99-101.

The district court did not abuse its discretion by rejecting LaPorte's account of his interview as incredible, given that the uncontested facts were incompatible with this account. As noted, the NYSP radio log showed that LaPorte arrived at the station at 5:58 p.m. A:91. Although LaPorte had an opportunity to challenge this claim through his reply memorandum, he did not do so, let alone submit an additional affidavit. Likewise, LaPorte

---

[14] As Ballargeon explained in his affidavit, he interviewed LaPorte between 6:04 p.m. and 7:30 p.m, before taking down LaPorte's written statement. A:87. This was corroborated by the fact that "6:45" is written in the margin at the approximate middle point of Baillargeon's handwritten notes. A:96.

44

did not contest that the interview began at 6:04 p.m., and that his written statement was finished at 8:30 p.m., as noted on the face of the statement itself. A:101. Given these unchallenged facts, it was not possible, as LaPorte claimed in his affidavit, that he first spoke with Ballargeon for twenty minutes and then was forced to wait "a few hours" before signing the written statement, A:45.

For similar reasons, the district court did not abuse its discretion by rejecting LaPorte's claim below that his written statement itself was not knowing and voluntary.[15] As an initial matter, LaPorte does not contest that he was twice given *Miranda* warnings before signing his statement, a factor that weighs heavily against a finding of coercion. *See Williams*, 681 F.3d at 45. Moreover, LaPorte's claim in this regard is premised on the same amorphous assertion that he had consumed alcohol and drugs at some earlier point, and his allegation that there was a twenty-minute pre-*Miranda* period during which he was supposedly coerced – an allegation inconsistent with the documentary evidence. *See* Br. at 17-19.

LaPorte also claimed in his affidavit that Baillargeon composed the written confession by

---

[15] Again, LaPorte's claim on appeal is that the written statement was not his, but was fabricated by Baillargeon, and that he "felt compelled to sign" the statement. Br. at 23.

45

himself, while LaPorte waited alone. A:45. The district court was entitled to find this claim implausible, given the length and level of detail in the written confession that is not found in Baillargeon's written notes.[16] *Compare* A:95-97 *with* A:99-100. The presence of this additional information in the written statement undermines LaPorte's claim that Baillargeon wrote the entire statement by himself, outside LaPorte's presence, without any input from LaPorte, and corroborates Baillargeon's account that he composed the statement with LaPorte's input and approval, while the two sat together at Baillargeon's desk, starting at 7:30 p.m.[17] A:87-88.

---

[16] Although LaPorte now claims that the written statement was entirely fabricated, and not based on any information that he provided, he makes no effort to explain how this claim is even faintly plausible, given the level of personal details found in the written statement (and to a lesser extent in Baillargeon's handwritten notes from the interview). LaPorte does not dispute the accuracy of any of this personal information, begging the question of how Baillargeon could have known it. *See* PSR ¶ 147-149 (LaPorte providing similar account of his childhood).

[17] This further undermines LaPorte's claim to have waited alone for "several hours" while Baillargeon wrote the statement. A:45.

46

Because a defendant is not automatically entitled to a suppression hearing, the district court may exercise its judgment in assessing the necessity for an evidentiary hearing. It was not an abuse of discretion for the district court to compare the affidavits provided by LaPorte and the government, and to determine that, in light of the government's supporting documentation, LaPorte's affidavit did not merit a testimonial hearing on his suppression motion.

## 2. Any Error by the District Court in Denying LaPorte's Suppression Motion Without a Hearing was Harmless.

Assuming, *arguendo*, the district court abused its discretion by refusing to hold an evidentiary hearing on LaPorte's suppression motion, this Court should nevertheless affirm LaPorte's conviction. Even if an evidentiary hearing would have resulted in suppression of LaPorte's statement – a remote possibility – the admission of his statement at trial was harmless error. In his statement, LaPorte did not admit to having abused anyone other than B.L. Nor did he acknowledge control over the cellular telephone containing the charged child pornography. In other words, he did not admit to *any* of the crimes with which he was charged and for which he was convicted in this case. Accordingly, the admission of the statement

47

was harmless because it did not directly incriminate him in any way.

Nor can LaPorte credibly claim that he was prejudiced from the admission of his statement acknowledging sexual abuse of a family member, B.L., on the theory that it caused the jury to be more willing to believe that he also abused the other victims or disbelieve his trial testimony denying abusing the others and distancing himself from the incriminating cellular telephone. This is so for three reasons.

First, there was abundant trial evidence that LaPorte sexually abused B.L. without consideration of his statement. B.L described the abuse in detail. GA:20-26. B.L.'s testimony was corroborated by Bailey. *See, e.g.*, GA:77, 79, 85, 89. LaPorte's statement added little if anything to this testimony.

Second, LaPorte had a significantly different relationship with B.L. than he did with the other victims. B.L. was a family member to whom he had ready access for a prolonged period of time, making her an easy target of sexual abuse. Even if LaPorte's statement helped to persuade the trial jury that he had sexually abused B.L., it would not easily follow that he also serially sexually abused two infants and recruited others to assist in this endeavor, conduct so grotesque and horrific as to be almost unimaginable, or that he would prompt

48

abuse among two minor siblings who visited his residence.

Third, and most significantly, whatever minimal spillover effect LaPorte's statement admitting abuse of B.L. may have had with respect to the crimes involving other victims charged in the indictment, the evidence of that other sexual abuse itself was overwhelming, rendering any potential spillover inconsequential.

As discussed previously, the evidence included testimony by LaPorte's accomplices, as well as his victims, in which they described first-hand LaPorte's acts of sexual abuse and exploitation. GA:78-82, 85-89, 94-96, 127-28, 136-41, 151-54. In addition, the government introduced numerous Kik messages sent and received by the user "fastfamily25," in which "fastfamily25" ordered and orchestrated the sexual exploitation of the victims. *See, e.g.*, GA:93-96, 139-41. The government identified LaPorte as "fastfamily25" through witness testimony, forensic analysis of LaPorte's electronic devices, and "selfie" images that LaPorte sent and received through that account – an account that he falsely denied having created. GA:27-30, 47, 49-52, 65-69, 73, 81, 89, 92, 95, 154-57, 174-76, 183.

Moreover, because LaPorte took the stand, the jury was entitled to discredit LaPorte's exculpatory testimony, and to consider his false denials as

49

additional evidence of his guilt. *See, e.g.*, *United States v. Stanley*, 928 F.2d 575, 577 (2d Cir, 1991); *United States v. Morrison*, 153 F.3d 34, 50 (2d Cir. 1998). Given the strength of the case against LaPorte, it is beyond a reasonable doubt that the jury would have convicted him of the charged offenses, even if his statement to Investigator Ballargeon concerning his sexual abuse of B.L. was not admitted at trial.

Nor did LaPorte's statement lead to other evidence concerning the charged offenses that was presented at trial. As Investigator Baillargeon explained, the discovery of LaPorte's abuse of B.L. did not result from LaPorte's interview; rather, LaPorte's interview resulted from B.L.'s earlier report and multiple interviews concerning that abuse. Similarly, the discovery of LaPorte's abuse of V-1 did not result from LaPorte's interview with Baillargeon, but from Baillargeon's later interview of Bailey, which occurred because she had been identified by others as a potential witness to B.L.'s abuse. GA:14-15.

Finally, it bears emphasis that LaPorte's claim on appeal is a narrow one – that his suppression motion merited an evidentiary hearing. To the extent that the district court erred by discrediting LaPorte's affidavit without first holding a testimonial hearing, this error was rendered harmless by LaPorte's trial testimony – which itself discredited his affidavit. For example, in his

50

affidavit, LaPorte claimed that he signed the statement "without reading it or having it read to me," and that he later realized it contained many untruths. A:45. At trial, however, LaPorte admitted under cross-examination that, in fact, he had read the written statement and signed it "as an accurate statement." GA:197. Likewise, in his affidavit, LaPorte claimed that he spoke with Baillargeon for only 20 minutes, after which he was left alone. A:44. At trial, LaPorte admitted that he talked to Baillargeon for about 90 minutes, which is consistent with Baillargeon's account, and the time notations in Baillargeon's handwritten notes and on the statement itself. GA:197; A:95-101. LaPorte's effective disavowal of key claims in his affidavit underscores that a remand for a testimonial hearing is not necessary.

### 3. In the Event That the Court Finds Reversible Error, the Judgment of Conviction Should Not Be Vacated.

If this Court determines that the district court should have held an evidentiary hearing on LaPorte's suppression motion, and that such a hearing remains necessary because the admission of the LaPorte's pre-arrest statements was not harmless error, it should remand this matter for an evidentiary hearing on LaPorte's suppression motion, while allowing LaPorte's judgment of conviction to remain in force. *See Mathurin*, 148 F.3d at 68. If, after such a hearing, the district

51

court again determines that LaPorte's statements were admissible, LaPorte would be entitled to file a new notice of appeal from that decision. *Id.* On the other hand, if the district court grants LaPorte's suppression motion, a new trial would be required because this Court already will have rejected the claim of harmless error. But the district court's suppression decision would be subject to an immediate appeal by the government under 18 U.S.C. § 3731, and the judgment of conviction would remain in place pending resolution of that appeal. *Mathurin*, 148 F.3d at 68.

52

## CONCLUSION

The judgment of conviction should be affirmed in all respects.

Dated:  Syracuse, New York
       April 15, 2019

          Respectfully submitted,

          GRANT C. JAQUITH
          *United States Attorney for the*
           *Northern District of New York*
          *Attorney for Appellee*

          s/ *Rajit S. Dosanjh*
By:  RAJIT S. DOSANJH
          *Assistant United States Attorney*

LISA M. FLETCHER
*Assistant United States Attorney*
 *of Counsel*

## CERTIFICATE OF COMPLIANCE

Pursuant to Rule 32(a)(7) of the Federal Rules of Appellate Procedure, the undersigned counsel for the United States hereby certifies that this brief complies with the type volume limitation of Rule 32(a)(7)(B). As measured by the word-processing system used to prepare this brief, there are approximately 10,083 words in the brief.

GRANT C. JAQUITH
*United States Attorney for the*
  *Northern District of New York*

s/ *Rajit S. Dosanjh*
By:  RAJIT S. DOSANJH
*Assistant United States Attorney*

**CERTIFICATE OF SERVICE**
**BY NEXTGEN CM/ECF**

UNITED STATES OF AMERICA
v.
LAPORTE

Docket No. 18-105

The undersigned hereby certifies that she is an employee of the Office of the United States Attorney for the Northern District of New York, and is a person of such age and discretion as to be competent to serve papers.

She further certifies that on April 15, 2019, she served a copy of the appellee's Brief and Government Appendix on the United States Court of Appeals for the Second Circuit and counsel for appellant, James P. Egan, AFPD, by uploading to the Second Circuit's ECF system a Portable Document Format (PDF) version of the Brief.

s/ *Deanna Lieberman*
Deanna Lieberman