# 18-105

## United States Court of Appeals

### FOR THE SECOND CIRCUIT

**Docket No. 18-105**

UNITED STATES OF AMERICA,

*Appellee,*

v.

MACKENZIE J. BAILEY,

*Defendant,*

STACEY J. LAPORTE, JR.,

*Defendant-Appellant.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF NEW YORK

# GOVERNMENT APPENDIX

GRANT C. JAQUITH
*United States Attorney for the*
*Northern District of New York*
*Attorney for the United States*
*of America*
100 South Clinton Street
Syracuse, New York 13261-7198
Tele: 315-448-0672
Email: Rajit S. Dosanjh@usdoj.gov

# TABLE OF CONTENTS

Page

Transcript of Trial (Docket No. 118) ...................................................1

Opening Statement by Government
    Tr. 221-33 ...................................................................3

Opening Statement by Defense
    Tr. 234-39 ...................................................................6

Testimony of Dewayne Baillargeon
    Tr. 240-83 ...................................................................7

Testimony of B.L.
    Tr. 284-370 ................................................................ 18

Testimony of Jason Olson
    Tr. 371-85 ................................................................. 40

Testimony of Cory Francis
    Tr. 386-95 ................................................................. 44

Testimony of Paul Fregoe
    Tr. 395-415 ............................................................... 46

Testimony of Nicholas Arcadi
    Tr. 416-26 ................................................................. 51

Testimony of Todd Svarczkopf
    Tr. 427-46 ................................................................. 54

Testimony of Deborah Jasinski
    Tr. 452-507 ............................................................... 60

Testimony of Mackenzie Bailey
    Tr. 507-677 ............................................................... 74

Testimony of Jean Merriam
    Tr. 683-719 ............................................................. 118

Testimony of J.M.
    Tr. 719-48 ................................................................. 127

Testimony of C.F.
    Tr. 749-805 ............................................................... 134

Testimony of Hillary Trimm
    Tr. 806-94 ................................................................. 148

Testimony of Chad Willard
    Tr. 901-50 ................................................................. 172

Motion
    Tr. 951-64 ................................................................. 184

Testimony of Michelle Hirst
    Tr. 965-68 ................................................................. 188

Testimony of Stacy LaPorte
    Tr. 969-1008 ............................................................. 189

UNITED STATES  DISTRICT COURT

NORTHERN DISTRICT OF NEW YORK
*************************************************
UNITED STATES OF AMERICA,

vs.                              16-CR-320

STACEY J. LAPORTE, JR.,

                    Defendants
*************************************************

        Transcript of a Jury Trial held on June 13, 2017,
before the HONORABLE DAVID N. HURD, at the United States
Federal Courthouse, 10 Broad Street, Utica, New York,
stenographically recorded by Nancy L. Freddoso, Registered
Professional Reporter.

              A P P E A R A N C E S

Government:     UNITED STATES ATTORNEY'S OFFICE
                ROOM 900, HANLEY FEDERAL BLDG.
                100 SOUTH CLINTON STREET
                SYRACUSE, NEW YORK  13261-7198
          BY:   LISA M. FLETCHER, AUSA
                SAHAR L. AMANDOLARE, AUSA

Defendant:      FEDERAL PUBLIC DEFENDER'S OFFICE
                4 CLINTON SQUARE
                SYRACUSE, NEW YORK 13202
          BY:   RANDI J. BIANCO, AFPD
                MARTIN P. WOLFSON, AFPD


                NANCY L. FREDDOSO, R.P.R.
            Official United States Court Reporter
              10 Broad Street, Room 316
                 Utica, New York 13501
                    (315) 793-8114

214

I N D E X   O F   P R O C E E D I N G S

|   |  | PAGE |
|---|---|---|
| 1 |  |  |
| 2 | Opening Statement By Ms. Amandolare: | 220 |
| 3 | Opening Statement By Mr. Wolfson: | 233 |
| 4 | WITNESS | PAGE |
| 5 | DEWAYNE BAILLARGEON |  |
| 6 | Direct Examination By Ms. Fletcher: | 239 |
| 7 | Cross-Examination By Mr. Wolfson: | 275 |
| 8 | Redirect Examination By Ms. Fletcher: | 282 |
| 9 | B.L. |  |
| 10 | Direct Examination By Ms. Fletcher: | 284 |
| 11 | Cross-Examination By Ms. Bianco: | 334 |
| 12 | Redirect Examination By Ms. Fletcher: | 361 |
| 13 | Recross Examination By Ms. Bianco: | 366 |
| 14 | JASON OLSON |  |
| 15 | Direct Examination By Ms. Amandolare: | 371 |
| 16 | Voir Dire By Mr. Wolfson: | 376 |
| 17 | Direct Examination By Ms. Amandolare: | 377 |
| 18 | Cross-Examination By Mr. Wolfson: | 382 |
| 19 | Redirect Examination By Ms. Amandolare: | 385 |
| 20 | COREY FRANCIS |  |
| 21 | Direct Examination By Ms. Amandolare: | 386 |
| 22 | Cross-Examination By Ms. Bianco: | 392 |
| 23 | Redirect Examination By Ms. Amandolare: | 394 |
| 24 | Recross Examination By Ms. Bianco: | 394 |
| 25 |  |  |

215

I N D E X   O F   P R O C E E D I N G S

|   | WITNESS | PAGE |
|---|---|---|
| 1 |  |  |
| 2 | PAUL FREGOE |  |
| 3 | Direct Examination By Ms. Fletcher: | 395 |
| 4 | Cross-Examination By Ms. Bianco: | 410 |
| 5 | NICHOLAS ARCADI |  |
| 6 | Direct Examination By Ms. Amandolare: | 416 |
| 7 | Cross-Examination By Mr. Wolfson: | 421 |
| 8 | Redirect Examination By Ms. Amandolare: | 425 |
| 9 | TODD SVARCZKOPF |  |
| 10 | Direct Examination By Ms. Amandolare: | 427 |
| 11 | Cross-Examination By Mr. Wolfson: | 441 |
| 12 | Redirect Examination By Ms. Amandolare: | 445 |
| 13 |  |  |
| 14 |  |  |
| 15 |  |  |
| 16 |  |  |
| 17 |  |  |
| 18 |  |  |
| 19 |  |  |
| 20 |  |  |
| 21 |  |  |
| 22 |  |  |
| 23 |  |  |
| 24 |  |  |
| 25 |  |  |

216

I N D E X   O F   E X H I B I T S

|   | EXHIBIT | PAGE |
|---|---|---|
| 1 |  |  |
| 2 | Government's Exhibit 3 | 218 |
| 3 | Government's Exhibit 42 | 218 |
| 4 | Government's Exhibit 30 | 248 |
| 5 | Government's Exhibit 1 | 249 |
| 6 | Government's Exhibit 2 | 258 |
| 7 | Government's Exhibit 25 | 274 |
| 8 | Government's Exhibit 16A and 16B | 275 |
| 9 | Government's Exhibit 35A, B, C, D, E | 324 |
| 10 | Government's Exhibit 24 | 329 |
| 11 | Government's Exhibit 4, 5 | 377 |
| 12 | Government's Exhibit 6 through 9, 9A, 10, 11 | 379 |
| 13 | Government's Exhibit 12 | 389 |
| 14 | Government's Exhibit 13 | 390 |
| 15 | Government's Exhibit 14 | 391 |
| 16 | Government's Exhibit 39A, 39B | 400 |
| 17 | Government's Exhibit 40 | 408 |
| 18 | Government's Exhibit 15 | 421 |
| 19 | Government's Exhibit 43A, B, C, D | 431 |
| 20 | Government's Exhibit 15B, 15E | 437 |
| 21 | Government's Exhibit 13A through 13M | 438 |
| 22 |  |  |
| 23 |  |  |
| 24 |  |  |
| 25 |  |  |

217

```
 1              (WHEREUPON, the proceedings held on June 13, 2017,
 2         were commenced at 9:30 a.m..)
 3              (Whereupon, the proceedings were held in open court
 4         out of the presence of the Jury.)
 5
 6              COURT CLERK:  United States versus Stacey LaPorte,
 7    Junior, 2016-CR-320.  Attorneys, please note their appearance
 8    for the record.
 9              MS. FLETCHER:  Lisa Fletcher and Sahar Amandolare
10    for the United States.  Good morning.
11              MS. BIANCO:  Randi Bianco and Martin Wolfson for
12    Stacey LaPorte.
13              THE COURT:  Okay.  You have received a copy of the
14    amended Preliminary Charge clarifying a couple of matters that
15    Ms. Fletcher pointed out.  So I am going to summon the jury and
16    explain that to them, and then we will continue with the
17    opening statements.
18              MS. FLETCHER:  Judge, if I may before we start.
19    Exhibit 3 is a map that the parties have stipulated into
20    evidence this morning so that I don't have to lay more of a
21    foundation before its admission.  I have an enormous blowup of
22    the map that I am going to use with the first witness, and if
23    we could put on the record now that it is in evidence, and we
24    won't have to go through showing the witness privately.
25              MS. BIANCO:  We agree.
```

218

```
 1              THE COURT:  So noted, and Exhibit 3 received.
 2              (Exhibit No. 3, received.)
 3              MS. FLETCHER:  We also have entered into a
 4    stipulation with regard to chain of custody of certain items
 5    which we have marked Government Exhibit 42.  Both parties have
 6    signed it, and I would move that into evidence at this time.
 7              MS. BIANCO:  We agree.
 8              THE COURT:  Where is a copy?
 9              Anything further?
10              MS. FLETCHER:  I would also just like the record to
11    reflect that the defendant in this particular case is not
12    shackled for the trial and will not be shackled during the
13    course of this trial.
14              THE COURT:  So noted.
15              MS. FLETCHER:  Thank you, Judge.
16              THE COURT:  And the stipulation Government
17    Exhibit 42 has been received.
18              (Exhibit No. 42, received.)
19              THE COURT:  Anything further?
20              MS. FLETCHER:  Nothing further.
21              THE COURT:  Okay.  Summon the jury.
22              (Whereupon, the proceedings were held in open court
23         in the presence of the Jury.)
24              THE COURT:  Good morning, members of the jury.
25    Thank you for being here on time.  First of all, you will note
```

219

```
 1    that this photo machine is still up.  After eleven years of
 2    almost continuous use, we find out the, what, the battery is
 3    gone?
 4              COURT CLERK:  Yes, the electric motor.
 5              THE COURT:  The electric motor.  The way it works is
 6    when somebody is on the podium questioning a witness, it can be
 7    popped up, and there is a picture for the witness to see and
 8    then you would also see the picture or the video, whatever it
 9    is, on your screens there.  Noon hour -- we will have to put up
10    with it this morning, noon hour we are going to try to --
11    apparently this is somewhat of a unique matter and machine, so
12    we have to find a way to try to do it and get it down so it
13    doesn't obscure anybody's vision here, but we will put up with
14    it for a while here, and we appreciate it.
15              Also before we begin, I have two updates to the
16    Preliminary Charge I gave you yesterday.  I want to remind you
17    that I will fully instruct you at the end of the case on the
18    law and on the elements the government must prove beyond a
19    reasonable doubt.  The preliminary instructions you heard
20    yesterday merely provide a brief overview.
21              First, the conspiracies alleged in Counts 1 and 2 do
22    not require an overt act, and your preliminary instructions
23    have been amended on page ten to reflect this.  Accordingly,
24    the government will need to prove the two elements on page ten
25    beyond a reasonable doubt.
```

220

```
 1              Second, as I explained yesterday, the substantive
 2    exploitation offenses alleged in Counts 3, 4, and 5 require the
 3    government to prove three elements beyond a reasonable doubt.
 4    These elements are found on page eleven.
 5              With respect to the third element, I want to make
 6    clear that the government must prove that the visual depiction
 7    actually moved in interstate commerce, that the defendant knew
 8    or had reason to know that the visual depiction would move in
 9    interstate commerce, and that the materials used to produced
10    these depictions had previously moved in interstate commerce as
11    indicated on page eleven.
12              Your individual copies of the Preliminary Charge
13    have been updated, and my clerk will now give you each a copy
14    of the amended charge with the additional instructions that we
15    have -- you have turned in in the original ones.  That is the
16    only changes.  Otherwise the Preliminary Charge is exactly the
17    same.
18              You have been provided with notebooks to take notes
19    if you wish.  Good.
20              All right.  We will now start the trial.  The
21    government is required to make an opening statement, and I
22    understand that Assistant U.S. Attorney Sahar Amandolare will
23    make the opening statement on behalf of the government.
24
25    OPENING STATEMENT BY MS. AMANDOLARE
```

221

Opening Statement by Ms. Amandolare

1    MS. AMANDOLARE:  Good morning.  My name is Assistant
2  United States Attorney Sahar Amandolare, and I, along with
3  Assistant United States Attorney Lisa Fletcher, represent the
4  government.
5        The first thing I want to do for you this morning is
6  tell you about the children that are involved in this case.
7  There is B.L.  She was born June 1st, 1999, and she was eight
8  years old when she was first became a victim of sexual abuse.
9  A.T. and C.T., both born in early 2014, and they were both less
10 than one year old when they first became victims of sexual
11 abuse.  J.M., born November 20, 2003, and he was twelve years
12 old when he became a victim of sexual abuse.  C.F., born
13 August 23, 1999, and she was sixteen years old when she became
14 a victim of sexual abuse.  All of these children have something
15 in common.  Their sexual exploitation all came at the hands of
16 this defendant, Stacey J. LaPorte, Jr..
17       Over the course of this trial, you are going to
18 learn how this defendant victimized each of these children with
19 acts of sexual abuse, sexual exploitation, and coercion.
20       Now, you heard a lot about the types of evidence and
21 the testimony that you are going to hear.  Much of that
22 testimony, as has been indicated, is a difficult nature.  It is
23 going to be sensitive, it's going to be emotional, and
24 sometimes it is going to be difficult to hear or see.  What I
25 want to tell you from this point is that it is important for

222

Opening Statement by Ms. Amandolare

1  you to watch and you listen and you pay attention to all of
2  that evidence because every person in this courtroom has a job
3  to do.  Your job as a jury is to pay attention to all of the
4  evidence presented and act as a fair and impartial body when
5  you go back to that room to reach a verdict.
6        We, on the other hand, as the government, need to
7  make sure that you, as the jury, see and hear all of the
8  evidence necessary to prove the defendant guilty beyond a
9  reasonable doubt.  Now, as I mentioned in a case like this, the
10 evidence is going to include images of child pornography.  It
11 is going to include testimony regarding sexual abuse by this
12 defendant against young children.  The government's obligation
13 to present this evidence is necessary to prove to you the
14 defendant's guilt as to each and every count charged in this
15 indictment.
16       At the close of this case, you are going to be asked
17 to consider six counts against this defendant, which span
18 approximately a two-year period between 2014 through March of
19 2016.  As I mentioned at the beginning of my opening statement,
20 these charges involved multiple victims ranging in age from
21 infants to teenagers.  You are going to hear testimony from
22 various witnesses who are going to reference at least six
23 different locations within St. Lawrence County where these
24 crimes took place.  You will hear from victims, law enforcement
25 witnesses, and even from individuals who were charged and have

223

Opening Statement by Ms. Amandolare

1  since pled guilty for their part of the conduct that relates to
2  this defendant's charges.
3        You are going to hear about multiple electronic
4  devices that were recovered by law enforcement which ultimately
5  resulted in the chats and the images that you are going to hear
6  about.  You are also going to learn a little bit about a
7  messaging application for cell phones referred to as Kik
8  Messenger.  That's where the parties in this case would chat
9  between one another, and they would send images, and that's
10 where the charged conduct reflected in the indictment occurred.
11       Now, I want to talk to you a little bit about each
12 particular count.  Counts 1, 3, and 4 charge the defendant with
13 sexual exploitation of and conspiracy to sexually exploit A.T.
14 who was an infant born in February of 2014.  She is referred to
15 as V-1 in the indictment, and her mother is Mackenzie Bailey
16 who is a coconspirator.
17       To prove the defendant guilty of these three counts,
18 the government will introduce evidence including the testimony
19 of Mackenzie Bailey that will show you this defendant sexually
20 abused A.T. or V-1 from 2014 to 2016.  This abuse, you will hear
21 about this abuse being in the form of digital, vaginal, and
22 anal penetration, all at the hands of this defendant and the
23 coconspirator, Mackenzie Bailey.  You will learn that some, but
24 not all, of these acts are depicted in various videos and
25 images taken by the defendant and by Mackenzie Bailey at the

224

Opening Statement by Ms. Amandolare

1  time of the abuse.  You will hear about two specific incidents
2  as charged in Counts 3 and 4 of the indictment where images of
3  Mackenzie Bailey abusing A.T. were sent over Kik Messenger to
4  Kik user fastfamily25.  The evidence will prove that behind
5  that username was this defendant.  He was directing
6  Mackenzie Bailey to perform the abuse of A.T., take pictures of
7  it and send it to him.
8        The abuse of A.T. and the depictions of such abuse
9  that were taken and sent over Kik Messenger on certain
10 occasions reflect the conduct that is charged in Counts 1, 3,
11 and 4 of the indictment.
12       Now, Count 2 is similar to Count 1.  The evidence
13 you will hear regarding Count 2 involves the defendant's sexual
14 abuse of C.T., referred to as V-4 in the indictment.  This took
15 place between approximately April through June of 2015.  C.T.
16 is the daughter of Hillary Trimm, and Hillary Trimm, like
17 Mackenzie Bailey, is also a named coconspirator in the
18 indictment.
19       Now, you are not going to see any images or videos
20 as it pertains to the abuse of C.T. but you will hear C.T. take
21 that stand and discuss how this defendant sexually abused C.T.
22 and how this defendant had Hillary abuse C.T., take photos and
23 videos of the abuse and then send them to the defendant over
24 Kik Messenger.
25       Now, Count 5 involves the sexual exploitation of

225

Opening Statement by Ms. Amandolare

1 C.F., victim three in the indictment, and J.M., victim two in
2 the indictment, all at the hands of this defendant.
3 Specifically you are going to hear evidence that the defendant
4 told C.F. to perform sexual acts on her brother, J.M., while
5 simultaneously taking photographs of that abuse to send to the
6 defendant over Kik Messenger.  Again, all of these acts were at
7 the defendant's request.
8        Finally, Count 6 charges the defendant with receipt
9 of child pornography.  You are going to hear evidence that,
10 again, shows this defendant, while on Kik Messenger, solicited
11 and received two images depicting a minor engaged in sexually
12 explicit conduct.  This charge is a little different from the
13 other five charges I just went into detail for you.  But I want
14 you to understand that it is intertwined with the defendant's
15 conduct in that this defendant demonstrated a desire to see
16 images, hear words, and himself perform actions all related to
17 the sexual abuse of minors.
18        Now, every child in this case has his or her own
19 story, and those who are able are going to come into this
20 courtroom.  They are going to take that witness stand, and they
21 are going to relive for you the abuse that they endured at the
22 hands of this defendant.  The best way for you to get a glimpse
23 into what you are going to learn over the course of this trial
24 is to discuss the various and interrelated stories of abuse and
25 to discuss both the people that you are going to hear that

226

Opening Statement by Ms. Amandolare

1 abuse from and those that you won't.
2        I want to start with a B.L..  She is going to take
3 that stand as a strong eighteen year old woman who is headed
4 for college in the fall.  But you are going to quickly learn
5 through her testimony that life was no fair shake for much of
6 her childhood.  She will tell you about family's history and
7 how at a very young age, she witnessed her parents' death with
8 her very own eyes.  You are going to learn that while those
9 were trying times in her life, nothing compared to what she
10 would face when moved in with this defendant, her older brother
11 and her guardian.  Brandy will tell you how this defendant, her
12 own brother, sexually abused her over and over again.
13        First, when she was eight, then again when she was
14 eleven, and then again when they moved in together right before
15 she turned fifteen, and it happened over and over again. And it
16 happened as they moved from apartment to apartment until she
17 couldn't take it anymore.  Ultimately when Brandy was sixteen
18 years old, she went to the police, and she told her story.
19 What you are going to learn is that story ultimately led law
20 enforcement to learn that Brandy wasn't this defendant's only
21 child victim.
22        Now, B.L., C.F., and A.T., and C.T. all suffered
23 various acts of sexual abuse at the hands of this defendant.
24 However, these acts alone are not federal crimes.  What makes
25 the incidence that you are going to learn about with over the

227

Opening Statement by Ms. Amandolare

1 course of this trial, a crime in the federal system, is that
2 images were taken over Kik Messenger.  It is the very
3 production of these images that you are going use to consider
4 the charges that are charged in this indictment.
5        Now, I want to talk about Mackenzie Bailey.
6 Mackenzie Bailey was just eighteen years old when she became
7 the defendant's live-in girlfriend.  At the time, she was a
8 mother of an infant.  She had just dropped out of high school.
9 She was unhappy in her home life.  Mackenzie Bailey was looking
10 for a place she felt loved and appreciated, and this is how she
11 met and fell in love with this defendant.
12        Mackenzie Bailey will tell you that the relationship
13 started with the defendant saying all of the right things.  He
14 wooed her.  He made her feel special.  But then the defendant
15 set his eyes on victimizing her infant daughter, A.T.  What
16 Mackenzie Bailey will tell you is that she felt scared because
17 this defendant consistently threatened Mackenzie Bailey, her
18 daughter, and her family, and that's what she will tell you
19 prevented her from getting out of the situation that she was
20 in.
21        You are going to learn that she was a young girl in
22 a bad stage in her life.  She had low self esteem and she was
23 vulnerable.  You will also learn that she was partially
24 responsible for the abuse of her daughter, but she is going to
25 tell you the defendant started it, he controlled it, and he

228

Opening Statement by Ms. Amandolare

1 wouldn't stop it.
2        Mackenzie Bailey's conduct was not just limited to
3 her daughter either.  You are going to learn that it extended
4 to other victims that you will hear about in this case, B.L.
5 and C.F.  She is going to take that stand and tell you that she
6 admits responsibility for her actions.  Specifically she will
7 tell you that she, at this defendant's request, perpetrated
8 these various forms of sexual abuse.
9        These acts took place by Mackenzie Bailey and by the
10 defendant.  Some of them were captured by photographs and
11 videos and others were not.  She will recall for you, again,
12 there were two specific incidents charged in the indictment
13 from March of 2016 where she sexually abused A.T. for the
14 purpose of producing images to be sent over Kik Messenger to
15 she will tell you was this defendant.  This was done because
16 the defendant wanted to hear about the sexual abuse that he
17 was perpetrating and to see the images of that sexual abuse.
18        I want you to listen to her testimony and consider
19 the fact that her story will retell the sexual abuse of her
20 daughter at the hands of this defendant as she witnessed it
21 herself, often times in the same house and even in the same
22 room.  Mackenzie Bailey was not only a party to the criminal
23 conduct, but she was also an eye-witness.  And you will learn
24 that her story is corroborated by the facts in this case, and
25 it is no coincidence that what happened to Mackenzie Bailey

229

Opening Statement by Ms. Amandolare

1   also happened to Hillary Trimm.

2           So now I want to tell you about Hillary Trimm.  She

3   is another young woman who fell for this defendant.  She is

4   also going to take that stand and she is going to condemn her

5   own actions and tell you under oath what she did and what she

6   saw this defendant do to her and her infant daughter.  What

7   happened to C.T. between April and June of 2015 will sound

8   almost identical to what happened to A.T., specifically that

9   Hillary Trimm and the defendant sexually abused C.T., took

10  pictures and videos for the abuse to be sent over Kik Messenger

11  to the defendant so that, again, the defendant could hear about

12  the abuse and so he could see the abuse.

13          Hillary Trimm's credibility will follow that of

14  Mackenzie Bailey when you are asked to consider their

15  credibility.  Remember that her story is being told not only as

16  a participant, but also as someone with the personal knowledge

17  of what the defendant was doing, where the defendant was when

18  this sexual abuse was happening, what the defendant was saying,

19  what the defendant was asking for when C.T. was being sexually

20  abused.

21          Now, J.M., he is a quiet thirteen year old who has

22  not yet really found the strength to move past the incidents

23  that are charged in this indictment.  You are going to see him

24  also walk into this courtroom.  He is going to take that stand,

25  and he is going to retell for you the events of February 28,

---

230

Opening Statement by Ms. Amandolare

1   2016, when he engaged in sexual activities with his older

2   sister, C.F., again at the hands of this defendant.  Jacob is

3   going to tell you that on that day he was at the defendant's

4   house, and in the defendant's bedroom with his sister, C.F.,

5   watching a movie.  The defendant made it known to his sister,

6   C.F., by coming into the bedroom that he would be using Kik

7   Messenger with a cell phone and that C.F. would be in the

8   bedroom while the defendant was in the bathroom with his cell

9   phone.

10          As those messages came through Kik Messenger from

11  user fastfamily25, C.F. began performing sexual acts on her

12  brother, J.M., for the purpose of taking photos of the abuse as

13  the defendant directed her to do so, and then sending those

14  images through Kik Messenger back to the user fastfamily25.

15  You are going to hear those chats and you are going to see

16  those images.

17          When this incident took place, J.M. was a mere

18  twelve years old who was enticed by the defendant's neverending

19  supply of alcohol and cigarettes.  In fact, the night of

20  February 28th, when this incident took place, Jacob is going to

21  tell you he was extremely intoxicated and looking to the

22  defendant for cigarettes.  The defendant took advantage of

23  this, urging sex between J.M. and his sister, C.F., for the

24  return of those cigarettes.

25          Now, C.F., she is J.M.'s older sister.  She, like

---

231

Opening Statement by Ms. Amandolare

1   B.L., found her way out of St. Lawrence County and into a new

2   life.  You are going to learn that she met the defendant

3   through B.L., her then best friend.  C.F. was sixteen years old

4   when she started hanging out with Brandy at the defendant's

5   house in Massena.  What started as a place for her to go and

6   hang out with her friend and help babysit A.T., turned into a

7   place synonymous with sex, alcohol, and tattoos.  The entire

8   time C.F. interacted with this defendant, she was under age.

9   So again, just like with many of the other children in this

10  case, this defendant was the adult.  He was supposed to be the

11  responsible person in the house, and instead he took advantage

12  of everyone and everything that came across his path.

13          Now, I told you a little bit about the messaging

14  application Kik.  In addition to the screen names or user names

15  belonging to the witnesses that you are going to hear from.

16  You will also hear the following two user names over and over

17  again: fastfamily25 and prouddaddy3_15_16.  These are the two

18  user names on the other side of Kik Messenger.  The chats that

19  are relevant, and again, where this charged conduct took place.

20          B.L., Mackenzie Bailey, Hillary Trimm, J.M., and

21  C.F., will all tell you that this defendant was behind each and

22  every one of those chats.  You are going to learn how each of

23  these individuals is able to place the defendant there.  It is

24  going to include testimony about the defendant's likes and

25  hobbies, including Superman and the Fast and Furious movies.

---

232

Opening Statement by Ms. Amandolare

1   You are going to learn that it is no coincidence that this

2   defendant also has a young daughter with Hillary Trimm whose

3   birthday happens to be 3-15-16.

4           You will also learn that while those chats took

5   place between two separate cell phones each time, like I

6   mentioned, the defendant would also be in the same house and

7   sometimes even in the same room.  Therefore, many of these

8   witnesses are going to tell you that this defendant was the

9   person behind fastfamily25 and prouddaddy3_15_16 because they

10  witness him conducting these chats with their very own eyes.

11          Now, I went through a lot of the counts referred in

12  the indictment.  Unfortunately the case doesn't not end with

13  the victims I just described for you.  On March 25, 2016, Kik

14  user prouddaddy3_15_16, which the end will show as the

15  defendant, participated in a Kik chat with another individual

16  by the username Banx75, in which this defendant requested and

17  received two images depicting child pornography.  In requesting

18  specific images depicting a minor engaging in sexually explicit

19  conduct, you will learn that the defendant engaged in

20  conversations where he relayed to use Banx75 his fetish for the

21  sexual abuse of young children.  In fact, you are also going to

22  hear Mackenzie Bailey take that stand and tell you that this

23  was common for the defendant.  He would use Kik Messenger to

24  solicit child pornography.

25          Now, I just want to tie in some of the victims that

---

233

Opening Statement by Ms. Amandolare

1  you are going to hear from in this case, but I also want to
2  draw your attention to many of the law enforcement personnel
3  that you are going to hear who were very involved in this case.
4  They took this case from January of 2016 when B.L. first went
5  to the police to tell her story.  They carried it through today
6  where they are now, where this defendant is being charged in a
7  six-count indictment, again, for months and months of sexual
8  abuse involving these various young children.  And all of that
9  abuse was done for the purpose of documenting such abuse in the
10 form of images and videos, some of which you are going to see
11 in this case.  Now, I just spent a lot of time giving you a
12 brief overlay of what you are expected to hear over the course
13 of this trial.  The timeline here is lengthy, the facts are
14 drawn out, and the related parties and witnesses are
15 complicated, but once you have heard all of the testimony and
16 seen all of the evidence, the results are going to come
17 together to show that this defendant is guilty of each and
18 every count as charged in the indictment.  Thank you.
19        THE COURT:  Thank you.
20        Mr. Wolfson, do you wish to make an opening
21 statement on behalf of the defendant?
22        MR. WOLFSON:  I do, Your Honor.
23        THE COURT:  Proceed.
24
25 OPENING STATEMENT BY MR. WOLFSON

234

Opening Statement by Mr. Wolfson

1        MR. WOLFSON:  Good morning.  My name is
2  Martin Wolfson.  I, along with Randi Bianco, represent
3  Stacey LaPorte.  Ms. Amandolare just told you that a bunch of
4  the charges found occurred on the instant messaging application
5  Kik.  So what this case is really about is who pushed send on
6  those messages.
7        Now, you will hear from a number of witnesses, many
8  of whom are law enforcement, but none of this law enforcement
9  witnesses will tell you that they saw Stacey push send.  The
10 only witnesses will say they saw Stacey push send have motive
11 and are in jail right now for molesting their own children and
12 photographing the abuse.  They did horrible things to their own
13 children.  They have everything to gain and nothing to lose by
14 testifying against Stacey.  They were facing life sentences for
15 molesting their own children and photographing it.  And the
16 only way out from under these life sentences was to point the
17 finger at Stacey.
18        And Stacey was an easy target.  You will hear that
19 he was already the subject of allegations against his sister.
20 So when Hillary Trimm and Mackenzie Bailey got caught, he was
21 the perfect person to put the blame on.  Mackenzie and Hillary
22 will both testify that Stacey persuaded them to molest their
23 own children.  I want to ask you yourself if that makes sense,
24 if these women would molest their own babies just because
25 asked.  And I want you to ask yourself if it makes sense for

235

Opening Statement by Mr. Wolfson

1  J.M. to have sex with his sister in exchange for cigarettes.
2  That doesn't make sense either.
3        Ask yourself if Hillary Trimm and Mackenzie Bailey
4  had a chance to get their stories straight.  The evidence will
5  show that they did.  You will learn that these two knew each
6  other very, very well.  They were friends.  They were lovers.
7  And they shared some sick, twisted sexual predilections.  What
8  they have in common is not just Mr. LaPorte.  What they have in
9  common is the fact that they molested their own babies
10 digitally, vaginally, anally.  Because Stacey persuaded them to
11 do that?  Again, it just doesn't make sense.
12        You will learn that child pornography was found on
13 Mackenzie Bailey's cell phone.  You will learn that
14 Mackenzie Bailey had thirteen different user accounts on social
15 media.  The only thing Stacey is guilty of is exercising poor
16 judgment in who he dated.
17        You will learn that Stacey's parents died within six
18 months of each other not too long ago, and when that happened,
19 he was tasked with taking care of his younger sister.  He was a
20 young man himself.  You will learn that poverty and desperation
21 forced Stacey to move frequently, and you will see a map
22 showing all the apartments.  This wasn't because he liked to
23 move.  This is because he had to.  Stacey couldn't afford his
24 own place.  Stacey couldn't even afford his own cell phone.
25 You will hear that the cell phone that the government will

236

Opening Statement by Mr. Wolfson

1  attribute to Stacey was actually bought by Mackenzie Bailey's
2  mom.
3        You will learn that many of the people in this case
4  shared their cell phones, and they shared their computers and
5  most importantly they shared their social media accounts.  They
6  shared their messenger app.  You will learn that a female used
7  Stacey's messaging profile to obtain child pornography.  This
8  monroe (phonetically) at prouddaddy3_15_16 was Stacey LaPorte,
9  but what she didn't tell you is that the user on that account
10 on multiple occasions identified themself as a female.  It was
11 not Stacey using that account.
12        You will learn that a Lenovo computer belonging to
13 Mackenzie Bailey was used to back up multiple cell phones.  The
14 point being, Stacey is not responsible for the messages the
15 government will attempt to attribute to him.  The evidence
16 simply does not lead to this conclusion beyond a reasonable
17 doubt.
18        The witnesses that will point to Stacey have some
19 very serious credibility issues.  They have motivation to
20 fabricate.  They have engaged in sexual abuse of their own
21 children.  These will be the witnesses that claim they saw
22 Stacey push send.  These will be the witnesses that claim he
23 was behind the messages.
24        You will learn that the instant messaging platform
25 Kik does not require any subscriber information.  Anyone can

Case 18-105, Document 44, 04/15/2019, 2540369, Page10 of 202

Case 5:16-cr-00320-DNH   Document 118-1   Filed 09/05/18   Page 25 of 237          Case 5:16-cr-00320-DNH   Document 118-1   Filed 09/05/18   Page 26 of 237

237

Opening Statement by Mr. Wolfson

1   make an account and use whatever name and information they

2   want. I ask you to listen carefully to the witnesses. And I

3   ask you to think critically about their motivations. I ask you

4   to question if law enforcement rushed to conclusions.

5       Finally, I will caution you that it is my

6   understanding that you will hear some disturbing testimony from

7   B.L.. That's Stacey sister, but I caution you that that's not

8   part of the charged conduct in this case. There will be a day

9   for which he will have to answer for that, but that is not in

10  this court.

11      Here, Stacey is charged in six counts. Three of

12  them have to do with Mackenzie Bailey and her daughter, A.T.,

13  and revolve around who, if anyone, persuaded her to molest her

14  own child. There is no question that Mackenzie is sexually

15  abusing her own daughter, and that she took pictures of it

16  herself. There is no question that Mackenzie Bailey is alone

17  in these pictures abusing her own daughter. The only issue for

18  you to decide is if someone persuaded her to take them and if

19  that person was Stacey.

20      Count 2 presents a similar situation.

21  Hillary Trimm, friend and lover of Mackenzie Bailey, also

22  sexually abused her infant daughter. And like Mackenzie, she

23  took photographs of the abuse. And when caught, like Bailey,

24  she cooperated with the government and, like Bailey, she then

25  pointed the finger at Stacey. She will claim that Stacey

238

Opening Statement by Mr. Wolfson

1   persuaded her to take these pictures of her abusing her own

2   daughter. In exchange for what? Nothing. It just doesn't

3   make sense. Again, the only question you have to decide is if

4   anyone persuaded her to molest her own daughter, and if that

5   person is Stacey.

6       Count 5 alleges that Stacey persuaded a teenaged

7   girl name C.F. to have sex with her brother, and to take

8   pictures of that sexual conduct. Listen to the testimony about

9   this very carefully. Listen to who was in the room while these

10  pictures were being taken. Listen to how drunk J.M. and C.F.

11  were, and listen to if they actually engaged in sex or if they

12  were just kidding around. Listen carefully as to when their

13  stories surfaced, and listen carefully to how their stories

14  kept changing over time.

15      Count 6 charges the receipt of child pornography.

16  The person using the screen name Banx75 sent pictures to an

17  unregistered Kik account with the screen name I am

18  prouddaddy3_15_16. However, you will hear about other people

19  using this account. You will hear about a female using this

20  account on multiple occasions. It is clear that Stacey does

21  not have exclusive access to this account. Like I said,

22  everyone involved in this case shared their applications, they

23  shared their social media apps. Ask yourself if someone else

24  who is in this case, like Mackenzie Bailey, who has an interest

25  in child pornography, is the one who is actually behind this

239

Opening Statement by Mr. Wolfson

1   chat.

2       The government is putting all of these cases

3   together in the hopes that something will stick and you will be

4   repulsed by the weight of the cumulative evidence. I ask you

5   to view each charge separately and view the evidence

6   individually and critically and not let the repulsive nature of

7   the allegations cloud your judgment. We will ask you to find

8   Stacey not guilty. Thank you again for being there.

9       THE COURT: Thank you.

10      Is the government prepared to call their first

11  witness?

12      MS. FLETCHER: Yes, Your Honor. The United States

13  calls New York State Police Investigator Dewayne Baillargeon.

14

15      DEWAYNE BAILLARGEON, having been called as a Witness,

16  being first duly sworn, was examined and testified as follows

17  under oath:

18

19  DIRECT EXAMINATION BY MS. FLETCHER:

20      THE COURT: Ms. Fletcher, you may proceed.

21      MS. FLETCHER: Thank you, Your Honor.

22  BY MS. FLETCHER, CONTINUED:

23  Q.  Good morning, Investigator Baillargeon.

24  A.  Good morning.

25  Q.  By whom are you employed?

240

DEWAYNE BAILLARGEON - Direct By Ms. Fletcher

1   A.  New York State Police.

2   Q.  In what capacity?

3   A.  I am an investigator.

4       THE COURT: Just a minute. Members of the jury, if

5   you ever can't hear the attorneys or the witness, just raise

6   your hand so we can correct the situation. Proceed.

7   BY MS. FLETCHER, CONTINUED:

8   Q.  How long have you been with the New York State Police?

9   A.  Seventeen years.

10  Q.  And how long have you been an investigator?

11  A.  Over four.

12  Q.  Where are you currently assigned?

13  A.  I am assigned to SP Massena.

14  Q.  How long have you been assigned in Massena?

15  A.  As an investigator three years, but for most of my

16  career.

17  Q.  What are your duties and responsibilities generally as an

18  investigator with the New York State Police?

19  A.  I investigate property crimes, misdemeanor, felonies, and

20  sex offenses.

21  Q.  Do the sex offenses include sex offenses against children

22  and other child exploitation crimes?

23  A.  It does.

24  Q.  I want to draw your attention to January of 2016. Did

25  there come a time in January of 2016 that you were assigned an

241

DEWAYNE BAILLARGEON - Direct By Ms. Fletcher

investigation relating to the defendant in this case

Stacey J. LaPorte, Junior?

2  A.  Yes, ma'am.

4  Q.  How did that investigation come to the New York State

5  Police?

6  A.  I was contacted by the Massena Police, Investigator

7  Jason Olson.

8  Q.  What was the nature of the investigation?

9  A.  It was the sexual abuse of a young female.

10  Q.  What was her name?

11  A.  B.L..

12  Q.  Why was the investigation in regard to B.L. turned over

13  from Massena to the New York State Police?

14  A.  Some of the crimes committed were outside the Village of

15  Massena jurisdiction.

16  Q.  Does the New York State Police have a larger area of

17  jurisdiction than the Village of Massena?

18  A.  Yes, ma'am, the entire state.

19  Q.  As a part of your investigation, did you interview B.L.?

20  A.  I did.

21  Q.  And one or more dates?

22  A.  Two dates.

23  Q.  Do you recall those dates?

24  A.  Yes.  It was January 2016 and again February 25th of

25  2016.

242

DEWAYNE BAILLARGEON - Direct By Ms. Fletcher

1  Q.  What is a child forensic interview?

2  A.  A child forensic interview is a structured conversation

3  with a child to obtain or elicit detailed information with

4  regards to an event that the child either witnessed or

5  experienced.

6  Q.  Is that different than interviewing an adult?

7  A.  Yes, it is.

8  Q.  Why?

9  A.  It doesn't lead a child.  It allows a child to have a

10  conversation with somebody in a structured manner to elicit

11  information.

12  Q.  Was a child forensic interview conducted or arranged for

13  B.L.?

14  A.  It was.

15  Q.  Where was that conducted?

16  A.  It was conducted at the Children's Advocacy Center in

17  Plattsburgh, New York.

18  Q.  When was that?

19  A.  April of 2016.

20  Q.  Were you present for that?

21  A.  I was.

22  Q.  Did you continue your investigation thereafter?

23  A.  I did.

24  Q.  Did there come a time in that investigation into the

25  allegations brought forth by B.L. that you determined that

243

DEWAYNE BAILLARGEON - Direct By Ms. Fletcher

1  Stacey LaPorte should be interviewed regarding those

2  allegations?

3  A.  Yes, ma'am.

4  Q.  Did you make efforts to locate and interview him?

5  A.  Yes.

6  Q.  Did you find him?

7  A.  We did.

8  Q.  Where did you find him?

9  A.  The apartment of Paul Fregoe on North Main Street in

10  Massena.

11  Q.  What day was that?

12  A.  May 17, 2016.

13  Q.  Were you alone with or with another officer?

14  A.  I was not.  I was with a marked unit or uniformed police

15  officer.

16  Q.  As an investigator, do you wear this trooper uniform on a

17  day-to-day basis?

18  A.  No, I do not.  I wear business attire.

19  Q.  Who was the trooper that you were with?

20  A.  It was Trooper Brian Lamarch (phonetically).

21  Q.  What time was it when you arrived at the location at

22  Paul Fregoe's house on Main Street?

23  A.  5:50 p.m..

24  Q.  5-0, fifty?

25  A.  Yes, ma'am.

244

DEWAYNE BAILLARGEON - Direct By Ms. Fletcher

1  Q.  Can you explain to the members of the jury what happened

2  when you arrived?

3  A.  Absolutely.  We proceeded to a small hallway that goes up

4  a flight of stairs to a small landing.  I knocked on the door

5  of the apartment of Paul Fregoe.  Mr. Fregoe answered the door.

6  At that time I told him I was looking for Stacey LaPorte.  He

7  said just a minute.  He retreated back into the apartment, and

8  Mr. LaPorte appeared.

9  Q.  At the door?

10  A.  Yes, ma'am.

11  Q.  Did you have a conversation with Mr. LaPorte?

12  A.  I did, very brief conversation.

13  Q.  What did you tell him?

14  A.  I explained to him there was allegations made against him

15  and that I needed to speak with him.

16  Q.  Did you tell him who the allegations had been made by?

17  A.  I don't believe at that time, no.

18  Q.  Did you ask him to speak -- whether he was willing to

19  speak with you?

20  A.  I did.  I didn't feel the appropriate place to have this

21  conversation was at the top of a flight of stairs for safety

22  reasons.  So I asked him if he would come down to the station

23  to speak with me there.

24  Q.  What was his response?

25  A.  He said yes, but he did not have a ride.

**G.A. 008**

245

DEWAYNE BAILLARGEON - Direct By Ms. Fletcher

1  Q.   Were you able to provide or was someone able to provide a
2  ride for Mr. LaPorte to the station?
3  A.   Yes.  Trooper Lamarch provided a courtesy transport from
4  the location we were at to the station.
5  Q.   How long did the conversation last at the top of the
6  stairs at Paul Fregoe's house?
7  A.   A minute to two minutes.
8  Q.   And did you drive separately from Trooper Lamarch?
9  A.   I did, yes.  I had my police vehicle.
10 Q.   Did you see the defendant go to Trooper Larmarch's
11 uniformed car?
12 A.   Yes.
13 Q.   Was he handcuffed?
14 A.   No, he was not.
15 Q.   Was he under arrest?
16 A.   No, not at that point.
17 Q.   Do you see Stacey LaPorte in the courtroom today?
18 A.   I do.
19 Q.   Could you identify him for the jury please?
20 A.   Yes.  He is sitting there.  He has a black shirt, his
21 glasses on the top of his head.
22       MS. FLETCHER:  Your Honor, may the record reflect
23 that he has identified the defendant?
24       THE COURT:  So noted.
25 BY MS. FLETCHER, CONTINUED:

246

DEWAYNE BAILLARGEON - Direct By Ms. Fletcher

1  Q.   What time was it that Trooper Lamarch provided the
2  transport for the defendant from Paul Fregoe's home to the
3  State Police barracks?
4  A.   It was 5:55 p.m..
5  Q.   When you left?
6  A.   Yes, ma'am.
7  Q.   How far is it from 245 North Main Street to SP Massena?
8  A.   Two to three miles maximum.
9  Q.   And what time then did the defendant arrive at SP Massena
10 with Trooper Lamarch?
11 A.   5:58 p.m..
12 Q.   Is there a reason you know specifically 5:58 p.m.?
13 A.   Yes, ma'am.  We are required to call the beginning and
14 ending mileage of courtesy transports and it is recorded on a
15 radio log.
16 Q.   You have reviewed reports in that regard?
17 A.   Yes.
18 Q.   Did you arrive back at SP Massena at about the same time?
19 A.   Yes, ma'am.
20 Q.   What happened next?
21 A.   We proceeded into the station.  I advised Trooper Lamarch
22 to have Mr. LaPorte enter into the interview room so I could
23 speak with him.
24 Q.   Did Mr. LaPorte go into the interview room?
25 A.   He did.

247

DEWAYNE BAILLARGEON - Direct By Ms. Fletcher

1  Q.   Was he handcuffed?
2  A.   No, he was not.
3  Q.   What did you do when Trooper Lamarch put the defendant
4  into the interview room?
5  A.   I had to grab a pad of paper, and I proceeded into the
6  interview room.
7  Q.   Can you describe the interview room?
8  A.   Yes, ma'am.  It is approximately eight feet wide with a
9  door on one end, twelve feet deep with a desk and two chairs.
10 Q.   I am going to hand you Government's Exhibit 30 for
11 identification?
12 A.   Thank you.
13 Q.   Do you recognize what is depicted in that exhibit?
14 A.   I do.
15 Q.   What is that?
16 A.   This is the interview room with two chairs and a desk.
17 Q.   Does that appear the same condition as it did on May 17th
18 of 2016 when you interviewed the defendant in that room?
19 A.   Yes, ma'am.
20 Q.   Same size, same desk, same chair?
21 A.   Yes, ma'am.
22       MS. FLETCHER:  Judge, I move Exhibit 30 into
23 evidence.
24       THE COURT:  Any objection?
25       MR. WOLFSON:  No objection, Your Honor.

248

DEWAYNE BAILLARGEON - Direct By Ms. Fletcher

1        THE COURT:  Received.
2        (Exhibit No. 30, received.)
3        MS. FLETCHER:  May we publish that?
4        THE COURT:  You may.
5  BY MS. FLETCHER, CONTINUED:
6  Q.   Exhibit 30 is now up on the monitors so the jury can see
7  it.  The chair to the right of the image is where Mr. LaPorte
8  would have sat?
9  A.   Yes, ma'am.
10 Q.   And you sat at that desk?
11 A.   I did.
12 Q.   How long did you speak with him in that room?
13 A.   Less than ninety minutes.
14 Q.   What time did your interview begin?
15 A.   My interview began at 6:04 p.m..
16 Q.   How did you begin your interview?
17 A.   Miranda.
18 Q.   What are the Miranda rights?
19 A.   They are his rights to remain silent if he wishes to.
20 Q.   Do you have a card from which you read Miranda rights to
21 targets that you are interviewing?
22 A.   Yes, ma'am.
23 Q.   Is that a card that you carry with you at all times?
24 A.   It is.
25 Q.   I am going to hand you Government's Exhibit 1 for

249

DEWAYNE BAILLARGEON - Direct By Ms. Fletcher

1   identification.

2   A.   Thank you.

3   Q.   Do you recognize that exhibit?

4   A.   Yes, ma'am, I do.

5   Q.   What is that?

6   A.   This is a copy of my Miranda card.

7   Q.   Is that a photograph?

8   A.   It is.

9   Q.   Did you take that photograph?

10  A.   I did.

11  Q.   Is that the exact Miranda card that you used in May of

12  2016 to advise the defendant of his rights?

13  A.   It is.

14       MS. FLETCHER:  Judge, I would move Exhibit 1 into

15  evidence.

16       THE COURT:  Any objection?

17       MR. WOLFSON:  No objection.

18       THE COURT:  Received.

19       (Exhibit No. 1, received.)

20       MS. FLETCHER:  May we publish that, please?

21  BY MS. FLETCHER, CONTINUED:

22  Q.   Investigator Baillargeon, looking at Exhibit 1, did you

23  read each right on this card to the defendant as it appears on

24  the card?

25  A.   I did.

250

DEWAYNE BAILLARGEON - Direct By Ms. Fletcher

1   Q.   Verbatim?

2   A.   Verbatim.

3   Q.   I am going to ask you to read to the jury the rights you

4   read to the defendant as you read them to him, please?

5   A.   Number one!  You have a right to remain silent.  Number

6   two:  Anything you can say will be used against you in a court

7   of law.  Number three!  You have the right to talk to a lawyer

8   and have a lawyer present with you while you are being

9   questioned.  If you cannot afford to hire a lawyer, one will be

10  appointed to represent you free of charge before any question

11  if you wish.  You may decide at any time to exercise these

12  rights and not answer any questions or make any statements.

13  The waiver was one, do you understand each of these rights I

14  have explained to you.  And having these rights in mind, do you

15  wish to talk to us now?

16  Q.   Did the defendant respond to the questions in the waiver?

17  A.   He did.

18  Q.   So when you read to him do you understand each of these

19  rights I have explained to you, did he respond after you read

20  that question?

21  A.   He did.

22  Q.   What was his response?

23  A.   Yeah, yeah.

24  Q.   Did you then read to him having these rights in mind, do

25  you wish to talk to us now?

251

DEWAYNE BAILLARGEON - Direct By Ms. Fletcher

1   A.   Yes.

2   Q.   What was his response to that question?

3   A.   Again, it was yeah.

4   Q.   After you read the rights to the defendant, what did you

5   do next?

6   A.   Engaged him in conversation.

7   Q.   Was anyone else present?

8   A.   There was not.

9   Q.   Where was Trooper Lamarch?

10  A.   Trooper Lamarch actually -- after I finished Miranda, he

11  knocked on the door and explained to me he had to leave to

12  engage another call.

13  Q.   Did he say something else to you at that time?

14  A.   He did.  He said that when he was getting in the car that

15  the defendant, Mr. LaPorte, stated that he knew his sister was

16  making allegations.

17  Q.   Was the defendant still unhandcuffed when you began your

18  questioning?

19  A.   Yes, ma'am.

20  Q.   And you indicated to him -- to the jury that you spoke to

21  him in the interview room for how long?

22  A.   Less than ninety minutes.

23  Q.   Was he cooperative?

24  A.   He was.

25  Q.   Were his answers responsive your questions?

252

DEWAYNE BAILLARGEON - Direct By Ms. Fletcher

1   A.   They were.

2   Q.   Did he appear to be intoxicated or under the influence of

3   drugs or alcohol?

4   A.   No, ma'am.

5   Q.   Did he ever say to you that he was under the influence?

6   A.   He did not.

7   Q.   Did he ever say to you that he had difficulty

8   understanding you?

9   A.   He did not.

10  Q.   Did he ever request an attorney?

11  A.   He did not.

12  Q.   Did he ever ask to stop speaking to you?

13  A.   He did not.

14  Q.   Did you record the interview?

15  A.   I did not.

16  Q.   Can you explain to the members of the Grand Jury (sic)

17  the recording system at the state police barracks at that time?

18  A.   Yes, ma'am.  It is a newly integrated system.  And

19  unfortunately I did not know how to run it, and I was the only

20  one at the station.

21  Q.   Was there anyone at the barracks to help you?

22  A.   There was not.

23  Q.   Did you need training before you were able to run it?

24  A.   Yes, ma'am.

25  Q.   You had not had that training?

Case 18-105, Document 44, 04/15/2019, 2540369, Page14 of 202

Case 5:16-cr-00320-DNH   Document 118-1   Filed 09/05/18   Page 41 of 237          Case 5:16-cr-00320-DNH   Document 118-1   Filed 09/05/18   Page 42 of 237

253

DEWAYNE BAILLARGEON - Direct By Ms. Fletcher

1    A.    Not at the point of his interview.

2    Q.    We did you get the training?

3    A.    It was in June is when I received that training.

4    Q.    After speaking with the defendant, did you ask if he

5    would be willing to provide a written statement summarizing the

6    things that he had told you?

7    A.    Yes, ma'am.

8    Q.    Did he agree to that?

9    A.    He did.

10   Q.    How did you accomplish taking a written statement from

11   the defendant?

12   A.    Well, we moved from the interview room to my actual desk.

13   I have two monitors at my desk.  One would face the laptop,

14   which he was able to view.  And the larger one that I used as

15   we were typing it.

16   Q.    Was he still unhandcuffed?

17   A.    He was.

18   Q.    Could you explain to the members of the jury how you go

19   about condensing someone's oral statements into a written

20   statement?

21   A.    Yes, ma'am.  I would take my notes from the interview.  I

22   would use them as an outline to set up, type a bit, discuss it,

23   wouldn't move on to the next subject until he agreed that

24   everything in there was what he wanted to say.

25   Q.    Did you follow that procedure with Mr. LaPorte?

254

DEWAYNE BAILLARGEON - Direct By Ms. Fletcher

1    A.    I did.

2    Q.    Did you discuss the content of the statement as you were

3    typing?

4    A.    Yes, ma'am.

5    Q.    And did he agree with each sentence, each line that you

6    were writing as you were writing it?

7    A.    Yes, ma'am.

8    Q.    Did he ask to change, add or delete anything?

9    A.    He did not.

10   Q.    How long did this process take?

11   A.    An hour.

12   Q.    What time did you start taking the written statement?

13   A.    I began typing at 7:30.

14   Q.    Is that indicated on the statement form somewhere?

15   A.    It is.

16   Q.    Did you ask him his date of birth?

17   A.    I did.

18   Q.    What is his date of birth?

19   A.    09/23 of 1990.

20   Q.    What time did you finish typing the statement?

21   A.    8:30.

22   Q.    Is that indicated on the statement form as well?

23   A.    It is, yes.

24   Q.    So from the time you started typing to the time you

25   finished was an hour; is that correct?

255

DEWAYNE BAILLARGEON - Direct By Ms. Fletcher

1    A.    Finished typing was an hour, yes, ma'am.

2    Q.    What did you do after you stopped typing that written

3    statement?

4    A.    Stopped typing, I printed it so that he would have a hard

5    copy to read.

6    Q.    What did you do with the printed version?

7    A.    I brought it over to his desk, and at the top of the

8    printed version is his Miranda warnings again.

9    Q.    What did you do with that?

10   A.    I went through each one of them, and I explained to him

11   that he needed to read and initial next to each one to make

12   sure that he understood his rights.

13   Q.    Did he do that?

14   A.    He did.

15   Q.    And then what happened?

16   A.    There is a signature line at the bottom which allows him

17   to sign so at that he understands his Miranda Rights.

18   Q.    Did you read those out loud to him or did he read them to

19   himself?

20   A.    I did not read them aloud.  He read them to himself.

21   Q.    Did you ask him if he could read?

22   A.    I did.

23   Q.    What was his response?

24   A.    Yes, I read fine.

25   Q.    Did he appear to be reading them?

256

DEWAYNE BAILLARGEON - Direct By Ms. Fletcher

1    A.    He did.

2    Q.    Did he initial each right as he read them?

3    A.    Yes, ma'am, he did.

4    Q.    Did he read all of it and then initial all of it or did

5    he initial one by one?

6    A.    No.  He read the -- there is two lines to each one.  He

7    read those two lines, initialed it, read the two lines,

8    initialed it, read the two lines, initialed it.

9    Q.    After he initialed and signed the Miranda portion of the

10   statement form, what happened next?

11   A.    I allowed him to -- right where he was sitting I handed

12   it to him and allowed him to read the entire document at his

13   leisure, as fast or as slow as he needed to.

14   Q.    Had you read what you were typing out loud to him while

15   you were preparing the statement?

16   A.    Yes, ma'am.

17   Q.    So had he heard, sitting next to you, all of it read out

18   loud before you printed it?

19   A.    He had heard it read out loud before.  He was able to

20   view it on the second monitor to allow him to follow as I was

21   typing.

22   Q.    And then you gave him the printed version and asked him

23   to read that to himself?

24   A.    Yes, ma'am.

25   Q.    Did he appear to take the time to read it?

257

DEWAYNE BAILLARGEON - Direct By Ms. Fletcher

1   A.   He did.

2   Q.   Did you ask him if there was anything that he wanted to

3   change, add or delete after he read the printed version?

4   A.   I did.

5   Q.   What has his response?

6   A.   He said no.  It looks fine.

7   Q.   What happened next?

8   A.   The next thing I would do is explained the signature

9   process to him.  On the top of each page we initialed it

10  indicating the page number, one of two or two of two or one of

11  three.  I initialed it.  He initialed.  Proceeded to the

12  bottom, made an indication that it was the end of the page.  He

13  was allowed to initial that as well.  The next page, we did the

14  same thing, initials, and on the signature page, he was allowed

15  to read through everything and again sign.

16  Q.   Did he do that?

17  A.   He did.

18  Q.   Was he handcuffed at that time?

19  A.   He still was not.

20  Q.   What happened next?

21  A.   At that time, while he was reading, Trooper Lamarch had

22  come by the door of my office and indicated that he was back.

23  So as soon as he was done reading and signing it, I advised

24  Trooper Lamarch to come take Mr. LaPorte into custody.

25  Q.   Was he arrested at that time?

---

258

DEWAYNE BAILLARGEON - Direct By Ms. Fletcher

1   A.   He was, yes.

2   Q.   What happened with him then?

3   A.   He was taken down and processed by Trooper Lamarch.

4   Q.   I am going to hand you Government's Exhibit 2 for

5   identification.

6   A.   Thank you.

7   Q.   Do you recognize that exhibit?

8   A.   Yes, ma'am, I do.

9   Q.   What is that?

10  A.   This is the New York State Police voluntary statement,

11  written statement that I took from Stacey LaPorte on May 17th.

12       MS. FLETCHER:  Judge, at this time I would move

13  Exhibit 2 into evidence.

14       THE COURT:  Any objection?

15       MR. WOLFSON:  No objection, Your Honor.

16       THE COURT:  Received.

17       (Exhibit No. 2, received.)

18       MS. FLETCHER:  I am going to ask to publish that at

19  this time starting with page one.

20  BY MS. FLETCHER, CONTINUED:

21  Q.   And, Investigator Baillargeon, first of all, looking at

22  page one you indicated that there were signatures and initials.

23  So let's start at the top, page one of three, and there are

24  some initials at the top right corner?

25  A.   Yes, ma'am.

---

259

DEWAYNE BAILLARGEON - Direct By Ms. Fletcher

1   Q.   Whose initials are they?

2   A.   Those are Stacey LaPorte's and mine.

3   Q.   And at the bottom it says end of page one and there is

4   initials, whose initials are they?

5   A.   Stacey LaPorte's.

6   Q.   And then I am going to have you read the document

7   starting -- read page one of the document right now starting at

8   I, Stacey J. LaPorte, Jr.

9   A.   I Stacey J. LaPorte, Junior, age twenty-five, and born on

10  September 23, 1990, and residing at 52 Maple Street, Apartment

11  3, Massena, New York have been advised by Investigator Dewayne

12  R. Baillargeon of the New York State Police of the following:

13       I have the right to remain silent, and I do not have to

14  make any statement if I do not want to.  If I give up that

15  right, anything I do say can and will be used against me in a

16  court of law.  I have the right to have a lawyer present before

17  making any statement or at any time during this statement.  If

18  I should decide that I do not want a lawyer and cannot afford

19  to hire one, a lawyer will be appointed for me free of charge

20  and I may have that lawyer present before making any statement.

21       I also understand that I have the right to stop at any

22  time during this statement and remain silent and have a lawyer.

23  I fully understand these rights and at this time I agree to

24  give up my rights and make the following statement.

25  Q.   Let me stop you there for a second.  I want to go up to

---

260

DEWAYNE BAILLARGEON - Direct By Ms. Fletcher

1   the very first paragraph.  It says residing at 52 Maple Street,

2   Apartment 3, Massena, New York.  Who gave you that information?

3   A.   He did.

4   Q.   That was what he indicated to you in May of 2016 was his

5   current address?

6   A.   Yes, ma'am.

7   Q.   Where did you find him on that day?

8   A.   245 North Main Street in Massena at the apartment of

9   Paul Fregoe.

10  Q.   If you could read the narrative portion starting after

11  his signature of the rights?

12  A.   I am at the state police barracks in Massena speaking

13  with Investigator Dewayne Baillargeon of the New York State

14  Police with regards to sexual intercourse I had with my sister

15  B.L..  I am giving this statement of my own free will.

16       When I two, three olds until I was five or six years old,

17  my grandfather, Douglas Judware abused me.  He would touch my

18  dick and he would touch mine.  He would make me jerk him off.

19  It stopped when I was five or six years old because I told my

20  mom and dad.  I mean an investigation was done and he lost his

21  job as a school bus driver, but no physical evidence, and he

22  did not get charged and he kept living his life.  After my

23  sister was born I was --

24  Q.   I am going to stop you there.  Can you back up, please?

25  You skipped a part.

---

261

DEWAYNE BAILLARGEON - Direct By Ms. Fletcher

1   A.   I am sorry.  Where was I?

2   Q.   After my sister -- start with that.

3   A.   After my sister B.L. was born, I was nine or ten years

4   old, my mother, Mandy L. LaPorte, starting abusing me.  She

5   would always drink and smoke marijuana at night.  She would

6   wake me up --

7   Q.   Hang on.  We need to switch to page two, please.

8   A.   She would wake me up by touching my dick.  She would tell

9   me to get into her room and she would get undressed.  She would

10  tell me to do stuff like finger her and made me put my dick in

11  her pussy.  This would happen almost every night especially

12  when she was drinking or smoking pot.  This was for about a

13  year.  I was about eleven years old.  I went to live with my

14  dad in Brasher Falls.

15       I was about sixteen when I moved to Massena with my mom,

16  my sister, and my little brother.  We moved to Town Line Road.

17  We lived there until I was nineteen years old.  We moved from

18  there to 2 Willow Street, Massena, after a house fire.  We

19  lived there for a couple of months, and then we moved to 64

20  Grantville Road in Norfolk.

21       In 2010, my mom found out she had cancer and had to go to

22  the hospital and they kept her over night.  I stayed in the

23  house with B.L..  I think she was eleven or twelve years old.

24  We started texting on my sister's Ipod in the Notes app.  I was

25  asking her if she remembered what grandpa used to do us when we

262

DEWAYNE BAILLARGEON - Direct By Ms. Fletcher

1   were little, and she said yes.

2        We were using the same Ipod to text back and forth.  I

3   would type something and hand it to her.  I asked her if she

4   wanted to continue what grandpa started, and she said yes.  I

5   went into the bedroom and she took off her own clothes and I

6   took off mine.  I had an erection.  She laid down on the bed on

7   her side.  I laid down behind her, and I put my dick inside

8   her.  It was like five minutes.  I pulled out of her and

9   ejaculated.  I don't remember where it went.  She went into the

10  bathroom and cleaned herself up.  We got dressed and went back

11  out into the living room.

12       My mom, B.L., and Kyler moved to Felts Mills with my

13  mother.  I stayed with my friends on Grantville Road.  I never

14  had sex with B.L. when she was living in Felts Mills with my

15  mother.  My mother died on September 11, 2013.  My sister moved

16  back to Brasher Falls with our father.  Six months later my

17  father died, and my sister moved in with me and Sinclair Bab at

18  2 Willow Street, Massena.  We had sex once or twice.  I

19  don't remember the particulars.  It did happen a few times when

20  I was drunk.

21       We moved from there to 52 Maple Street, Apartment 2 in

22  the Village of Massena.  B.L. and I had sex there two or three

23  more times.  It was always agreed upon by both of us.  I never

24  forced her.  We moved from Maple to Somerset Avenue.  I lived

25  there with Mackenzie Bailey, A.T., me, and B.L..  B.L. and I

263

DEWAYNE BAILLARGEON - Direct By Ms. Fletcher

1   had sex two or three times when we lived there.  I don't

2   remember all the details, but each time I stuck my dick in her

3   pussy.  I never ejaculated inside her.  I always ejaculated on

4   her or on the bed.

5        We moved to 18 Talcott Street.  We had sex four more

6   times when we lived there.  We were there for about 8 months

7   and we moved to the cabin in Chase Mills.  I lived there with

8   Mackenzie, B.L., and A.T..  Over the next two or three months,

9   we had sex three or four times.  It usually happened when we

10  were alone, and I was having a bad day remembering my abuse and

11  dealing with my parents' death.  We lived in the cabin for

12  about two or three months.

13       And we moved to Glenn Street in the Village of Massena.

14  I think we had sex twice while I lived there.  That was when

15  everything happened, and she left and ran away.  Nicholas Emens

16  came to my house on Glenn Street to get his XBox with my sister

17  B.L. because I told him I needed to talk to her.  I thought she

18  was going to run away.  We started talking and asking what was

19  going on, what were her plans.  She told me she was not running

20  away, and we started arguing.  I told her I had enough and we

21  should just die and be with our parents.  She took it as a

22  threat.

23       After they left, I tried to get ahold of Nick by calling

24  and texting him because he was supposed to be my best friend.

25  He never answered me back after I texted him.  I have not had

264

DEWAYNE BAILLARGEON - Direct By Ms. Fletcher

1   sex with B.L. since she left my house on Glenn Street.

2   Q.   And he signed on that line that says end of statement?

3   A.   Yes, ma'am, he did.

4   Q.   In the statement the defendant mentions a number of

5   locations where he had sexual intercourse with his sister B.L.?

6   A.   Yes, ma'am, he does.

7   Q.   Are you familiar with each of the locations mentioned in

8   his statement?

9   A.   I am.

10  Q.   How are you familiar with those locations?

11  A.   I have lived in the area a long time.  I have been a

12  police officer for seventeen years.  They are all very close to

13  where I work.

14  Q.   Behind you there is Government's Exhibit 3, which is a

15  map.  Do you recognize the map and the locations depicted on

16  the map?

17  A.   Yes, ma'am, I do.

18  Q.   Are each of those locations that were mentioned by the

19  defendant in his statement as to where he abused his sister

20  B.L.?

21  A.   Yes, ma'am.

22  Q.   Who took the pictures?

23  A.   Myself and Special Agent Willard (phonetically).

24  Q.   Does the map accurately depict each of the locations,

25  where they are and what they look like?

265

DEWAYNE BAILLARGEON - Direct By Ms. Fletcher

1  A.  Yes, ma'am, they do.

2  Q.  Did your investigation reveal approximate dates that the

3  defendant lived in each of those locations?

4  A.  Yes.

5  Q.  And are those dates on that map as well as the address?

6  A.  Yes, they are.

7  Q.  So I am going to have you, with the Court's permission,

8  have you come down to the map.

9      MS. FLETCHER:  If that is okay, Judge?

10     THE COURT:  You may.

11 BY MS. FLETCHER, CONTINUED:

12 Q.  First, the defendant stated that he and B.L. -- or that

13 B.L. moved in with him and Sinclair Bab at 2 Willow Street in

14 Massena.  Could you point that out to the jury, please?

15 A.  Yes, ma'am.  It is at this location in the center.

16 Q.  So the location is at the end of the arrow and the

17 picture is right there on the side; is that correct?

18 A.  That is correct.

19 Q.  2 Willow Street, does that have a name in the community

20 that people refer to it as?

21 A.  It is usually referred to as the OTB building.

22 Q.  Why is it referred to as the OTB?

23 A.  It was previously owned and used as an Off Track Betting

24 location.  It was bought by an individual at which time it was

25 converted into apartments.

266

DEWAYNE BAILLARGEON - Direct By Ms. Fletcher

1  Q.  And so now it is apartments?

2  A.  Yes, ma'am.

3  Q.  What dates did your investigation reveal approximately

4  that the defendant lived at that location with B.L.?

5  A.  From March of 2014 through June of 2014.

6  Q.  From there, where did they move?

7  A.  52 Maple Street.

8  Q.  Where is that located on the map?

9  A.  It is located in this location.

10 Q.  And the picture is above it?

11 A.  Yes, ma'am.

12 Q.  And what dates did your investigation reveal that he and

13 B.L., Mackenzie, and A.T. lived at that location?

14 A.  From June of 2014 through September of 2014.

15 Q.  After that, where did he tell you that they lived?

16 A.  He said they lived at 8 Somerset Avenue, which is

17 indicated here, which is in this location.

18 Q.  What dates did your investigation reveal they were at

19 that location?

20 A.  From September of 2014 through January of 2015.

21 Q.  Where was the next place that they lived?

22 A.  It is indicated on here as four, and that would be 18

23 Talcott Street.

24 Q.  And the dates that they were there?

25 A.  They were there from January 2015 through July of 2015.

267

DEWAYNE BAILLARGEON - Direct By Ms. Fletcher

1  Q.  And where did they move to from Talcott Street?

2  A.  It is indicated on here as number five.  It is a small

3  cabin located on county route 36 in the Town of Loisville.

4  Q.  So the arrow kind of points off the map.  It is not that

5  particular location, but somewhere -- where in relation to the

6  Village of Massena?

7  A.  It would be about four miles outside the village

8  westerly.

9  Q.  What dates did they live in the cabin?

10 A.  From July of 2015 through December of 2015.

11 Q.  And what was the final location where the defendant lived

12 with B.L. and Mackenzie Bailey and A.T.?

13 A.  It is located in the center of the map.  It is probably

14 this location near the Massena Public Library.  And they were

15 there from December of 2015 through March of 2016.

16 Q.  What is the address of that location?

17 A.  44 Glenn Street.

18     MS. FLETCHER:  Thank you.  Please take the stand.

19 BY MS. FLETCHER, CONTINUED:

20 Q.  Before you interviewed the defendant in May of 2016, did

21 you through your investigation know about each of these

22 locations where he and B.L. had lived together?

23 A.  Yes, ma'am, I did.

24 Q.  Before your interview of the defendant in May of 2016,

25 did you know that B.L. had been abused in each of these

268

DEWAYNE BAILLARGEON - Direct By Ms. Fletcher

1  locations?

2  A.  No, I didn't.

3  Q.  Which location did you not know that she had been abused

4  in before he told you?

5  A.  The abuse had not been disclosed at 8 Somerset.

6  Q.  Was it later disclosed?

7  A.  Yes, it was.

8  Q.  Did there come a time in your investigation that you

9  began looking into the possible abuse of A.T.?

10 A.  Yes, ma'am.

11 Q.  At the time you interviewed the defendant, were you

12 looking into the abuse of A.T. or any other victims?

13 A.  No, I was not.

14 Q.  At the time you interviewed the defendant, who was the

15 only victim that you were investigating?

16 A.  B.L..

17 Q.  When did you become aware of and begin investigating the

18 abuse of A.T.?

19 A.  Specifically June 8th of 2016.

20 Q.  How did that come about?

21 A.  I had -- through the investigation, the name

22 Mackenzie Bailey had come up several times as a possible

23 witness to the abuse of B.L..  I had not had an opportunity to

24 interview her until June 8th.

25 Q.  Had anyone disclosed to you before you interviewed

269

DEWAYNE BAILLARGEON - Direct By Ms. Fletcher

1    Mackenzie that she had been involved with any abuse of B.L.?

2    A.   No.

3    Q.   The defendant didn't say that to you?

4    A.   The defendant?  Of Mackenzie?

5    Q.   Yes?

6    A.   No.

7    Q.   Stacey LaPorte did not tell you that Mackenzie Bailey had

8    been involved?

9    A.   He had not.

10   Q.   And at the time you interviewed Mackenzie Bailey on

11   June 8th, did you have any photographic evidence regarding the

12   abuse of A.T.?

13   A.   No, I did not.

14   Q.   Following your interview of Mackenzie Bailey, did you

15   have evidence that A.T. had been also victimized in this case?

16   A.   Yes, ma'am.

17   Q.   Did you begin an investigation into that abuse after that

18   interview?

19   A.   I did.

20   Q.   Did there come a time after that that the New York State

21   Police began looking into the abuse of C.T.?

22   A.   Yes, ma'am.

23   Q.   Who was assigned to that investigation?

24   A.   Investigator Nicholas Arcadi.

25   Q.   Did there come a time that C.T. was confirmed to be a

270

DEWAYNE BAILLARGEON - Direct By Ms. Fletcher

1    victim in this matter as well?

2    A.   Yes, ma'am, it did.

3    Q.   What date was that?

4    A.   It would be June 10th of 2016.

5    Q.   Under what circumstances was it that she was confirmed to

6    be a victim in this case?

7    A.   Hillary Trimm had been interviewed by

8    Investigator Arcadi.

9    Q.   Did the investigation into the acts committed against

10   A.T. and C.T. continue then after June 10th?

11   A.   Yes, ma'am, it did.

12   Q.   Investigator Baillargeon, what is a multidisciplinary

13   team?

14   A.   A multidisciplinary team is a team that is often conveyed

15   in situations such as this where there is multiple

16   disciplinaries, Child Protective Services, other police

17   agencies, all brought together into a meeting which allows us

18   to share information to prosecute possible violations of the

19   New York State Penal Law.

20   Q.   Were multidisciplinary team meetings convened in relation

21   to this investigation?

22   A.   They were.

23   Q.   About how many?

24   A.   There were two.

25   Q.   Where did they take place?

271

DEWAYNE BAILLARGEON - Direct By Ms. Fletcher

1    A.   SP Massena.

2    Q.   Do you know when?

3    A.   They took place in June of 2016 and again in July of

4    2016, approximately four weeks apart.

5    Q.   What happened after the July meeting of the

6    multidisciplinary team?

7    A.   The HSI was contacted with regards to taking the case

8    over.

9    Q.   HSI being Homeland Security Investigation?

10   A.   Yes, ma'am.

11   Q.   Why was it determined that a federal agency should be

12   brought in?

13   A.   Because on several of the devices that were obtained

14   during the investigation there was evidence of child

15   pornography.

16   Q.   Were you aware of the production of any child pornography

17   relating to this matter at the time you interviewed

18   Stacey LaPorte?

19   A.   No, I was not.

20   Q.   Were you aware of the production of any child pornography

21   related to this matter at that time you interviewed

22   Mackenzie Bailey?

23   A.   I was not.

24   Q.   Did she reveal any to you?

25   A.   She did not.

272

DEWAYNE BAILLARGEON - Direct By Ms. Fletcher

1    Q.   Did he reveal any to you?

2    A.   He being?

3    Q.   Stacey LaPorte?

4    A.   No, ma'am.

5    Q.   Did there come a time that your investigation expanded,

6    again, to include potential crimes by the defendant involving

7    C.F. and J.M.?

8    A.   Yes, it did.

9    Q.   What is C.F. and J.M.'s relation to one another?

10   A.   They are brother and sister.

11   Q.   Did you interview C.F.?

12   A.   I did.

13   Q.   When was the first time you interviewed her?

14   A.   September of 2016.

15   Q.   Where?

16   A.   At the SP Canton facility.

17   Q.   When we say SP, that means what?

18   A.   State Police.

19   Q.   So like a state police barracks would be known as an SP?

20   A.   Yes, ma'am.

21   Q.   Did you interview J.M.?

22   A.   I did.

23   Q.   When did that interview take place?

24   A.   It took place in October of 2016.

25   Q.   Where did that interview take place?

273

DEWAYNE BAILLARGEON - Direct By Ms. Fletcher

1   A.   It took place at SP Massena.

2   Q.   Did your investigation uncover produced images relevant

3   to C.F. and J.M.?

4   A.   It did.

5   Q.   Were the images recovered before your first interview of

6   C.F.?

7   A.   They were.

8   Q.   Had they been recovered before your interview of J.M.?

9   A.   Yes.

10  Q.   I am going to show you Exhibit 16A and 16B for

11  identification.  Do you recognize those images?

12  A.   I do.

13  Q.   What are they?

14  A.   Images are of a hand and a penis and a green pair of

15  shorts and then two abdominal areas near the genitals.

16  Q.   Who is J.M. and C.F.'s mother?

17  A.   Jean Merriam.

18  Q.   Was she at the state police barracks when you interviewed

19  J.M. in October of 2016?

20  A.   Yes, ma'am, she was.

21  Q.   Did you show those recovered images to Jean Merriam?

22  A.   I did.

23  Q.   After that, did she turn over an item of evidence to you?

24  A.   She did.

25  Q.   What did she turn over?

---

274

DEWAYNE BAILLARGEON - Direct By Ms. Fletcher

1   A.   The green pair of shorts that are indicated in this

2   photograph.

3   Q.   I am going to hand you what is marked as Exhibit 25.  Do

4   you recognize that?

5   A.   I do.  These are the shorts provided to me from

6   Jean Merriam on October 4, 2016.

7   Q.   What is the relevance of those shorts?

8   A.   They are in the photograph that depicts --

9            THE COURT:  What exhibit number is that?

10           MS. FLETCHER:  Twenty-five.

11  BY MS. FLETCHER, CONTINUED:

12  Q.   They are in the photograph that you just identified?

13  A.   With the hand and the penis, yes.

14  Q.   Did she then turn them over to your custody?

15  A.   She did.

16           MS. FLETCHER:  Judge, at this time I move

17  Exhibit 25.

18           THE COURT:  Any objection.

19           MR. WOLFSON:  No objection, Your Honor.

20           THE COURT:  Received.

21           (Exhibit No. 25, received.)

22  BY MS. FLETCHER, CONTINUED:

23  Q.   I am going to hand you back 16A and 16B.

24  A.   Thank you.

25  Q.   Are those the pictures that you showed to Jean Merriam?

---

275

DEWAYNE BAILLARGEON - Direct By Ms. Fletcher

1   A.   Yes, ma'am, they are.

2   Q.   As a result of that she brought you those shorts?

3   A.   She did.

4            MS. FLETCHER:  Judge, I would move Exhibit 16A and B

5   at this time.

6            THE COURT:  Any objection?

7            MR. WOLFSON:  No objection, Your Honor.

8            THE COURT:  Received.

9            (Exhibit No. 16A and 16B, received.)

10  BY MS. FLETCHER, CONTINUED:

11  Q.   I am going to ask to publish Exhibit 16A.  What is

12  depicted in this picture?

13  A.   There is a hand with nail polish, a penis and green

14  shorts.

15  Q.   Are those the green shorts that you just had in your hand

16  as Exhibit 25?

17  A.   Yes, ma'am, they are.

18           MS. FLETCHER:  I have no further questions.  Thank

19  you.  We can take the exhibit down, please.

20           THE COURT:  Mr. Wolfson, you may examine.

21           MR. WOLFSON:  Thank you, Judge.

22

23  CROSS-EXAMINATION BY MR. WOLFSON:

24  Q.   Good morning, Investigator Baillargeon.  You testified

25  that you handled the initial investigation as related to B.L.?

---

276

DEWAYNE BAILLARGEON - Cross by Mr. Wolfson

1   A.   That's correct.

2   Q.   And you testified that she is under eighteen?

3   A.   Yes, I did.

4   Q.   And it is best practices to have a forensic interview

5   when someone is under eighteen, right?

6   A.   I am sorry.  I don't understand you.

7   Q.   You testified before the Grand Jury on September 19,

8   2016, right?

9   A.   Yes, sir.

10  Q.   And there you testified that it is best practices to have

11  a forensic interview when someone is under eighteen?

12  A.   Up to the age of eighteen.

13  Q.   When you were answering those questions, you said the

14  forensic interview was important because it doesn't lead a

15  child?

16  A.   That is correct.

17  Q.   But before you conducted the forensic, you interviewed

18  B.L., yourself?

19  A.   I did.

20  Q.   But you are not trained to conduct forensic interviews of

21  children?

22  A.   I am.

23  Q.   You testified that on sent 29th that you weren't?

24  A.   I wasn't at that point in time.  I have since been

25  trained.

---

277

DEWAYNE BAILLARGEON - Cross by Mr. Wolfson

1   Q.   Okay.  So when you were actually interviewing B.L. you
2   hadn't been trained?
3   A.   I had not at that point.
4   Q.   During this investigation you learned that C.F. was
5   involved in this case?
6   A.   I did.
7   Q.   And had you learned that C.F. would lie to her mother?
8        MS. FLETCHER:  Objection.
9        THE COURT:  Overruled.  Cross-exam.
10  BY MR. WOLFSON, CONTINUED:
11  Q.   The question was you learned that C.F. would lie to her
12  mother?
13  A.   Occasionally.
14  Q.   Specifically she would lie about hanging out with B.L.
15  when she was really going over to Mackenzie and Stacey's
16  apartment?
17  A.   I didn't interview C.F. at that point in time.
18  Q.   And you did take a statement from Stacey LaPorte, right?
19  A.   I did.
20  Q.   And you typed up this statement at the police barracks in
21  Massena?
22  A.   Yes, sir, I did.
23  Q.   He didn't write the statement, himself?
24  A.   He did not.
25  Q.   You didn't let him sit at the computer and type it up?

278

DEWAYNE BAILLARGEON - Cross by Mr. Wolfson

1   A.   He sat next to me.
2   Q.   And he was handcuffed to the floor at that point?
3   A.   He was not.
4   Q.   You testified at the State Grand Jury that you didn't
5   type up Stacey LaPorte's statement verbatim, right?
6   A.   It is not verbatim.
7   Q.   Instead you typed it up in sum and substance, correct?
8   A.   That's correct.
9   Q.   Did you also testify that you didn't have him read any
10  portion of that statement back to you?
11  A.   He did not read it back to me.  He read it to himself.
12  Q.   He did not have his glasses on at that point?
13  A.   He did not.
14  Q.   And Officer Lamarch is the one that brought Stacey to the
15  police barracks?
16  A.   He did.
17  Q.   When he was there he was friendly?
18  Q.   Who was friendly?
19  Q.   Stacey?
20  A.   Yes.
21  Q.   And he was cooperative?
22  A.   He was.
23  Q.   And he spoke to you voluntarily even after you told him
24  he didn't have to?
25  A.   Yes, he did.

279

DEWAYNE BAILLARGEON - Cross by Mr. Wolfson

1   Q.   The apartment where he was picked up, he didn't own,
2   right?
3   A.   I am sorry, he didn't --
4   Q.   The apartment where Stacey was picked up wasn't owned by
5   Stacey, was it?
6   A.   No, it was not.
7   Q.   Paul Fregoe owned that apartment?
8   A.   I wouldn't be able to tell you who owns the apartment.  I
9   know Paul Fregoe is the person that was there when I picked him
10  up.
11  Q.   Okay.  Did you also have the opportunity to interview
12  Mackenzie Bailey?
13  A.   I did.
14  Q.   Did you learn that she was romantically involved with
15  Stacey?
16  A.   I did.
17  Q.   Did you also learn that she was romantically involved
18  with Hillary Trimm?
19  A.   I don't recall if she told me that or not at that point.
20  Q.   You also interviewed B.L.?
21  A.   Yes, sir, I did.
22  Q.   And that interview was recorded pursuant to New York
23  State Police guidelines?
24  A.   For B.L.?
25  Q.   Yes.

280

DEWAYNE BAILLARGEON - Cross by Mr. Wolfson

1   A.   At the time, yes.
2   Q.   And you interviewed J.M.?
3   A.   I did.
4   Q.   And that interview was also recorded?
5   A.   It was.
6   Q.   But Stacey LaPorte's was not?
7   A.   It was not.
8   Q.   And you said the equipment was available?
9   A.   The equipment was newly installed, but my training had
10  not been put in place yet.
11  Q.   And you had been an investigator for seventeen years?
12  A.   No, I was not an investigator for seventeen years.  I was
13  an investigator for four years.
14  Q.   And there was no one else in the police barracks that
15  could help you with the recording equipment?
16  A.   There was no one else.
17  Q.   And you couldn't wait for Trooper Lamarch to come back to
18  help you?
19  A.   I was unaware of how long it would take Trooper Larmarch
20  to get back to the station.
21  Q.   You couldn't call Trooper Lamarch or anyone else to help?
22  A.   Not when I was engaged in an interview.
23  Q.   You couldn't put it off for the five minutes it would
24  take to call someone and ask for help?
25  A.   Unfortunately at that point, no.

281

DEWAYNE BAILLARGEON - Cross by Mr. Wolfson

1  Q.  So long story short, there is no audio recording of
2  Stacey Laporte making his statement?
3  A.  There is not.
4  Q.  And there is no video recording?
5  A.  There is not.
6  Q.  As part of your investigation you made an unannounced
7  visit to the home where Stacey LaPorte was staying at 44 Glenn
8  Street on January 16, 2016?
9  A.  No, sir, I did not.
10  Q.  You did write in an e-mail to Toni Salerno that you
11  visited this house at 44 Glenn Street on January 16th, is that
12  not true?
13  A.  I don't recall going to Glenn Street.
14  Q.  Would you seeing your e-mail refresh your recollection?
15  A.  It may.
16         MR. WOLFSON:  May I approach?
17         THE COURT:  You may.
18  A.  This is actually Toni Salerno's notes.  This is written
19  by Toni Salerno.  She was the one that made an unannounced
20  visit to 44 Glenn Street.
21  BY MR. WOLFSON, CONTINUED:
22  Q.  Okay.  Understood.  My apologies.  Now, before you
23  interviewed Stacey LaPorte, you hadn't any allegations about
24  any abuse being committed against A.T.?
25  A.  B.L. had mentioned in her statement that she -- at the

282

DEWAYNE BAILLARGEON - Cross by Mr. Wolfson

1  very end of it she had said that there were things that he had
2  done to her as well other children, and she listed them.
3  Q.  And turning to Stacey's statement, you testified that it
4  began at 6:04 p.m.?
5  A.  That's correct.
6  Q.  But on the voluntary statement sheet it says the
7  statement start time was 7:30; is that not true?
8  A.  That is correct.
9  Q.  Okay.  And you testified during the first Grand Jury that
10  you arrived at Paul's apartment at 5:30?
11  A.  I may have.  I was unaware at the time, but after
12  checking the radio logs I was able to identify exactly what
13  time.
14         MR. WOLFSON:  I have no further questions.
15         THE COURT:  Redirect, if any.
16         MS. FLETCHER:  Thank you, Your Honor.
17
18  REDIRECT EXAMINATION BY MS. FLETCHER:
19  Q.  Investigator Baillargeon, could you just clarify the 6:04
20  and the 7:30, what the difference is in beginning the
21  defendant's statement at 6:04 and what happened then and what
22  happened at 7:30.
23  A.  Absolutely.  At 6:04 we were in the interview room and
24  began talking, engaged in conversation, getting through
25  everything we needed to get through.  It is a sensitive subject

283

DEWAYNE BAILLARGEON - Redirect by Ms. Fletcher

1  to talk about.  At 7:30 I began typing in my office.
2  Q.  So when Mr. Wolfson asked you about whether this typed
3  statement is verbatim, it isn't verbatim the ninety
4  minute -- it isn't a transcription of that ninety minute
5  interview; is that correct?
6  A.  That's correct.
7  Q.  It is a summary of that ninety minute interview?
8  A.  Yes.
9  Q.  Who is Toni Salerno?
10  A.  Toni Salerno would be a Child Protective Services worker
11  who was tasked with the B.L. investigation on the CPS side.
12  Q.  So if B.L. reported the abuse by her brother in January
13  of 2016, was Toni Salerno, the CPS worker, assigned?
14  A.  Yes, she was.
15  Q.  And so the e-mail that Mr. Wolfson just showed you was
16  from Toni Salerno indicating her participation in the
17  multidisciplinary part of the investigation; is that correct?
18  A.  Yes it is.
19         MS. FLETCHER:  I have no further questions.
20         THE COURT:  Anything else Mr. Wolfson.
21         MR. WOLFSON:  No, Your Honor.  Thank you.
22         THE COURT:  Okay.  Thank you, Officer.  You may be
23  excused.
24         (Whereupon, the Witness is excused.)
25         THE COURT:  And, members of the jury, we will take

284

1  our break for this morning now, about ten, fifteen minutes and
2  remind you again not to discuss the case among yourselves or
3  anyone else, and we will be back in about fifteen minutes.
4  Thank you.
5         (Whereupon, a brief recess was taken.)
6         (Whereupon, the proceedings were held in open court
7         in the presence of the Jury.)
8         THE COURT:  Ms. Fletcher, the government may call
9  its next witness.
10         MS. FLETCHER:  The government calls B.L..
11
12         B.L. having been called as a Witness, being first duly
13  sworn, was examined and testified as follows under oath:
14
15  DIRECT EXAMINATION BY MS. FLETCHER:
16  Q.  B.L., how old are you?
17  A.  I am eighteen.
18  Q.  What is your date of birth?
19  A.  6/1/99.
20  Q.  What year are you in school currently?
21  A.  I am in twelfth grade.
22  Q.  Are you graduating this year?
23  A.  Yes.
24  Q.  When is your graduation?
25  A.  June 23rd.

285

B.L. - Direct By Ms. Fletcher

1   Q.   Have you been accepted to college?

2   A.   Yes.

3   Q.   What are you going to be studying?

4   A.   Computer science.

5   Q.   Are you also currently holding a part time job?

6   A.   Yes.

7   Q.   What are you doing?

8   A.   I am a cashier at a hardware store.

9   Q.   Do you have other responsibilities at your job other than

10  cashier?

11  A.   Yes.

12  Q.   What other responsibilities do you have?

13  A.   I help out customers.  I do pricing, and I organize

14  shelves.

15  Q.   How long have you been working?

16  A.   Like two months.

17  Q.   B.L., who do you live with now?

18  A.   My foster family, the Fretwells.

19  Q.   Who else lives with the Fretwells?

20  A.   Two biological children and three other foster children.

21  Q.   B.L., how long have you been in foster care?

22  A.   A year and two months.

23  Q.   Have you been with the Fretwells for that entire time?

24  A.   Yes.

25  Q.   Do you enjoy living there?

286

B.L. - Direct By Ms. Fletcher

1   A.   Yes.

2   Q.   What is your relationship to the defendant in this case

3   Stacey J. LaPorte, Jr.?

4   A.   I am his younger sister.

5   Q.   How much older than you is he?

6   A.   Nine years.

7   Q.   What is his date of birth?

8   A.   September 23rd 1990.

9   Q.   Do some people call him Joey?

10  A.   Yes.

11  Q.   Where does that name come from?

12  A.   From his middle name, Joseph.

13  Q.   Which name do you use?

14  A.   Joey unless I am mad at him, then I call him Stacey.

15  Q.   What do you mean by unless you are mad you call him

16  Stacey, does he not like that?

17  A.   Not really.

18  Q.   Do you see your brother in the courtroom today?

19  A.   Yes.

20  Q.   Can you identify him please for the jury?

21  A.   He is over there.

22  Q.   What is he wearing?

23  A.   Black shirt and it looks like sunglasses.

24        MS. FLETCHER:  Let the record reflect she has

25  identified the defendant.

287

B.L. - Direct By Ms. Fletcher

1         THE COURT:  So noted.

2   BY MS. FLETCHER, CONTINUED:

3   Q.   B.L., do you have another sibling?

4   A.   Yes.

5   Q.   Who is that?

6   A.   That is Kyler, my younger brother.

7   Q.   Do you know how old Kyler is?

8   A.   Ten.

9   Q.   Who does he live with?

10  A.   My Aunt Michelle.

11  Q.   Does Kyler have some special challenges?

12  A.   Yes, he has a slight learning disability.

13  Q.   B.L., what was your mother's name?

14  A.   Mandy LaPorte.

15  Q.   Did you live with her when you were younger?

16  A.   Yes.

17  Q.   When you lived with your mother, did your father live

18  with you also?

19  A.   No, never.

20  Q.   Did there come a time that your mother passed away?

21  A.   Yes.

22  Q.   How old were you when you mother passed away?

23  A.   I was fourteen.

24  Q.   Had she been sick?

25  A.   Yes.

288

B.L. - Direct By Ms. Fletcher

1   Q.   What was wrong with her?

2   A.   She had stage four cancer.

3   Q.   Did you live with her throughout her cancer and her

4   cancer treatments?

5   A.   Yes.

6   Q.   Where did you live with your mom when she was sick?

7   A.   At first we lived on Grantville Road which was in

8   Raymondville, and then we moved to Felts Mills with my aunt.

9   Q.   Who lived on Grantville Road when you were there?

10  A.   Me, my mom, my little brother, four constantly and my

11  brother, older brother, and his girlfriend off and on.

12  Q.   Your older brother being the defendant?

13  A.   Yes.

14  Q.   Who was his girlfriend at that time?

15  A.   Rochelle.

16  Q.   Did he and Rochelle have children together?

17  A.   Yes.

18  Q.   And why did you move from Grantville Road?

19  A.   Because I couldn't take care of mom by myself anymore.

20  Q.   How old were you?

21  A.   Fourteen.

22  Q.   And you were taking care of your mom?

23  A.   I started taking care of her when I was thirteen.

24  Q.   Is that when she was diagnosed with cancer?

25  A.   Yes.

289

B.L. - Direct By Ms. Fletcher

1  Q.  Where did you move to?

2  A.  We moved to Felts Mills with my aunt.

3  Q.  Who lived with you at Felts Mills?

4  A.  It was me, my mom, my little brother Kyler, my Aunt

5  Michelle, my Uncle Ray, and off and on his kids would come over

6  and stay the weekend.

7  Q.  Were you living at Felts Mills when your mom passed away?

8  A.  Yes.

9  Q.  Were you there?

10  A.  Yes.

11  Q.  Were you there when your mom passed away?

12  A.  Yes.

13  Q.  At home?

14  A.  Yes, right in the living room.

15  Q.  Do you remember what day that was?

16  A.  September 11, 2013.

17  Q.  Where did you go to live after your mom passed away?

18  A.  A month after my mom passed away, I moved in with my

19  father.

20  Q.  Had you ever lived with him before?

21  A.  No.

22  Q.  What about Kyler?

23  A.  He stayed behind with my Aunt Michelle.

24  Q.  Has he lived with your Aunt Michelle ever since?

25  A.  Yes.

290

B.L. - Direct By Ms. Fletcher

1  Q.  Did you have much of a relationship with your father

2  before you moved in?

3  A.  Not really a close one.

4  Q.  Who else lived there when you moved in with your father?

5  A.  It was me, my father and his girlfriend, Fran.

6  Q.  How did you live with your father?

7  A.  Five months and five days before he passed away.

8  Q.  What day did he pass away?

9  A.  March 17, 2014.

10  Q.  How old were you?

11  A.  Fourteen.

12  Q.  Do you know what his cause of death was?

13  A.  No, he the second one in either twenty-five or fifty

14  years, but they do not know.

15  Q.  Where did he die?

16  A.  Right in the living room at home.

17  Q.  Were you there?

18  A.  Yes.

19  Q.  Did you see it happen?

20  A.  Yes, I tried to perform CPR on him.

21  Q.  Where did you go to live after your father passed away?

22  A.  I moved in with my older brother.

23  Q.  The defendant in this case?

24  A.  Yes.

25  Q.  What day did you go to live with your brother?

291

B.L. - Direct By Ms. Fletcher

1  A.  The exact same day that my dad passed away, March 17th.

2  Q.  Of 2014?

3  A.  Yes.

4  Q.  And you were fourteen?

5  A.  Yes.

6  Q.  Did you have an option on another place to go live?

7  A.  I did, but I couldn't stand being there.  I was way too

8  depressed, and I thought my brother had changed.

9  Q.  So let's back up on that.  Where else did you have a

10  possibility of living?

11  A.  Going back to Felts Mills with my aunt.

12  Q.  Why did you decide not to live with your aunt?

13  A.  Because I was way too depressed when I was near her.

14  Q.  You didn't like living there?

15  A.  No.

16  Q.  Were you at age fourteen allowed to make the decision as

17  to where you were going to live?

18  A.  Sort of.  I mean because she stated clearly that she

19  didn't want me back in the house and nobody really went against

20  it.

21  Q.  So you went to live with your brother?

22  A.  Yes.

23  Q.  Where did he live when you first moved in with him?

24  A.  He lived in 2 Willow in Massena.

25  Q.  Is that depicted on the map behind you there?

292

B.L. - Direct By Ms. Fletcher

1  A.  Yes.

2  Q.  So where the picture that says 2 Willow, that is the

3  first place you lived with him?

4  A.  Yes.

5        THE COURT:  Move the mike a little closer.  Speak

6  right into it.

7  BY MS. FLETCHER, CONTINUED:

8  Q.  And you moved in with him on March 17th of 2014.

9  A.  Yes.

10  Q.  Had you ever lived with him before?

11  A.  Off and on.

12  Q.  Did he live with you much when you were younger?

13  A.  Not really.

14  Q.  Who else lived with you when you first moved into

15  2 Willow Street?

16  A.  His girlfriend, Sinclair Bab.

17  Q.  At that time in March, he had a girlfriend named

18  Sinclair Bab?

19  A.  Yes.

20  Q.  And she lived with him there?

21  A.  Yes.

22  Q.  B.L., Stacey admitted to Investigator Baillargeon that he

23  had sexual intercourse with you when you were eleven?

24        MS. BIANCO:  Objection to leading nature of the

25  question and the form of the question.

293

B.L. - Direct By Ms. Fletcher

1          THE COURT:  Yes, sustained as to form.

2    BY MS. FLETCHER, CONTINUED:

3    Q.   Did your brother sexually abuse you when you were eleven

4    years old?

5    A.   Yes.

6    Q.   Do you recall that?

7    A.   Yes.

8    Q.   How do you know that you were eleven and not twelve?

9    A.   Because it was closer to my birthday.

10   Q.   How old was he?

11   A.   Nineteen.

12   Q.   Where did it happen?

13   A.   It happened on Grantville Road in Raymondville.

14   Q.   Who were you living with there?

15   A.   I was living with my mom and my little brother.

16   Q.   Was the defendant living with you there at the time?

17   A.   Yes.

18   Q.   Would you tell the members of the jury what happened

19   during that incident?

20   A.   He took out his Ipod and began to write to me.

21   Q.   Go ahead.

22   A.   Asking if I wanted to play a so-called game, and...

23   Q.   You say he took out an Ipod and wrote to you.  Could you

24   explain that?

25   A.   He went on the app notes and would write it -- all the

294

B.L. - Direct By Ms. Fletcher

1    questions and responses back and forth.

2    Q.   And he would type in a question and would he then hand

3    you the Ipod?

4    A.   Yes.

5    Q.   Were you to respond in writing and hand it back to him?

6    A.   Yes.

7    Q.   And what he asked was whether you wanted to play a game?

8    A.   Yes.

9    Q.   Did he tell you what kind of game he wanted to play?

10   A.   Not really explaining it.

11   Q.   What happened?

12   A.   We ended up in the back bedroom, which was his room at

13   the time.  And the door got shut and locked.  Curtains got

14   closed.  Sound was put on by the stereo and there was

15   intercourse.

16   Q.   Did the defendant have sexual intercourse with you?

17   A.   Yes.

18   Q.   Vaginal or anal?

19   A.   Vaginal -- no, that was anal.  I am sorry.  I have the

20   other one.  I am sorry.

21   Q.   Did he mention anything about your grandfather?

22   A.   No, not really.

23   Q.   Was that the first time -- when you were eleven, was that

24   the first time that your brother had intercourse with you?

25   A.   No.

295

B.L. - Direct By Ms. Fletcher

1    Q.   How old were you the first time that he had sexual

2    intercourse with you?

3    A.   Eight.

4    Q.   Where did that happen?

5    A.   My grandparents' trailer in North Laurens.

6    Q.   You were eight years old?

7    A.   Yes.

8    Q.   How old was he?

9    A.   Seventeen.

10   Q.   Could you tell the members of the jury what happened with

11   the defendant when you were eight years old in your

12   grandparents' trailer?

13   A.   He asked if I wanted to play a fun game.  I don't

14   remember too much of the details, but I do remember that it

15   ended up being intercourse, anal intercourse.

16   Q.   Was it just you and your brother?

17   A.   Yes.

18   Q.   Did he perform anal intercourse on you?

19   A.   Yes.

20   Q.   Were there any other instances where he sexually abused

21   you while your parents were still alive?

22   A.   Yes -- no.  I am sorry.  I am jumping ahead thinking of

23   other questions.

24   Q.   So at eight and eleven your parents were still alive, and

25   those were two incidents, correct?

296

B.L. - Direct By Ms. Fletcher

1    A.   Yes.

2    Q.   And again, did he live with you much before you moved in

3    with him in 2014?

4    A.   He didn't live there much.

5    Q.   When was the next time that your brother had some type of

6    sexual contact with you?

7    A.   When we moved into Maple.

8    Q.   Did anything happen at 2 Willow?

9    A.   Yes.

10   Q.   What happened at 2 Willow?

11   A.   He grabbed out his phone just like -- because it was a

12   pattern, grabbing out a device, going on to notes and trying to

13   write to me, asking questions, and I was scared to always say

14   no because I was always afraid that something was going to

15   happen.  Like he would always ask if like he could do stuff or

16   if like there could be intercourse or if I could do something

17   to him.

18   Q.   Sexually?

19   A.   Yes.

20   Q.   You said it was a pattern with the Notes application.

21   What do you mean by that?

22   A.   Almost every single -- well, every single time that

23   everything would happen, he would always write on Notes.

24   Q.   He didn't say it out loud?

25   A.   No.

297

B.L. - Direct By Ms. Fletcher

1   Q.   He would hand you a device that you then needed to read?

2   A.   Yes.

3   Q.   What devices would he use to -- with the Notes

4   application?

5   A.   At first it was an Ipod.  And later on it was mostly

6   always LG phones.

7   Q.   Did you have any sexual intercourse or other sexual

8   contact with your brother at 2 Willow?

9   A.   No.

10  Q.   How long did you live at 2 Willow?

11  A.   Not that long.  Like a few months.  That was the last we

12  ever stayed at any place.

13  Q.   Did Sinclair Bab live with you the entire time that you

14  were at 2 Willow?

15  A.   Yes.

16  Q.   Did there come a time that they broke up?

17  A.   Yes.

18  Q.   Where were you living when they broke up?

19  A.   I was living at 2 Willow.  It was a couple of days before

20  my fifteenth birthday.

21  Q.   And what happened?

22  A.   My brother and her had gotten into an argument and they

23  broke up, and he ended up becoming boyfriend and girlfriend

24  with the next door neighbor, Mackenzie Bailey.

25  Q.   Did your brother work when you lived at 2 Willow?

298

B.L. - Direct By Ms. Fletcher

1   A.   No.

2   Q.   Now, you said the next door neighbor Mackenzie Bailey.

3   Did Mackenzie live at 2 Willow while you were there?

4   A.   Yes.

5   Q.   Who did she live with?

6   A.   She lived with her boyfriend, Nathan Thrana, and her

7   daughter, which at the time was a newborn, A.T.

8   Q.   Where did they live in relation to you?

9   A.   The next apartment to the right of us.

10  Q.   Had you become acquainted with them while you lived

11  there?

12  A.   Yes.

13  Q.   Did you babysit for A.T.?

14  A.   Yes.

15  Q.   So would you say that Stacey and Mackenzie became

16  boyfriend and girlfriend?

17  A.   Yes.

18  Q.   Did she move in with you at 2 Willow?

19  A.   Not at 2 Willow.

20  Q.   Did you leave 2 Willow?

21  A.   Yes.

22  Q.   Where did you go to?

23  A.   We went to 52 Maple Street.

24  Q.   Is that on the map behind you?

25  A.   Yes, it is the top left corner.

299

B.L. - Direct By Ms. Fletcher

1   Q.   How many apartments in that house?

2   A.   Three.

3   Q.   Which one did you have?

4   A.   The middle floor.

5   Q.   And did Mackenzie Bailey move in with you and your

6   brother at 52 Maple?

7   A.   Yes.

8   Q.   Did A.T. move in as well?

9   A.   Yes.

10  Q.   Did your brother work when you lived at 52 Maple?

11  A.   No.

12  Q.   Did your brother have sexual relations with you when you

13  lived at 52 Maple?

14  A.   Yes.

15  Q.   About how many times?

16  A.   Like two or three.

17  Q.   What type of activity?

18  A.   It was vaginal intercourse, oral, and that's about it.

19  Q.   How would he ask or approach you about that activity when

20  you lived at 52 Maple?

21  A.   There was alcohol involved and Notes involved.

22  Q.   What do you mean Notes involved?

23  A.   The Notes app on his phone.

24  Q.   And what do you mean there was alcohol involved?

25  A.   Like during his friend's birthday.  That was the first

300

B.L. - Direct By Ms. Fletcher

1   time that stuff happened.

2   Q.   At Maple?

3   A.   At Maple.

4   Q.   So your brother's friend had a birthday?

5   A.   Yes.

6   Q.   Could you explain what happened?

7   A.   Originally the alcohol was only supposed to be for them

8   but then I ended up started drinking and then after he had left

9   to go back up to his apartment, because he lived on the floor

10  above us.

11  Q.   Who is he?

12  A.   Nick Emens.  My brother, Mackenzie, and I were playing

13  truth or dare.  And at first the dares were something as simple

14  as do like the chicken dance, and then they turned into sexual.

15  I don't know how, sexual dares.

16  Q.   When the dares were like the chicken dance, were they

17  spoken out loud or typed on the notes app?

18  A.   Spoken.

19  Q.   When they turned sexual, how were they relayed?

20  A.   Either whispered in mine or Mackenzie's ear or by writing

21  on the Notes, again, on his phone.

22  Q.   How old were you?

23  A.   I was fifteen.

24  Q.   Do you know how old Mackenzie was?

25  A.   Eighteen.

301

B.L. - Direct By Ms. Fletcher

1  Q.   You were fifteen and she was eighteen, and how old was
2  your brother?
3  A.   Twenty-four.
4  Q.   And what type of sexual dares were given by your brother?
5  A.   Things like me and Mackenzie giving him oral or doing
6  things to Mackenzie sexually or like just doing things with him
7  sexually.
8  Q.   And you said doing things with Mackenzie sexually, who
9  doing things with Mackenzie sexually?
10 A.   Me.
11 Q.   As a result of that, were there sexual activity between
12 yourself and your brother as a part of these dares?
13 A.   Yes.
14 Q.   Was there sexual activity between you and Mackenzie
15 Bailey as part of these dares?
16 A.   Yes.
17 Q.   Had you ever had any type of sexual contact with
18 Mackenzie Bailey before this truth or dare game?
19 A.   No.
20 Q.   Who directed what acts were to be performed?
21 A.   Mainly my brother.  Mackenzie would say a few now and
22 then.
23 Q.   After the truth or dare game, were there other times
24 where your brother engaged you in sexual conduct at 52 Maple?
25 A.   Yes.

302

B.L. - Direct By Ms. Fletcher

1  Q.   Did those sexual events also include Mackenzie Bailey?
2  A.   Yes.
3  Q.   Did all of them include her or some of them?
4  A.   All of them because it only happened like two or three
5  times.
6  Q.   During the times when Mackenzie Bailey was involved, was
7  it all three of you having sexual conduct with one another at
8  the same time?
9  A.   Yes.
10 Q.   Did you ever agree to this conduct?
11 A.   Not willingly.
12 Q.   What do you mean by that?
13 A.   Because if I didn't agree, there was sometimes threats
14 given to me, and there was always alcohol so my decision making
15 wasn't clear as it was.
16 Q.   What do you mean by threats?
17 A.   He would either say he would kill me or sometimes there
18 would be actual physical abuse threats.
19 Q.   When did you move out of 52 Maple?
20 A.   Right around the beginning of the school year.
21 Q.   Where did you go from 52 Maple?
22 A.   We went to Somerset in Massena.
23 Q.   Is that on the map behind you?
24 A.   Yes.
25 Q.   And that indicates on the map that you moved in there

303

B.L. - Direct By Ms. Fletcher

1  around September of 2014, is that your recollection as well?
2  A.   Yes.
3  Q.   Around the beginning of the school year?
4  A.   Yes.
5  Q.   Who lived at Somerset?
6  A.   It was me, Stacey, Mackenzie, A.T., and Nick.
7  Q.   Was Nick the friend who lived upstairs at Maple?
8  A.   Yes.
9  Q.   Why did Nick move in with you?
10 A.   To help pay rent.
11 Q.   Was your brother working when you moved to Somerset?
12 A.   No.
13 Q.   Did your brother have sexual intercourse with you at
14 Somerset?
15 A.   Yes.
16 Q.   Approximately how many times?
17 A.   Once or twice that is clear.
18 Q.   What do you mean by that is clear?
19 A.   That I can remember almost all the details about.
20 Q.   Are there others that are more fuzzy to you?
21 A.   Yes.
22 Q.   Was there a time that your brother asked about taking
23 explicit pictures of you?
24 A.   Yes.
25 Q.   Were you living on Somerset at that time?

304

B.L. - Direct By Ms. Fletcher

1  A.   Yes.
2  Q.   Can you tell the members of the Grand Jury about that
3  event?
4  A.   It was the morning before school started, and it was like
5  around wintertime, and I had come downstairs after getting
6  ready and got ready to head out the door.  My brother told me
7  to come in and sit down, and then he started asking if he could
8  take a picture, and I don't remember the reason why he wanted
9  the picture.
10 Q.   Did he say what kind of picture he wanted?
11 A.   He wanted a picture of my upper torso.
12 Q.   Was he more specific than that?
13 A.   No.
14 Q.   What did he want a picture of?
15 A.   My breast.
16 Q.   Were you dressed for school?
17 A.   Yes.
18 Q.   Were you ready to go to school?
19 A.   Yes.
20 Q.   What did you do?
21 A.   I was scared, and I ended up obeying him, and I pulled up
22 my shirt and my jacket.
23 Q.   Did he take a picture of your breasts?
24 A.   Yes.
25 Q.   And then what did you do?

305

B.L. - Direct By Ms. Fletcher

1    A.   I went to school feeling so ashamed.

2    Q.   We are talking about you going to school.  These

3   locations in Massena, are they all within the same school

4   district?

5    A.   Yes.

6    Q.   Did you ever have to move to a different school when you

7   kept moving to different apartments?

8    A.   No.

9    Q.   How long did you live at Somerset?

10    A.   Not that long.  We moved out of there around January.

11    Q.   Where did you go?

12    A.   We went to 18 Talcott.

13    Q.   Is that on the map behind you as well?

14    A.   Yes.

15    Q.   Is that a one-family house or a multi-family house?

16    A.   One family.

17    Q.   Who lived at Talcott with you when you first moved?

18    A.   It was me, my older brother, Mackenzie, A.T., and Nick.

19    Q.   How long did Nick stay with you there?

20    A.   For a little while until he had to go back to help his

21   mom because she got really sick.

22    Q.   Did your brother engage you in sexual activity at

23   Talcott?

24    A.   Yes.

25    Q.   Alone or with Mackenzie?

306

B.L. - Direct By Ms. Fletcher

1    A.   Alone.

2    Q.   Did you also have sexual contact with Mackenzie at that

3   location?

4    A.   Yes, separately.

5    Q.   So you and Mackenzie without your brother on occasion at

6   Talcott would have sexual relations?

7    A.   Yes.

8    Q.   Had you and Mackenzie alone had sexual contact with one

9   another before you moved to Talcott?

10    A.   No.

11    Q.   While you were living at Talcott, did Mackenzie Bailey

12   get a job?

13    A.   Yes.

14    Q.   Where did she work?

15    A.   She worked at Wal-Mart.

16    Q.   Where is the Wal-Mart in relation to the house on

17   Talcott?

18    A.   Within walking distance.

19    Q.   Did there come a time that you brother got a job when you

20   lived at Talcott?

21    A.   Yes.

22    Q.   Where did he work?

23    A.   He worked at Wal-Mart as well.

24    Q.   Who watched A.T. while they were at work?

25    A.   I did.

307

B.L. - Direct By Ms. Fletcher

1    Q.   Did they work during the school day?

2    A.   Sometimes.

3    Q.   Did you miss school?

4    A.   Sometimes.

5    Q.   Did you become aware of or suspect any abuse of A.T.

6   while you lived at Talcott?

7    A.   Yes.

8    Q.   Did something happen that made you think that she was

9   being abused?

10    A.   Yes.  One day I was downstairs.  My bother had grabbed

11   A.T. and said he was going to go lay her down for a nap.  It

12   was unusual timing, and he told me to turn up the music, which

13   normally I don't turn up the music when she was trying to take

14   a nap because it sometimes bothers her depending on the music.

15   And while the songs were in the middle of being changed, I

16   heard her scream and it was abnormal.

17    Q.   What was abnormal about it?

18    A.   Like it was kind of like more like high pitched and like

19   as if she was in pain.

20    Q.   Did you start missing school?

21    A.   Yes.

22    Q.   Why?

23    A.   Because I wanted to make sure she was taken care of

24   properly.

25    Q.   Did you change Arizona's diapers?

308

B.L. - Direct By Ms. Fletcher

1    A.   Yes.

2    Q.   Did you feed her?

3    A.   Yes.

4    Q.   Did you wash her?

5    A.   Yes.

6    Q.   How did she behave when you changed her?

7    A.   She would try to pull away from me and like I would go to

8   wipe her bottom.  She would like scream.

9    Q.   Did you notice any rashes?

10    A.   Yes.

11    Q.   How frequently?

12    A.   Quite often.  Right after I would get them cleared up,

13   they would show up again.

14    Q.   B.L., who is Hillary Trimm?

15    A.   Hillary Trimm was at first a co-worker and then a friend

16   and then my brother's girlfriend/mother of his newest child.

17    Q.   Let's back up a minute.  She was at first a friend of

18   whose?

19    A.   Of my brother and Mackenzie's.

20    Q.   And a co-worker at Wal-Mart?

21    A.   Yes.

22    Q.   Were you on Talcott when you first met her?

23    A.   Yes.

24    Q.   And how was she introduced to you?

25    A.   My brother had her come over and said that this was --

309

B.L. - Direct By Ms. Fletcher

1    she was introduced to me as a co-worker, and then later on my

2    brother had taken me to the side and said that he had liked her

3    and if everything went downhill with Mackenzie, that was who he

4    might end up with.

5    Q.   Did there come a time that Hillary Trimm moved in with

6    you at Talcott?

7    A.   Yes.

8    Q.   Did she have a baby?

9    A.   Yes.

10   Q.   Who was Hillary's baby?

11   A.   C.T..

12   Q.   Do you know how old C.T. was?

13   A.   Around the same age as A.T., two years old.

14   Q.   Did C.T. come to live with you at Talcott also?

15   A.   Yes.

16   Q.   So were Mackenzie and A.T. still living there?

17   A.   Yes.

18   Q.   So it was you and your brother, Mackenzie, A.T., Hillary,

19   and C.T.?

20   A.   Yes.

21   Q.   All together?

22   A.   Yes.

23   Q.   What were the sleeping arrangements?

24   A.   My brother, Mackenzie and Hillary in one room, and I had

25   the room with the two babies.

---

310

B.L. - Direct By Ms. Fletcher

1    Q.   How long did Mackenzie work at Wal-Mart?

2    A.   She had the job for a few months until she switched to

3    her other job.

4    Q.   What was her other job?

5    A.   Dollar Tree.

6    Q.   How long did your brother work at Wal-Mart?

7    A.   Only like a couple months.

8    Q.   Did he get another job?

9    A.   No.

10   Q.   The rest of time you lived with him, did he have another

11   job at all?

12   A.   No.

13   Q.   Did Hillary Trimm work at Wal-Mart the entire time she

14   lived with you at Talcott?

15   A.   Yes.

16   Q.   Did you come to babysit for C.T. as well?

17   A.   Yes.

18   Q.   Did you notice rashes with C.T. too?

19   A.   Yes, they were similar to A.T.'s.

20   Q.   Did there come a time when you had a conversation with

21   your brother about A.T. and C.T.?

22   A.   Yes.

23   Q.   Can you tell the members of the jury where that happened

24   and what he said to you?

25   A.   We were walking to Wal-Mart to go pay Hillary a visit

---

311

B.L. - Direct By Ms. Fletcher

1    because she was working, and we were on the topic about

2    relationships and how we didn't like who we were with and

3    everything.  He had told me that he wanted to leave both

4    Hillary and Mackenzie because he wasn't getting along with

5    them, and he didn't want to be with them anymore, but he said

6    that he had dirt on them -- or they all had dirt on him.

7    Q.   He said they had dirt on him?

8    A.   Yes.

9    Q.   Did he tell you what that was?

10   A.   Yes.

11   Q.   What did he tell you?

12   A.   He told me that Hillary and Mackenzie both had pictures

13   or videos of him doing things with the babies.

14   Q.   Did he say what kind of things?

15   A.   Yes.

16   Q.   What did he tell you?

17   A.   He told me that he could take and stick the tip of his

18   penis in one and more than that in the other.

19   Q.   Did he say which of the babies he could put his penis

20   further into than the other?

21   A.   He did, but I don't remember which.

22   Q.   What did you do after he told you that he had abused

23   these babies?

24   A.   I tried to find evidence so that way I could turn him in

25   and protect them.

---

312

B.L. - Direct By Ms. Fletcher

1    Q.   Did you ever find evidence or turn him in?

2    A.   No.

3    Q.   Did there come a time that Hillary moved out of Talcott?

4    A.   Yes.

5    Q.   How did that come about?

6    A.   Her mother had taken C.T. for the weekend.  She said that

7    she was only taking her for the weekend, and then she ended up

8    calling up Hillary and said that she wasn't getting C.T. back

9    unless she moved in with her.

10   Q.   Did Hillary move out to be with her baby?

11   A.   Yes.

12   Q.   When did you leave Talcott?

13   A.   Around the summer of 2015 I believe.

14   Q.   Where did you go?

15   A.   We went to the cabin in Chase Mills/Loisville.

16   Q.   Why the cabin?

17   A.   Because it was a friend's of ours place, and we were

18   trying to get away from things.

19   Q.   Is the cabin on the map behind you?

20   A.   Yes, it is on the bottom left.

21   Q.   Who stayed at the cabin?

22   A.   It was me, Stacey, Mackenzie, and A.T..  And then Sarah

23   and Zach, but they didn't stay long.

24   Q.   Who were Sarah and Zach?

25   A.   Sarah was my girlfriend at one point and then Zach and

---

**G.A. 025**

313

B.L. - Direct By Ms. Fletcher

1   Sarah got together.  Zach was my brother's friend off and on.

2   Q.   Did your brother have sexual relations with you at the

3   cabin?

4   A.   Yes.

5   Q.   Approximately how many times?

6   A.   Two or three times.

7   Q.   Did that involve Mackenzie each time or some of the

8   times?

9   A.   No, she wasn't in those ones.

10  Q.   Did that involve sexual intercourse?

11  A.   Yes.

12  Q.   How old were you at the cabin?

13  A.   I believe I was still fifteen.

14  Q.   Would you have turned sixteen in June of that year?

15  A.   Yes.  Mixing dates in my head.

16  Q.   So if you were at the cabin in the summer --

17  A.   I was already sixteen.

18  Q.   Where did you move after the cabin?

19  A.   After the cabin we moved to 42 Glenn Street, 42 or 44.  I

20  always get them mixed.

21  Q.   Is it on the map behind you?

22  A.   Yes.

23  Q.   Is that the right house?

24  A.   Yes.

25  Q.   Is that 44 Glenn?

314

B.L. - Direct By Ms. Fletcher

1   A.   Yes.

2   Q.   What is in that building?

3   A.   It used to be a funeral home, but the bottom floor is the

4   like the office area, and we had the top floor.

5   Q.   Who is we, who lived there?

6   A.   Me, Mackenzie, Stacey, and A.T..

7   Q.   Did the sexual abuse continue at Glenn Street?

8   A.   Yes, but it was only once that I can remember clearly.

9   Q.   What was that one time that you remember clearly?

10  A.   It was me and him at the house by ourselves, and I don't

11  remember where Mackenzie was, but he started asking in Notes

12  again, like he hadn't asked for a while.  So when he said

13  something fun, you know, I honestly was mindset that he was

14  talking about like zombies or something.

15  Q.   What is zombies?

16  A.   From Call of Duty.  It is an XBox game.

17  Q.   You thought he wanted to play a video game?

18  A.   Yes.

19  Q.   What happened?

20  A.   There was vaginal intercourse.

21  Q.   B.L., do you know C.F.?

22  A.   Yes.

23  Q.   Were you friends with her in 2016?

24  A.   Yes.

25  Q.   Did you go to school together?

315

B.L. - Direct By Ms. Fletcher

1   A.   Yes.

2   Q.   Was she in your same grade?

3   A.   Yes.

4   Q.   Are you the same age?

5   A.   Yes.

6   Q.   Did there come a time that C.F. started coming over to

7   Glenn Street?

8   A.   Yes.

9   Q.   How did that start?

10  A.   Because Mackenzie's little brother Dalton saw me up in

11  the window and yelled at me to come down for a few minutes, and

12  I ended up waving at him.  And then C.F. saw me so she booked

13  it over and started coming over after that.

14  Q.   Mackenzie has a brother named Dalton?

15  A.   Yes.

16  Q.   How old is he?

17  A.   Same age as I am.

18  Q.   After that, did C.F. start coming over?

19  A.   Yes.

20  Q.   How often did she come over?

21  A.   At first it was maybe once every like other weekend and

22  then she started coming during school days and staying the

23  night and stuff, and on weekends too.

24  Q.   What would you and C.F. do on the times that she came

25  over?

316

B.L. - Direct By Ms. Fletcher

1   A.   Play games.  We would listen to music.  We would just be

2   girls.

3   Q.   Did you and C.F. play with A.T.?

4   A.   Yes.

5   Q.   Did you take care of A.T.?

6   A.   Yes.

7   Q.   Did your brother ever sexually abuse you while C.F. was

8   over?

9   A.   No.

10  Q.   Did you know or did you ever see him sexually abuse C.F.

11  when you were there?

12  A.   No.

13  Q.   Did he express any sexual interest in C.F. to you?

14  A.   Yes.

15  Q.   What did he say?

16  A.   At the time he wasn't using Notes.  He was using his Kik

17  account, and I had one too because it was the only way to get

18  ahold of me outside of the house.  And he said that with her

19  wearing a tank top it was a tease.

20  Q.   I am sorry?

21  A.   He said with her wearing a tank top it was a tease.

22  Q.   What did that mean?

23  A.   That because of her boobs were popping out of it.

24  Q.   Now, you said you were using your Kik account.  Can you

25  explain to the members of the Grand Jury what Kik is?

317

B.L. - Direct By Ms. Fletcher

1    A.   Kik is a texting app which you can use wifi or if you
2    have data you can use it and text people.
3    Q.   You said you had an account.  Did you set up your own
4    account?
5    A.   Yes.
6    Q.   Do you remember your user name?
7    A.   No.
8    Q.   Did your brother have an account?
9    A.   Yes, he had multiple ones, multiple ones.
10   Q.   If you are trying to chat or message somebody over Kik,
11   can you only message another Kik user?
12   A.   No.
13   Q.   Okay.  So if you had Kik, could you send a message to
14   somebody through Facebook?
15   A.   Not through Facebook, but you can send it to like their
16   actual text.
17   Q.   Their actual phone number?
18   A.   Yes.
19   Q.   You said that your brother also had a Kik account?
20   A.   Yes.
21   Q.   When you messaged with him through Kik, did you message
22   to his phone number or to his Kik account?
23   A.   His Kik.
24   Q.   You said he had multiple user names?
25   A.   Yes.

318

B.L. - Direct By Ms. Fletcher

1    Q.   Do you remember any of them?
2    A.   I remember that he had fastfamily multiple times and he
3    had mellowyellow.
4    Q.   What do you mean he had fastfamily multiple times?
5    A.   Because throughout like while he had Kik he would change
6    his user name, so like I guess people couldn't like keep track
7    of it and wouldn't know for sure --
8         MS. BIANCO:  Objection to this line of testimony
9    about why he would change his user name.  She is speculating about
10   why he would change it.
11        THE COURT:  Overruled.  You may continue.
12   A.   Basically he just changed all the time.
13   BY MS. FLETCHER, CONTINUED:
14   Q.   And fastfamily, is that of any significance to you?
15   A.   Not to me.
16   Q.   What does it mean?
17   A.   It was out of the series Fast and Furious, and it is what
18   the actors in the movie were called for their family.
19   Q.   Do you ever watch those movies?
20   A.   Yes.
21   Q.   Did you watch them with your brother?
22   A.   Sometimes.
23   Q.   Was he a fan of Fast and Furious?
24   A.   Yes.
25   Q.   Now, why do you say it that way?

319

B.L. - Direct By Ms. Fletcher

1    A.   Because he had all the movies.  He had some of the cars.
2    He got -- well, he ended up tattooing himself with some of the
3    stuff from that, and his Kik user names.
4    Q.   What do you mean he had some of the cars, did he have
5    cars?
6    A.   Yes, they were little model cars.
7    Q.   Not real cars?
8    A.   No.
9    Q.   Does your brother have biological children?
10   A.   Yes.
11   Q.   How many?
12   A.   Four.
13   Q.   Who was his first child?
14   A.   Carson.
15   Q.   Who is Carson's mother?
16   A.   Angelica Jones (phonetically).
17   Q.   Does Carson's name mean anything in the Fast and Furious
18   genre there?
19   A.   Yes, because the first part of his name is car.
20   Q.   And your brother like cars in the Fast and the Furious?
21   A.   Yes.
22   Q.   And who are his next children, after Carson, who was
23   next?
24   A.   Bentley and Nova.
25   Q.   Who is the mother of Bentley and Nova?

320

B.L. - Direct By Ms. Fletcher

1    A.   Rochelle LaPorte.
2    Q.   What does Bentley mean?
3    A.   Bentley is a type of car.
4    Q.   What about Nova?
5    A.   Same, it is a type of car.
6    Q.   And your brother has another child?
7    A.   Yes.
8    Q.   Who is that?
9    A.   Mia.
10   Q.   Who is Mia's mother?
11   A.   Hillary Trimm.
12   Q.   What, if any, relation does the name Mia have to the Fast
13   and the Furious?
14   A.   Mia was one of the main characters in the Fast and the
15   Furious series.
16   Q.   And you mentioned that he had tattoos?
17   A.   Yes.
18   Q.   And some relate to the Fast and the Furious?
19   A.   Yes.
20   Q.   Are you familiar with your brother's tattoos?
21   A.   Most of them, yes.
22   Q.   Have you seen them?
23   A.   Yes.
24   Q.   Do you know how he got some of them?
25   A.   Yes.

321

B.L. - Direct By Ms. Fletcher

1   Q.   How?

2   A.   The joker with the flames on his arm with the cards going

3   up, he got that one done by a professional back when we lived

4   on Grantville, and then he got the Mackenzie done by a friend

5   in Massena.  And most of the other ones he did himself.

6   Q.   He does tattooing?

7   A.   Yes.

8   Q.   Did he tattoo you?

9   A.   Yes.

10  Q.   How old were you when he tattooed you?

11  A.   Fifteen.

12  Q.   What kind of a tattoo did he give you?

13  A.   I have two of them.  On my foot I have a lobster symbol.

14  On my back I have a cancer ribbon symbol, a dolphin, and

15  G-clef mixed together.

16  Q.   He did all of those himself?

17  A.   Yes.

18  Q.   Does he have a license?

19  A.   No.

20  Q.   Where did he get the tattooing supplies?

21  A.   Often online.

22  Q.   Would you recognize your brother's tattoos if you saw

23  them?

24  A.   Yes.

25  Q.   I am handing you Exhibits 35G, B, C, D, and E.  Look at

322

B.L. - Direct By Ms. Fletcher

1   them individually please.

2         MS. BIANCO:  Your Honor, may we approach before the

3   pictures are shown?

4         THE COURT:  What?

5         MS. BIANCO:  May we approach?

6         (Whereupon, a sidebar conference was held outside

7         the hearing of the jury.)

8         MS. BIANCO:  Some of the pictures show my client in

9   jail garb.  If they can block out that jail garb that would be

10  okay, but we don't want the jail garb.

11        MS. FLETCHER:  I wish you could have told me that.

12        MS. BIANCO:  I got the pictures Friday night.  I

13  haven't had a chance to go through everything.

14        MS. FLETCHER:  Should we break for lunch?

15        THE COURT:  No, no, finish this witness before we

16  break for lunch.

17        MS. FLETCHER:  I am not sure how to display them on

18  the screen.

19        MR. WOLFSON:  We can use a piece of construction

20  paper.

21        MS. FLETCHER:  All right.  We will figure it out.

22  Okay.

23        (Whereupon, the sidebar conference was concluded,

24        and the following occurred in open court in the

25        presence of the jury.)

323

B.L. - Direct By Ms. Fletcher

1   BY MS. FLETCHER, CONTINUED:

2   Q.   35A, do you recognize that tattoo?

3   A.   Yes.

4   Q.   What is that?

5   A.   It is Mackenzie Bailey's first name.

6   Q.   Where is that tattoo on your brother?

7   A.   On his right forearm on the back.

8   Q.   What about 35B?

9   A.   Tribal dragon with ride or die, team twenty-seven.

10  Q.   Where is that on your brother?

11  A.   That is his right leg on the inside.

12  Q.   What is in 35C?

13  A.   That is a mixture of his jester tattoo with the cards and

14  HKL with stars and ribbons, superman symbol with flames on it

15  and a hitman symbol.

16  Q.   What is HKL?

17  A.   Hillary Katherine LaPorte.

18  Q.   Who is Hillary LaPorte?

19  A.   Hillary Trimm.

20  Q.   Did they ever get married?

21  A.   No.

22  Q.   Are we on E next?

23  A.   D.

24  Q.   What is on D?

25  A.   It is Kelly with the bear or dog paws starting to cover

324

B.L. - Direct By Ms. Fletcher

1   up the K and the E and the traces around the two Ls and the Y.

2   Q.   And E?

3   A.   That's A.T.'s name.

4   Q.   He has A.T.'s name tattooed on his body?

5   A.   Yes.

6   Q.   Do those accurately depict the tattoos that you know your

7   brother to have?

8   A.   Yes.

9         MS. FLETCHER:  Judge, I move A, B, C, D, E into

10  evidence.

11        MS. BIANCO:  The only objection we have is the one

12  we discussed at the bench.

13        THE COURT:  Which one is that that we have the

14  objection to?

15        MS. FLETCHER:  I think we can show them all in the

16  trial presenter, Your Honor.  All of them, we can show them

17  through the trial presenter, document presenter.

18        THE COURT:  Can you do that?

19        EXHIBIT PRESENTER:  Yes.

20        THE COURT:  All right.  Received under those

21  conditions.

22        (Exhibit No. 35A, B, C, D, E, received.)

23  BY MS. FLETCHER, CONTINUED:

24  Q.   Do you see 35A on the screen there?

25  A.   Yes.

**G.A. 028**

325

B.L. - Direct By Ms. Fletcher

1   Q.   Is that the Mackenzie tattoo?

2   A.   Yes.

3   Q.   This is 35B.  Do you see that?

4   A.   Yes.

5   Q.   Could you explain this tattoo to the jury, please?

6   A.   Yes, it is the tribal dragon and the words ride or die,

7   and 1327 at the bottom.

8   Q.   What is ride or die, what is that from?

9   A.   Basically the saying that went along with Fast and

10  Furious.

11  Q.   What is 1327?

12  A.   The original house number that the family lived in in the

13  Fast and Furious.

14  Q.   The fastfamily?

15  A.   Yes.

16  Q.   This is part of 35C, and then I will move it down, this

17  is the HKL?

18  A.   Yes.

19  Q.   And below that, is that his hand?

20  A.   Yes.

21  Q.   What is on his hand?

22  A.   The superman symbol with flames.

23  Q.   This is 35D, what is that?

24  A.   Kelly's name, which is one of his ex-girlfriends, and

25  then it is like bear or wolf paws going down, but he could

326

B.L. - Direct By Ms. Fletcher

1   never finish because he said that it hurt too much.

2   Q.   What do you mean finish?

3   A.   Finish tattooing him.

4   Q.   Was he trying to cover the Kelly?

5   A.   Yes.

6   Q.   And this is 35E, what is that?

7   A.   A.T.'s name.

8   Q.   Where is that tattoo on his body?

9   A.   It is right here.

10  Q.   On his upper arm?

11  A.   Yes, the inside.

12  Q.   Thank you.  Did your brother ever use a fastfamily Kik

13  account to communicate with you?

14  A.   Yes.

15  Q.   And did you know that it was him using that account?

16  A.   Yes.

17  Q.   How did you know?

18  A.   Because he would also ask me for groceries and stuff

19  while I was at the store, and then he would sometimes leave his

20  phone around.  Usually it is shut off because sometimes he

21  would leave the screen locked and it was normally popped up.

22  Q.   What do you mean it was normally locked up?  Did you say

23  locked up or popped up?

24  A.   I said that it was popped up.

25  Q.   Oh, popped up.  Did he lock his phone?

327

B.L. - Direct By Ms. Fletcher

1   A.   Yes.

2   Q.   And what kind of a phone did you know him to have?

3   A.   An LG.

4   Q.   Did he have more than one when you lived with him?

5   A.   Yes.

6   Q.   Why, how did that happen?

7   A.   Because the phone usually malfunctioned so he would have

8   a new one.

9   Q.   Every time he got a new phone that you knew did he always

10  get the same type of LG?

11  A.   Yes.

12  Q.   Did anyone use his phone other than him?

13  A.   No.

14  Q.   Were you able to use it without his permission?

15  A.   Not without permission, no.

16  Q.   Did he ever give you permission to use his phone?

17  A.   Like once.

18  Q.   Did you ever see anyone use his phone other than your

19  brother?

20  A.   No.

21  Q.   Did you ever see him allow anyone to use his phone?

22  A.   No.

23  Q.   Did you ever see Mackenzie with it?

24  A.   Once, but he flipped out on her about it.

25  Q.   What do you mean?

328

B.L. - Direct By Ms. Fletcher

1   A.   Because he didn't like it when people touched his phone.

2   Q.   Did you ever see Hillary use his phone?

3   A.   No.

4   Q.   Did he have it password protected?

5   A.   Yes.

6   Q.   Did you know his password?

7   A.   Not always, but sometimes it was easy to guess after a

8   while.  When I would say it to him he would instantly change

9   it, like within ten minutes.

10  Q.   Now, we talked about the Fast and the Furious, did your

11  brother also have a fascination with superman?

12  A.   Yes.

13  Q.   Did he have clothing related to superman?

14  A.   Yes.

15  Q.   Talk to me about his superman fascination?

16  A.   I am not sure how it all started, but after when he got

17  into it he tried to make his girlfriends like superman, and it

18  was always a theme, superman, supergirl or woman for them.  And

19  he had boughten like shirts and sweatshirts with the symbol on

20  it.

21  Q.   We saw the superman tattoo on his hand, correct?

22  A.   Yes.

23  Q.   And I am going to show you Exhibit 24.  Do you recognize

24  what's depicted in that exhibit?

25  A.   Yes.

329

B.L. - Direct By Ms. Fletcher

1    Q.    What is that?

2    A.    Superman hoodie with I believe the superman shirt that he

3    had bought underneath it.

4    Q.    Is that your brother?

5    A.    Yes.

6          MS. FLETCHER:  I am going to move Exhibit 24 into

7    evidence.

8          THE COURT:  Any objection?

9          MS. BIANCO:  No objection.

10         THE COURT:  Received.

11         (Exhibit No. 24, received.)

12         MS. FLETCHER:  May I publish that, please.

13   BY MS. FLETCHER, CONTINUED:

14   Q.    Can you tell where this picture was taken?

15   A.    It was in the bathroom at 44 Glenn Street.

16   Q.    How do you know that?

17   A.    Because the curtains are the last ones we used and you

18   could you see the pattern on the wall.

19   Q.    And is that what he looked like when you lived at

20   44 Glenn Street?

21   A.    Yes, more or less.

22   Q.    What do you mean more or less?

23   A.    Because in this one he looks like he had shorter hair and

24   he used to have it a little longer.

25   Q.    He is holding a phone in this picture.  Do you recognize

330

B.L. - Direct By Ms. Fletcher

1    that phone or that type of phone?

2    A.    Yes.

3    Q.    What do you recognize that to be?

4    A.    LG.

5    Q.    Is that the type of phone you knew him to always use?

6    A.    Yes.

7          MS. FLETCHER:  We can take that down.

8    BY MS. FLETCHER, CONTINUED:

9    Q.    B.L., did there come a time that you ran away from home?

10   A.    Yes.

11   Q.    When was that?

12   A.    The weekend before January 16th of 2016.

13   Q.    How old were you when you ran away from home?

14   A.    I was currently sixteen.

15   Q.    Why did you run away?

16   A.    Because I was sick and tired of the abuse.

17   Q.    How long had you been planning to leave?

18   A.    A couple of months before, but I was too afraid to act it

19   out.

20   Q.    Why?

21   A.    One, because of what he would do if he found out.  And

22   two, I did not want to leave A.T. behind.

23   Q.    So why did you leave?

24   A.    Because I just couldn't take it anymore, and I needed to

25   find a way to go out and protect her.

331

B.L. - Direct By Ms. Fletcher

1    Q.    What did you do?

2    A.    I stayed at a friend's house that weekend.  We had talked

3    about it.  And then when I ran away later, he said that I could

4    stay there and that they would do whatever needed to be done to

5    be able to keep me and everything.  And then it wasn't until a

6    few days later that I told somebody outside the house and about

7    everything.

8    Q.    Whose house did you run away to?

9    A.    Carrie and Doug's, Carrie Durant and Douglas Gauger.

10   Q.    And where did Carrie and Doug live?

11   A.    Over near -- Woodlawn I think the name of the road is

12   called.

13   Q.    Are they still in Massena?

14   A.    Yes.

15   Q.    Did you immediately tell them about the abuse?

16   A.    Not immediately.

17   Q.    How long were you living with Carrie and Doug before you

18   told somebody what happened?

19   A.    It was that weekend, but in order to make everything

20   like -- so they knew why I wanted to run away.  I explained to

21   Doug one night.  And then he said that we needed to go to the

22   police.  If it wasn't that day, that we needed to go the next

23   day.

24   Q.    Did you go to the police?

25   A.    Yes.

332

B.L. - Direct By Ms. Fletcher

1    Q.    What day did you go to the police?

2    A.    I went January 16th of 2016.

3    Q.    What police department did you report the abuse to?

4    A.    Massena, the local PD.

5    Q.    Do you remember who you spoke with the first time?

6    A.    Olson, who was on duty at the time.

7    Q.    And did an investigator then come and talk to you also?

8    A.    Yes.

9    Q.    Who was that?

10   A.    Investigator Olson.

11   Q.    After Investigator Olson talked to you, do you know --

12   did you later then talked to a member of the New York State

13   Police?

14   A.    Yes.

15   Q.    Do you remember who was that?

16   A.    Yes, Investigator Baillargeon.

17   Q.    Did you immediately detail all of the abuse when you

18   talked to the police?

19   A.    No.

20   Q.    Why not?

21   A.    Because it was too hard to talk about it all.

22   Q.    Did it take you some time to be able to discuss all of

23   this?

24   A.    Yes.

25   Q.    When you reported the abuse on January 16th of 2016, were

333

B.L. - Direct By Ms. Fletcher

1    you given an order of protection?

2    A.   Yes.

3    Q.   Did you see your brother again?

4    A.   Afterwards, yes, but it was only by glance in the store.

5    Q.   Did you see your brother the night of January 16th?

6    A.   I didn't see him personally, but I heard him downstairs.

7    Q.   Downstairs where?

8    A.   In Carrie and Doug's house.

9    Q.   And you were upstairs?

10   A.   Yes, I was in the shower.

11   Q.   You didn't go downstairs?

12   A.   No.

13   Q.   You saw him one time in the store after that?

14   A.   Yes.

15   Q.   Is that the last time you have seen him until today?

16   A.   Yes.

17   Q.   When did you go into foster care?

18   A.   April 19, 2016.

19   Q.   You have been there ever since?

20   A.   Yes.

21   Q.   Have you been with the same family?

22   A.   Yes.

23   Q.   Do you like this family?

24   A.   Yes, a lot.

25        MS. FLETCHER:  I have no further questions.

334

B.L. - Direct By Ms. Fletcher

1         THE COURT:  Ms. Bianco, you may cross-examine.

2         MS. BIANCO:  Judge, my cross will take a while.  I

3    don't know if you wanted to break for lunch, but it is up to

4    you.

5         THE COURT:  No.  Proceed for now for a while and see

6    how it goes.

7

8    CROSS-EXAMINATION BY MS. BIANCO:

9    Q.   Good afternoon, Miss B.L..

10   A.   Good afternoon.

11   Q.   Do you prefer to be called B.L. or Miss B.L.?

12   A.   B.L..

13   Q.   Okay, B.L.  If there is a question that you don't

14   understand that I am asking, please, tell me and I will

15   rephrase it, okay.  And you have to answer yes or no for the

16   Court Reporter, and you have to speak up or she has threatened

17   that the air will be turned off, okay.

18        Now, I understand your testimony that you grew up living

19   with your mom; is that right?

20   A.   Yes.

21   Q.   And your mom died of cancer in September of 2013?

22   A.   Yes.

23   Q.   And your younger brother then went to live with your Aunt

24   Michelle, correct?

25   A.   We were all -- me, my mom, and my little brother moved

335

B.L. - Cross by Ms. Bianco

1    there before she passed.

2    Q.   Okay.  What was your Aunt Michelle's full name?

3    A.   Michelle Hurst.

4    Q.   And this was a person who was your mother's sister,

5    correct?

6    A.   Yes, it was the youngest sister.

7    Q.   Okay, and after your mom died, did you then go live with

8    some cousins for about a month?

9    A.   No, I stayed with my aunt and then I moved in with my

10   father.

11   Q.   Okay, and when you lived with your father, he ultimately

12   died in 2014, correct?

13   A.   Yes.

14   Q.   And the loss of your parents was incredibly difficult on

15   you, would that be fair?

16   A.   Yes.

17   Q.   And you were going through, I believe you testified on

18   direct examination, a depression, correct?

19   A.   Yes.

20   Q.   Okay.  Were you on any medication for the depression?

21   A.   No, but when I was -- when I finally went to school, I

22   started talking to people subtly about it.

23   Q.   Okay.  Now, after your parents had died and you decided

24   to move in with Stacey, you were how old?

25   A.   I was fourteen.

336

B.L. - Cross by Ms. Bianco

1    Q.   And you testified on direct examination that Stacey had

2    previously sexually abused you when you were eight?

3    A.   Yes.

4    Q.   And then again when you were eleven, correct?

5    A.   Yes.

6    Q.   Now, you could have moved in with your other aunt,

7    Missy Judware; is that right?

8    A.   Yes, but at the time I wasn't on speaking terms with any

9    of my other family.

10   Q.   So you made the decision to move in with Stacey, yes?

11   A.   Yes, because I thought that it would be better.

12   Q.   But you chose to live with him even though he was the one

13   who was sexually abusing you, yes?

14   A.   Because I had thought that he had changed.

15   Q.   Okay.  When I ask a question I am going to ask yes or no.

16   If you could please answer it, great, okay.  You could have

17   moved in with your Aunt Becky, correct?

18   A.   Yes.

19   Q.   Okay, and you could have moved in with your friend, your

20   friend's mother Sandy; is that right?

21   A.   No.

22   Q.   No?  She didn't want you in the house?

23   A.   It wasn't that.  It is because with everything going on

24   she had way too much on her plate, and I would have added so

25   much more stress.

337

B.L. - Cross by Ms. Bianco

1    Q.    Now, when you moved in with Stacey, he was living with a
2    woman named Sinclair Bab; is that right?
3    A.    Yes.
4    Q.    And Sinclair Bab was his present girlfriend, right?
5    A.    Yes.
6    Q.    And you moved in with the two of them because Stacey
7    allowed that; is that right?
8    A.    Yes.
9    Q.    And Stacey and Sinclair broke up I believe you testified,
10   yes?
11   A.    Yes.
12   Q.    And then the same day that they broke up, he and
13   Mackenzie moved in together?
14   A.    No, not moved in.
15   Q.    Okay.  When they broke up, did you stay at Mackenzie's
16   mother's house?
17   A.    Not like stay, stay.  We went for like a night or two
18   during like holidays.
19   Q.    Okay.  But eventually you moved in with Mackenzie, A.T.,
20   and Stacey; is that right?
21   A.    Yes.
22   Q.    And him moving in with these different women was a little
23   bit uncomfortable for you; is that correct?
24   A.    Not really.
25   Q.    Didn't you ask Stacey that you didn't want to live with

338

B.L. - Cross by Ms. Bianco

1    any of these other women, didn't you say that, you wanted
2    Mackenzie out?
3    A.    After a while, not at first.  It was because things had
4    turned sour.
5    Q.    But you did eventually say you wanted Mackenzie out, yes?
6    A.    I did, but then we became on good terms again.
7    Q.    Okay.  So the answer would be yes, you asked him to
8    tell --
9            MS. FLETCHER:  Objection.
10           THE COURT:  Yes.  Sustained.
11   BY MS. BIANCO, CONTINUED:
12   Q.    Now, you testified that Stacey is your older brother,
13   correct?
14   A.    Oldest and older, yes.
15   Q.    And you also testified that he sexually abused you
16   multiple times; is that right?
17   A.    Yes.
18   Q.    Now, you and Stacey spoke about him being sexually abused
19   by your grandfather; is that right?
20   A.    Yes.
21   Q.    And you were also abused by your grandfather; is that
22   correct?
23   A.    Yes.
24   Q.    And your grandfather would force you and Stacey to do
25   sexual things to each other against your will; is that right?

339

B.L. - Cross by Ms. Bianco

1    A.    No, it was never with both of us.
2    Q.    Oh, separate?
3    A.    Yes.
4    Q.    Okay, and he talked a lot about him being sexually
5    abused, correct, Stacey?
6    A.    Not a lot.  It only got mentioned only after I finally
7    came out about my grandfather.
8    Q.    Okay.  You came out to Stacey about being abused by your
9    grandfather?
10   A.    Yes.
11   Q.    And Stacey told you also that he was abused by your
12   grandfather?
13   A.    Yes.
14   Q.    Now, I would imagine that Stacey sexually abusing you for
15   a number of years had a profound effect on your childhood,
16   correct?
17   A.    Yes.
18   Q.    And you were angry at Stacey?
19   A.    At first, yes, but now like I am trying to protect
20   everybody else it happened to as well.
21   Q.    I am saying at first.  When this is happening prior to
22   going to the police, you were angry at Stacey for doing these
23   things to you, is that fair to say?
24   A.    Yes.
25   Q.    And you were resentful at Stacey, correct?

340

B.L. - Cross by Ms. Bianco

1    A.    Sometimes, yes.
2    Q.    Okay, and before you left -- before you ran away, do you
3    remember testifying that you ran away in January of 2016?
4    A.    Yes.
5    Q.    Were you and Stacey fighting over Nick Emens.  Do you
6    remember fighting over Nick Emens?
7    A.    Yes, but that wasn't in January.
8    Q.    But Stacey and you fought over Nick Emens because Stacey
9    did not want you to have any kind of relationship with him, is
10   that right?
11   A.    It was the opposite.
12   Q.    You wanted to have a relationship with Nick Emens?
13   A.    My bother didn't resent it.
14   Q.    I am asking you -- I am sorry if I am unclear.  It is
15   probably me.  There was arguments about you having a
16   relationship with Nick Emens between you and Stacey; is that
17   right?
18   A.    Yes.
19   Q.    Okay.  Now, and the arguments about you and Nick Emens in
20   a relationship, that happened before you went to the police; is
21   that right?
22   A.    Quite a while before, yes.
23   Q.    Okay.  Now, you testified here that Stacey told you on
24   the way either to or from Wal-Mart about a conversation that
25   you had.  Do you remember giving that testimony?

341

B.L. - Cross by Ms. Bianco

1    A.    Yes.

2    Q.    And you testified on direct examination, you were talking

3    about the relationships you had, and we didn't like who we were

4    with; is that right?

5    A.    Yes.

6    Q.    And you were with Nick Emens at the time?

7    A.    No.

8    Q.    You were with somebody else?

9    A.    Yes.

10   Q.    Now, the conversation you had with Stacey, didn't Stacey

11   tell you certain things that he didn't like about

12   Mackenzie Bailey?

13   A.    Yes.

14   Q.    And he told you that she was engaging in some kind of

15   taking pictures for child pornography with her daughter, A.T.,

16   didn't he tell you that?

17   A.    He said that there was possible pictures of him doing

18   things.  That is why he couldn't leave.

19   Q.    I am asking you if he told you that Mackenzie was

20   taking pictures of A.T. and trading them on the Internet with

21   other people?

22   A.    No.

23   Q.    He didn't say that to you?

24   A.    No.

25   Q.    Okay.  Did he tell you specifically that he was

342

B.L. - Cross by Ms. Bianco

1    uncomfortable with the way Mackenzie was around A.T.?

2    A.    No.

3    Q.    He didn't say she was a bad mother?

4    A.    No, because he wasn't concerned about her like I was.  I

5    was the one who took care of her.

6    Q.    When you took care of her -- well, Mackenzie wouldn't

7    change her diaper, correct?

8    A.    She did, but very rarely.

9    Q.    And Mackenzie kind of left her to cry and left it up to

10   you, correct?

11   A.    Yes.

12   Q.    And Mackenzie also passed A.T. off to different people on

13   weekends sometimes when she just wanted a break; is that right?

14   A.    Yes.

15   Q.    And you wouldn't know what people she handed her off to

16   all the time, do you?

17   A.    For the most part, yes.

18   Q.    For the most part, but occasionally you didn't know who

19   she handed her off to because she didn't ask your permission,

20   did she?

21   A.    No, but she would always talk about who she was going to

22   ask.

23   Q.    Okay.  Because she kept trying to have time alone with

24   Stacey; is that right?

25   A.    Yes.

343

B.L. - Cross by Ms. Bianco

1    Q.    And when you said that she is -- she rarely changed her

2    diaper, oftentimes unfortunately it was in her own

3    soiled diaper until you came to change it, right?

4    A.    Well, when I stayed home I made sure I kept up on her

5    diapers.

6    Q.    But when you were at school and A.T. was home, she

7    would leave her in those soiled diapers, wouldn't she?

8    A.    Yes.

9    Q.    Okay, and then as a result of those soiled diapers,

10   oftentimes you would come back and you would see that A.T. had

11   a rash; is that right?

12   A.    Yes.

13   Q.    And Mackenzie oftentimes would yell and scream at A.T.;

14   is that right?

15   A.    Yes.

16   Q.    And you tried to stop that, correct?

17   A.    Yes.

18   Q.    And you did not think Mackenzie was doing a good job at

19   taking care of A.T., correct?

20   A.    At first she was.

21   Q.    Okay.  But there came a time that you didn't think that

22   was going on, she wasn't taking proper care of her, correct?

23   A.    Correct.

24   Q.    And Mackenzie and you would argue and Mackenzie would

25   tell you you can't tell me what to do; is that right?

344

B.L. - Cross by Ms. Bianco

1    A.    Somewhere along those lines.

2    Q.    Okay.  Now, when you testified that Stacey had this

3    conversation with you on the way, was it on the way to Wal-Mart

4    he is having a conversation with you about putting his penis in

5    A.T., was that on the way to Wal-Mart or was that in Wal-Mart?

6    A.    It was on the way to Wal-Mart.  We were on the tracks.

7    Q.    And he said this to you out of the blue, I am putting my

8    penis in A.T., correct?

9    A.    Yes.

10   Q.    And he also told you out of the blue he is putting his

11   penis in C.T., correct?

12   A.    Yes, he said that it was -- because that's what he was

13   explaining about the dirt.

14   Q.    Now, but he is telling you this unsolicited, you are not

15   asking him these questions, correct?

16   A.    Correct.

17   Q.    And this is after he has already been, as you testified,

18   sexually abusing you a number of times, correct?

19   A.    Yes.

20   Q.    Now, I believe you testified on direct examination that

21   you went to look for evidence to see if this happened, correct?

22   A.    Yes.

23   Q.    You wanted to see if there were any videos or pictures,

24   right?

25   A.    Yes, so that way I could turn it in.

345

B.L. - Cross by Ms. Bianco

1   Q.   And in order to look at the evidence you had to look at
2   Stacey's phone, right?
3   A.   No.  Not at his phone, mainly looking like for
4   differences in the way that everybody acted.
5   Q.   And you didn't see any differences?
6   A.   Not really, just that people were becoming more negative,
7   and they started growing distance from C.T. and A.T..
8   Q.   When you say people started becoming negative, this is at
9   a time when Hillary and Mackenzie are living in the same room
10  as Stacey, correct?
11  A.   No, this was before she moved in.
12  Q.   Okay.  So you were just looking for evidence of abuse of
13  A.T., yes?
14  A.   Yes.
15  Q.   And you didn't find any, yes, didn't find any?
16  A.   No.
17  Q.   Okay.  And you never saw any pictures of A.T. being
18  sexually abused, did you?
19  A.   No.
20  Q.   You never saw any videos of A.T. being sexually abused?
21  A.   No.
22  Q.   And you never saw with your own eyes Stacey sexually
23  abusing A.T., right, never saw it?
24  A.   No.
25  Q.   When you said that there was a time that Stacey brought

346

B.L. - Cross by Ms. Bianco

1   A.T. up to the bedroom, do you remember giving that testimony?
2   A.   Yes.
3   Q.   Mackenzie was with him as well, correct?
4   A.   I don't remember if she was or not that day.
5   Q.   Okay.  Do you remember giving testimony before the Grand
6   Jury?
7   A.   Vaguely.
8   Q.   Okay.  When you testified before, there were a bunch of
9   people in the room, correct?
10  A.   Yes.
11  Q.   And you had to swear under oath that what you were saying
12  was true, right?
13  A.   Yes.
14  Q.   And your memory would certainly be better then than now
15  maybe; is that right?
16  A.   Sort of.
17  Q.   The prosecutors were there as well, correct, these
18  prosecutors here?
19  A.   No.
20  Q.   Oh, they weren't there?
21  A.   No.
22  Q.   I am going to show you your Grand Jury testimony.  You
23  testified in state court and federal court.  Do you remember
24  that?
25  A.   Yes.

347

B.L. - Cross by Ms. Bianco

1   Q.   In the federal court you testified on November 27, 2017,
2   correct?
3   A.   I believe so.  I also did one...
4   Q.   In state court?
5   A.   Yes.
6   Q.   Now, when you testified at the federal grand jury that's
7   when these two prosecutors were present; is that right?  Or you
8   don't remember.
9   A.   I can't remember.
10  Q.   Fair enough.
11       MS. BIANCO:  Judge, would you like for me to have
12  this marked before I show it to her?
13       THE COURT:  How much longer do we have?  Should we
14  take a break?
15       MS. BIANCO:  I do have a while.
16       THE COURT:  All right.  We will break for lunch now,
17  members of the jury.  Excuse me.  And we will be back at two
18  o'clock.  Leave your materials here.  And please -- it is not a
19  please, just don't discuss the case at all among yourselves or
20  anyone else in the noon hour, and we will see you back here at
21  two o'clock?
22       (Whereupon, the proceedings were held in open court
23       out of the presence of the Jury.)
24       THE COURT:  Don't discuss your testimony with
25  anybody over the noon hour.  Do you understand?  Don't talk

348

B.L. - Cross by Ms. Bianco

1   with anybody.
2            THE WITNESS:  Yes.
3            THE COURT:  Anything further, counselors before we
4   adjourn?
5            MS. FLETCHER:  No, Your Honor.
6            THE COURT:  Mr. McBrearty.
7            COURT CLERK:  Court stands for the lunch recess.
8            (Whereupon, the luncheon recess was taken.)
9            (Whereupon, the proceedings were held in open court
10           in the presence of the Jury.)
11           THE COURT:  Ms. Bianco you may continue with your
12  cross.
13           MS. BIANCO:  Thank you, Your Honor.
14  BY MS. BIANCO, CONTINUED:
15  Q.   Are you ready, B.L.?
16  A.   Yes.
17  Q.   When we broke I was asking you questions about what you
18  testified on direct examination about Stacey taking A.T. up
19  into the room himself and asked you to put on loud music.  Do
20  you remember that question?
21  A.   Yes.
22  Q.   And I asked you if you had ever testified before the
23  Grand Jury that Stacey and Mackenzie brought A.T. up to that
24  room.  Do you remember that?
25  A.   Yes.

349

1   Q.   Do you remember whether or not you ever gave testimony
2   that Mackenzie and Stacey took A.T. upstairs for a nap?
3   A.   I don't remember.
4   Q.   Okay.
5        MS. BIANCO:  May I approach, Your Honor.
6        THE COURT:  You may.
7   BY MS. BIANCO, CONTINUED:
8   Q.   Showing you what has been marked Defendant's Exhibit 13.
9   I would like you to read pages eleven and twelve to yourself,
10  please, and just look up when you are finished, okay.
11       MS. FLETCHER:  That would be the Federal Grand Jury
12  testimony?
13       MS. BIANCO:  Yes.
14  BY MS. BIANCO, CONTINUED:
15  Q.   Did you have enough time to review that?
16  A.   Yes.
17  Q.   Did you, in fact, tell the Grand Jury that they brought
18  her up to the room; is that right?
19  A.   Yes.
20  Q.   And that would be Stacey and Mackenzie, correct?
21  A.   Yes.
22  Q.   So both of them, not just Stacey, are bringing her up to
23  the room upstairs?
24  A.   Yes.
25  Q.   Okay.  Thank you.  I would like to talk to you about your

350

1   relationship with Mackenzie Bailey, okay.  And you testified on
2   direct examination that you had some kind of a sexual
3   relationship with Mackenzie without Stacey being present; is
4   that right?
5   A.   Yes.
6   Q.   Okay, and you talked about that relationship with
7   Mackenzie at times Stacey wasn't present, correct?
8   A.   Yes.
9   Q.   And you would stop talking about the relationship when
10  Stacey walked in the room; is that right?
11  A.   Yes.
12  Q.   Okay, and you had some secrets with Mackenzie, correct?
13  A.   Yes.
14  Q.   And one of those secrets is that she traded child
15  pornography pictures; isn't that right?
16  A.   I didn't know anything about that.
17  Q.   So she never told you that she was trading child
18  pornography?
19  A.   No.
20  Q.   You saw her on her cell phone a lot, didn't you?
21  A.   Yes, mainly on Facebook.
22  Q.   Do you know if she was on any other websites?
23  A.   Like shopping websites and...
24  Q.   How about extremedating.com, did you see her on that?
25  A.   Not really like ever.  It was very rare.

351

1   Q.   But you saw her on this extreme dating, yes?
2   A.   Yes.
3   Q.   Okay, and that was kind of an adult website where people
4   would take sexually explicit pictures; is that right?
5   A.   I don't know.  The only thing I know is when she was
6   trying to get a girlfriend.
7   Q.   Okay, and that's why she was living with Stacey?
8   A.   Yes.
9   Q.   And she was taking semi-nude pictures of herself,
10  correct?
11  A.   I honestly don't know.  I didn't look through her photos.
12  Q.   Okay.  But she would oftentimes go in her room, shut the
13  door, and use her phone, correct?
14  A.   Yes, when she was relaxing or laying down.
15  Q.   At no point did you ever force yourself on Mackenzie; is
16  that right?
17  A.   Right.
18  Q.   Do you remember living at the cabin with Stacey,
19  Mackenzie, and A.T.?
20  A.   Yes.
21  Q.   And you said that you had a girlfriend living there for a
22  time, Sarah?
23  A.   Yes.
24  Q.   And there was another guy there at the time, yes?
25  A.   Yes.

352

1   Q.   Okay, and how long did they stay there?
2   A.   He left within like the first month and she left a little
3   after that.
4   Q.   You were only at -- the cabin is which particular
5   location up there?
6   A.   Number five.
7   Q.   Number five.  So living there from July of 2015 to
8   December of 2015, yes?
9   A.   Yes.
10  Q.   And part of that time, this Sarah lived there?
11  A.   Yes.
12  Q.   Did Nick Emens also live there?
13  A.   No.
14  Q.   He never stayed there?
15  A.   No, not live, but the night, yes.
16  Q.   He would stay the night frequently, wouldn't he?
17  A.   Not really.
18  Q.   How would you describe how many nights Nick Emens was
19  there?
20  A.   Every once in a great while when he was too tired to
21  drive back to Norwood.
22  Q.   Okay.  Would he come over to the house a lot?
23  A.   Only to see my brother because we weren't on good terms.
24  Q.   Okay.  Now, when you were living at the cabin with
25  Stacey, Mackenzie, and A.T., did there come a point in time

353

1    when Mackenzie became very intoxicated and attacked you?
2    A.   Yes.
3    Q.   And she tried to hurt you, is that right?
4    A.   Yes, because I didn't allow her to leave the house
5    because there was coyotes so I was worried about her safety.
6    Q.   There was what?
7    A.   Coyotes.
8    Q.   But she physically attacked you, yes?
9    A.   Yes.
10   Q.   And Stacey stepped in front and protected you from
11   Mackenzie, right?
12   A.   After a while he didn't really have to, to be honest.  I
13   could defend myself.
14   Q.   Oh, okay, but didn't she hit him on the head with an
15   ashtray?
16   A.   I honestly don't know about that.  I didn't see it.
17   Q.   Were you present when she went after Stacey?
18   A.   No.  They were upstairs, and they had curtains for their
19   room, and I was letting the dogs out.
20   Q.   Okay.  But you had no problem defending yourself against
21   Mackenzie, is that your testimony?
22   A.   Yes.
23   Q.   Now, you talked a little bit on direct examination about
24   being on the Kik app and that's how you would communicate with
25   Stacey.  Do you remember that testimony?

354

1    A.   Yes.
2    Q.   And you had your own phone at that point?
3    A.   I had a tablet.
4    Q.   A tablet that you would bring to school?
5    A.   Yes.
6    Q.   Okay, and the tablet had the Kik account, correct?
7    A.   At the time that I was bringing it to school, no.
8    Q.   Okay.  Didn't you testify on direct examination, and
9    correct me if I am wrong, that that's the only way that you and
10   Stacey could communicate while you were at school?
11   A.   Not while I was at school because there was phones that
12   he would call the school.
13   Q.   Okay.  So you were communicating with Stacey by phone at
14   the school?
15   A.   Yes.
16   Q.   Now, in terms of the Kik account that you had on your
17   tablet, you were using that, that was your own tablet?
18   A.   Yes.
19   Q.   And you created your own Kik account?
20   A.   Yes.
21   Q.   And what was user name of that Kik account?
22   A.   I don't remember.
23   Q.   And you had that tablet through the year 2015?
24   A.   Yes.
25   Q.   And 2016, correct?

355

1    A.   Yes.
2    Q.   Did you give that tablet to the police so they could
3    download some of these messages?
4    A.   No, because my tablet got destroyed somehow.  I don't
5    know how.
6    Q.   Okay.  You also testified that many of the times when
7    Stacey would sexually abuse you, you said he had a pattern of
8    using the notebook or the Notes application.  Do you remember
9    that testimony?
10   A.   Yes.
11   Q.   And he was using the Notes application on his LG phone?
12   A.   Yes.
13   Q.   And he was using it in 2015?
14   A.   Yes.
15   Q.   And 2016, yes?
16   A.   Yes.
17   Q.   And he used it every time before he would sexually abuse
18   you, he would communicate with you through the Notes; is that
19   right?
20   A.   Yes.
21   Q.   Now, in terms of the fastfamily account, didn't Stacey
22   have a tattoo fastfamily -- excuse me ride or die 132?
23   A.   Yes.
24   Q.   He also had a Facebook account fastfamily 1327, didn't
25   he?

356

1    A.   I don't know.  The only account I know is where he had it
2    back when we were in Grantville, and it got hacked by his wife
3    because she was trying to sabotage it.
4    Q.   So his wife was able to get into his account?
5    A.   Yes.
6    Q.   And that would be Rachel?
7    A.   Rochelle.
8    Q.   Rochelle, I am sorry.  But Mackenzie often tried to get
9    into Stacey's, didn't she?
10   A.   From time to time she would talk about being jealous
11   about it.
12   Q.   And she is the one who got the phone, didn't she?
13   A.   I think she got him one of the phones.  She got him one
14   of the phones, and then he, when he was working at Wal-Mart, he
15   ended up getting another one.
16   Q.   But the phone, the LG phone, Mackenzie or Mackenzie's
17   mother, is that correct, got him the phone to use; is that
18   right?
19   A.   Yes.
20   Q.   And Mackenzie was, as you stated, she would become
21   jealous, is that fair?
22   A.   Yes.
23   Q.   And she would want to control Stacey and what he was
24   doing and where he was going, yes?
25   A.   Sort of.

357

1   Q.  Okay, and she would want access to his phone to see who
2   he was talking to, yes?
3   A.  Yes.
4   Q.  Okay, and she would want his passwords so she could see
5   what he is doing on his phone; is that right?
6   A.  Well, she didn't really want his password.  She tried to
7   talk to him and ask him what he was doing some of the times.
8   Q.  But she would get on that phone herself and look,
9   correct?
10  A.  She couldn't get past the password unless it was already
11  unlocked.
12  Q.  Wasn't there an argument in your presence that she is the
13  one who got him the phone, and she will do with it as she
14  pleases, something like that, do you remember that argument?
15  A.  No.
16  Q.  Okay.  You don't remember her opening up the phone and
17  looking at it and asking him to explain certain things on the
18  phone?
19  A.  No.
20  Q.  That never happened in your presence?
21  A.  Not that I know of because they argued a lot about a lot
22  of things.
23  Q.  And one of the things they argued about was his phone and
24  who he was speaking to, right?
25  A.  Yes, but not about -- like all the times that she was in

358

1   front of me, she never said about him or buying the phone.
2   Q.  That was in front of you, but you heard the arguments
3   between he and her about that phone, yes?
4   A.  Yes.
5   Q.  Okay, and Mackenzie's phone, she would let other people
6   use it including you, yes?
7   A.  Yes.
8   Q.  She would let Stacey use her phone?
9   A.  From time to time, yes.
10  Q.  Hillary use her phone?
11  A.  I believe so.
12  Q.  Okay.  Now, I want to talk to you about when you first
13  made the report to the police.  That was after you had run
14  away; is that correct?
15  A.  Yes.
16  Q.  And you had spoken to a case worker that first night,
17  January 16, 2015?
18  A.  Yes.
19  Q.  And when you spoke to the case worker, you were
20  explaining what was going on in the household, correct?
21  A.  Yes.
22  Q.  And you were explaining what had been going on with you,
23  yes?
24  A.  Yes.
25  Q.  And you had never said to the case worker that Stacey had

359

1   admitted to sexually abusing either C.T. or A.T. on
2   January 16th; is that right?
3   A.  Yes.
4   Q.  Did not say that?  I am sorry.  Bad question.
5   A.  No.
6   Q.  Did not say that.  Okay, and then when you spoke to --
7   was it an Investigator Olson the next person you spoke to, the
8   police officer?
9   A.  Yes.
10  Q.  That was on January 18th, correct?
11  A.  Yes.
12  Q.  And when you spoke to Investigator Olson, you also
13  obviously were trying to be truthful about what was going on,
14  correct?
15  A.  Yes.
16  Q.  And you told Investigator Olson that Stacey had sexually
17  abused you, yes?
18  A.  Yes.
19  Q.  And you told him as much as you could about the details,
20  yes?
21  A.  Yes.
22  Q.  And you never told Investigator Olson that Stacey
23  admitted to molesting A.T. or C.T., correct?
24  A.  Correct, but because it was hard enough to talk about
25  myself at that moment.

360

1   Q.  Okay, but you had cared a great deal about A.T., right?
2   A.  Yes.
3   Q.  And that is the reason you didn't want to leave the
4   house, you were worried about her safety, yes?
5   A.  Yes.
6   Q.  And yet, you did not tell the police or a case worker at
7   that time that she was in danger; is that right?
8   A.  I did try telling them that she was in danger.  They said
9   that I needed to worry about myself at that moment and that
10  they would try everything they could to get A.T. out of the
11  house.
12  Q.  Did you specifically tell them that Stacey admitted to
13  you that he had molested A.T. on those dates?
14  A.  No.
15  Q.  In terms of preparing for your testimony, how many times
16  did you meet with the prosecutors?
17  A.  More than five times.  I just can't think of all the
18  numbers.
19  Q.  That is fine.  Would it be fair to say that you spent at
20  least ten hours with them during those five occasions total?
21  A.  Around eight.
22  Q.  Okay, and they told you the questions they were going to
23  ask you, yes?
24  A.  Yes.
25  Q.  And you would kind of rehearse how the testimony would

361

1   go; is that right?
2   A.   Yes.
3        MS. BIANCO:  May I have a moment, Your Honor?
4        THE COURT:  You may.
5        MS. BIANCO:  Thank you very much, B.L..  I have no
6   further questions.
7        THE COURT:  Ms. Fletcher, redirect, if any.
8
9   REDIRECT EXAMINATION BY MS. FLETCHER:
10  Q.   B.L., is this an easy thing for you to talk about?
11  A.   No, definitely not.
12  Q.   Was it -- has it ever been an easy thing for to you talk
13  about?
14  A.   No.
15  Q.   Did you talk to multiple police officers in this case?
16  A.   Yes.
17  Q.   And did you tell a little bit of your story each time?
18  A.   Yes.
19  Q.   When was -- do you know who the first police officer was
20  that you told about A.T. and C.T.?
21  A.   No.
22  Q.   Do you remember speaking with Investigator Baillargeon?
23  A.   Yes.
24  Q.   Do you remember there coming a time when you said it
25  would be easier for you to write out what happened rather than

362

B.L. - Redirect by Ms. Fletcher
1   to talk about it?
2   A.   Yes.
3   Q.   Is it easier for you to write it out than to talk about
4   it?
5   A.   Yes.
6   Q.   And when you wrote it out, did you write out that A.T.
7   and C.T. had also been abused?
8   A.   Yes, if my memory serves me correct.
9   Q.   And when you met with us about your testimony, did you
10  tell us every detail the first time we met?
11  A.   No.
12  Q.   The second time we met?
13  A.   No.
14  Q.   Did we talk about little pieces of it each time?
15  A.   Yes.
16  Q.   Does it get exhausting for you to go through the story?
17  A.   Yes.
18  Q.   Ms. Bianco asked you about Mackenzie at one occasion
19  physically attacking you.  What was the atmosphere in the house
20  with you and Stacey and Mackenzie?
21  A.   That night there was a lot of negativity in the house
22  because her and my brother were fighting beforehand, like
23  arguing.  They were both drunk, and I was aware enough -- not
24  completely, but sober enough to be able to realize everything
25  that was going on.  I tried to be the peacemaker, but instead I

363

B.L. - Redirect by Ms. Fletcher
1   got seen as the enemy.
2   Q.   Were there other occasions where Mackenzie was assaulted
3   by your brother?
4   A.   Yes.
5   Q.   Were there occasions that you were assaulted by your
6   brother?
7   A.   Yes.
8   Q.   Is it fair to say that there was a lot of physical abuse
9   as well as sexual abuse?
10  A.   Yes.
11  Q.   I think you testified on direct that Nick Emens was a
12  friend your brother's, correct?
13  A.   Yes.
14  Q.   Did you date him for a certain point in time?
15  A.   Yes.
16  Q.   And Ms. Bianco keeps talking about a fight with Nick or a
17  fight about Nick.  Do you remember a fight about Nick?
18  A.   Yes.
19  Q.   Where were you living when you and your brother fought
20  about Nick?
21  A.   We were living on Talcott right before they left.
22  Q.   So you weren't living on Glenn Street when you fought
23  about Nick?
24  A.   We fought about him on Glenn Street as well, but it was
25  on difference circumstances.

364

B.L. - Redirect by Ms. Fletcher
1   Q.   Was your brother -- did your object to you dating Nick?
2   A.   No.
3   Q.   How do you know that he didn't object to you dating Nick?
4   A.   Because he was honestly all for it at first because my
5   brother would get money from him for like, example, child
6   support bill that he owed.  He had gotten cigarettes, alcohol,
7   transportation, pretty much almost anything.
8   Q.   So it was good having Nick around?
9   A.   Yes.
10  Q.   Did you leave because your brother objected about you
11  having any relationship with Nick?
12  A.   No.
13  Q.   Were you with Nick when you left?
14  A.   No.
15  Q.   Did you have other boyfriends at school?
16  A.   No.
17  Q.   I want to talk about the care of A.T..  Did your brother
18  ever tell you that he was uncomfortable with how Mackenzie
19  cared for A.T.?
20  A.   No.
21  Q.   Did he care?
22  A.   No.
23        MS. BIANCO:  Objection to whether he cared.
24        THE COURT:  Sustained.
25  BY MS. FLETCHER, CONTINUED:

365

B.L. - Redirect by Ms. Fletcher

1   Q.   Did he care for A.T.?

2   A.   In a sort of sense, a little bit, yes.

3   Q.   Did he take care of her?

4   A.   Very, very rarely.

5   Q.   Did he change her diapers?

6   A.   Once in a blue moon if I wasn't there and if she was

7   screaming too loud.

8   Q.   Did he play with her?

9   A.   Every once in a while.

10  Q.   Did Mackenzie work at a time when your brother did not

11  work?

12  A.   Yes.

13  Q.   Who would care for A.T. when Mackenzie was at work?

14  A.   Me.

15  Q.   Was your brother home?

16  A.   Yes.

17  Q.   What did he do when you were taking care of A.T.?

18  A.   Sleep.

19  Q.   Did he have a job to go to?

20  A.   No, not at that point.

21  Q.   Did you miss school as a result of taking A.T. on

22  occasion?

23          MS. BIANCO:  I am going to object to the leading

24  nature of these questions, Judge.

25          THE COURT:  Sustained.

---

366

B.L. - Redirect by Ms. Fletcher

1   BY MS. FLETCHER, CONTINUED:

2   Q.   Were you in school during the time that you were taking

3   care of A.T.?

4   A.   Yes.

5   Q.   On those -- while you were in school, were there school

6   days that you were home?

7   A.   Yes.

8   Q.   What were you doing while you were home on a school day?

9   A.   Cleaning the house and taking care of A.T..

10  Q.   Where was your brother?

11  A.   Upstairs or gone somewhere.

12  Q.   You told Ms. Bianco that you never saw pictures or videos

13  of the abuse of A.T. or C.T., correct?

14  A.   Yes.

15  Q.   And your brother, you said, admitted to you that there

16  were pictures and videos?

17  A.   Yes.

18  Q.   What did he tell you were in the picture and videos?

19  A.   He said that it was a picture of him abusing the babies.

20          MS. FLETCHER:  I have no further questions.

21          THE COURT:  Recross, if any.

22          MS. BIANCO:  Yes, please.

23

24  RECROSS EXAMINATION BY MS. BIANCO:

25  Q.   B.L., you just testified that you were A.T.'s babysitter

---

367

B.L. - Recross by Ms. Bianco

1   when Mackenzie was at work: is that right?

2   A.   Yes.

3   Q.   And you would have to stay home from school to do that,

4   correct?

5   A.   Yes, because no one else would take care of her.

6   Q.   Right.  So Stacey wasn't left alone with A.T. because you

7   were always watching her, yes?

8   A.   Some days.

9   Q.   Some days.  Didn't you say that he refused to take care

10  of her?

11  A.   He did, but on the days that I fought with him about

12  going to school and I ended up going to school, he was still

13  there with her.

14  Q.   Okay.  So you weren't -- every time that Mackenzie was at

15  work you weren't home taking care of A.T.?

16  A.   Ninety percent of the time I was.

17  Q.   And ninety percent of the time he would not be alone with

18  A.T., correct?

19  A.   Yes.

20  Q.   And Nick was living in the house as well?

21  A.   Yes, but he worked during the day.

22  Q.   Okay.  Now, when you said that he hardly cared for A.T.,

23  hardly took care of her.  Do you remember that testimony?

24  A.   Yes.

25  Q.   And you are aware that -- you identified a tattoo on his

---

368

B.L. - Recross by Ms. Bianco

1   arm where he tattooed A.T. on his arm, correct?

2   A.   Yes.

3   Q.   Okay, and when he tattooed A.T. on his arm, he tattooed

4   it in permanent ink, didn't he?

5   A.   Yes.

6   Q.   When you testified about dating Nick Emens, and you said

7   your brother was all for it at first.  Do you remember that?

8   A.   Yes.

9   Q.   Didn't Stacey kick Nick out of the house because he

10  didn't want to pay the rent anymore?

11  A.   Because he was forced to basically pay most of the rent,

12  and my brother had already used him to get a good amount of

13  money for child support, which it didn't even go to the child

14  support.

15  Q.   Didn't he kick Nick Emens out of the house because he

16  refused to pay a portion of the rent, is that the reason he

17  kicked him out?

18  A.   It wasn't him that kicked him.  It was the landlord.

19  Q.   The landlord kicked Nick out?

20  A.   Yes, as well as him moving out himself as it was.

21  Q.   Because Nick wouldn't pay his portion of the rent, that's

22  why the landlord kicked him out, yes?

23  A.   Yes.

24  Q.   And you wanted to move in with Nick after Nick moved out,

25  didn't you?

369

B.L. - Recross by Ms. Bianco

1   A.   Yes.

2   Q.   And Stacey did not want you living with Nick; is that

3   right?

4   A.   Because he didn't like it that he couldn't control me if

5   I was there.

6   Q.   Okay.  But Stacey did not want you to move in with Nick,

7   right?

8   A.   Yes.

9   Q.   Okay.  Now, since the time of Stacey's arrest you have

10  communicated with Mackenzie Bailey; is that right?

11  A.   No.

12  Q.   Not at all since the time of Stacey's arrest in May until

13  now?

14  A.   No.

15  Q.   How about with Hillary Trimm, did you communicate with

16  her?

17  A.   At first for a few moments, but only to see the baby.

18  Q.   Okay, but you did have some communication with Hillary,

19  yes?

20  A.   Yes.

21  Q.   And that was in person?

22  A.   Yes.

23  Q.   And also on the phone?

24  A.   Every once in a while.  I don't remember actually calling

25  her.  I remember receiving messages when I asked her about how

370

B.L. - Recross by Ms. Bianco

1   Mia was.

2   Q.   Okay.  But you did talk to Hillary about the charges,

3   didn't you?

4   A.   She asked why was I putting my brother away and why was I

5   taking him away from his kids, and I said to protect them.

6   Q.   Okay, but you did you talk to her specifically about the

7   case, correct?

8   A.   Only to say that and this is when it first started.

9   Q.   Okay, and in terms of C.F., you spoke with C.F. about the

10  case, correct?

11  A.   Only when she first came out and told me about what had

12  happened to her.

13  Q.   Okay.  But you did speak to C.F. about you being abused

14  by Stacey, yes?

15  A.   Not as much as what she said.

16  Q.   You did have a conversation saying Stacey abused you,

17  yes?

18  A.   Yes, but it was after he was already convicted.

19  Q.   Convicted, you mean arrested?

20  A.   Yes.

21  Q.   Okay.  Well, thank very much.

22       THE COURT:  Okay.  Thank you.  You may step down.

23       (Whereupon, the Witness is excused.)

24       THE COURT:  Next witness.

25       MS. AMANDOLARE:  The government calls Massena Police

371

1   Investigator Jason Olson to the stand.

2

3        JASON OLSON, having been called as a Witness, being

4   first duly sworn, was examined and testified as follows under

5   oath:

6

7   DIRECT EXAMINATION BY MS. AMANDOLARE:

8   Q.   Good afternoon, Investigator Olson.

9   A.   Good afternoon.

10  Q.   By whom are you employed?

11  A.   Massena Police Department.

12  Q.   What is your title with the Massena Police Department?

13  A.   Senior investigator.

14  Q.   How long have you been a senior investigator with the

15  Massena Police Department?

16  A.   I have been a senior investigator for about two years.

17  Q.   Before that?

18  A.   I was an investigator for approximately eight years.

19  Q.   Did you have any law enforcement experience prior to

20  becoming an investigator?

21  A.   Yes.

22  Q.   What was that?

23  A.   I was a patrol officer.

24  Q.   Was that also with the Massena Police Department?

25  A.   Yes.

372

JASON OLSON - Direct By Ms. Amandolare

1   Q.   What geographical area does the Massena Police Department

2   cover or patrol?

3   A.   The Village of Massena.

4   Q.   Now, throughout your career as a law enforcement agent,

5   approximately how many arrests and investigations involving the

6   sexual abuse of minors have you been involved in?

7   A.   More than two dozen.

8   Q.   I would like to draw your attention to January 18th of

9   2016.  Were you working on that day?

10  A.   Yes.

11  Q.   And did you become involved in an investigation involving

12  this defendant, Stacey J. LaPorte, Jr.?

13  A.   Yes.

14  Q.   Did there come a point in time as part of your

15  investigation that you met and interviewed a young girl by the

16  name of B.L. in January of 2016?

17  A.   Yes.

18  Q.   Was this interview recorded in any way?

19  A.   Yes, it was.

20  Q.   What did you do after you spoke with B.L.?

21  A.   I turned the case over to the New York State Police.

22  Q.   Why did you do that?

23  A.   The vast majority of the incidents that were described by

24  B.L. during the interview happened outside of my jurisdiction.

25  Q.   What was the nature of what you learned as a result of

373

JASON OLSON - Direct By Ms. Amandolare

1   having interviewed B.L.?

2   A.   She described sexual abuse by Stacey LaPorte.

3   Q.   Now, I would like to draw your attention to March 6th of

4   2016.  Were you working on that date?

5   A.   No, I wasn't.

6   Q.   Did there come a point in time that you were called into

7   work on that day?

8   A.   Yes, I was.

9   Q.   What was the nature of that call?

10  A.   Sexual motivating crime involving a minor.

11  Q.   What time did that call come in approximately?

12  A.   About 11:05 p.m.

13  Q.   On March 7th of 2016 -- or March 6th going into March 7th

14  of 2016?

15  A.   Yes.

16  Q.   Did you have an opportunity to respond to some place as a

17  result of that call?

18  A.   Yes.

19  Q.   Where did you respond?

20  A.   To the Massena Memorial Hospital.

21  Q.   And when you responded to the hospital, did you come into

22  contact with a young woman by the name of C.F.?

23  A.   Yes, I did.

24  Q.   Was she the individual referred to in the call that

25  caused you to respond to the hospital?

374

JASON OLSON - Direct By Ms. Amandolare

1   A.   Yes, she was.

2   Q.   As you responded to the Massena Memorial Hospital, did

3   you have an opportunity to meet and speak with C.F.?

4   A.   Yes, I did.

5   Q.   You conducted an interview of her?

6   A.   Yes.

7   Q.   Was this interview recorded in any way?

8   A.   No, it was not.

9   Q.   Why was that?

10  A.   The situation, she was there to be examined medically and

11  there was no available privacy for us to do that.

12  Q.   Was there a reason why you felt the need to conduct that

13  interview at the hospital as opposed to waiting until she was

14  released?

15  A.   Yes.

16  Q.   What was that?

17  A.   To see what direction I needed to take the investigation

18  at that time.

19  Q.   As a result of having spoken to her that evening, did you

20  make a determination as to where to take your investigation

21  next?

22  A.   Yes.

23  Q.   What did you do?

24  A.   I applied for a search warrant for a residence in

25  Massena.

375

JASON OLSON - Direct By Ms. Amandolare

1   Q.   What residence was that?

2   A.   44 Glenn Street.

3   Q.   Taking a look at the map behind you that is already in

4   evidence, the image that's depicted in item six, is that the

5   house that you referred to in your search warrant?

6   A.   Yes, it is.

7   Q.   Did you ultimately obtain a search warrant?

8   A.   Yes, I did.

9   Q.   Did you ultimately execute that search warrant?

10  A.   Yes, I did.

11  Q.   Did you have assistance from other members of law

12  enforcement in executing that search warrant?

13  A.   Yes.

14  Q.   Who assisted you?

15  A.   Investigator Corey Francis and other members of the

16  Massena Police Department.

17  Q.   Do you recall approximately what time on March 7th you

18  executed the search warrant?

19  A.   It was about 2:50 a.m. on March 7th.

20  Q.   Can you describe the residence that is located at 44

21  Glenn Street?

22  A.   Yes.  It is a two unit building, downstairs would be a

23  business, upstairs would be an apartment, residential.

24  Q.   Are there two entrances to 44 Glenn street?

25  A.   Yes.

376

JASON OLSON - Direct By Ms. Amandolare

1   Q.   And can you describe the entrance that leads to the

2   residence?

3   A.   It was like a glass storm door on the front porch.

4   Q.   I am going to hand you what has been marked for

5   identification as Government's Exhibits 4 and 5, and ask if you

6   recognize what is depicted in those exhibits?

7   A.   Yes, I do.

8   Q.   What do you recognize those to depict?

9   A.   Exhibit 4, I recognize the front porch and the glass

10  storm door that leads up to the upstairs apartment.  And

11  Exhibit 5, I recognize the roof of the front porch and the two

12  windows to the upstairs apartment at 44 Glenn Street.

13  Q.   And those photographs that you just described, are those

14  a fair and accurate depiction of what the residence at 44 Glenn

15  Street looked like when you executed the search warrant on

16  March 7, 2016?

17  A.   Yes.

18       MS. AMANDOLARE:  Your Honor, I would ask that

19  Exhibits 4 and 5 be moved into evidence.

20       THE COURT:  Any objection?

21       MR. WOLFSON:  Yes, Your Honor.  I would like to

22  inquire about, voir dire as to when the picture was taken.

23       THE COURT:  Briefly.  Go ahead.

24  VOIR DIRE BY MR. WOLFSON:

25  Q.   Investigator Olson, when was that picture taken?

377

JASON OLSON - Voir Dire by Mr. Wolfson

1   A.   It was taken on March 7, 2016.

2          MR. WOLFSON:  Thank you.  No objection.

3          THE COURT:  Received.

4          (Exhibit No. 4, 5, received.)

5          MS. AMANDOLARE:  I would ask that those exhibits be

6   published to the jury.

7          THE COURT:  Go ahead.

8   DIRECT EXAMINATION BY MS. AMANDOLARE:

9    Q.   So taking a look at your screen, at what is in evidence

10  as Exhibit 4 --

11         THE COURT:  Wait a minute.  It's not up.

12  BY MS. AMANDOLARE, CONTINUED:

13   Q.   So taking a look at what is in evidence as Exhibit 4, is

14  that what the door looked like on that night at the residence?

15   A.   Yes.

16   Q.   Okay.  Now, looking at Exhibit 5.  And what is depicted

17  in Exhibit 5, is that the window outside of the residence that

18  you conducted your search?

19   A.   Yes, it is.

20   Q.   And when you responded to 44 Glenn Street to execute the

21  search warrant, did you knock on the door?

22   A.   Yes, I did.

23   Q.   What happened when you knocked on the door?

24   A.   Mackenzie Bailey answered the door.

25   Q.   Did she answer it immediately?

378

JASON OLSON - Direct By Ms. Amandolare

1    A.   No, she did not.

2    Q.   Was anyone else home at that time?

3    A.   No.

4    Q.   Can you -- did you ultimately enter the residence at 44

5   Glenn Street?

6    A.   Yes.

7    Q.   Can you describe the interior of that residence?

8    A.   As you walked up the first flight of the stairs to go to

9   the upstairs apartment, and you turn to go into the apartment

10  at the top of the stairs, there would be a living room to your

11  right, a bedroom in front of you, the doorway to a bedroom, and

12  then the bathroom to the left and then the kitchen to the left

13  of that.

14   Q.   I am going to hand you what is marked for identification

15  as Exhibits 6 through 9, 9A, 10 and 11.  Do you recognize what

16  is depicted in those exhibits?

17   A.   Yes, I do.

18   Q.   And based on what you just described for the jury, do

19  those exhibits fairly and accurately depict the inside of 44

20  Glenn Street when you and other members of the Massena Police

21  Department executed the search warrant?

22   A.   Yes, they do.

23         MS. AMANDOLARE:  Your Honor, I would ask that what

24  has been marked for identification as Exhibits 6 through 9, 9A,

25  and 10 and 11 be moved into evidence.

379

JASON OLSON - Direct By Ms. Amandolare

1          THE COURT:  Any objection?

2          MR. WOLFSON:  No objection, Your Honor.

3          THE COURT:  Received.

4          (Exhibit No. 6 through 9, 9A, 10, 11, received.)

5          MS. AMANDOLARE:  I would ask that those exhibits now

6   be published to the jury.

7          THE COURT:  Proceed.

8   BY MS. AMANDOLARE, CONTINUED:

9    Q.   Looking at what is in evidence as Exhibit 6, what area

10  does of the apartment does that depict?

11   A.   It depicts the entrance to the bathroom.

12   Q.   And Exhibit 7?

13   A.   Exhibit 7 depicts a room to the back of the living room

14  in the house.  There is a storage room of some kind back there.

15   Q.   Exhibit 8?

16   A.   There is a child's room that was close to the back of the

17  living room as well.

18   Q.   Exhibit 9?

19   A.   Exhibit 9 depicts what would appear to be a main bedroom.

20   Q.   Exhibit 9A?

21   A.   The living room.

22   Q.   Exhibit 10?

23   A.   A stand.

24   Q.   Where was this stand located?

25   A.   I don't recall where the stand was located.

380

JASON OLSON - Direct By Ms. Amandolare

1    Q.   Looking at --

2    A.   Actually I do recall where the stand was located.  It was

3   located in the main bedroom.

4    Q.   Did you learn whose bedroom that belonged to?

5    A.   Yes.

6    Q.   Who was that?

7    A.   Mackenzie Bailey and Stacey LaPorte.

8    Q.   And Exhibit 11?

9    A.   It is a safe that was on the floor in the main room.

10   Q.   What's next to that safe?

11   A.   A laptop computer.

12   Q.   Now, did you and other members of the Massena Police

13  Department ultimately seize items from 44 Glenn Street?

14   A.   I didn't seize the items.

15   Q.   Were you aware that items were seized from that

16  residence?

17   A.   Yes, I was.

18   Q.   Did those items include electronic devices?

19   A.   Yes, they did.

20   Q.   Who retrieved those items?

21   A.   Investigator Corey Francis.

22   Q.   Did you play any part once those items were received or

23  retrieved from that residence, did you do anything with those

24  items?

25   A.   Yes, I did.

Case 18-105, Document 44, 04/15/2019, 2540369, Page46 of 202
Case 5:16-cr-00320-DNH   Document 118-1   Filed 09/05/18   Page 169 of 237
Case 5:16-cr-00320-DNH   Document 118-1   Filed 09/05/18   Page 170 of 237

381

JASON OLSON - Direct By Ms. Amandolare

1   Q.   What did you do with them?

2   A.   I retrieved them from temporary evidence, and I logged

3   them into the Massena Police Department's evidence vault.

4   Q.   When did you do that?

5   A.   On March 7, 2016.

6   Q.   Do you recall what specific items of electronic devices

7   that you ultimately logged into evidence?

8   A.   Iphone, a Lenovo laptop computer and a Samsung Galaxy

9   cell phone.

10  Q.   If I can just pull up again what is in evidence as

11  Exhibit 11.   Is that the laptop that you logged in?

12  A.   Yes.

13  Q.   And Exhibit 9, is that the Iphone that you logged in?

14  A.   The yellow phone on the stand, yes.

15  Q.   And the other cell phone in the corner, is that the other

16  cell phone that you logged in?

17  A.   Yes, it is.

18  Q.   You indicated that you retrieved these items from

19  temporary, the temporary evidence locker.   What condition were

20  they in when you retrieved them?

21  A.   They were bagged, sealed, and signed.

22  Q.   By?

23  A.   Investigator Corey Francis.

24  Q.   Once you were done executing the search warrant at

25  44n Glenn Street, did your investigation continue regarding the

382

JASON OLSON - Direct By Ms. Amandolare

1   allegations involving sexual abuse against C.F.?

2   A.   Yes, I did.

3       MS. AMANDOLARE:   I have nothing further.

4       THE COURT:   You may cross-examination, Mr. Wolfson.

5       MR. WOLFSON:   Thank you, Judge.

6

7   CROSS-EXAMINATION BY MR. WOLFSON:

8   Q.   Good afternoon, Investigator Olson.

9   A.   Good afternoon.

10  Q.   You interviewed C.F. on March 7th, right?

11  A.   March 6th.

12  Q.   That was close to midnight?

13  A.   Yes.

14  Q.   And she told you that she had been raped that morning at

15  about nine in the morning?

16  A.   Correct.

17  Q.   And you were trying to get all the details from her?

18  A.   As much as I could.

19  Q.   And you told her how important it was to be accurate?

20  A.   Yes.

21  Q.   And to be truthful?

22  A.   Yes.

23  Q.   And to be complete?

24  A.   Yes.

25  Q.   And during this interview C.F. made allegations against

383

JASON OLSON - Cross by Mr. Wolfson

1   Stacey LaPorte?

2   A.   Correct.

3   Q.   And she made allegations against Mackenzie Bailey?

4   A.   Not so much Mackenzie.   It was mostly Stacey.

5   Q.   But there were some allegations against Mackenzie?

6   A.   Some.

7   Q.   She told you that the two of them forced her to have sex?

8       MS. AMANDOLARE:   Objection, Your Honor.

9   BY MR. WOLFSON, CONTINUED:

10  Q.   Did you learn through your investigation that

11  Mackenzie Bailey and Stacey forced her to have sex?

12  A.   Yes.

13  Q.   And she told you the number of times it happened?

14      MS. AMANDOLARE:   Objection.

15  BY MR. WOLFSON, CONTINUED:

16  Q.   Did you learn the number of times it happened?

17      MS. AMANDOLARE:   Objection, Your Honor, same

18  objection.

19      THE COURT:   Overruled.   Cross exam.

20  A.   I don't recall the number of times, but it was more than

21  once.

22  BY MR. WOLFSON, CONTINUED:

23  Q.   Did you learn where it happened?

24  A.   Yes.

25  Q.   During your investigation, did you learn that alcohol was

384

JASON OLSON - Cross by Mr. Wolfson

1   involved?

2   A.   Yes, I did.

3   Q.   And during this interview, she did not mention anything

4   about having sex with her brother, J.M.?

5   A.   No, she did not.

6   Q.   And she did not mention anything about Stacey forcing her

7   to have sex with J.M.?

8   A.   No, she didn't.

9   Q.   And when you executed the search warrant at 44 Glenn

10  Street, Mackenzie Bailey was the only person home; is that

11  correct?

12  A.   That is correct.

13  Q.   And you testified that she did not answer the door right

14  away?

15  A.   Correct.

16  Q.   And you found two phones in that apartment?

17  A.   Yes.

18  Q.   You also had the opportunity to interview B.L.?

19  A.   I did.

20  Q.   You interviewed her twice, once on January 18th and once

21  on January 20th, right?

22  A.   Correct.

23  Q.   And she never said anything during these interviews about

24  Stacey and A.T.?

25  A.   No, she did not.

385

JASON OLSON - Cross by Mr. Wolfson

1   Q.   And if she had, what would you have done?

2        MS. AMANDOLARE:  Objection, Your Honor.

3        THE COURT:  Sustained.

4        MR. WOLFSON:  I have nothing further.  Thank you.

5        THE COURT:  Redirect, if any.

6        MS. AMANDOLARE:  Just briefly.

7

8   REDIRECT EXAMINATION BY MS. AMANDOLARE:

9   Q.   What time, again, did you execute the warrant at 44 Glenn

10  Street?

11  A.   2:50 a.m. on March 7th.

12  Q.   And when Mackenzie Bailey answered the door, was it

13  evident that she had been sleeping?

14  A.   She appeared to have been possibly sleeping.

15       MS. AMANDOLARE:  I have nothing further.

16       THE COURT:  Anything further?

17       MR. WOLFSON:  No, Your Honor.  Thank you.

18       THE COURT:  You may step down.

19       (Whereupon, the Witness is excused.)

20       THE COURT:  Next witness.

21       MS. AMANDOLARE:  The government calls Massena Police

22  Investigator Corey Francis.

23

24       COREY FRANCIS, having been called as a Witness, being

25  first duly sworn, was examined and testified as follows under

386

1   oath:

2

3   DIRECT EXAMINATION BY MS. AMANDOLARE:

4   Q.   Good afternoon, Investigator Francis?

5   A.   Good afternoon.

6   Q.   By whom are you employed?

7   A.   Massena Village Police Department.

8   Q.   What is your title with the Massena Police?

9   A.   Investigator.

10  Q.   How long have you been an investigator with the Massena

11  Police Department?

12  A.   One year.

13  Q.   And do you have any other law enforcement experience

14  prior to becoming an investigator?

15  A.   I do.

16  Q.   What was that?

17  A.   I worked three years prior as a patrol officer.

18  Q.   I would like to draw your attention to March 7th of 2016.

19  Were you working on that day?

20  A.   No.

21  Q.   Did there come a point in time where you were called in

22  to work?

23  A.   Yes.

24  Q.   What were you called in to do?

25  A.   Execute a search warrant and collect evidence.

387

COREY FRANCIS - Direct By Ms. Amandolare

1   Q.   And where were you called to execute the search warrant?

2   A.   44 Glenn Street in the village.

3   Q.   Looking at the map behind you that is already in evidence

4   as Exhibit 3, what is depicted as image six, does that reflect

5   the residence that you responded to to execute a search

6   warrant?

7   A.   Yes.

8   Q.   Were you assisted by other members of the Massena Police

9   Department?

10  A.   Yes.

11  Q.   Were you working alongside Investigator Olson that

12  evening?

13  A.   I was.

14  Q.   When you responded to 44 Glenn Street to assist in the

15  execution of the search warrant, was one of your tasks to

16  retrieve any relevant evidence that you observed?

17  A.   Yes.

18  Q.   What -- did you retrieve electronic devices as some of

19  those items in the house?

20  A.   Yes.

21  Q.   What items specifically did you retrieve that you recall

22  with regards to electronic devices?

23  A.   A Samsung cell phone, an Iphone, and a Lenovo laptop.

24  Q.   I am going to hand you what has been marked for

25  identification as Exhibit 12.  I will ask you to remove what is

388

COREY FRANCIS - Direct By Ms. Amandolare

1   inside the bag marked Exhibit 12 and ask if you recognize that?

2   A.   Yes.

3   Q.   What do you recognize that to be?

4   A.   A cell phone I seized from 44 Glenn Street.

5   Q.   Which cell phone?

6   A.   Samsung.

7   Q.   What color is that Samsung?

8   A.   White.

9   Q.   Do you recall where that item was seized from?

10  A.   I do.

11  Q.   Where was that?

12  A.   It was located in the bedroom, bedside stand, in the

13  purse.

14  Q.   And observing that white Samsung phone, does that appear

15  to be the same white Samsung phone that you retrieved on

16  March 7, 2016, from 44 Glenn Street?

17  A.   Yes.

18  Q.   How do you know that?

19  A.   I took photo of it.

20  Q.   Is there anything on the bag that that phone was in that

21  reflects your contact with the phone?

22  A.   Yes, my signature, my tape.

23       MS. AMANDOLARE:  Your Honor, I would ask that what

24  has been marked for identification as Exhibit 12 be moved into

25  evidence.

389

COREY FRANCIS - Direct By Ms. Amandolare

1    THE COURT:  Any objection?

2    MS. BIANCO:  No objection.

3    THE COURT:  Received.

4    (Exhibit No. 12, received.)

5    MS. AMANDOLARE:  I will ask that what is in evidence

6    as Exhibit 10 be displayed, please.

7    BY MS. AMANDOLARE, CONTINUED:

8    Q.   What does this depict?

9    A.   The cell phone.

10   Q.   And is that where you seized it from on March 7, 2016?

11   A.   Yes.

12   Q.   Now, I am going to hand you what has been marked as

13   Government's Exhibit 13.  I will ask you to remove it from the

14   bag.  Do you recognize that?

15   A.   Yes, I do.

16   Q.   What do you recognize it to be?

17   A.   The Iphone that I seized from the bedroom.

18   Q.   How do you know that it is the Iphone you seized?

19   A.   I took a photo of it.

20   Q.   Is there anything reflected on the bag that I just handed

21   to you that helps you identify it as the Iphone you recovered

22   from 44 Glenn Street?

23   A.   Yes, my signature and my tape, evidence tape.

24   MS. FLETCHER:  Your Honor, I would asked that what

25   has been marked for identification as Exhibit 13 be moved into

390

COREY FRANCIS - Direct By Ms. Amandolare

1    evidence.

2    THE COURT:  Any objection?

3    MS. BIANCO:  No objection.

4    THE COURT:  Received.

5    (Exhibit No. 13, received.)

6    MS. AMANDOLARE:  I would ask that what is already in

7    evidence as Exhibit 9 be displayed.

8    BY MS. AMANDOLARE, CONTINUED:

9    Q.   Is that a photograph from this search that displays where

10   that cell phone was recovered from?

11   A.   Yes.

12   Q.   Is that the same location that the white Samsung was

13   recovered from?

14   A.   Yes.

15   Q.   I am going to hand you what has been marked for

16   identification as Exhibit 14.  Do you recognize that item in

17   evidence?

18   A.   Yes.

19   Q.   What do you recognize that to be?

20   A.   The Lenovo laptop.

21   Q.   Is that the Lenovo laptop that you earlier referenced

22   that you seized from 44 Glenn Street?

23   A.   Yes.

24   Q.   How do you know that to be the case?

25   A.   It has our sticker on it.

391

COREY FRANCIS - Direct By Ms. Amandolare

1    Q.   Is your name anywhere on that device?  Would your name be

2    on any of those bags that were used to seal that laptop?

3    A.   Yes.

4    MS. AMANDOLARE:  I would ask that what is in

5    evidence as Exhibit 11 be displayed.

6    BY MS. AMANDOLARE, CONTINUED:

7    Q.   Looking at what is evidence as Exhibit 11, is that a

8    photograph of where you seized that laptop from 44 Glenn

9    Street?

10   A.   Yes, it was.

11   Q.   What did you do once you seized those three pieces of

12   electronic devices from 44 Glenn Street?

13   A.   They were all placed in an evidence bag, sealed, and

14   signed.

15   MS. AMANDOLARE:  I have no further questions.  Thank

16   you.

17   THE COURT:  Did you offer Exhibit 14?

18   MS. AMANDOLARE:  I would ask that what I have marked

19   for identification as Exhibit 14 be entered into evidence.

20   Thank you, Your Honor.

21   THE COURT:  Any objection?

22   MS. BIANCO:  No objection.

23   THE COURT:  Received.

24   (Exhibit No. 14, received.)

25   THE COURT:  You may cross-examination.

392

COREY FRANCIS - Direct By Ms. Amandolare

1    MS. BIANCO:  Thank you.

2

3    CROSS-EXAMINATION BY MS. BIANCO:

4    Q.   Good afternoon, Investigator.

5    A.   Good afternoon.

6    Q.   You were one of several law enforcement officers to enter

7    the residence to execute the search warrant; is that right?

8    A.   Yes.

9    Q.   How many law enforcement officers were there?

10   A.   Five.

11   Q.   And when you knocked on the door, you learned that only

12   Mackenzie Bailey was home; is that right?

13   A.   Yes.

14   Q.   Did you ask where Stacey LaPorte's location was?

15   A.   I didn't speak to Mackenzie.

16   Q.   Okay.  But you were there when Mackenzie was speaking

17   with other officers?

18   A.   Yes, I was.

19   Q.   Did they ask in your presence where Stacey LaPorte was?

20   A.   Not to my knowledge.  No, not to my knowledge.

21   Q.   And he was the prime suspect in this rape investigation,

22   wasn't he?

23   A.   Yes.

24   Q.   And no one was asking where he was that night when you

25   were executing a search warrant in his home?

393

COREY FRANCIS - Cross by Ms. Bianco

1   A.   Not in front of me.

2   Q.   Okay.  Now, in the house, how many bedrooms is that

3   house?

4   A.   Two I believe.

5   Q.   There is also a back room?

6   A.   Yes.

7   Q.   It is like kind of a smaller third bedroom?

8   A.   Yes.

9   Q.   Okay, and in the house you found the white Samsung phone,

10  correct?

11  A.   Correct.

12  Q.   And you found the Iphone, would that be the 5S, the

13  Iphone 5S?

14  A.   I believe so.

15  Q.   And the Lenovo laptop computer, correct?

16  A.   Yes.

17  Q.   And the only one in the house with those devices was

18  Mackenzie Bailey, correct?

19  A.   Correct.

20  Q.   Did you hear Mackenzie Bailey asking the officers what is

21  this all about?

22  A.   No.

23  Q.   Didn't hear any of that?  You have to answer yes or no.

24  A.   Oh, no.

25       MS. BIANCO:  Thank you, sir.  I have no further

394

COREY FRANCIS - Cross by Ms. Bianco

1   questions.

2        THE COURT:  Anything further?

3        MS. AMANDOLARE:  Just briefly, Your Honor.

4

5   REDIRECT EXAMINATION BY MS. AMANDOLARE:

6   Q.   You just indicated on cross-examination that you weren't

7   the investigator that spoke with Mackenzie Bailey?

8   A.   Correct.

9   Q.   Are you aware of who did speak with Mackenzie Bailey that

10  evening?

11  A.   I am.

12  Q.   Who was that?

13  A.   Investigator Olson.

14  Q.   Were you present with investigator Olson and

15  Mackenzie Bailey when they were having a conversation?

16  A.   No.

17       MS. AMANDOLARE:  I have nothing further.  Thank you,

18  Judge.

19       THE COURT:  Anything further?

20       MS. BIANCO:  Just briefly.

21

22  RECROSS EXAMINATION BY MS. BIANCO:

23  Q.   You found out the investigator who interviewed Mackenzie

24  was Investigator Olson, correct?

25  A.   Yes.

395

COREY FRANCIS - Recross by Ms. Bianco

1   Q.   But while you were present during the execution of the

2   search, Mackenzie Bailey was made to sit in one room while you

3   confiscated all the devices, correct?

4   A.   I don't know if she was made to, but she was asked.

5   Q.   Well, did she have access to any of the devices while you

6   were present?

7   A.   No.

8        MS. BIANCO:  Thank you.

9        THE COURT:  Okay.  Thank you.  You may step down.

10       (Whereupon, the Witness is excused.)

11       THE COURT:  Next witness.

12       MS. FLETCHER:  United States calls Paul Fregoe.

13

14       PAUL FREGOE, having been called as a Witness, being

15  first duly sworn, was examined and testified as follows under

16  oath:

17

18  DIRECT EXAMINATION BY MS. FLETCHER:

19  Q.   Mr. Fregoe, how old are you?

20  A.   Thirty-three.

21  Q.   Where do you live?

22  A.   Right now on Main Street in Massena, 69 Main Street,

23  Apartment 1.

24  Q.   Who lives there with you?

25  A.   My girlfriend Amber Seacort (phonetically).

396

PAUL FREGOE - Direct By Ms. Fletcher

1   Q.   Is it just the two of you?

2   A.   Yes.

3   Q.   How long have you lived on Main Street in the Village of

4   Massena?

5   A.   Almost three years.

6   Q.   Where is your home on Main Street in relation to Glenn

7   Street?

8   A.   It is like right out back.

9   Q.   Can you turn around, do you see the map behind you there

10  if you turned around?

11  A.   Yes.

12  Q.   Do you see 44 Glenn Street?

13  A.   Yes, the middle one.

14  Q.   To the other side to left of Glenn Street, is that Main

15  Street?

16  A.   To the where?

17  Q.   Is this at Massena Public Library?

18  A.   Yes.

19  Q.   And Main Street would be the street directly to the left

20  on the map?

21  A.   Yes.

22  Q.   Is that where you live?

23  A.   Yes.

24  Q.   Did you live there in 2016?

25  A.   Yes.

397

PAUL FREGOE - Direct By Ms. Fletcher

1   Q.   Do you know the defendant in this case, Stacey LaPorte?

2   A.   Yes.

3   Q.   Do you call him Stacey or by another name?

4   A.   I call him both.

5   Q.   You call him both?

6   A.   Yes.

7   Q.   What's the other name you call him?

8   A.   Joey.

9   Q.   Do you know him to use both names?

10  A.   Yes.

11  Q.   How do you know him?

12  A.   From Maple Street.

13  Q.   What do you mean from Maple Street?

14  A.   We used to live on Maple, and he used to live across the

15  street.

16  Q.   When he lived on Maple did you also live on Maple?

17  A.   Yes.

18  Q.   And you became acquainted then?

19  A.   Yes.

20  Q.   Does he have some relation to your girlfriend, Amber?

21  A.   She says it is her cousin.

22  Q.   When you lived on Maple, who was living -- while when you

23  and the defendant both lived on Maple Street, who was living

24  with the defendant?

25  A.   Mackenzie, his sister, and Mackenzie's daughter.

398

PAUL FREGOE - Direct By Ms. Fletcher

1   Q.   And if you turned around again, 52 Maple on that map, is

2   that the location where he was living when you met him?

3   A.   Yes, top left.

4   Q.   Do you see Stacy LaPorte or Joey as you also know him in

5   the courtroom today?

6   A.   Yes, I see him.

7   Q.   Could you identify him for the record, please, where is

8   he sitting and what is he wearing?

9   A.   In the black with the black suit and tie.

10          MS. FLETCHER:   May the record reflect that he has

11  identified the defendant, Your Honor.

12          THE COURT:   So noted.

13  BY MS. FLETCHER, CONTINUED:

14  Q.   Do you remember when you moved to Main Street?

15  A.   I can't remember, about two and a half years ago.

16  Q.   Did there come a time after you moved to Main Street that

17  the defendant moved to the house on Glenn Street?

18  A.   Yes.

19  Q.   Did you visit him there?

20  A.   Yes, once in a while.

21  Q.   Did he visit your home on Main Street?

22  A.   Yes.

23  Q.   Did you have his phone number?

24  A.   Yes.

25  Q.   Would you contact him on the phone on occasion?

399

PAUL FREGOE - Direct By Ms. Fletcher

1   A.   Yes.

2   Q.   Did you have him listed as one of your contacts in your

3   phone.

4          MS. BIANCO:   Your Honor, I am going to object to

5   leading nature of these questions.

6          THE COURT:   Overruled.

7   A.   Yes.

8   BY MS. AMANDOLARE, CONTINUED:

9   Q.   Is his contact information still in your phone?

10  A.   Yes.

11  Q.   I am going to show you two pictures marked 39A and 39B

12  for identification.  Can you take a look at those pictures, do

13  you recognize those?

14  A.   Yes, it is his number saved on my phone.

15  Q.   Do you remember when those pictures were taken?

16  A.   Last Friday when I was here.

17  Q.   You still had his contact in your phone?

18  A.   Yes.

19  Q.   And 39A is part of -- what is the difference between the

20  two pictures?

21  A.   One is where I saved his name and the other has his phone

22  number saved under that name.

23  Q.   Is that how they appear in your phone?

24  A.   Yes.

25          MS. FLETCHER:   Judge, I would move 39A and B.

400

PAUL FREGOE - Direct By Ms. Fletcher

1          MS. BIANCO:   May I have a moment, Your Honor?  No

2   objection.

3          THE COURT:   Received.

4          (Exhibit No. 39A, 39B, received.)

5          MS. FLETCHER:   Put up 39A, please.

6   BY MS. FLETCHER, CONTINUED:

7   Q.   What is shown in the picture that's on your monitor?

8   A.   That's what I saved them under.

9   Q.   Why does it say Stace X?

10  A.   I don't know. That's just how I saved it.

11  Q.   Did you mistype?

12  A.   I don't know, something.

13  Q.   When you go into your contacts and you want to call

14  Stacey LaPorte, is this the number you go to?

15  A.   Yes.

16  Q.   What was the phone number that you had for

17  Stacey LaPorte?

18  A.   That one right there.

19  Q.   315-514-4814?

20  A.   Yes.

21          MS. FLETCHER:   And 39B, can we put that up, please?

22  BY MS. FLETCHER, CONTINUED:

23  Q.   And what screen of your phone is this?

24  A.   My contact screen.

25  Q.   So this is where all of your contacts are and if you want

401

PAUL FREGOE - Direct By Ms. Fletcher

1   to get to the phone number you touch where it says Stace X?

2   A.   Yes.

3   Q.   And then you get to the screen that we just saw 39A?

4   A.   Yes, and then you hit the call button.

5   Q.   And if you hit the call button, who do you get on the

6   other end?

7   A.   Stacey.

8   Q.   Do you know who he was living with when he moved into

9   Glenn Street?

10  A.   Same people.

11  Q.   Who were they?

12  A.   Mackenzie and Mackenzie's daughter.

13  Q.   Mackenzie, Mackenzie's daughter, and who?

14  A.   Joey's sister.

15  Q.   Do you know her name?

16  A.   I can't think off the top of my head.

17       MS. FLETCHER:  We can take that picture down now.

18  BY MS. FLETCHER, CONTINUED:

19  Q.   Did there come a time when Stacey and Mackenzie lived on

20  Glenn Street that Mackenzie came to your house looking for

21  Joey?

22  A.   Well, she called my phone asking if I seen him.  I said

23  no, I haven't.

24  Q.   And was there a time after that when he asked if he could

25  come and stay with you?

402

PAUL FREGOE - Direct By Ms. Fletcher

1   A.   Yes, he was -- he called me one day and said that

2   Mackenzie left him and he had no place to stay.  So I let him

3   stay at my house.

4   Q.   Do you remember when that was?

5   A.   About a little over a year ago.

6   Q.   But do you remember what month it was?

7   A.   No, I don't remember.

8   Q.   Was he living on Glenn street or had he been living on

9   Glenn Street at the time?

10  A.   Yes.

11  Q.   And then he told you Mackenzie left him and he had no

12  place to stay?

13  A.   Yes.

14  Q.   Did you let him move in with you?

15  A.   Well, I let him stay the night at my house.

16  Q.   And did he stay more than one night?

17  A.   Yes, he stayed a few nights.

18  Q.   Was he staying somewhere else too?

19  A.   At Tiffany Matthie's.

20  Q.   Where was Tiffany Matthie living at that time?

21  A.   At that old building he was living at 52 Maple Street.

22  Q.   To that house right there in the picture?

23  A.   Yes, but downstairs.

24  Q.   All right.  A different apartment than he had lived in?

25  A.   Yes.

403

PAUL FREGOE - Direct By Ms. Fletcher

1   Q.   So during this period of time when he said he had no

2   where to live, was he living sometimes with you and sometimes

3   with Tiffany?

4   A.   Yes, he stayed back and forth.

5   Q.   Did Joey bring any personal belongings to your house?

6   A.   Yes, a bookbag with a shirt, his father's ashes, and his

7   cell phone.

8   Q.   His father's ashes?

9   A.   Yes.

10  Q.   Did he carry them around?

11  A.   They were in like a box.

12  Q.   And he brought that to your house?

13  A.   Yes.

14  Q.   What kind of a phone did he have that he brought to your

15  house?

16  A.   A black phone and left it there when he got picked up.

17  Q.   So the phone that he brought to your house, had you seen

18  him using it?

19  A.   Yes.

20  Q.   Did he have it with him often?

21  A.   Yes.

22  Q.   Did you -- do you know who Hillary Trimm is?

23  A.   Yes.

24  Q.   Who is she?

25  A.   One of his baby mamas.

404

PAUL FREGOE - Direct By Ms. Fletcher

1   Q.   Did she come to your home when Joey was staying with you?

2   A.   She came once.

3   Q.   Did she visit him there?

4   A.   Yes, just once for a few hours and then she left.

5   Q.   Did there come a time that the police came to your home

6   looking for Stacey?

7   A.   Yes, two investigators.

8   Q.   Do you remember that?

9   A.   So, yes.

10  Q.   Okay.  Do you remember who the investigators were?

11  A.   Dewayne and some other guy.

12  Q.   This guy over here?

13  A.   Yes.

14  Q.   And did you answer the door or did somebody else answer

15  the door?

16  A.   I think I answered it or Amber.

17  Q.   Where was Joey when the police came to your door?

18  A.   Sitting on my couch.

19  Q.   What was he doing?

20  A.   Just sitting there.

21  Q.   Was Amber home?

22  A.   Yes.

23  Q.   What had you and Joey and Amber been doing before

24  Investigator Baillargeon came to the door?

25  A.   I don't know, just sitting around.  Watching TV shows.

405

PAUL FREGOE - Direct By Ms. Fletcher

1  Q.  Had you been drinking?
2  A.  No.
3  Q.  Had you been using drugs?
4  A.  No.
5  Q.  Do you have alcohol in your home?
6  A.  No.
7  Q.  Do you have drugs in your home?
8  A.  No.
9  Q.  Do you allow that?
10  A.  No.
11  Q.  Was Joey drinking before the police came?
12  A.  No.
13  Q.  Was Joey smoking marijuana before the police came?
14  A.  No.
15     MS. BIANCO:  Judge, she is leading the witness.  I
16  am going to object, continually leading.
17     THE COURT:  Overruled.
18  BY MS. FLETCHER, CONTINUED:
19  Q.  How do you know?
20  A.  I was there.
21  Q.  After the police came and asked for Joey what happened?
22  Or actually they asked for Stacey LaPorte, right?
23  A.  Yes.
24  Q.  What happened?
25  A.  I went inside and told him there was two people outside

406

PAUL FREGOE - Direct By Ms. Fletcher

1  looking for him, so he walked to the door.  They said you need
2  to come with us, and they walked down the stairs.  I looked out
3  the window.  He hopped in the car and that was the last I seen
4  of him.
5  Q.  Did he leave his belongings at your house?
6  A.  Yes, they were left there.
7  Q.  All of them?
8  A.  Yes.
9  Q.  Including his phone?
10  A.  Yes.
11  Q.  I am going to show you Government's Exhibit 15 for
12  identification?
13     THE COURT:  What number?
14     MS. FLETCHER:  Fifteen.
15  BY MS. FLETCHER, CONTINUED:
16  Q.  Do you recognize that phone?
17  A.  Yes.
18  Q.  What does it appear to be to you?
19  A.  An LG.
20  Q.  Is that the type of phone that Joey had?
21  A.  Yes.
22  Q.  Is that the type of phone that he left at your house?
23  A.  Yes.
24  Q.  Do you know whether or not this is that exact phone?
25  A.  If I seen a picture of the background.

407

PAUL FREGOE - Direct By Ms. Fletcher

1  Q.  Okay.  But this appears similar, correct?
2  A.  Yes.
3  Q.  And when you say if I saw a picture of the background,
4  what do you mean by that?
5  A.  Because I found it on my table.  And Amber did, and she
6  turned it on and tried to turn it on because she had the exact
7  same phone, but the background wasn't hers.
8  Q.  And what is the background?
9  A.  It was a black with like a blue superman symbol.
10  Q.  Did you look at the phone?
11  A.  Yes, I tried to unlock it a few times, but it didn't want
12  to work.
13  Q.  What kind of lock screen did it have?
14  A.  The one that you draw the lines.
15  Q.  You needed to draw a pattern to unlock it?
16  A.  Yes.
17  Q.  Did you try.
18  A.  Yes, I tried an Z -- or S for superman, but it wouldn't
19  work.
20  Q.  I am going to show you Exhibit 40 for identification.  Do
21  you recognize what's depicted in that exhibit?
22  A.  Yes.
23  Q.  What is that?
24  A.  The superman symbol that was on the background when I
25  tried to unlock it.

408

PAUL FREGOE - Direct By Ms. Fletcher

1  Q.  Is that exactly what that lock screen looked like on the
2  defendant's phone that he left behind at your house?
3  A.  Yes.
4     MS. FLETCHER:  Judge, I am going to move Exhibit 40
5  into evidence.
6     THE COURT:  Any objection?
7     MS. BIANCO:  No objection.
8     THE COURT:  Received.
9     (Exhibit No. 40, received.)
10     MS. FLETCHER:  Can you put that up, please?
11  BY MS. FLETCHER, CONTINUED:
12  Q.  So after the defendant was taken by the police, you tried
13  to get into his phone?
14  A.  Yes.
15  Q.  Is this what it looked like when you tried to get into
16  his phone?
17  A.  Yes.
18  Q.  Did there come a time after Joey left with the police
19  that you learned he had been arrested?
20  A.  Yes, when he didn't come back.
21  Q.  Did you find out where he was located?
22  A.  Yes, the Saint Lawrence County Jail.
23  Q.  Did you visit him there?
24  A.  Yes.  Amber wanted to go see him so we went to see him
25  once.

Case 18-105, Document 44, 04/15/2019, 2540369, Page53 of 202

Case 5:16-cr-00320-DNH  Document 118-1  Filed 09/05/18  Page 197 of 237          Case 5:16-cr-00320-DNH  Document 118-1  Filed 09/05/18  Page 198 of 237

409

PAUL FREGOE - Direct By Ms. Fletcher

1   Q.   Did he ask you do something with his belongings when you

2   went to visit him?

3   A.   Well, Tiffany said that it was all right for her to take

4   the stuff --

5         MS. BIANCO:   Objection to what Tiffany said.

6         THE COURT:   Overruled.

7   BY MS. FLETCHER, CONTINUED:

8   Q.   Go ahead.  You can answer?

9   A.   She asked Joey and Joey said it was all right to give the

10  stuff to her.

11  Q.   When you went to visit Joey, did you ask him if it was

12  okay to give his belongings to Tiffany?

13  A.   Well, Amber asked.

14  Q.   Were you sitting there?

15  A.   Yes.

16  Q.   And what did he say?

17  A.   He said it was all right.

18  Q.   And Tiffany being Tiffany Matthie?

19  A.   Yes.

20  Q.   So when he told you that you could take his belongings to

21  Tiffany Matthie, what did you do?

22  A.   I put all the stuff in his bookbag and brought it over

23  there with Amber.

24  Q.   You and Amber brought it over?

25  A.   Yes.

---

410

PAUL FREGOE - Direct By Ms. Fletcher

1   Q.   To where?

2   A.   52 Maple Street.

3   Q.   Did that include the LG phone?

4   A.   Yes.

5   Q.   Do you recall when you did it?

6   A.   About a week and a half after we seen him at the jail.

7   Q.   Have you spoken with the defendant ever again since the

8   day you visited him in the jail?

9   A.   No.

10        MS. FLETCHER:  I have no further questions.

11        THE COURT:  You may examine.

12        MS. BIANCO:  Thank you, Your Honor.

13

14  CROSS-EXAMINATION BY MS. BIANCO:

15  Q.   Good afternoon, Paul.

16  A.   How are you?

17  Q.   Now, you have been friends with Stacey for a while; is

18  that right?

19  A.   Yes, so so.

20  Q.   Well, he is a cousin of your girlfriend, correct?

21  A.   That's what she says, but I don't see how they are

22  related.

23  Q.   Okay.  He gave you a number of tattoos, didn't he,

24  Stacey?

25  A.   Yes, he gave me a few tattoos.

---

411

PAUL FREGOE - Cross by Ms. Bianco

1   Q.   And he spent a number of hours with you working on those

2   tattoos, correct?

3   A.   Yes.

4   Q.   One of those tattoos was a dragon, working on a dragon on

5   your arm; is that right?

6   A.   Yes.

7   Q.   And that was in the spring of this year, March, wasn't

8   it?

9   A.   I don't know exactly.

10  Q.   Well, when he came over to do the dragon, it was 2016,

11  wasn't it?

12  A.   I don't remember.

13  Q.   Okay, and he did spend a few hours working on the dragon

14  tattoo?

15  A.   Yes.

16  Q.   Now, when Stacey came to your house and said he had no

17  place to stay, do you remember giving that testimony?

18  A.   Yes.

19  Q.   And he said Mackenzie had ran?

20  A.   Yes.

21  Q.   And she had ran off with his uncle, didn't she?

22  A.   That's what he said.

23  Q.   Okay, and he asked you if he could stay at your house?

24  A.   Yes.

25  Q.   And there came a time when the police came to your house

---

412

PAUL FREGOE - Cross by Ms. Bianco

1   looking for Stacey, right?

2   A.   Yes.

3   Q.   And was it Amber that answered the door?

4   A.   She said she answered the door, but I don't remember.

5   Q.   Okay.  Well, when the door was opened, you heard what the

6   police were saying, correct?

7   A.   She said there was somebody at the door so I walked out,

8   and they asked for Stacey LaPorte.

9   Q.   And then Stacey walked up to the door, correct?

10  A.   Yes.

11  Q.   And they said that he had to go with them, right?

12  A.   Yes.

13  Q.   And that he can go with or without cuffs, is that what

14  you heard?

15  A.   I don't exactly remember.

16  Q.   Did you hear anything about handcuffs?

17  A.   I heard something, but I don't know if it was about

18  handcuffs.

19  Q.   When you say you heard something, do you mean from the

20  police?

21  A.   Something from Joey's mouth like a mumble or like talking

22  low.

23  Q.   Okay.  You said you had -- Stacey left his, was it a

24  backpack at your house?

25  A.   Yes.

413

PAUL FREGOE - Cross by Ms. Bianco

1   Q.   And that's because he was staying at your house, correct?

2   A.   No, he was staying back and forth between my house and

3   Tiffany's.

4   Q.   Okay.  When you say back and forth, he would bring some

5   of his items to the house, right?

6   A.   Yes.

7   Q.   And when he brought some of his items to the house, one

8   of those items was his father's ashes, correct?

9   A.   Yes.

10  Q.   Because he didn't want to leave them with no one, he

11  didn't want to abandon them, right?

12           MS. FLETCHER:  Objection.

13  A.   Yes.

14  BY MS. BIANCO, CONTINUED:

15  Q.   Well, he told you he did not want to abandon them, that's

16  why you had them, yes?

17  A.   Yes.

18  Q.   Okay, and he wanted to make sure nothing happened to

19  them, is that right?

20           MS. FLETCHER:  Objection to what the defendant

21  wanted.

22           THE COURT:  Sustained.

23  A.   Yes.

24           THE COURT:  The answer may be stricken.

25  BY MS. BIANCO, CONTINUED:

414

PAUL FREGOE - Cross by Ms. Bianco

1   Q.   After Stacey left with the police, how long was that

2   backpack in your house before you visited him in the jail?

3   A.   I don't remember.

4   Q.   A week?

5   A.   I don't know.  When I got gas money to go see him.

6   Q.   Do you know if it was more than a month?

7   A.   I don't know.

8   Q.   Could it have been more than a month?

9   A.   Maybe.

10  Q.   And during that time that his backpack was at your house

11  the phone in the backpack was also in the house, correct?

12  A.   Yes.

13  Q.   And Hillary Trimm had come over, right?

14  A.   Not that I know of.

15  Q.   She didn't come over to retrieve some of his possessions?

16  A.   No.

17  Q.   But the backpack sat in your house and you tried to open

18  it up, excuse me, the phone, you tried to open up the phone,

19  right?

20  A.   Yes, that night after the cops picked him up.

21  Q.   And after you went to see him in the jail you went

22  because your girlfriend wanted you to go; is that right?

23  A.   Yes.

24  Q.   Didn't Stacey say in front of you in your presence I want

25  you to keep my father's ashes, didn't he say that?

415

PAUL FREGOE - Cross by Ms. Bianco

1   A.   No.

2   Q.   Meaning to Amber, the cousin, he didn't say that?

3   A.   No, he did not.

4   Q.   Okay.  You are saying that he wanted you to give his

5   phone to Tiffany Matthie?

6   A.   Yes, he said all of his stuff.

7   Q.   Not specifically the phone, everything?

8   A.   He said his stuff.

9   Q.   Okay, and when you brought it to Tiffany Matthie's house,

10  I believe you testified on direct that it was a week or a week

11  and a half after you had seen him in the jail?

12  A.   Around that time.

13  Q.   Do you know when you gave Tiffany Matthie's his things,

14  did she open up the backpack in front of you?

15  A.   I don't know.  I said here is his stuff and she took it.

16           MS. BIANCO:  I have no further questions.

17           THE COURT:  Redirect, if any.

18           MS. FLETCHER:  No.

19           MS. BIANCO:  You may be excused.

20           (Whereupon, the Witness is excused.)

21           THE COURT:  And we will take our afternoon break,

22  members of the jury.  Don't discuss the case among yourselves

23  or anyone else, and we will be back in ten or fifteen minutes

24  for the final session for today.

25           (Whereupon, a brief recess was taken.)

416

1           (Whereupon, the proceedings were held in open court

2           in the presence of the Jury.)

3           THE COURT:  The government may call its next

4   witness.

5           MS. AMANDOLARE:  The government calls State of New

6   York state police Investigator Nicholas Arcadi.

7

8           NICHOLAS ARCADI, having been called as a Witness, being

9   first duly sworn, was examined and testified as follows under

10  oath:

11

12  DIRECT EXAMINATION BY MS. AMANDOLARE:

13  Q.   Good afternoon, Investigator Arcadi.

14  A.   Good afternoon.

15  Q.   By whom are you employed?

16  A.   With the New York State Police.

17  Q.   And what is your title with the New York State Police?

18  A.   Investigator.

19  Q.   Where are you assigned?

20  A.   To the State Police barracks in Massena.

21  Q.   How long have you been an investigator with the New York

22  State Police?

23  A.   For two years now.

24  Q.   Do you have any other law enforcement experience prior to

25  becoming an investigator?

Case 18-105, Document 44, 04/15/2019, 2540369, Page55 of 202

Case 5:16-cr-00320-DNH   Document 118-1   Filed 09/05/18   Page 205 of 237          Case 5:16-cr-00320-DNH   Document 118-1   Filed 09/05/18   Page 206 of 237

417

NICHOLAS ARCADI - Direct By Ms. Amandolare

1   A.   Yes, I worked nine years as a uniformed trooper.

2   Q.   Throughout your career as a law enforcement agent,

3   approximately how many arrests and investigations involving the

4   sexual abuse of minors have you been involved in any way?

5   A.   Approximately a dozen.

6   Q.   I would like to draw your attention to May 19, 2016.  Did

7   there come a time on that day that you became involved in an

8   investigation?

9   A.   Yes.

10  Q.   What was the nature of that investigation?

11  A.   Possibly sexual abuse of children.

12  Q.   By this defendant, Stacey LaPorte?

13  A.   Correct.

14  Q.   Was this investigation that you were conducting separate

15  and apart from the investigation surrounding allegations of

16  this defendant's conduct as it related to B.L.?

17  A.   Yes, it was separate.

18  Q.   Now, I would like to draw your attention to June 10,

19  2016.  Did you have an opportunity to interview Hillary Trimm?

20  A.   Yes, I did.

21  Q.   And as a result of that interview, did you determined

22  that there was steps that you needed to take to further your

23  investigation?

24  A.   Yes.

25  Q.   And in order to do that, did you ultimately interview

418

NICHOLAS ARCADI - Direct By Ms. Amandolare

1   additional people who had knowledge about the case and

2   knowledge about this defendant?

3   A.   Yes, I did.

4   Q.   Did there come a time that you, along with

5   Investigator Baillargeon from the New York State Police,

6   responded to 52 Maple Street in the Village of Massena?

7   A.   Yes.

8   Q.   Do you recall what date that was?

9   A.   It was June 17, 2016.

10  Q.   Were you looking for something specific?

11  A.   Yes.

12  Q.   What was that?

13  A.   Any electronic devices belonging to Mr. Stacey LaPorte,

14  as well as an LG cell phone.

15  Q.   And that was what you were searching for because that was

16  the information you had gathered prior to 6/17 2016 when you

17  were conducting your investigation?

18  A.   That's correct.

19  Q.   And who resided at 52 Maple Street in Massena?

20  A.   Tiffany Matthie.

21  Q.   Did you respond to 52 Maple Street?

22  A.   Yes.

23  Q.   Did you come into contact with Tiffany?

24  A.   I did.

25  Q.   Did you receive any items during your contact at 52 Maple

419

NICHOLAS ARCADI - Direct By Ms. Amandolare

1   with Tiffany?

2   A.   On June 17th I did not.

3   Q.   Did you conduct a search of that residence on 6/17?

4   A.   Yes.

5   Q.   Was that pursuant to a consent search?

6   A.   It was.

7   Q.   And did you locate anything that was of relevance to your

8   investigation?

9   A.   No.

10  Q.   Did you leave 52 Maple?

11  A.   Yes, I did.

12  Q.   Did there come a point in time when you returned to that

13  residence?

14  A.   Yes, I returned to the residence the following day on

15  June 18th.

16  Q.   And was that because you had developed additional

17  information as part of your investigation that led you to

18  believe that there was something at that residence that you

19  needed?

20  A.   Yes.

21  Q.   A what happened when you went back to 52 Maple for a

22  second time?

23  A.   I went back to 52 maple.  I spoke with Tiffany Matthie,

24  and she handed me a black LG cell phone that purported to be

25  Stacey LaPorte's phone.

420

NICHOLAS ARCADI - Direct By Ms. Amandolare

1          MR. WOLFSON:  Objection as to what Tiffany Matthie

2   purported it as being.

3          THE COURT:  Overruled.

4   BY MS. AMANDOLARE, CONTINUED:

5   Q.   Okay.  Investigator Arcadi, I am going to hand you what

6   has been marked for identification as Exhibit 15.  Do you

7   recognize that?

8   A.   Yes, I did.

9   Q.   What do you recognize it to be?

10  A.   This is the black LG cell phone that I retrieved from 52

11  Maple Street.

12  Q.   On June 18, 2016?

13  A.   Correct.

14  Q.   From Tiffany Matthie?

15  A.   Yes.

16  Q.   And is there anything -- how do you know that that's the

17  cell phone or the black LG phone that you retrieved on that

18  day?

19  A.   My initials to seal the bag are located on the bag

20  containing the phone.  There is an evidence tag that I

21  completed on June 18, 2016, and I recognize that to appear to

22  be the same phone inside of it.

23  Q.   What did you do with that LG phone?

24          MS. AMANDOLARE:  I am sorry.  Your Honor, I would

25  ask that what has been marked for identification as Exhibit 15

421

NICHOLAS ARCADI - Direct By Ms. Amandolare

be moved into evidence?

2        THE COURT:  Any objection?

3        MR. WOLFSON:  No objection, Your Honor.

4        THE COURT:  Received.

5        (Exhibit No. 15, received.)

6   BY MS. AMANDOLARE, CONTINUED:

7   Q.   What did you do with that LG phone after you retrieved it

8   from 52 Maple?

9   A.   I secured the phone as evidence at our New York State

10  Police barracks in Massena.

11       MS. AMANDOLARE:  I have nothing further.  Thank you,

12  Judge.

13       THE COURT:  Mr. Wolfson.

14       MR. WOLFSON:  Yes, Your Honor.  Thank you.

15

16  CROSS-EXAMINATION BY MR. WOLFSON:

17  Q.   Good afternoon.

18  A.   Good afternoon.

19  Q.   You recovered the LG cell phone, right?

20  A.   I recovered the LG cell phone, correct.

21  Q.   And you didn't recover that from Stacey LaPorte's person?

22  A.   Correct.

23  Q.   By the time you recovered that phone Stacey had already

24  been arrested the month prior?

25  A.   Correct.

422

NICHOLAS ARCADI - Cross by Mr. Wolfson

1   Q.   So you have no idea how many people had access to that

2   phone?

3   A.   That's correct.

4   Q.   And that phone was not at Hillary Trimm's house on

5   June 17th?

6   A.   Hillary Trimm's?

7   Q.   Yes.

8   A.   I have no idea.

9   Q.   I thought you just testified that you searched

10  Hillary Trimm's house on the 17th and found nothing?

11  A.   No, that was Tiffany Matthie house.

12  Q.   I apologize.  Tiffany Matthie, that phone was not at

13  Tiffany Matthews' house on June 17th?

14  A.   I did not locate it that day.  I am not sure if it was

15  there or not.

16  Q.   But you did search the house and didn't find it?

17  A.   Yes, but it was a rather large home.  We attempted our

18  best to locate it, but I did not find it that day, no.

19  Q.   But you were able to find it the 18th of June?

20  A.   Correct.

21  Q.   Stacey LaPorte never admitted to you that this was his

22  phone, did he?

23  A.   No, he did not.

24  Q.   You testified that as part of your responsibilities you

25  interviewed Hillary Trimm?

423

NICHOLAS ARCADI - Cross by Mr. Wolfson

1   A.   Correct.

2   Q.   During this interview, did you learn that Stacey used her

3   Facebook account to contact Mackenzie Bailey?

4        MS. AMANDOLARE:  Objection, Your Honor.

5        THE COURT:  Overruled.  Cross examine, if he knows?

6   A.   Can you repeat the question?

7   BY MR. WOLFSON, CONTINUED:

8   Q.   During this interview, did you learn that

9   Mackenzie Bailey -- I apologize.  During this interview, did

10  you learn that Stacey used her Facebook account to contact

11  Mackenzie Bailey, her being Hillary Trimm?

12  A.   I am not aware of that.

13  Q.   Did you learn that Mackenzie Bailey and Hillary Trimm

14  were sexually and romantically involved with each other?

15  A.   I knew that they had at one point been sexually involved.

16  Q.   Did you learn that they continued to talk after Stacey's

17  arrest?

18  A.   Yes.

19  Q.   Turning to the Kik messaging app, as part of your

20  investigation you attempted to preserve Kick messages by filing

21  a request with Kik?

22  A.   Correct.

23  Q.   And you learned that the screen name fastfamily1327 was

24  not a valid screen name?

25  A.   Correct.

424

NICHOLAS ARCADI - Cross by Mr. Wolfson

1        MS. AMANDOLARE:  Your Honor, I am going to object

2   noting that this is outside the scope of direct examination.

3        THE COURT:  Yes, Mr. Wolfson.  Do you have a

4   response?

5        MR. WOLFSON:  I mean, I think I should be allowed

6   some latitude on cross, Your Honor.

7        THE COURT:  Overruled.  Move on.

8   BY MR. WOLFSON, CONTINUED:

9   Q.   Are you familiar with Kik, Investigator Arcadi?

10  A.   I became familiar with Kik during this investigation.

11  Q.   Have you read Kik's guide for law enforcement?

12  A.   Yes, I did review it back then.

13  Q.   So you know that to use Kik, someone has to create a user

14  name?

15  A.   Correct.

16  Q.   And this does not have to be the person's real name?

17  A.   Correct.

18  Q.   And that's the name that would show when they

19  communicated with others on that platform?

20  A.   Yes.

21  Q.   And you learned that there is two fastfamily accounts?

22  During the investigation you learned that there were two

23  fastfamily accounts, correct?

24  A.   Correct.

25  Q.   That would be fastfamily2525 and fastfamily 1327, right?

425

NICHOLAS ARCADI - Cross by Mr. Wolfson

1   A.   I don't remember the exact numbers following those, but I
2   do remember there being two fastfamily accounts.
3   Q.   And after reviewing Kik's guide for law enforcement, you
4   know that Kik does not verify a user's age?
5   A.   I don't recall that either.
6   Q.   And do you know that Kik does not verify a person's sex?
7   A.   I am not aware of that as well.
8   Q.   But you have read the guide for law enforcement?
9   A.   I did.
10  Q.   You just don't remember what it said about that?
11  A.   Correct.
12       MR. WOLFSON:  I have no further questions.  Thank
13  you.
14       THE COURT:  Redirect, if any.
15       MS. AMANDOLARE:  Thank you, Judge.
16
17  REDIRECT EXAMINATION BY MS. AMANDOLARE:
18  Q.   Investigator Arcadi, when you went back to 52 Maple on
19  June 18th did you again conduct a search of the apartment?
20  A.   I did not.
21  Q.   And in fact, when you retrieved the LG cell phone now in
22  evidence as Exhibit 15, that was handed to you by
23  Tiffany Matthie?
24  A.   That's correct.
25  Q.   And Investigator Arcadi, are you the case agent on this

426

NICHOLAS ARCADI - Redirect by Ms. Amandolare

1   case?  Are you the assigned case agent for the Stacey LaPorte
2   federal case?
3   A.   No, I am not.
4   Q.   In fact, HSI Special Agent Chad Willard is, correct?
5   A.   That is correct.
6   Q.   And that's because there came a point in time during this
7   investigation that this case was handed over for federal
8   prosecution?
9   A.   Yes.
10  Q.   And therefore, any knowledge that you have with regards
11  to Kik is limited because most of that portion of this
12  investigation was conducted by Agent Willard?
13  A.   That's correct.
14       MS. AMANDOLARE:  I have nothing further.
15       THE COURT:  Anything further?
16       MR. WOLFSON:  Nothing further.  Thank you, Your
17  Honor.
18       THE COURT:  Thank you.  You may be excused.
19       (Whereupon, the Witness is excused.)
20       THE COURT:  Next witness.
21       MS. AMANDOLARE:  The government calls New York State
22  Police Investigator Todd Svarczkopf to the stand.
23
24       TODD SVARCZKOPF, having been called as a Witness, being
25  first duly sworn, was examined and testified as follows under

427

1   oath:
2
3   DIRECT EXAMINATION BY MS. AMANDOLARE:
4   Q.   Good afternoon, Investigator Svarczkopf.
5   A.   Good afternoon.
6   Q.   By whom are you employed?
7   A.   By the New York State Police.
8   Q.   What is your title with the New York State Police?
9   A.   I am an investigator with the Troop B Computer Crime
10  Unit.
11  Q.   Where is the Troop B Computer Crime unit located?
12  A.   In Raybrook, New York.
13  Q.   Is another way to refer to the computer crime unit CC?
14  A.   Yes.
15  Q.   What are your duties and responsibilities as an
16  investigator with CCU?
17  A.   I conduct forensic analysis as well as previews for
18  electronic devices, computers, cell phones, SD cards, etcetera.
19  Q.   Did you receive training in order to be able to conduct
20  that line of work?
21  A.   Yes, I did.
22  Q.   How long have you been an investigator with the New York
23  State Police?
24  A.   I have been an investigator since 2014, January of 2014.
25  Q.   And how long have you been assigned to CCU?

428

TODD SVARCZKOPF - Direct By Ms. Amandolare

1   A.   Since January of 2014.
2   Q.   And what, if any, law enforcement experience do you have
3   prior to becoming an investigator?
4   A.   I was a New York State Trooper since 2005?
5   Q.   Throughout your career as a law enforcement agent,
6   specifically throughout your entire career as a law enforcement
7   agent, approximately how many of these types of investigations
8   involving the sexual abuse of minors have you been involved in?
9   A.   I would say probably thousands.
10  Q.   And with regards to your time as an investigator assigned
11  to CCU, approximately how many electronic devices have you
12  forensically analyzed?
13  A.   Also thousands.
14  Q.   Did there come a point in time that you became involved
15  in an investigation concerning this defendant,
16  Stacey J. LaPorte, Jr.?
17  A.   Yes, I did.
18  Q.   What, if anything, were your responsibilities in regards
19  to this investigation?
20  A.   My duties were to forensically examine the electronic
21  devices associated with this case.
22  Q.   And how did you obtain those electronic devices?
23  A.   They were brought through evidence chains.
24  Q.   From other members in law enforcement?
25  A.   Correct.

429

TODD SVARCZKOPF - Direct By Ms. Amandolare

1   Q.   Both from the state and federal level?

2   A.   Yes.

3   Q.   And when you say forensically examine or analyze

4   electronic devices what do you mean by at that?

5   A.   I conduct an examination or a download of the data that's

6   on whatever the device may be, whether it is a computer, cell

7   phone, SD card, etcetera, and put that into a readable form

8   that I then interpret and analyze.

9   Q.   And when you conduct that examination and you are

10  analyzing the data, you are looking for evidence that is

11  relevant to the cases you are working on?

12  A.   That's correct.

13  Q.   I want to draw your attention to August 24th of 2016.

14  Were you working on that day?

15  A.   Yes, I was.

16  Q.   Did there come a time on that day that you were asked to

17  conduct a search of a black LG cellular telephone?

18  A.   Yes.

19  Q.   I am going to hand you what is in evidence as Exhibit 15.

20  Feel free to take it out of the bag.  Do you recognize that?

21  A.   Yes, I do.

22  Q.   What do you recognize that to be?

23  A.   This is an LG cell phone that I was given, provided to

24  analyze.

25  Q.   How do you know that you were provided that particular LG

430

TODD SVARCZKOPF - Direct By Ms. Amandolare

1   to analyze?

2   A.   My initials are on the bag.

3   Q.   How did you retrieve that device?

4   A.   This device was provided to me from Troop B Headquarters'

5   vault, evidence vault also located in Raybrook.

6   Q.   What was the condition of that cell phone when you first

7   came into contact with it?

8   A.   The phone was in a paint can, or as we refer to them as

9   arson cans.  It was sealed.  I mean knocked down at the top so

10  that it was closed, and the phone, itself, was in a sealed

11  plastic bag inside the can.

12  Q.   Is that the common form an electronic device would come

13  to you or that you would retrieve it from the evidence locker?

14  A.   Yes.

15  Q.   I am going to hand you what has been marked for

16  identification as 43A, B, C, and D.  Do you recognize those

17  images depicted in those exhibits?

18  A.   Yes.

19  Q.   Did you take those photographs?

20  A.   Yes, I did.

21  Q.   Do each one of those photographs depict a fair and

22  accurate depiction of what you just described for this jury,

23  that that phone was located in a sealed paint can, and inside

24  of that paint can was located in a sealed plastic bag?

25  A.   Yes.

431

TODD SVARCZKOPF - Direct By Ms. Amandolare

1        MS. AMANDOLARE:  Your Honor, I would ask that what's

2   been marked as Government's Exhibits 43A through D be moved

3   into evidence.

4        THE COURT:  Any objection?

5        MR. WOLFSON:  Just a moment, please.

6        MS. BIANCO:  Can we see yours?  I can't seem to find

7   mine.

8        MR. WOLFSON:  No objection, Your Honor.

9        THE COURT:  43A, B, C, and D are received.

10       (Exhibit No. 43A, B, C, D, received.)

11       MS. AMANDOLARE:  I would ask that 43A be published

12  to the jury?

13       THE COURT:  You may.

14  BY MS. AMANDOLARE, CONTINUED:

15  Q.   Investigators Svarczkopf, looking as what is in evidence

16  as Exhibit 43A, does that depict the sealed paint can that

17  contained this LG phone?

18  A.   Yes.

19  Q.   How do you know that that is the paint can containing the

20  LG phone that's in evidence as Exhibit 15?

21  A.   The yellow stickers that are on the device, I placed on

22  there.

23       MS. AMANDOLARE:  And if 43B could be published.

24  BY MS. AMANDOLARE, CONTINUED:

25  Q.   What does that photograph depict?

432

TODD SVARCZKOPF - Direct By Ms. Amandolare

1   A.   That's the inside of the paint can after I removed the

2   lid from the paint can showing the LG phone in the plastic bag

3   in the bottom of the can.

4   Q.   That's the condition that you received this cell phone?

5   A.   Yes.

6   Q.   Looking a 43C, asking that to be published to the jury.

7   What does that depict?

8   A.   That is the cell phone in the sealed plastic bag outside

9   of the paint can.  That is the front of the phone.

10       MS. AMANDOLARE:  And 43D, asking that to be

11  published.

12  BY MS. AMANDOLARE, CONTINUED:

13  Q.   What does that depict?

14  A.   That is a picture of the LG cell phone in the sealed

15  plastic bag, and that is the back of the phone.

16  Q.   And you indicated that that bag was sealed?

17  A.   Yes.

18  Q.   Does that seal have a date and an initial on it?

19  A.   Yes.

20  Q.   And whose initials does it depict?

21  A.   Those are Investigator Nicholas Arcadi's initials.

22  Q.   Once you received this LG cellular phone, what did you do

23  with it next?

24  A.   I placed it into my evidence and put it in my evidence

25  locker.

433

TODD SVARCZKOPF - Direct By Ms. Amandolare

1  Q.   Did there come a time when you conducted a forensic
2  analysis of this phone?
3  A.   Yes.
4  Q.   Can you describe for the jury what that entailed?
5  A.   I removed the phone from my evidence locker.  I took
6  pictures of the can, itself, how it arrived to me, pictures of
7  the phone, front, back, sides.  If there was any attached media
8  to the phone.  Took pictures of any relevant serial numbers,
9  etcetera.  I then placed the phone into a, what is called, a
10 Faraqay enclosure, which isolates the device from the network.
11 I powered the phone on and placed the phone into airplane mode.
12 Q.   All of those steps that just described, is that normal
13 protocol that you take when you retrieve an electronic device
14 and are preparing to conduct an examination?
15 A.   Yes, it is.
16 Q.   Now, and the photographs you just described, what I just
17 entered into evidence as 43A through D, does that reflect a
18 portion of those photographs that you took of that phone on
19 that day?
20 A.   Yes, those are my pictures.
21 Q.   Now, when you turned the phone on to begin your analysis,
22 what, if anything, did you notice about the state of the phone?
23 A.   The phone was in a locked condition and there was a lock
24 screen picture of a blue superman logo.
25 Q.   Did you document that lock screen in any way?

434

TODD SVARCZKOPF - Direct By Ms. Amandolare

1  A.   I did.
2  Q.   How?
3  A.   I took a picture of it.
4  Q.   I am going to hand you what I have asked to be marked for
5  identification -- or what is marked for identification as
6  Exhibit 18.  Do you recognize that?
7  A.   Yes.
8  Q.   And what does Exhibit 18 depict?
9  A.   This is the lock screen of the phone.
10      THE COURT:  What is that exhibit?
11 A.   18.
12 BY MS. AMANDOLARE, CONTINUED:
13 Q.   I am handing you what is already in evidence as
14 Government's Exhibit 40.  Do you recognize that image?
15 A.   Yes, I do.
16 Q.   Is that a photograph that you took?
17 A.   Yes, it is.
18 Q.   Is that a fair and accurate depiction of the lock screen
19 as you witnessed it on the day that you were prepared to
20 forensically that black LG?
21 A.   Yes, it is.
22      MS. AMANDOLARE:  Can I have Exhibit 40 published for
23 the jury.
24 BY MS. AMANDOLARE, CONTINUED:
25 Q.   What is depicted on that lock screen?

435

TODD SVARCZKOPF - Direct By Ms. Amandolare

1  A.   You can see that the phone has been placed in airplane
2  mode.  There is a blue superman logo on the screen as well as
3  the dots for a swipe pattern to unlock the device.
4  Q.   Thank you.  So you indicated that this particular device
5  was locked?
6  A.   Correct.
7  Q.   Were you able in any way to get into that phone or break
8  that lock or come up with the password to get into that phone?
9  A.   No, I was not.
10 Q.   What did you do once you realized the phone was locked
11 and you couldn't analyze it?
12 A.   I contacted the lead investigator in this case to
13 determine whether or not we had a pass code available to us for
14 that device.  I was advised that we did not.  We further
15 discussed sending the phone to our main office, our main lab in
16 Albany for analysis.
17 Q.   And how did you prepare it before you sent it to the lab
18 to be analyzed there?
19 A.   When I realized the phone was locked, I turned the phone
20 off.  I placed it back into the plastic bag.  I then sealed the
21 plastic with New York State Police evidence tape, and initiated
22 along that tape, placed it back into the paint can, and
23 returned it to my evidence locker.
24 Q.   Once you returned it to your evidence locker, what did
25 you do next in order to further the analysis process?

436

TODD SVARCZKOPF - Direct By Ms. Amandolare

1  A.   I contacted the members of the investigation to determine
2  if we were going to send that for further analysis.
3  Q.   And what was the ultimate determination?
4  A.   That we were indeed going to send that for further
5  analysis.
6  Q.   Where was it being sent for further analysis?
7  A.   To Albany, New York.
8  Q.   What's located in Albany?
9  A.   Our forensic investigation center, which is our main
10 computer lab.
11 Q.   At that point in the investigation, did you become aware
12 as to who would be conducting further analysis at that
13 laboratory?
14 A.   Deborah Jasinski.
15 Q.   And she is a member of the New York State Police?
16 A.   Yes.
17 Q.   I am going to hand you what is marked for identification
18 as Government's Exhibits B and E.  Do you recognize those
19 images?
20 A.   I do.
21 Q.   And do those images depict a fair and accurate
22 representation of how you sealed that phone before it was sent
23 to Albany for further analysis?
24 A.   Yes, they do.
25      MS. AMANDOLARE:  Your Honor, I would ask that what

Case 18-105, Document 44, 04/15/2019, 2540369, Page60 of 202

Case 5:16-cr-00320-DNH   Document 118-1   Filed 09/05/18   Page 225 of 237          Case 5:16-cr-00320-DNH   Document 118-1   Filed 09/05/18   Page 226 of 237

437

TODD SVARCZKOPF - Direct By Ms. Amandolare

1   is marked for identification as Exhibit 15B and 15E be moved
2   into evidence.
3             THE COURT:  Any objection.
4             MR. WOLFSON:  No objection, Your Honor.
5             THE COURT:  Received.
6             (Exhibit No. 15B, 15E, received.)
7             MS. AMANDOLARE:  Thank you Your Honor. I would ask
8   that 15B be published for the jury.
9   BY MS. AMANDOLARE, CONTINUED:
10  Q.   Looking at what is in evidence as Exhibit 15B, can you
11  describe that for the jury?
12  A.   Sure.  It is the sealed paint can containing the LG cell
13  phone.
14  Q.   And 15E?  What does 15E depict?
15  A.   15E is the cell phone, LG cell phone, in the sealed
16  plastic bag with my initials on the New York State Police
17  evidence tape.
18  Q.   And that's how you know that you are the individual that
19  sealed that bag and sent it to Albany for further analysis?
20  A.   Yes.
21  Q.   And why Albany?
22  A.   Albany has -- Troop B Computer Crime Unit is a regional
23  office.  The main lab for our computer crime unit is in Albany.
24  They have some advanced process and trainings that we do not
25  have available to us at the regional level.

438

TODD SVARCZKOPF - Direct By Ms. Amandolare

1   Q.   In addition to attempting to forensically analyzing the
2   LG cell phone that you just described, did there come a point
3   in time where you were asked to analyze an iPhone?
4   A.   Yes.
5   Q.   As part of this investigation?
6   A.   Yes.
7   Q.   I am going to hand you what is marked for identification
8   as Government's Exhibits 13A through 13M.  Do you recognize
9   those?
10  A.   Yes, I do.
11  Q.   Are you the individual that took those images?
12  A.   Yes, I am.
13  Q.   And was that in preparation to conduct a forensic
14  analysis of that iPhone?
15  A.   Yes.
16  Q.   Are those a fair and accurate depiction of the iPhone as
17  you received it as part of this investigation?
18  A.   Yes.
19            MS. AMANDOLARE:  Your Honor, I would ask that what's
20  marked for identification as Government's Exhibit 13A through M
21  be moved into evidence?
22            THE COURT:  Any objection?
23            MR. WOLFSON:  No objection, Your Honor.
24            THE COURT:  Received.
25            (Exhibit No. 13A through 13M, received.)

439

TODD SVARCZKOPF - Direct By Ms. Amandolare

1             MS. AMANDOLARE:  If I could have Exhibit 13A
2   published to the jury.
3   BY MS. AMANDOLARE, CONTINUED:
4   Q.   What is depicted in Exhibit 13A?
5   A.   It is the paper bag containing the iPhone.
6   Q.   And Exhibit 13B?
7   A.   It is the back side of the bag containing the iPhone.
8   Q.   13C?
9   A.   It is the iPhone outside of the paper bag with part of
10  the case removed.
11  Q.   13D?
12  A.   13D is the iPhone outside of the bag with the case
13  removed.
14  Q.   13E?
15  A.   I am sorry, 13D is the front of the phone.  13E contains
16  a picture of the paper bag and the iPhone outside of the paper
17  bag, and that is the rear or back of the phone.
18  Q.   13F?
19  A.   13F is the numbers identifiers of the iPhone on the back
20  of the phone.
21  Q.   13G?
22  A.   13G is also the identifiers, numbers, label iPhone on the
23  back of the phone.
24  Q.   Looking at 13G, does anything in that image depict where
25  this phone was assembled?

440

TODD SVARCZKOPF - Direct By Ms. Amandolare

1   A.   Yes, the iPhone was assembled in China.
2   Q.   Looking at 13H?
3   A.   13H is the front of the iPhone depicting the SIM card
4   tray slightly ajar.
5   Q.   13I?
6   A.   13I is a picture of the SIM card, the SIM card tray, and
7   the numbers on that SIM card.
8   Q.   13J?
9   A.   13J is the SIM card tray showing the IMEI number and the
10  serial number for the iPhone.
11  Q.   And based on your training and experience, do the serial
12  number and IMEI number on an iPhone help identify that
13  particular phone?
14  A.   Yes.
15  Q.   What is depicted in 13K?
16  A.   13K is the screen after I powered the device on showing
17  that the iPhone has been disabled.
18  Q.   And 13L?
19  A.   13L is the attempt at an extraction that I completed.
20  Q.   And 13M?
21  A.   13M is the secondary screen showing that that extraction
22  is not possible.
23  Q.   I am going to hand you what is in evidence as Exhibit 15
24  one more time.  I will ask you to remove that LG cell phone
25  from that bag.  Are there any identifiers on that particular

**G.A. 057**

441

TODD SVARCZKOPF - Direct By Ms. Amandolare

1 phone that would indicate where that phone was made,

2 manufactured or assembled?

3    A.   On the phone board, itself, it says made in China.

4         MS. AMANDOLARE:  Thank you.  I have no further

5 questions.

6         THE COURT:  Mr. Wolfson, you may examine.

7         MS. BIANCO:  Thank you.

8

9 CROSS-EXAMINATION BY MR. WOLFSON:

10   Q.   Good afternoon, Investigator.

11   A.   How are you, sir?

12   Q.   I am well.  Thank you.  You have analyzed thousands of

13 phones over your career.  Do you have any independent

14 recollection of the phone involved in this case?

15   A.   Yes.

16   Q.   And when it comes to the LG cell phone that you were just

17 testifying about, did you remove the monster interview sticker

18 from that phone at any point?

19   A.   I don't recall.

20   Q.   And that phone did not have a cracked screen?

21   A.   I -- no, I don't believe so.

22   Q.   Did you know that phone was missing for a month after

23 Stacey's arrest?

24   A.   No.

25   Q.   You also testified about Mackenzie's Iphone, correct?

442

TODD SVARCZKOPF - Cross by Mr. Wolfson

1    A.   The Iphone 4?

2    Q.   Yes, and you could not get into that phone, right?

3    A.   Correct.

4    Q.   Mackenzie Bailey wouldn't give you the password to that

5 phone, would she?

6    A.   I never spoke to Mackenzie Bailey.

7    Q.   And none of the other investigators on this case were

8 able to give you a password to that phone?

9    A.   I was not able to get a passcode for that phone.

10   Q.   Did you have an opportunity to analyze Hillary Trimm's

11 phone?

12   A.   I did.

13   Q.   And forensic analysis includes a review of text messages,

14 correct?

15   A.   Yes.

16   Q.   And you reviewed these text messages for their accuracy,

17 correct?

18   A.   Yes.

19   Q.   Did you observe any anomalies?

20   A.   No.

21         MR. WOLFSON:  Just one moment, please.

22 BY MR. WOLFSON, CONTINUED:

23   Q.   You didn't see text messages that purported to be sent in

24 1972?

25   A.   No, I did not read every text message that came from that

443

TODD SVARCZKOPF - Cross by Mr. Wolfson

1 phone.

2    Q.   So a moment ago you said you reviewed it for accuracy,

3 but you didn't review every single text message?

4    A.   I did not individually review every single text message

5 on that phone.  That's not my job.

6    Q.   Let's review a couple now.  I am going to hand you what I

7 am going to have marked as Defense Exhibit 1, please.

8 Investigator, if you have any trouble reading this, please let

9 me know.  I know it comes out very small.  Does it purport --

10         THE COURT:  Has this been marked?  Has this been

11 marked as an exhibit or potential exhibit?

12         MR. WOLFSON:  May I have it back?

13         THE COURT:  So we know what you are showing him.

14         MS. BIANCO:  Defense 14.

15         MR. WOLFSON:  Defense 14.

16         THE COURT:  Defendant's 14 marked for

17 identification.

18 BY MR. WOLFSON, CONTINUED:

19   Q.   Does that analysis purport that text messages were sent

20 in 1972?

21         THE COURT:  Wait a minute.  It is not even admitted

22 or not even identified.  We don't even know what it is.  If he

23 can identify what it is, they can answer some questions

24 about it.

25         MR. WOLFSON:  Thank you, Your Honor.

444

TODD SVARCZKOPF - Cross by Mr. Wolfson

1 BY MR. WOLFSON, CONTINUED:

2    Q.   Could you identify that for me, please?

3    A.   It is a printout from IOS messages.

4    Q.   Does that look like the type of messages you analyze when

5 you analyze these cell phones?

6    A.   Yes.

7         MR. WOLFSON:  Your Honor, has that been properly

8 identified?

9         THE COURT:  Go ahead.

10 BY MR. WOLFSON, CONTINUED:

11   Q.   Does it purport that text messages were sent in 1972?

12   A.   Yes, but it also shows that it is from an Iphone 5S.  I

13 don't know what --

14         MS. AMANDOLARE:  Your Honor, I am going to object to

15 a lack of foundation with regard to the testimony on this

16 document.

17         THE COURT:  Overruled.

18 BY MR. WOLFSON, CONTINUED:

19   Q.   Does it also purport that text messages were sent in

20 1974?

21         THE COURT:  What relevance is this, 1972, 1974?  I

22 thought we were talking about this century.

23         MR. WOLFSON:  Well, the relevance, Your Honor, is

24 that there is obviously some inaccuracies with the report

25 because it would be impossible for text messages --

445

TODD SVARCZKOPF - Cross by Mr. Wolfson

1    MS. AMANDOLARE:  Your Honor, I am going to object

2  to --

3    THE COURT:  All right.  Continue.  Next question.

4  BY MR. WOLFSON, CONTINUED:

5    Q.  Does it also purport that a text message was sent this

6  1997?

7    A.  Yes.

8    Q.  And 1999?

9    A.  Yes.

10    MR. WOLFSON:  Thank you.  I have no further

11  questions.

12    THE COURT:  Redirect, if any.

13

14  REDIRECT EXAMINATION BY MS. AMANDOLARE:

15    Q.  Investigators Svarczkopf, can you describe for the jury

16  the difference between your responsibilities of retrieving the

17  data versus analyzing the data?

18    A.  My responsibilities are to forensically retrieve the data

19  from the phone or the computer and put that into a human

20  readable form for the lead investigator, case officers to look

21  at and make their determination as to what is relevant to the

22  case and what is not.

23    Q.  So with regards to each one of the electronic devices

24  that you analyzed to retrieve the data including the Iphone

25  that Mr. Wolfson described, did you pass on that data to

446

TODD SVARCZKOPF - Redirect by Ms. Amandolare

1  federal agents for analysis?

2    A.  I did.

3    Q.  Did you conduct analysis yourself?

4    A.  I did not.

5    Q.  You simply retrieved the information?

6    A.  Correct.

7    Q.  And what Mr. Wolfson provided to you as a defense exhibit

8  for identification purposes, is that just a screen shot of

9  several chats?

10    A.  This appears to be a screen shot of an IOS message,

11  SMS/MMS message.  There is no identifiers as to where that came

12  from or what device that came from.

13    Q.  And this reference to the years 1972 and 1974, based on

14  your training and experience, did iPhones exist in the 1970s?

15    MS. AMANDOLARE:  I have no further questions.

16    THE COURT:  Anything further?

17    MR. WOLFSON:  No, Your Honor.  Thank you.

18    THE COURT:  You may step down.

19    (Whereupon, the Witness is excused.)

20    THE COURT:  Any more witnesses?

21    MS. FLETCHER:  No, Your Honor.

22    THE COURT:  Okay.  Members of the jury, I guess we

23  have run out of witnesses for today.  We will have to adjourn.

24  We can't continue without witnesses.  We advise you we will

25  start at 9:30 tomorrow with the next witness, and we thank you

447

1  for your service again.

2    And advise you very strongly that you do not discuss

3  the case among yourselves or with anyone else overnight.  Just

4  tell the family and friends that you have gotten selected on a

5  jury and that's it.  I will talk to you about it when it is

6  over.  And when it is over you will be able to talk about it

7  with others, but certainly not now.

8    Be here at least by 9:30.  I assume the parking is

9  okay.  You got everything all lined up for parking.  Good.  We

10  thank you for your service, and we will see you tomorrow at

11  9:30.

12    COURT CLERK:  Court stands adjourned.

13    (Whereupon, the proceedings were held in open court

14    out of the presence of the Jury.)

15    THE COURT:  Counselors, is there anything to discuss

16  in chambers?  I would like a list of witnesses for tomorrow,

17  but other than that, is there anything else we have to discuss?

18    MS. FLETCHER:  Nothing other than that.

19    MS. BIANCO:  I don't believe so.

20    THE COURT:  Give my clerk a list of the witnesses

21  for tomorrow, and we will be set to go.

22    COURT CLERK:  Court stands adjourned.

23

24    (Whereupon, the proceedings held on June 13, 2017,

25    were ended at 4:30 p.m..)

UNITED STATES  DISTRICT COURT

NORTHERN DISTRICT OF NEW YORK
****************************************************
UNITED STATES OF AMERICA,

vs.                          16-CR-320

STACEY J. LAPORTE, JR.,

Defendants
****************************************************
Transcript of a Jury Trial held on June 14, 2017,
before the HONORABLE DAVID N. HURD, at the United States
Federal Courthouse, 10 Broad Street, Utica, New York,
stenographically recorded by Nancy L. Freddoso, Registered
Professional Reporter.

A P P E A R A N C E S

Government:   UNITED STATES ATTORNEY'S OFFICE
              ROOM 900, HANLEY FEDERAL BLDG.
              100 SOUTH CLINTON STREET
              SYRACUSE, NEW YORK  13261-7198
          BY: LISA M. FLETCHER, AUSA
              SAHAR L. AMANDOLARE, AUSA

Defendant:    FEDERAL PUBLIC DEFENDER'S OFFICE
              4 CLINTON SQUARE
              SYRACUSE, NEW YORK 13202
          BY: RANDI J. BIANCO, AFPD
              MARTIN P. WOLFSON, AFPD

              NANCY L. FREDDOSO, R.P.R.
          Official United States Court Reporter
              10 Broad Street, Room 316
              Utica, New York 13501
              (315) 793-8114

450

I N D E X   O F   P R O C E E D I N G S

WITNESS                                          PAGE

1

2  DEBORAH JASINSKI

3    Direct Examination By Ms. Amandolare:        452

4    Cross-Examination By Mr. Wolfson:            499

5    Redirect Examination By Ms. Amandolare:      505

6  MACKENZIE BAILEY

7    Direct Examination By Ms. Fletcher:          507

8    Cross-Examination By Ms. Bianco:             619

9    Redirect Examination By Ms. Fletcher:        671

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

451

I N D E X   O F   E X H I B I T S

EXHIBIT                                                PAGE

1

2  Government's Exhibit 12A through 12M                  459

3  Government's Exhibit 16, 16C, 16D                     463

4  Government's Exhibit 15A, 15C, 15D                    471

5  Government's Exhibit 15F through 15V                  471

6  Government's Exhibit 37                               475

7  Government's Exhibit 37A through 37N                  476

8  Government's Exhibit 21, 21A, 21B                     477

9  Government's Exhibit 19                               478

10 Government's Exhibit 22                               480

11 Government's Exhibit 44                               481

12 Government's Exhibit 20, 20A through 20J              483

13 Government's Exhibit 14A through 14V                  486

14 Government's Exhibit 23.1                             489

15 Government's Exhibit 23                               490

16 Government's Exhibit 23A through 23D                  491

17 Government's Exhibit 23A.1 through 23A.4              491

18 Government's Exhibit 23B.1 through 23B.11             491

19 Government's Exhibit 23C.1 through 23C.7              491

20 Government's Exhibit 23D, 23D.1 through 23D.9         491

21 Government's Exhibit 41                               604

22 Government's Exhibit 17                               607

23 Defendant's Exhibit 32                                669

24

25

452

1          (WHEREUPON, the proceedings held on June 14, 2017,

2      were commenced at 9:30 a.m..)

3          (Whereupon, the proceedings were held in open court

4      out of the presence of the Jury.)

5

6          THE COURT:  Good morning, members of the jury, on

7  this beautiful day.  Thank you for being with us.  As I told

8  you before, we will have a full day today because of the

9  Naturalization commitment that was made months ago before this

10 trial was even scheduled, we will be off tomorrow, and you will

11 have a day off, but then we will continue with a full day on

12 Friday, and we will have full days next week until the case is

13 concluded.

14         With that, the government may call its next witness.

15         MS. AMANDOLARE:  Thank you, Your Honor.  The

16 government calls Deborah Jasinski to the stand.

17

18         DEBORAH JASINSKI, having been called as a Witness, being

19 first duly sworn, was examined and testified as follows under

20 oath:

21

22 DIRECT EXAMINATION BY MS. AMANDOLARE:

23 Q.  Good morning, Ms. Jasinski, how are you?

24 A.  I am good, thank you.

25 Q.  By whom are you employed?

453

DEBORAH JASINSKI - Direct By Ms. Amandolare

1  A.  I am employed by the New York State Police.

2  Q.  What is your title with the New York State Police?

3  A.  I am a computer forensic analyst three.

4  Q.  That also referred to at times as a CFA?

5  A.  It is, yes.

6  Q.  And is that a civilian position with the New York State

7  Police?

8  A.  Yes.

9  Q.  Where are you currently assigned?

10 A.  I work out of the forensic investigation center in

11 Albany.

12 Q.  What are some of your duties and responsibilities as a

13 CFA?

14 A.  I analyze cell phones, computers, tablets, things of that

15 nature.

16 Q.  When you say analyze, what do you mean?

17 A.  Well, I look for evidence on devices of those types in

18 accordance with either consent documents that I have or a

19 search warrant.

20 Q.  Hong long have you been a CFA?

21 A.  I have been a CFA since the end of December of 2014.

22 Q.  What, if any, training have you received in order to be

23 become a CFA?

24 A.  I took course work at Champlain College in Vermont in the

25 field of computer forensics, and I have also had on-the-job

454

DEBORAH JASINSKI - Direct By Ms. Amandolare

1   training and courses related to the software tools and
2   techniques that I have used.
3       Q.   Do you have any certifications that are relevant to the
4   work that you do as a CFA?
5       A.   I do.  I am certified in use of the UFED (phonetically)
6   and physical analyzer software.  I am also certified in the use
7   of End Case.  That is another software tool that we have.  I
8   also carry other certifications as well.
9       Q.   Do you at times need to re-certify or obtain additional
10  training that's relevant to the job that you do on a day-to-day
11  basis?
12      A.   I do, yes.  Computer and cell phone forensics are rapidly
13  evolving fields.  I do take yearly training in various software
14  tools and techniques that we use in the lab and also some of my
15  certifications do require periodic retesting just to maintain.
16      Q.   Prior to becoming a CFA with the New York State Police,
17  do you have any prior relevant employment?
18      A.   I do.  Prior to my current position, I worked with the
19  Vermont State Police as a digital forensic examiner in
20  essentially the same capacity that I work now.  Prior to that,
21  I worked as a serology case work analyst for the State of
22  Vermont.  While I was doing that, I also did some moonlighting
23  work with the Internet Crimes Against Children Task Force.
24      Q.   That was also in Vermont?
25      A.   It was.

455

DEBORAH JASINSKI - Direct By Ms. Amandolare

1       Q.   Now, throughout your professional career in this line of
2   work, approximately how many electronic devices would you say
3   that you have analyzed?
4       A.   So for the State of Vermont I closed approximately twenty
5   cases.  Those cases could have anywhere from one to several
6   devices associated with them.  For New York State, so far I
7   have analyzed approximately fifty-three cell phones, eight
8   computers, and approximately fifteen portable media.
9       Q.   Now, I want to talk a little bit about the process in
10  which you begin a case and carry it through your investigative
11  process.  So how do you first get assigned a case?
12      A.   Cases are assigned by either of the laboratory
13  supervisors.
14      Q.   What do you do when you first get a case assigned?
15      A.   When I first get a case assigned, I make an effort to
16  identify what items have been assigned to me and where they are
17  currently physically located.  I then take a look at any
18  paperwork that might have been also been assigned to me for the
19  case.  And that would either be on my computer or it would be
20  physically in a folder that's handed to me.  And after that, I
21  make sure that I have either a consent document or a search
22  warrant that authorizes my work.
23      Q.   And once you confirm that you have the authority to
24  conduct an analysis of a particular device, what do you do
25  next?

456

DEBORAH JASINSKI - Direct By Ms. Amandolare

1       A.   Generally speaking, my next steps are to contact the case
2   agent and let him or her know that I have been assigned to the
3   case.  And then when I have room in my work schedule to then
4   process the case, I retrieve the item and begin my work.
5       Q.   At that point in time when you make contact generally
6   speaking with the case agent, is that the time that you become
7   familiar with what the nature of that particular case or
8   investigation concerns?
9       A.   It is, yes.  Through conversation with the investigator
10  as well as through review of the paperwork.
11      Q.   So I want to talk specifically about this particular
12  investigation.  Did there come a point in time that you became
13  involved by being asked to analyze certain electronic devices
14  as it related to an investigation of this defendant,
15  Stacey J. LaPorte, Jr.?
16      A.   I did, yes.
17      Q.   Do you recall approximately when that was?
18      A.   Roughly that was in September of 2016.
19      Q.   And just like you indicated for the jury generally
20  speaking you become familiar with the nature of a case, and
21  this particular matter, at that time did you become familiar
22  the nature of this investigation?
23      A.   I did, yes.
24      Q.   And as a result of that, what, if any, specific evidence
25  were you looking for when you were going to conduct your

457

DEBORAH JASINSKI - Direct By Ms. Amandolare

1   analysis?
2       A.   Well, I became aware that the case was involving crimes
3   against children.  So in terms of the types of evidence I would
4   be looking for, generally speaking I would be looking for
5   images and videos.  I would also be looking at things like text
6   messages or chat conversations or really items that might
7   depict a sexual content where I was not sure perhaps of the
8   ages of those involved.
9       Q.   And generally speaking when you conduct an analysis and
10  are searching for that type of evidence, what, if anything, do
11  you do once you notice that there is relevant evidence
12  contained within those specific analyses of the device?
13      A.   Once I find potential items of evidence or items of
14  interest, I, through my analysis software, I bookmark those
15  items.
16      Q.   And at that point do you alert a case agent or a
17  prosecutor involved in the investigation?
18      A.   Yes, I do keep the case investigator or possibly the
19  prosecutor as well up to speed with my findings.
20      Q.   Is that what you did in this investigation?
21      A.   I did, yes.
22      Q.   Now, what was the first item that you were asked to
23  analyze as part of this case?
24      A.   The first item I was asked to analyze was a white Samsung
25  cell phone.

458

DEBORAH JASINSKI - Direct By Ms. Amandolare

1  Q.  I am going to hand you what is in evidence as Exhibit 12.
2  Feel free to take the item out of the bag.  Do you recognize
3  that?
4  A.  I do.
5  Q.  What do you recognize that to be?
6  A.  This would be the white Samsung cell phone that I
7  analyzed.
8  Q.  How do you know that it is the cell phone that you
9  analyzed?
10  A.  I see my initials and the date on the seal of the
11  evidence item.
12  Q.  I will take that back from you and hand you what has been
13  marked for identification as Government's Exhibits 12A through
14  12M.  Now, before taking a look at those, what do you do --
15  tell the jury what you do when you first receive a piece of
16  evidence.
17  A.  When I first receive a piece of evidence, my job is to
18  document the condition that it is submitted to me in.  So I
19  take pictures of the evidence item, and I also record
20  identifying serial numbers or ID numbers associated with the
21  device.
22  Q.  Did you do that with this particular device, this white
23  Samsung?
24  A.  I did, yes.
25  Q.  Now, looking at what I have handed you as Exhibits 12A

459

DEBORAH JASINSKI - Direct By Ms. Amandolare

1  through 12M marked for identification, do you recognize what is
2  depicted in those exhibits?
3  A.  I do.  These are my photos.
4  Q.  Are those a fair and accurate depiction of the electronic
5  device as you received it on the date that you received it?
6  A.  Yes.
7      MS. AMANDOLARE:  Your Honor, I would ask what's
8  marked for identification as Exhibits 12A through 12M be moved
9  into evidence?
10      THE COURT:  Any objection?
11      MR. WOLFSON:  No objection, Your Honor.
12      THE COURT:  Received.
13      (Exhibit No. 12A through 12M, received.)
14  BY MS. AMANDOLARE, CONTINUED:
15  Q.  Now, I want to draw your attention specifically to
16  Exhibit 12I?
17      MS. AMANDOLARE:  And I would ask for that image to
18  be published to the jury.
19  BY MS. AMANDOLARE, CONTINUED:
20  Q.  Looking at that photograph, does that depict where this
21  particular item was manufactured or assembled or made?
22  A.  It does, yes.
23  Q.  What does it indicate?
24  A.  It indicates made in Korea.
25  Q.  I will take those back.  Now, after you documented the

460

DEBORAH JASINSKI - Direct By Ms. Amandolare

1  state of the item prior to doing anything further, what did you
2  do next with this particular device?
3  A.  So my next step is to place the device within a Faraday
4  enclosure.  A Faraday enclosure assists me in shielding the
5  device from network signals.  When I do that, I do that with
6  the idea of turning on the device so that I can verify what the
7  device date and time is.
8  Q.  Were you able to do that with this particular device?
9  A.  I was not.
10  Q.  Why was that?
11  A.  When I went to turn on the device I could feel the device
12  sort of vibrating in my hand indicating that power was sort of
13  being accepted by the phone, but the screen was not functional.
14  Q.  Do you recall anything specific about the screen of this
15  particular device?
16  A.  Yes, it was slightly cracked.
17  Q.  So were you able to conduct further analysis of this
18  phone in light of the fact that you couldn't turn it on?
19  A.  Well, I needed to make an attempt to sort of repair the
20  device or get it to a state where I could perform my analysis.
21  Q.  Were you able to do that?
22  A.  I was.
23  Q.  How were you able to do that?
24  A.  So I performed what we call in the laboratory a board
25  swap.  In our laboratory we have a box of what we would call

461

DEBORAH JASINSKI - Direct By Ms. Amandolare

1  laboratory stock phones, and it is a random collection of
2  phones that we have for various purposes.  So we use them for
3  testing.  Sometimes we use them for training.  Or to use them
4  for parts or whatnot.  So I looked in this box, and I found a
5  phone that physically resembled the item of evidence that I was
6  analyzing.
7      My next step was to disassemble the evidence phone and
8  get down to the logic board that was inside it.  I then placed
9  the laboratory stock phone on another section of my desk, and I
10  did the same thing.  I disassembled that and got it to a logic
11  board.  So the logic boards of both phones were shaped pretty
12  similar.  So what I did was with the laboratory stock phone, I
13  took the logic board from my evidence phone and placed it
14  inside the body of the phone that we had in the lab.  Once I
15  did that and put the screws back into the phone and turned it
16  on, I now had a functional device.
17  Q.  And a device that you would ultimately be able to
18  analyze?
19  A.  That is correct.
20  Q.  So once you were able to power on that phone using the
21  tools that you just indicated, what did you do next?
22  A.  I then brought the device to one of our laboratory UFEDs.
23  A UFED is a standalone piece of hardware that we can plug a
24  cell phone into and it facilitates data extraction.
25  Q.  Were you able to extract data from this phone?

Case 18-105, Document 44, 04/15/2019, 2540369, Page66 of 202
Case 5:16-cr-00320-DNH   Document 118-2   Filed 09/05/18   Page 14 of 232
Case 5:16-cr-00320-DNH   Document 118-2   Filed 09/05/18   Page 15 of 232

462

DEBORAH JASINSKI - Direct By Ms. Amandolare

1   A.   I was.  I achieved three separate extractions of data
2   from this phone.
3   Q.   What did you use, if anything, to be able to analyze that
4   particular data?
5   A.   So I then brought that data to my desk, and I analyzed
6   the data using a piece of software called Physical Analyzer.
7   Q.   As part of your analysis, did you come across what you
8   determined to be relevant chat messages that were taken from
9   that device?
10  A.   I did, yes.
11  Q.   What software program or application did those chats
12  appear to be connected with?
13  A.   They appeared to be connected with Kik.
14  Q.   I am going to hand you what is marked for identification
15  as Exhibit 16, as well as what has been marked for
16  identification as 16A through 16D.  Take a look at those, and I
17  will ask you if you recognize those particular items.
18  A.   I do recognize these items.
19  Q.   What do you recognize those particular exhibits to
20  depict?
21  A.   So Exhibit 16 is a printout of a Kik chat conversation
22  that I was able to get from the Samsung cell phone.  The
23  images, beginning with Exhibit 16A are images that are
24  connected with that Kik chat.
25           MS. AMANDOLARE:  I will just note for the record

463

DEBORAH JASINSKI - Direct By Ms. Amandolare

1   that Exhibits 16A and 16B are already in evidence.
2   BY MS. AMANDOLARE, CONTINUED:
3   Q.   So the images in that chat came off the white Samsung
4   cell phone?
5   A.   Correct.
6   Q.   Did you bookmark this particular chat and these images
7   because they were relevant to the types of evidence that you
8   were searching for?
9   A.   Yes.
10  Q.   And is what you have in your hand as Exhibits 16 and 16A
11  through D fairly and accurately represent a portion of the data
12  that was extracted and then subsequently analyzed off the
13  Samsung?
14  A.   Yes.
15           MS. AMANDOLARE:  Your Honor, I would ask what's been
16  marked for identification as 16 and then 16C and D be moved
17  into evidence.
18           THE COURT:  Any objection?
19           MR. WOLFSON:  No objection, Your Honor.
20           THE COURT:  16, and 16C and D are received.
21           (Exhibit No. 16, 16C, 16D, received.)
22  BY MS. AMANDOLARE, CONTINUED:
23  Q.   Now, looking at those chats you indicated that they
24  occurred over Kik Messenger?
25  A.   Yes.

464

DEBORAH JASINSKI - Direct By Ms. Amandolare

1   Q.   What are the user names that are associated with that
2   chat?
3   A.   One of the user names reads fastfamily25_XMS.
4   Q.   Is that the only user name depicted in that chat?
5   A.   It is the only one depicted, yes.
6   Q.   But based on your training and experience and your
7   analysis of this particular data, did you come to learn that
8   that chat involves more than one person?
9   A.   Yes.
10  Q.   Who did you learn the other person to be in that chat
11  identified as?
12  A.   I learned the other person to be C.P..
13  Q.   Now, let's talk a little bit about those images that are
14  affiliated with what is in evidence as Exhibit 16, which is the
15  actual chat.  Were you able to trace where those images fell in
16  relation to the back and forth of those chats?
17  A.   I was, yes.
18  Q.   How were you able to do that?
19  A.   So within this chat, I could see the conversation going
20  back and forth and every so often within the chat I could see
21  that there would be a time stamp and then a void.  And based on
22  the context of the chat, it appeared that some sort of a file
23  was sent back and forth between the participants.
24       I was able to identify what the name of what the file
25  name of that was.  When I searched the rest of the contents of

465

DEBORAH JASINSKI - Direct By Ms. Amandolare

1   the phone, I was able to come up with images that were -- that
2   had the same file names associated with the chat.  Based on
3   that, as well as the content of the images being sort of making
4   sense in the context, led me to make this association.
5   Q.   Now, what you just described for the jury in this
6   particular piece of evidence, is that what you always have to
7   do in order to associate images with chats?
8   A.   Not always, no.
9   Q.   But in this particular instance you did?
10  A.   Yes.
11  Q.   So I want to talk about Exhibit 16A, which is an image
12  already in evidence.  And direct your attention to within the
13  chat.
14           MS. AMANDOLARE:  And I will ask for this particular
15  portion to be published to the jury.  Not the image.  I am
16  sorry, the chat.  2/28/16 6:12 a.m..  So it is going to be on
17  page fourteen about three or four lines down.  So if we could
18  zoom in on the top portion of that chat.
19  BY MS. AMANDOLARE, CONTINUED:
20  Q.   Before we go into specifics of this, the images that you
21  have in your hand which are Exhibits 16A through D, is there
22  any text on those images?
23  A.   No.
24  Q.   Were you able to, prior to testifying here today, review
25  both these chats, those images, and your report?

466

DEBORAH JASINSKI - Direct By Ms. Amandolare

1   A.   Yes.

2   Q.   And that's how you were able to determine which images

3   that you have in your hand are affiliated with particular chat

4   lines of this exhibit?

5   A.   Yes.

6   Q.   Okay.  So looking at what is depicted on your screens

7   and, Ms. Jasinski, on yours, with the time stamp 2/28/2016 at

8   6:24 a.m., which exhibit did you learn to have been sent at

9   that particular time?

10  A.   That would be Exhibit 16A.

11       MS. AMANDOLARE:  I would ask that 16A be published

12  to the jury.

13  BY MS. AMANDOLARE, CONTINUED:

14  Q.   Now, going to page fourteen on the top portion of that

15  page, about the fourth line down.  Looking at the particular

16  time stamp of 6:24 a.m. on 2/28/2016, again, does there appear

17  to be a blank chat message?

18  A.   Yes.

19  Q.   Which exhibit that you have in your hand appeared to have

20  been related to that message?

21  A.   I believe the exhibit we just referenced, 16A.

22  Q.   Was that the first or second image that was sent as part

23  of this chat?

24  A.   This would be the first.

25       MS. AMANDOLARE:  So let's go back to page ten, and

467

DEBORAH JASINSKI - Direct By Ms. Amandolare

1   the third line down, which the timestamp reflects 2/28/16 at

2   6:12 a.m.,

3   BY MS. AMANDOLARE, CONTINUED:

4   Q.   So looking at that, which is an earlier portion of this

5   chat message, is there a blank reflected in those particular

6   messages?

7   A.   Yes.

8   Q.   At that timestamp I just indicated 6:12 a.m.?

9   A.   Yes.

10  Q.   Which exhibit number that you have in your hand is

11  associated with that message?

12  A.   So for this message this would be associated with

13  Exhibit 16A.

14  Q.   Okay.  So -- which already published to the jury so

15  now we will go to page fourteen, the fourth line down at

16  6:24 a.m.  And again, does there appear to be a blank message

17  that was sent at 6:24 a.m.?

18  A.   Yes.

19  Q.   Were you able to affiliate that with a particular image?

20  A.   Yes, that was affiliated with image 16B.

21       MS. AMANDOLARE:  If I could have 16B published to

22  the jury, and you can take that off.

23  BY MS. AMANDOLARE, CONTINUED:

24  Q.   Now, switching back to the chats and going to page -- I

25  am sorry.  Going to page one, the bottom portion of the page.

468

DEBORAH JASINSKI - Direct By Ms. Amandolare

1   Does there appear to be two empty chat messages sent at

2   approximately 9:01 a.m. and 9:02 a.m.?

3   A.   Yes.

4   Q.   And based on what you were able to review prior to

5   testifying here today, what images were associated with those

6   chats?

7   A.   Those would be the images reflected as 16A and 16B.

8   Q.   So based on your analysis it appears that images 16A and

9   B, which have already been published to the jury, were sent

10  more than once within this chat?

11  A.   Yes.

12  Q.   Now, going to page twenty-eight, the top of the page,

13  does there appear to be a blank message affiliated the

14  timestamp 9:21?

15  A.   Yes.

16  Q.   Were you able to determine the image that affiliates with

17  that particular message?

18  A.   Yes.

19  Q.   Which image is that?

20  A.   16C.

21       MS. AMANDOLARE:  I would ask that 16C be published

22  to the jury.

23  BY MS. AMANDOLARE, CONTINUED:

24  Q.   Now, going to page thirty-three of the chats.  At the

25  bottom portion of that page with the timestamp of 9:36 a.m.,

469

DEBORAH JASINSKI - Direct By Ms. Amandolare

1   does there appear to be another blank message?

2   A.   Yes.

3   Q.   What image were you able to determine is affiliated with

4   that message?

5   A.   Image marked as Exhibit 16D.

6       MS. AMANDOLARE:  If I could have that published to

7   the jury.

8   BY MS. AMANDOLARE, CONTINUED:

9   Q.   And finally in the chat at approximately 9:15 a.m., which

10  is on page -- at the top of page twenty-six, the first message,

11  does there appear to be a blank on that page or at that time?

12  A.   Yes.

13  Q.   Were you able to determine what image was affiliated with

14  that message?

15  A.   I was not.

16  Q.   And we just talked a little bit about this going through

17  each one of these, but what is the date and time that this chat

18  starts?

19  A.   This chat starts on 2/28/16 at 5:45 in the morning.

20  Q.   And what is the date and timestamp of the last chat in

21  that exhibit?

22  A.   The date and time of the last chat is 2/28/16 at 10:45

23  a.m..

24  Q.   Is that Eastern Standard Time?

25  A.   Yes, it is.

470

DEBORAH JASINSKI - Direct By Ms. Amandolare

1   Q.   I will take those from you.  What was the second item of
2   evidence that you analyzed as part of this case?
3   A.   I analyzed a black LG cell phone.
4   Q.   I am going to hand you what is already in evidence as
5   Exhibit 15, and ask you if you recognize that item?  Feel free
6   to take it out of the bag.
7   A.   Yes, I recognize this item.
8   Q.   What do you recognize that to be?
9   A.   This would be the item of evidence that I examined.
10  Q.   How do you know that to be the case?
11  A.   I know that to be the case because I can see my initials
12  and the date on one of the seals.
13  Q.   I will take that back from you.  And again, just like you
14  did with the white Samsung in this case, did you take
15  photographs of this piece of evidence?
16  A.   I did, yes.
17  Q.   And that was prior to you conducting your analysis?
18  A.   Yes.
19  Q.   I am going to hand you Exhibits 15A through 15V, noting
20  that 15B and 15E are already in evidence.  I will ask if you
21  recognize these?
22  A.   Yes, I recognize these.
23  Q.   What do you recognize those to be?
24  A.   These are the photographs of the evidence item that I
25  took.

471

DEBORAH JASINSKI - Direct By Ms. Amandolare

1   Q.   Are those a fair and accurate depiction of the way this
2   LG cell phone looked prior to you conducting your analysis?
3   A.   Yes.
4        MS. AMANDOLARE:  Your Honor, I would ask that
5   exhibits 15A through 15V excluding 15B and 15D be moved into
6   evidence.
7        THE COURT:  They have already been admitted.
8        MS. AMANDOLARE:  15B and 15E, I am sorry have
9   already been moved into evidence.
10       THE COURT:  Right.
11       MS. AMANDOLARE:  So I am asking that 15A and then
12  15C through 15D and then 15F through 15V be moved into
13  evidence.
14       THE COURT:  Any objection?
15       MR. WOLFSON:  No objection.
16       THE COURT:  Received.
17       (Exhibit No. 15A, 15C, 15D, received.)
18       (Exhibit No. 15F through 15V, received.)
19       MS. AMANDOLARE:  Now, I am going to draw your
20  attention to Exhibit 15M and ask that it be published to the
21  jury.
22  BY MS. AMANDOLARE, CONTINUED:
23  Q.   Is there anywhere on this image of the black LG cell
24  phone that you analyzed that depicts where this cell phone was
25  made, manufactured or assembled?

472

DEBORAH JASINSKI - Direct By Ms. Amandolare

1   A.   Yes.
2   Q.   Where does it reflect that it was made?
3   A.   It says made in China.
4   Q.   Now, I am going to ask that 15R -- well, actually, what
5   did you do after you took the photos and before you conducted
6   your analysis of the phone?
7   A.   Similar to the first phone, my next step was to place
8   this phone into a Faraday enclosure to shield it from any
9   network signal, and then to power the phone on to determine
10  what date and time the device is recording.
11  Q.   Were you able to do that with this device?
12  A.   I was.
13  Q.   And did you take a photograph of what was depicted on the
14  face of that phone when you turned it on?
15  A.   I did.
16       MS. AMANDOLARE:  I am going to ask for 15R to be
17  published to the jury.
18  BY MS. AMANDOLARE, CONTINUED:
19  Q.   Is that what you saw when you turned this phone on?
20  A.   It is, yes.
21  Q.   What is that depicted in this photograph?
22  A.   It is a superman logo in blue.
23  Q.   So you were able to turn this particular device on, but
24  what, if anything, did you recognize about the device once you
25  turned it on?

473

DEBORAH JASINSKI - Direct By Ms. Amandolare

1   A.   Once I turned it on I saw that item was locked.
2   Q.   Were you able to extract and analyze from this device
3   despite the fact that it was locked?
4   A.   I was, yes.
5   Q.   How did you do that?
6   A.   So with this device, my first step was to research and
7   see if there were any ways that I could bypass that lock on the
8   phone.  So I did not have any software that would allow me to
9   do that, so I moved to what we call a chip off process.  And
10  the chip off process basically is me dismantling the phone,
11  getting down to that logic board component of the phone.
12       And then at that time I take a look at all of the chips,
13  and I identify which chip is going to have the data on it that
14  I am potentially looking for.  I then apply heat to the board,
15  which facilitates me taking that chip off without damaging it.
16  I have to then take that chip and sort of clean the bottom of
17  it a little bit to make it ready for me to read.  I grab an
18  adapter for that is compatible with the type of chip that I
19  have, and I then go to a piece of hardware called an up A2A.  I
20  put the chip in the adapter, and I put the adapter on this
21  hardware, and I get the chip to read.
22  Q.   And you were able to do that in this particular case?
23  A.   I was.
24  Q.   Now, when you conduct an analysis or when you did conduct
25  an analysis of this phone, were you able to determine a phone

**G.A. 065**

474

DEBORAH JASINSKI - Direct By Ms. Amandolare

1   number associated with this phone to be 315-514-8414?

2   A.   Yes.

3   Q.   Now, once the chip off as you indicated was successful on

4   this phone, what did you do next to analyze the data that you

5   extracted?

6   A.   I brought the data again to my physical analyzer software

7   for analysis.

8   Q.   And the data that you extracted off this phone, what did

9   you do with it, where did you put it?

10   A.   Well, I analyzed the data.  I created a set of results

11   consisting of my bookmarks, and then I created a CD of those

12   results.

13   Q.   I am going to hand you what has been marked for

14   identification as Exhibit 37.  I will ask if you recognize

15   that?

16   A.   I do.

17   Q.   What do you recognize that to be?

18   A.   This would be the CD of my bookmarked results from the

19   phone.

20   Q.   And again, that's not the entire results of that phone,

21   it is just the bookmarked data?

22   A.   Yes, it is.

23   Q.   And that was data that you determined to be relevant

24   based on the nature of the investigation?

25   A.   That's correct.

475

DEBORAH JASINSKI - Direct By Ms. Amandolare

1        MS. AMANDOLARE:  Your Honor, I would ask what's been

2   marked for identification as Exhibit 37 be moved into evidence.

3        THE COURT:  Any objection.

4        MR. WOLFSON:  No objection, Your Honor.

5        THE COURT:  Received.

6        (Exhibit No. 37, received.)

7   BY MS. AMANDOLARE, CONTINUED:

8   Q.   Now, as part of the data you extracted off the LG, did

9   that include chat messages?

10   A.   It did, yes.

11   Q.   Did it include images?

12   A.   Yes.

13   Q.   Did it include text messages?

14   A.   Yes, it did.

15   Q.   And did it include an item from the Notes application of

16   that phone?

17   A.   It did, yes.

18   Q.   I am going to hand you what has been marked as

19   Exhibits 37A through 37N.  I will ask if you recognize those?

20   A.   I do, yes.

21   Q.   And what do you recognize though images to depict?

22   A.   These images are some of the images that were found on

23   the phone.

24   Q.   And are those images a part of the disk that just went

25   that evidence as Exhibit 37?

476

DEBORAH JASINSKI - Direct By Ms. Amandolare

1   A.   Yes.

2   Q.   And those are a fair and accurate depiction of the images

3   that you partially took off the LG cell phone?

4   A.   Yes.

5        MS. AMANDOLARE:  Your Honor, I would ask what's been

6   marked for identification as Exhibits 37A through N be moved

7   into evidence.

8        THE COURT:  Any objection?

9        MR. WOLFSON:  No objection, Your Honor.

10        THE COURT:  Received.

11        (Exhibit No. 37A through 37N, received.)

12   BY MS. AMANDOLARE, CONTINUED:

13   Q.   I would ask that each of these exhibits, first starting

14   with 37A be published to the jury.  37A through 37N if you

15   could just go through each.

16        (Photos published to the jury.)

17   BY MS. AMANDOLARE, CONTINUED:

18   Q.   Now, I am going to hand you what has been marked for

19   identification as Exhibit 21 in addition to 21A and B.  Do you

20   recognize what is depicted in those exhibits?

21   A.   I do, yes.

22   Q.   What is depicted in Exhibit 21?

23   A.   Exhibit 21 is a Kik chat from the LG cell phone.

24   Q.   And again, is that a portion of what is contained off of

25   Exhibit 37, the disk that's in evidence?

477

DEBORAH JASINSKI - Direct By Ms. Amandolare

1   A.   Yes, it is.

2   Q.   Looking at Exhibits 21A and 21B, what is depicted there?

3   A.   Those are the images that are contained within the Kik

4   chat.

5   Q.   That is referenced as Exhibit 21 that you have in your

6   hand?

7   A.   That is correct, yes.

8   Q.   And again, those images are also reflected in Exhibit 37,

9   which is the disk that reflects the entire data from the LG?

10   A.   The disk that represents my results, yes.

11        MS. AMANDOLARE:  Your Honor, I would ask what's been

12   marked for identification as Exhibit 21 and 21A and B be moved

13   into evidence.

14        THE COURT:  Any objection?

15        MR. WOLFSON:  No objection, Your Honor.

16        THE COURT:  Received.

17        (Exhibit No. 21, 21A, 21B, received.)

18   BY MS. AMANDOLARE, CONTINUED:

19   Q.   And again, the exhibits that I just showed you reflect

20   bookmarked data that you determined to be relevant based on the

21   nature of this investigation?

22   A.   Yes, that's correct.

23   Q.   And were the images in this particular chat traced back

24   to the chat the same way you did with the chat recovered off

25   the Samsung?

478

DEBORAH JASINSKI - Direct By Ms. Amandolare

1   A.   Not exactly.  In this case, physical analyzer was able to
2   directly weave these images in with Kik chat.
3   Q.   Now, I am going to hand you what has been marked for
4   identification as Exhibit 19.  Do you recognize that?
5   A.   Yes, I do.
6   Q.   What do you recognize that to be?
7   A.   This is a note from the memo application that was on the
8   LG cell phone.
9   Q.   And again, is that also a portion of the disk that's in
10  evidence as Exhibit 37?
11  A.   It is, yes.
12       MS. AMANDOLARE:  Your Honor, I would ask whats been
13  marked for identification as Exhibit 19 be moved into evidence.
14       THE COURT:  Any objection?
15       MR. WOLFSON:  So objection.
16       THE COURT:  Received.
17       (Exhibit No. 19, received.)
18       MS. AMANDOLARE:  And ask that be published to
19  the jury please.
20  BY MS. AMANDOLARE, CONTINUED:
21  Q.   What is the date of that note?
22  A.   The created date of this note is 3/26/2016.
23  Q.   Again, did you bookmark this particular note because you
24  found it relevant to the nature of the investigation?
25  A.   Yes.

479

DEBORAH JASINSKI - Direct By Ms. Amandolare

1   Q.   Can I ask you to read -- I know that what is depicted
2   here is lot of technical jargon.  So I am going to ask you to
3   read what is actually depicted in that note minus reading it to
4   irrelevant letters and symbols for purposes of reading it to
5   the jury?
6   A.   Sure.  K.  Let's do another one, hehe.  Pick a good one
7   and ages and start it love.  Mom and son, I am thirty-eight,
8   you are nineteen.  Hey, do you think you could come help me in
9   the kitchen for a minute.  Yes, with what mom?  The sink, it
10  won't drain and I got down and looked but IDK anything about
11  that.
12  Q.   Thank you.  Now, I am going to hand you what has been
13  marked for identification as Exhibit 22.  Do you recognize that
14  exhibit?
15  A.   Yes, I do.
16  Q.   What do you recognize that to be?
17  A.   This is another Kik chat from the LG cell phone.
18  Q.   And again, is that another item that is contained in
19  Exhibit 37, which is your bookmarked data from the LG cell
20  phone?
21  A.   Yes.
22  Q.   Who are the participants in that chat?
23  A.   One of the participants is prouddaddy3_15_16.  The other
24  participate is washoveryou Bomb Chick.
25  Q.   And that exhibit reflects data that you observed when you

480

DEBORAH JASINSKI - Direct By Ms. Amandolare

1   analyzed the LG cell phone?
2   A.   Yes.
3        MS. AMANDOLARE:  Your Honor, I would ask whats
4   marked for identification as Exhibit 22 be admitted into
5   evidence.
6        THE COURT:  Any objection?
7        MR. WOLFSON:  No objection.
8        THE COURT:  Received.
9        (Exhibit No. 22, received.)
10  BY MS. AMANDOLARE, CONTINUED:
11  Q.   Unlike some of the other exhibits that we have discussed,
12  are there images that pertain to this chat?
13  A.   Yes.
14  Q.   Are those images separate and apart from the actual chat
15  messages?
16  A.   No, in this case they are woven into the chat.
17  Q.   Therefore you can tell by just looking at this document
18  where those images were sent and received?
19  A.   Yes.
20  Q.   What is the date of the first chat?
21  A.   The date of the first chat is 5/15/2016.
22  Q.   What is the date of the last chat and the timestamp?
23  A.   So the date and time of the last chat is 5/17/2016 at
24  9:06 a.m..
25  Q.   Thank you.  Now, I am going to hand you what has been

481

DEBORAH JASINSKI - Direct By Ms. Amandolare

1   marked for identification as Government's Exhibit 44.  Do you
2   recognize that item?
3   A.   Yes, I do.
4   Q.   What do you recognize that to be?
5   A.   This is another chat from the LG cell phone.
6   Q.   Is that again contained within Exhibit 37?
7   A.   It is.
8   Q.   Who are the user names depicted this at that chat?
9   A.   The user names depicted in this chat are again,
10  prouddaddy3_15_16 and the other user name is mattp2711.
11       MS. AMANDOLARE:  Your Honor, I would ask what has
12  been marked for identification as Exhibit 44 be moved into
13  evidence.
14       THE COURT:  Any objection?
15       MR. WOLFSON:  No objection, Your Honor.
16       THE COURT:  Received.
17       (Exhibit No. 44, received.)
18       MS. AMANDOLARE:  I want to have a portion of this
19  chat published for the jury, specifically at the date and
20  timestamp of 3/28/16 at 7:15 a.m. and 7:17 a.m..
21       So we can stop there.
22  BY MS. AMANDOLARE, CONTINUED:
23  Q.   Looking at the chat from 3/28/16 at 7:16:52 a.m., can you
24  read that message for the jury?
25  A.   Yes, it reads:  Have you got a daughter?

```
                                                        482
        DEBORAH JASINSKI - Direct By Ms. Amandolare
 1   Q.   Who is the sender of that message?
 2   A.   The sender is mattp2711.
 3   Q.   Who is the recipient of that message?
 4   A.   Prouddaddy3_15_16.
 5   Q.   And again, what is the month that that message was sent?
 6   A.   March.
 7   Q.   Now, going down to the message that was sent at 7:17 --
 8   it is broken up between those two pages, but the timestamp is
 9   7:17:25, what the message there?
10   A.   The message there reads:  Yes, I do.  She was just born
11   on the 15th.
12   Q.   Who is the sender of that message?
13   A.   The sender is prouddaddy3_15_16.
14   Q.   And the recipient of that message?
15   A.   Mattp.
16   Q.   And again, the -- tell the jury what the date of that
17   message was?
18   A.   The date of this message is 3/28/16.
19   Q.   Thank you.
20           MS. AMANDOLARE:  That can be removed.
21   BY MS. AMANDOLARE, CONTINUED:
22   Q.   Now, I am going to hand you what has been marked for
23   identification as Government's Exhibit 20, and 20A through 20J.
24   Do you recognize what is depicted in that exhibit?
25   A.   Yes, I do.
```

```
                                                        483
        DEBORAH JASINSKI - Direct By Ms. Amandolare
 1   Q.   What is that?
 2   A.   Exhibit 20 is a printout of all the SMS or text messages
 3   from the LG cell phone.
 4   Q.   And what is depicted in Exhibits 20A through 20J?
 5   A.   So Exhibits 20A through 20I are --
 6   Q.   I am sorry, 20I?
 7   A.   -- are individual printouts of those text messages.  20J
 8   is an entry from the context.
 9   Q.   And are both of those, being the 20A through 20J or 20A
10   through 20I as a portion of Exhibit 20, and 20J is a contact,
11   are each of those exhibits contained within Exhibit 37, the
12   disk containing the bookmarked data?
13   A.   Yes.
14           MS. AMANDOLARE:  Your Honor, I would ask what has
15   been marked as Exhibit 20 and then 20A through 20J be moved
16   into evidence.
17           THE COURT:  Any objection?
18           MR. WOLFSON:  No objection.
19           THE COURT:  Received.
20           (Exhibit No. 20, 20A through 20J, received.)
21   BY MS. AMANDOLARE, CONTINUED:
22   Q.   Now, looking at those text messages depicted in Exhibit
23   20, did you, during your investigation, did you notice a
24   certain pattern of unread messages from a certain date and time
25   on that exhibit?
```

```
                                                        484
        DEBORAH JASINSKI - Direct By Ms. Amandolare
 1   A.   Yes, I did.
 2   Q.   Was that certain date and time after 5/17/16 at
 3   6:00 p.m.?
 4   A.   Yes, it was.
 5   Q.   And what I mean by that is that the messages received
 6   after 5/17/16 at 6:00 p.m. have not been read?
 7   A.   That's correct.
 8   Q.   Now, you have indicated in your testimony that one of the
 9   Kik users that you came across on this LG cell phone was
10   fastfamily25.  Was there another -- I am sorry,
11   prouddaddy3_15_16, was there another Kik user name that you
12   came across on this cell phone?
13   A.   There were other users and accounts on the cell phone,
14   yes.
15   Q.   And was one of those users an e-mail address that was
16   fast8251327@gmail.com?
17   A.   Yes.
18   Q.   Why did you find that to be relevant, why did you
19   bookmark that particular user name?
20   A.   For two reasons.  One, as a matter of practice, I
21   typically will exhibit all of the user accounts associated with
22   a device.  Also, the fast8 was also -- continued to be
23   reflected of the Fast and Furious theme.
24   Q.   And I want to just go really quickly back to the Exhibit
25   20 that reflected those SMS text messages.  You indicated that
```

```
                                                        485
        DEBORAH JASINSKI - Direct By Ms. Amandolare
 1   every message after 5/17/2016 at 6:00 p.m. were unread?
 2   A.   Unread.
 3   Q.   Were the messages prior to that date and time reflected
 4   as read?
 5   A.   Yes.
 6   Q.   Now, I want to hand you what is in evidence as Exhibit
 7   14.  Do you recognize that?
 8   A.   Yes, I do.
 9   Q.   What do you recognize that to be?
10   A.   I recognize this to be the black Lenovo laptop that I
11   analyzed associated with this case.
12   Q.   Was that the third electronic device that you were asked
13   to analyze?
14   A.   It was.
15   Q.   How did you know that that's the particular laptop that
16   you analyzed in connection with this case?
17   A.   Similar with the other items I see my initials and the
18   date on the seal.
19   Q.   Okay, and again, just like you did with the white Samsung
20   and black LG, did you take photographs of this particular
21   device?
22   A.   Photographs were taken of this device.
23   Q.   I am going to hand you what has been marked as 14A
24   through 14V. I will ask if you recognize those exhibits?
25   A.   I do, yes.
```

486

DEBORAH JASINSKI - Direct By Ms. Amandolare

1   Q.   And are those images of the Lenovo laptop prior to your
2   analysis?
3   A.   Yes, they are.
4   Q.   Do those images fairly and accurately depict the device
5   the way it was before you conducted your analysis?
6   A.   Yes, they do.
7        MS. AMANDOLARE:  I am going to ask that what has
8   been marked for identification as Exhibits 14A through 14V, as
9   in Victor, be moved into evidence?
10       THE COURT:  Any objection?
11       MR. WOLFSON:  No, objection, Your Honor.
12       THE COURT:  Received.
13       (Exhibit No. 14A through 14V, received.)
14       MS. AMANDOLARE:  And I would ask that Exhibit 14G be
15  published to the jury.
16  BY MS. AMANDOLARE, CONTINUED:
17  Q.   In that image, is there anywhere that it depicts where
18  this particular electronic device was made?
19  A.   Yes, it does.  It says made this China.
20  Q.   Thank you.  Now, what did you do to begin the process of
21  analysis of this particular device?
22  A.   This particular device, the initial steps for the photos
23  and the imaging of the hard drive were conducted by a trainee
24  examiner in the laboratory.  The steps taken prior to my
25  analysis would include again, taking these photos, recording

487

DEBORAH JASINSKI - Direct By Ms. Amandolare

1   serial numbers.  And then the next step would be to remove the
2   hard drive and go about creating a forensic copy of the hard
3   drive for me to use in my analysis.
4   Q.   Why would you want to do that?
5   A.   We use a copy in order to preserve the hard drive as the
6   best evidence in the case.  That way if something were to
7   happen to the copy of the hard drive, we can always go back to
8   the original and make a new copy.
9   Q.   And this is standard practice?
10  A.   It is.
11  Q.   I am going to take those exhibits that you have in your
12  hand.  So how did you go about analyzing this particular data
13  once you were able to get a copy of the hard drive?
14  A.   So once the copy was made and authenticated that the copy
15  process was successful, I brought the hard drive copy --
16  sometimes we refer to it as the image, into a software tool
17  called End Case, and I also brought the hard drive image into a
18  software tool called Axiom.
19  Q.   Did you at any point prior to conducting your analysis
20  verify the date and time of that data on that hard drive?
21  A.   Yes, I did.  One of the steps that we take is to
22  photograph the computer BIOS.  And BIOS stands for basic input
23  output system.  When we do that, when we take this image,
24  essentially we are trying to see what date and time the
25  computer thinks it is.

488

DEBORAH JASINSKI - Direct By Ms. Amandolare

1   Q.   And did this particular computer's date and time match up
2   to the present date and time of your analysis, I mean give or
3   take a couple minutes?
4   A.   Yes, it did.
5   Q.   When you produced results from this laptop, what time
6   zone or time frame did it -- was it in eastern standard time?
7   A.   The Axiom data that I produced from this laptop was
8   produced in UTC time.  UTC stands for Universal Coordinated
9   Time and it is a time standard.  It is kept by a very precise
10  atomic clocks.
11  Q.   I am going to hand you what has been marked for
12  identification as Exhibit 23.1.  Do you recognize that?
13  A.   I do, yes.
14  Q.   What do you recognize that to be?
15  A.   This would be the results CD that I created from my
16  analysis of this item.
17  Q.   And again, just like with the other devices in this case,
18  what is contained on that disk represents bookmarked evidence
19  as you determined it to be relevant that was extracted from
20  this device?
21  A.   Yes.
22       MS. AMANDOLARE:  Your Honor, I would ask what has
23  been marked for identification as Exhibit 23.1 be moved into
24  evidence?
25       THE COURT:  What number was that?

489

DEBORAH JASINSKI - Direct By Ms. Amandolare

1        MS. AMANDOLARE:  23.1.
2        THE COURT:  Any objection?
3        MR. WOLFSON:  No objection, Your Honor.
4        THE COURT:  Received.
5        (Exhibit No. 23.1, received.)
6   BY MS. AMANDOLARE, CONTINUED:
7   Q.   Does the data contained on this particular device that
8   was extracted contain chats and images just like the other
9   devices?
10  A.   Yes.
11  Q.   Were these chats also Kik chats?
12  A.   Yes.
13  Q.   Now, I am going to hand you what has been marked for
14  identification as Exhibit 23.  What does that document appear
15  to be?
16  A.   This document is a spreadsheet reflective of the Kik
17  Messenger chats that were found on the hard drive.
18  Q.   And you know that because prior to testifying here today
19  you were able to compare what is presented in Exhibit 23 for
20  identification with what just went into evidence as Exhibit
21  23.1, which is the complete data that you bookmarked?
22  A.   Yes.
23  Q.   And that's a fair and accurate sort of copy of the
24  results that were in your report?
25  A.   Yes.

490

DEBORAH JASINSKI - Direct By Ms. Amandolare

1   Q.   It is just in a more readable format?

2   A.   Yes.

3   Q.   What, if anything, is different on that spreadsheet,

4   what, if anything, has been added to that spreadsheet from what

5   you produced?

6   A.   What is added to this spreadsheet is a column reflecting

7   the local time of those messages.

8   Q.   And again, that's because, as we discussed, the data off

9   the laptop is in UTC, and this now is in Eastern Standard Time?

10  A.   That's correct.

11       MS. AMANDOLARE:   Your Honor, I would ask what has

12  been marked for identification as Government's Exhibit 23 be

13  moved into evidence.

14       THE COURT:   Any objection?

15       MR. WOLFSON:   No objection, Your Honor.

16       THE COURT:   Received.

17       (Exhibit No. 23, received.)

18  BY MS. AMANDOLARE, CONTINUED:

19  Q.   Now, I am going to hand you what has been marked as 23A,

20  B, C, and D, 23A.1 through 23A.4, 23B.1 through 23B.11; 23C;

21  23C.1 through 23C.7, 23D; 23D.1 through 23D.9.  Do you

22  recognize those exhibits that have been marked for

23  identification?

24  A.   Yes.

25  Q.   And what to you recognize those to be?

---

491

DEBORAH JASINSKI - Direct By Ms. Amandolare

1   A.   Those are portions of the spreadsheets.  23A is the

2   portion of the spreadsheet.  23A.1 through 23A.4 are images

3   that were contained within the Kik chats.  And the rest of the

4   exhibits appear to be portions of the spreadsheet, portions of

5   the Kik chats that were found on the laptop, as well the images

6   contained within those chats.

7   Q.   And again, having examined these items prior to

8   testifying here today, were you able to compare those exhibits

9   marked for identification with both your data on Exhibit 23.1

10  as well the spreadsheet, Exhibit 23, to determine that those

11  are in fact extracted portions from those items of evidence?

12  A.   Yes.

13       MS. AMANDOLARE:   Your Honor, I would ask what has

14  been marked here be moved into evidence.

15       THE COURT:   Any objection?

16       MR. WOLFSON:   No objection, Your Honor.

17       THE COURT:   Received.

18       (Exhibit No. 23A through 23D, received.)

19       (Exhibit No. 23A.1 through 23A.4, received.)

20       (Exhibit No. 23B.1 through 23B.11, received.)

21       (Exhibit No. 23C.1 through 23C.7, received.)

22       (Exhibit No. 23D; 23D.1 through 23D.9, received.)

23  BY MS. AMANDOLARE, CONTINUED:

24  Q.   And again, just like you were doing with other portions

25  of evidence in this case, did you bookmark these chats and

---

492

DEBORAH JASINSKI - Direct By Ms. Amandolare

1   these images because they were relevant to the investigation?

2   A.   I did, yes.

3   Q.   Now, can you explain for the jury what it means to

4   extract evidence off of a laptop that you trace back to another

5   electronic device, say, a cell phone?

6   A.   With this laptop I noticed that some of the files that I

7   found on the laptop appear to have originated from mobile

8   devices.  Specifically the Kik chats could be on -- sort of

9   traced back to the backup of a mobile device.

10  Q.   How many mobile devices were you able to determine had

11  been either plugged in, backed up or both with that Lenovo

12  laptop?

13  A.   I don't recall the exact number, but there were two that

14  I could identify.

15  Q.   And was one of those devices an LG cell phone?

16  A.   Yes.

17  Q.   Did you determine the associated device name with that LG

18  cell phone to be fast family's LG 34C?

19  A.   Yes.

20  Q.   Were you able to determine whether or not that particular

21  LG was the same LG phone that you were asked to analyze as part

22  of this investigation?

23  A.   It was not the same.

24  Q.   And the other device that you referred to cell phone

25  wise, was that an iPhone 4S?

---

493

DEBORAH JASINSKI - Direct By Ms. Amandolare

1   A.   It was.

2   Q.   And you indicated that you were able to trace the Kik

3   chats reflected in Exhibits 23 to trace back to that iPhone?

4   A.   Correct.

5   Q.   Were there other items of evidence that you traced back

6   to that iPhone that were found on the laptop?

7   A.   Yes.

8   Q.   I am going to hand you what has been marked for

9   identification as Exhibit 24.  Do you recognize that?

10  A.   Yes.

11  Q.   And what do you recognize that to be?

12  A.   This would be an image of the defendant.

13  Q.   And where did you locate that image?

14  A.   Contained within the backup of the iPhone.

15       MS. AMANDOLARE:   Your Honor, I would ask what has

16  been marked for identification as Exhibit 24 be moved into

17  evidence.

18       THE COURT:   I believe it has been admitted.

19  BY MS. AMANDOLARE, CONTINUED:

20  Q.   Now -- now, I will take that back.  You indicated that

21  you determined this iPhone to have been associated with this

22  laptop.  Did there come a point in time that as a result of

23  that determination you were asked to take an iPhone 4S into

24  evidence?

25  A.   I was, yes.

494

DEBORAH JASINSKI - Direct By Ms. Amandolare

1    Q.   I am going to hand you what is already in evidence as
2    Exhibit 13 and ask if you recognize that?
3    A.   I do, yes.
4    Q.   And what do you recognize that to be?
5    A.   This would be iPhone that I was asked to take a look at.
6    Q.   How do you know that that is the iPhone that you were
7    asked to take a look at?
8    A.   I can see my initials and date on the seal of the
9    package.
10   Q.   Were you asked to analyze this particular device?
11   A.   No.
12   Q.   Why was that?
13   A.   It was my understanding that that had already been
14   accomplished.
15   Q.   And the purpose of asking you to physically take this
16   device into evidence was to be able to see if it matched the
17   iPhone that had been plugged into the Lenovo laptop?
18   A.   Correct.
19   Q.   Were you able to make that determination?
20   A.   I was, yes.
21   Q.   I am going to hand you what is already in evidence as
22   Exhibit 13J.  Do you recognize that?
23   A.   I do.
24   Q.   And prior to testifying here today, did you have an
25   opportunity see that image?

495

DEBORAH JASINSKI - Direct By Ms. Amandolare

1    A.   Yes.
2         MS. AMANDOLARE:  I am going to ask that that image
3    be published to the jury, Exhibit 13J.
4    BY MS. AMANDOLARE, CONTINUED:
5    Q.   So prior to testifying you viewed this image; is that
6    correct?
7    A.   I did.
8    Q.   What is depicted in that image?
9    A.   This is the SIM card tray taken from the iPhone that I
10   examined.
11   Q.   And you know that because you were able to compare the
12   serial number and this IMEI number depicted in Exhibit 13J with
13   both the iPhone that you just examined as Exhibit 13 as well as
14   your analysis?
15   A.   Correct.
16   Q.   And did you determine that they matched?
17   A.   Yes, I did.
18        MS. AMANDOLARE:  Can I have one brief moment, Your
19   Honor?
20        THE COURT:  You may.
21   BY MS. AMANDOLARE, CONTINUED:
22   Q.   Just so that everybody is on the same page, the iPhone
23   that I just showed you as Exhibit 13, you determined that to be
24   the iPhone that had been plugged into the Lenovo laptop?
25   A.   Yes, it was.

496

DEBORAH JASINSKI - Direct By Ms. Amandolare

1    Q.   Were you able to determine whether or not data from that
2    iPhone had been backed up to that laptop?
3    A.   Yes.  On the laptop I have a backup from that iPhone and
4    it is identified within the backup.  There is a file that
5    depicts the serial number of the device that's backed up.
6    Q.   And Exhibit 23, which is the chats, the Kik chats, that
7    were obtained from that Lenovo laptop, did those trace back to
8    that exact iPhone?
9    A.   Yes, they did.
10   Q.   Were you able to determine where on that iPhone those
11   chats had been stored, if they had been stored at all?
12   A.   Where on the iPhone?
13   Q.   Or on the laptop?
14   A.   On the laptop those chats and that backup are stored in
15   what is referred to as a mobile SIM backup area.  It is right
16   in the filing folder structure of the Lenovo laptop.
17   Q.   Were you able to determine whether or not those chats and
18   images had been previously deleted off the I-phone?
19   A.   I don't recall.
20   Q.   I want to just ask you based on your training and
21   experience with regards to the extraction of data off
22   electronic devices.  Have you ever come across an instance
23   where the data that was extracted or the messages that were
24   extracted reflect an inaccurate date and time?
25   A.   Yes.

497

DEBORAH JASINSKI - Direct By Ms. Amandolare

1    Q.   And it could be as inaccurate as dating back to like the
2    1970s?
3    A.   Yes.
4    Q.   And based on your training and experience, can you
5    explain to the jury why that would happen or may happen?
6    A.   Yes, yes.  So physical analyzer has a decoding process in
7    it.  When I say decoding I mean it will take the raw data from
8    the cell phone and turn it into what we say is a human readable
9    form.
10        That decoding process relies on the developers of the
11   tool having access to different types of cell phones and
12   different types of operating systems.  And they are writing
13   this decoding process based on things that they expect of those
14   devices and cell phones, and operating systems.
15        With cell phones, the type of memory that's in there is
16   different than a hard drive.  It contains routines referred to
17   a where leveling and garbage collection.  And those are
18   complicated processes that will frequently rearrange the data
19   on the chip.
20        So depending on when I get a read of the device or the
21   chip, I am never quite certain exactly what the frequency of
22   the of where leveling and the garbage collection process is.
23   So depending on when you catch that in play, that can affect
24   the decoding process that physical analyzer has because the
25   data is then rearranged.  And it can be rearranged in a way

498

DEBORAH JASINSKI - Direct By Ms. Amandolare

1   that physical analyzer doesn't expect.  So it is incumbent upon
2   the examiner using the tool to be aware of that.
3        And when data, when data is seen that is decoded that
4   perhaps goes back to the 1970s, it is important then to go into
5   the raw data of the extraction because sometimes when you are
6   looking at that raw data, you can tell that, gosh, maybe the
7   data that was expected to be in this file, maybe it shifted
8   over two slots], or something like that.  And it is possible
9   sometimes just to see that in the raw data and to able to
10  account for that.  Sometimes we are able to.  Sometimes we are
11  not.  But that can be one explanation of what is taking place
12  there.
13  Q.   And you just described what happens when you retrieve
14  data and then subsequently you analyze it?
15  A.   Yes.
16  Q.   And in this particular case you were asked to both
17  extract data and analyze that data on each of the three devices
18  that we went through here today?
19  A.   Yes.
20  Q.   And is there any reason to believe with the three devices
21  that we went through here today that there is an inaccuracy in
22  the date and time reflected in the data that you presented?
23  A.   In the data that I presented, no.
24       MS. AMANDOLARE:  I have no further questions, Your
25  Honor.  Thank you.

499

DEBORAH JASINSKI - Direct By Ms. Amandolare

1        THE COURT:  All right.  Mr. Wolfson, do you have any
2   idea how much time you need.
3        MR. WOLFSON:  It will probably be about ten minutes,
4   Your Honor.
5        THE COURT:  Okay.  You may proceed.
6
7   CROSS-EXAMINATION BY MR. WOLFSON:
8   Q.   Good morning, Ms. Jasinski.
9   A.   Good morning.
10  Q.   Let's break this down device by device.  You analyzed
11  three devices in this case, right?
12  A.   Two cell phones and a computer, yes.
13  Q.   Let's start with the computer.  That was a Lenovo T61,
14  right?
15  A.   Yes, it was.
16  Q.   And you prepared a synopsis of this item, correct?
17  A.   Correct.
18  Q.   And in this synopsis you wrote that the T61 with the full
19  name shown is Kenzie (phonetically), correct?
20  A.   Yes.
21  Q.   And you also wrote that eighty-two images of child
22  pornography came off of this device?
23  A.   I did write that, yes.
24  Q.   Could you explain those images?
25  A.   When I was reviewing the contents of the laptop, there

500

DEBORAH JASINSKI - Cross by Mr. Wolfson

1   were eighty-two images which I felt could potentially fit the
2   definition of child pornography.
3   Q.   And you also wrote that you discovered eleven images of
4   beastiality on this computer?
5   A.   Yes.
6   Q.   Could you explain those images?
7   A.   Those images would be images where individuals were
8   engaged in sexual content -- sexual conduct, I should say, with
9   animals.
10  Q.   And you discovered eleven images that you described as
11  child erotica/unknown age participants?
12  A.   Yes.
13  Q.   Could you explain those images?
14  A.   Yes.  Child erotica, they are images where children are
15  dressed perhaps in a manner that is -- that can be determined
16  to be sexually provocative image or also having poses or be
17  placed in scenes that could be determined to be sexually
18  provocative.
19  Q.   And again the other user name on this was shown as
20  Kenzie?
21  A.   Yes.
22  Q.   And this item was used to back up at least two iPhones?
23  A.   Correct.
24  Q.   Let talk about the Samsung cell phone.
25       MR. WOLFSON:  Just one moment, please.

501

DEBORAH JASINSKI - Cross by Mr. Wolfson

1   BY MR. WOLFSON, CONTINUED:
2   Q.   On the Samsung cell phone you wrote that there were
3   thirteen user accounts associated with it?
4   A.   Yes.
5   Q.   And in a supplemental report you wrote that all thirteen
6   accounts pertain to Mackenzie Bailey?
7   A.   They appeared to have some, some version of the name
8   associated with the account, yes.
9   Q.   And going through just a couple of these, one of these
10  user names was voodookenzie17@aol.com, correct?
11  A.   Yes.
12  Q.   And that was used for the service type speeddate.com?
13  A.   I don't recall specifically.
14  Q.   Would reviewing the printout of that help you?
15  A.   It would, yes.
16       MR. WOLFSON:  Defense Exhibit 15 marked for
17  identification.
18  BY MR. WOLFSON, CONTINUED:
19  Q.   Ms. Jasinski, do you recognize this?
20  A.   I do, yes.
21  Q.   What is that?
22  A.   This is a portion of the results from my analysis of the
23  phone.
24  Q.   And if you could please just review those user names so I
25  can ask you a couple more questions.

502

DEBORAH JASINSKI - Cross by Mr. Wolfson

1   A.   Yes.

2   Q.   Thank you.  If I could have that back, please.  I
3   appreciate it.

4   A.   Sure.

5   Q.   So after reviewing that you would say that
6   voodookenzie17@aol.com was used for the service type
7   speeddate.com?

8   A.   Yes.

9   Q.   And the user name voodookenzie17@aol.com was also used
10  for livefreefun.net?

11  A.   Yes.

12  Q.   Do you know if that is a dating website?

13  A.   I am unfamiliar with that website.

14  Q.   Okay.  The user name voodookenzie17@aol.com was also used
15  on a website called exdating.com?

16  A.   Yes.

17  Q.   In the SIMS, the user name mackenziebailey160@gmail.com
18  was used for the site okaycupid.com?

19  A.   Yes.

20  Q.   And the user name mackenzie again was used at the
21  screenname for aol.com chats?

22  A.   Yes.

23  Q.   So it is safe to say that the white Samsung phone
24  belonged to Mackenzie Bailey?

25       MS. AMANDOLARE:  Objection, Your Honor.

503

DEBORAH JASINSKI - Cross by Mr. Wolfson

1        THE COURT:  Overruled.  You may answer.

2   A.   The user accounts on the phone did all pertain to her,
3   yes.

4   BY MR. WOLFSON, CONTINUED:

5   Q.   Turning to the LG phone, the black one, is that described
6   as an LG Lucky?

7   A.   It is.

8   Q.   And you also prepared a synopsis for this device?

9   A.   I did.

10  Q.   And in that synopsis you wrote that approximately twenty
11  screen shots of text messages conversations, including one that
12  indicates someone named Hillary, was using this item to
13  communicate via text messages --

14       MS. AMANDOLARE:  Objection, Your Honor.  The defense
15  is reading from a document that is not in evidence.

16       THE COURT:  It is cross-exam.  He can use that.  Go
17  ahead.  You may answer.

18  A.   Yes, that is a portion of my synopsis.

19  BY MR. WOLFSON, CONTINUED:

20  Q.   So someone named Hillary was using this device, the LG
21  Lucky phone?

22  A.   Possibly.

23  Q.   When you reviewed the LG Lucky phone, did you attempt to
24  the verify the subscriber records for that phone number?

25  A.   Verification of subscriber records is not something that

504

DEBORAH JASINSKI - Cross by Mr. Wolfson

1   I typically do within my course of analysis.

2   Q.   So in this case you did not verify who the registered
3   owner of that phone was?

4   A.   Correct.

5        MR. WOLFSON:  Just one moment, please, Ms. Jasinski.

6   BY MR. WOLFSON, CONTINUED:

7   Q.   So you, in your sole discretion, when you were doing this
8   synopsis determined what may have been relevant for the
9   investigation?

10  A.   Yes, based on my training and experience.

11  Q.   Okay.  So you were focused in on chats that had a sexual
12  nature content?

13  A.   Not chats specifically, but I was focused in on sexual
14  content.

15  Q.   Okay, and just to be clear, the first couple of chats
16  that you discussed with Ms. Amandolare came off of that white
17  Samsung phone?

18  A.   Yes.

19  Q.   And that phone was the one with thirteen user accounts
20  which all pertained to Mackenzie Bailey?

21  A.   Yes.

22  Q.   Thank you, Ms. Jasinski.

23       MR. WOLFSON:  I don't have any further questions.

24       THE COURT:  Redirect, if any.

25       MS. AMANDOLARE:  Just briefly.

505

DEBORAH JASINSKI - Redirect by Ms. Amandolare

1

2   REDIRECT EXAMINATION BY MS. AMANDOLARE:

3   Q.   Ms. Jasinski, Mr. Wolfson referred to images of child
4   pornography that you recovered off of the Lenovo laptop,
5   correct?

6   A.   Yes.

7   Q.   And those are separate and apart from the images that we
8   just put into evidence as having been extracted off that
9   device?

10  A.   Yes, those are separate.

11  Q.   And were all of those images traced back to the iPhone?

12  A.   No.

13  Q.   Were some of them traced back to the LG, the fastfamily
14  LG 34C?

15  A.   Some of them were, yes.

16  Q.   And did you also, in fact, extract various images of
17  child pornography off that black LG Lucky phone?

18  A.   Yes.

19  Q.   And while Mr. Wolfson determined that you didn't retrieve
20  the subscriber information from that LG, you were able to
21  verify that the cell phone number associated with that phone
22  was in fact 315-514-4814?

23  A.   Yes.

24  Q.   And the lock screen on that phone reflected a superman
25  logo?

506

DEBORAH JASINSKI - Redirect by Ms. Amandolare

1    A.   That's correct.

2    Q.   Now, Mr. Wolfson also talked to you about how you

3    determined what was relevant in this case to bookmark.  Did you

4    have opportunities to meet with the investigation team at

5    various times during this entire investigation?

6    A.   I did, yes.

7    Q.   And during those meetings, did you have conversations

8    about where the prosecution and the federal agents were gearing

9    this investigation?

10   A.   Yes, I did.

11   Q.   Did that help you in making a determination as to what

12   was relevant throughout the course of your investigation?

13   A.   It did.  It helped shaped the nature of what I was

14   looking for.

15   Q.   Did that nature change from time to time depending upon

16   the results of those meetings?

17   A.   Slightly, yes.

18   Q.   So it is fair to say that your analysis grew with the

19   investigation?

20   A.   That is fair to say, yes.

21        MS. AMANDOLARE:  I have nothing further.  Thank you,

22   Judge.

23        THE COURT:  Mr. Wolfson, anything further?

24        MR. WOLFSON:  No, Your Honor.  Thank you.

25        THE COURT:  Thank you.  You may be excused in just a

507

DEBORAH JASINSKI - Redirect by Ms. Amandolare

1    second.

2         Members of the jury, we will take our morning break

3    now.  Do not discuss the case among yourselves of course or

4    anyone else.  And then we will be back in about fifteen minutes

5    with the next witness.

6         (Whereupon, a brief recess was taken.)

7         (Whereupon, the Witness is excused.)

8         (Whereupon, the proceedings were held in open court

9         in the presence of the Jury.)

10        THE COURT:  Government may call its next witness.

11        MS. FLETCHER:  United States calls Mackenzie Bailey.

12

13        MACKENZIE BAILEY, having been called as a Witness, being

14   first duly sworn, was examined and testified as follows under

15   oath:

16

17   DIRECT EXAMINATION BY MS. FLETCHER:

18   Q.   Mackenzie, how old are you?

19   A.   I am twenty-one.

20   Q.   What is your date of birth?

21   A.   11-28-95.

22   Q.   Where did you grow up?

23   A.   I grew up in Madrid, Waddington, and Chase Mills.

24   Q.   Where is Madrid, Waddington, and Chase Mills?

25   A.   St. Lawrence County.

508

MACKENZIE BAILEY - Direct By Ms. Fletcher

1    Q.   Where did you go to school?

2    A.   I went to school in Massena Central.

3    Q.   How far did you in school?

4    A.   Eleventh grade.

5    Q.   Why did you leave?

6    A.   I became pregnant.

7    Q.   How old were you when you got pregnant?

8    A.   Eighteen.

9    Q.   Did you have the baby?

10   A.   Yes.

11   Q.   And what is her name?

12   A.   A.T..

13   Q.   What is A.T.'s date of birth?

14   A.   2-28-14.

15   Q.   Who is her father?

16   A.   Nathan Thrana.

17   Q.   And was he in school with you when you got pregnant?

18   A.   Yes, he was.

19   Q.   Was he your age?

20   A.   No, he was younger.

21   Q.   And we are talking about him in the present tense.  Has

22   Nate since passed?

23   A.   Yes, passed away in 2015.

24   Q.   What happened to him?

25   A.   He was in a tragic car accident.

509

MACKENZIE BAILEY - Direct By Ms. Fletcher

1    Q.   He was younger than you?

2    A.   Yes.

3    Q.   Did he drop out of school too when you became pregnant?

4    A.   Yes, he did.

5    Q.   Where were you living when you found out that you were

6    pregnant at age eighteen?

7    A.   I was living in Massena with Nathan.

8    Q.   You had already been living with him?

9    A.   Yes.

10   Q.   Who else lived with you?

11   A.   His grandmother.

12   Q.   Why were you living with Nate and his grandmother when

13   you were eighteen?

14   A.   I moved out when I sixteen.

15   Q.   Moved out from where?

16   A.   I moved out of my mother's house when I was sixteen.

17   Q.   Why?

18   A.   Due to her relationship with her ex-boyfriend.  I did not

19   get along with her boyfriend at the time, so I moved out of my

20   mom's house.

21   Q.   When you say you didn't get along with him, what do you

22   mean?

23   A.   There was a lot of emotional abuse, him calling me names,

24   and there was some physical abuse with him, me and him getting

25   in physical contact with each other, and I just -- I couldn't

510

MACKENZIE BAILEY - Direct By Ms. Fletcher

1   take it anymore. I made up excuses. There was some CPS
2   reports that were involved, and I didn't want to live there
3   anymore. So when I turned sixteen, I moved out.
4   Q.  Is your mom still with that boyfriend?
5   A.  No, she is not.
6   Q.  Is she married now?
7   A.  She is married now.
8   Q.  Who is she married to?
9   A.  She was married to Bruce Northrop.
10  Q.  What is your mom's name?
11  A.  Jennifer.
12  Q.  Do you like Bruce?
13  A.  Yes, I do.
14  Q.  Has she turned her life around?
15  A.  She has.
16  Q.  Do you have any siblings?
17  A.  Yes, I do. I have a brother.
18  Q.  Who is he?
19  A.  Dalton Bailey.
20  Q.  How old is Dalton?
21  A.  Dalton is eighteen.
22  Q.  Do you know his date of birth?
23  A.  2-7-99.
24  Q.  Did there come a time that you and Nathan Thrana moved
25  out of his grandmother's house and got your own place?

511

MACKENZIE BAILEY - Direct By Ms. Fletcher

1   A.  Yes.
2   Q.  How old were you when that happened?
3   A.  I was eighteen. It was frequent before I -- when I did
4   find out I was pregnant, we had our own place. There was a
5   couple of times where we moved out of his grandmother's while I
6   was pregnant. We got our own place, and before I had the baby
7   we moved back to his grandmother's house.
8   Q.  Okay, and then after you had A.T., where did you live?
9   A.  We moved back to the same apartment building. His uncle
10  owned the apartment building, and we got our own apartment
11  again.
12  Q.  Where was that?
13  A.  It was at 2 Willow Street in Massena.
14  Q.  I am going to have you turn around and look at the map.
15  Do you see 2 Willow Street?
16  A.  Yes.
17  Q.  Is that the apartment where you lived or the apartment
18  building where you lived with Nathan?
19  A.  Yes.
20  Q.  You said his uncle owned that place?
21  A.  Yes.
22  Q.  Who is his uncle?
23  A.  Sean Thrana.
24  Q.  Where did you live at 2 Willow?
25  A.  I lived on the second floor. We lived on the third

512

MACKENZIE BAILEY - Direct By Ms. Fletcher

1   floor. Those are the only two floors that we lived on.
2   Q.  Which one was the second place where you lived at
3   2 Willow?
4   A.  The second floor.
5   Q.  And when you lived on the second floor at 2 Willow, who
6   lived next door to you?
7   A.  Stacey.
8   Q.  Who is Stacey?
9   A.  LaPorte.
10  Q.  Who did he live with?
11  A.  Sinclair and then B.L. moved in shortly after they lived
12  there.
13  Q.  Now, Stacey, did you get to know him?
14  A.  Before that, no. After they moved in, frequently, yes.
15  Q.  Do you see him here in the courtroom?
16  A.  Yes, I do.
17  Q.  Could you point him out for the members of the jury and
18  identify him by something that he is wearing?
19  A.  Over there, he has got glasses on his head.
20      MS. FLETCHER:  May the record reflect she has
21  identified the defendant, Your Honor.
22      THE COURT:  So noted.
23  BY MS. FLETCHER, CONTINUED:
24  Q.  Did you know Sinclair Bab?
25  A.  Yes, I did.

513

MACKENZIE BAILEY - Direct By Ms. Fletcher

1   Q.  How did you know her?
2   A.  We went to school together.
3   Q.  Did you meet Stacey through Sinclair?
4   A.  Yes.
5   Q.  Was he introduced to you as Stacey or Joey?
6   A.  Stacey, I believe.
7   Q.  Did you hear people call him Joey?
8   A.  Afterwards, yes.
9   Q.  What name did you come to call him by?
10  A.  Stacey.
11  Q.  How long did you live with Nathan Thrana at 2 Willow?
12  A.  A few months.
13  Q.  Where did you go?
14  A.  When?
15  Q.  Okay. So I guess we need to back up. You lived with
16  Nate at 2 Willow before you met Stacey?
17  A.  Yes.
18  Q.  And then you moved back to his grandmother's house?
19  A.  Yes.
20  Q.  And then you moved back to 2 Willow with Nate?
21  A.  Yes.
22  Q.  Okay, and was that -- did you move out with Nathan again
23  or did you stay there with Nathan when you lived at 2 Willow?
24  A.  After I had the baby, yes.
25  Q.  And when you moved back to 2 Willow after you had the

514

MACKENZIE BAILEY - Direct By Ms. Fletcher

1   baby, how old was A.T. when you moved into 2 Willow?
2   A.   She was only a few months old.
3   Q.   How old was Nate?
4   A.   Seventeen.
5   Q.   And you were eighteen?
6   A.   Yes.
7   Q.   How did you pay the rent?
8   A.   We were going through DSS, and what didn't cover the
9   rent, his uncle offered him to go and help his uncle pay off
10  the rest of that rent.
11  Q.   When you say him, who is that, Nate?
12  Nathan, yes.
13  Q.   He worked for his uncle to work off the rent?
14  A.   Yes.
15  Q.   Did there come a time that Stacey made a comment to you
16  about the two of you getting together?
17  A.   Yes.
18  Q.   Could you explain that to the members of the jury,
19  please?
20  A.   There was one night that we were outside.  He come up to
21  me, and he said if anything happened between me and Nathan, to
22  let him know.  And I took that as that Stacey was interested in
23  me.
24  Q.   But you were still with Nathan at the time?
25  A.   Yes.

515

MACKENZIE BAILEY - Direct By Ms. Fletcher

1   Q.   Did there come a time after that that you and Nate broke
2   up?
3   A.   Yes.
4   Q.   How long after that did you and Nate break up?
5   A.   A few days.
6   Q.   How did that happen?
7   A.   I confronted Nathan, and I told him that I was leaving
8   him.  We got in an argument.  Before I confronted him, I was
9   leaving him, and we got in an argument that day, and then the
10  police were involved further into that argument, and he ended
11  up leaving that day.
12  Q.   Did you stay at 2 Willow?
13  A.   I did for the remainder of the day, and then later that
14  day, I ended up leaving.
15  Q.   Where did you go?
16  A.   I went and hung out with Stacey and a couple of his
17  friends.
18  Q.   What happened between you and Stacey after you broke up
19  with Nate that day?
20  A.   We continued to hang out.  We went out to his friend's
21  house, and after that, we ended up getting together.
22  Q.   What do you mean getting together?  Were you boyfriend
23  and girlfriend?
24  A.   Yes.
25  Q.   Where was Sinclair Bab?

516

MACKENZIE BAILEY - Direct By Ms. Fletcher

1   A.   Sinclair was not around after that.
2   Q.   Was he still with Sinclair when you first started to hang
3   out?
4   A.   No.  He said that he had left her.
5   Q.   So when you and Stacey started becoming boyfriend and
6   girlfriend, where were you living?
7   A.   Still in the apartment at 2 Willow.  He still had the
8   apartment at 2 Willow also.  But I didn't feel safe going back
9   to the apartment because later that night he -- Nathan ended up
10  going back to the apartment.  I was told by a friend of mine
11  that was living upstairs from me that Nathan had gone back to
12  the apartment and was trashing the apartment.  So I didn't feel
13  safe going back to my apartment, and after that, I didn't go
14  back there until I knew where I was going to go.  A.T. was at
15  his mother's house.
16  Q.   Who is his?
17  A.   Nathan's.  And at that time, my mom had already left her
18  boyfriend, so she was with Bruce.  Bruce was living at
19  Riverdale Apartments, and that's where I ended up going to
20  stay, and then my mom helped me and a couple other family
21  members had come and get me, get my stuff out of the apartment
22  within a couple weeks after the -- me breaking up with Nathan.
23  Q.   So did you stay at your mom's when you were uncomfortable
24  going back to 2 Willow?
25  A.   Yes, I did.

517

MACKENZIE BAILEY - Direct By Ms. Fletcher

1   Q.   Did anyone stay there with you?
2   A.   Stacey and B.L. did.
3   Q.   Where did you go after -- now, you have left 2 Willow.
4   You are staying at your mom's.  Did you move to another
5   apartment after that?
6   A.   Yes.
7   Q.   Where did you move to?
8   A.   We moved to 52 Maple.
9   Q.   Who is we?
10  A.   Me, Stacey, B.L., and A.T..
11  Q.   Look behind you on the map again.  Do you see 52 Maple?
12  A.   Yes.
13  Q.   Is that the home where you, Stacey, B.L., and A.T. moved
14  after you and Stacey got together at 2 Willow?
15  A.   Yes.
16  Q.   How was your relationship with Stacey when you first
17  moved in together?
18  A.   It was very good.
19  Q.   Any problems?
20  A.   No.
21  Q.   How long did that last?
22  A.   A few months.
23  Q.   And then what happened?
24  A.   It started to get iffy.  It started going downhill.
25  Q.   How so?

518

MACKENZIE BAILEY - Direct By Ms. Fletcher

1  A.   It started to where, like, our relationship, we weren't

2  connecting very well, and then it got to where he started

3  opening up about his past.

4  Q.   What do you mean by that?

5  A.   What had happened to him when he was -- what had happened

6  to him when he was younger.

7  Q.   What did he tell you?

8  A.   He told me that he was sexually touched by his uncle and

9  his mother.

10  Q.   Did he say why he was telling you this?

11  A.   He said that he had -- he said he had sexual fantasies

12  and that he needed help, that he had pains and he didn't know

13  how to deal with them on his own.

14  Q.   Did he tell you what kind of pains?

15  A.   No.

16  Q.   Did he tell you what he needed to do to deal with the

17  pain?

18  A.   He just -- that he needed help coping with them.

19  Q.   What happened in the conversation from there?

20  A.   He asked me if anything had been done to me when I was

21  younger, and I had told him that I had been touched by my

22  cousin when I was younger, and he had asked me if I had any

23  fantasies about touching or doing anything with anybody else,

24  and I told him no, that I pushed that in the back of my head,

25  that I didn't -- like that was done and over with when that was

519

MACKENZIE BAILEY - Direct By Ms. Fletcher

1  taken care of.

2  Q.   Your childhood abuse?

3  A.   Yes.

4  Q.   Did he talk to you about B.L.?

5  A.   Eventually after that conversation was done, he brought

6  up that he touched B.L. when she was younger and that he --

7  later on in the conversation he brought up doing stuff with

8  B.L..

9  Q.   Doing stuff, what do you mean by doing stuff?

10  A.   Doing sexual stuff with B.L..

11  Q.   That he had done sexual stuff with B.L. or that he wanted

12  to do sexual stuff with B.L.?

13  A.   He had done stuff with her when she was younger.

14  Q.   Was there a time at 52 Maple that he brought up the

15  subject of playing truth or dare with B.L.?

16  A.   Yes.

17  Q.   Could you explain that to the members of the jury,

18  please?

19  A.   He had brought up playing truth or dare, which is a game

20  where it can be sexual or it can be just a conversational game,

21  and it wasn't an out conversation game.  The way he --

22  Q.   When you say it wasn't an out conversation game, what do

23  you mean by that?

24  A.   Like he doesn't approach somebody by talking, he writes

25  it or he will write it on like a notepad or a phone app.  So he

520

MACKENZIE BAILEY - Direct By Ms. Fletcher

1  conversated (sic) with me over a notepad, a phone app, and

2  asked me if we could play truth or dare with B.L., and that he

3  wanted to know if I wanted to do stuff with B.L., and I told

4  him no, that I didn't feel right doing that, that it was his

5  sister, and he was just persistent about asking about playing

6  the game.

7  Q.   When you say do stuff with B.L., did you take it to mean

8  sexual things?

9  A.   Yes.

10  Q.   And you said he was persistent, did you agree to play?

11  A.   After he was very persistent about asking, I did agree to

12  play.

13  Q.   Did B.L. play?

14  A.   Yes, she did.

15  Q.   And who controlled the game?

16  A.   Stacey did.

17  Q.   Who played?

18  A.   Stacey, B.L., and I.

19  Q.   Did he dare you to do certain sexual acts during that

20  game?

21  A.   Yes, he did.

22  Q.   What did he dare you to do?

23  A.   I dared me to flash my breasts to her, and he dared me to

24  have her have sex with him, and it was the same thing with her.

25  He dared her to flash her breasts to me, and dared her to dare

521

MACKENZIE BAILEY - Direct By Ms. Fletcher

1  me to have sex with him.

2  Q.   And did you do all of those things?

3  A.   Yes.

4  Q.   Did she do all of those things?

5  A.   Yes.

6  Q.   Did there come a time when you lived at 52 Maple that the

7  defendant asked you about engaging in sexual activity with

8  A.T.?

9  A.   Yes.

10  Q.   How did he approach that with you?

11  A.   He brought up the subject about him being abused when he

12  was younger, and he brought up that he needed help, and that

13  his pains, and he just needed -- he needed help to get rid of

14  his pains, that he would feel better if I would just help him.

15  Q.   Did he tell you what he wanted to do?

16  A.   He needed like sexual favors.  I don't remember exactly

17  how he put it, but I knew exactly how -- like he -- I knew

18  exactly what he meant.

19  Q.   What did he mean?

20       MS. BIANCO:   Objection what she knew about what he

21  meant unless he expressly said it to her.

22       THE COURT:   Sustained.

23  BY MS. FLETCHER, CONTINUED:

24  Q.   So when he said he needed sexual favors, is this within a

25  discussion about A.T.?

522

MACKENZIE BAILEY - Direct By Ms. Fletcher

1    A.   Yes.

2    Q.   Is he talking to you out loud or is he putting it in his

3    notepad app?

4    A.   In his notepad app.

5    Q.   Just tell the jury what happened during this first time

6    or this event where he brought this up to you for the first

7    time?

8    A.   He asked me if I would let him do stuff with A.T., and at

9    first I told him no.  I didn't feel comfortable with him doing

10   that.  And I asked him if there was anything else that I could

11   do to help him like get rid of his pains, help, do anything

12   besides that, that she was young, that I didn't want him doing

13   that kind of stuff, and he said no, that he wanted that.

14   Q.   You offered to have sex with him yourself?

15   A.   Yes.

16   Q.   And so when he said no, what happened next?

17   A.   And he was just persistent on asking me and asking me and

18   asking me.

19   Q.   So what happened?

20   A.   And I just gave in.

21   Q.   What happened after that?

22   A.   He told me to go get A.T. and bring her out to him and I

23   did.

24   Q.   Was anyone else home?

25   A.   No.

523

MACKENZIE BAILEY - Direct By Ms. Fletcher

1    Q.   What happened?

2    A.   I brought A.T. out to him, and I took her clothes off.  I

3    took her diaper off, and I laid her in between his legs.  And

4    his dick was already hard, and I just told him not to hurt her.

5    Q.   What did he do?

6    A.   He spit on her which he used his spit as lube and he

7    rubbed her vaginal area with his dick, and I just sat there and

8    let him continue doing it.

9    Q.   Were you dressed?

10   A.   Yes.

11   Q.   Did he attempt to penetrate A.T. during this first event?

12   A.   No.

13   Q.   Did he ejaculate?

14   A.   Yes.

15   Q.   Where did he ejaculate?

16   A.   I don't remember the first time.

17   Q.   Did this type of abuse happen again at Maple Street?

18   A.   Yes.

19   Q.   About how many times?

20   A.   Three or four.

21   Q.   Did he ever try to penetrate A.T. when you lived on Maple

22   Street?

23   A.   No.

24   Q.   And you lived on Maple Street in June of 2014?

25   A.   Yes.

524

MACKENZIE BAILEY - Direct By Ms. Fletcher

1    Q.   How old was A.T. in June of 2014?

2    A.   Six months -- no, four months.

3    Q.   Where did you move to after you left Maple Street?

4    A.   To Sommerset.

5    Q.   Do you see Sommerset on the map behind you?

6    A.   Yes.

7    Q.   Is that the address where you lived with -- did the

8    defendant live there with you?

9    A.   Yes, he did.

10   Q.   Who else lived there?

11   A.   B.L. and A.T..

12   Q.   Was there any sexual abuse of A.T. when you lived at

13   Sommerset?

14   A.   No.

15   Q.   Was there any sexual abuse of B.L. when you lived at

16   Sommerset?

17   A.   Yes.

18   Q.   Did you participate in that?

19   A.   No.

20   Q.   Did you witness that?

21   A.   No.

22   Q.   Did there come a time that you moved out of Sommerset?

23   A.   Yes.

24   Q.   Where did you go?

25   A.   To Talcott.

525

MACKENZIE BAILEY - Direct By Ms. Fletcher

1    Q.   Do you see Talcott on the map?

2    A.   Yes, I do.

3    Q.   And that home is depicted on Exhibit 3.  Is that the home

4    where you lived on Talcott?

5    A.   Yes.

6    Q.   Who lived there with you?

7    A.   Me, Stacey, A.T., B.L., and Nick moved in.

8    Q.   Who is Nick?

9    A.   Nick was a friend of Stacey's.

10   Q.   Why did you move to Talcott?

11   A.   My uncle owned the house, and he was moving to a

12   different house, a bigger house, and he wanted to fill that

13   house, so he gave me first pick, and he wasn't going to charge

14   me a security deposit or anything like that.  So I just decided

15   to take it.

16   Q.   Was it a better house than Sommerset?

17   A.   Yes.

18   Q.   And was the rent better?

19   A.   Yes.

20   Q.   Did Nick help pay the rent?

21   A.   Yes, he was supposed to.

22   Q.   Did he?

23   A.   He did for a few months that he was there.

24   Q.   Why was he only there for a few months?

25   A.   He fell back on the rent, and he just stopped paying it,

526

MACKENZIE BAILEY - Direct By Ms. Fletcher

and then Stacey told him he had to move out.

1    Q.   Your uncle was the landlord?

3    A.   Yes.

4    Q.   Did your uncle tell him he had to move out?

5    A.   No.

6    Q.   Who told Nick he had to move out?

7    A.   Stacey did.

8    Q.   Did the sexual abuse of B.L. continue at Talcott?

9    A.   Yes.

10   Q.   Were you involved?

11   A.   Yes.

12   Q.   About how many times were you involved in the sexual

13  abuse with B.L. at Talcott?

14   A.   I would say three times.

15   Q.   Did Stacey have sexual contact with B.L. at Talcott?

16   A.   Yes.

17   Q.   How do you know that?

18   A.   He told me, and I heard it.

19   Q.   Was he also involved with you and B.L. at the same time

20  on occasion?

21   A.   No.

22   Q.   When you had sexual contact with B.L. at Talcott, was it

23  just you and B.L.?

24   A.   Yes.

25   Q.   And the defendant told you that he and B.L. also had

---

527

MACKENZIE BAILEY - Direct By Ms. Fletcher

sexual contact at Talcott?

2    A.   Yes.

3    Q.   What was your relationship like with Stacey when you

4  moved to Talcott?

5    A.   It was good.  When we got to Talcott, I thought

6  everything was -- it seemed a lot better.  Nothing really

7  happened at Sommerset, so I thought everything just kind of

8  disappeared.  I thought everything was getting better.  I did

9  not have to worry about anything anymore.  He wasn't asking

10  really for anything.  So I wasn't really worried about it

11  anymore.

12   Q.   Did something happen with A.T. at Talcott?

13   A.   Yes.

14   Q.   How old was she when you were at Talcott?

15   A.   A year.

16   Q.   Was she sexually abused by the defendant at Talcott?

17   A.   Yes.

18   Q.   Did you witness that?

19   A.   Yes.

20   Q.   Did you participate?

21   A.   Yes.

22   Q.   Approximately how many times was A.T. sexually abused by

23  the defendant at Talcott?

24   A.   A few times.

25   Q.   Was the abuse similar on each occasion?

---

528

MACKENZIE BAILEY - Direct By Ms. Fletcher

1    A.   Yes.

2    Q.   And could you describe what acts were committed then on

3  each occasion, the similar acts?

4    A.   They all played out the same way, how you approach me.

5  There was a couple of times where he penetrated her.

6    Q.   Did he penetrate her vaginally?

7    A.   He tried to.

8    Q.   Did he penetrate her anally?

9    A.   Yes.

10   Q.   Did he use his finger to penetrate her?

11   A.   No.

12   Q.   What did he use?

13   A.   His penis.

14   Q.   Where were you when this was happening?

15   A.   I was in the same room.

16   Q.   Were you with her?  You have to answer out loud.

17   A.   Yes.

18   Q.   Would he ask you to do anything during the abuse of A.T.?

19   A.   Yes.

20   Q.   What did he ask you to do?

21   A.   Before anything happened between them two, he would ask

22  me ahead of time to do stuff with A.T. to get him ready to do

23  stuff with her.  He would ask me go into like a different room,

24  and he would direct me to doing stuff.  Like through text

25  messages, he would have me -- he would tell me to do, take her

---

529

MACKENZIE BAILEY - Direct By Ms. Fletcher

1  diaper off and let me know when she is naked, and then he would

2  just have me do sexual stuff with her just to get him ready.

3    Q.   So this is over text messaging?

4    A.   Yes.

5    Q.   Was there a specific kind of messaging application that

6  you used?

7    A.   Yes, it's called Kik.

8    Q.   Did you have a Kik account?

9    A.   Yes.

10   Q.   Did he have a Kik account?

11   A.   Yes, he did.

12   Q.   What type of things would he text to you that he wanted

13  you to do?

14   A.   That he wanted me to spread her pussy open and send him a

15  picture of it.

16   Q.   Did you agree to that?

17   A.   Yes.

18   Q.   Did you take pictures of her naked vaginal area?

19   A.   Yes.

20   Q.   Did you send them to him over Kik?

21   A.   Yes, I did.

22   Q.   What other types of sexual acts did he ask you to perform

23  on A.T. and take pictures of?

24   A.   He asked me to -- he asked me to finger her, open her up

25  for him.  There was a time where he asked me to eat her out.

530

MACKENZIE BAILEY - Direct By Ms. Fletcher

1   Q.   I am going to ask you, when you say finger her and open
2   her up for him, what do you mean by that?
3   A.   Using my fingers by penetrating her.
4   Q.   What was the purpose of that?
5   A.   Like he would have me like penetrate her, take a picture,
6   and it would -- like he would tell me to like go a certain
7   distance, and it would open her up for him to try to get his
8   dick in her.
9   Q.   So were you trying to open her vaginal opening?
10  A.   Yes.
11  Q.   And when you say he would ask you to eat her out, what
12  does that mean?
13  A.   I don't know how to explain it, like going down on her
14  with my mouth, like licking her vaginal area.
15  Q.   Did you do those things at his request?
16  A.   Yes, I did.
17  Q.   Did you take pictures of them?
18  A.   Yes, I did.
19  Q.   What did you do with the pictures that you took?
20  A.   I sent them to him.
21  Q.   What were you using to text and take pictures, what
22  device?
23  A.   My iPhone, my Samsung.
24  Q.   So did you have two phones during the course of the
25  events that we are talking about in regards to A.T.?

531

MACKENZIE BAILEY - Direct By Ms. Fletcher

1   A.   Yes.
2   Q.   Which phone did you first have?
3   A.   My Samsung.
4   Q.   And so when you lived at Talcott, did you have the
5   Samsung?
6   A.   Yes.
7   Q.   And so the pictures that you took at Talcott would have
8   been taken with the Samsung?
9   A.   Yes.
10  Q.   And then sent to him through Kik?
11  A.   Yes.
12  Q.   Did you know the defendant to have Kik user names?
13  A.   Yes, I did.
14  Q.   Did you know his user names?
15  A.   Yes.
16  Q.   Did he have multiple user names?
17  A.   Yes, he did.
18  Q.   Did he change them frequently?
19  A.   Yes.
20  Q.   And you lived with him at the time?
21  A.   Yes.
22  Q.   So after you would abuse A.T. and sent the pictures to
23  him, what would happen next?
24  A.   I -- he would ask me -- or he would tell me that he was
25  ready, and he would have me bring her in to him.

532

MACKENZIE BAILEY - Direct By Ms. Fletcher

1   Q.   He is in the apartment?
2   A.   He is just in a different room.
3   Q.   And after when he was ready, would you bring her to him?
4   A.   Yes.
5   Q.   And what happened when you brought A.T. to
6   Stacey LaPorte?
7   A.   He would already be ready.
8   Q.   What do you mean ready?
9   A.   His dick would already be hard.  He would already be
10  sitting on the floor, and I would lay her in between his legs.
11  And he would use his spit as lube.  And he would rub her up and
12  down with his penis a few times, and then he would work at
13  trying to penetrate her.
14  Q.   And then what would happen?
15  A.   Then eventually he was able to penetrate her.
16  Q.   Did he ejaculate after each instance of abuse?
17  A.   Yes.
18  Q.   Where?
19  A.   Sometimes it was on my chest.  Sometimes it was on her
20  stomach.  And there was a point that he ejaculated inside of
21  her.
22  Q.   Did he ever express to you concerns about leaving marks
23  on A.T. that might be suspicious for abuse?
24  A.   Yes.
25  Q.   What did he talk to you about in that regard?

533

MACKENZIE BAILEY - Direct By Ms. Fletcher

1   A.   He told me that he didn't want to -- he didn't want to go
2   too far because then somebody would know if like they changed
3   her, and that he was just scared of people finding out.
4   Q.   Now, you said that you used Kik.  Do you know when you
5   started first using Kik?
6   A.   I don't.
7   Q.   Did you use Kik before you met Stacey LaPorte?
8   A.   No.  I didn't even know what it was.
9   Q.   Did you know how to set up your own Kik account the first
10  time you did it?
11  A.   No.
12  Q.   Did somebody set it up for you?
13  A.   Yes.
14  Q.   Who?
15  A.   Stacey.
16  Q.   And was there a reason that you needed a Kik account?
17  A.   He wanted me to get one.
18  Q.   And did you have a user name?
19  A.   Yes.
20  Q.   Do you remember your first user name?
21  A.   No, I don't remember the first one.
22  Q.   Did he give you advice on how to set up the account and
23  what kind of personal information to use or not use?
24  A.   Yes.
25  Q.   What did he tell you?

534

MACKENZIE BAILEY - Direct By Ms. Fletcher

1    A.   He told me not to use my real name, not to put my real
2    e-mail address up there, and that was all.
3    Q.   Do you recall any of the user names that Stacey used for
4    Kik?
5    A.   Prouddaddy and fastfamily.
6    Q.   Did he have multiple fastfamily user names over a period
7    of time?
8    A.   Yes.
9    Q.   What did fastfamily refer to?
10   A.   Fastfamily, he is a big fan of Fast and Furious, so
11   that's where fastfamily comes from.
12   Q.   Did he watch the movies?
13   A.   Yes.
14   Q.   Did he talk about that?
15   A.   Yes.
16   Q.   Did he have tattoos that related to the Fast and Furious?
17   A.   Yes.
18   Q.   When you lived on Talcott approximately how many times
19   did the defendant have you perform sexual acts on A.T. and send
20   those pictures to him?
21   A.   Three times.
22   Q.   Did he always attempt or did he always sexually abuse her
23   after that?
24   A.   Yes.
25   Q.   How did you know that he was the user on the other end of

535

MACKENZIE BAILEY - Direct By Ms. Fletcher

1    that Kik when you were abusing A.T. and sending him pictures?
2    A.   Because he was in the other room.
3    Q.   Was the user that you were corresponding with telling you
4    I am ready, bring her in here?
5    A.   Yes.
6    Q.   When you got that message, where did you go?
7    A.   Right into the other room.
8    Q.   And who was in there?
9    A.   Stacey.
10   Q.   Now, did you have a job before you moved to Talcott?
11   A.   Yes, I did.
12   Q.   Where did you work?
13   A.   Actually no, I didn't have a job before I moved to
14   Talcott.  I am sorry.
15   Q.   Okay.  Did you get one after you moved to Talcott?
16   A.   Yes, I did.
17   Q.   Where did you get a job?
18   A.   Wal-Mart.
19   Q.   Did Stacey have a job before you moved to Talcott?
20   A.   No.
21   Q.   Did he get one while you were living there?
22   A.   Yes.
23   Q.   And where did he get a job?
24   A.   Wal-Mart.
25   Q.   Where is the Wal-Mart in relation to your home on

536

MACKENZIE BAILEY - Direct By Ms. Fletcher

1    Talcott?
2    A.   I don't know where it's at.
3    Q.   Is the Wal-Mart close to Talcott?
4    A.   Yes.
5    Q.   Could you walk there?
6    A.   Yes.
7    Q.   Who got hired first?
8    A.   I did.
9    Q.   How long were you employed at Wal-Mart?
10   A.   Only a few months.
11   Q.   Why so short?
12   A.   Because I --
13   Q.   Did you get fired?
14   A.   Yes, I did get fired.
15   Q.   What was the reason?
16   A.   Because I was no shows.  I was calling in all the time.
17   Q.   Why were you not going to work?
18   A.   Because he never wanted me to go to work.  He always
19   wanted me to stay home.
20   Q.   How long did he work at Wal-Mart?
21   A.   Only a few months, and then he got fired for the same
22   reasons.
23   Q.   Did you get another job after Wal-Mart?
24   A.   Yes, I did.
25   Q.   Where?

537

MACKENZIE BAILEY - Direct By Ms. Fletcher

1    A.   Dollar Tree.
2    Q.   How long did you work at Dollar Tree?
3    A.   I want to say maybe five months.
4    Q.   Did the defendant ever get another job after Wal-Mart?
5    A.   No.
6    Q.   During the entire time you were together, did he ever
7    work again?
8    A.   No.
9    Q.   Do you know Hillary Trimm?
10   A.   Yes.
11   Q.   Who is she?
12   A.   She is an ex of ours.  She was in a relationship with us.
13   I first met her at Wal-Mart.  She -- we briefly talked in the
14   smoke cart at Wal-Mart.  We had a quick conversation, and after
15   that we didn't really talk.  He came up to me and told me that
16   he knew her.
17   Q.   Who is he?
18   A.   Stacey.  He told me that he knew her from before, that
19   she dated one of his old friends, and that that's how he knew
20   her.  He later on had mentioned about a three-way relationship
21   with her, that she liked girls, and that he thought that she
22   would be willing to be in a relationship with us.  And he later
23   on got into my Facebook and contacted Hillary through my
24   Facebook and started talking to her.
25   Q.   Were you receptive to a three-way relationship between

538

MACKENZIE BAILEY - Direct By Ms. Fletcher

1   you and Stacey and Hillary?

2   A.   I did not want the relationship.  When I am in a

3   relationship, I don't like other people in my relationship.

4   Q.   What happened with Hillary?

5   A.   We ended up being in a three-way relationship because he

6   was persistent about having her in our relationship.  A few

7   months after, she -- well, she started coming around more and

8   more and more, and then eventually she ended up moving in with

9   us.  She had her own place before.  She ended up losing that,

10  and then she ended up moving in with us at Talcott.

11  Q.   Where did she live before she came to live with you at

12  Talcott?

13  A.   She lived at 3 Perkins.

14  Q.   Is that in Massena also?

15  A.   Yes.

16  Q.   And were there times where Stacey would go to see her at

17  3 Perkins?

18  A.   Yes.

19  Q.   Would you go with him?

20  A.   I went over a couple times.

21  Q.   Did he start going over without you?

22  A.   Yes.

23  Q.   How did you feel about that?

24  A.   I didn't like it, but I really didn't have a say.

25  Q.   What do you mean you didn't have a say?

539

MACKENZIE BAILEY - Direct By Ms. Fletcher

1   A.   Because if I said that I didn't want him to go, it would

2   always turn into an argument with him.  He would tell me that I

3   was being too jealous, that I needed to stop being jealous,

4   that she was only a friend, and that was before we got into a

5   relationship with her.

6   Q.   What happened after you got into a relationship with her?

7   A.   He said that nothing was going on between them, that it

8   wasn't like that, that we were all in a relationship together,

9   that it wasn't just them two, that she just had to get used to

10  me, that she knew him more, so she was more open with him.

11  Q.   Did you still consider yourself his girlfriend?

12  A.   Yes.

13  Q.   Did you think Hillary was also his girlfriend?

14  A.   Yes.

15  Q.   How old were you when this was going on?

16  A.   Nineteen, nineteen, twenty.

17  Q.   And then you said there came a time when Hillary moved in

18  with you?

19  A.   Yes.

20  Q.   And how did that happen?

21  A.   Hillary and her daughter, C.T., moved in with us.  She

22  left her apartment at 3 Perkins.  She ended up sharing a

23  bedroom with me and Stacey.  We give the bigger bedroom to B.L.

24  and the kids.  It was big enough for them to share.  So it was

25  B.L. and the two kids.

540

MACKENZIE BAILEY - Direct By Ms. Fletcher

1   Q.   Do you know how old C.T. was?

2   A.   I know she was the same age, she was around the same age

3   as A.T., but I didn't know which one was older.

4   Q.   So they were both about one?

5   A.   Yes.

6   Q.   Was Hillary still working at Wal-Mart when she moved in

7   with you at Talcott?

8   A.   Yes.

9   Q.   Did she work at Wal-Mart the entire time that she lived

10  with you at Talcott?

11  A.   I believe so.

12  Q.   Who watched C.T. while Hillary was at work?

13  A.   I did and Stacey did.

14  Q.   Did B.L. watch the children also?

15  A.   Yes.

16  Q.   Did there come a time that Hillary was at work and the

17  defendant approached you about sexually abusing C.T.?

18  A.   Yes.

19  Q.   Explain to the members of the jury how that happened?

20  A.   He had approached me about doing stuff with C.T. because

21  Hillary wasn't there.  Hillary wouldn't know and she would

22  never find out and we wouldn't tell her.  And he wanted to do

23  stuff with C.T. instead of A.T. that day, and I told him that I

24  didn't want to do stuff with C.T. because she wasn't my child.

25  And he said it's fine, she is not going to know.  And he just

541

MACKENZIE BAILEY - Direct By Ms. Fletcher

1   kept going, kept asking and asking and asking.

2   Q.   What did you do?

3   A.   I gave in like any other time, and I went and got C.T..

4   Q.   What did you do with C.T.?

5   A.   I brought her in the bedroom.  I took her clothes off.  I

6   took her diaper off and he had me hold her arms.  She was like

7   moving her arms around.  He used the spit as lube and he

8   started rubbing her up and down and...

9   Q.   And what happened?

10  A.   He ended up penetrating her.

11  Q.   Vaginally or anally or do you not know?

12  A.   Anally.

13  Q.   What were you doing when he was doing that?

14  A.   I was holding her arms.

15  Q.   What was she doing?

16  A.   Screaming, crying.

17  Q.   Did he ejaculate?  You have to answer out loud.

18  A.   Yes.

19  Q.   Where?

20  A.   On her stomach.  He pulled out.

21  Q.   What did you do then?

22  A.   I cleaned her up, and I put her diaper back on, and I put

23  her clothes back on, and that was it.

24  Q.   Is that the only time he asked you to help him sexually

25  abuse C.T.?

542

MACKENZIE BAILEY - Direct By Ms. Fletcher

1  A.  Yes.

2  Q.  You said that you and Hillary and the defendant shared a

3  room.  Were the three of you sexually involved with one

4  another?

5  A.  Yes.

6  Q.  Would you say that you and Hillary were romantically

7  involved?

8  A.  No.

9  Q.  How would you describe your relationship with Hillary?

10 A.  It wasn't -- we were in a three-way relationship.  But

11 neither one of us wanted it.  It was on -- it was where I

12 wanted Stacey and she wanted Stacey --

13        MS. BIANCO:  Objection to what Hillary Trimm wanted.

14        THE COURT:  Sustained.

15 BY MS. FLETCHER, CONTINUED:

16 Q.  You wanted Stacey?

17 A.  Yes.

18 Q.  After all of this?

19 A.  Yes.

20 Q.  Why?

21 A.  Because I loved him, and I was happy with him at one

22 point.

23 Q.  Were there times when it was good?

24 A.  Yes.  There was times I was happy.

25 Q.  Did you know how to get out?

543

MACKENZIE BAILEY - Direct By Ms. Fletcher

1  A.  No.

2  Q.  Did you want to get out?

3  A.  Yes, I did.

4  Q.  Did you always want to get out or sometimes want to get

5  out?

6  A.  Sometimes.

7  Q.  Did you have a place to go?

8  A.  There was places that I could go.

9  Q.  Your relationship with Stacey, was there physical

10 altercations involved in that?

11 A.  Yes.

12 Q.  Can you explain that?

13 A.  It would start out with arguments because I wouldn't do

14 what he asked or I would do something wrong.  And it would go

15 from arguments to physical contact.  There was only two real

16 scariest fights, and those two serious fights, I thought I was

17 going to die.

18 Q.  Was there physical violence with B.L.?

19 A.  Yes.

20 Q.  Did that include the defendant?

21 A.  Yes.

22 Q.  Did you ever see him hit B.L.?

23 A.  Yes.

24 Q.  What about A.T.?

25 A.  No.

544

MACKENZIE BAILEY - Direct By Ms. Fletcher

1  Q.  What about emotionally, were there words that made you

2  feel that you couldn't leave?

3  A.  Yes.

4  Q.  Can you explain that?

5  A.  There was a lot of threats that if I ever left then he

6  would find me and that either he would kill me or that I knew

7  too much already about what already went on with the sexual

8  abuse of A.T. and C.T. and that he would turn it all around on

9  me.

10 Q.  Were you afraid of losing your baby?

11 A.  Yes.

12 Q.  Did he threaten to call CPS?

13 A.  Yes.

14 Q.  Did you stay with him?

15 A.  Yes, I did.

16 Q.  Did there come a time when you lived on Talcott that

17 Hillary Trimm's mother, C.T.'s grandmother, came to get C.T.?

18 A.  Yes.

19 Q.  Do you know Hillary's mother's name?

20 A.  Lisa.

21 Q.  What happened when Lisa came to get C.T.?

22 A.  Lisa came one day when Hillary went to work.  Hillary had

23 texted us and told us that Lisa was going to get C.T. for the

24 day and that she would only be taking her for the day, that she

25 would bring her back when Hillary got home from work.  Lisa

545

MACKENZIE BAILEY - Direct By Ms. Fletcher

1  showed up, and we had C.T. ready, her diaper bag ready for her.

2  Lisa came in and asked where all C.T.'s stuff was, and we

3  told her upstairs, and there was like a basket full of her

4  clothes on the stairs, and she had said that she wanted all of

5  C.T.'s stuff, her clothes, the diapers, the wipes, everything

6  that she had there.  So we got it together for her.  And she

7  took C.T. and left.  She didn't say why she was taking the

8  stuff.  We asked her why she was taking the stuff, but she

9  wouldn't answer us.

10 Q.  Did C.T. ever come back to that house?

11 A.  No.

12 Q.  What happened when Hillary got home?

13 A.  Hillary got home.  She had told us that her mom -- we

14 told her what her mom had did.  She seemed upset.  She had

15 contacted her mom and asked her mom why she took all of C.T.'s

16 stuff.  We did not hear the conversation because she didn't

17 have her on speaker phone.  But she had said that her mom

18 wasn't bringing her --

19        MS. BIANCO:  Objection to what her mom said,

20 hearsay.

21        THE COURT:  Sustained.

22 BY MS. FLETCHER, CONTINUED:

23 Q.  After Hillary spoke with her mom?

24 A.  She said that her mom --

25 Q.  You can't say what she said.  Is that what she told you?

```
                                              546
     MACKENZIE BAILEY - Direct By Ms. Fletcher
 1   A.   Yes, it is what she told me.  She told me that her mom,
 2   that she was not bringing C.T. back to the house, that she was
 3   keeping C.T. from Hillary, that she was going to take C.T. from
 4   Hillary if Hillary didn't come to her mom's house.
 5   Q.   What did Hillary do?
 6   A.   Hillary continued to fight with her mom, said that she
 7   was not leaving, that her mom needed to bring C.T. back to
 8   Massena or she was going to find a ride out there to get C.T.,
 9   and which we didn't have no transportation.  Hillary didn't
10   have her car.  And later on that night, she agreed --
11   Q.   Who is she?
12   A.   Hillary agreed, and her mom and her stepdad ended up
13   coming in to town and they ended up coming to get Hillary, and
14   Hillary ended up packing her stuff, and she ended up leaving
15   with her mom and her stepdad.
16   Q.   Did Hillary ever come back to live at Talcott after that
17   day?
18   A.   No, she didn't.
19   Q.   Did you have a conversation with Hillary after she got
20   out of Talcott?
21   A.   Not afterwards, no.
22   Q.   Did she leave and get out of that situation at Talcott?
23   A.   Yes.
24   Q.   Did there come a time that she offered to get you out?
25   A.   Yes.
```

```
                                              547
     MACKENZIE BAILEY - Direct By Ms. Fletcher
 1   Q.   Did you have a conversation with her or was that through
 2   text messaging?
 3   A.   It was a brief conversation that night that she was
 4   packing her stuff.
 5   Q.   What did she say to you?
 6   A.   She asked me if I needed help and I wanted to leave, if
 7   she wanted to help me -- or if she wanted her to help me and
 8   A.T. to get out if we wanted to leave.
 9   Q.   So that got a little garbled.  Back it up.  She asked you
10   if you wanted help getting out of there?
11   A.   Yes.
12   Q.   And whether you wanted to get A.T. and leave also?
13   A.   Yes.
14   Q.   What did you say to Hillary?
15   A.   I told her no, that I was fine.
16   Q.   Were you fine?
17   A.   At that time I felt like I was.
18   Q.   You decided to stay?
19   A.   Yes, I did.
20   Q.   Do you know whether Stacey and Hillary were back in touch
21   with each other after she left Talcott?
22   A.   Yes, they did.
23   Q.   How do you know that?
24   A.   I was told that.
25   Q.   By who?
```

```
                                              548
     MACKENZIE BAILEY - Direct By Ms. Fletcher
 1   A.   Stacey.
 2   Q.   What did he tell you about Hillary after she left
 3   Talcott?
 4   A.   He told me that he was still in contact with her.
 5   Q.   Did there come a time when you found out she was
 6   pregnant?
 7   A.   Yes.
 8   Q.   Who told you?
 9   A.   Stacey.
10   Q.   What did he tell you about that?
11   A.   He told me that she had texted him and told him that
12   she --
13         MS. BIANCO:  Objection to what -- objection to the
14   statement that Hillary is saying to Stacey, hearsay.
15         THE COURT:  Overruled.  You may answer.
16   BY MS. FLETCHER, CONTINUED:
17   Q.   Go ahead.  She told him that she what?
18   A.   She had messaged him and told him that she was pregnant,
19   and she had sent him a picture of the pregnancy test saying
20   that she was pregnant.
21   Q.   Did he indicate to you that it was his baby?
22   A.   He said it was a possibility, yes.
23   Q.   Did you stay with him?
24   A.   Yes, I did.
25   Q.   Did there come a time that you left Talcott?
```

```
                                              549
     MACKENZIE BAILEY - Direct By Ms. Fletcher
 1   A.   Yes.
 2   Q.   Where did you go to from there?
 3   A.   To the cabin.
 4   Q.   Can you turn around and see the cabin behind you on the
 5   map behind you, Exhibit 3?
 6   A.   Yes.
 7   Q.   In the lower left corner, number five, is that the cabin
 8   where you moved to when you left Talcott?
 9   A.   Yes, in the Town of Loisville.
10   Q.   Why did you leave Talcott?
11   A.   I knew the people that owned the cabin.  She said that
12   she wasn't really going to charge us rent out there.  We were
13   slacking on rent to my uncle.  My uncle was getting a little
14   bit upset with it.  So we figured that it would be a little bit
15   better until we could figure out money situations.
16   Q.   Were you working at Dollar Tree?
17   A.   Yes, I was.
18   Q.   What kind of money were you making at Dollar Tree?
19   A.   It was not -- it was bi-weekly paycheck, and it was only
20   minimum wage, and I wasn't getting that many hours a week.
21   Q.   Was that the only income that you and Stacey had?
22   A.   Yes.
23   Q.   Did you also have public assistance?
24   A.   No.
25   Q.   Why not?
```

550

MACKENZIE BAILEY - Direct By Ms. Fletcher

1   A.   It was -- we didn't have transportation out there.   We

2   had offered transportation.   My mom was willing to bring us out

3   there for public assistance, but I always turned it down

4   because he never wanted to go out there.

5   Q.   Where did you have to go?

6   A.   To Canton.

7   Q.   How far is Canton from Massena?

8   A.   It is about an hour away.

9   Q.   Did you have to go to Canton in order to apply and

10  receive public assistance?

11  A.   Yes, and to recertify if you already had it.

12  Q.   And so because you didn't go, you weren't getting public

13  assistance?

14  A.   Yes.

15  Q.   You lived off of your minimum wage Dollar Tree job?

16  A.   Yes.

17  Q.   Did you have family that helped?

18  A.   Yes.

19  Q.   Did Stacey contribute at all?

20  A.   No.

21  Q.   Was A.T. sexually abused when you lived at the cabin?

22  A.   No.

23  Q.   Was B.L. sexually abused when you lived at the cabin?

24  A.   Yes.

25  Q.   By whom?

551

MACKENZIE BAILEY - Direct By Ms. Fletcher

1   A.   Stacey and I.

2   Q.   What is the age difference between you and B.L., do you

3   know?

4   A.   I want to say four years.   I am not sure.

5   Q.   Okay.

6   A.   I want to say only a few years.

7   Q.   Just about three, three and a half years?

8   A.   Yes.

9   Q.   How long did you live at the cabin?

10  A.   Only a few months.

11  Q.   Where did you go from there?

12  A.   To Glenn Street.

13  Q.   Who lived with you on Glenn Street?

14  A.   It was Stacey, me, B.L., and A.T..

15  Q.   Did the defendant continue to sexually abuse B.L. at

16  Glenn Street?

17  A.   Yes.

18  Q.   Did you participate?

19  A.   No.

20  Q.   Did there come a time in January of 2016 that B.L. ran

21  away?

22  A.   Yes.

23  Q.   Where -- or did you and Stacey ultimately figure out that

24  she had run away?

25  A.   Yes.

552

MACKENZIE BAILEY - Direct By Ms. Fletcher

1   Q.   When did you figure that out?

2   A.   On the day that we figured, we woke up and later on

3   that day, we realized that she was not coming back.   We had no

4   contact with her throughout the day after we woke up.   We

5   didn't know where she went.   My brother had told us that he had

6   seen her at the library earlier that day, but he didn't say

7   anything to her.   And he just said that he seen her.

8   Q.   And did he say who he saw her with?

9   A.   Carrie.

10  Q.   Who is Carrie?

11  A.   One of my good friends.

12  Q.   So what happened after that?

13  A.   After we figured out that she had ran away, it was a

14  couple of days later, Massena PD had showed up at Glenn Street

15  looking for Stacey and --

16  Q.   Was he home?

17  A.   No, he was not.   I told him that Massena PD was looking

18  for him, and we thought it was because of B.L..

19  Q.   Did Massena PD tell you why they were looking for him?

20  A.   No, they wouldn't tell me anything.   I asked them.

21  Q.   But you told the defendant they had come by looking for

22  him?

23  A.   Yes.

24  Q.   And what happened then?

25  A.   We thought it was because of B.L..   We had knew that

553

MACKENZIE BAILEY - Direct By Ms. Fletcher

1   she -- I don't know how we knew that she was at Carrie's.

2        MS. BIANCO:   Objection if she doesn't know.

3        THE COURT:   Yes, sustained.

4   BY MS. FLETCHER, CONTINUED:

5   Q.   Where did you go?

6   A.   We went to Carrie's.

7   Q.   Did you have an idea that she might be there?

8   A.   Yes.

9   Q.   Was she?

10  A.   Yes.

11  Q.   What happened when you got to Carrie's?

12  A.   We got to Carrie's.   We knocked on the door.   Carrie

13  barely opened the door like she didn't want to let us in.

14  Stacey was at the door first.   I was standing behind Stacey.

15  We got let in, Carrie let us in.   We were standing there having

16  a conversation.   Stacey wanted to talk with B.L..   B.L. was

17  upstairs at the time.   Carrie said that she was going to go up

18  there and get B.L.   She went upstairs, and I noticed the order

19  of protection on the wall, and I told Stacey to look at the

20  wall.   And he went over and read it, and then she -- B.L. never

21  came down.

22  Q.   What was the order of protection for?

23  A.   B.L. to stay away from Stacey.

24  Q.   Or the other way around?

25  A.   Yes.

554

MACKENZIE BAILEY - Direct By Ms. Fletcher

1   Q.   It was in favor of B.L.?
2   A.   Yes.
3   Q.   And Stacey was ordered to stay away from her?
4   A.   Yes.
5   Q.   What happened next?
6   A.   The Massena PD ended up coming to Carrie's house.
7   Q.   What happened?
8   A.   They told us that we had to leave.
9   Q.   Did you?
10  A.   Yes.
11  Q.   Was Stacey served with a copy of the order of protection?
12  A.   Yes, he was.
13  Q.   Did B.L. ever come back home?
14  A.   No, she did not.
15  Q.   Did she have belongings at your apartment?
16  A.   Yes.
17  Q.   What was done with them?
18  A.   We packed them up and they -- some of the, one of the
19  officers or the investigator, they came and got some of her
20  things, and they brought it to her.  The rest of her stuff, I
21  had asked my mom if she would be willing to bring it over to
22  Carrie's house for B.L., and I packed the truck up, and I
23  brought it over with my mom and delivered it to B.L..
24  Q.   Mackenzie, do you know C.F.?
25  A.   Yes, I do.

555

MACKENZIE BAILEY - Direct By Ms. Fletcher

1   Q.   How do you know C.F.?
2   A.   Through B.L..
3   Q.   When did you meet C.F.?
4   A.   Before B.L. ran away.
5   Q.   Where were you living?
6   A.   At Glenn Street.
7   Q.   Who was C.F. to B.L.?
8   A.   A friend.
9   Q.   Did you know whether they went to school together?
10  A.   Yes.
11  Q.   Did you know whether they were in the same grade?
12  A.   No.
13  Q.   Was B.L. still living on Glenn when C.F. starting coming
14  over?
15  A.   Yes.
16  Q.   And how long was -- how long was it after C.F. started
17  coming over that B.L. ran away?
18  A.   C.F. only came over twice while B.L. was living there,
19  and then after B.L. -- before B.L. ran away, she never came
20  over after like before B.L. ran away.  Like she came over
21  twice, and then B.L. ran away, and then she didn't come over
22  until my brother had contacted her, told her that we wanted to
23  talk to her about what was going on with B.L., that B.L. was no
24  longer at the house anymore, and then she started coming over.
25  Q.   Why did you want to contact C.F.?

556

MACKENZIE BAILEY - Direct By Ms. Fletcher

1   A.   To let her know that B.L. was no longer at the house, and
2   then we asked her if she would be willing to babysit if we
3   needed her.
4   Q.   Was she willing to babysit?
5   A.   Yes.
6   Q.   Was she good with A.T.?
7   A.   She was.
8   Q.   Did she start coming over?
9   A.   Yes, she did.
10  Q.   How often did she start coming over after that?
11  A.   Frequently during the week after school.
12           THE COURT:  Okay.  I think this is a good time to
13  break.  We will take our hour lunch hour now, members of the
14  jury, until 1:30.  And again advise you, of course, not to talk
15  about the case over the noon hour among yourselves or anyone
16  else, and we will see you back here at approximately 1:30.
17  Thank you again for your service.
18           (Whereupon, the proceedings were held in open court
19           out of the presence of the Jury.)
20           THE COURT:  Ms. Bailey, do not discuss this case or
21  your testimony with anyone during the noon hour.  Do you
22  understand?
23           THE WITNESS:  I understand.
24           THE COURT:  Don't talk about it with anybody.
25           THE WITNESS:  Okay.

557

MACKENZIE BAILEY - Direct By Ms. Fletcher

1            THE COURT:  Everybody wait here for a few minutes so
2   the jury can get out to lunch.  We are adjourned until 1:30.
3            (Whereupon, the luncheon recess was taken.)
4            (Whereupon, the proceedings were held in open court
5            in the presence of the Jury.)
6            THE COURT:  You may continue with your direct
7   examination.
8            MS. FLETCHER:  Thank you, Your Honor.
9   BY MS. FLETCHER, CONTINUED:
10  Q.   Mackenzie, I think we were talking about C.F. and when
11  C.F. started coming over to Glenn Street.  Did anything sexual
12  happen with C.F. when B.L. was still living at Glenn Street?
13  A.   No.
14  Q.   Did anything sexual happen with B.L. when C.F. was
15  visiting at Glenn Street?
16  A.   No.
17  Q.   Did C.F. continue to come over after B.L. left?
18  A.   Yes.
19  Q.   And you talked about asking her to come and babysit?
20  A.   Yes.
21  Q.   Did she come to babysit?
22  A.   Yes, she did.
23  Q.   How often did she start coming over?
24  A.   Frequently during the week after school, and then she
25  started coming over on the weekends during the day, and then

Case 18-105, Document 44, 04/15/2019, 2540369, Page90 of 202
Case 5:16-cr-00320-DNH   Document 118-2   Filed 09/05/18   Page 110 of 232
Case 5:16-cr-00320-DNH   Document 118-2   Filed 09/05/18   Page 111 of 232

558

MACKENZIE BAILEY - Direct By Ms. Fletcher

1  she got permission through her mother.  She told her mother
2  that was coming over to babysit, and that was her go that she
3  could stay the night over on the weekends.
4  Q.   Did she actually babysit every time she came over?
5  A.   It was most of the time like when I was working, but most
6  of time, yes.
7  Q.   But not all of the time?
8  A.   No.
9  Q.   Were there times that she came over that you were home as
10  well?
11  A.   Yes.
12  Q.   The times that she came over to babysit A.T., was Stacey
13  home?
14  A.   Yes, he was.
15  Q.   Why did you have C.F. come and babysit if Stacey was
16  home?
17  A.   I felt that she was really good with A.T., and she would
18  be taken care of more if somebody else was there.
19  Q.   Did there come a time that things became sexual with
20  C.F.?
21  A.   Yes.
22  Q.   When did that start?
23  A.   After a couple of times that she started staying over, he
24  started texting her off my phone.
25  Q.   Who is he?

559

MACKENZIE BAILEY - Direct By Ms. Fletcher

1  A.   Stacey.  He started texting her off my phone, and
2  pretending it was me, saying that I was interested in her, and
3  he had asked her if she liked me more than a friend, and he had
4  told me that she was looking at me like -- that he thought that
5  she liked me more than a friend, that she was looking at me all
6  the time.  And he had asked her if she looked me more than a
7  friend, and he told me that she did.
8  Q.   When you say more than a friend, do you mean sexually?
9  A.   Yes.
10  Q.   Were you interested in C.F.?
11  A.   I thought she was very -- she was a very attractive girl.
12  Q.   Did she ever talk to you specifically about whether she
13  was interested in you?
14  A.   No, she did not.
15  Q.   The information you had in that regard, did that come
16  from Stacey?
17  A.   Yes.
18  Q.   And was B.L. already gone, had B.L. already run away when
19  this started happening?
20  A.   Yes.
21  Q.   When was the first time that sexual activity or that
22  there was sexual activity with C.F.?
23  A.   I don't remember the exact time.
24  Q.   Do you remember the first time?
25  A.   Yes, I do.

560

MACKENZIE BAILEY - Direct By Ms. Fletcher

1  Q.   Can you tell us what happened?
2  A.   He had talked to me.
3  Q.   Who is he?
4  A.   Stacey had talked to me about doing stuff with C.F., that
5  she had agreed to do stuff with us and be in a relationship
6  with us.  And we were laying in our bed.
7  Q.   Who is we?
8  A.   Me, Stacey, and C.F..  C.F. was in the middle of us.  And
9  it started out that he started kissing her, and I was leaning
10  up against the wall.  I wasn't like completely laying down.  He
11  started kissing her and looking at me, and he started like
12  groping her boobs, and he would stop like kissing her, and he
13  would like mimic, do something, do something, and I would shake
14  my head no, that I didn't want to do anything, and he would
15  kind of get that look like he was mad that I said no, and he
16  would get mad because that was my answer to everything to him,
17  was no.  He hated the answer no.
18       And he kept going with C.F., groping her boobs.  He then
19  started rubbing her vaginal area, and he took his dick out, and
20  she started rubbing it, and then her clothes ended up coming
21  off, and his were already off.  I laid on the bed.  My clothes
22  were still on.  I had shorts and a tank top on, and I laid
23  there, and looked dumbfounded, and they ended up having sex
24  that time.
25  Q.   Did you see that?

561

MACKENZIE BAILEY - Direct By Ms. Fletcher

1  A.   Yes.
2  Q.   How often after that did Stacey and C.F. have sex that
3  you observed?
4  A.   There was a few times.
5  Q.   Did there come a time that you then also participated?
6  A.   Yes.
7  Q.   How did it come about that you became involved with the
8  sex between Stacey and C.F.?
9  A.   I was just getting involved.  I don't know how I like
10  came about it.  I just started kissing her.  She kissed me
11  back, and I started groping her and like her boobs, and I ate
12  her out, and she never did that to me.  She did it once, but
13  that was a different occasion.  But it all played out the same
14  every time.
15  Q.   Was Stacey involved in those instances when you were
16  having sexual contact with C.F.?
17  A.   Yes.
18  Q.   Was there ever an instance that you and C.F. had sexual
19  contact with one another that Stacey was not involved?
20  A.   No.
21  Q.   During those instances of sexual conduct with you and
22  Stacey and C.F., who initiated the conduct?
23  A.   Stacey.
24  Q.   Every single time?
25  A.   Yes.

562

MACKENZIE BAILEY - Direct By Ms. Fletcher

1   Q.   Does C.F. have a tattoo?

2   A.   Yes.

3   Q.   What tattoo does she have?

4   A.   She has a tattoo on her vaginal area that says kinky.

5   Q.   Who gave her that tattoo?

6   A.   Stacey did.

7   Q.   Did you see that?

8   A.   Yes, I did.

9   Q.   Do you have the same tattoo?

10  A.   I have the same exact tattoo.

11  Q.   In the same exact place?

12  A.   Same exact place.

13  Q.   In your vaginal area?

14  A.   Yes.

15  Q.   Did he give you other tattoos as well?

16  A.   He did.

17  Q.   What other tattoos do you have that Stacey gave you?

18  A.   I have multiple other tattoos.  I have words.  I have

19  stars.  I have a horse tattoo.  I have a heart tattoo.  I have

20  his name, but he didn't give me that one.  He did A.T.'s name

21  on my arm.

22  Q.   Who gave you the tattoo that says Stacey?

23  A.   Jamie Patterson.

24  Q.   Why did you get that?

25  A.   He wanted to get matching tattoos.

563

MACKENZIE BAILEY - Direct By Ms. Fletcher

1   Q.   He has a Mackenzie tattoo?

2   A.   He does.

3   Q.   Can I see your Stacey tattoo, can you show the jury?

4        (Witness indicates.)

5   BY MS. FLETCHER, CONTINUED:

6   Q.   Thank you.  Mackenzie, who is J.M.?

7   A.   J.M. is C.F.'s brother.

8   Q.   Did there come a time that he started coming over to

9   Glenn Street?

10  A.   Yes.

11  Q.   Do you know how old J.M. was?

12  A.   No, I do not.

13  Q.   Did you believe that he was younger or older than C.F.?

14  A.   I thought he was around the same age as C.F..  He didn't

15  act younger.

16  Q.   Did you know he was twelve years old?

17  A.   No.

18  Q.   How often would J.M. come over?

19  A.   Occasionally.

20  Q.   What would he do when he came over?

21  A.   He came over, hung out, associated.  He would come over

22  and get cigarettes, play video games.

23  Q.   J.M. smoked?

24  A.   Yes.

25  Q.   Did there come a time that alcohol was involved?

564

MACKENZIE BAILEY - Direct By Ms. Fletcher

1   A.   Yes.

2   Q.   Was alcohol provided to J.M.?

3   A.   Yes.

4   Q.   Was alcohol provided to C.F.?

5   A.   Yes.

6        MS. BIANCO:  Objection to the leading nature of

7   these questions.

8        THE COURT:  Overruled.

9   BY MS. FLETCHER, CONTINUED:

10  Q.   Did you drink alcohol?

11  A.   Yes, I did.

12  Q.   How old were you?

13  A.   Eighteen, nineteen.

14  Q.   Was there anyone that lived at Glenn Street that was over

15  the age of twenty-one?

16  A.   Yes.

17  Q.   Who?

18  A.   Stacey.

19  Q.   Was he the only person at Glenn Street that was over the

20  age of twenty-one?

21  A.   Yes.

22  Q.   Do you recall the day of February 28th of 2016?

23  A.   Yes.

24  Q.   Is that A.T.'s birthday?

25  A.   It is.

565

MACKENZIE BAILEY - Direct By Ms. Fletcher

1   Q.   In 2016, she was how old?

2   A.   Two.

3   Q.   I want to draw your attention to the early morning hours,

4   the night before into the morning of her second birthday.  Do

5   you remember what was going on in your home during that

6   morning?

7   A.   Yes.

8   Q.   Do you recall events involving C.F. and J.M. that took

9   place in your home that early morning?

10  A.   No.

11  Q.   Do you remember whether C.F. and J.M. were at your house

12  on the 28th?

13  A.   Yes, I do.

14  Q.   Was the defendant home as well?

15  A.   Yes.

16  Q.   What phone did you have on February 28th?

17  A.   The Samsung.

18        MS. FLETCHER:  May I see Exhibit 12, please.

19  BY MS. FLETCHER, CONTINUED:

20  Q.   Mackenzie, I am going to show you what has been marked as

21  Exhibit 12 in evidence.  Take a look at that.  Do you recognize

22  that?

23  A.   Yes, I do.

24  Q.   What is that?

25  A.   That is my old Samsung phone.

566

MACKENZIE BAILEY - Direct By Ms. Fletcher

1  Q.  Was that the phone that you had on February 28th of 2016?

2  A.  It is.

3  Q.  How do you know that's your phone?

4  A.  It was the phone I actually smashed earlier that day.

5  Q.  So we will get to that, but this is the phone that you

6  had on February 28th?

7  A.  Yes, it is.

8  Q.  Did you use that phone, this phone, on February 28th?

9  A.  Yes, I did.

10  Q.  Did somebody else use your phone that day as well?

11  A.  Not that I recall.

12  Q.  Was that your only phone at the time?

13  A.  Yes.

14  Q.  What type of phone did the defendant have in February of

15  2016?

16  A.  He had an LG.

17  Q.  Did you ever use his phone?

18  A.  No.

19  Q.  Why not?

20  A.  Because that was his phone.

21  Q.  Did he allow you to use his phone?

22  A.  He allowed me to when I needed to, but he was right

23  there.

24  Q.  Were you able to access his phone without his permission?

25  A.  No.

567

MACKENZIE BAILEY - Direct By Ms. Fletcher

1  Q.  Did he have a password?

2  A.  Sometimes he did.

3  Q.  If he didn't, were you able to get into it?

4  A.  Yes.

5  Q.  Did you?

6  A.  No.

7  Q.  Why not?

8  A.  Because I was afraid for him to catch me.

9  Q.  Do you recall during -- on the day of February 28th a

10  time that Stacey and you texting with one another?

11  A.  Yes.

12  Q.  Were you using that Samsung phone?

13  A.  Yes.

14  Q.  Do you recall what he was asking you to do?

15  A.  Yes.

16  Q.  Did it involve J.M.?

17  A.  Yes.

18  Q.  What was asking you to do?

19  A.  He was asking me to do sexual stuff with J.M..

20  Q.  What did you say?

21  A.  I told him no.

22  Q.  Where was J.M. when he was asking you these questions?

23  A.  J.M. was in the apartment.  He was sleeping.

24  Q.  Where was Stacey?

25  A.  Stacey was in my bedroom.

568

MACKENZIE BAILEY - Direct By Ms. Fletcher

1  Q.  Did he have his phone with him?

2  A.  Yes.

3  Q.  And was he asking you to have some kind of sexual conduct

4  with J.M. out loud and by talking or through texting?

5  A.  Through texting.

6  Q.  And were you using Kik?

7  A.  Yes.

8  Q.  Do you remember what his user name was?

9  A.  Fastfamily.

10  Q.  I am going to show you Government Exhibit 16.  Have you

11  reviewed that exhibit before?

12  A.  Yes, I have.

13  Q.  Are there parts of the chats contained within that

14  exhibit that are you and Stacey texting with one another?

15  A.  Yes.

16  Q.  And are there parts of that exhibit where you and Stacey

17  are texting with one another in regard to sexual activity with

18  J.M.?

19  A.  Yes.

20  Q.  Did you actually initial that original as the exhibit

21  that you have reviewed?

22  A.  Yes, I have.

23  MS. FLETCHER:  I am going to ask to publish

24  Exhibit 16 and starting on page twenty, and the last line.

25  Pull up the very last line which is 2/28/2016 at 8:58 a.m.

569

MACKENZIE BAILEY - Direct By Ms. Fletcher

1  BY MS. FLETCHER, CONTINUED:

2  Q.  Do you recall receiving this message from Stacey that

3  morning?

4  A.  Yes.

5  MS. FLETCHER:  And then if we continue, I am going

6  to ask that Agent Willard and AUSA Amandolare read through the

7  messages from Stacey, from the last line at 8:58 until

8  page thirty-seven -- I am sorry, until page thirty-three.

9  BY MS. FLETCHER, CONTINUED:

10  Q.  And so just to set this up first, Mackenzie.  The green,

11  where it says fastfamily, please for me love, please I am

12  begging you, is that Stacey talking to you?

13  A.  Yes.

14  Q.  And then the blue icon where it says, I don't want to

15  babe, is that you talking to Stacey?

16  A.  That is me.

17  MS. FLETCHER:  Agent Willard is going to read the

18  messages from Stacey, and AUSA Amandolare is going to read the

19  messages from you, as I said, from 8:58 a.m. to 9:33 a.m.

20  (Exhibit 16 read to the jury.)

21  MS. FLETCHER:  Okay.  We are going to stop there.

22  There are two blank lines here now where we have already had

23  testimony that certain images were sent, and those were 16A

24  B.  If we can show 16A and 16B.

25  (Exhibit 16A shown to the jury.)

570

MACKENZIE BAILEY - Direct By Ms. Fletcher

1     MS. FLETCHER:  And then 16B.
2         (Exhibit 16B shown to the jury.)
3     MS. FLETCHER:  And then go back to the text.
4         (Exhibit 16 read to the jury.)
5     MS. FLETCHER:  And then there is a blank space where
6  we had testimony earlier that the image was not recovered.
7  Continue from there.
8         (Exhibit 16 read to the jury.)
9     MS. FLETCHER:  And then there is a blank here which
10 is a picture file that we heard testimony about earlier at 9:21
11 I believe is Exhibit 16C.  Could we put that up, please.
12        (Exhibit 16C shown to the jury.)
13 BY MS. FLETCHER, CONTINUED:
14 Q.   What is that picture of, Mackenzie?
15 A.   It is a picture of me with my mouth open.
16 Q.   Did you take that picture?
17 A.   Yes.
18 Q.   Did you send it to him during this chat?
19 A.   Yes, I did.
20 Q.   Why?
21 A.   Because she was sucking his dick, and I thought he would
22 want me to do it too.
23        MS. FLETCHER:  We can take the picture down.
24 BY MS. FLETCHER, CONTINUED:
25 Q.   Who is she?

571

MACKENZIE BAILEY - Direct By Ms. Fletcher

1  A.   C.F..
2         MS. FLETCHER:  If we can go back to where we were.
3  Can we go up a line, please, Jason.
4         (Exhibit 16 read to the jury.)
5         MS. FLETCHER:  Stop there.
6  BY MS. FLETCHER, CONTINUED:
7  Q.   Do you remember that conversation?
8  A.   Yes.
9  Q.   Was that between you and Stacey?
10 A.   Yes, it was.
11 Q.   What was he asking you to do?
12 A.   He was asking me to do stuff with J.M..
13 Q.   And you didn't want to?
14 A.   No.
15 Q.   What was he doing while was texting you?
16 A.   He was doing stuff with C.F. in the bedroom.
17 Q.   Did you offer to do other things instead of having some
18 type of sexual contact with J.M.?
19 A.   Yes.
20 Q.   What did you offer to do instead?
21 A.   I offered to role play, take pictures of the baby and
22 send them to him.
23 Q.   When you say role play, was that something that you did?
24 A.   Yes.
25 Q.   And what do you mean by role play, what would you and

572

MACKENZIE BAILEY - Direct By Ms. Fletcher

1  Stacey do?
2  A.   Role play is made up stories, and it is like two made up
3  people, two different ages, and it is like fantasy type
4  conversations, and it would just play out.
5  Q.   Would you and Stacey role play on occasion?
6  A.   Yes.
7  Q.   How often?
8  A.   Occasionally.
9  Q.   And during this fantasy, was it with children or adults?
10 A.   Both.
11 Q.   And would he be the child or the adult in the fantasy?
12 A.   It varied back and forth.
13 Q.   Were you both home at Glenn Street when this conversation
14 happened?
15 A.   Yes.
16 Q.   And after, when we finished the conversation, he said to
17 you, and she needs your phone, who is she?
18 A.   C.F..
19 Q.   Did you bring your phone to C.F.?
20 A.   Yes.
21 Q.   Was that the Samsung?
22 A.   Yes.
23 Q.   Did she use that Samsung then or did you give it to her
24 for a period of time that same morning?
25 A.   I gave it to her for a period of time.

573

MACKENZIE BAILEY - Direct By Ms. Fletcher

1  Q.   Did there come a time after that that you got the Samsung
2  back and had additional chat with the defendant using that
3  Samsung?
4  A.   There was no chats on there.
5  Q.   I am sorry, messaging?
6  A.   Yes.
7  Q.   And let me show you this exhibit again, and starting at
8  page thirty-seven at the bottom?
9         MS. FLETCHER:  Judge, may we approach?
10        (Whereupon, a sidebar conference was held outside
11        the hearing of the jury.  No transcript taken.)
12        THE COURT:  All right.  We will have to take a short
13 break, members of the jury.  Don't discuss the case among
14 yourselves or anyone else.  We will be back very shortly.
15        COURT CLERK:  Court stands for a very short recess.
16        (Whereupon, a brief recess was taken.)
17        (Whereupon, the proceedings were held in open court
18        in the presence of the Jury.)
19        THE COURT:  You may resume your direct examination.
20        MS. FLETCHER:  Thank you, Your Honor.
21 BY MS. FLETCHER, CONTINUED:
22 Q.   Mackenzie, showing you again Exhibit 16 at the bottom of
23 the page thirty-seven, there is a chat that begins again at
24 10:37 in the morning, and have you just review this while you
25 are on the stand, starting from there, forward.  Do you

574

MACKENZIE BAILEY - Direct By Ms. Fletcher

1    remember reviewing that before?

2    A.   Yes.

3    Q.   Is that a chat between you and Stacey again on the 28th

4    later that morning?

5    A.   Yes.

6    Q.   Had you gotten your phone back from C.F.?

7    A.   Yes.

8    Q.   Did you continue to text with him from that line on page

9    thirty-seven through the end of the exhibit?

10    A.   Yes.

11        MS. FLETCHER:  We are going to publish page

12    thirty-seven, third to the last line, 2/28/16 at 10:37 a.m.  So

13    the first line --

14        THE COURT:  Okay.  Move the mike down so people can

15    hear you.

16        MS. FLETCHER:  So we are starting at what is

17    actually displayed on the monitor as the second line.  The

18    first line ends at 9:51 a.m., and then another conversation

19    starts 10:37.  So we are going in the same way, read, starting

20    at 10:37 a.m..

21            (Exhibit 16 read to the jury.)

22    BY MS. FLETCHER, CONTINUED:

23    Q.   Do you remember having this messaging conversation with

24    the defendant that morning?

25    A.   Yes.

575

MACKENZIE BAILEY - Direct By Ms. Fletcher

1    Q.   This is the morning of A.T.'s birthday?

2    A.   Yes.

3    Q.   And what is he -- he says, are you going to do it?  What

4    is he talking about?

5    A.   J.M..

6    Q.   Still?

7    A.   Yes.

8    Q.   Did you ever do anything with J.M.?

9    A.   No.

10    Q.   And he says, don't worry, I am turning myself in for my

11    warrant when I wake up.  What did that refer to?

12    A.   He was going to sleep.

13    Q.   What's the warrant?

14    A.   He thought that he had a warrant from Massena PD, like

15    Massena PD coming to house and stuff like that.  He thought

16    that there was a warrant out for his arrest.

17    Q.   Was he threatening then to go --

18        MS. BIANCO:  Objection, Your Honor.  May we

19    approach?

20        THE COURT:  No.

21    BY MS. FLETCHER, CONTINUED:

22    Q.   Then he said, I am turning myself in.  I can't do this.

23    Correct?

24    A.   Yes.

25    Q.   You tell him, well, stop, I am letting you do the other

576

MACKENZIE BAILEY - Direct By Ms. Fletcher

1    thing, be happy for that.  What did you mean by that?  What was

2    the other thing you were going to let him to?

3    A.   I don't remember.

4    Q.   Did you ever have sexual contact with J.M. at his request

5    that day?

6    A.   No.

7    Q.   What did you do then on February 28th after these texts

8    in the morning?

9    A.   I smashed my phone.

10    Q.   Right after?

11    A.   Yes.

12    Q.   Why did you smash your phone?

13    A.   Because I was getting mad with him asking and him saying

14    what he was saying, that he was turning himself in, and more

15    likely making me feel guilty because I was saying no to him and

16    that he was turning himself in, and more like the feeling of

17    making me feel like it was my fault, and I wasn't doing

18    anything, so he was going to sleep and then when he woke up, he

19    was going to turn himself in because I didn't please him, and I

20    didn't say yes at his command that time.

21    Q.   So what did you do to your phone?

22    A.   I smashed it on the kitchen floor.

23    Q.   Did it break?

24    A.   Yes.

25    Q.   Was it usable?

577

MACKENZIE BAILEY - Direct By Ms. Fletcher

1    A.   No.

2    Q.   Did you get a new phone?

3    A.   Later that day, yes, I did.

4    Q.   How did you get a new phone that day?

5    A.   We went to my mom's house for A.T.'s birthday party, and

6    I got my iPhone from my mom.

7    Q.   Was it a new iPhone?

8    A.   No, it was used.  It was my mom's old one.

9    Q.   Did she give it to you?

10    A.   Yes.

11    Q.   Was it reset before you got it?

12    A.   Yes.

13    Q.   What time did you go to your mother's?

14    A.   It was in the afternoon.

15    Q.   Was there a birthday party there for A.T.?

16    A.   Yes.

17    Q.   Did the defendant go with you?

18    A.   Yes, he did.

19    Q.   Did you get the iPhone from your mother that day?

20    A.   Yes.

21    Q.   I show you what is in evidence as Government's

22    Exhibit 13.  Do you recognize that?

23    A.   Yes.

24    Q.   What is that?

25    A.   This is my old iPhone that I got from my mother.

578

MACKENZIE BAILEY - Direct By Ms. Fletcher

1   Q.   That day?

2   A.   Yes.

3   Q.   Did you start using that iPhone then on February 28th?

4   A.   Yes.

5   Q.   The Samsung was no longer any good?

6   A.   No.

7   Q.   Is that the case you kept the iPhone in?

8   A.   Yes.

9   Q.   Did you put Kik Messenger on that iPhone?

10  A.   Yes, I did.

11  Q.   When?

12  A.   That day.

13  Q.   Do you remember what user name you used?

14  A.   No, I do not.

15  Q.   Was it the same one that you had on the Samsung or a

16  different one?

17  A.   I believe it was a different one.

18  Q.   Did you then begin engaging in Kik messages with the

19  defendant using the iPhone on February 28th?

20  A.   Yes, I did.

21  Q.   I show you Government Exhibit 23 in evidence.  Have you

22  seen that before?

23  A.   Yes.

24  Q.   Have you reviewed all of the messages in that exhibit?

25  A.   Yes, I have.

579

MACKENZIE BAILEY - Direct By Ms. Fletcher

1   Q.   Do you recognize the messages in that exhibit?

2   A.   Yes.

3   Q.   Were they messages that you sent and received from your

4   iPhone?

5   A.   Yes.

6   Q.   Do some of them involve Stacey?

7   A.   Yes.

8   Q.   Do some involve C.F.?

9   A.   Yes.

10  Q.   Do you remember what user name Stacey was using at the

11  time?

12  A.   Fastfamily.

13       MS. FLETCHER:  I want to put up Exhibit 23, please,

14  first page, first line.  The first page, first line of Exhibit

15  23 -- I think we need to go over actually one more to have the

16  date on it.

17  BY MS. FLETCHER, CONTINUED:

18  Q.   So the very first recovered message on your iPhone is

19  from 5:37 p.m., and it says, babe, ask your mom for a pack of

20  smokes until we can get to the res later.

21       Do you remember that?

22  A.   Yes.

23  Q.   Who sent that text to you?

24  A.   Stacey did.

25  Q.   What does it mean "until we can get to the res later?"

580

MACKENZIE BAILEY - Direct By Ms. Fletcher

1   A.   Until we can go and get our own smokes, until we can get

2   a ride there.

3   Q.   What is the res?

4   A.   It is the reservation where we get cigarettes where it is

5   cheaper.

6   Q.   Were you still at your mom's house?

7   A.   Yes.

8   Q.   When you got these texts?

9   A.   Yes.

10  Q.   Did you ask your mother for a pack of cigarettes?

11  A.   Yes, I did.

12  Q.   Did you give them to Stacey?

13  A.   Yes.

14  Q.   The next one is, you can text me on this now?  What does

15  that mean?  You sent that text.

16  A.   It was on the iPhone.

17  Q.   Did that mean that the iPhone was ready to be used?

18  A.   Yes.

19  Q.   Now, I want to go to, starting from line seven to

20  twenty-five.  This is also on February 28, 2016, starting at

21  5:42 p.m.  Messages sent would be you sending messages,

22  correct?

23  A.   Yes.

24  Q.   And the messages received, would be the message you

25  received, correct?

581

MACKENZIE BAILEY - Direct By Ms. Fletcher

1   A.   Yes.

2   Q.   Do you remember reviewing these?

3   A.   Yes.

4   Q.   Do you remember these messages?

5   A.   Yes, I do.

6   Q.   Who were you chatting with in these messages?

7   A.   Stacey.

8        MS. FLETCHER:  And Agent Willard and AUSA Amandolare

9   are going to read lines seven through twenty-five of this

10  exhibit.

11       (Exhibit 23 read to the jury.)

12  BY MS. FLETCHER, CONTINUED:

13  Q.   Do you remember that?

14  A.   Yes.

15  Q.   Is that the night of A.T.'s second birthday?

16  A.   Yes.

17  Q.   What were you discussing with Stacey?

18  A.   Doing stuff with A.T.

19  Q.   After these chats, did you do stuff with A.T.?

20  A.   Yes.

21  Q.   What did you do with A.T.?

22  A.   Brought her in.  I originally brought her -- I started

23  with her first as he wanted me to.

24  Q.   What do you mean started with her?

25  A.   I was in a different room than him.

Case 18-105, Document 44, 04/15/2019, 2540369, Page96 of 202
Case 5:16-cr-00320-DNH   Document 118-2   Filed 09/05/18   Page 134 of 232
Case 5:16-cr-00320-DNH   Document 118-2   Filed 09/05/18   Page 135 of 232

582

MACKENZIE BAILEY - Direct By Ms. Fletcher

1   Q.   And then what happened?

2   A.   And then I brought her in to him.

3   Q.   What happened?

4   A.   He anally penetrated her.

5   Q.   Did you see that?

6   A.   Yes.

7   Q.   Were you there?

8   A.   Yes.

9   Q.   Did he ejaculate?

10  A.   Yes.

11  Q.   Where?

12  A.   In her.

13  Q.   And line fourteen at 6:29, he says, "and I am going to

14  try and get C.F. to fuck either him again tonight or her dog."

15  Do you know what that meant?

16  A.   He is talking about J.M.

17  Q.   Who is C.F.?

18  A.   C.F.

19       MS. FLETCHER:   Take Exhibit 23A in evidence.  Pull

20  that up.  It is an excerpt from Exhibit 23, a chat in evidence

21  that occurred starting a 10:21 p.m. on March 1st through 5:48

22  a.m. on March 2nd.  Can you pull that up, please.  We are going

23  to have Agent Willard and AUSA Amandolare read through this

24  chat that begins again at 10:21 p.m. on March 1st and ends at

25  5:48 a.m. on March 2nd.

---

583

MACKENZIE BAILEY - Direct By Ms. Fletcher

1        (Exhibit 23A read to the jury.)

2        MS. FLETCHER:   And then the next line, there is an

3   attachment which is 23A.1 that was sent.

4   BY MS. FLETCHER, CONTINUED:

5   Q.   I am going to show you 23A.1 because of the way it shows

6   on the screen.  Do you remember seeing that when we were

7   reviewing the texts?

8   A.   Yes.

9   Q.   And that just, if I can publish to the jury this way, is

10  something that came out blank, it is just a picture that did

11  not come out, correct?

12  A.   Yes.

13       MS. FLETCHER:   And so then after that got sent, we

14  will go to the next line.

15       (Exhibit 23A read to the jury.)

16       MS. FLETCHER:   And then another image was sent which

17  is 23A.2.  We will put that up.

18  BY MS. FLETCHER, CONTINUED:

19  Q.   Do you recognize that image?

20  A.   Yes.

21  Q.   What is that?

22  A.   It is me.

23  Q.   Did you take that picture?

24  A.   Yes.

25  Q.   Did you send it during this chat?

---

584

MACKENZIE BAILEY - Direct By Ms. Fletcher

1   A.   Yes, I did.

2        MS. FLETCHER:   Continue.

3        (Exhibit 23A read to the jury.)

4        MS. FLETCHER:   And then an image file 23A.3 was

5   sent.  Put that up.

6   BY MS. FLETCHER, CONTINUED:

7   Q.   Did you take that picture?

8   A.   Yes.

9   Q.   Did you send that picture?

10  A.   Yes.

11  Q.   What was that?

12  A.   That was the wifi connector that I was hanging up to get

13  better wifi.

14  Q.   And then you continue with the chats.

15       (Exhibit 23A read to the jury.)

16       MS. FLETCHER:   And then an image file is sent which

17  is 23A.4.  Put that up.

18  BY MS. FLETCHER, CONTINUED:

19  Q.   What is that picture?

20  A.   It is a picture of me holding my eyes open.

21  Q.   Did you take that and send it to him?

22  A.   Yes, I did.

23       MS. FLETCHER:   Continue.

24       (Exhibit 23A read to the jury.)

25  BY MS. FLETCHER, CONTINUED:

---

585

MACKENZIE BAILEY - Direct By Ms. Fletcher

1   Q.   Do you recall this conversation?

2   A.   Yes.

3   Q.   Who were you talking about?

4   A.   My brother.

5   Q.   Dalton?

6   A.   Yes.

7   Q.   Was Stacey asking you to do sexual things with your

8   brother?

9   A.   Yes.

10  Q.   And you didn't want to?

11  A.   No.

12  Q.   What were you talking about about taking Nyquil?

13  A.   Because I just wanted to go to sleep.

14  Q.   You told him it would be okay if they did things to you

15  while you were asleep?

16  A.   Yes.

17  Q.   Did you fall asleep?

18  A.   Yes.

19  Q.   Did there come a time that you woke up?

20  A.   I don't remember.

21  Q.   I am going to show you what is in evidence as 23B, which

22  is a portion of the chat from twenty-three.

23       MS. FLETCHER:   If you can put that up, please.

24  BY MS. FLETCHER, CONTINUED:

25  Q.   23B starts on March 2nd at 3:54 a.m.  Do you recall those

---

586

MACKENZIE BAILEY - Direct By Ms. Fletcher

1   chats now?

2   A.   Yes.

3   Q.   So did there come a time that around 3:54 in the morning

4   that you began chatting with him again?

5   A.   Yes.

6        MS. FLETCHER:   We are going to read the chats of

7   23B, and we will stop when there are images that are

8   distributed.

9        (Exhibit 23B read to the jury.)

10  BY MS. FLETCHER, CONTINUED:

11  Q.   And then an attachment was sent -- or received, received

12  to your iPhone, and that is Exhibit 23B.1.   Do you recall

13  receiving that image.

14  A.   Yes.

15  Q.   Did the defendant send that to you?

16  A.   Yes, he did.

17  Q.   What is that?

18  A.   That is a picture of his dad's alcohol that he had saved

19  up.

20  Q.   What do you mean his dad's alcohol?

21  A.   It was his dad's favorite alcohol that he drank.

22       MS. FLETCHER:   After he sends this image, the

23  conversation continues.

24       (Exhibit 23B read to the jury.)

25  BY MS. FLETCHER, CONTINUED:

587

MACKENZIE BAILEY - Direct By Ms. Fletcher

1   Q.   And then an image was sent from your iPhone which is

2   23B.2.   What is that a picture of?

3   A.   A.T..

4   Q.   Did you take that picture?

5   A.   Yes.

6   Q.   Did you take it during this chat with the defendant?

7   A.   Yes.

8   Q.   Did you send it to him during this chat?

9   A.   I did.

10  Q.   Over Kik?

11  A.   Yes.

12       MS. FLETCHER:   Continue.

13       (Exhibit 23B read to the jury.)

14  BY MS. FLETCHER, CONTINUED:

15  Q.   And a picture attachment was sent from your iPhone which

16  is 23B.3.   What is that picture?

17  A.   Picture of me putting her foot inside me.

18  Q.   Did you take that picture?

19  A.   I did.

20  Q.   Did you send that to him during this chat?

21  A.   Yes.

22  Q.   Following that picture, another picture was sent which is

23  23B.4.   Who is that?

24  A.   Picture of A.T..

25  Q.   Did you take that picture during this chat?

588

MACKENZIE BAILEY - Direct By Ms. Fletcher

1   A.   Yes.

2   Q.   Did you send that to him during this chat?

3   A.   I did.

4        MS. FLETCHER:   Continue with the chat, please.

5        (Exhibit 23B read to the jury.)

6   BY MS. FLETCHER, CONTINUED:

7   Q.   And then another picture was sent from your iPhone which

8   is 23B.5.   What is that, Mackenzie?

9   A.   Another picture of her foot in my vaginal area.

10  Q.   Did you take that and send that to him during this chat?

11  A.   I did.

12       MS. FLETCHER:   Continue the chat.

13       (Exhibit 23B read to the jury.)

14       MS. FLETCHER:   Hang on a second.   We were at 23B.5.

15  Start reading after that attachment was sent.

16       (Exhibit 23B read to the jury.)

17  BY MS. FLETCHER, CONTINUED:

18  Q.   And then an image was sent, which is 23B.6.   What is that

19  picture, Mackenzie?

20  A.   It is a picture of her hand.

21  Q.   What are you doing with her hand in this picture?

22  A.   Putting it inside of me.

23  Q.   Did you take that picture of her hand inside you?

24  A.   Yes, I did.

25  Q.   Did you send that to the defendant during this chat?

589

MACKENZIE BAILEY - Direct By Ms. Fletcher

1   A.   I did.

2        MS. FLETCHER:   Take that down and continue with the

3   chat.

4        (Exhibit 23B read to the jury.)

5   BY MS. FLETCHER, CONTINUED:

6   Q.   Then two picture files were sent.   The first is 23B.7.

7   What is that a picture of, Mackenzie?

8   A.   Me licking her vaginal area.

9   Q.   And 23B.8, and what is that picture of, Mackenzie?

10  A.   Me doing the same thing.

11  Q.   To A.T.?

12  A.   Yes.

13  Q.   During this chat with the defendant?

14  A.   Yes.

15  Q.   Did you send those images to him over Kik during this

16  chat?

17  A.   I did.

18       MS. FLETCHER:   Continue with the chat.

19       (Exhibit 23B read to the jury.)

20       MS. FLETCHER:   Hang on.   That's not up on the

21  screen.   So after the last attachment, please start.

22       (Exhibit 23B read to the jury.)

23       MS. FLETCHER:   Hang on a second.

24  BY MS. FLETCHER, CONTINUED:

25  Q.   And the next is after he says, show me, there is an

590

MACKENZIE BAILEY - Direct By Ms. Fletcher

1    attachment and an image sent which is 23B.9.  What is that a
2    picture of, Mackenzie?
3         A.   It is a picture of my finger in her.
4         Q.   In her what?
5         A.   Her vaginal area.
6         Q.   Did you take that picture during this chat?
7         A.   I did.
8         Q.   Did you send this picture to the defendant?
9         A.   Yes.
10             MS. FLETCHER:  We will go back to the chat.
11   Continue after the attachment was sent, please.
12             (Exhibit 23B read to the jury.)
13   BY MS. FLETCHER, CONTINUED:
14        Q.   And then from your iPhone, you send an image file which
15   is marked 23B.10.  Do you recognize that image?
16        A.   Yes.
17        Q.   What is that?
18        A.   It is a picture of my finger.
19        Q.   What are you doing in this image?
20        A.   Marking how much I put in her.
21        Q.   How much of your finger you inserted into her?
22        A.   Yes.
23             MS. FLETCHER:  Continue with the chat from after
24   23B.10.
25             (Exhibit 23B read to the jury.)

591

MACKENZIE BAILEY - Direct By Ms. Fletcher

1    BY MS. FLETCHER, CONTINUED:
2         Q.   And 23B.11 was sent.  What is that a picture of,
3    Mackenzie?
4         A.   That's a picture of me opening her and sending a picture
5    of her vaginal area.
6         Q.   Did you take that during this chat and send it to the
7    defendant?
8         A.   I did.
9              MS. FLETCHER:  Continue after that attachment.
10             (Exhibit 23B read to the jury.)
11   BY MS. FLETCHER, CONTINUED:
12        Q.   Do you remember that whole conversation?
13        A.   Yes.
14        Q.   Who is the he?
15        A.   My brother.
16        Q.   What was the defendant asking you to do with your
17   brother?
18        A.   Have sex with him.
19        Q.   You didn't want to?
20        A.   No.
21        Q.   And why did you involve A.T. in this?
22        A.   Because I knew that it would be in a different room, and
23   I could control the situation.
24        Q.   You offered to abuse A.T. if he would agree to you not
25   abusing your brother?

592

MACKENZIE BAILEY - Direct By Ms. Fletcher

1         A.   Yes.
2         Q.   He said several times in this chat, it was on my dad, I
3    brought my dad into it.  Could you explain that?
4         A.   He would make me like swear on his dad I would do
5    something.  He would do it to a lot of people.  Like if he
6    asked me to do something with A.T., he would be like swear on
7    my mom and dad that you are going to do this for me.
8         Q.   Did that mean something, to swear on his mom and dad?
9         A.   It meant a lot to him, that if you didn't do that, that
10   was disrespecting them and him because you didn't do it, and
11   you lied on them.
12        Q.   So if he asked you to swear on my mom and dad, was that
13   something that you felt you had to do?
14        A.   Yes.
15        Q.   This chat ended on March 2nd of 2016 at 3:50 in the
16   afternoon.  I am going to hand you Exhibit 23C which is an
17   excerpt of Exhibit 23 which is the chat that started on
18   March 3rd -- excuse me, March 2nd at 11:55 p.m.
19             MS. FLETCHER:  And continue there.
20             THE COURT:  This is March 2nd?
21             MS. FLETCHER:  March 2nd into March 3rd, just before
22   midnight.  If we could put 23C up, please.
23   BY MS. FLETCHER, CONTINUED:
24        Q.   You have reviewed these chats before as well, Mackenzie?
25        A.   Yes.

593

MACKENZIE BAILEY - Direct By Ms. Fletcher

1         Q.   And are these additional chats that you had with the
2    defendant later on March 2nd, actually just before midnight and
3    going into the early morning hours of March 3rd; is that
4    correct?
5         A.   Yes.
6         Q.   Do you recall these chats?
7         A.   Yes, I do.
8              MS. FLETCHER:  We are going to read through these
9    chats, again stopping with any image attachments.
10             (Exhibit 23C read to the jury.)
11   BY MS. FLETCHER, CONTINUED:
12        Q.   And an attachment was sent which is Exhibit 23C.1.  Who
13   is depicted there, Mackenzie?
14        A.   A.T..
15        Q.   Is that a picture that you took during this chat?
16        A.   Yes.
17        Q.   Did you send that to the defendant during this chat?
18        A.   I did.
19             MS. FLETCHER:  We can continue with the chat after
20   23C.1.
21             (Exhibit 23C read to the jury.)
22   BY MS. FLETCHER, CONTINUED:
23        Q.   And then another attachment image was sent which is
24   23C.2.  What is that, Mackenzie?
25        A.   Me spreading her and taking a picture of it and sending

594

MACKENZIE BAILEY - Direct By Ms. Fletcher

1   it to him.

2          MS. FLETCHER:  Take that down and continue with the

3   chat.

4          (Exhibit 23C read to the jury.)

5   BY MS. FLETCHER, CONTINUED:

6   Q.   And then there is an image which is 23C.3.  What's

7   depicted in that image, Mackenzie?

8   A.   Me sticking my finger in her.

9   Q.   Did you take that during this chat?

10  A.   I did.

11  Q.   Did you send it to him?

12  A.   Yes.

13         MS. FLETCHER:  Continue after that.

14         (Exhibit 23C read to the jury.)

15  BY MS. FLETCHER, CONTINUED:

16  Q.   He says, keep showing, there is 23C.4.  What is that,

17  Mackenzie?

18  A.   My finger in her.

19  Q.   And 23C.5.  What is that, Mackenzie?

20  A.   My finger in her also.

21  Q.   In A.T.?

22  A.   Yes.

23         MS. FLETCHER:  Let's continue.

24  BY MS. FLETCHER, CONTINUED:

25  Q.   And then an image attachment was sent which is 23C.6.

595

MACKENZIE BAILEY - Direct By Ms. Fletcher

1   What is that?

2   A.   It is my finger in her.

3   Q.   Did you take that picture when he said show me?

4   A.   Yes.

5   Q.   Did you send it to him?

6   A.   I did.

7          MS. FLETCHER:  Let's continue the chat?

8          (Exhibit 23C read to the jury.)

9   BY MS. FLETCHER, CONTINUED:

10  Q.   And then an attachment was sent after that which is

11  23C.7.  What is that a picture of, Mackenzie?

12  A.   It is my thumb in her.

13         MS. FLETCHER:  Continue with the chat.

14         (Exhibit 23C read to the jury.)

15         MS. FLETCHER:  Stop there.  So "I am probably going

16  to cum though" as at 12:28 a.m., and there is a two hour gap,

17  and then we start with the chat again at 2:18.  Go ahead.

18         (Exhibit 23C read to the jury.)

19  BY MS. FLETCHER, CONTINUED:

20  Q.   Do you recall this event, Mackenzie?

21  A.   Yes.

22  Q.   So there is a gap between the chats where the images were

23  sent and then the last end of the chat where it talks about --

24  where he says, what did you think?  And you say, it was hot and

25  you came a lot.  What happened in that two hours between the

596

MACKENZIE BAILEY - Direct By Ms. Fletcher

1   end of the images and the next set of chats where you talk

2   about -- he says, felt really good, can't believe I made her

3   cum.  What happened in that gap of time?

4   A.   I brought her in to him.

5   Q.   You brought her where?

6   A.   Into the bedroom.

7   Q.   Who was in the bedroom?

8   A.   Stacey.

9   Q.   What happened in the bedroom?

10  A.   Vaginally penetrated her.

11  Q.   Did he ejaculate?

12  A.   Yes.

13  Q.   Where?

14  A.   In her.

15         THE COURT:  Okay.  We will take our afternoon break

16  now, members of the jury.  Don't discuss the case among

17  yourselves or anyone else.  We will be back around 3:30.

18         COURT CLERK:  Court stands for a short recess.

19         (Whereupon, a brief recess was taken.)

20         (Whereupon, the proceedings were held in open court

21          in the presence of the Jury.)

22         THE COURT:  You may continue with your direct

23  examination of this witness.

24         MS. FLETCHER:  Thank you, Your Honor.

25  BY MS. FLETCHER, CONTINUED:

597

MACKENZIE BAILEY - Direct By Ms. Fletcher

1   Q.   Mackenzie, the last set of chats contained in Exhibit 23

2   has been excerpted into 23D.  I am going to put that up right

3   now.

4          And on the first line -- well, excuse me, fourteen

5   thirty-seven is an image file that was sent from your iPhone to

6   fastfamily.  We are going to put that up as 23D.1.  That was

7   sent on March 4th of 2016 at 1:54 in the afternoon.

8          Who is in that picture?

9   A.   Me and A.T..

10  Q.   Do you remember taking that as a selfie and sending it to

11  somebody?

12  A.   I do.  I remember sending it to Stacey.

13  Q.   And after that was sent to Stacey at 2:01, an image was

14  sent back to you, and that's 23D.2.  Do you remember receiving

15  that in exchange for the one that you sent?

16  A.   I do.

17  Q.   Who is that?

18  A.   Stacey LaPorte.

19  Q.   Do you recognize what is in his hand?

20  A.   It is his LG phone.

21  Q.   When you say his LG phone, you talked about him having an

22  LG phone, correct?

23  A.   Yes.

24  Q.   And on March 5th -- excuse me March 4th, he had an LG

25  phone?

598

MACKENZIE BAILEY - Direct By Ms. Fletcher

1    A.   Yes.

2    Q.   And then after those images were exchanged, later that

3    night, at 6:59 p.m. on March 4th, you sent a series of images,

4    and we are going to start with 23D.3.  And 23D.5.

5         Do you remember sending those images?

6    A.   I do.

7    Q.   Who did you send them to?

8    A.   Stacey.

9    Q.   And then following that, there is a text from you at

10   7:04.  It says, you can cum there.  What does that mean?

11   A.   Like in my mouth.

12   Q.   From the picture that preceded the chat?

13   A.   Yes.

14   Q.   Or excuse me, the text?

15   A.   Yes.

16   Q.   Following that text, four more images are sent from your

17   phone.  It is 23D.6.  23D.7.  23D.8.  And 23D.9.

18        Do you remember these images?

19   A.   I do.

20   Q.   Did you take them or did somebody else take them?

21   A.   I took them.

22   Q.   Who did you send them to?

23   A.   Stacey.

24   Q.   If we could take the pictures down and go to the chat

25   then.  This is on March 5, 2016, at 7:14 p.m.

599

MACKENZIE BAILEY - Direct By Ms. Fletcher

1         (Exhibit 23D read to the jury.)

2    BY MS. FLETCHER, CONTINUED:

3    Q.   Do you remember those chats?

4    A.   Yes.

5    Q.   What were you talking about?

6    A.   I was talking about A.T..

7    Q.   Who were you talking to?

8    A.   Stacey.

9    Q.   Had you and Stacey engaged in the sexual abuse of A.T.

10   leading to those chats?

11   A.   It was the occasion before when he vaginally penetrated

12   her.

13   Q.   The one that we had just talked about?

14   A.   Yes.

15   Q.   And you are talking about it again?

16   A.   Yes.

17   Q.   Mackenzie, did you save the Kik chats on your phone?

18   A.   No, I did not.

19   Q.   Did you save the pictures that we have seen here that you

20   have exchanged with the defendant on your phone?

21   A.   No.

22   Q.   What did you do with them?

23   A.   I deleted them all automatically.  The only ones I ever

24   saved were the recent ones of me and A.T. and the ones of

25   myself.

600

MACKENZIE BAILEY - Direct By Ms. Fletcher

1    Q.   The ones that we just saw in 23D?

2    A.   Yes.

3    Q.   The sexually explicit pictures of A.T., what did you do

4    with those?

5    A.   I automatically deleted them.

6    Q.   And that was on your iPhone?

7    A.   Yes.

8    Q.   Did you think that they were gone?

9    A.   Yes.

10   Q.   Did you have a computer?

11   A.   Yes, I did.

12   Q.   What kind of computer did you have?

13   A.   I had a laptop.

14   Q.   I am going to hand you Government's Exhibit 14.  It has

15   got a lot of tape on it, but other than that, do you recognize

16   that?

17   A.   I do.

18   Q.   What is it?

19   A.   It is my old laptop.

20   Q.   Were you home when the police took this out of your home?

21   A.   I was.

22   Q.   Did you ever hook your iPhone into this?

23   A.   I did.

24   Q.   Did you know when you hooked your iPhone into it that the

25   data, even deleted data, would be saved to that laptop?

601

MACKENZIE BAILEY - Direct By Ms. Fletcher

1    A.   No.

2    Q.   Did you think that the Kik chats and the images that you

3    had that we have talked about were still located on that

4    computer?

5    A.   No.

6    Q.   Did you ever hook another phone up to that computer also?

7    A.   Yes.

8    Q.   What phone did you hook up to that computer?

9    A.   I hooked Stacey's LG phone up to it.  I have hooked my

10   Samsung up to it.

11   Q.   For what purpose?

12   A.   Pictures, like transferring pictures and music.

13   Q.   Do you know whether those phones also would have -- the

14   data from those phones would also have been saved or some of

15   the data saved to that computer?

16   A.   I did not know that.

17   Q.   Did you ever collect child pornography from the Internet?

18   A.   No.

19   Q.   Did you ever trade child pornography with anyone on the

20   Internet?

21   A.   No.

22   Q.   Did you ever receive child pornography from anyone on the

23   Internet?

24   A.   No.

25   Q.   Did you ever use Kik to talk to or trade with other users

602

MACKENZIE BAILEY - Direct By Ms. Fletcher

    other than the defendant?
1   A.   No.
2   Q.   Did you know the defendant to use Kik Messenger with
3   people other than yourself?
4
5   A.   Yes.
6   Q.   Did you know whether the defendant was engaged in
7   receiving child pornography from other users?
8   A.   He was.
9   Q.   How did you know that?
10  A.   He would either show me the pictures or he would send
11  them to me and ask me what I thought of them.
12  Q.   What kind of pictures would he show you?
13  A.   They were sexual explicit pictures of young children or
14  they were teenagers or they would be older adults.
15  Q.   Did he tell how he got these pictures?
16  A.   From other users.
17  Q.   Did he tell you whether it was Kik or a different
18  application?
19  A.   From Kik.
20  Q.   Did you ever use the fastfamily Kik account?
21  A.   No.
22  Q.   Were you aware of a Kik account with the name
23  prouddaddy3_15_16?
24  A.   I was.
25  Q.   Whose account was that?

603

MACKENZIE BAILEY - Direct By Ms. Fletcher

1   A.   That was Stacey's.
2   Q.   What is 3-15-16?
3   A.   That is Mia's birthday.
4   Q.   Who is Mia?
5   A.   His daughter that he has with Hillary.
6   Q.   Did you ever see anyone else use Stacey's LG phone?
7   A.   No.
8   Q.   Did you ever see B.L. use it or attempt to use it?
9   A.   No.
10  Q.   Did you ever see Hillary use it or attempt to use it?
11  A.   No.
12  Q.   Now, the phone that he had during the chats on
13  February 28th, and then the other chats, March 2nd through 5th,
14  is that the phone we saw in the picture, the selfie he had sent
15  to you?
16  A.   Yes.
17  Q.   And did there come a time that that phone got broken?
18  A.   Yes.
19  Q.   Do you remember when that was?
20  A.   I do not.  I don't remember.
21  Q.   Was it after those chats?
22  A.   Yes.
23  Q.   Do you know how the phone got broken?
24  A.   I don't recall.
25  Q.   Do you know what happened to the broken phone?

604

MACKENZIE BAILEY - Direct By Ms. Fletcher

1   A.   No, I don't.
2   Q.   Did he get another phone?
3   A.   He did get another phone.
4   Q.   How long after the first phone was broken did he get this
5   replacement?
6   A.   It was like a couple of days after.
7   Q.   Do you know how he got the replacement?
8   A.   I asked my mom to get him another phone.
9   Q.   Did she buy him a phone?
10  A.   She did.
11  Q.   And was he able to retain the same phone number?
12  A.   Yes.
13  Q.   What kind of phone does he have, what kind of service
14  does he have?
15  A.   It is track phone.
16       MS. FLETCHER:  Judge, at this time I am going to
17  offer Government Exhibit 41 which is a business record the
18  parties have stipulated to.
19       MS. BIANCO:  No objection.
20       THE COURT:  Received.
21       (Exhibit No. 41, received.)
22       MS. FLETCHER:  Put up Exhibit 41.
23  BY MS. FLETCHER, CONTINUED:
24  Q.   It says at the top, purchase history 315-514-4814.  Are
25  you familiar with that phone number?

605

MACKENZIE BAILEY - Direct By Ms. Fletcher

1   A.   Yes.
2   Q.   Whose phone number is that?
3   A.   That was Stacey's phone number.
4       MS. FLETCHER:  If we can zoom, please, down to the
5   middle section where it is kind of dark.
6   BY MS. FLETCHER, CONTINUED:
7   Q.   This indicates the purchase history, and the purchase
8   date was 3-14 2016.  Does that sound familiar to you?
9   A.   Yes.
10  Q.   Would that be about accurate to the best of your
11  recollection?
12  A.   Yes.
13  Q.   So he would have a new phone on March 14th?
14  A.   Yes.
15  Q.   And if we could scroll down to the credit card holder
16  information.  Who is Jennifer Northrop?
17  A.   That was my mom.
18  Q.   Is that her address?
19  A.   Yes.
20  Q.   Is this the then record that she had or that would have
21  been given to her after purchasing this phone for the
22  defendant?
23  A.   Yes.
24  Q.   Mackenzie, I want to draw your attention, the last text
25  we were talking about was on March 5th, and I want to draw your

606

MACKENZIE BAILEY - Direct By Ms. Fletcher

1    attention to March 6th of 2016.  Do you recall receiving a text
2    from C.F.'s mother on that day?
3    A.   I do.
4    Q.   What did it say?
5    A.   It said that she wanted C.F. home.
6    Q.   What phone did you receive that text on?
7    A.   On the iPhone.
8    Q.   Did you respond?
9    A.   Yes.
10        MS. FLETCHER:  And pull up Exhibit 17.
11   BY MS. FLETCHER, CONTINUED:
12   Q.   I am going to hand you Government Exhibit 17 for
13   identification.  Do you recognize what is contained in that
14   exhibit?
15   A.   Yes.
16   Q.   What is that?
17   A.   It is the text messages between my phone and C.F.'s mom.
18   Q.   Were they sent and received on March 6th?
19   A.   Yes.
20   Q.   Were you present or a party to each of those
21   conversations?
22   A.   Yes.
23   Q.   There is about four texts, correct?
24   A.   Yes.
25   Q.   Is that the text you recall getting and receiving?

607

MACKENZIE BAILEY - Direct By Ms. Fletcher

1    A.   Yes.
2    Q.   And sending?
3    A.   Yes.
4        MS. FLETCHER:  Judge, I would move Exhibit 17.
5        THE COURT:  Any objection?
6        MS. BIANCO:  No objection.
7        THE COURT:  Received.
8        (Exhibit No. 17, received.)
9        MS. FLETCHER:  Can we put that up, please.
10   BY MS. FLETCHER, CONTINUED:
11   Q.   So at the top of the exhibit, it says 3-6 2016 at 11:08
12   a.m.  It says, I want C.F. home.  Do you recall getting that?
13   A.   Yes.
14   Q.   And it indicates it is from Chy's mom's cell?
15   A.   Yes.
16   Q.   What does that mean?
17   A.   That it's C.F.'s mom's cell phone number.
18   Q.   Is that how you had her in your contacts?
19   A.   Yes.
20   Q.   Whatever information you had or saved under your contacts
21   would be what she comes up as?
22   A.   Yes.
23   Q.   And then as a result of that, did you respond to her?
24   A.   Yes.  I said okay.
25   Q.   And then there is another sent text from 12:35 p.m. to

608

MACKENZIE BAILEY - Direct By Ms. Fletcher

1    Chy's mom's cell, and it says, hey, it is Stacey, can I call
2    and talk to you, it's important.  Were you there for that text
3    being sent?
4    A.   I wasn't.
5    Q.   Who sent that text?
6    A.   Stacey did.
7    Q.   Did he use your phone?
8    A.   He did.
9    Q.   In your presence?
10   A.   Yes.
11   Q.   And was a response received from C.F.'s mother?
12   A.   Yes.
13   Q.   What was that response?
14   A.   That was C.F.'s mom saying I will call you back here, I
15   am talking with C.F.  She said, you know she is sixteen,
16   right?
17   Q.   Is that the end of the chat conversations with C.F.'s
18   mother that day?
19   A.   Yes.
20        MS. FLETCHER:  We can take that down.
21   BY MS. FLETCHER, CONTINUED:
22   Q.   What happened after those texts were exchanged?
23   A.   C.F.'s mom called.
24   Q.   Who did shall talk to?
25   A.   She talked to Stacey.

609

MACKENZIE BAILEY - Direct By Ms. Fletcher

1    Q.   What happened after Stacey spoke to C.F.'s mom?
2    A.   Stacey had told me that she said that she wasn't -- she
3    wasn't mad, that she wasn't going to call the cops on us, that
4    we just had to stay away from C.F., that C.F. was not allowed
5    back over our house, that she was done babysitting for us.
6    Q.   What happened then?
7    A.   It was -- we didn't really worry about her mom anymore.
8    We did try to contact C.F. to find out what had happened
9    between her and her mom.  She didn't respond to my text
10   messages.  I don't recall -- I don't remember the conversations
11   between him and her.
12   Q.   And her being who?
13   A.   Stacey and C.F.
14   Q.   What happened then?
15   A.   She -- we never talked to her again.  She never came back
16   over.
17   Q.   And this is all on March 6th?
18   A.   March 6th, yes.
19   Q.   Did you stay at home on March 6th?
20   A.   I did.
21   Q.   Where was Stacey?
22   A.   Stacey ended up leaving.
23   Q.   When?
24   A.   March 6th.
25   Q.   Do you remember what time?

610

MACKENZIE BAILEY - Direct By Ms. Fletcher

1  A.   Later that day, it was in the afternoon.
2  Q.   Where did he go or where did he tell you he was going?
3  A.   He told me he was going out to Hillary's house.
4  Q.   Where was A.T.?
5  A.   A.T. was down with my mom.
6  Q.   And did he stay overnight at Hillary's house on
7  March 6th?
8  A.   Yes.  He never came back that night.
9  Q.   Did something happen during the early morning hours of
10 March 7th?
11 A.   Yes.
12 Q.   What happened?
13 A.   Massena PD ended up coming back.  They ended up coming
14 there that night.  It was like twelve o'clock in the morning.
15 A.T. ended up coming back to the house later that day.
16 Q.   So back up.  When the police came, was A.T. home?
17 A.   A.T. was home that night, but after Stacey left, A.T.
18 went with my mom for a little while.  Then she came back.  She
19 was there when the police came.  Massena PD
20 did come.  They did the search warrant at like twelve o'clock
21 in the morning.
22 Q.   Did they take some items from your apartment?
23 A.   They did.
24 Q.   Did they take pictures while they were there?
25 A.   Yes.

611

MACKENZIE BAILEY - Direct By Ms. Fletcher

1          MS. FLETCHER:  I am going to ask to put up
2  Exhibit 6.
3  BY MS. FLETCHER, CONTINUED:
4  Q.   Do you recognize what is depicted in that picture?
5  A.   That's the bathroom at Glenn Street.
6  Q.   Exhibit 7.  Was is depicted there?
7  A.   That's the spare bedroom.
8  Q.   What is that comforter on the ground?
9  A.   That was like where my daughter would sleep because we
10 didn't have an extra mattress.
11 Q.   Exhibit 8, what is that?
12 A.   That's A.T. room.
13 Q.   Exhibit 9, what is that depicting?
14 A.   That's me and Stacey's bedroom.
15 Q.   And do you see against the wall, appears to be some kind
16 of piece of furniture covered in the fabric?
17 A.   That was one of the end table that you can bring out to
18 eat on, like at your couch or whatever.  I just covered it with
19 an extra pillow case.
20 Q.   And do you see your iPhone on there?
21 A.   I see the iPhone and I see the Samsung.
22 Q.   The iPhone is kind of to the middle of the picture in the
23 foreground of the table?
24 A.   Yes.
25 Q.   And the Samsung is against -- leaning against the wall?

612

MACKENZIE BAILEY - Direct By Ms. Fletcher

1  A.   Yes.
2  Q.   Exhibit 9A.  What is that?
3  A.   That's the living room.
4  Q.   Were these pictures taken in March during the search
5  warrant?
6  A.   Yes.
7  Q.   You had your Christmas tree up?
8  A.   Yes.
9  Q.   Exhibit 10.  Is that the Samsung?
10 A.   Yes, it is.
11 Q.   And Exhibit 11, what is that?
12 A.   That is the laptop.
13 Q.   Is that where the laptop and the phones were when the
14 police came and took them from your apartment?
15 A.   Yes.
16 Q.   Mackenzie, what did you do after the police executed the
17 search warrant at your apartment?
18 A.   I was nervous.  I was nervous.  I had no further contact
19 with nobody because they took my only working phone.  It was
20 late at night.  My mom and my stepdad were out of town, they
21 were in Florida, so I had no communication.  Stacey wasn't
22 there.  He had his phone.
23      So early the next morning, I ended up going to my mom's
24 house.  I had packed a bag of me and A.T.'s clothes, and I went
25 to my mom's house.  And my stepsister was there.  I used my

613

MACKENZIE BAILEY - Direct By Ms. Fletcher

1  stepsister's phone.  I tried calling Stacey's phone a bunch of
2  times, trying to get ahold of him, telling him what was going
3  on.  No answer.
4      I got ahold of my mom and my stepdad, told them what was
5  going on.  Then I called my real father, and my real father
6  ended up coming down and getting me and A.T. from Massena from
7  my mom's house, and we went out to my dad's house.
8  Q.   So you left Glenn Street and went to your mom's house?
9  A.   Yes.
10 Q.   And she was out of town?
11 A.   My mom and Bruce were in Florida at the time.
12 Q.   So you went to stay with your dad?
13 A.   Yes.
14 Q.   Did A.T. ever go back to Glenn Street after that day?
15 A.   No.
16 Q.   Where did she stay?
17 A.   She stayed with my dad until my mom and my stepdad
18 returned from Florida, and then when my mom and stepdad
19 returned from Florida, she went with my mom and my stepdad, and
20 she has been there ever since.
21 Q.   Do they still have her?
22 A.   They still have her.
23 Q.   Did you stay at Glenn Street after March 7th?
24 A.   I went back to Glenn Street, yes.
25 Q.   Without A.T.?

G.A. 100

614

MACKENZIE BAILEY - Direct By Ms. Fletcher

1   A.   Without A.T..
2   Q.   Why did you go back?
3   A.   Stacey wanted me to.
4   Q.   How long did you stay?
5   A.   I would say the end of March.
6   Q.   What happened at the end of March.
7   A.   I left.
8   Q.   How did you leave?
9   A.   Stacey left for the night, and I was in contact with his
10  uncle, and his uncle told me that he could get me out, and he
11  asked me if that was the night that I wanted to get out.
12  Q.   What did you say?
13  A.   And I said I wanted to, but I am scared.
14  Q.   What happened?
15  A.   He -- it was past his curfew, so he couldn't come get me,
16  and he had his parents, which is Stacey's grandparents, come
17  and get me that night.  I packed a bag and I left.
18  Q.   Where did you go?
19  A.   I went to Chuck's house.
20  Q.   Chunk is Stacey's uncle?
21  A.   Yes.
22  Q.   You said he had a curfew?
23  A.   He is on parole.
24  Q.   He is on parole?
25  A.   Yes.

615

MACKENZIE BAILEY - Direct By Ms. Fletcher

1   Q.   For a sex offense?
2   A.   Yes.
3   Q.   Did you ever bring A.T. to Chuck's house?
4   A.   No.
5   Q.   Did she stay with your mom?
6   A.   Yes.
7   Q.   How long did you stay at Chuck's house?
8   A.   The whole month of April, up until Stacey got arrested.
9   Q.   Did you let anyone know where you were?
10  A.   No, I did not.
11  Q.   Why not?
12  A.   Because I didn't want nobody to know where I was.  Stacey
13  was trying to figure out where I was, and I didn't want him to
14  find out where I was because he would just convince me to come
15  back, and I didn't want to go back.
16  Q.   Did there come a time that you learned that Stacey had
17  been arrested?
18  A.   Yes.
19  Q.   Where were you when you found out?
20  A.   I was with Chuck.
21  Q.   And how long did you stay with Chuck after Stacey was
22  arrested?
23  A.   A few days after that.  It was for me to gather all my
24  stuff.  Before Stacey got arrested, I was able to go back to
25  the apartment and get all my stuff out of the apartment

616

MACKENZIE BAILEY - Direct By Ms. Fletcher

1   building to where -- we put it to where Stacey wasn't around
2   for me to go to the apartment to get my stuff out of the
3   apartment.  Chuck helped me get all of my stuff out of the
4   apartment.  So I brought all my stuff out to his house.  So I
5   was able to gather a lot stuff I had out there to bring back to
6   my mom's.
7   Q.   And so then a few days after you found out that Stacey
8   had been arrested, you moved back to your mom's?
9   A.   Yes.
10  Q.   Did there come a time after that the police came to see
11  you?
12  A.   Yes.
13  Q.   Did you go down to the state police barracks in Massena?
14  A.   I did.
15  Q.   Were you interviewed by Investigator Baillargeon?
16  A.   I was.
17  Q.   And did he ask you about allegations relating to B.L.?
18  A.   Yes.
19  Q.   And did you tell him what happened with her when she
20  lived with you?
21  A.   I did.
22  Q.   Did you also tell him about A.T.?
23  A.   I did.
24  Q.   Did you and Hillary Trimm ever communicate with one
25  another after you found out the defendant was arrested?

617

MACKENZIE BAILEY - Direct By Ms. Fletcher

1   A.   We did.
2   Q.   How many times?
3   A.   A few times.
4   Q.   In person or over the phone?
5   A.   Both.
6   Q.   What did you talk about?
7   A.   Basic everyday life things like how are you doing, what
8   are you up to.  Just basic things.
9   Q.   Did you talk about Stacey?
10  A.   No.
11  Q.   Did you talk about your kids?
12  A.   No.
13  Q.   Did you talk about what Stacey had done to A.T.?
14  A.   No.
15  Q.   Did she talk about what Stacey had done to C.T.?
16  A.   No.
17  Q.   Did you talk about what kind of parents you were?
18  A.   Yes.
19  Q.   What did you say?
20  A.   We said that we felt like shit parents for ever letting
21  him do that.
22  Q.   Did you say do that or did you get into details?
23  A.   We never got into details.
24  Q.   Now, did there come a time that you were arrested for the
25  crimes you committed against A.T.?

618

MACKENZIE BAILEY - Direct By Ms. Fletcher

1   A.   Yes.

2   Q.   You were brought to federal court?

3   A.   Yes.

4   Q.   Have you pled guilty to those crimes?

5   A.   Yes.

6   Q.   Do you know what crimes you pled guilty to?

7   A.   Yes.

8   Q.   What?

9   A.   Conspiracy, exploit, and exploitation.

10  Q.   Have you also been charged in St. Lawrence relating to

11  crimes involving B.L. and C.F.?

12  A.   Yes.

13  Q.   Are you represented by an attorney on both cases?

14  A.   Yes, I am.

15  Q.   Is it the same attorney on both cases?

16  A.   Yes.

17  Q.   Do you know what's happening with your state case?

18  A.   I do not.

19  Q.   Do you have a court date scheduled?

20  A.   No.

21  Q.   I am going to show you Exhibit 31 for identification.  Do

22  you recognize that document?

23  A.   Yes.

24  Q.   What is that?

25  A.   It is a Plea Agreement.

619

MACKENZIE BAILEY - Direct By Ms. Fletcher

1   Q.   Did you sign the Plea Agreement?

2   A.   I did.

3   Q.   You entered a guilty plea in this courtroom pursuant to

4   that agreement?

5   A.   Yes.

6   Q.   I am going to hand you Government Exhibit 32 for

7   identification.  Do you recognize that document?

8   A.   Yes.

9   Q.   What is that?

10  A.   It is the Cooperation Agreement.

11  Q.   Did you sign that Cooperation Agreement?

12  A.   I did.

13  Q.   Did you agree to cooperate in this case?

14  A.   Yes.

15  Q.   What is your understanding of your Cooperation Agreement?

16  A.   To tell the truth.

17  Q.   Why did you agree to cooperate?

18  A.   To get justice for A.T..

19       MS. FLETCHER:  I have no further questions.

20       THE COURT:  Ms. Bianco, you may examine.

21       MS. BIANCO:  Thank you, Judge.

22

23  CROSS-EXAMINATION BY MS. BIANCO:

24  Q.   Good afternoon, Ms. Bailey.

25  A.   Good afternoon.

620

MACKENZIE BAILEY - Cross by Ms. Bianco

1   Q.   You are currently twenty-one years old; is that right?

2   A.   That's right.

3   Q.   And you met Stacey when you were living with your

4   boyfriend, Nathan, in the same apartment complex, correct?

5   A.   Correct.

6   Q.   And when you were living with Nathan, I believe you

7   testified on direct examination that you and Nathan got into

8   some physical altercation, correct?

9   A.   Correct.

10  Q.   And you had Nathan arrested.  Yes?

11  A.   I did not have him arrested.

12  Q.   You called the police?

13  A.   I did not call the police.

14  Q.   He was taken away?

15  A.   He was taken away because we got into an argument because

16  I told him that I was leaving him.  He ran out of the apartment

17  building and he tried to hang himself out in front of the

18  apartment building, and people were stopping outside and called

19  the police.  We went upstairs to the apartment, and we were

20  arguing.  The police showed up, banging on the door, and that's

21  when they called him out and that's when they arrested him and

22  took him away.

23  Q.   They took him away because he tried to hang himself?

24  A.   Yes.

25  Q.   And then they took him to the psychiatric center?

621

MACKENZIE BAILEY - Cross by Ms. Bianco

1   A.   Yes.

2   Q.   And the very next day, you hooked up with Stacey?

3   A.   Yes.

4   Q.   Okay, and when you hooked up with Stacey, did you have

5   any further contact with the father of A.T., Nathan?

6   A.   No.

7   Q.   Did you tell -- and at this point, A.T. is with Nathan's

8   mother, correct?

9   A.   Yes.

10  Q.   Did you tell Nathan's mother you had met and moved in

11  with someone else?

12  A.   No.  I had not moved in with Stacey at the point.  We

13  hadn't got our own apartment yet.

14  Q.   You went to your mother's house that night?

15  A.   Yes.

16  Q.   But you invited Stacey and B.L. to go to your mother's

17  house, yes?

18  A.   Yes.

19  Q.   Okay. So from that point, on, you were staying together,

20  right?

21  A.   Yes.

22  Q.   Okay.  Did you tell Nathan's mother that you had hooked

23  up with someone else at that point, the next day?

24  A.   No.

25  Q.   Now, A.T. is your only child, correct?

622

MACKENZIE BAILEY - Cross by Ms. Bianco

1   A.   Correct.

2   Q.   And she was born in 2014?

3   A.   Yes.

4   Q.   And you love your child?

5   A.   I do.

6   Q.   Okay.  Let's talk about what you did to A.T., okay.  On

7   March 2nd you were living on Glenn Street; is that right?

8   A.   Yes.

9   Q.   And the only ones living in that house were you, A.T.,

10  and Stacey; is that right?

11  A.   On March 2nd, yes.

12  Q.   And Stacey had been going back and forth to Hillary's

13  house, correct?

14  A.   Correct.

15  Q.   And you didn't like that, did you?

16  A.   No.

17  Q.   You were having a lot of fights with Stacey about him

18  going to Hillary's house?

19  A.   Yes.

20  Q.   And as a matter of fact, the phone that Stacey had, the

21  LG phone, isn't it true you were getting in a lot of arguments

22  with him over who he was calling?

23  A.   No.

24  Q.   You never argued in front of B.L. about him using the

25  phone and who he was calling?

623

MACKENZIE BAILEY - Cross by Ms. Bianco

1   A.   I don't remember that.

2   Q.   Okay.  Did you ever try to get into Stacey's LG phone to

3   see who he was calling?

4   A.   No.

5   Q.   I believe you said he had a password that was sometimes

6   on and sometimes not on, correct?

7   A.   Yes.

8   Q.   But you didn't try to get into the phone?

9   A.   No.

10  Q.   Then how do you know the password wasn't on?

11  A.   Because when I asked him use his phone every once in a

12  while, he would have to put the password before I was able to

13  use it.

14  Q.   But you said sometimes the password wasn't on?

15  A.   Right.

16  Q.   Is it your testimony that you never tried to get into

17  that phone?

18  A.   No, I never tried to get in his phones without his

19  presence.

20  Q.   So you just argued with him back and forth over who he

21  was calling?

22  A.   Yes.

23  Q.   And this particular phone, now at that time Stacey had no

24  job; is that right?

25  A.   Right.

624

MACKENZIE BAILEY - Cross by Ms. Bianco

1   Q.   He had this LG phone, correct?

2   A.   Yes.

3   Q.   Didn't you get that for him?

4   A.   Yes, my mom paid for it.

5   Q.   Okay, and you were letting him use it because his other

6   one broke?

7   A.   Well, my mom -- I asked my mom to get him a phone so he

8   had a phone so he wasn't bitching.

9   Q.   Okay.  But in terms of the LG phone, itself, didn't you

10  tell Stacey that this is my phone, and I am letting you use it,

11  but you can only use it when you are with me?

12  A.   No, I never said that to him.

13  Q.   You never said you don't call other women?

14  A.   No, never.

15  Q.   Okay.  When you were with Stacey on Glenn Street and he

16  is going back and forth to Hillary's that's because his

17  daughter Mia was living there; is that right?

18  A.   Yes.

19  Q.   Do you agree that there was a lot of jealousy at this

20  point between Stacey leaving your house to go to Hillary's, do

21  you agree with that?

22  A.   Yes.

23  Q.   And on March 2nd when you were on Glenn you had

24  sexually abused your own daughter?

25  A.   When?

625

MACKENZIE BAILEY - Cross by Ms. Bianco

1   Q.   March 2nd 2016, the chats the prosecutor just showed you.

2   Do you remember those?

3   A.   Yes.

4   Q.   You sexually abused A.T., correct?

5   A.   Yes.

6   Q.   Okay, and she was less than two years old at the time?

7   A.   Correct.

8   Q.   Okay, and you were alone in the room with A.T. at the

9   time?

10  A.   Yes.

11  Q.   And Stacey is not physically present in that room,

12  correct?

13  A.   Correct.

14  Q.   Wasn't Stacey at Hillary's house at that point?

15  A.   No, he was not.

16  Q.   And you are certain of that?

17  A.   I am certain of that.

18  Q.   Okay.  Well, while you are in the room with A.T. you took

19  A.T. clothes off, yes?

20  A.   Yes.

21  Q.   Okay, and you took close up pictures of her vagina?

22  A.   Yes.

23  Q.   You took your daughter's foot and put it in your vagina?

24  A.   Yes.

25  Q.   Took picture of that, yes?

626

MACKENZIE BAILEY - Cross by Ms. Bianco

1   A.   Yes.
2   Q.   You put A.T.'s hand in your vagina?
3   A.   Yes.
4   Q.   And took a picture of that?
5   A.   Yes.
6   Q.   You licked A.T.'s vagina?
7   A.   Yes.
8   Q.   And you took a picture of that?
9   A.   Yes.
10  Q.   And you took a picture of your finger in A.T.'s vagina?
11  A.   Yes.
12  Q.   And you are alone with A.T. in the room at the time
13  that's happening?
14  A.   Yes.
15  Q.   On March 2nd you took a total of ten pictures of you
16  sexually abusing A.T.; is that right?
17  A.   Yes.
18  Q.   And you testified that Stacey was making you do this?
19  Q.   He is making you abuse A.T.?
20  A.   Yes.
21  Q.   Okay.  So you are in one room, right?
22  A.   Yes.
23  Q.   And he is not this at that room, right?
24  A.   Yes.
25  Q.   And he is not in that room, right?

627

MACKENZIE BAILEY - Cross by Ms. Bianco

1   A.   Yes.
2   Q.   And he is forcing you to sexually abuse A.T. and send him
3   pictures while he is in the same house?
4   A.   Yes.
5   Q.   Okay, and this -- you were crying during your direct
6   testimony because you felt so bad; is that right?
7   A.   Yes.
8   Q.   But the next day March 3rd, you did it all over again,
9   didn't you?
10  A.   Yes.
11  Q.   You abused A.T.?
12  A.   Yes.
13  Q.   Okay.  You are still alone in the room with A.T. on March
14  3rd, right?
15  A.   Yes.
16  Q.   Okay, and on March 3rd you took her clothes off again?
17  A.   Correct.
18  Q.   And then you took pictures of A.T.'s vagina close ups,
19  right?
20  A.   Correct.
21  Q.   And you took a picture of you putting your finger in
22  A.T., yes?
23  A.   Yes.
24  Q.   And you are still alone in the room with A.T., right?
25  A.   Yes.

628

MACKENZIE BAILEY - Cross by Ms. Bianco

1   Q.   And you have the camera, right?
2   A.   Correct.
3   Q.   And you were taking the pictures, yes?
4   A.   Yes.
5   Q.   And A.T. was crying, wasn't she?
6   A.   Yes.
7   Q.   But you kept going, didn't you?
8   A.   Yes.
9   Q.   I am sorry?
10  A.   Yes.
11  Q.   And you took seven pictures that day, yes?
12  A.   Yes.
13  Q.   Now, I want to talk to you about the statement you gave
14  to the police on June 8, 2016, do you remember that?
15  A.   Yes, I do.
16  Q.   Okay, and you spoke with Investigator Baillargeon right
17  here, correct?
18  A.   Correct.
19  Q.   Okay, and you were at the police station, right?
20  A.   Yes.
21  Q.   And it was -- you wanted to talk to him and tell the
22  truth, correct?
23  A.   Yes.
24  Q.   And he told you how important it was to tell the truth?
25  A.   Yes.

629

MACKENZIE BAILEY - Cross by Ms. Bianco

1   Q.   To be detailed, yes?
2   A.   Yes.
3   Q.   To be thorough, yes?
4   A.   Yes.
5   Q.   To be accurate?
6   A.   Yes.
7   Q.   And not to hold back things, didn't he say that?
8   A.   Uh-huh.
9   Q.   And you were sitting face to face with him eye to eye,
10  weren't you?
11  A.   Yes.
12  Q.   And you started that statement at 3:04 in the afternoon,
13  right?
14  A.   Yes.
15  Q.   And you finished it at 5:12 in the afternoon, yes?
16  A.   Yes.
17  Q.   And it was a total of five typed pages, wasn't it?
18  A.   Yes.
19  Q.   Single spaced, correct?
20  A.   Yes.
21  Q.   And you read each and every one of those pages, didn't
22  you?
23  A.   Yes.
24  Q.   And you initialed the bottom of the page, each page,
25  correct?

630

MACKENZIE BAILEY - Cross by Ms. Bianco

1   A.   Yes.

2   Q.   And you swore under oath under penalty of perjury that

3   this was true, didn't you do that?

4   A.   Yes, I did.

5   Q.   Okay.  Now, when you spoke with the investigator looking

6   at him eye to eye, you never once said that you had taken

7   pictures of yourself sexually abusing A.T. on March 2nd, never

8   once said that in that statement, did you?

9   A.   No.

10  Q.   And you left all of that out, correct?

11  A.   Yes, I did.

12  Q.   Okay.  Because he didn't have your phone at that time,

13  did he?

14  A.   No.

15  Q.   And you left everything out about what you did on

16  March 3rd to A.T., you taking pictures of you sexually abusing

17  her, you left all of that out, didn't you?

18  A.   Yes.

19  Q.   After he told you he wanted you to be detailed, thorough,

20  and to tell him everything, correct?

21  A.   Yes.

22  Q.   And you looked him right in the eye and you held back

23  information, right?

24  A.   Yes.

25  Q.   Because you didn't want to get yourself in trouble; isn't

631

MACKENZIE BAILEY - Cross by Ms. Bianco

1   that true?

2   A.   That's not why.

3   Q.   You didn't tell him that you were taking pictures of

4   yourself sexually abusing A.T. because you forgot?

5   A.   No, it is just there was a lot going through my head that

6   day and I was very emotional.

7   Q.   And you just forgot those two days worth of sexual abuse?

8   A.   No, it is not that I forgot.

9   Q.   Okay.  This is a five page single spaced statement,

10  correct?

11  A.   Yes.

12  Q.   And you are giving him a lot of details, right?

13  A.   Yes.

14  Q.   And you are giving him details about B.L., yes?

15  A.   Yes.

16  Q.   C.F., yes?

17  A.   Yes.

18  Q.   And you are giving him details about every time that

19  Stacey -- that you say Stacey sexually abused A.T., right?

20  A.   Yes.

21  Q.   And all of the time you are telling him about these

22  details with Stacey abusing A.T. you don't mention yourself and

23  the pictures, right?

24  A.   Yes.

25  Q.   Okay.  Now, you in effect told the investigators that you

632

MACKENZIE BAILEY - Cross by Ms. Bianco

1   were just watching the abuse, right?

2   A.   Yes.

3   Q.   That you were merely present, correct?

4   A.   Yes.

5   Q.   Yes?

6   A.   Yes.

7   Q.   Almost like you had no part in this, right?  You have to

8   answer.  I am sorry.

9   A.   Yes.

10  Q.   Okay.  Now, when you spoke to the investigators on that

11  June 8th, giving that sworn statement, you also didn't tell him

12  anything about C.T., did you?

13  A.   No.

14  Q.   You had never said that Stacey sexually abused C.T.?

15  A.   No, I didn't.

16  Q.   And you never said that you brought C.T. in for Stacey to

17  do that, correct?

18  A.   No.

19  Q.   You said nothing about that, right?

20  A.   Right.

21  Q.   And that is when you were trying to be truthful, yes?

22  A.   Yes.

23  Q.   Now, in terms of the alleged abuse by Stacey and A.T.,

24  there were no pictures of Stacey sexually abusing A.T., were

25  there?

633

MACKENZIE BAILEY - Cross by Ms. Bianco

1   A.   No.

2   Q.   Because the idea to take pictures according to you was

3   his idea for you take pictures of you molesting A.T., right?

4   A.   Because that's all he wanted.  Those pictures were to

5   please him.

6   Q.   When he is molesting A.T. allegedly, he didn't want any

7   pictures, no?

8   A.   No.

9   Q.   And you didn't take any pictures?

10  A.   No.

11  Q.   And he is not asking for any naked pictures of A.T. while

12  he is in the room?

13  A.   No, because she is right there.

14  Q.   Okay.  Correct me if I am wrong, but while you were

15  sexually abusing A.T., isn't he in the same house?

16  A.   He is in the same house, but he is in a different room

17  directing it.

18  Q.   But if he wants to see it, he can walk right in, right?

19  A.   But that is not him.

20  Q.   Okay.  But when he is in the room and supposedly he is

21  abusing A.T. he wants no pictures, right?

22  A.   Yes.

23  Q.   Let's talk a little bit with about that March 2nd and

24  3rd.  You are saying your brother Dalton was in the house?

25  A.   Yes.

634

MACKENZIE BAILEY - Cross by Ms. Bianco

1   Q.   And how old is your brother, Dalton?

2   A.   He is eighteen now.

3   Q.   How old was he then in 2016?

4   A.   Seventeen.

5   Q.   And he was in the house sleeping there that night?

6   A.   Yes.

7   Q.   So he was there in the house while you were abusing your

8   daughter?

9   A.   Yes.

10  Q.   And you were abusing your daughter because you are afraid

11  of Stacey?

12  A.   That's what he wanted.

13  Q.   I am asking you if you are abusing your daughter because

14  you are afraid of Stacey?

15  A.   Yes.

16  Q.   And your brother, your seventeen year old brother is in

17  the house with you right in the house, yes?

18  A.   Yes.

19  Q.   And you don't go to your brother and say, hey, help me,

20  he wants me to abuse my child?

21  A.   How am I supposed to go about -- to anybody to tell

22  anybody that I am abusing my child?

23  Q.   Okay, but this is the first time, March 2nd that you

24  supposedly abused your child, right, first time you do it?

25  A.   Right.

635

MACKENZIE BAILEY - Cross by Ms. Bianco

1   Q.   So somebody is asking you to abuse your child, and rather

2   than tell your brother or call out for help, it is easier just

3   to abuse your child, is that what you are saying?

4   A.   No.

5   Q.   Why didn't you go tell Dalton, he wants me to abuse A.T.?

6   A.   Because I was scared of Stacey.

7   Q.   Dalton is in the house, you didn't tell him?

8   A.   No.

9   Q.   Didn't phone anyone to say help me, he is trying to abuse

10  my daughter, no?

11  A.   No, I didn't.

12  Q.   Okay.  Let's talk about your relationship with B.L.?

13       MS. BIANCO:  May I have a moment, Your Honor.

14  BY MS. BIANCO, CONTINUED:

15  Q.   On January 16, 2016, Investigator Baillargeon made an

16  unannounced visit to your home, correct, do you remember that?

17  A.   Yes.  My mom's home.

18  Q.   What is that?

19  A.   You said when?

20  Q.   January 16th when B.L. ran away?

21  A.   Oh, yes.

22  Q.   And when B.L. --

23       MS. FLETCHER:  Objection, Your Honor.  Investigator

24  Baillargeon did not go there on January 16th.  It is confusing.

25       MS. BIANCO:  Well, I am asking her if he came to the

636

MACKENZIE BAILEY - Cross by Ms. Bianco

1   house and she said yes.

2        THE COURT:  All right.  Continue.

3   BY MS. BIANCO, CONTINUED:

4   Q.   You did speak with somebody of authority?

5   A.   It was an investigator.

6   Q.   Fair enough on January 16th, right?

7   A.   Yes.

8   Q.   Because they were there about B.L.; is that right?

9   A.   Yes, they came for her stuff.

10  Q.   But B.L. had run away; is that right?

11  A.   Yes.

12  Q.   And B.L. had left after Stacey kicked Nick out of the

13  house for not paying rent, right?

14  A.   That was a while ago.  January was when we were living on

15  Glenn Street.

16  Q.   Okay.  Was B.L. upset -- were you present when B.L. and

17  Stacey got in an argument about Stacey kicking Nick out of the

18  house?

19  A.   Yes.

20  Q.   And B.L. wanted to move in with Nick; is that right?

21  A.   Yes.

22  Q.   And Stacey didn't want that to happen, right?

23  A.   Yes.

24  Q.   And B.L. left soon after, correct?

25  A.   Yes.

637

MACKENZIE BAILEY - Cross by Ms. Bianco

1   Q.   And when B.L. left, she then made allegations against

2   Stacey you were later to learn, correct?

3   A.   Yes.

4   Q.   Okay, and when the authorities came to your house they

5   questioned you about allegations of Brandy's sexual abuse,

6   didn't they?

7   A.   Yes.

8   Q.   And that was on January 16th, correct, thereabouts?

9   A.   Yes.

10  Q.   And you told him that you had no information about B.L.

11  being sexually abused, didn't you say that?

12  A.   Yes, I did.

13  Q.   And you told them this was a shock, you said that, right?

14  A.   Yes.

15  Q.   You said that you are always there with A.T., nothing

16  like this has ever come up, you said that, right?

17  A.   I don't recall saying that.

18  Q.   You don't -- you didn't say anything that you knew he was

19  abusing B.L., correct?

20  A.   Yes.

21  Q.   You said you knew nothing, right?

22  A.   Yes.

23  Q.   And you looked at that law enforcement officer directly

24  in the eye, are you saying you lied?

25  A.   No.

638

MACKENZIE BAILEY - Cross by Ms. Bianco

1  Q.  Well, you told him you knew nothing, you just testified
2  on direct examination that you knew B.L. was being abused?
3  A.  I understand that.
4  Q.  But when the investigator came to talk to you, looked you
5  face to face, eye to eye and asked you, you said you knew
6  nothing about it, right?
7  A.  Right.
8  Q.  Are you saying that was a lie, that you lied to the
9  investigator?
10 A.  No.
11 Q.  Well, you didn't tell him that B.L. was being abused,
12 right?
13 A.  Right.
14 Q.  Now, let's talk about your relationship with B.L., okay?
15 A.  Yes.
16 Q.  You and B.L. had your own sexual relationship apart from
17 Stacey, correct?
18 A.  Yes.
19 Q.  And you kept that a secret from Stacey, didn't you?
20 A.  No.
21 Q.  Oh, you told Stacey?
22 A.  Stacey knew about it.
23 Q.  I am asking -- well, let me backtrack.  Did you have a
24 conversation with B.L. about your relationship when Stacey
25 walked in and immediately quieted down, shut up about it?

639

MACKENZIE BAILEY - Cross by Ms. Bianco

1  A.  No.
2  Q.  That never happened?
3  A.  No.
4  Q.  So if B.L. testified to that, she would be a liar?
5        MS. FLETCHER:  Objection.
6        THE COURT:  Sustained.  Be stricken from the record.
7  The jury is instructed to disregard that last question.
8  BY MS. BIANCO, CONTINUED:
9  Q.  So it was not a secret that you were having your own
10 relationship with B.L.?
11 A.  No.
12 Q.  When you talked to the police on June 8th, did you talk
13 to them about the threesome, you, B.L., and Stacey, you had a
14 threesome while in the cabin in Loisville?
15 A.  Yes.
16 Q.  You told the police about that?
17 A.  Yes, I did.
18 Q.  And did you tell the police that B.L. and Stacey were the
19 ones coming at you, and you didn't want them to do this, did
20 you tell them that?
21 A.  No.
22 Q.  Are you saying you never said that you didn't want them
23 to have sex with you while you laid in bed, nothing of that
24 nature?
25 A.  I never told the police that.

640

MACKENZIE BAILEY - Cross by Ms. Bianco

1        MS. BIANCO:  May I have a moment, Your Honor?
2        THE COURT:  Proceed.
3        MS. BIANCO:  Fine, Your Honor.  I will get back to
4  that.
5  BY MS. BIANCO, CONTINUED:
6  Q.  So everything with B.L. was consensual, is that what you
7  are saying?
8  A.  Yes.
9  Q.  Okay, and now, I want to talk to you a little bit about
10 B.L..  Were you using B.L. as your babysitter?
11 A.  Yes.
12 Q.  Okay.  Did you try to take A.T. and give her to various
13 family members from time to time because you wanted to spend
14 time with Stacey?
15 A.  No.
16 Q.  Never happened?
17 A.  I asked B.L. to watch her.
18 Q.  You didn't give her to other family members and said
19 here, take her?
20 A.  No.
21 Q.  And in terms of B.L. watching her, was B.L. the one
22 primarily responsible for changing her diaper?
23 A.  Primarily, yes.
24 Q.  Because you didn't change her diaper very often?
25 A.  No.

641

MACKENZIE BAILEY - Cross by Ms. Bianco

1  Q.  Now, with B.L. you developed kind of a, would it be fair
2  to say, a close relationship with her?
3  A.  Yes.
4  Q.  And you two would talk a lot, correct?
5  A.  I wouldn't say talk a lot.  We --
6  Q.  Well, you lived together?
7  A.  We lived together, but I wouldn't say that we talked like
8  serious conversations.
9  Q.  You had a sexual encounter with her, yes?
10 A.  Yes.
11 Q.  And you lived with her?
12 A.  Yes.
13 Q.  And you trusted her with your child?
14 A.  Yes.
15 Q.  But you didn't really have any serious conversations with
16 B.L.?
17 A.  No.
18 Q.  Well, when you went -- when B.L. left and she ran away,
19 you knew where she was going, correct?
20 A.  I had an idea, yes.
21 Q.  That's because she told you, didn't she?
22 A.  No.
23 Q.  Well, when she went, where did she go?
24 A.  She went to my friend Carrie's house.
25 Q.  Carrie, the one who is sitting in this courtroom, or was

G.A. 107

642

MACKENZIE BAILEY - Cross by Ms. Bianco

1   sitting in this courtroom?

2   A.   She was sitting here.

3   Q.   And Carrie is another that you and Stacey had a

4   relationship with; is that right?

5   A.   Not a relationship.

6   Q.   Sexual threesome, I am sorry?

7   A.   Yes.

8   Q.   When you testified on direct examination you said you

9   didn't want to share him with anyone else, but that didn't

10  happen; is that right?

11  A.   Yes.

12  Q.   He was constantly cheating, yes?

13  A.   Yes.

14  Q.   And making you very mad, yes?

15  A.   Yes.

16  Q.   Let's talk about your brother, Dalton, okay.

17  A.   Okay.

18  Q.   Dalton is someone else you had a sexual relationship

19  with; isn't that right?

20  A.   Correct.

21  Q.   And that happened about two times?

22  A.   Correct.

23  Q.   And you told the police that Stacey made you do this?

24  A.   Yes.

25  Q.   So you were the victim again in this, you are the victim?

643

MACKENZIE BAILEY - Cross by Ms. Bianco

1   A.   I am not saying I am a victim.

2   Q.   Let's talk about C.F..  You said you met C.F. through

3   B.L.?

4   A.   Yes.

5   Q.   Okay, and that she had come over when B.L. was there and

6   spent some time?

7   A.   Yes.

8   Q.   And then when B.L. ran away you reached out to C.F.?

9   A.   Yes.

10  Q.   And you reached out to C.F. because you wanted C.F. to

11  know why B.L. left?

12  A.   Yes.

13  Q.   But you are reaching out to C.F. to let her know why B.L.

14  left when C.F. is not calling or asking about B.L., right?

15  A.   Right.

16  Q.   So you reached out to her, correct?

17  A.   I didn't.

18  Q.   Oh, you didn't?

19  A.   I didn't.

20  Q.   Was that Dalton?

21  A.   No.

22  Q.   Was that Stacey?

23  A.   That was Stacey that reached out to her because my

24  brother said that -- my brother had come over to the house and

25  told us that C.F. was walking around, and she said that he

644

MACKENZIE BAILEY - Cross by Ms. Bianco

1   hadn't seen B.L. at school.

2   Q.   Okay.  So was --

3   A.   And that's when Stacey had told my brother to tell

4   C.F. -- when he seen C.F. again, tell C.F. that she could come

5   over and that he would explain everything that happened with

6   C.F..

7   Q.   Okay, and when C.F. came over, were you present?

8   A.   Yes, I was present.

9   Q.   And did Stacey tell C.F. in your presence that he was

10  accused of sexually abusing B.L.?

11  A.   No.

12  Q.   Didn't say that?

13  A.   He didn't get into detail with her.

14  Q.   He just told --

15  A.   Earlier he just told that she put an order of protection

16  against him.

17  Q.   Okay.  He explained in front of you to C.F. that she has

18  an order of protection?

19  A.   Yes.

20  Q.   To keep him away?

21  A.   Yes, that's why she ran away.

22  Q.   And at that point it is your testimony that you guys

23  asked her to babysit; is that right?

24  A.   Yes.

25  Q.   And that was her primary reason she is coming over?

645

MACKENZIE BAILEY - Cross by Ms. Bianco

1   A.   Yes.

2   Q.   Really the only reason at that point, correct?

3   A.   Yes.

4   Q.   When you are speaking to the investigators on June 8th in

5   your five page sworn statement, never once do you mention that

6   C.F. was coming over to babysit; isn't that right?

7   A.   Yes.

8   Q.   You don't mention that at all, correct?

9   A.   Correct.

10  Q.   Because that wasn't important?

11  A.   No.

12  Q.   Now, when C.F. came over, she came over almost every day?

13  A.   Yes.

14  Q.   And when she would leave, she would be texting Stacey

15  everyday?

16  A.   Yes.

17  Q.   And this upset you?

18  A.   Yes.

19  Q.   Because you didn't like the fact that he is again talking

20  to yet another women?

21  A.   No, I am a very jealous person.

22  Q.   Fair enough.  And then eventually C.F. starts spending

23  the night?

24  A.   Yes.

25  Q.   And she is sleeping in the same bedroom as you and

Case 18-105, Document 44, 04/15/2019, 2540369, Page112 of 202

Case 5:16-cr-00320-DNH   Document 118-2   Filed 09/05/18   Page 198 of 232          Case 5:16-cr-00320-DNH   Document 118-2   Filed 09/05/18   Page 199 of 232

646

MACKENZIE BAILEY - Cross by Ms. Bianco

Stacey?

1   A.   After she is in the relationship, yes.

2   Q.   This is a relationship.  This wasn't the rape?

3   A.   No, it wasn't a rape.

4   Q.   Okay.  Now, I think you testified on direct examination

5   about a tattoo that you have that C.F. has a matching tattoo?

6   A.   She does.

7   Q.   And you guys -- when C.F. was talking about getting a

8   tattoo, you were present?

9   A.   Yes.

10  Q.   And you guys talked about what would be kind of the best,

11  right?

12  A.   Yes.

13  Q.   Yes?

14  A.   Yes.

15  Q.   And she wanted a tattoo that matched one of yours; isn't

16  that right?

17  A.   Yes.

18  Q.   And that's why she picked kinky, correct?

19  A.   Yes.

20  Q.   At this wasn't your idea for C.F. to get a tattoo?

21  A.   No.

22  Q.   It was C.F.'s idea to get a tattoo?

23  A.   Yes.

24  Q.   And C.F. when she told you she wanted a tattoo, she had

---

647

MACKENZIE BAILEY - Cross by Ms. Bianco

1   also told you that she was seventeen, didn't she say that to

2   you?

3   A.   Yes.

4   Q.   And she gave you when she was talking to you, she made it

5   like she had her mother's approval to get this tattoo, right?

6   A.   Yes.

7   Q.   Because you weren't trying to do anything wrong to C.F.,

8   right?

9   A.   No.

10  Q.   And C.F. would tell you things in front of Stacey that

11  she made up a story about working papers and that's why she

12  couldn't get a job because she was adopted or something like

13  that, did she say that?

14  A.   Yes.

15  Q.   And none of that turned out to be true?

16       MS. FLETCHER:  Objection.

17       THE COURT:  Overruled.

18  BY MS. BIANCO, CONTINUED:

19  Q.   None of that turned out to be true, right?

20  A.   I don't know if it came out to be true or not.

21  Q.   She told you she was adopted?

22  A.   She had her real mom or her real dad was in different

23  county or state or whatever.  I didn't look into it.  It is

24  none my business.

25  Q.   You had no reason to doubt that she wasn't in fact

648

MACKENZIE BAILEY - Cross by Ms. Bianco

1   seventeen, right?

2   A.   I never questioned her mother.  I never talked to her

3   mother.

4   Q.   Okay, and when you said on direct examination you thought

5   her brother J.M. was the same age?

6   A.   Yes.  He didn't present himself as a twelve year old.

7   He -- I mean he smoked cigarettes.  He acted older than what he

8   looked.  Like, he didn't -- well, he didn't even look twelve.

9   He looked older than what he was.  I mean he hung out with my

10  brother.  He acted like my brother.  He didn't act like a

11  twelve year old.

12  Q.   And your brother at the time was seventeen you said?

13  A.   Sixteen, seventeen, yes.

14  Q.   And J.M. was hanging out with him?

15  A.   Yes.

16  Q.   Did J.M. ever tell you how old he was?

17  A.   No.

18  Q.   You just assumed that J.M. was older because he was

19  hanging out with your brother?

20  A.   Yes.

21  Q.   Okay.  There came a point in time that you and C.F. had

22  your own relationship; isn't that right?

23  A.   No, we never had our own relationship.

24  Q.   You never had sex by yourself?

25  A.   No.

---

649

MACKENZIE BAILEY - Cross by Ms. Bianco

1   Q.   Do you remember telling the police that you did?

2   A.   No.

3   Q.   Would taking a look at your own sworn testimony statement

4   help refresh your memory about whether or not you told the

5   police that you had your own relationship with C.F.?

6   A.   No, I don't remember having a relationship by myself with

7   her.  It was me, her, and Stacey.

8   Q.   Did you ever say to the police I only did things with her

9   twice, meaning C.F.?

10  A.   With Stacey.  That's what I meant.

11  Q.   Okay.  So it just wasn't clear?

12  A.   Yes, it wasn't clear.

13  Q.   Fair enough.  And C.F. was over on a regular basis?

14  A.   Yes.

15  Q.   And you never said anything to C.F. about Stacey abusing

16  A.T.?

17  A.   Never.

18  Q.   And she is over there though, isn't she?

19  A.   Yes.

20  Q.   And which house -- this was Glenn Street, wasn't it?

21  A.   This was Glenn Street, yes.  This is the last house.

22  Q.   All right, and she is spending at least every weekend or

23  every other weekend there, right?

24  A.   Yes.

25  Q.   And none of this abuse happened while C.F. is around?

---

G.A. 109

650

MACKENZIE BAILEY - Cross by Ms. Bianco

1    A.   No.
2    Q.   I want to talk to you about your phones.  You said you
3    had a Samsung, that was your first phone, correct?
4    A.   Yes.
5    Q.   And on your Samsung, you hooked up to some different
6    social media accounts, correct?
7    A.   Correct.
8    Q.   And one of them was okaycupid.com; is that right,
9    okaycupid.com?
10   A.   Possibly.
11   Q.   How about exdating.com, do you remember that one?
12   A.   I don't remember, but possibly, yes.
13   Q.   Okay.  Well, did you tell B.L. you were looking for a new
14   girlfriend on this site?
15   A.   I never told B.L. anything.
16   Q.   So you weren't looking for a new girlfriend on this
17   exdating.com?
18   A.   Stacey and I both were.
19   Q.   So you were looking for a new girlfriend and Stacey was
20   looking for a new girlfriend?
21   A.   For our three-way relationships.
22   Q.   But would you look on your own?
23   A.   Yes, we went through them together.
24   Q.   My question is did you look at this exdating site by
25   yourself?

651

MACKENZIE BAILEY - Cross by Ms. Bianco

1    A.   Yes.
2    Q.   Didn't you testify that you didn't want anyone else in
3    the relationship?
4    A.   Sure.
5    Q.   But you are looking at a dating site to pick a new woman
6    yourself?
7    A.   Yup.
8    Q.   Live Free Fun, do you remember that dating site or
9    website?
10   A.   No.
11   Q.   That wasn't on your Samsung phone?
12   A.   I don't remember it.
13   Q.   How about Topix, do you remember that site?
14   A.   Topix is for KIK.
15   Q.   Right, but there was a Topix site you would go to; is
16   that right or not?
17   A.   I believe so.
18   Q.   On Topix there were different sexual themes on the Topix
19   site, correct?
20   A.   Correct.
21   Q.   Beastiality.
22   A.   Correct.
23   Q.   Child pornography?
24   A.   Correct.
25   Q.   Adult porn?

652

MACKENZIE BAILEY - Cross by Ms. Bianco

1    A.   Correct.
2    Q.   Threesomes?
3    A.   Correct.
4    Q.   And you were on that site posting chats, correct?
5    A.   I was?
6    Q.   Yes, you were?
7    A.   No, I was not.
8    Q.   You went on the site though?
9    A.   Yes, I went on the site.
10   Q.   And you looked?
11   A.   Yes.
12   Q.   You would send out replies or chats out on those sites?
13   A.   I wouldn't.
14   Q.   Okay, but you were looking, just not using?
15   A.   Right.  I would go through there, and I would help Stacey
16   try to find different categories to help him get user names to
17   help him chat with other users.
18   Q.   So you are just assisting him to find other women?
19   A.   And other things that he likes to talk about.
20   Q.   Okay.
21   A.   While he is chatting with other people he likes me to
22   help him try to find other people to talk to.
23   Q.   Didn't you use the Fast and Furious account to text other
24   people about selling a sex slave, do you remember doing that?
25   A.   I remember doing that, yes.

653

MACKENZIE BAILEY - Cross by Ms. Bianco

1    Q.   And you use the fastfamily account, whether you were
2    joking or not, but you were using it and sending out saying you
3    were going to sell a sex slave?
4    A.   That was not me.
5    Q.   Not you?
6    A.   Not me.
7    Q.   So you didn't write you are a female, twenty years old on
8    the fastfamily account?
9    A.   I wrote it.  There is a video of me saying that --
10   repeating what is on the piece of paper, but that's what Stacey
11   wanted me to write on the paper.
12   Q.   So you wrote it using fastfamily?
13   A.   He wrote it.  I rewrote it on the piece of paper, and I
14   said it on video, and he sent it out.
15   Q.   You said --
16   A.   He was trying to sell me as a sex slave.  He was trying
17   to pimp me out to other people trying to get money.
18   Q.   And you were agreeable to this?
19   A.   No, I wasn't agreeable, but did I have a choice?  No, I
20   didn't.
21   Q.   Okay.  Let's back track.  Did you ever get on fastfamily
22   and write other chat members of this Topix group that you were
23   a female, twenty years old looking to talk with people, did you
24   ever do that?
25   A.   I don't remember.

654

MACKENZIE BAILEY - Cross by Ms. Bianco

1   Q.  Okay, and do you remember being questioned, do you
2 remember using the prouddaddy account saying you were a female
3 twenty years old and the person responding back why are you
4 named prouddaddy. And you said you just don't want to be
5 bothered with certain people, do you remember that?
6   A.  I had never used the user name prouddaddy.
7   Q.  Just fastfamily?
8   A.  I never used fastfamily either.
9   Q.  Just when you were on Topix?
10   A.  The only account that I ever used was mine.
11   Q.  Let's talk about some of your user names. You used the
12 name hotmommy, yes?
13   A.  I don't recall all my user names. I don't remember all
14 of them.
15   Q.  You had thirteen user names, don't you?
16   A.  I don't remember all of them.
17   Q.  Let's go through some other names and see if you will
18 recall them, hotbitch1327, do you remember using that name?
19   A.  I do not.
20   Q.  You don't recall or you didn't use it?
21   A.  I don't remember. The only one I remember is the
22 sexyassbitch one. That's the only one that I can remember
23 using.
24   Q.  How about kenziebailey created 1/27/15. Do you remember
25 that one?

655

MACKENZIE BAILEY - Cross by Ms. Bianco

1   A.  I -- briefly, yes.
2   Q.  Okay. Boobookenzie17@aol.com, do you remember that?
3   A.  Yes.
4   Q.  Okay, and when you put yourself out as boobookenzie17 you
5 wanted people that you were chatting with to think you were
6 seventeen, that's what you wanted?
7   A.  No.
8   Q.  You just picked the number seventeen?
9   A.  That was an old e-mail.
10   Q.  How about using the name kenziedoodle10 at young.com
11 created 4/5/14, do you remember that?
12   A.  Yes.
13   Q.  Kenziedoodle10, you wanted people you were chatting with
14 to think you were ten years old?
15   A.  No, I did not.
16   Q.  Why did you pick the number ten?
17   A.  It was an old name that I used to go by.
18   Q.  Okay. Wetandready18, do you remember that name?
19   A.  I do not remember that name.
20   Q.  And a display name kenzieLaPorte, do you remember using
21 that?
22   A.  I don't remember using that one, but I remember the name.
23   Q.  Wetandready18?
24   A.  No, the kenzieLaPorte one.
25   Q.  You would sometimes would hold yourself out as Stacey's

656

MACKENZIE BAILEY - Cross by Ms. Bianco

1 wife, right?
2   A.  Yes.
3   Q.  Like calling yourself Kenzie LaPorte?
4   A.  Yes.
5   Q.  Okay. In terms of the accounts you had, the social media
6 user names, you had several different passwords with the user
7 names; is that right?
8   A.  Yes.
9   Q.  And you would make up the passwords, correct?
10   A.  Yes.
11   Q.  And you keep the passwords for yourself, right? I am
12 sorry. She has --
13   A.  Yes.
14   Q.  And sometimes they would be kind of complicated wouldn't
15 they, your passwords?
16   A.  No.
17   Q.  Never?
18   A.  No. They are pretty basic and most of the time I never
19 created my accounts for Kik.
20   Q.  So kenziedoodle, did you do that one?
21   A.  I made up the name, yes.
22   Q.  But you didn't create the account?
23   A.  Like I didn't put the information in. I always had help
24 doing like creating the account.
25   Q.  Who was helping you create the account?

657

MACKENZIE BAILEY - Cross by Ms. Bianco

1   A.  Stacey was helping me create the account.
2   Q.  But once you created the accounts you were using them on
3 your own?
4   A.  Right. The ones that I do remember.
5   Q.  You are not saying you didn't have thirteen accounts, you
6 are just saying you don't remember?
7   A.  Right.
8   Q.  Okay. Fair enough. And you don't know how many
9 passwords you had?
10   A.  No.
11   Q.  And you didn't write them down and give them to Stacey to
12 use, did you?
13   A.  No.
14   Q.  When you were on the Topix account, the Topix website, I
15 am sorry, is it your testimony that you never communicated with
16 individuals on this Topix, this forum?
17   A.  No.
18   Q.  Never?
19   A.  No.
20   Q.  You just helped Stacey?
21   A.  Right.
22   Q.  So how would you help him, you would type for him?
23   A.  No, I wouldn't type for him. I would help him get user
24 names off the thing and he would write them down on like a
25 piece of paper.

658

MACKENZIE BAILEY - Cross by Ms. Bianco

1   Q.   Didn't you just testify that he had to open up your
2   accounts for you?
3   A.   Yes.
4   Q.   He had to help you?
5   A.   Yes.  But you go on like the web browser, and you go to
6   the Topix website, it is totally different from the app of Kik,
7   from Kik.  Kik is an app.  Topix is website, which you have to
8   go to a browser to view the page.
9   Q.   And when you are viewing the page that's where there is
10  the different topics?
11  A.   Yes.
12  Q.   And that's where there is the beastiality?
13  A.   Yes.
14  Q.   And the child porn?
15  A.   Yes.
16  Q.   Okay.  You never sent any pictures to any individuals
17  through this Topix website, is that your testimony?
18  A.   Yes.
19  Q.   And you never sent any pictures through private chat
20  rooms of yourself trying to get a girlfriend?
21  A.   I never said that.
22  Q.   Well, you did say you weren't looking for a girlfriend?
23  A.   I never said that.
24  Q.   Okay.
25  A.   I just told you that I was -- like -- that we were

659

MACKENZIE BAILEY - Cross by Ms. Bianco

1   looking for a girlfriend on the dating sites.  You never asked
2   about pictures being sent of myself.
3   Q.   I am sorry.  I apologize.  You sent naked pictures of
4   yourself out, right?
5   A.   Yes.
6   Q.   Looking for a girlfriend?
7   A.   Yes, and if it wasn't me sending them, it was Stacey
8   taking pictures of me sending them to other people.
9   Q.   Did you send the pictures, a picture, one picture of A.T.
10  naked out on the Internet trying to sell her for money?
11  A.   No.
12  Q.   Never?
13  A.   Never.
14  Q.   Now, there came -- oh, when you were trading your naked
15  pictures, were you receiving naked pictures back?
16  A.   I don't recall trading my naked pictures with anybody
17  else.  I recall Stacey trading my naked pictures.
18  Q.   But you sent some naked pictures out to get a girlfriend?
19  A.   On like a website, yes.
20  Q.   Did you get naked pictures back?
21  A.   Yes, sometimes I did.
22  Q.   And sometimes you would get naked pictures of younger
23  girls; is that right?
24  A.   No.  I never got younger pictures.
25  Q.   You never got younger pictures of teenage girls?

660

MACKENZIE BAILEY - Cross by Ms. Bianco

1   A.   No.  The only young pictures that were ever shown to me
2   was from Stacey.  Nobody ever sent me any young pictures but
3   him.  And those were the ones that he was getting from other
4   people.  And those are the pictures that he was sending me
5   asking me what I thought about them.
6   Q.   So --
7          THE COURT:  I want to just break for a moment.  We
8   are going to take tomorrow off so we are going to finish this
9   witness today.  Both sides have had plenty of opportunities.
10  If the witness isn't finished at five o'clock we will take a
11  brief break and then finish the witness just so you know.
12         MS. BIANCO:  Thank you Your Honor.
13         THE COURT:  This witness will be concluded because
14  we are not having court tomorrow.
15  BY MS. BIANCO, CONTINUED:
16  Q.   You testified that you were an extremely jealous person;
17  is that right?
18  A.   Yes.
19  Q.   And he is showing you pictures of other naked girls?
20  A.   Yes.
21  Q.   To make you -- and that -- the purpose of this is what?
22  A.   I don't know what the purpose is.
23  Q.   Okay.  Now, there came a time when Hillary moves into
24  your house, right?
25  A.   Correct.

661

MACKENZIE BAILEY - Cross by Ms. Bianco

1   Q.   Okay, and at that time A.T. is living there?
2   A.   Yes.
3   Q.   B.L. is living there?
4   A.   Correct.
5   Q.   C.T. has moved in too, right?
6   A.   Correct.
7   Q.   And sometimes you and Hillary would have your own chats
8   back and forth, correct?
9   A.   Correct.
10  Q.   And these were chats that you didn't show Stacey right?
11  A.   No, Stacey seen my chats all the time because I wouldn't
12  know what to say to her, and I would ask him what do I say,
13  what to I say, and he would make up our conversations.
14  Q.   Well, you are living in the house with her, right?
15  A.   Right.
16  Q.   And you are not sending chats back and forth?
17  A.   To who?
18  Q.   Hillary?
19  A.   Hillary, yes, I am.
20  Q.   While you are living in the house, right?
21  A.   Yes.
22  Q.   And you are talking about Stacey, aren't you?
23  A.   I don't remember talking about him.
24  Q.   Okay.  Well, were you talking about trading naked
25  pictures with Hillary?

662

MACKENZIE BAILEY - Cross by Ms. Bianco

1   A.   With each other?

2   Q.   Yes.

3   A.   I don't remember.

4   Q.   Okay.  Were you talking to Hillary about trading naked

5   pictures with other people, talking with Hillary about that?

6   A.   No.

7   Q.   You just were doing it to each other?

8   A.   Yes.

9   Q.   Okay, and I believe you said you had a sexual

10  relationship with Hillary, right?

11  A.   Yes.

12  Q.   Okay, and did you also do fantasy chats with her?

13  A.   No.

14  Q.   Just with Stacey?

15  A.   Yes.

16  Q.   And you did fantasy chats often?

17  A.   Yes.

18  Q.   And that's where you make up things?

19  A.   Yes.

20  Q.   Like you pretend to be a child, for example?

21  A.   Yes.

22  Q.   And he pretends to be an adult?

23  A.   Yes.

24  Q.   Or vice versa?

25  A.   Yes.

663

MACKENZIE BAILEY - Cross by Ms. Bianco

1   Q.   And you talk about sexual fantasies?

2   A.   Yes.

3   Q.   None of which were true?

4   A.   Right.

5   Q.   After Stacey was arrested, you communicated with Hillary;

6   is that right?

7   A.   Correct.

8   Q.   And you talked to Hillary about what Stacey was charged

9   with, didn't you?

10  A.   No.

11  Q.   Never said a word about it, the person you shared a

12  relationship with is in jail and you don't say anything?

13  A.   No.  The only thing that we ever said to each other is

14  that we felt like shit parents for what we let him do to our

15  kids.

16  Q.   But you never had a conversation with her about what you

17  had done to A.T., right?

18  A.   Nope.

19  Q.   And this is the first time out of blue, you haven't

20  spoken to her, and say we feel like shit parents for what we

21  did to our kids?

22  A.   Yes.

23  Q.   Okay.  Nothing was said to elaborate or explain?

24  A.   No.

25  Q.   You never told her that you helped molest C.T.?

664

MACKENZIE BAILEY - Cross by Ms. Bianco

1   A.   No.

2   Q.   And she never told you that Stacey was molesting C.T.?

3   A.   No.

4   Q.   And this conversation, you hadn't spoken in how many

5   weeks before you guys talked after Stacey was arrested?

6   A.   A while.

7   Q.   So a week, two weeks, four weeks?

8   A.   Months.

9   Q.   So the first time you have a conversation with Hillary,

10  you talk about something you have never disclosed before to her

11  about what shit parents you are?

12  A.   Right.

13  Q.   And you left it at that?

14  A.   Yes.

15  Q.   You didn't discuss the things you two would say if the

16  cops came to you?

17  A.   Never.

18  Q.   Never said one thing about what your story would be?

19  A.   Never.

20  Q.   After Stacey was arrested you said you went with his

21  uncle, Chuck?

22  A.   It was not before he got -- or not when he got arrested.

23  Q.   Oh, it was before?

24  A.   It was before.

25  Q.   So you left and went to Chuck Judway?

665

MACKENZIE BAILEY - Cross by Ms. Bianco

1   A.   Yes.

2   Q.   And you lived with Chuck Judway?

3   A.   Yes.

4   Q.   And you had a relationship with Chuck Judway?

5   A.   After I had stayed there for a little while, yes.

6   Q.   Okay.  So Stacey's uncle you are now having a sexual

7   relationship with him?

8   A.   Yes.

9   Q.   And he is the registered sex offender?

10  A.   Yes.

11  Q.   And you had just left A.T. with your parents and that was

12  it?

13  A.   With my mom.

14  Q.   But you said you didn't tell anyone where you were,

15  right?

16  A.   Right.

17  Q.   You didn't tell your mother?

18  A.   No.

19  Q.   You didn't go see A.T.?

20  A.   No.

21  Q.   So you stayed with Chuck in seclusion for about a month?

22  A.   Yes.  And that was because I didn't want Stacey to know

23  where it was.

24  Q.   It wasn't because you were worried about getting

25  arrested?

666

MACKENZIE BAILEY - Cross by Ms. Bianco

1    A.    No, it was not.

2    Q.    Okay.  Let's talk about the charges that you face --

3    excuse me -- that you have pled to.  You pled guilty to

4    conspiracy to sexually exploit A.T.; is that right?

5    A.    Correct.

6    Q.    And that was from a time she was an infant in 2014 until

7    your arrest in June of 2016, yes, that's what you pled to?

8    A.    Correct.

9    Q.    So you pled guilty to molesting your child for over two

10   years?

11   A.    Correct.

12   Q.    Yes?

13   A.    Correct.

14   Q.    Okay.  You pled guilty to sexually exploiting A.T. on

15   March 2nd 2016, right?

16   A.    Yes.

17   Q.    And that's because you took the pictures of you sexually

18   abusing A.T., right?

19   A.    Yes.

20   Q.    And you pled guilty to sexually exploiting A.T. on March

21   3rd 2016, right?

22   A.    Yes.

23   Q.    That's because you admitted you sexually abused A.T. and

24   took pictures of it, right?

25   A.    Yes.

667

MACKENZIE BAILEY - Cross by Ms. Bianco

1    Q.    And you didn't have to plead guilty to abusing B.L., did

2    you?

3    A.    No.

4    Q.    All right.  You didn't have to plead guilty to sexually

5    abusing C.F.?

6    A.    No.

7    Q.    Okay, and you didn't have to plead guilty to sexually

8    abusing your own brother?

9    A.    No.

10   Q.    That's because you decided to cooperate with the

11   government by testifying against Stacey; is that right?

12   A.    No.

13   Q.    Oh, you didn't cooperate with the government to testify

14   against Stacey?

15   A.    I did decide to cooperate, sorry.

16   Q.    No problem, my bad.  And you are hoping by cooperating

17   against Stacey that you are going to get a reduced sentence,

18   correct?

19   A.    Correct.

20   Q.    You are in jail right now?

21   A.    Right.

22   Q.    And you were told before you entered the cooperation

23   agreement with the government that you were facing a life

24   sentence; is that right?

25   A.    Correct.

668

MACKENZIE BAILEY - Cross by Ms. Bianco

1    Q.    Okay, and you were explained about the United States

2    Sentencing Guidelines by the your lawyer, right?

3    A.    Correct.

4    Q.    And she is present in the courtroom?

5    A.    Yes.

6    Q.    Kimberly Zimmer right there in the front row, right?

7    A.    Correct.

8    Q.    Okay, and she told you that a court has to consider those

9    sentencing guidelines in determining your sentence, right?

10   A.    Correct.

11   Q.    And with the sentencing guidelines your sentence would be

12   life without your cooperation against Stacey, yes?

13   A.    Correct.

14   Q.    Now, in order for you to get less than a life sentence

15   and for the government to recommend a reduction of that, you

16   signed this agreement where you have certain obligations, isn't

17   that right, you have obligations in your cooperation agreement?

18   A.    Could you break that down for me?  I don't understand.

19   Q.    You signed a cooperation agreement?

20   A.    Right.

21   Q.    I believe that is Government's Exhibit 31.  If I can get

22   my own.

23         THE COURT:  32 is the cooperation agreement.

24   BY MS. BIANCO, CONTINUED:

25   Q.    And you remember reviewing that cooperation agreement?

669

MACKENZIE BAILEY - Cross by Ms. Bianco

1    A.    Yes, I remember reviewing it.

2    Q.    And you reviewed it with your lawyer?

3    A.    Yes.

4    Q.    And you signed it?

5    A.    Yes, I did.

6          MS. BIANCO:  May I approach, Your Honor?

7          THE COURT:  You may.

8    BY MS. BIANCO, CONTINUED:

9    Q.    Showing you Government's Exhibit 32, is this the

10   cooperation you reviewed and signed with your lawyer?  You can

11   take a look.

12   A.    That's correct.

13         MS. BIANCO:  I move 32 into evidence.

14         THE COURT:  Any objection?

15         MS. FLETCHER:  No objection.

16         THE COURT:  32 is received.

17         (Exhibit No. 32, received.)

18   BY MS. BIANCO, CONTINUED:

19   Q.    Now, your cooperation agreements spells out certain

20   obligations that you have in order to get the benefit of this

21   agreement, correct?

22   A.    Correct.

23   Q.    Okay, and one of those obligations is that you have to

24   testify truthfully here against Stacey, correct?

25   A.    Correct.

670

MACKENZIE BAILEY - Cross by Ms. Bianco

1    Q.    And the people who determine whether you testify

2    truthfully is the government, right?

3    A.    Right.

4    Q.    If they don't like your testimony or find that you are

5    truthful (sic), your agreement is off, right?

6    A.    Correct.

7    Q.    So it you testify to anything --

8          MS. BIANCO:  Strike that.

9    BY MS. BIANCO, CONTINUED:

10   Q.    If you admitted that you sexually abused A.T. without

11   Stacey's participation, your agreement is off, right?

12         MS. FLETCHER:  Objection.

13         THE COURT:  Sustained.  Come on.

14   BY MS. BIANCO, CONTINUED:

15   Q.    You want to fulfill your agreement, correct?

16   A.    Correct.

17   Q.    Because you don't want to spend life in prison?

18   A.    That's not why.

19   Q.    You wouldn't care if you spent life in prison?

20   A.    No.

21   Q.    So could you rip up this agreement right now and it won't

22   matter?

23   A.    It is not that.

24   Q.    Well, I am asking you, if this doesn't matter, would you

25   being willing to rip it up right here in front of the jury?

671

MACKENZIE BAILEY - Cross by Ms. Bianco

1    A.    Yes.

2    Q.    Showing you 32, do you want to rip it up?

3          THE COURT:  No, no, no, no.

4          MS. BIANCO:  May I have a moment, Your Honor?

5          THE COURT:  You may.

6          MS. BIANCO:  No further questions.  Thank you.

7          THE COURT:  Redirect, if any.

8          MS. FLETCHER:  Thank you, Your Honor.

9

10   REDIRECT EXAMINATION BY MS. FLETCHER:

11   Q.    Mackenzie, I have a document --

12         MS. FLETCHER:  Judge, I have marked two documents

13   that are not on the exhibit list during the course of the

14   cross-examination, documents 45 and 46.

15   BY MS. FLETCHER, CONTINUED:

16   Q.    46 is an indictment.  I am going to show you that, A

17   Superseding Indictment in this case, do you recognize that?

18   A.    Yes, I do.

19   Q.    Is that the indictment to which you pled guilty in this

20   case?

21   A.    Yes.

22   Q.    I can take that back.  Now, Ms. Bianco just said to you

23   you pled guilty to conspiracy to abuse A.T., correct?

24   A.    Yes.

25   Q.    What you pled to is conspiring with Stacey LaPorte to

672

MACKENZIE BAILEY - Redirect by Ms. Fletcher

1    abuse --

2    A.    Right.

3    Q.    -- to sexually exploit A.T. for the purpose of taking

4    sexually explicit images; is that correct?

5    A.    Correct.

6    Q.    She asked you if you pled guilty to sexual exploitation

7    of A.T., correct?

8    A.    Correct.

9    Q.    In your indictment, didn't you plead and are you not

10   charged with acting together with Stacey LaPorte to sexually

11   exploit A.T. for the purpose of taking sexually explicit

12   pictures?

13   A.    Yes.

14   Q.    Did you plead guilty to aiding and abetting

15   Stacey LaPorte in the abuse of A.T.?

16   A.    Yes.

17   Q.    She also talked to you about a statement that you give to

18   Investigator Baillargeon.  I have marked that as Exhibit 45.  I

19   want you to take a look at that.  Have you had time to review

20   that Mackenzie?

21   A.    Yes.

22   Q.    That's a five-page written statement, correct?

23   A.    Correct.

24   Q.    Is that a summary of the oral statement that you made to

25   Investigator Baillargeon?

673

MACKENZIE BAILEY - Redirect by Ms. Fletcher

1    A.    Yes, it is.

2    Q.    You sat with him in a room for hours, didn't you?

3    A.    Yes.

4    Q.    And that was summarized in that statement?

5    A.    Yes.

6    Q.    Did you admit to Investigator Baillargeon that you had

7    participated and were an accomplice with Stacey LaPorte in the

8    abuse of A.T.?

9    A.    I told him that I was in the room.

10   Q.    And you held her?

11   A.    I told them I didn't do anything.

12   Q.    Was that true?

13   A.    No.

14   Q.    Were you there?

15   A.    Yes, I was.

16   Q.    Did you bring her to him?

17   A.    Yes.

18   Q.    Did you tell him that you had engaged in sexual activity

19   with B.L.?

20   A.    Yes.

21   Q.    Did you tell him that you engaged in sexual activity with

22   C.F.?

23   A.    Yes.

24   Q.    Did you tell him that you had sex at the defendant's

25   request with your brother, Dalton?

674

MACKENZIE BAILEY - Redirect by Ms. Fletcher

1   Q.   And that took five pages of a written statement that you
2   gave to the police in June?
3
4   A.   Yes.
5   Q.   You said that you didn't want another woman in the
6   relationship, but you were looking for another person online
7   anyway?
8   A.   Yes.
9   Q.   Why?
10  A.   I don't know why.
11  Q.   Who wanted a third person in the relationship?
12  A.   Stacey.
13  Q.   Did you want to help pick that person?
14  A.   Yes.
15  Q.   Did you want the third person?
16  A.   I didn't, but it would help with like my jealousy that I
17  would be able to help the person, that he wouldn't have control
18  of that situation of picking the person.
19  Q.   So you wanted the to help with that?
20  A.   Yes.
21  Q.   Did somebody tell you that this would be a good idea for
22  your relationship?
23  A.   Yes.
24  Q.   Who?
25  A.   Stacey.

675

MACKENZIE BAILEY - Redirect by Ms. Fletcher

1   Q.   You also talked about role playing with Stacey.  What did
2   your role playing consist of?
3   A.   It was occasional with the fantasy.
4   Q.   Okay.
5        MS. FLETCHER:  I am go to ask to put up Exhibit 23
6   starting at line 718.  Scroll down until you see on the
7   left-hand side are some numbers.  Go down to where it says 718.
8   Page twenty.  If you could go 718 down the end of that page,
9   please.
10  BY MS. FLETCHER, CONTINUED:
11  Q.   Line 718 of Exhibit 23 is a message received from
12  fastfamily25 to your iPhone that says, start a really good role
13  play.  And then there is chat after that.  Could you read just
14  down to the end of that page?
15  A.   Me?
16  Q.   Just read it to yourself?
17  A.   Right.
18  Q.   Tell me if you recall this role play?
19  A.   Yes, I recall that.
20  Q.   Is this the type of thing you were talking about when you
21  talk about role play?
22  A.   Yes.
23  Q.   Were pictures of A.T. ever involved in role play?
24  A.   No.
25  Q.   Was any child actually involved in your role play?

676

MACKENZIE BAILEY - Redirect by Ms. Fletcher

1   A.   No.
2   Q.   So when pictures of A.T. are taken, is that actual abuse
3   that's going on?
4   A.   Yes.
5   Q.   And the actual abuse, does that involve the defendant
6   asking you for pictures?
7   A.   Yes.
8        MS. FLETCHER:  If we could go to page twenty-seven
9   please.
10  BY MS. FLETCHER, CONTINUED:
11  Q.   The top of page twenty-seven, this is a chat that we have
12  already read in.  It says okay, keep going.  And then at
13  12:25:15 a.m., it says show me, and you send a picture?  Was
14  that role play?
15  A.   I don't remember.
16       MS. FLETCHER:  Well, let's put up 23C.7.
17       THE COURT:  Haven't we been over this?  This is
18  already part of the evidence.  This is re-direct.  If you have
19  got something, continue on, or else we are going to shut this
20  down.
21  BY MS. FLETCHER, CONTINUED:
22  Q.   Stacey is asking you to show him a picture of A.T., is
23  that role play or is that abuse?
24       MS. BIANCO:  Your Honor, asked and answered.
25       THE COURT:  Sustained.

677

MACKENZIE BAILEY - Redirect by Ms. Fletcher

1        MS. FLETCHER:  I have nothing further.
2        THE COURT:  Any recross?
3        MS. BIANCO:  No, Your Honor.
4        THE COURT:  All right.  Members of the jury, we are
5   now going to be excused until Friday at 9:30.  Have a good
6   extra day.  You probably would like to have an extra day here.
7   And we will see you at 9:30 to start.  Come in a little early
8   for some coffee.
9        As I said, I am sure you won't take me up on it.
10  You probably don't want to come back here tomorrow to see the
11  naturalization ceremony, but it is open to the public, and you
12  would be welcome, but I don't expect to see you here.  But we
13  will see you.
14       And again, I emphasize this more and more always as
15  we go.  Do not discuss the case with anyone else or among
16  yourselves or until sometime next week when you will all be
17  together to make an important decision on this matter.  So
18  until then, you just -- again, as I said before, just tell
19  people that you are on the middle of a federal trial.  And if
20  there should be, I don't think so, because we are sort of under
21  the radar screen here.  We don't get in the papers very often
22  even though the OD is right next door.  So if there is anything
23  on TV or anything on the radio or anything else, turn it off.
24  Don't pay any attention to it.  They won't know anywhere near
25  as much as you do about the case.

G.A. 116

678

MACKENZIE BAILEY - Redirect by Ms. Fletcher

1          As I said earlier, don't go on social media.  You
2  heard a lot of testimony here today about social media, the
3  Internet.  Don't go on anything like that to try to get any
4  information.  You have obligations, you have taken an oath.
5  You are going to decide the case based on what you hear and the
6  evidence and the exhibits here in this courtroom.  That's the
7  way it works.  That is the way you get justice.  That's what
8  you are going to be doing here is doing justice.
9          So I thank you very much for your service.  We will
10  see you at 9:30 on Friday.  Have a good day.
11          COURT CLERK:  Court stands adjourned.
12
13          (Whereupon, the proceedings held on June 14, 2017,
14          were ended at 5:20 p.m..)
15
16
17
18
19
20
21
22
23
24
25

UNITED STATES  DISTRICT COURT

NORTHERN DISTRICT OF NEW YORK
*************************************************
UNITED STATES OF AMERICA,

vs.                    16-CR-320

STACEY J. LAPORTE, JR.,

                       Defendants
*************************************************

          Transcript of a Jury Trial held on June 16, 2017,
before the HONORABLE DAVID N. HURD, at the United States
Federal Courthouse, 10 Broad Street, Utica, New York,
stenographically recorded by Nancy L. Freddoso, Registered
Professional Reporter.

          A P P E A R A N C E S

Government:    UNITED STATES ATTORNEY'S OFFICE
               ROOM 900, HANLEY FEDERAL BLDG.
               100 SOUTH CLINTON STREET
               SYRACUSE, NEW YORK  13261-7198
          BY:  LISA M. FLETCHER, AUSA
               SAHAR L. AMANDOLARE, AUSA

Defendant:     FEDERAL PUBLIC DEFENDER'S OFFICE
               4 CLINTON SQUARE
               SYRACUSE, NEW YORK 13202
          BY:  RANDI J. BIANCO, AFPD
               MARTIN P. WOLFSON, AFPD

               NANCY L. FREDDOSO, R.P.R.
          Official United States Court Reporter
               10 Broad Street, Room 316
                 Utica, New York 13501
                   (315) 793-8114

681

I N D E X   O F   P R O C E E D I N G S

1   WITNESS                                      PAGE
2  JEAN MERRIAM
3    Direct Examination By Ms. Fletcher:         683
4    Cross-Examination By Ms. Bianco:            697
5    Redirect Examination By Ms. Fletcher:       717
6  J.M.
7    Direct Examination By Ms. Fletcher:         719
8    Cross-Examination By Ms. Bianco:            727
9    Redirect Examination By Ms. Fletcher:       746
10   Recross Examination By Ms. Bianco:          748
11  C.F.
12   Direct Examination By Ms. Amandolare:       749
13   Cross-Examination By Ms. Bianco:            778
14   Redirect Examination By Ms. Amandolare:     802
15  HILLARY TRIMM
16   Direct Examination By Ms. Fletcher:         806
17   Cross-Examination By Ms. Bianco:            853
18   Redirect Examination By Ms. Fletcher:       888
19   Recross Examination By Ms. Bianco:          892
20
21
22
23
24
25

682

I N D E X   O F   E X H I B I T S

1   EXHIBIT                                      PAGE
2  Government's Exhibit 26                        757
3  Government's Exhibit 36                        759
4  Defendant's Exhibit 8                          784
5  Government's Exhibit 29                        841
6  Government's Exhibit 38                        846
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

683

```
 1                (WHEREUPON, the proceedings held on June 16, 2017,
 2           were commenced at 9:30 a.m..)
 3                (Whereupon, the proceedings were held in open court
 4           out of the presence of the Jury.)
 5
 6           THE COURT:  Members of the jury, welcome back.  I am
 7   kind of sorry to bring you here on this beautiful, bright,
 8   sunny day, but we will put up with it.  We appreciate your
 9   being here.  There were a lot of smiles in the courtroom
10   yesterday as we went through the Naturalization Ceremony, and
11   it was very inspiring in many ways.
12                We will now continue with the case, and the
13   government will call its next witness.
14           MS. FLETCHER:  Thank you, Judge.  United States
15   calls Jean Merriam.
16
17           JEAN MERRIAM, having been called as a Witness, being
18   first duly sworn, was examined and testified as follows under
19   oath:
20
21   DIRECT EXAMINATION BY MS. FLETCHER:
22   Q.   Jean, where do you live?
23   A.   I live in Massena, New York.
24   Q.   How long have you been in Massena, New York?
25   A.   Since the summer of 2015, approximately June.
```

684

JEAN MERRIAM - Direct By Ms. Fletcher

```
 1   Q.   Where did you live before you moved to Massena?
 2   A.   Brasher Falls, New York.
 3   Q.   Where is Brasher Falls in relation to Massena?
 4   A.   It is about ten minutes from Massena, St. Lawrence
 5   County, same county.
 6   Q.   Are they different school districts?
 7   A.   Yes, they are.
 8   Q.   Why did you move?
 9   A.   It was easier.  I am disabled, so it was more convenient
10   having everything right there around me.
11   Q.   Massena has more services and resources?
12   A.   Yes.
13   Q.   Jean, are you married?
14   A.   I am.
15   Q.   Do you have children?
16   A.   Yes.
17   Q.   How many children do you have?
18   A.   Altogether I have six.
19   Q.   What do you mean altogether?
20   A.   I have three with my husband and three from my previous.
21   Q.   Who are your children and how old are they?
22   A.   Michelle Fortier.  She is twenty.  I have Coco Fortier.
23   She is nineteen.  C.F., she is seventeen; Kayla Merriam, she is
24   sixteen; Samuel Merriam, fifteen; and J.M., he is thirteen.
25   Q.   Which of those children were living with you in Massena
```

685

JEAN MERRIAM - Direct By Ms. Fletcher

```
 1   during the school year 2015 to 2016?
 2   A.   J.M., Kayla Merriam, Samuel Merriam, and C.F..
 3   Q.   Were Michelle and Coco --
 4   A.   They are adults.  They were grown and graduated.
 5   Q.   Where did C.F., Kayla, Sam, and J.M. go to school during
 6   the 2015 to 2016 school year?
 7   A.   Massena High.
 8   Q.   Was J.M. in high school?
 9   A.   He was not in high school.  Sammy and J.M. were in JW
10   Leary, and C.F. and Kayla were in Massena High.
11   Q.   Is JW Leary a middle school?
12   A.   It is a middle school.
13   Q.   What grade was C.F. in that year?
14   A.   She was in eleventh grade.
15   Q.   What grade was J.M. in that year?
16   A.   He was in seventh.
17   Q.   How old were they during that school year?
18   A.   J.M. was twelve and C.F. was sixteen, fifteen going on
19   sixteen.  She had just turned sixteen.
20   Q.   What is her birthday?
21   A.   August 23rd.
22   Q.   So she had just turned sixteen?
23   A.   Yes, as school started.
24   Q.   When is J.M.'s date of birth?
25   A.   November 20th, 2003.
```

686

JEAN MERRIAM - Direct By Ms. Fletcher

```
 1   Q.   Did J.M. adjust well to the move from Brasher Falls?
 2   A.   No, he did not.  J.M. has sensory integration.  He
 3   started Head Start in Brasher, and he went right up 'til the
 4   end of sixth grade in Brasher which worked well with us, so we
 5   never had an issue with him with the changes that we did when
 6   we moved to Massena.
 7   Q.   What happened when you moved to Massena?
 8   A.   It was a very big change for him.  He did not adjust to
 9   the school system.  He did not make friends.  He was a loner.
10   He had his siblings.  He kind of pulled back.
11   Q.   Did you have him tested for any type of learning
12   disability or autism?
13   A.   We did submit some papers to have him tested further.
14   The school denied it the first time.  Massena Mental Health
15   wrote a letter, and he was re-tested and that's where he got
16   his IEP.
17   Q.   An IEP?
18   A.   IEP.
19   Q.   What is that?
20   A.   It is for special education, but he didn't get it for
21   learning disability.  He got it for other reasons.  He got it
22   for -- which was just recently, and that was because of a lot
23   of stuff that he was -- going on with this case and what
24   happened to him.
25   Q.   Did he have some emotional issues then?
```

687

JEAN MERRIAM - Direct By Ms. Fletcher

1   A.   He has emotional.  He has got a lot of diagnoses.  He is
2   emotional.  He has got post-traumatic stress disorder.  He has
3   got severe depression.  He is ADHD.  He has got sensory
4   integration.
5   Q.   How about C.F., did she make friends at the new school
6   when you moved to Massena?
7   A.   She made one friend, which I was kind of excited because
8   we were in a new school system.  Her name was B.L..
9   Q.   Did there come a time when C.F. asked if she could go to
10  B.L.'s house?
11  A.   Yes.
12  Q.   About when was that?
13  A.   That was around November.
14  Q.   Of 2015?
15  A.   Sorry, 2015, yes.
16  Q.   Did you allow it?
17  A.   I did.
18  Q.   Did she go on weekdays or weekends?
19  A.   Weekends.
20  Q.   And did you know anything about B.L.?
21  A.   I did not.
22  Q.   Did you know whether she had parents?
23  A.   I did not.
24  Q.   Did you know who she lived with or what her living
25  situation was?

688

JEAN MERRIAM - Direct By Ms. Fletcher

1   A.   I did not.
2   Q.   Had you met B.L.'s brother?
3   A.   I did not at that time.
4   Q.   Was there a time that you did?
5   A.   There was one time towards the end, he walked C.F. home.
6   That was the only one time I met him.
7   Q.   Did you know what C.F. was doing at B.L.'s house when she
8   first started going over in November?
9   A.   As far as I know she was just hanging out with B.L..
10  Q.   Did there come a time that you learned that J.M. was
11  going over to B.L.'s house also?
12  A.   Yes, with his sister, C.F..
13  Q.   Do you know when that started?
14  A.   It was later.  Probably the end -- beginning of the next
15  year, December, January probably.
16  Q.   Did he ask permission to go over there?
17  A.   He did with C.F..
18  Q.   Did you allow that?
19  A.   I did.  It was his sister.
20  Q.   As far as you knew, did he go with C.F.?
21  A.   He went with C.F..
22  Q.   What about Kayla and Sam?
23  A.   They went over approximately, I believe, one time.  That
24  was it.
25  Q.   Do you know how often J.M. was going over?

689

JEAN MERRIAM - Direct By Ms. Fletcher

1   A.   As far as I know he went over a few times with C.F..  I
2   later learned they were going to the library.  I did never
3   check on them at B.L.'s house and that's bad on my part, but I
4   would check on them at the library.  They weren't at the
5   library.  And later I found out they were over with C.F. at
6   B.L.'s house.
7   Q.   Do you know where B.L.'s house was in relation to the
8   library?
9   A.   I didn't at the time.  I do now.  It was right across the
10  road.
11  Q.   So in February of 2016, were J.M. and C.F. still sixteen
12  and twelve years old?
13  A.   J.M. just turned -- 2016, J.M. was thirteen, C.F.
14  sixteen.
15  Q.   Were they continuing to go to B.L.'s house in February of
16  2016?
17  A.   February, yes.
18  Q.   Were you aware that B.L. had run away from home in
19  January?
20  A.   No.
21  Q.   Did you know that C.F. and J.M. were continuing to go
22  over there after January of 2016?
23  A.   I knew they were there with B.L..
24  Q.   You thought B.L. --
25  A.   I thought B.L. was there, yes.

690

JEAN MERRIAM - Direct By Ms. Fletcher

1   Q.   Did C.F. or J.M., either one of them ever come home
2   appearing to be drunk or smelling like alcohol?
3   A.   No.
4   Q.   Did they ever come home smelling like cigarettes?
5   A.   Yes.
6   Q.   Did J.M. smoke?
7   A.   He didn't before this, but I did start smelling
8   cigarettes on him.  I even called his pediatrician and made an
9   appointment.
10  Q.   Why?
11  A.   Because he is a minor and smoking.
12  Q.   What about C.F.?
13  A.   C.F. did start smoking at this time too, and I did talk
14  to her.  She was sixteen, and I asked her to stop.
15  Q.   Did there come a time in March of 2016 that you found out
16  that C.F. had been tattooed?
17  A.   Yes, it was actually March 5th.  My son, Samuel, came to
18  me -- or sorry, my son, J.M. came to me and told me that C.F.
19  had a tattoo, but did tell me no more information on the
20  tattoo.  So I had to talk to C.F. on the phone about it.
21  Q.   Was she home when you found out?
22  A.   C.F. was not home.
23  Q.   Do you know where she was?
24  A.   She was where I thought B.L. was.
25  Q.   So how did you reach C.F.?

691

JEAN MERRIAM - Direct By Ms. Fletcher

1   A.   The number I had in my phone was under B.L.'s number, so
2   I believe it was Mackenzie's number though later.
3   Q.   Did you call or text?
4   A.   I think -- I believe I called.  I might have texted to
5   have her call me, but I believe I called her.
6   Q.   Did you speak with C.F.?
7   A.   I did speak with C.F..
8   Q.   Did she come home that night?
9   A.   She did not.  It was late and C.F. did not tell me who
10   gave her the tattoo.  It was late at night, and I told her to
11   stay there for the night.
12   Q.   What happened the next day?
13   A.   The next morning, my older son, Samuel, came to me and
14   told me that C.F. was having a sexual relation with Stacey and
15   Mackenzie.  And I had immediately texted C.F. to come home.
16   Q.   What number did you text asking for C.F. to come home?
17   A.   I had it in my phone as B.L..
18   Q.   Did she come home?
19   A.   She did come home.
20   Q.   Did you receive another text?
21   A.   I did receive another text, yes.
22       MS. FLETCHER:  I am going to ask to put up
23   Exhibit 17, please.
24   BY MS. FLETCHER, CONTINUED:
25   Q.   If you look on your screen, do you recall these text

---

692

JEAN MERRIAM - Direct By Ms. Fletcher

1   messages?
2   A.   Yes, I do.
3   Q.   The first one says:  I want C.F. home. Is that the text
4   you sent?
5   A.   That is the one I sent.
6   Q.   After you found out that C.F. was having sex with Stacey
7   and Mackenzie?
8   A.   Yes.
9   Q.   And the response was okay?
10   A.   Yes.
11   Q.   The next text that you received says, hey, it is Stacey.
12   Can I call and talk to you.  It is important.  Do you remember
13   getting that?
14   A.   Yes, I do.
15   Q.   And did you respond to him?
16   A.   I did.
17   Q.   Is that what is depicted in this exhibit?
18   A.   It is.
19   Q.   And you tell him:  You know she is sixteen, right?
20   A.   Yes, I did.
21   Q.   Did you have any conversation with Stacey LaPorte that
22   day?
23   A.   I did on the phone after.
24   Q.   After these text messages?
25   A.   Yes.

693

JEAN MERRIAM - Direct By Ms. Fletcher

1   Q.   Could you tell the jury about that?
2   A.   Yes.  When I had finally called him back to find out what
3   he wanted because he kept calling my phone, the first thing out
4   of his -- he said I thought she was seventeen.  He kept saying
5   it over and over and over, and I just want the best interest of
6   C.F., her schooling, and I thought she was seventeen.  And he
7   just kept stressing he thought she was seventeen.  I said she
8   is sixteen.
9   Q.   And what happened after that?
10   A.   He also had said:  This is going to look great on me with
11   my other case.  I was like what other case?  He said my sister
12   B.L.'s case that was unfounded.
13   Q.   Did you know what he was talking about?
14   A.   I did not know what he was talking about.
15   Q.   What did you do that day after -- with all this going on with
16   the phone calls and now getting this information?
17   A.   C.F. was not open at first with me.  We also had a big
18   family dinner that night.  So I waited for C.F. to be ready to
19   talk to me because I wanted it to be the truth and from C.F..
20   Once C.F. told me everything, I told her to get ready because
21   I was taking her to the hospital.
22   Q.   Why did you want to take her to the hospital?
23   A.   For a rape kit.
24   Q.   Did you take her to the hospital?
25   A.   I did.

---

694

JEAN MERRIAM - Direct By Ms. Fletcher

1   Q.   Had she showered before going to the hospital.
2   A.   She showered and washed her clothes.
3   Q.   What happened when you got to the hospital?
4   A.   We were brought into a room to do a rape kit.
5   Investigator Olson met us up there.  He stayed with C.F..  I
6   went to police station with another officer and did a report.
7   Q.   Did there come a time after this in October of 2016 that
8   J.M. was interviewed at the New York State Police barracks in
9   Massena by Investigator Baillargeon?
10   A.   Yes.
11   Q.   Were you there that day as well?
12   A.   Yes.
13   Q.   Did Investigator Baillargeon show you two images that
14   day?
15   A.   Yes.
16   Q.   Did you recognize those images?
17   A.   I did.
18       MS. FLETCHER:  I am going to ask to put up 16A.
19   Take that down.
20   BY MS. FLETCHER, CONTINUED:
21   Q.   Did you see that picture with Investigator Baillargeon?
22   A.   I did.
23   Q.   Did you recognize the people in that image?
24   A.   I did.
25   Q.   Who are they?

695

JEAN MERRIAM - Direct By Ms. Fletcher

1    A.    My son and my daughter, J.M. and C.F..

2    Q.    How were you able to recognize them in that image?

3    A.    J.M. had to be recircumcised and C.F.'s nails.

4    Q.    What do you mean J.M. had to be recircumcised?

5    A.    J.M. was circumcised wrong as a baby and he was just

6    recircumcised last year.

7    Q.    Somewhat before this picture was taken?

8    A.    Yes.

9    Q.    Did you have to help care for the wound?

10   A.    I did.

11   Q.    And you recognize his body in that picture?

12   A.    I do.

13           MS. FLETCHER:  Show her 16B please.  Take that down.

14   BY MS. FLETCHER, CONTINUED:

15   Q.    Did you recognize that?

16   A.    I do.

17   Q.    Who are they?

18   A.    It is my daughter and my son.

19   Q.    Are those the images that Investigator Baillargeon showed

20   you that day?

21   A.    They are.

22   Q.    There is a pair of green shorts in Exhibit 16A, that

23   picture, did you recognize those shorts?

24   A.    I found those in my house.

25   Q.    Had you purchased shorts like that?

696

JEAN MERRIAM - Direct By Ms. Fletcher

1    A.    Never.

2    Q.    How did you find them in your house?

3    A.    They were in between J.M.'s mattress and his box spring

4    like he was hiding them.

5    Q.    Did you find them and turn them into the police?

6    A.    I did.

7    Q.    I am going to show you Government Exhibit 25.  Do you

8    recognize what is in that exhibit?

9    A.    These are the shorts I found.  These are the shorts I

10   found between J.M.'s mattress and box spring in the middle.

11   Q.    Did you turn those into the police?

12   A.    I did.

13   Q.    Jean, where does C.F. live now?

14   A.    She lives in Massachusetts, in Gardner, Massachusetts

15   with my sister, Erin.

16   Q.    When did she move to Massachusetts?

17   A.    I believe towards the end of the year.

18   Q.    Of which year, 2016?

19   A.    2016.

20   Q.    And why did she move?

21   A.    She moved because both of my kids went through this

22   trauma together as C.F. was -- had to sexually assault my son,

23   J.M., which they are brother and sister.  It was very traumatic

24   for both of them, and they both needed time to heal.

25   Q.    They needed time away from each other?

697

JEAN MERRIAM - Direct By Ms. Fletcher

1    A.    They did.

2    Q.    Where does J.M. live?

3    A.    J.M. right now is in Jefferson County Boys Home.

4    Q.    Why is he in a boys home?

5    A.    Because he has not recovered, and he is not healing.

6    J.M.'s mental status is not there.  He is very traumatized.  He

7    can't function.  You can't even touch him.  I can't even touch

8    his back without him freaking out.  He couldn't sleep.  He felt

9    like if I went to bed, I wouldn't protect him.

10   Q.    Was he going to school after this happened?

11   A.    No, he doesn't go to school.  He can't be around people.

12   Q.    Did he go to school before this happened?

13   A.    He did.

14           MS. FLETCHER:  I have no further questions.  Thank

15   you.

16           THE COURT:  Ms. Bianco, you may cross-examine.

17

18   CROSS-EXAMINATION BY MS. BIANCO:

19   Q.    Good morning, Ms. Merriam.

20   A.    Good morning.

21   Q.    If there is a question you don't understand, please tell

22   me, and I will be happy to rephrase, okay?

23   A.    Okay.

24   Q.    Now, obviously you have talked to C.F. about what

25   happened to her, correct?

698

JEAN MERRIAM - Cross by Ms. Bianco

1    A.    Yes.

2    Q.    And you talked to J.M. about what happened to him?

3    A.    Yes.

4    Q.    And you talked to them together initially, correct?

5    A.    No, not together.

6    Q.    You never spoke to them together about what happened?

7    A.    No, we never talked to them together.

8    Q.    But they were both living in the same house when this

9    happened, correct?

10   A.    Right.

11   Q.    And C.F. didn't move away, I think you said, until the

12   beginning of 2016?

13   A.    No, not the beginning.

14   Q.    Okay, when did she move away?

15   A.    The end.

16   Q.    So they lived in the same house for several months before

17   she moved away?

18   A.    Right.

19   Q.    Do you know if they had any conversations about what had

20   happened to them?

21   A.    They didn't.

22   Q.    They did not?

23   A.    Nope, that I am aware of.

24   Q.    Fair enough.  You moved to Massena you said in 2015,

25   June?

699

JEAN MERRIAM - Cross by Ms. Bianco

1   A.   Yes.
2   Q.   Okay, and C.F. began attending Massena High School in
3   September of 2015?
4   A.   Yes.
5   Q.   And she became friends with B.L. soon after she got to
6   the school in November of 2016?
7   A.   Right.
8   Q.   And at the end of 2015, that's when C.F. began asking you
9   if she could start going over to B.L.'s house; is that right?
10  A.   Correct.
11  Q.   And you agreed because you were happy she had a friend?
12  A.   Correct.
13  Q.   Now, as C.F.'s mother, I would imagine that you wanted to
14  keep track of where she was and what she was doing, is that
15  fair?
16  A.   That's fair.
17  Q.   And you wanted to know who she was hanging out with?
18  A.   Fair enough.
19  Q.   Okay, and you had asked her things about B.L., right?
20  A.   Yes.
21  Q.   Just because you were interested in finding out about her
22  new friend, right?
23  A.   Right.
24  Q.   And C.F. never told you that B.L.'s parents were
25  deceased?

700

JEAN MERRIAM - Cross by Ms. Bianco

1   A.   No.
2   Q.   Never told that you B.L.'s parents didn't live at the
3   house?
4   A.   No.
5   Q.   And that is something that you would have wanted to know
6   as a mother, correct?
7   A.   Yes.
8   Q.   Now, in January 2016, C.F. didn't tell you that B.L. had
9   moved out of that house; is that right?
10  A.   Yes.
11  Q.   And she kept telling you that she was going to B.L.'s
12  house; is that right?
13  A.   B.L.'s.
14  Q.   B.L.'s?
15  A.   Right.
16  Q.   And obviously you would not have let her go there if B.L.
17  wasn't living there, correct?
18  A.   Right, but she is child.  Why is she hanging out with
19  adults?
20  Q.   Exactly.  But she went to that house after school, lying
21  to you telling you that she was going to B.L.'s house?
22  A.   Correct.
23  Q.   As a mom, that wouldn't have happened had you known,
24  right?
25  A.   Correct.

701

JEAN MERRIAM - Cross by Ms. Bianco

1   Q.   Now, J.M. began going over to what you thought was B.L.'s
2   house also, right?
3   A.   Correct.
4   Q.   And J.M. didn't tell you that B.L. wasn't living there?
5   A.   No.
6   Q.   And at times, J.M. would tell you he was going to the
7   library?
8   A.   They both would, yes.
9   Q.   Oh, they both told you?
10  A.   Yes.
11  Q.   And as a mom, you were concerned so you went to check up
12  on them, right?
13  A.   Right.
14  Q.   And you found that they weren't at the library?
15  A.   Right.
16  Q.   And that they had lied to you, yes?
17       THE COURT:  Is that a yes?
18  A.   Yes.
19  BY MS. BIANCO, CONTINUED:
20  Q.   I want to talk to you about events of March 5, 2016,
21  okay?
22  A.   Okay.
23  Q.   You had a conversation with your son, J.M., after six
24  o'clock that night; is that right?
25  A.   Of March?

702

JEAN MERRIAM - Cross by Ms. Bianco

1   Q.   March 5th?
2   A.   Yes.
3   Q.   Okay, and when you talked to J.M., J.M. was telling you
4   that C.F. had a tattoo?
5   A.   Right.
6   Q.   And did he tell you that the tattoo said kinky?
7   A.   No, I didn't know what the tattoo was.
8   Q.   Okay.  But you got upset when you found out your
9   underaged daughter had a tattoo?
10  A.   Right.
11  Q.   Because you never gave C.F. any permission to get tattoo?
12  A.   Right.
13  Q.   As a concerned parent this is something you would want to
14  know?
15  A.   Right.
16  Q.   Would it be fair to say you were upset about learning
17  that information that she had a tattoo?
18  A.   I was upset.
19  Q.   And you immediately called your daughter, C.F., to find
20  out about this tattoo, right?
21  A.   I did.
22  Q.   And when you called her, you were upset?
23  A.   Yes.
24  Q.   And you confronted her on the phone whether she had a
25  tattoo?

703

JEAN MERRIAM - Cross by Ms. Bianco

1    A.   Yes.

2    Q.   And C.F. was whispering her answers; is that right?

3    A.   She whispered that she did have a tattoo.

4    Q.   But when she was first whispering, you didn't understand

5    what she was saying?

6    A.   Right.  I asked her three times.

7    Q.   Because you are concerned why she is not answering you,

8    correct?

9    A.   Correct.

10   Q.   And at this point, you are getting a little suspicious

11   that she is maybe lying to you?

12   A.   Right.

13   Q.   Then you asked her who gave you this tattoo, right?

14   A.   Right.

15   Q.   And she told you she couldn't tell you who gave it to

16   her?

17   A.   Right.

18   Q.   And obviously you are even more upset at this point?

19   A.   Right.

20   Q.   But you allowed C.F. to stay at what you thought was

21   B.L.'s house that night, yes?

22   A.   Right.

23   Q.   Because it was too late to come home?

24   A.   It was late.

25   Q.   How far does B.L. live from your house?

704

JEAN MERRIAM - Cross by Ms. Bianco

1    A.   It was probably a good fifteen minute walk.

2    Q.   And it is night time --

3    A.   It is night time, right.

4    Q.   Okay.  Let's talk about March 6, 2016, okay?

5    A.   Okay.

6    Q.   You spoke with your son, Sam; is that right?

7    A.   Samuel.

8    Q.   How old was Samuel at the time?

9    A.   At the time he was fifteen.

10   Q.   And Samuel told you that C.F. was having sex with Stacey

11   and Mackenzie; is that right?

12   A.   Yes.

13   Q.   And would it be fair to say that that upset you?

14   A.   Yes, I was very upset.

15   Q.   And would it be also fair to say you were angry?

16   A.   I was very angry.

17   Q.   So you immediately text C.F. telling her to come home,

18   right?

19   A.   I did.

20   Q.   Because you wanted to know what is this all about, right?

21   A.   Right.

22   Q.   You wouldn't give your daughter permission to be having

23   sex with these people?

24   A.   No.

25   Q.   Okay, and you got a text back from Mackenzie's phone.  I

705

JEAN MERRIAM - Cross by Ms. Bianco

1    believe we saw it on the screen, and it said okay; is that

2    right?

3    A.   Yes.

4    Q.   Okay, and you texted Stacey -- excuse me.  Stacey texted

5    you through that same phone, hey, it is Stacey.  Can I call and

6    talk to you?  It is important?

7    A.   Yes.

8    Q.   But you weren't ready to talk to Stacey?

9    A.   I was not.

10   Q.   He kept calling?

11   A.   Yes.

12   Q.   You texted Stacey to tell him I will call after I am done

13   talking to C.F.  You know she is sixteen, right?

14   A.   Yes.

15   Q.   But you didn't want to hear from him at that point, you

16   wanted to wait?

17   A.   I wanted to hear my daughter's side.

18   Q.   C.F. came home?

19   A.   Yes.

20   Q.   Was J.M. with her when she came home or she came home

21   alone?

22   A.   J.M. was already there, I believe, at the house.

23   Q.   Okay.  When C.F. came home, you are upset?

24   A.   Yes.

25   Q.   And you wanted to talk to her right away?

706

JEAN MERRIAM - Cross by Ms. Bianco

1    A.   I had talked to her and -- yes, I talked to her, and I

2    told her when she is ready, she needs to talk to me in private.

3    Q.   But she wasn't apparently ready to talk to you?

4    A.   Right.  She would not answer my questions at that time.

5    Q.   She went up to her room?

6    A.   She went to her room.

7    Q.   Is that upstairs?

8    A.   It is upstairs.

9    Q.   And you decided to give her some space?

10   A.   Yes.

11   Q.   Because she didn't want to tell you what was happening?

12   A.   At that time, no.

13   Q.   So at this point, would it be fair to say that you are

14   upset about the tattoo and the about the allegations of sex?

15   A.   Yes.

16   Q.   Okay, and this is something you would punish her for; is

17   that right?

18   A.   The tattoo, yes, yes.

19   Q.   Okay.  Well, when you asked C.F. specifically if she was

20   having sex with Stacey and Mackenzie, she said nothing and put

21   her head down; is that right?

22   A.   That's correct, at first.

23   Q.   Now, you talked to Stacey on the phone at approximately

24   12:46; is that right?

25   A.   Approximately, yes.

707

JEAN MERRIAM - Cross by Ms. Bianco

1  Q.  Okay, and you wanted to get to the bottom of this,
2  correct?
3  A.  I wanted the answers, yes.
4  Q.  Okay, and when you talked to Stacey, Stacey was polite?
5  A.  He wasn't rude if that's what you are asking.
6  Q.  Yes, yes.  So he wasn't rude?
7  A.  Correct.
8  Q.  And you asked Stacey questions about how old Stacey
9  thought C.F. was; is that right?
10  A.  Because he knew, I had just told him she was sixteen.  He
11  keeps repeating himself that he thought she was seventeen.
12  Q.  But you asked him specifically how old do you think she
13  was?
14  A.  Right, because he keeps repeating that she is seventeen.
15  Q.  Okay, and you told Stacey that she shouldn't be getting a
16  tattoo without your permission; is that right?
17  A.  Correct.
18  Q.  And Stacey again tells you he thought she was older?
19  A.  Seventeen is what he said.
20  Q.  And he was apologetic about the tattoo?
21  A.  Yes, because at this time I know he gave her the tattoo.
22  Q.  Okay.  So he is saying he is sorry.  He thought she was
23  older?
24  A.  No, I don't think he apologized to me.  I don't recall
25  that, but he kept saying she is seventeen.  I said, no, she is

708

JEAN MERRIAM - Cross by Ms. Bianco

1  sixteen.
2  Q.  And he said he cared about C.F.?
3  A.  Yes.
4  Q.  And he cared about her schooling?
5  A.  Yes.
6  Q.  And what was best for her?
7  A.  Yes.
8  Q.  You had heard a female in the background during this
9  telephone conversation yelling sorry; is that right?
10  A.  I did.  I asked what that was.  He said it was Mackenzie
11  saying sorry.
12  Q.  Okay.  Now, after this phonecall with Stacey, you had a
13  bunch of family members over.
14  A.  I had a family dinner that night.
15  Q.  And at this point, C.F., she is still upstairs, you are
16  giving her some space?
17  A.  Right.  My family was there about noontime.
18  Q.  And you let C.F. stay in her room until the company was
19  gone?
20  A.  Yes.
21  Q.  But during the course of the time the company was there,
22  you had C.F. talk to her father on the phone about the tattoo;
23  is that right, do you remember that?
24  A.  Her step father, yes.
25  Q.  Her step father?

709

JEAN MERRIAM - Cross by Ms. Bianco

1  A.  Yes.
2  Q.  Is that your current husband?
3  A.  Yes.
4  Q.  And she considers him like a dad?
5  A.  Correct.
6  Q.  And when she talked to him on the phone in your presence?
7  A.  It could have been.  I was with my family as well having
8  dinner.
9  Q.  And you instructed C.F. you have to tell your father
10  about this tattoo?
11  A.  Oh, yes, I did.  I was not going to tell him.  She had to
12  tell him.
13  Q.  Because you wanted her to be responsible?
14  A.  Right.
15  Q.  Okay.  So she told him about the tattoo, correct?
16  A.  Correct.
17  Q.  And she was very nervous about telling him about the
18  tattoo?
19  A.  I am sure she was.
20  Q.  And he hung up on her, didn't he?
21  A.  No, that's not how it went.  He said to her -- he was
22  upset, and he says once I calm down, I will call you back and
23  then he hung up the phone.
24  Q.  But it was clear --
25  A.  He was upset.  Any parent would be.

710

JEAN MERRIAM - Cross by Ms. Bianco

1  Q.  Sure.  And you are still upset at this point?
2  A.  At the phonecall, yes.
3  Q.  With the tattoo, the whole thing?
4  A.  I am upset, yes.  These are my children, yes.
5  Q.  Absolutely.  Now, you spoke to C.F. between seven and
6  7:15 p.m.?
7  A.  Correct.
8  Q.  And this is several hours after she had come home?
9  A.  When she texted that she was ready to talk, my family was
10  just getting ready to leave, and we talked.
11  Q.  Fair to say you are still upset at this point?
12  A.  I am upset, yes.
13  Q.  You specifically asked C.F. how old she told Stacey she
14  was, you asked that question, correct?
15  A.  I did.
16  Q.  And C.F. first told you that she told Stacey she was
17  seventeen; is that right?
18  A.  She did, and she repeated herself several times which
19  C.F. never does, so I knew that she was not telling me the
20  truth at this time.
21  Q.  And this is your daughter so you know when she is lying?
22  A.  I know when she is telling me the truth.  C.F. never
23  repeats herself.
24  Q.  And C.F. has lied to you in the past and you have caught
25  her?

G.A. 124

711

JEAN MERRIAM - Cross by Ms. Bianco

1   A.   Yes, she is a teenager, she is a kid.

2   Q.   Teenagers, they lie?

3   A.   Yes.

4   Q.   Now, you asked her specifically if she was having sex

5   with Stacey, yes?

6   A.   I asked if she was having sex with Stacey and Mackenzie,

7   and she said yes.

8   Q.   Okay, and that made you upset?

9   A.   Yes, it did.

10  Q.   And you let C.F. know in no uncertain terms that this was

11  absolutely unacceptable, right?

12  A.   Well, she is a child, yes.

13  Q.   That you didn't approve?

14  A.   I did not approve of a child having sex with an adult,

15  yes.

16  Q.   Absolutely, and you are telling her how upset you are

17  with her about her decision making?

18  A.   Actually I am not telling her I am upset.  I am telling

19  her to get ready because I am taking her to the hospital at

20  this time for a rape kit.

21  Q.   She did not tell you at this point in time that she was

22  raped?

23  A.   It don't matter.  I know the law.  She is a minor.  I am

24  going for statutory rape.  I am the parent.

25  Q.   After you told her that you are taking her for this rape

712

JEAN MERRIAM - Cross by Ms. Bianco

1   kit, she told you that Stacey got her drunk first, right?

2   A.   That could have happened in the car on the way up to the

3   hospital that she was drinking there, and partying there.  I

4   asked if there was any drugs involved.  She denied any drugs,

5   but said there was alcohol, cigarettes, games, so...

6   Q.   And she also tried to make an excuse about why she kept

7   going back to Stacey's house; is that right?

8   A.   An excuse for what?

9   Q.   She said that after the first time they had sex Stacey

10  threatened to beat her up if she --

11  A.   She did tell me that he threatened our whole family she

12  said.

13  Q.   The whole family that if she broke up with him --

14  A.   That he would get people after her.

15  Q.   And that was after or on your way to the hospital?

16  A.   I believe she told me that as we were sitting in my room

17  talking because I asked her why she went back.

18  Q.   Because she kept going back?

19  A.   She said she was scared for her life and her family's

20  life.

21  Q.   Okay.  The police transported -- or you drove C.F. to the

22  hospital or did the police drive her?

23  A.   I did, and I had the hospital call the police when I got

24  up there.

25  Q.   Your idea to call the police?

713

JEAN MERRIAM - Cross by Ms. Bianco

1   A.   Yes.

2   Q.   And the police had transported you to the station?

3   A.   Investigator Olson stayed with C.F. at the hospital, and

4   I was transported or to Massena Police Department to do a

5   statement.

6   Q.   Okay.  Now, on March 6th, did -- C.F. never told you

7   anything about having sexual contact with her brother, J.M.; is

8   that right?

9   A.   That is correct.

10  Q.   And on March 8th, you called the police to report that

11  you had some more information, right?

12  A.   On what date?

13  Q.   March 8th, two days later?

14  A.   Possibly.

15  Q.   You did make subsequent calls after the 6th --

16  A.   I did keep up with this whole case, yes, I did.

17  Q.   Because you were concerned?

18  A.   Yes, because I wanted to know where this case was going.

19  These are my children.  At that time it was just her.  She is

20  my child.

21  Q.   Any time you had information you called the police, right

22  away you reported it?

23  A.   I reported it.

24  Q.   And when you called the police, you told them that you

25  had spoken with your son, J.M., correct?

714

JEAN MERRIAM - Cross by Ms. Bianco

1   A.   That was not on March 8th.

2   Q.   It wasn't on March 8th?

3   A.   That was later.

4   Q.   Later --

5   A.   That was in like November, towards the end of the year,

6   and he told his father I believe it was.  It was not two days

7   after C.F. was there.  It was later, later.

8   Q.   You didn't speak to an Investigator Wilson on March --

9   A.   Olson?  That's who I did my statement with.

10  Q.   Okay, but on March 8th, you didn't speak to him again to

11  report that you had more information involving the case?

12  A.   Not about J.M..

13  Q.   You didn't say that your twelve year old son J.M. advised

14  you that he goes over to Stacey's and Stacey gave him alcohol?

15  A.   Oh, for alcohol, not for J.M.'s case and the whole thing.

16  Yes, for alcohol, for cigarettes, yes.

17  Q.   So on the 8th you did report --

18  A.   I did.  He is twelve year old and he is being fed

19  alcohol.

20  Q.   Now, when you called the police on March 8th, that was

21  after J.M. told you about the alcohol and cigarettes, right?

22  A.   Correct.

23  Q.   And J.M. didn't say anything to you at that time about

24  having any sexual contact with his sister?

25  A.   He did not.

715

JEAN MERRIAM - Cross by Ms. Bianco

1   Q.   No?
2   A.   No.
3   Q.   And at that point, March 8th, you did not know about J.M.
4   or C.F. having sexual contact with each other, correct?
5   A.   No, I did not.
6   Q.   Because neither one of them had reported that to you?
7   A.   Correct.
8   Q.   On March 9th, did you call the police again to tell them
9   again that C.F. and Stacey had been communicating through a
10  service called Text Now?
11  A.   That was another app they were using.  I wanted to make
12  sure they knew all the apps so they can block any messages they
13  needed.
14  Q.   And you gave the police C.F.'s log-in information?
15  A.   I did.
16  Q.   And her password?
17  A.   Yes.
18  Q.   And by March 9th, C.F. still had not said anything to you
19  about having sexual contact with J.M.?
20  A.   No.
21  Q.   And J.M. had not said anything to you?
22  A.   No.
23  Q.   Now, you brought J.M. to the police station on March 9th
24  so they could speak with him; is that right?
25  A.   Correct.

716

JEAN MERRIAM - Cross by Ms. Bianco

1   Q.   And at the conclusion of J.M.'s meeting with the police,
2   he had still not said anything about the sexual contact that he
3   had with C.F.?
4   A.   Correct.
5   Q.   He didn't say anything about Stacey forcing him to take
6   his clothes off?
7   A.   No.
8   Q.   And he said nothing to you about any photographs being
9   taken?
10  A.   No.
11  Q.   And he said nothing to the police on March 9th about any
12  inappropriate photographs being taken?
13  A.   No.
14  Q.   And I believe you said that you weren't sure how many
15  times J.M. went to Stacey's house correct?
16  A.   Correct, he was with C.F. when he went.
17  Q.   On one of those occasions, were you advised by C.F. that
18  J.M. had stolen some property from Stacey's house?
19  A.   That was the day I believe I met Stacey.  There was some
20  rings missing.  J.M. did not have them.
21  Q.   Okay.  So J.M. did not steal the rings?
22  A.   There was no rings in my house.
23  Q.   Did C.F. report to you that J.M. had stolen some rings?
24  A.   No, she said there were rings missing, and they were
25  assuming J.M. took them.

717

JEAN MERRIAM - Cross by Ms. Bianco

1   Q.   And that was Stacey's dead mother's ring?
2   A.   That was Stacey's deceased mother's.
3   Q.   And you found this out from C.F., not from J.M., about
4   the missing rings?
5   A.   It was C.F. and Stacey both.  I believe I heard Stacey in
6   the background.
7   Q.   And at this point you said you met Stacey?
8   A.   Yes, that's the day I met Stacey when he walked over to
9   my house.
10  Q.   Okay, and Stacey came over to ask about these rings?
11  A.   Rings, which I told him I did not have.  They were not in
12  my house.
13  Q.   But Stacey told you he didn't want J.M. coming over any
14  more; is that right?
15  A.   I don't recall honestly.
16  Q.   Fair enough.  Thank you so much for your time.
17            THE COURT:  Redirect, if any.
18
19  REDIRECT EXAMINATION BY MS. FLETCHER:
20  Q.   Jean, during the phonecall you testified to on
21  cross-examination where you said C.F. was whispering, telling
22  you she couldn't tell you who gave her the tattoo?
23  A.   Yes.
24  Q.   Was she at Stacey's house when you were having that
25  conversation?

718

JEAN MERRIAM - Redirect by Ms. Fletcher

1   A.   She was at Stacey's house.
2   Q.   She was whispering and saying she couldn't tell you?
3   A.   She was whispering.
4   Q.   And when she came home and you were finally able to speak
5   with her, she was ready to talk about what had happened with
6   Stacey and Mackenzie in the sexual conduct, you mentioned that
7   she at first told you that she said she had told them she was
8   seventeen?
9   A.   Correct.
10  Q.   Could you explain that conversation to the members of the
11  jury, please?
12  A.   Yes, I had talked to -- Stacey was making it clear to me
13  that C.F. said she was seventeen, and I was making it clear to
14  Stacey that she was sixteen.  So when I spoke to C.F., I said
15  C.F., how old did you tell Stacey you were.  She was like, um,
16  um, I told them I was seventeen.  And then she paused, and she
17  went, um, I told them I was seventeen.  I am like C.F..  She is
18  like I told him I was seventeen.  She did it one more time.  I
19  said C.F., I was like you are not telling me the truth.  I said
20  I need the full truth to help you in this.  So when you are
21  ready to talk to me and be honest, please come to me and tell
22  me you are ready to talk to me.
23  Q.   Did she?
24  A.   She did, and she said Stacey told me to tell you I was
25  seventeen so he would not get in trouble.

719

JEAN MERRIAM - Redirect by Ms. Fletcher

1          MS. FLETCHER:  Thank you.  I have no further

2   questions.

3          THE COURT:  Recross, if any?

4          MS. BIANCO:  None.  Thank you.

5          THE COURT:  Thank you.  You may step down.  Thank

6   you.

7          (Whereupon, the Witness is excused.)

8          THE COURT:  Next witness for the government.

9          MS. FLETCHER:  United States calls J.M..

10

11         J.M. having been called as a Witness, being first duly

12  sworn, was examined and testified as follows under oath:

13

14  DIRECT EXAMINATION BY MS. FLETCHER:

15  Q.   J.M., how old are you?

16  A.   I am thirteen years old.

17  Q.   What is your birthday?

18  A.   11/20 2003.

19  Q.   J.M., who is your mom?

20  A.   Jean Merriam.

21  Q.   Do you have a sister named C.F.?

22  A.   Yes.

23  Q.   Do you know the defendant in this case, Stacey LaPorte?

24  A.   Yes.

25  Q.   How do you know him?

720

J.M. - Direct By Ms. Fletcher

1   A.   I went over to his house a couple of times.

2   Q.   How old were you when you went over to Stacey's house?

3   A.   Eleven or twelve.

4   Q.   Do you see him in the courtroom today?

5   A.   Yes.

6   Q.   Can you tell the jury who he is?

7   A.   I am pretty sure right there.

8   Q.   What is he wearing?

9   A.   I don't know, regular clothing.

10  Q.   What color?

11  A.   Tan.

12         MS. FLETCHER:  Judge, may the record reflect he has

13  identified the defendant.

14         THE COURT:  So noted, and move up closer to the mike

15  and speak up.

16  BY MS. FLETCHER, CONTINUED:

17  Q.   Do you remember when you started going over to Stacey's

18  house?

19  A.   No.

20  Q.   What grade were you in?

21  A.   Seventh I am pretty sure.

22  Q.   Was C.F. going over too?

23  A.   Yes.

24  Q.   Did you go over with her?

25  A.   Yes.

721

J.M. - Direct By Ms. Fletcher

1   Q.   Do you know Dalton Bailey?

2   A.   Yes.

3   Q.   Is he a friend of yours?

4   A.   Yes.

5   Q.   Would he go over to Stacey's house when you were there

6   also?

7   A.   Only a couple times.

8   Q.   What did you do at Stacey's house?

9   A.   We drunk and smoked.

10  Q.   Who gave you the cigarettes?

11  A.   Stacey.

12  Q.   Who gave you the alcohol?

13  A.   Stacey.

14  Q.   Did C.F. -- was C.F. there with you every time that you

15  went?

16  A.   Not every time.

17  Q.   Did you have a brother named Sam?

18  A.   Yes.

19  Q.   Did Sam go over?

20  A.   Once or twice.

21  Q.   How about do you have a sister named Kayla?

22  A.   Yes, I did.

23  Q.   Did she go over?

24  A.   Once.

25  Q.   Never came back.

722

J.M. - Direct By Ms. Fletcher

1   A.   No.

2   Q.   Did you drink alcohol every time you went over to

3   Stacey's?

4   A.   Not every time.

5   Q.   What other kinds of things did you do?

6   A.   Watch TV, Dalton would bring over some video games.  We

7   played beer pong.

8   Q.   You played beer pong?

9   A.   Yes.

10  Q.   Who played beer pong?

11  A.   Me, Stacey, C.F. played one time.  I think Dalton played

12  one time.

13  Q.   Was Mackenzie there on occasion when you were there?

14  A.   Not all the time.  She was over to some friends.

15  Q.   What about a baby named A.T.?

16  A.   Yes.

17  Q.   Was she usually there?

18  A.   Yes.

19  Q.   Do you recall a night in February of 2016 that something

20  sexual happened between you and C.F.?

21  A.   Yes.

22  Q.   How did that start?

23  A.   We were just drinking, playing beer pong.

24  Q.   Who is we?

25  A.   Me, Stacey, and C.F..

Case 18-105, Document 44, 04/15/2019, 2540369, Page131 of 202

Case 5:16-cr-00320-DNH   Document 118-3   Filed 09/05/18   Page 44 of 219
Case 5:16-cr-00320-DNH   Document 118-3   Filed 09/05/18   Page 45 of 219

723

J.M. - Direct By Ms. Fletcher

1   Q.   Did you get drunk?
2   A.   Yes.
3   Q.   What happened?
4   A.   I wet to that bedroom and starting watching TV.  C.F.
5   came in naked.
6   Q.   What were you wearing?
7   A.   I was wearing green shorts.
8   Q.   Were they your green shorts?
9   A.   They were either Stacey's or Dalton's.
10  Q.   Who gave them to you to wear?
11  A.   Stacey.
12  Q.   Why did you need to change into those shorts?
13  A.   Because I had beer all over mine.
14  Q.   All over your own clothes?
15  A.   Yes.
16  Q.   And what happened in that bedroom?
17  A.   We were just watching TV.  C.F. came in naked.  He held
18  me down and C.F. got on top.
19  Q.   Who held you down?
20  A.   Stacey.
21  Q.   Was there a cell phone involved?
22  A.   Yes.
23  Q.   Whose cell phone?
24  A.   Stacey's, I don't know.  C.F.'s, I don't know.
25  Q.   Who had the cell phone?

724

J.M. - Direct By Ms. Fletcher

1   A.   C.F. had the cell phone.
2   Q.   Where did she get it from?
3   A.   I don't know.
4   Q.   So C.F. had the cell phone?
5   A.   Yes.
6   Q.   Was there a time that you were alone in the room with
7   C.F.?
8   A.   Yes.
9   Q.   Where was Stacey, if you know?
10  A.   The bathroom.
11  Q.   Was C.F. texting while you were alone in the room with
12  her?
13  A.   Yes.
14  Q.   Did something sexual happen between you and C.F. while
15  you were alone in the room with her?
16  A.   Yes.
17  Q.   What happened?
18  A.   She got on top of me.
19  Q.   Did she touch your penis?
20  A.   Yes.
21  Q.   Do you know whether pictures were taken?
22  A.   On the bed?  I don't know.  What do you mean?
23  Q.   Well, she had a cell phone, right?
24  A.   Yes.
25  Q.   Did she use it to take pictures, if you know?

725

J.M. - Direct By Ms. Fletcher

1   A.   Yes.
2   Q.   Do you know what she took pictures of?
3   A.   Us doing that.
4   Q.   I am going to show you 16A.  Take that down.  Do you
5   recognize that?
6   A.   Yes.
7   Q.   Who are those people?
8   A.   That's me and C.F..
9   Q.   Are those the green shorts you were talking about?
10  A.   Yes.
11  Q.   Did that happen that night in February of 2016?
12  A.   I am pretty sure.  I don't remember the date.
13  Q.   You remember the event?
14  A.   Yes.
15  Q.   And 16B?
16  A.   Yes, I remember that picture.
17  Q.   Who are those people?
18  A.   Me and C.F..
19  Q.   Did you have sex with your sister?
20  A.   Yes.
21  Q.   Why?
22  A.   Because if I didn't either me or C.F. would have got hit.
23  Q.   What do you mean you would have gotten hit?  Who was
24  going to hit you?
25  A.   Stacey.

726

J.M. - Direct By Ms. Fletcher

1   Q.   Did you see him hit people before?
2   A.   Yes.
3   Q.   Who did you see him hit?
4   A.   C.F..  I remember him hitting Mackenzie, and he wouldn't
5   like full on hit A.T., but he did hit her.
6   Q.   Let me show you, do you remember these shorts?
7   A.   Yes, I do.
8   Q.   Are these the shorts that you were wearing that night
9   when that happened?
10  A.   Yes.
11  Q.   What did you do with the shorts after that night after
12  you got home?
13  A.   Brought them home.
14  Q.   What did you do with them?
15  A.   I don't remember.  Honestly I think I put them on the
16  floor, but they wound up under my bed.
17  Q.   Did you ever wear them again?
18  A.   No.
19  Q.   Did you sleep over -- after this happened, did you end up
20  sleeping there that night?
21  A.   That night, yes.
22  Q.   And you slept over before you went home the next day?
23  A.   Yes.
24       MS. FLETCHER:  I have no further questions.
25       THE COURT:  Cross-examine.

727

J.M. - Cross by Ms. Bianco

1   CROSS-EXAMINATION BY MS. BIANCO:
2   Q.   Good morning, J.M..
3   A.   Morning.
4   Q.   If there is any question that you don't understand I will
5   be happy to rephrase it okay?
6   A.   Yes, ma'am.
7   Q.   Are you a little nervous?
8   A.   Yes.
9   Q.   Now, you met Stacey through your sister C.F.; is that
10  right?
11  A.   Yes, ma'am.
12  Q.   And before Stacey met -- before C.F. met Stacey, you and
13  C.F. had spent a lot of time together, is that fair?
14  A.   Yes.
15  Q.   And when she met Stacey things began to change; is that
16  right?
17  A.   Yes, ma'am.
18  Q.   And C.F. began spending a lot of time at Stacey's house?
19  A.   Yes.
20  Q.   And she would leave you behind?
21  A.   Yes.
22  Q.   And C.F. told you she was dating Stacey but she didn't
23  want you to tell anyone?
24  A.   She didn't tell me.  All I think she said she was
25  babysitting.  The first time I went over there, I got drunk

728

J.M. - Cross by Ms. Bianco

1   with Stacey and Stacey told me.
2   Q.   C.F. didn't tell you that herself?
3   A.   I don't remember, no, I don't think so.
4   Q.   Do you remember talking to the police on March 9th and
5   giving them a sworn statement?
6   A.   Yes, ma'am.
7   Q.   Do you remember telling them that Stacey -- that C.F.
8   told you she was dating Stacey?
9   A.   I don't remember.
10  Q.   Okay.  Showing you what has been marked as -- what will
11  be mark as Defendant's Exhibit 16, would reviewing your
12  statement help refresh your recollection about what you told
13  the police?
14  A.   Maybe.
15  Q.   Okay.
16       MS. BIANCO:  May I approach, Your Honor?
17       THE COURT:  You may.
18  BY MS. BIANCO, CONTINUED:
19  Q.   Showing you defendant's Exhibit 16, J.M., is that the
20  statement you gave to the police?
21  A.   Yes, ma'am.
22  Q.   And you signed that at the police station under oath,
23  correct?
24  A.   Yes, ma'am.
25  Q.   Did you tell the police that Stacey and C.F. were kind of

729

J.M. - Cross by Ms. Bianco

1   dating, but didn't want me to tell anyone?
2   A.   Yes, ma'am.
3   Q.   Does that refresh your recollection as to what you said?
4   A.   Kind of, yes.
5   Q.   Okay.  Thank you, sir.  Now, eventually you asked C.F. if
6   you can go over to Stacey's with her, correct?
7   A.   Yes, ma'am.
8   Q.   Because you missed hanging out with your sister?
9   A.   Yes.
10  Q.   And C.F. said okay, right, she agreed?
11  A.   Yes.
12  Q.   And you only went over to Stacey's house a couple of
13  times; is that right?
14  A.   I am pretty sure, yes.
15  Q.   That is what you told the Grand Jury in the past,
16  correct?
17  A.   Yes.
18  Q.   So you went over there maybe twice, three times?
19  A.   No, more than that.
20  Q.   More than that?
21  A.   Yes.
22  Q.   Did you tell the Grand Jury that you only went over there
23  a couple of times?
24  A.   Yes.
25  Q.   And when you testified in front of the Grand Jury, that

730

J.M. - Cross by Ms. Bianco

1   was under oath?  You have to say yes or no.
2   A.   Yes, ma'am.
3   Q.   And you swore to tell the truth?
4   A.   Yes, ma'am.
5   Q.   And when you told the Grand Jury you only went over there
6   a couple of times, are you saying that you lied?
7   A.   No, a couple times meaning like six or seven times.
8   Q.   Okay.  Fair enough, and you testified on direct
9   examination that Dalton was only there a couple of times, would
10  that be the same thing, the six or seven times?
11  A.   No, that was like two or three.
12  Q.   When you went over to Stacey's house you never saw B.L.
13  there, right?
14  A.   No.
15  Q.   And you would tell your mother when you were going to
16  C.F.'s house -- you were going over to B.L.'s house, right?
17  A.   No, I would tell her I was going to the library.
18  Q.   Okay.  Not to B.L.'s house?
19  A.   No.  Well, sometimes I would tell her I was going to
20  B.L.'s house with C.F., but most of the time it was the
21  library.
22  Q.   So when you told your mom you were going to the library,
23  that was a lie?
24  A.   Yes, well, he lived right across the road.
25  Q.   Okay, but you did not tell her where you were actually

731

J.M. - Cross by Ms. Bianco

1   going?

2   A.   Yes.

3   Q.   And when you said you were going over to B.L.'s house to

4   your mother, B.L. didn't live there anymore.

5   A.   No.

6   Q.   And you didn't tell your mother B.L. doesn't live there?

7   A.   I didn't her tell until the day I told her

8   everything.

9   Q.   Okay.  One of the times you went over to Stacey's house,

10  do you remember seeing a safe?

11  A.   A safe, yes, I do.

12  Q.   And did you go into that safe and take out some rings?

13  A.   Yes.

14  Q.   And that was Stacey deceased mother's rings, right?

15  A.   I don't know.

16  Q.   They were rings?

17  A.   Yes, they were rings.

18  Q.   And you didn't have permission to go into that safe?

19  A.   No.

20  Q.   But you took the rings, yes?

21  A.   Yes.

22  Q.   And you left with them?

23  A.   Yes.

24  Q.   And you brought them to your house, right?

25  A.   Yes.

732

J.M. - Cross by Ms. Bianco

1   Q.   And you wanted to sell those rings for money?

2   A.   Yes.

3   Q.   And your sister confronted you about stealing the rings,

4   didn't she?

5   A.   Yes.

6   Q.   And she was upset with you?

7   A.   Yes.

8   Q.   And she told your mother on you?

9   A.   Yes.

10  Q.   And your mother -- you told your mother you did not steal

11  the rings?

12  A.   Yes.

13  Q.   You lied to your mother?

14  A.   I am pretty sure.  I don't remember a lot of things.

15  Q.   Okay.  Well, Stacey came over the house, right, looking

16  for the rings?

17  A.   Yes.

18  Q.   And you were there?

19  A.   Yes, I was there.

20  Q.   And Stacey told you and your mother he didn't want you to

21  come over anymore; is that right?

22  A.   No.

23  Q.   So he thought -- well, he accused you of stealing his

24  rings?

25  A.   Yes, and he wanted me to go over the same night, and I

733

J.M. - Cross by Ms. Bianco

1   said no.

2   Q.   Did you admit to stealing the rings to Stacey?

3   A.   Yes.

4   Q.   You admitted it in front of your mother?

5   A.   Yes, I admitted it in front of my mother.

6   Q.   Okay.  Did your mother ask Stacey not to prosecute you,

7   not to call the police?

8   A.   I don't know.  No, I don't think so.

9   Q.   So you admitted stealing the rings in front of your

10  mother, yes?

11  A.   Yes.

12  Q.   Did you give the rings back to Stacey that day?

13  A.   Yes.

14  Q.   And that was in front of your mother?

15  A.   Yes.

16  Q.   Okay.  You also told your mom that C.F. had a tattoo; is

17  that right?

18  A.   Yes.

19  Q.   And that was after C.F. told on you about the rings; is

20  that right?

21  A.   I don't think C.F. told on me.  I am pretty sure my other

22  sister told on me.

23  Q.   Your other sister told on you?

24  A.   Yes.

25  Q.   But after you were accused of stealing the rings, then

734

J.M. - Cross by Ms. Bianco

1   you told on C.F. that she had a tattoo?

2   A.   Yes.

3   Q.   And you got in some trouble with your mom for stealing,

4   didn't you?

5   A.   No, not -- well, I don't know.  It was --

6   Q.   She was upset with you?

7   A.   Yes, she was upset.

8   Q.   And your mother actually called Stacey to talk to him

9   about the rings, yes?

10  A.   No, I am pretty sure -- I don't know.  I don't remember.

11  Q.   You don't remember.  Fair enough.  Now, you testified

12  earlier that your sister took photographs of you and she

13  engaging in some sex; is that right?

14  A.   Yes.

15  Q.   And there was only one time that this happened; is that

16  right?

17  A.   Yes.

18  Q.   Just once?

19  A.   Just once.

20  Q.   No question about that?

21  A.   No.

22  Q.   Okay, and the time that the pictures were taken, that was

23  at night?

24  A.   Yes, I am pretty sure, yes.

25  Q.   Okay, and at that time you had been drinking Vodka and

735

J.M. - Cross by Ms. Bianco

1   beer?

2   A.   Yes.

3   Q.   And you had got pretty drunk; is that right?

4   A.   Yes.

5   Q.   And you were stuttering in your speech?

6   A.   Yes.

7   Q.   Falling over?

8   A.   Yes.

9   Q.   Had you also been smoking marijuana?

10  A.   No, not -- no.

11  Q.   You had been smoking marijuana around that time, hadn't

12  you?

13  A.   Yes.

14  Q.   And you had a Facebook page that you created, right?

15  A.   Yes.

16  Q.   At that time.  And did you post on your Facebook on

17  February 16, 2016, started working at being a fucking stoner,

18  did you post that?

19  A.   Probably, yes.

20  Q.   Okay, and throughout your Facebook you have a lot of

21  posts about smoking marijuana; is that right?

22  A.   Yes.

23  Q.   And that continued for more than a year; is that right?

24  A.   Yes.

25  Q.   I mean, you still -- you are at the boys home now?

736

J.M. - Cross by Ms. Bianco

1   A.   Yes.

2   Q.   And that is for not attending school?

3   A.   Not attending school and getting help with drug use.

4   Q.   Getting help with what?

5   A.   Drug use.

6   Q.   Okay, and the last time you posted on Facebook was just a

7   couple of months ago?

8   A.   About drugs?

9   Q.   About anything.

10  A.   That was a couple weeks ago, maybe a month ago.

11  Q.   Let's get back to the night of the incident between you

12  and your sister.  C.F. had also been drinking?

13  A.   Yes.

14  Q.   And she was pretty drunk; is that right?

15  A.   She was -- I don't want to say she was wasted, but she

16  was drunk.

17  Q.   Well, she was stuttering her words, yes?

18  A.   I am pretty sure, yes.  I don't remember.

19  Q.   Because you were intoxicated, right?

20  A.   Yes.

21  Q.   And Mackenzie was home at the time, wasn't she?

22  A.   No, I don't think Mackenzie was home.

23  Q.   Well, do you remember testifying at the Grand Jury, page

24  eighty-five -- and you remember going to Grand Jury; is that

25  right?

737

J.M. - Cross by Ms. Bianco

1   A.   Yes.

2   Q.   That was like a group of citizens listening to your

3   testimony.  Do you remember that?

4   A.   Yes.

5   Q.   And the prosecutors were there?

6   A.   Yes.

7   Q.   And a Court Reporter was there taking everything down?

8   A.   Yes.

9   Q.   And they are asking you questions and you are giving the

10  answers?

11  A.   Yes.

12  Q.   You were sworn to tell the truth?

13  A.   Yes.

14  Q.   You were trying your best to tell the truth; is that

15  right?

16  A.   Yes, ma'am.

17  Q.   Do you remember these questions and this answer:  How

18  about C.F.?

19       Yeah.

20       And when you said she was drunk, did you see --

21       She wasn't like falling over, but she was like kind of

22  sick.  She kept drinking more.

23       What was she drinking?

24       Beer and Vodka.

25       Was Mackenzie drinking also?

738

J.M. - Cross by Ms. Bianco

1        No.

2        Did there come a point in time that Mackenzie and A.T.

3   were not part of the conversation with you, C.F., and Stacey?

4        Answer!  What do you mean?  Mackenzie and A.T. went into

5   another room.

6   A.   I don't really remember.

7   Q.   You don't remember?

8   A.   No.

9   Q.   So would you say that your memory is better today than at

10  the time you testified at the Grand Jury?

11  A.   Probably the Grand Jury.

12  Q.   So you are saying today you don't know one way or another

13  whether Mackenzie was present?

14  A.   I don't remember.  I don't remember.  It has been so

15  long.

16  Q.   Okay.  Fair enough.  Well, you remember A.T. being home?

17  A.   Yes, A.T. was definitely there.

18  Q.   And C.F. began receiving some texts, do you remember

19  that?

20  A.   Yes.

21  Q.   And the texts were saying that C.F. should have sex with

22  you, and she should take pictures, is that what happened?

23  A.   I don't know.  I didn't see the text.

24  Q.   But you don't know for a fact who was behind the text,

25  you don't know that it was Stacey?

739

J.M. - Cross by Ms. Bianco

1   A.   I don't know it was Stacey, but I am pretty sure it was
2   Stacey.
3   Q.   But you didn't know --
4   A.   But I did not know for a fact.
5   Q.   Okay.  I believe you testified on direct examination that
6   C.F. walked in naked?
7   A.   Yes.
8   Q.   And she was still drunk?
9   A.   Yes.
10  Q.   And you are still drunk?
11  A.   Yes.
12  Q.   Would it be fair to say that this night everyone was
13  acting kind of silly?
14  A.   I don't know.
15  Q.   Goofy?
16  A.   Kind of.
17  Q.   Had you ever been intoxicated before?
18  A.   Yes.
19  Q.   Okay, and when you were intoxicated at this particular
20  night, it wasn't joking around, silly, playing beer pong kind
21  of thing?
22  A.   We were just having fun for a little bit.
23  Q.   Okay.  So C.F. and you are in the room alone; is that
24  right?
25  A.   Yes.

740

J.M. - Cross by Ms. Bianco

1   Q.   And you said that Stacey first made you take your clothes
2   off or he took your clothes off?
3   A.   He didn't take them off.  They were down to here,
4   somewhere around there.
5   Q.   So he didn't take them off?
6   A.   Well, yes, he did.
7   Q.   And then he leaves the room and C.F. is telling you what
8   you have to do?
9   A.   She was already on top of me.
10  Q.   Pardon?
11  A.   She was already on top of me.
12  Q.   And C.F. didn't tell you, and I apologize for the
13  language, that you had to stick your penis in her behind?
14  A.   She did because if I didn't --
15  Q.   I am so sorry, J.M..  You have to speak up a little bit
16  to be clear?
17  A.   I am saying I know I had to because I would have gotten
18  hit.
19  Q.   Okay, but C.F., she specifically told you had to stick
20  your penis in her behind?
21  A.   Yes.
22  Q.   Now, after this incident, you never went over to Stacey's
23  again?
24  A.   I don't remember.
25  Q.   Okay.  You didn't go back a few days later knocking on

741

J.M. - Cross by Ms. Bianco

1   the door trying to talk to him?
2   A.   I don't know.
3   Q.   You are saying it didn't happen or you just don't know?
4   A.   I just don't know.
5   Q.   Now, when you met with the police on March 9, 2016, and
6   you gave that sworn statement, right?
7   A.   Yes.
8   Q.   You wanted to be truthful?
9   A.   Yes.
10  Q.   And you wanted to be honest?
11  A.   Yes.
12  Q.   And you signed the statement, you did it under oath?
13  A.   Yes.
14  Q.   And your mother was in the police station at the time?
15  A.   Yes.
16  Q.   And this was less than two weeks after the incident with
17  your sister; is that right?
18  A.   I don't remember.
19  Q.   Okay.  The incident with your sister happened sometime in
20  February?
21  A.   I don't know.  I don't remember the date.
22  Q.   Could it have been in January?
23  A.   I have no idea.
24  Q.   But on March 9th you are certain you went to the police?
25  A.   Pretty sure.  I still don't remember that.

742

J.M. - Cross by Ms. Bianco

1   Q.   Going to the police?
2   A.   I remember going to the police, but I don't remember the
3   date.
4   Q.   Not a problem.  When you went to the police on that day,
5   you never told the police that Stacey made you and C.F. have
6   sex; is that right?
7   A.   Yes.
8   Q.   Never said that?
9   A.   Never.
10  Q.   And you never told the police anything about Stacey
11  making C.F. take pictures of you; is that right?  Didn't say
12  that?
13  A.   No.
14  Q.   Okay.  Never told the police anything about you and C.F.
15  having sexual contact?
16  A.   Never.
17  Q.   Never told the police anything about Stacey pulling your
18  clothes off?
19  A.   Never.
20  Q.   Or anything about C.F. getting on top of you and coming
21  in your room naked?
22  A.   Never.
23  Q.   And the next time you talked to the police was in October
24  of 2015, is that right, several months later?
25  A.   I don't think it was 2015.  I don't remember the date.

743

J.M. - Cross by Ms. Bianco

1    Q.   Was it months later?

2    A.   I am pretty sure.

3    Q.   And you had another interview with the police?

4    A.   Yes.

5    Q.   Okay, and this was the first time you had ever said

6    anything about what happened between you and C.F.; is that

7    right?

8    A.   Yes.

9    Q.   And at that time you told them you didn't remember a

10   whole lot?

11   A.   Yes, I didn't remember a whole lot.

12   Q.   You remember playing beer pong and getting really drunk?

13   A.   Yes.

14   Q.   And you remembered being intoxicated?

15   A.   Yes.

16   Q.   And did you tell the police that -- you said at one point

17   that is all I really remember?

18   A.   Yes.

19   Q.   Okay, and then it came out after that that Stacey had

20   stripped you off of your clothes; is that right?

21   A.   Yes.

22   Q.   And then you told the police Stacey held you down for ten

23   minutes?

24   A.   Not ten minutes.

25   Q.   It wasn't ten minutes?

744

J.M. - Cross by Ms. Bianco

1    A.   No.

2    Q.   All right.  How long did he hold you down for?

3    A.   I have no idea.

4    Q.   You told the police at the time of the sexual contact

5    with C.F. that you were wearing sweat pants, do you remember

6    that?

7    A.   I don't remember, but I remember now that I was wearing

8    the green shorts, but I didn't remember the other one.

9    Q.   So at the time you talked to the police, you don't

10   remember telling them you were wearing sweat pants, so you

11   thought you were --

12   A.   I was wearing sweat pants that day, but I changed into

13   the shorts.

14   Q.   Now, but you did not tell the police that day you were

15   wearing the green shorts; is that right?

16   A.   Yes.

17   Q.   Yes, that's right?

18   A.   Yes, that is right.  I didn't tell them.

19   Q.   Okay.  Thank you.  Is it true that C.F. positioned the

20   two of you for the picture to fake like you were having sex, is

21   that true.

22   A.   Yes.

23   Q.   So you didn't really have sex, it was just kind of faking

24   it?

25   A.   I couldn't even get hard for my sister.

745

J.M. - Cross by Ms. Bianco

1    Q.   So this was like a -- you were faking it for the picture,

2    correct?

3    A.   Yes.

4    Q.   And at this point, you and C.F., when the pictures were

5    taken, were laughing about how you were faking it, is that

6    right?

7    A.   No, we weren't laughing.

8    Q.   You weren't laughing at all?  Stacey never came into that

9    the room when this was going on, when you were faking sex?

10   A.   I have no idea.  He might have been in the hallway.  I

11   don't think he came in the room.

12   Q.   He never came in the room to exchange words with you,

13   correct?

14   A.   I don't remember.

15   Q.   You told that to the Grand Jury, is that right, that he

16   never came in?

17   A.   I don't know.  I don't remember.

18        MS. BIANCO:  May I have a moment, Your Honor?

19   BY MS. BIANCO, CONTINUED:

20   Q.   Between March 9th, the first time you spoke to the

21   police, and the second time you spoke to the police, you had

22   gotten into some trouble at school; is that right?

23   A.   Yes.

24   Q.   And Child Protective got involved?

25   A.   Yes.

746

J.M. - Cross by Ms. Bianco

1    Q.   And it wasn't until after you spoke to Child Protective

2    about the trouble you were in that you told them about what

3    happened with your sister; is that right?

4    A.   I don't remember right now.  I don't know what you mean.

5    Q.   In May of 2017, did you write on your Facebook:  Court is

6    giving me a good punishment LMFAO?

7    A.   Yes.

8    Q.   Had you wrote that?

9    A.   Yes.

10   Q.   What does LMFAO?

11   A.   Laugh my fucking ass off.  Sorry for my language.

12        MS. BIANCO:  Thank you very much.

13        THE COURT:  Redirect, if any.

14

15   REDIRECT EXAMINATION BY MS. FLETCHER:

16   Q.   J.M., when you were telling your mom you were going to

17   the library instead of going Stacey's house, why didn't you

18   want her to know you were going to Stacey's?

19   A.   Because she would ask what was going on.  She would take

20   me -- like won't let me see him.

21   Q.   Because things were going on there that she wouldn't

22   approve of?

23   A.   Yes, and he is older.

24   Q.   You were twelve?

25   A.   I was eleven, twelve, yes.

Case 18-105, Document 44, 04/15/2019, 2540369, Page137 of 202

Case 5:16-cr-00320-DNH   Document 118-3   Filed 09/05/18   Page 68 of 219        Case 5:16-cr-00320-DNH   Document 118-3   Filed 09/05/18   Page 69 of 219

747

J.M. - Redirect by Ms. Fletcher

1   Q.   And did Stacey tell you that he was dating C.F.?

2   A.   Yes, when I was drunk, but I remember that.

3   Q.   C.F. was sixteen and he was twenty something?

4   A.   Yes, twenty something.

5   Q.   And he told you he was dating your sister?

6   A.   Yes.

7   Q.   Mackenzie was also living there at the time?

8   A.   Yes.

9   Q.   Was he dating Mackenzie?

10  A.   Yes, they both were.

11  Q.   J.M., were you embarrassed about having had sex and

12  sexual contact with your sister?

13  A.   Yes.

14  Q.   Did you try to keep that a secret for as long you could?

15  A.   Yes.

16  Q.   You weren't going to tell anybody, were you?

17  A.   No.

18  Q.   You were going to take that to your grave, weren't you?

19  A.   Yes.

20  Q.   Between March and October, did it start to bother you and

21  eat away at you?

22  A.   Yes.

23  Q.   Did the police come to you and sit you down and

24  Investigator Baillargeon sat you down and told you we need to

25  talk about this?

748

J.M. - Redirect by Ms. Fletcher

1   A.   Well, my father did.  He wanted me to talk about it.  At

2   first I told him no.  And then he just started bringing up a

3   bunch of stuff, and I told him it actually did happen, yes.

4   Q.   Because it was time to talk?

5   A.   Yes.

6        MS. FLETCHER:  I have nothing further.

7        THE COURT:  Recross, if any.

8        MS. BIANCO:  Just a couple of questions.

9

10  RECROSS EXAMINATION BY MS. BIANCO:

11  Q.   J.M., did you just tell Ms. Fletcher that both Mackenzie

12  and Stacey were dating C.F.?

13  A.   Yes.

14  Q.   And you weren't supposed to tell anyone that at the time,

15  correct?

16  A.   Yes.  Well, I don't remember.  I don't remember.  I know

17  I wasn't supposed to tell anyone.

18  Q.   Thank you, J.M.

19       THE COURT:  Okay.  Members of the jury, we will take

20  our morning break now until eleven o'clock.  Don't discuss the

21  case among yourselves or anyone else, and you may be excused.

22       (Whereupon, a brief recess was taken.)

23       (Whereupon, the proceedings were held in open court

24       in the presence of the Jury.)

25       THE COURT:  Government may call its next witness.

749

1        MS. AMANDOLARE:  The Government calls C.F..

2

3        C.F. having been called as a Witness, being first duly

4   sworn, was examined and testified as follows under oath:

5

6   DIRECT EXAMINATION BY MS. AMANDOLARE:

7   Q.   Good morning, C.F..

8   A.   Good morning.

9   Q.   How old are you?

10  A.   Seventeen.

11  Q.   When is your birthday?

12  A.   August 23rd, 1999.

13  Q.   Where do you currently live?

14  A.   Gardner, Massachusetts.

15  Q.   Where did you live before you moved to Gardner,

16  Massachusetts?

17  A.   Massena, New York.

18  Q.   And when you lived in Massena, who did you live with?

19  A.   My mother, Jeanie Merriam; my father, Samuel Merriam; and

20  my siblings, J.M., Kayla, and Sammy Merriam.

21  Q.   Who is J.M. in relation to you?

22  A.   My brother.

23  Q.   Your younger or older brother?

24  A.   Younger.

25  Q.   Where did you go to school when you lived in Massena, New

750

C.F. - Direct By Ms. Amandolare

1   York?

2   A.   Massena Central High.

3   Q.   When did you start at Massena Central High, do you

4   remember what grade you were in?

5   A.   Eleventh.

6   Q.   Was that in September of 2015?

7   A.   Yes.

8   Q.   Where did you live before you moved to Massena?

9   A.   Brasher Falls.

10  Q.   Where did you go to school when you lived in Brasher

11  Falls?

12  A.   St. Lawrence Central.

13  Q.   When you lived in Brasher Falls, who did you live with?

14  A.   My foster mom, Wendy Fortier; my mom, Jeanie; my dad,

15  Sam; my siblings, Kayla, Sammy, J.M., and my sister, Coco.

16  Q.   When did you move to Gardner, Massachusetts?

17  A.   November 2016.

18  Q.   Who do you live with now?

19  A.   My aunt, my uncle, my cousin.

20  Q.   Why did you move to Gardner, Massachusetts?

21  A.   After everything that had happened with me and my brother

22  and the whole case, we thought it would be better off to have a

23  fresh start.

24  Q.   Are you in school in Gardner, Massachusetts?

25  A.   I just graduated.

751

C.F. - Direct By Ms. Amandolare

1   Q.   What do you hope to do now that you graduated high
2   school?
3   A.   Eventually finish and go to college and maybe into the
4   National Guard.
5   Q.   Do you have a job?
6   A.   Yes, I got a new job at the hospital.
7   Q.   Have you started working there yet?
8   A.   No, I will start after this.
9   Q.   C.F., do you know B.L.?
10  A.   Yes.
11  Q.   Where do you know her from?
12  A.   I went to school with her in Brasher and Massena.
13  Q.   So you met her at St. Lawrence Central in Brasher Falls?
14  A.   Yes.
15  Q.   And then you also were friends with her when you were at
16  Massena High School?
17  A.   Yes.
18  Q.   Are you and B.L. the same age?
19  A.   She is a year older.
20  Q.   In the same grade?
21  A.   Yes.
22  Q.   And you just testified that you were -- you started in
23  eleventh grade when you went to Massena High school?
24  A.   Yes.
25  Q.   And B.L. was also in eleventh grade?

752

C.F. - Direct By Ms. Amandolare

1   A.   Yes.
2   Q.   Did you and B.L. start hanging out and spending time with
3   each other outside of school?
4   A.   Yes.
5   Q.   Where would you hang out?
6   A.   Her house.
7   Q.   Do you remember where that was located?
8   A.   Glenn Street.
9   Q.   44 Glenn Street?
10  A.   Yes.
11  Q.   Was that in the Village of Massena?
12  A.   Yes.
13  Q.   What was across the street?
14  A.   The Massena Public Library.
15  Q.   I am going to have you take a look behind you, C.F., and
16  looking at that photo that is depicted as 44 Glenn Street, is
17  that what you remember the house to look like that you would
18  hang out?
19  A.   Yes.
20  Q.   Who would you hang out with there other than B.L.?
21  A.   Mackenzie, the baby, A.T., and Stacey.
22  Q.   So is that where you got to know Stacey LaPorte?
23  A.   Yes.
24  Q.   Do me a favor, do you see Stacey LaPorte in this
25  courtroom today?

753

C.F. - Direct By Ms. Amandolare

1   A.   Yes.
2   Q.   Can you identify him by something that he is wearing and
3   point him out for the jury?
4   A.   He is sitting at the defense table with the glasses on
5   his head.
6        MS. AMANDOLARE:  Your Honor, I would ask the record
7   reflect that this witness has identified the defendant.
8        THE COURT:  So noted.
9   BY MS. AMANDOLARE, CONTINUED:
10  Q.   When did you start going over, if you remember
11  approximately, the timeframe you started going over to 44 Glenn
12  Street?
13  A.   Around Christmas time.
14  Q.   Some time in the end of 2015?
15  A.   Yes.
16  Q.   How often would you go over to that house?
17  A.   A couple times a week and on the weekends.
18  Q.   When you would go during the week, was that during or
19  after school?
20  A.   After school.
21  Q.   What would you do when you would hang out at 44 Glenn
22  Street?
23  A.   We would play video games.  I would help B.L. catch up on
24  homework.
25  Q.   Would you drink alcohol?

754

C.F. - Direct By Ms. Amandolare

1   A.   After B.L. had left, yes.
2   Q.   Okay.  Would you smoke cigarettes?
3   A.   Yes.
4   Q.   Were there a lot of rules at 44 Glenn Street?
5   A.   No.
6   Q.   You just indicated that when B.L. left.  Do you remember
7   approximately when B.L. left?
8   A.   A little after Christmastime.
9   Q.   Sometime in January of 2016?
10  A.   Yes.
11  Q.   And you would still go over there after B.L. left?
12  A.   Yes.
13  Q.   And that is when you started drinking alcohol?
14  A.   Yes.
15  Q.   And smoking cigarettes?
16  A.   Yes.
17  Q.   Where did you get that alcohol?
18  A.   Stacey.
19  Q.   Where would you get those cigarettes?
20  A.   Stacey.
21  Q.   Was there anyone other than Stacey LaPorte who was over
22  the age of twenty-one at that house?
23  A.   No.
24  Q.   So other than you and the people you just talked about
25  who lived at 44 Glenn Street, would anybody else come over to

755

C.F. - Direct By Ms. Amandolare

1   hang?

2   A.   Mackenzie's brother come over a few times and my brother

3   had come over with me a few times.

4   Q.   When you say Mackenzie's brother, is that Dalton Bailey?

5   A.   Yes.

6   Q.   And your brother, you are referring to J.M.?

7   A.   Yes.

8   Q.   Would your brother, Sammy, ever come over?

9   A.   He had been once, yes.

10  Q.   And what about your sister, Kayla?

11  A.   Once.

12  Q.   Why did you keep going over to 44 Glenn Street after your

13  friend B.L. had left?

14  A.   To hang out, play video games.  There wasn't a lot of

15  rules.

16  Q.   It was fun, right?

17  A.   Yes.

18  Q.   You developed some friendships while you were there with

19  the people that lived there?

20  A.   Yes.

21  Q.   You became friends with Mackenzie?

22  A.   Yes.

23  Q.   You became friends with Stacey?

24  A.   Yes.

25  Q.   That friendship with both Mackenzie and Stacey developed

756

C.F. - Direct By Ms. Amandolare

1   into a physical relationship?

2   A.   Yes.

3   Q.   A sexual relationship?

4   A.   Yes.

5   Q.   How did this relationship start?  What, if anything,

6   happened where you changed the relationship from a friendship

7   to a physical relationship?

8   A.   They had -- Stacey had asked me to be involved with him

9   and Mackenzie.

10  Q.   And did you ultimately become involved with Stacey and

11  Mackenzie together?

12  A.   Yes.

13  Q.   Did you ever have sex with Stacey LaPorte?

14  A.   Yes.

15  Q.   Did you ever have sex with Mackenzie Bailey alone?

16  A.   No.

17  Q.   Did you have sex with Stacey LaPorte and Mackenzie Bailey

18  together?

19  A.   Yes.

20  Q.   Did this physical and sexual relationship develop over

21  Kik Messenger?

22  A.   Yes.

23  Q.   And you used Kik Messenger on a cell phone?

24  A.   Yes.

25  Q.   You had a cell phone?

757

C.F. - Direct By Ms. Amandolare

1   A.   Yes.

2   Q.   What kind of cell phone was that?

3   A.   A black LG.

4   Q.   C.F., I am going to hand you what has been marked for

5   identification as Exhibit 26.  Do you recognize that?

6   A.   Yes.

7   Q.   What do you recognize that to be?

8   A.   My LG phone.

9   Q.   That is the cell phone you had at the time you were going

10  over to 44 Glenn Street?

11  A.   Yes.

12       MS. AMANDOLARE:  Your Honor, I would ask what's been

13  marked for identification as Exhibit 26 be moved into evidence.

14       THE COURT:  Any objection?

15       MS. BIANCO:  No objection.

16       THE COURT:  Received.

17       (Exhibit No. 26, received.)

18  BY MS. AMANDOLARE, CONTINUED:

19  Q.   C.F., I am going to ask you to take a look at the phone

20  you have in your hand, your LG, is there anywhere on that phone

21  that indicates where that phone was made or manufactured?

22  A.   Yes, made in China.

23  Q.   I will take that back.  Can you tell the Grand Jury --

24  you indicated that you would speak with the defendant over

25  Kik -- excuse me, can you tell the jury, what Kik is?

758

C.F. - Direct By Ms. Amandolare

1   A.   It is a messaging app that runs off of wifi.

2   Q.   So as long as you had Internet access you could use the

3   messaging application?

4   A.   Yes.

5   Q.   Did you talk to the defendant over any other applications

6   other than Kik?

7   A.   No.

8   Q.   Did you ever text with the defendant?

9   A.   Only on Kik.

10  Q.   So any conversations that you ever had with the defendant

11  on the cell phone were through Kik Messenger?

12  A.   Yes.

13  Q.   Do you have a log-in that was associated with Kik

14  Messenger?

15  A.   Yes.

16  Q.   What was your log-in?

17  A.   Littlecushing99.

18  Q.   Do you remember what the defendant's log-in or user name

19  was at the time?

20  A.   Fastfamily25.

21  Q.   When you are saying fastfamily25, did the defendant ever

22  express to you his fascination with the Fast and the Furious

23  movies?

24  A.   Yes.

25  Q.   Did you guys talk about that?

759

C.F. - Direct By Ms. Amandolare

1    A.    Yes.

2    Q.    Did you know at the time what the Fast and Furious movies

3    were?

4    A.    Yes.

5    Q.    Had you see any of them?

6    A.    Maybe one of them.

7    Q.    I am going to hand you what I have marked as Government's

8    Exhibit 36.  Do you recognize what's depicted on that document?

9    A.    Yes.

10   Q.    And what does that document reflect?

11   A.    A conversation over Kik.

12   Q.    And who are the users on that document?

13   A.    Me and Stacey.

14   Q.    And is that a fair and accurate depiction of the chat

15   messages that you remember having with the defendant at this

16   time period?

17   A.    Yes.

18   Q.    And when you were chatting with the defendant, it was

19   through that LG cell phone you just put into evidence?

20         MS. AMANDOLARE:  Your Honor, I would ask what is

21   marked as Government's Exhibit 36 be moved into evidence.

22         THE COURT:  Any objection?

23         MS. BIANCO:  No objection.

24         THE COURT:  Received.

25         (Exhibit No. 36, received.)

760

C.F. - Direct By Ms. Amandolare

1         MS. AMANDOLARE:  And I would ask that it be

2    published to the jury.

3    BY MS. AMANDOLARE, CONTINUED:

4    Q.    C.F., can you read for the jury the text message that

5    is -- the first text message from the bottom half with the time

6    stamp of 1:10 on 2/24/2016?

7    A.    It states all my kids are Fast and Furious names or cars.

8    Q.    Who was that sent from?

9    A.    Stacey.

10   Q.    And that is reflected because the user name that sent

11   that message is?

12   A.    Fastfamily25.

13   Q.    And what is the next line underneath that chat message?

14   A.    Dominick Joseph LaPorte.

15   Q.    Who sent that message?

16   A.    Stacey.

17   Q.    And you know that again because of the user name?

18   A.    Fastfamily25.

19   Q.    Do you know if there is any relationship between the name

20   Dominick and the Fast and Furious?

21   A.    Yes, there is a character in the movie called Dom.

22   Q.    Is that the main character?

23   A.    I have no idea.

24   Q.    But you know Dom or Dominick to be a character from the

25   Fast and the Furious?

761

C.F. - Direct By Ms. Amandolare

1    A.    Yes.

2    Q.    Over the time that you were going over to 44 Glenn

3    Street, did you develop feelings for Stacey?

4    A.    Yes.

5    Q.    Were you attracted to Stacey?

6    A.    Yes.

7    Q.    Would you have considered Stacey to be your boyfriend at

8    the time?

9    A.    Yes.

10   Q.    And this entire time how old were you?

11   A.    Sixteen.

12   Q.    How old was the defendant?

13   A.    Twenty-five.

14   Q.    Do you have any tattoos?

15   A.    Yes.

16   Q.    How many?

17   A.    One.

18   Q.    Where did you get that tattoo?

19   A.    Stacey.

20   Q.    Was it while you were going over to 44 Glenn Street?

21   A.    Yes.

22   Q.    Where is that tattoo?

23   A.    Above my privates.

24   Q.    What does it say?

25   A.    Kinky.

762

C.F. - Direct By Ms. Amandolare

1    Q.    And again you were sixteen when you got that tattoo?

2    A.    Yes.

3    Q.    You indicated earlier that your brother J.M., your

4    younger brother, would sometimes come over to 44 Glenn Street

5    to hang out?

6    A.    Yes.

7    Q.    Do you remember when he started coming over?

8    A.    A few weeks after B.L. had left.

9    Q.    And B.L. left in January of 2016?

10   A.    Yes.

11   Q.    So sometime maybe early February 2016?

12   A.    Yes.

13   Q.    And how old again was he when he would start coming over?

14   A.    Twelve.

15   Q.    I want to draw your attention to February 28, 2016.  Do

16   you remember that day?

17   A.    Yes.

18   Q.    Where were you on that day?

19   A.    Stacey's apartment.

20   Q.    And February 28, 2016, was a Sunday.  So were you over

21   that Saturday?

22   A.    Yes.

23   Q.    And did you spend the night on Saturday night?

24   A.    Yes.

25   Q.    Who was there on that day?

763

C.F. - Direct By Ms. Amandolare

1   Q.   J.M., me, Mackenzie, Stacey, and A.T..

2   Q.   And what were you doing when you went over to the house

3   to begin with?

4   A.   We were drinking that night.

5   Q.   Were you playing games?

6   A.   Yes.

7   Q.   And this was the standard stuff you would do when you

8   would go over there?

9   A.   Yes.

10  Q.   So you were drinking?

11  A.   Yes.

12  Q.   Did you observe J.M. drinking?

13  A.   Yes.

14  Q.   And again, who supplied the alcohol on that day?

15  A.   Stacey.

16  Q.   Where were you all drinking in the house?

17  A.   In the kitchen and living room.

18  Q.   Do you remember what you were drinking?

19  A.   There was Bud Light and some mixed liquors.

20  Q.   Do you remember if you got intoxicated?

21  A.   Yes.

22  Q.   Do you remember seeing if your brother J.M. was

23  intoxicated?

24  A.   He had had a lot to drink as well.

25  Q.   Did you have your cell phone, that LG that you just

764

C.F. - Direct By Ms. Amandolare

1   pointed out for the jury, did you have that with you?

2   A.   Yes, but it had died so I was letting it charge.

3   Q.   Where was it charging, do you remember?

4   A.   I think I had put it in the kitchen.  I don't remember.

5   Q.   So you were hanging out, you were in the living room and

6   in the kitchen area, your phone was charging in the kitchen.

7   Did there come a point in time where you moved to what was

8   Stacey and Mackenzie's bedroom?

9   A.   Yes.

10  Q.   And were you alone when you went to the bedroom?

11  A.   No, my brother was there as well, J.M..

12  Q.   And was Mackenzie there?

13  A.   She was asleep on the couch.

14  Q.   And was the defendant there?

15  A.   Yes.

16  Q.   Where was he?

17  A.   He was in the bathroom.

18  Q.   Before he went to bathroom, had he come into the bedroom?

19  A.   Yes.

20  Q.   What did he indicate to you when he came into the

21  bedroom?

22  A.   To use Mackenzie's Samsung phone.

23  Q.   For what?

24  A.   To text him on Kik.

25  Q.   What user name was he using when he was telling you to

765

C.F. - Direct By Ms. Amandolare

1   text him on Kik?

2   A.   Fastfamily25.

3   Q.   And you indicated that it was a white Samsung that he

4   told you to use?

5   A.   Yes.

6   Q.   And that was Mackenzie Bailey's cell phone?

7   A.   Yes.

8   Q.   I am going to hand you what is in evidence as

9   Government's Exhibit 12.  Do you recognize that?

10  A.   Yes.

11  Q.   And what do you recognize that to be?

12  A.   Mackenzie's Samsung.

13  Q.   And does that look like the phone you used that night?

14  A.   Yes.

15  Q.   Looking at that phone, does that have a cracked screen?

16  A.   Yes.

17  Q.   Do you remember if it had a cracked screen when you were

18  using it that night?

19  A.   No.

20  Q.   Was it working?

21  A.   Yes.

22  Q.   And you said the defendant came in and said I want you to

23  text me on Kik using Mackenzie Bailey's phone?

24  A.   Yes.

25  Q.   Did you observe him with a cell phone?

766

C.F. - Direct By Ms. Amandolare

1   A.   Yes.

2   Q.   Do you remember what kind of cell phone that was?

3   A.   A black LG.

4   Q.   I am going to hand you what is in evidence as Government

5   Exhibit 15.  Do you recognize that?

6   A.   Yes.

7   Q.   What does that look like?

8   A.   The black LG he was using.

9   Q.   Where was Mackenzie's cell phone when you took it to use

10  that night?

11  A.   On the night stand in the bedroom.

12       MS. AMANDOLARE:  If I could have what is in evidence

13  as Exhibit 9 published to the jury.

14  BY MS. AMANDOLARE, CONTINUED:

15  Q.   C.F., taking a look at what is on your screen, does that

16  look familiar?

17  A.   Yes.

18  Q.   What does that look like to you?

19  A.   The night stand in the bedroom.

20  Q.   And that is at 44 Glenn Street?

21  A.   Yes.

22  Q.   And that was the bedroom that you and J.M. were in on

23  February 20, 2016?

24  A.   Yes.

25       MS. AMANDOLARE:  Now, if I can have Government

767

C.F. - Direct By Ms. Amandolare

Exhibit 10 published to the jury.

1   BY MS. AMANDOLARE, CONTINUED:

2   Q.   Do you recognize that photo?

3   A.   Yes.

4   Q.   Is that a close-up of the photo I just showed you?

5   A.   Yes.

6   Q.   Is that the white Samsung or look like the white Samsung

7   that you used that night?

8   A.   Yes.

9        MS. AMANDOLARE:  You can take that off.

10  BY MS. AMANDOLARE, CONTINUED:

11  Q.   So you indicated that the defendant went to into the

12  bathroom after he had come in and asked you to start Kik

13  messaging with him?

14  A.   Yes.

15  Q.   Do you remember observing the defendant take a cell phone

16  with him when he went into the bathroom?

17  A.   Yes.

18  Q.   Can you tell us what happened that night?

19  A.   He was in the bathroom.  He was texting me off of Kik,

20  and he would ask me to do things with my brother that neither

21  of us had wanted to do because it would help him.

22  Q.   So let's -- I am going to walk through this a little bit.

23  When he would say -- when he said to you I want you to do

24  things with your brother, what did you take that to mean?

768

C.F. - Direct By Ms. Amandolare

1   A.   He wanted me to have intercourse with my brother.

2   Q.   When he told you that it would help him, what did you

3   take that to mean?

4   A.   That it would please him and arouse him.

5   Q.   So did you -- you had this conversation through Kik?

6   A.   Yes.

7   Q.   Did you indicate to him or do things in a way to

8   demonstrate to him that you didn't want to do that with your

9   brother?

10  A.   Yes.

11  Q.   Did that involve delay tactics?

12  A.   Yes.

13  Q.   Did that involve trying to draw his attention elsewhere?

14  A.   Yes.

15  Q.   Did that involve you trying to offer yourself to the

16  defendant?

17  A.   Yes.

18  Q.   Anything to avoid having sex with your brother?

19  A.   Yes.

20  Q.   Tell the jury what happened?

21  A.   I had kept texting him and trying to change the subject

22  on to different things so that he would drop it, but he

23  wouldn't let it go.  And he was asking for pictures so we made

24  it look like that we were doing things and took pictures to

25  please him.

769

C.F. - Direct By Ms. Amandolare

1   Q.   Were you dressed?

2   A.   No.

3   Q.   Was your brother dressed?

4   A.   His shorts were pulled down.

5   Q.   And all of this happened over Kik Messenger?

6   A.   Yes.

7   Q.   There were chats going back and forth?

8   A.   Yes.

9   Q.   There were images sent back and forth?

10  A.   Yes.

11  Q.   Images sent from you to the defendant?

12  A.   Yes.

13  Q.   I am going to show you what is in evidence as

14  Government's Exhibit 16 and take a look at that.  Do you

15  recognize that?

16  A.   Yes.

17  Q.   And what does that depict?

18  A.   The conversation that we had over the night.

19  Q.   And you know that because who are the users that are

20  depicted in that document?

21  A.   Mackenzie's phone and fastfamily25.

22  Q.   What is the date of the first -- date and time of the

23  first message on that document?

24  A.   2/28/2016 5:45 a.m..

25  Q.   And you have had a chance to review those messages prior

770

C.F. - Direct By Ms. Amandolare

1   to testifying?

2   A.   Yes.

3   Q.   And to your recollection those messages are the messages

4   that went back and forth that night?

5   A.   Yes.

6        MS. AMANDOLARE:  Your Honor, I am go to ask

7   AUSA Fletcher and Special Agent Willard to read portions of

8   these chats?

9        THE COURT:  You may.

10       MS. AMANDOLARE:  I would ask that 16 be published,

11  starting on page one.  And every time there is a blank message,

12  I am going to ask AUSA Fletcher and Special Agent Willard to

13  pause.

14       (Document read to the Jury.)

15       MS. AMANDOLARE:  I am going to pause there and ask

16  that Government's Exhibit 16A be published to the jury.  Take

17  that down.

18  BY MS. AMANDOLARE, CONTINUED:

19  Q.   C.F., did you take a look at that photo?

20  A.   Yes.

21  Q.   Have you seen that photo before?

22  A.   Yes.

23  Q.   Is that the photo that is depicted in that chat that was

24  sent from you to the defendant?

25  A.   Yes.



771

C.F. - Direct By Ms. Amandolare

1       MS. AMANDOLARE:  Continue.

2       (Document read to the Jury.)

3       MS. AMANDOLARE:  I am going to ask that you pause

4   there and have Exhibit 16B published to the jury briefly.

5   BY MS. AMANDOLARE, CONTINUED:

6   Q.   C.F., have you seen that photo before?

7   A.   Yes.

8   Q.   Did you take that photo?

9   A.   Yes.

10  Q.   What is depicted in this chat as a blank message is the

11  image that you sent at that point in time?

12  A.   Yes.

13  Q.   And that's the image that you just saw on the screen?

14  A.   Yes.

15  Q.

16       MS. AMANDOLARE:  I am going ask you to continue.

17       (Document read to the Jury.)

18  BY MS. AMANDOLARE, CONTINUED:

19  Q.   Is that where that incident ended?

20  A.   Yes.

21  Q.   Those pictures you took, you took took those because the

22  defendant asked you to take them?

23  A.   Yes.

24  Q.   Have you been threatened by the defendant?

25  A.   Yes.

772

C.F. - Direct By Ms. Amandolare

1   Q.   What were those threats?

2   A.   That he would hurt me.  He would hurt my family.

3   Q.   Did he ever hit you?

4   A.   Yes.

5   Q.   More than once?

6   A.   Yes.

7   Q.   Were you afraid if you didn't do these things that he

8   would hurt you or your family?

9   A.   Yes.

10  Q.   Did there come a point in time where Mackenzie took her

11  phone back?

12  A.   Yes.

13  Q.   It was early in the morning?

14  A.   Yes.

15  Q.   And then did you again have the phone after Mackenzie had

16  it?

17  A.   Yes.

18       MS. AMANDOLARE:  If I could ask that starting on

19  page thirty-three be published.  I am going to have AUSA

20  Fletcher and A.T. Special Agent Willard continue to read the

21  chat starting at:  He is not going to let me.

22       (Document read to the Jury.)

23       MS. AMANDOLARE:  Pausing there and ask that what is

24  in evidence as Government's Exhibit 16D be published.

25  BY MS. AMANDOLARE, CONTINUED:

773

C.F. - Direct By Ms. Amandolare

1   Q.   Do you recognize that photo, C.F.?

2   A.   Yes.

3   Q.   Who is in that photo?

4   A.   My brother, J.M..

5   Q.   Did you take that photo?

6   A.   Yes.

7   Q.   And is that what you sent at this part of the chat?

8   A.   Yes.

9   Q.   Looking at what your brother is sleeping on, are those

10  blankets from 44 Glenn Street?

11  A.   Yes.

12  Q.   Do you remember seeing those in the house?

13  A.   Yes.

14       MS. AMANDOLARE:  You can take the image down and

15  continue with the chat.

16       (Document read to the Jury.)

17  BY MS. AMANDOLARE, CONTINUED:

18  Q.   Did there come a point in time that Mackenzie again took

19  her cell phone back?

20  A.   Yes.

21  Q.   And the person that is referred to in chats as Kenzie, is

22  that Mackenzie?

23  A.   Yes.

24  Q.   You indicated that before the only people in the house

25  were you, J.M., your brother, Mackenzie, A.T., and

774

C.F. - Direct By Ms. Amandolare

1   Stacey LaPorte?

2   A.   Yes.

3   Q.   And you were in the bedroom with your brother?

4   A.   Yes.

5   Q.   And at one point your brother went outside and was

6   sleeping?

7   A.   Yes.

8   Q.   And Mackenzie was sleeping on the couch?

9   A.   Yes.

10  Q.   And A.T. was an infant?

11  A.   Yes.

12  Q.   And the only other person in that house was the

13  defendant?

14  A.   Yes.

15  Q.   When the defendant indicated that these things were on

16  his parents, is that something that you understood?

17  A.   No.

18  Q.   He never told you anything about do it -- it is on my

19  parents, do it for my mom or dad?

20  A.   Yes, he would say those things, but he didn't explain

21  what he meant by it.

22  Q.   And he would say them often?

23  A.   Yes.

24  Q.   And the chats that you just read, the second portion,

25  that's the defendant trying to have you do additional sexual

775

C.F. - Direct By Ms. Amandolare

1   acts with your brother?

2   A.   Yes.

3   Q.   And that was within a matter of hours of the first time

4   he asked you and you did?

5   A.   Yes.

6   Q.   Was he relentless in asking you to do these things with

7   your brother?

8   A.   Yes.

9   Q.   I want to draw your attention to March 6th of 2016.  Did

10  there come a point in time on that day that your mom contacted

11  you in one way or another and demanded that you come home?

12  A.   Yes.

13  Q.   Was there anything unusual about the way that you were

14  ordered to come home?

15  A.   Yes.

16  Q.   Why was that?

17  A.   Because she said that I needed to be home right away.

18  Usually if she needed to talk to me she would tell me she would

19  talk to me once I had gotten home.

20  Q.   Did you decide to leave the house when she asked you to

21  come home?

22  A.   Yes.

23  Q.   Before you had the opportunity to leave, did you have a

24  conversation with the defendant?

25  A.   Yes.

776

C.F. - Direct By Ms. Amandolare

1   Q.   What did the defendant tell you before you left that day?

2   A.   To tell my mom that I told him and Mackenzie that I was

3   seventeen.

4   Q.   What else did he tell you?

5   A.   To text him and make it seem like I was apologizing for

6   telling him the wrong age.

7   Q.   Did he tell you why he wanted you to do that?

8   A.   No.

9   Q.   He didn't tell you why he wanted you to tell your mom

10  that you had told Stacey that you were seventeen?

11  A.   So he wouldn't get in trouble for the age.

12  Q.   After you had this conversation with the defendant, did

13  you go home?

14  A.   Yes.

15  Q.   What did you do after you got home?

16  A.   I went upstairs in my room for a while, ended up taking a

17  shower and talking to my mom.

18  Q.   Was there people over at your house when you got home?

19  A.   Yes.

20  Q.   After they left, did you have an opportunity to have a

21  conversation with your mom?

22  A.   Yes.

23  Q.   Did you tell her what happened?

24  A.   Yes.

25  Q.   When you told her what happened, you were referring to

777

C.F. - Direct By Ms. Amandolare

1   what had happened between you and Stacey?

2   A.   Yes.

3   Q.   And about your tattoo?

4   A.   Yes.

5   Q.   Did you tell your mom about J.M. at that point?

6   A.   No.

7   Q.   Did she ask you about anything with your brother?

8   A.   No.

9   Q.   Did you want to talk about what happened between you and

10  your brother?

11  A.   No.

12  Q.   What happened after you had a conversation with your mom

13  and you told her what had happened between you and Stacey?

14  A.   She had brought me up to the hospital.

15  Q.   Which hospital was that?

16  A.   Massena Memorial.

17  Q.   While you were at Massena Memorial, did you have an

18  opportunity to meet with Massena police Investigator Jason

19  Olson?

20  A.   Yes.

21  Q.   Did you talk to Jason Olson?

22  A.   Yes.

23  Q.   Did you tell him what happened with you and Stacey?

24  A.   Yes.

25  Q.   Did you tell him about your tattoo?

778

C.F. - Direct By Ms. Amandolare

1   A.   Yes.

2   Q.   Did you tell him about J.M.?

3   A.   No.

4   Q.   You didn't want to talk about it?

5   A.   No.

6   Q.   Did he ask you about it?

7   A.   No.

8   Q.   You were planning on never telling anybody if you didn't

9   have to?

10  A.   Yes.

11       MS. AMANDOLARE:  I have nothing further, Judge.

12       THE COURT:  Cross examine, Ms. Bianco.

13

14  CROSS-EXAMINATION BY MS. BIANCO:

15  Q.   Good afternoon.

16  A.   Good afternoon.

17  Q.   May I call you C.F.?

18  A.   Yes.

19  Q.   You met Stacey through his sister B.L.; is that right?

20  A.   Yes.

21  Q.   If you don't understand any of my questions I will be

22  happy to rephrase, okay?

23  A.   Okay.

24  Q.   And you started going over to Stacey's house because of

25  B.L., right?

779

C.F. - Cross by Ms. Bianco

1   A.   Yes.

2   Q.   But B.L. moved out in January of 2016?

3   A.   Yes.

4   Q.   You have to answer just so she can take the notes, okay?

5   A.   Okay.

6   Q.   But you kept going over there?

7   A.   Yes.

8   Q.   Stacey's house, and I believe you testified on direct

9   examination there were no rules?

10  A.   Yes.

11  Q.   And you were hanging out with Stacey and girlfriend

12  Mackenzie?

13  A.   Yes.

14  Q.   And you were going there on a regular basis after school?

15  A.   Yes.

16  Q.   And you were also going there on weekends?

17  A.   Yes.

18  Q.   And you had told your mom you were going over to B.L.'s

19  house?

20  A.   Yes.

21  Q.   You didn't tell your mom that B.L. had moved out?

22  A.   No.

23  Q.   You told your mom occasionally you were going to the

24  library?

25  A.   Yes.

---

780

C.F. - Cross by Ms. Bianco

1   Q.   You were lying to your mother?

2   A.   Yes.

3   Q.   Because you didn't want her to know you were over there?

4   A.   Yes.

5   Q.   And you began bringing J.M. over?

6   A.   Yes.

7   Q.   And J.M. only -- how many times did J.M. go over?

8   A.   About six times.

9   Q.   He didn't go over as much as you?

10  A.   No.

11  Q.   I want to talk to about the night of March 5, 2016, okay?

12  A.   Okay.

13  Q.   You were hanging out at Stacey and Mackenzie's house,

14  right?

15  A.   Yes.

16  Q.   And that is when you got a phonecall from your mother,

17  right?

18  A.   Yes.

19  Q.   And your mother confronted you about a tattoo she heard

20  you got, right?

21  A.   Yes.

22  Q.   And she was angry with you?

23  A.   Yes.

24  Q.   Asking you questions about the tattoo, right?

25  A.   Yes.

---

781

C.F. - Cross by Ms. Bianco

1   Q.   And you were very reluctant to tell her about the tattoo,

2   is that fair?

3   A.   Yes.

4   Q.   Now, did your mother let you stay the night because it

5   was too late to walk home?

6   A.   Yes, there is a curfew in Massena.

7   Q.   Okay.  Now, on March 6th you stated you got a text from

8   your mother telling you to come home immediately; is that

9   right?

10  A.   Yes.

11  Q.   And that was a text to Mackenzie's phone; is that

12  correct?

13  A.   Yes.

14  Q.   So she texted Mackenzie to get ahold of you, correct?

15  A.   Yes.

16  Q.   That you had given your mom Mackenzie's number?

17  A.   Yes.

18  Q.   And that specifically Mackenzie's number, not B.L.'s?

19  A.   Yes.

20  Q.   And when you got home your mother confronted you about

21  something she heard from your brother that she considered quite

22  disturbing, right?

23  A.   Yes.

24  Q.   And she asked you if it were true that you and Stacey and

25  Mackenzie were having sex, right?

---

782

C.F. - Cross by Ms. Bianco

1   A.   Yes.

2   Q.   And you didn't want to talk about it; is that correct?

3   A.   Yes.

4   Q.   And you went in your room upstairs?

5   A.   Yes.

6   Q.   And then you began texting Stacey; isn't that right?

7   A.   Yes.

8   Q.   And you told Stacey on the text that your mother won't

9   even look at you?

10  A.   We were -- she was upset.  She didn't know what to say to

11  me.

12  Q.   Okay.  Did you tell Stacey in a text she won't talk to

13  you?

14  A.   She was visiting with some family that we had over.

15  Q.   Did you say those words in a text to Stacey, won't talk

16  to you?

17  A.   Yes.

18  Q.   And did you tell Stacey she won't look at you?

19  A.   Yes.

20  Q.   And that was in a text, correct?

21  A.   Yes.

22  Q.   And you explained to Stacey in a text "really fucked up,

23  it is my fault.  I am taking responsibility, but that is not

24  what is upsetting."  Did you say that?

25  A.   I don't recall.

783

C.F. - Cross by Ms. Bianco

1   Q.   Okay.  Would seeing that text refresh your recollection?

2   A.   Maybe.

3   Q.   Okay.

4        MS. BIANCO:  I think this in evidence already.  I am

5   going to show D8 at 4:49:30.  Can we put that on the screen?

6        MS. AMANDOLARE:  What is the exhibit number?

7        MS. BIANCO:  It is our D8, but it is the text

8   between C.F. and Stacey on March 6th.  I believe they are in

9   evidence already.  You put them in.  I am not sure which

10  exhibit you have it in.  I have it as D8.

11       MS. AMANDOLARE:  I don't believe that those are in

12  evidence.

13       MS. BIANCO:  This is the device between the LG and

14  C.F.'s phone.

15       May I approach the witness, Your Honor?

16       THE COURT:  You may.

17  BY MS. BIANCO, CONTINUED:

18  Q.   Showing you what has been marked as D8 --

19       THE COURT:  What is it marked as?

20       MS. BIANCO:  D8.

21  BY MS. BIANCO, CONTINUED:

22  Q.   Did you recognize those series of texts between you and

23  an LG phone?

24  A.   Yes.

25  Q.   Okay, and those are the texts you did that morning of

784

C.F. - Cross by Ms. Bianco

1   March the 6th?

2   A.   Yes.

3   Q.   And those are accurate, correct?

4   A.   Yes.

5        MS. BIANCO:  I would offer D8.

6        MS. AMANDOLARE:  Can I take a look at that?

7        MS. BIANCO:  Absolutely.

8        MS. AMANDOLARE:  No objection.

9        THE COURT:  Are you offering it in evidence?

10       MS. BIANCO:  I am.

11       THE COURT:  No objection, received, Defendant's 8.

12       (Exhibit No. 8, received.)

13  BY MS. BIANCO, CONTINUED:

14  Q.   D8 at 4:49:30.  Where it says from littlestarcushings99,

15  do you see that?

16  A.   Yes.

17  Q.   Do you remember saying it is my fault.  I am taking full

18  responsibility, but that's not what is upsetting me.  Do you

19  remember saying that to Stacey?

20  A.   No, I don't recall.

21  Q.   You are not saying it didn't happen, you just don't

22  remember doing it?

23  A.   Yes.

24  Q.   But you were texting back and forth to Stacey before you

25  talked to your mother?

785

C.F. - Cross by Ms. Bianco

1   A.   Yes.

2   Q.   D8 at 4:50:47.  Do you remember saying I just -- I don't

3   want her to hate me.  I want her to be able to trust me but I

4   always mess it up.  Do you remember saying that to Stacey?

5   A.   I don't remember.  This was a while ago.

6   Q.   All right.  The next line from littlestarcushing, that

7   would be you, correct?

8   A.   Yes.

9   Q.   I am sorry I got you guys into this mess.  Do you

10  remember saying that?

11  A.   That had been part of what he had told me to text them.

12  Q.   Okay.  But at this point you were upstairs, correct?

13  A.   Yes.

14  Q.   And your mother is downstairs not talking to you?

15  A.   Yes.

16  Q.   And you are having communications with Stacey?

17  A.   Yes.

18  Q.   And you are saying you feigned all of this for some

19  future date?

20  A.   I don't understand.

21  Q.   Sure.  You said that's what Stacey told you to write.

22  You said you didn't write this of your own volition?

23  A.   He told me to act normal, make it seem like I told him I

24  was sixteen.

25  Q.   Okay, but I am asking you specifically about I am sorry I

786

C.F. - Cross by Ms. Bianco

1   got you guys into this mess.  You wrote that, didn't you?

2   A.   Yes.

3   Q.   Okay, and that was of your own volition, in other words,

4   you did that on your own, correct?

5   A.   No.  He told me to act normal and write things like that

6   to make it look as if I had lied to them, and told them the

7   wrong age.

8   Q.   So this was a guise somehow to get people to believe that

9   this actually happened, you are saying this was a made up show,

10  these texts?

11  A.   Yes.

12       MS. BIANCO:  6:02:52 -- oh no, excuse me, 5:31:13

13  please.

14  BY MS. BIANCO, CONTINUED:

15  Q.   Do you tell Stacey that you were fighting with your

16  parents about the tattoo, 5:31:13.  I really messed up.  My mom

17  handed me the phone.  I said hi.  He said hi.  I told him I had

18  to tell him something and that he was going to be pissed off,

19  and he said what.  And I told him I got a tattoo about two

20  months ago.  There was a ten second pause.  Then he said

21  goodbye.  Did you write that?

22  A.   Yes.

23  Q.   Was that part of the made up story?

24  A.   No.  I had told my dad about my tattoo, and he didn't know

25  how to comprehend it.

G.A. 143

787

C.F. - Cross by Ms. Bianco

1  Q.   So that part was you writing it and that was true?

2  A.   Yes.

3  Q.   And you remember doing that?

4  A.   Yes.

5  Q.   Okay.  6:02:54.  Did you apologize to Stacey for lying to

6  him and Mackenzie and say -- 6:02:54, I am sorry for lying to

7  you guys.  I could have gotten yous in serious trouble.  Did

8  you write that?

9  A.   Yes.

10 Q.   And you wrote that on your own or was that somebody

11 making you write that?

12 A.   He had told me to write that earlier in the day.

13 Q.   This was a fairly lengthy conversation that you are

14 texting back and forth all day long?

15 A.   Yes.

16 Q.   So sometimes you are writing what you are saying and

17 sometimes you are writing what he told you to say?

18 A.   Yes.

19       MS. BIANCO:   6:04:59, please.

20 BY MS. BIANCO, CONTINUED:

21 Q.   From fastfamily, is this Stacey saying, well, it is done

22 and over.  I talked to your mom and told her about you saying

23 you were and that we were all together, and she agreed that if

24 you would have told the truth this would have been better for

25 you.  You answered okay.  Is that -- do you remember that

---

788

C.F. - Cross by Ms. Bianco

1  conversation?

2  A.   Yes.

3  Q.   Is that more of just a fake conversation that you are

4  setting up for -- to fool your mom?

5  A.   Yes.

6  Q.   But you are anticipating that your mom is going to read

7  these texts?

8  A.   I didn't know at the time.

9  Q.   Okay.  So you don't know, but you are making up lies on

10 the text with Stacey in case someday in the future she looked

11 at them?

12 A.   Yes.

13 Q.   Okay.

14       MS. BIANCO:   6:04:59.  Oh, I am sorry.  I just did

15 that one.  6:14:38, please.  61:14:38.  All right.  We will

16 just skip ahead.

17 BY MS. BIANCO, CONTINUED:

18 Q.   When you met Stacey, did you tell him certain things --

19 do you need a break?

20 A.   No.

21 Q.   When you met Stacey -- do you need some water or

22 something?

23 A.   No.

24 Q.   When you met Stacey, did you tell him certain things

25 about you that were untrue?

789

C.F. - Cross by Ms. Bianco

1  A.   What do you mean by that?

2  Q.   Did you tell him you were from Texas?

3  A.   Not that I recall.

4  Q.   Did you tell him you were adopted by your aunt?

5  A.   No.

6  Q.   Did you tell him you were having problems getting working

7  papers because your paperwork was in another state, do you

8  remember saying that?

9  A.   No.

10 Q.   You didn't say it or you don't remember saying it?

11 A.   I don't remember say that.

12 Q.   Did you tell Stacey when you first met him that you were

13 in fact seventeen?

14 A.   No.

15 Q.   Did you tell Mackenzie that you were seventeen?

16 A.   No.

17 Q.   Did you tell Stacey that you had your mother's permission

18 to get a tattoo?

19 A.   No.

20 Q.   You never said that my mother said it is okay?

21 A.   No.

22 Q.   When you were getting the tattoo that said -- I believe

23 you said kinky; is that right?

24 A.   Yes.

25 Q.   You were aware that Mackenzie had a kinky tattoo?

---

790

C.F. - Cross by Ms. Bianco

1  A.   Yes.

2  Q.   And you wanted something that matched something that

3  Mackenzie had?

4  A.   Yes.

5  Q.   And you wanted to keep it in a private place so no one

6  would see it?

7  A.   Yes.

8  Q.   And when you were texting Stacey on that March 6th, you

9  knew you were in a lot of trouble with your mother because of

10 the tattoo; is that right?

11 A.   Yes.

12 Q.   And you had refused to go downstairs to talk to her?

13 A.   Like I said, there was family visiting so I didn't really

14 want to bring anything up with all the family inside of the

15 house.

16 Q.   Okay.

17       MS. BIANCO:   6:23:14, please.

18 BY MS. BIANCO, CONTINUED:

19 Q.   You are familiar with the fact that Stacey had already

20 had a conversation with your mother, correct, by this point?

21 A.   Yes.

22 Q.   And did you say -- and this is the one, 6:23:14, did she

23 say I wouldn't even go downstairs.  Did you say that?

24 A.   I don't remember.

25 Q.   Okay.  You are not saying you didn't say it, you just

791

C.F. - Cross by Ms. Bianco

1    don't remember, fair?

2    A.   Yes.

3    Q.   Did you say that you wanted to text Mackenzie on Kik, but

4    you didn't have her screen name, did you say that?

5    A.   I don't remember.

6    Q.   Okay.

7         MS. BIANCO:  6:16:37.

8    BY MS. BIANCO, CONTINUED:

9    Q.   Did you say I know -- can I have Ken's Kik, please, and

10   say I wasn't allowed back over, do you remember saying that?

11   A.   No.

12   Q.   Not saying it didn't happen, you just don't remember

13   saying it?

14   A.   Yes.

15   Q.   Do you remember wanting to get ahold of Mackenzie to let

16   her know why you weren't coming back to the house, you didn't

17   want her to feel bad?

18   A.   I don't remember.

19   Q.   Do you remember talking to Stacey and talking to him

20   about having a conversation -- this is the same night?

21        MS. BIANCO:  6:52:42, please.

22   BY MS. BIANCO, CONTINUED:

23   Q.   Do you remember talking to Stacey and saying this, my

24   grandpa's GF, that would be girlfriend, correct?

25   A.   Yes.

792

C.F. - Cross by Ms. Bianco

1    Q.   Just came to my doorway and said what is the matter?  I

2    said nothing.  She said I heard about your tattoo.  She is like

3    I am not one to judge, don't worry.  Do you remember saying

4    that?

5    A.   No.

6    Q.   Do you remember having a conversation with the other

7    family members that night about how much trouble you were in

8    because of the tattoo?

9    A.   I remember my grandpa's girlfriend coming to the doorway

10   and asking me if I was okay, but that is about it.

11   Q.   And you were upset when you were upstairs because you

12   thought you were in a lot of trouble with your mom, is that

13   fair?

14   A.   Yes.

15   Q.   Did you tell Stacey at 7:07:02 that your nerves were

16   totally shot, do you remember saying that?

17   A.   No.

18        MS. BIANCO:  7:07:02.

19        COURTROOM TECHNICIAN:  I don't have it.

20        MS. BIANCO:  I will move along.

21   BY MS. BIANCO, CONTINUED:

22   Q.   Do you remember texting Stacey that night that you loved

23   him?

24   A.   No.

25        MS. BIANCO:  7:10:53, please.  I have a have a copy

793

C.F. - Cross by Ms. Bianco

1    right here.

2    BY MS. BIANCO, CONTINUED:

3    Q.   Let's go back to the one where we talked about you not

4    remembering telling Stacey your nerves are totally shot.

5    7:07:02.  Do you remember writing that my nerves are totally

6    shot.

7    A.   I don't recall.  There was lot of texting conversations

8    that we had.

9    Q.   Sure.  I mean you were texting all afternoon, fair?

10   A.   Yes.

11   Q.   And he is telling you that you needed to calm down, yes?

12   A.   Yes.

13   Q.   And at 7:10:53, which is the very next page, you are

14   texting that you love him.  Do you remember that?

15   A.   No.

16   Q.   You don't remember that at all?  Okay.  By midnight that

17   same night you are talking to the police, correct?

18   A.   Yes.

19   Q.   And when you were talking to the police you spoke to an

20   Investigator Olson?

21   A.   Yes.

22   Q.   Okay, and your mother called the police, it wasn't you,

23   correct?

24   A.   Yes.

25   Q.   And at midnight you were telling Investigator Olson that

794

C.F. - Cross by Ms. Bianco

1    you had been raped by Stacey that very morning; is that right?

2    A.   Yes.

3    Q.   You said you were raped, correct?

4    A.   Yes.

5    Q.   And you told Investigator Olson that you didn't consent

6    to have sex with Stacey; is that right?

7    A.   Yes.

8    Q.   And that this had been going on over a two-month period;

9    is that correct?

10   A.   Yes.

11   Q.   But that wasn't true, was it?

12   A.   Some of it was consensual.  Some of it was not.

13   Q.   But were you lying to Investigator Olson when you were

14   saying you were raped that morning, correct?

15   A.   No.

16   Q.   You were raped that morning, yes?

17   A.   Yes.

18   Q.   But you are telling him you love him in a text?

19   A.   Yes.

20   Q.   Did you tell Investigators Olson that you never consented

21   to have sex with Stacey?

22   A.   I don't recall.

23   Q.   Okay.  Would seeing your report written by Investigator

24   Olson --

25        MS. BIANCO:  I will strike that.

Case 18-105, Document 44, 04/15/2019, 2540369, Page149 of 202
Case 5:16-cr-00320-DNH   Document 118-3   Filed 09/05/18   Page 116 of 219
Case 5:16-cr-00320-DNH   Document 118-3   Filed 09/05/18   Page 117 of 219

795

C.F. - Cross by Ms. Bianco

BY MS. BIANCO, CONTINUED:

2  Q.  Did you tell Investigator Olson that you never consented
3  to have sex with Mackenzie?
4  A.  I don't recall.
5  Q.  You are not saying you didn't say that, you just don't
6  recall?
7  A.  Yes.
8  Q.  Okay.  Did you tell Investigators Olson that Mackenzie
9  would hold you down, do you remember saying that?
10 A.  Yes.
11 Q.  That you told that to Investigator Olson that she is
12 forcing you down?
13 A.  Yes.
14 Q.  And yet you continued to go back to the house over and
15 over again, back to Stacey's house, yes?
16 A.  Yes.
17 Q.  And when you were telling Investigator Olson that you had
18 been raped by Stacey and Mackenzie, he didn't have your phone
19 texts at the time, did he?
20 A.  No.
21 Q.  And you didn't show him any of the conversations you had
22 with Stacey earlier that night between you and he before you
23 went to the police station saying you were raped?
24 A.  No.
25 Q.  And when you spoke to Investigator Olson, you never told

796

C.F. - Cross by Ms. Bianco

1  him about Stacey making you have sex with J.M.?
2  A.  No.
3  Q.  Do you remember having conversations with
4  Mackenzie Bailey testifying to her by text, you guys mean
5  everything to me.  Every time someone asks if I am single, man,
6  do I just want to brag and tell them I have best girlfriend and
7  boyfriend on earth.  Do you remember texting that to Mackenzie?
8  A.  I don't recall.
9  Q.  Would seeing the text refresh your recollection?
10 A.  Maybe.
11     MS. BIANCO:  May I have D2, please.  May I approach,
12 Your Honor?
13     THE COURT:  You may.
14 BY MS. BIANCO, CONTINUED:
15 Q.  Showing you Defendant's Exhibit 2, and I am going to ask
16 you to review that to yourself and see if that refreshes your
17 recollection about the text you sent?
18 A.  I don't recall this.
19 Q.  You would be littlestarcushing, correct?
20 A.  Yes.
21 Q.  You are not say you didn't say that, you are just saying
22 you don't recall saying that; is that right?
23 A.  Yes.
24 Q.  Did you frequently refer to Stacey and Mackenzie as your
25 boyfriend and girlfriend?

797

C.F. - Cross by Ms. Bianco

1  A.  Yes.
2  Q.  So that wouldn't be a lie that they were your boyfriend
3  and girlfriend?
4  A.  Yes.
5  Q.  And you would tell them specifically that they mean
6  everything to you, didn't you say that to them directly?
7  A.  I don't recall.
8  Q.  Did you have conversations between Mackenzie -- just you
9  and Mackenzie on January 25, 2016, did you ever text just
10 Mackenzie back and forth?
11 A.  Maybe a few times.
12 Q.  Do you remember her asking you about the sexual contact
13 between you and she, that whether you were -- whether you like
14 her to do certain things to you, do you remember her asking
15 questions like that?
16 A.  She had sometimes, yes.
17 Q.  And she was communicating with you trying to engage you
18 sexually; is that right?
19 A.  Yes.
20 Q.  And trying to joke around with you about you, Stacey, and
21 her?
22 A.  Yes.
23 Q.  Now, I believe the prosecutor showed you an exhibit which
24 was Government's Exhibit 36, which was some texts about the
25 Fast and Furious names; is that right?  Do you remember seeing

798

C.F. - Cross by Ms. Bianco

1  that about the names of his children?
2  A.  Yes.
3  Q.  Were you specifically talking on that day about naming a
4  proposed child between you and Stacey, Elias James LaPorte?
5  A.  No, there had been talk of Stacey and Mackenzie wanting
6  to have a child together.
7  Q.  And that would be the name Elias?
8  A.  Yes, they were talking about names, and I had thrown that
9  one out there.
10 Q.  Okay.  So you were just helping them with names of a
11 potential child?
12 A.  Yes.
13 Q.  Now, I want to direct your attention to February 28,
14 2016, the night that there was some sexual contact between you
15 and J.M., okay?
16 A.  Yes.
17 Q.  And I know this is a difficult subject for you.  You were
18 intoxicated that night.
19 A.  Yes.
20 Q.  And you had slurred speech?
21 A.  Yes.
22 Q.  And you testified before the Grand Jury that you were
23 pretty out of it?
24 A.  Yes.
25 Q.  You were drunk through and through, you testified to

799

C.F. - Cross by Ms. Bianco

1   that?

2   A.   Yes.

3   Q.   Okay.  J.M. was also drunk?

4   A.   I hadn't seen how much he had to drink, but I know he had

5   been drinking quite a bit.

6   Q.   And J.M. was acting kind of silly, goofy?

7   A.   Yes.

8   Q.   Also a little bit inappropriate, not just to you, but to

9   everyone in the house, silly?

10  A.   Yes.

11  Q.   He was doing it to Mackenzie, correct?

12  A.   I don't recall.

13  Q.   Do you remember him pulling his pants down to Mackenzie

14  to show her his behind, do you remember that?

15  A.   No.

16  Q.   Didn't happen or you don't remember?

17  A.   I don't remember.

18  Q.   Do you remember J.M. acting like the whole night was

19  really funny, what was going on?

20  A.   When we were drinking, yes.

21  Q.   And you had Mackenzie's Samsung phone at the time; is

22  that right?

23  A.   Yes.

24  Q.   And that's the phone you took the pictures on,

25  Mackenzie's phone?

800

C.F. - Cross by Ms. Bianco

1   A.   Yes.

2   Q.   And Mackenzie was home, correct?

3   A.   Yes.

4   Q.   And you never had sex with J.M. that night, right?

5   A.   No.

6   Q.   You just pretended that you were having sex for the

7   pictures; is that right?

8   A.   Yes.

9   Q.   Were you and Stacey laughing about or excuse me, you and

10  the person on the other end of the text, laughing about what

11  was going on, like ha ha, he kind of thing?

12  A.   No.  I was trying to change his attention away from

13  everything.

14  Q.   During this sexual encounter with your brother that never

15  amounted to sex, Stacey never came in the room, correct?

16  A.   Yes.

17  Q.   Yes -- I am sorry, bad question.  Yes, he never -- he

18  never came into the true, is that true?

19  A.   He did not come in the room.

20  Q.   Okay, and I believe you testified during direct

21  examination that there was some promise if you did this you

22  were going to get a tattoo; is that right?

23  A.   Yes.

24  Q.   And you are referring to the kinky tattoo?

25  A.   Yes.

801

C.F. - Cross by Ms. Bianco

1   Q.   Because you didn't have a tattoo at that time, correct?

2   A.   Yes.

3        MS. BIANCO:  May I see 16A and B, please.  Thank

4   you.

5   BY MS. BIANCO, CONTINUED:

6   Q.   Showing you 16B, does the person on top of 16B have a

7   tattoo?

8   A.   Yes.

9   Q.   And it says kinky, correct?

10  A.   Yes.

11  Q.   And you didn't have a tattoo at that point, did you?

12  A.   Yes, I did.

13  Q.   I thought you just testified that you were debating

14  whether -- if you did these they things, you would be able to

15  get a tattoo, didn't you say that?

16  A.   I had wanted another tattoo.

17  Q.   Another tattoo?

18  A.   Yes.

19  Q.   So it wasn't the -- so you were mistaken when you said it

20  was about the kinky tattoo?

21  A.   Yes.

22  Q.   And during this conversation between the person texting

23  you while you are in with J.M., the person is  offering to pay

24  money and cigarettes to J.M., was that what I heard on direct

25  examination, twenty dollars or something like that and a bag?

802

C.F. - Cross by Ms. Bianco

1   A.   Yes.

2   Q.   Stacey wasn't working at the time, was he?

3   A.   No.

4   Q.   The only one that had a job was Mackenzie; is that right?

5   A.   Yes.

6        MS. BIANCO:  May I have a moment, Your Honor?  I

7   have no further questions.  Thank you very much.

8        THE COURT:  Redirect, if any.

9        MS. AMANDOLARE:  Briefly, Your Honor.

10

11  REDIRECT EXAMINATION BY MS. AMANDOLARE:

12  Q.   C.F., you indicated on cross-examination that you often

13  would lie to your mom and say you were going to the library or

14  you were going over to hang out with B.L. at 44 Glenn Street,

15  right?

16  A.   Yes.

17  Q.   Why would you lie?

18  A.   Because I didn't want to get in trouble for going over

19  there and drinking and staying up all night, smoking

20  cigarettes.

21  Q.   Is it fair to say that if your mom knew Stacey's age,

22  knew what was going on, knew that you were drinking, knew that

23  you were smoking, she wouldn't allow you to go over there?

24  A.   Yes.

25  Q.   And you indicated on direct that you would go over there

803

C.F. - Redirect by Ms. Amandolare

1  because it was fun?

2      A.   Yes.

3      Q.   And you were sixteen?

4      A.   Yes.

5      Q.   And the defendant was twenty-five?

6      A.   Yes.

7      Q.   Now, on direct examination you talked about -- a little

8  bit about why you would go over there.  Would you go over there

9  to help babysit A.T.?

10          MS. BIANCO:  Objection.  Outside the scope of

11  cross-examination.

12          THE COURT:  Sustained.

13  BY MS. FLETCHER, CONTINUED:

14     Q.   Why did your mom have Mackenzie Bailey's cell phone

15  number?

16     A.   Because at times I would help babysit A.T. for them.

17     Q.   And your mother knew that?

18     A.   Yes.

19          MS. BIANCO:  Objection.  This is way beyond the

20  scope of cross-examination.

21          THE COURT:  Yes.  Sustained that answer be stricken.

22  Members of the jury, you are instructed to disregard it.  Move

23  on.

24          MS. AMANDOLARE:  Your Honor, I would just note that

25  defense counsel asked the witness with regard --

804

C.F. - Redirect by Ms. Amandolare

1          THE COURT:  The ruling has been made.  Move on.

2  BY MS. AMANDOLARE, CONTINUED:

3      Q.   And what defense counsel is referring to as text

4  messages, those were all Kik messages between you and the

5  defendant?

6      A.   Yes.

7      Q.   And as defense counsel indicated the defendant had

8  fastfamily25?

9      A.   Yes.

10     Q.   You didn't deny on direct examination that you had

11  feelings for the defendant, correct?

12     A.   Yes.

13     Q.   And you didn't deny on direct examination that you had

14  feelings for Mackenzie, correct?

15     A.   Yes.

16     Q.   But how old were you?

17     A.   Sixteen.

18     Q.   How old was the defendant?

19          MS. BIANCO:  Objection.  Asked and answered.

20          THE COURT:  Sustained.  Answer stricken.  You just

21  asked and answered that.

22  BY MS. AMANDOLARE, CONTINUED:

23     Q.   Is it fair to say that none of the sexual conduct you had

24  with the defendant was consensual because you were sixteen and

25  he was twenty-five?

805

C.F. - Redirect by Ms. Amandolare

1          MS. BIANCO:  Objection.

2          THE COURT:  Sustained.  Sustained.  It is not up to

3  her to decide that.

4  BY MS. AMANDOLARE, CONTINUED:

5      Q.   Who supplied the alcohol at 44 Glenn Street?

6          MS. BIANCO:  Asked and answered.

7          THE COURT:  Sustained.

8  BY MS. AMANDOLARE, CONTINUED:

9      Q.   Who supplied the cigarettes at 44 Glenn Street?

10          MS. BIANCO:  Same objection.

11          THE COURT:  Sustained.

12          MS. AMANDOLARE:  May I have a moment, Your Honor?

13          THE COURT:  You may.

14          MS. AMANDOLARE:  Nothing further.

15          THE COURT:  Recross, if any?

16          MS. BIANCO:  No thank you, Your Honor.

17          THE COURT:  All right.  Members of the jury we are

18  going to break for lunch now, and we will be back at 1:30.

19  Again, as I said before, don't discuss the case among

20  yourselves or anyone else.  Keep an open mind, and we will be

21  back at 1:30.  Everyone shall remain in the courtroom until the

22  jury has had a chance to exit.

23          Mr. McBrearty.

24          COURT CLERK:  Court stands for the luncheon recess.

25          (Whereupon, the luncheon recess was taken.)

806

1          (Whereupon, the proceedings were held in open court

2           in the presence of the Jury.)

3          THE COURT:  Government may call its next witness.

4          MS. FLETCHER:  Thank you, Your Honor.  The

5  Government calls Hillary Trimm.

6

7          HILLARY TRIMM, having been called as a Witness, being

8  first duly sworn, was examined and testified as follows under

9  oath:

10

11  DIRECT EXAMINATION BY MS. FLETCHER:

12     Q.   Hillary, how old are you?

13     A.   I am twenty-six.

14     Q.   Where did you grow up?

15     A.   Between Massena and Norfolk.

16     Q.   Did you graduate from high school?

17     A.   Yes, I did.

18     Q.   What school did you graduate from?

19     A.   Massena Central.

20     Q.   What did you do after high school?

21     A.   Did the things every kid wants to do, take a year off

22  before college, got stuck in a fast food restaurant job.

23     Q.   Did you ever go to college?

24     A.   No.

25     Q.   Where did you work after high school?

**G.A. 148**

Case 18-105, Document 44, 04/15/2019, 2540369, Page152 of 202
Case 5:16-cr-00320-DNH   Document 118-3   Filed 09/05/18   Page 128 of 219
Case 5:16-cr-00320-DNH   Document 118-3   Filed 09/05/18   Page 129 of 219

807

HILLARY TRIMM - Direct By Ms. Fletcher

1   A.   I continued to work at McDonald's through and after high
2   school.
3   Q.   So you worked at McDonald's while you were in high
4   school?
5   A.   Yes.
6   Q.   And then you stayed?
7   A.   Yes.
8   Q.   How long did you work at McDonald's?
9   A.   Probably altogether about four years.
10  Q.   Did there come a time that you moved away from Massena?
11  A.   Yes, I moved to Plattsburgh.
12  Q.   When was that?
13  A.   It was in the summertime of maybe 2010.  I am not really
14  positive.
15  Q.   What did you do when you moved to Plattsburgh?
16  A.   I worked at a hotel.
17  Q.   How did you work there?
18  A.   For about a few months, the whole summertime.
19  Q.   What did you do after that?
20  A.   I was homesick so I came back home to live with my mom
21  again.
22  Q.   In Massena?
23  A.   We were in Norfolk at the time.
24  Q.   Did you get a job?
25  A.   I did.

808

HILLARY TRIMM - Direct By Ms. Fletcher

1   Q.   What did you do?
2   A.   I believe that job that I got after that was working at
3   Western Nor on the res.
4   Q.   Where did you go from there, what did you do after that
5   job?
6   A.   After that job I ended up -- I think that's when I ended
7   up moving back to Plattsburgh with my really good friend.  We
8   got a job at Wal-Mart so we went and worked there.
9   Q.   Who is your really good friend?
10  A.   Michelle Stipest (phonetically).
11  Q.   And you and Michelle moved to Plattsburgh and got jobs at
12  Wal-Mart?
13  A.   I got hired before I moved, and she was already there.
14  Q.   Did she live in Plattsburgh?
15  A.   She did.  She doesn't anymore.
16  Q.   Do you remember what year it was that you moved to
17  Plattsburgh to work at the Wal-Mart?
18  A.   2012 I want to say.
19  Q.   Did you become pregnant when you lived in Plattsburgh?
20  A.   I did.
21  Q.   Was that your first child?
22  A.   Yes.
23  Q.   When was she born?
24  A.   May 31, 2014.
25  Q.   What is her name?

809

HILLARY TRIMM - Direct By Ms. Fletcher

1   A.   C.T..
2   Q.   Who is her father?
3   A.   Spencer.
4   Q.   Where were you living when C.T. was born?
5   A.   I was living back at home with my mother in Norfolk.
6   Q.   You moved back after you found out you were pregnant?
7   A.   Yes.
8   Q.   Did there come a time that you and C.T., after she was
9   born, moved out on your own?
10  A.   It was about six months or so after she was born, I ended
11  up finally getting approved to move into the projects.
12  Q.   In the projects where?
13  A.   Massena.
14  Q.   Is there an address there?
15  A.   I was at 3 Perkins.
16  Q.   Were you working?
17  A.   I was working at Wal-Mart in Massena.
18  Q.   Who was watching C.T. while you worked?
19  A.   At first I had my friend do it.  I trusted her.  She was
20  reliable.  So I was trying to pay her through Canton, and that
21  fell through.  So then one of my friend's girlfriend's mother
22  was babysitting her for a little while.
23  Q.   Was it just you and C.T. when you first moved into 3
24  Perkins?
25  A.   And my cat.

810

HILLARY TRIMM - Direct By Ms. Fletcher

1   Q.   What is your cat's name?
2   A.   Lizzy.
3   Q.   Do you know the defendant in this case, Stacey LaPorte?
4   A.   Yes.
5   Q.   And do you know him as Stacey or Joey?
6   A.   I know him as Joey.
7   Q.   Do you see him in the courtroom today?
8   A.   Yes.
9   Q.   Could you identify him for the record, please?  You need
10  to point and tell us where he is sitting and what he is
11  wearing?
12  A.   Well, he is to my right and he is wearing a tan dress
13  shirt.
14       MS. FLETCHER:  Let the record reflect she has
15  identified the defendant.
16       THE COURT:  So noted.
17  BY MS. FLETCHER, CONTINUED:
18  Q.   When was the first time you met Joey?
19  A.   I was pregnant with C.T..
20  Q.   Was that in 2014?
21  A.   At the beginning of it, yes, before she was born.
22  Q.   Did you have a boyfriend at the time?
23  A.   I did.
24  Q.   And did you have a conversation with Joey at that time
25  when you first met him?

811

HILLARY TRIMM - Direct By Ms. Fletcher

1  A.  We didn't really talk too much.  We went over to my

2  boyfriend-at-the-time's friend's house, and he was there

3  because he was dating her.  He introduced himself and said he

4  likes to be called Joey because he didn't like his first name.

5  So that is how it went by.  I was too infatuated with that guy

6  to really pay too much attention.

7  Q.  Okay.  Who was Joey dating when you first met him?

8  A.  Sarah Burnett.

9  Q.  Did there come a time after you had C.T. that you saw

10  Joey again?

11  A.  When I was working at Wal-Mart in Massena.

12  Q.  And can you explain to the members of the jury how it was

13  that you became reacquainted him after C.T. was born?

14  A.  One day while I was working, I was walking back to my

15  register.  I had noticed him.  I kind of stared at him for a

16  minute because he looked familiar, but I couldn't put a face to

17  it.  And then he gave me a dirty look so I looked away, and I

18  just kept walking.  I left it alone at that.

19      And then one day I was working the self checkout, and he

20  was coming through purchasing, and I realized -- it clicked to

21  who he was.  I asked him, I was like why do you hate me?  And

22  we just started talking after that.

23  Q.  And did you know Mackenzie Bailey?

24  A.  I knew of her.  We had talked, but I didn't know at that

25  time that they were together.

812

HILLARY TRIMM - Direct By Ms. Fletcher

1  Q.  What do you mean you and Mackenzie had talked?

2  A.  In our passing when we were on breaks.  She was in the

3  butt hut.

4  Q.  What is the butt hut?

5  A.  Where it was safe to smoke.

6  Q.  Was she working at Wal-Mart at the time?

7  A.  Yes.

8  Q.  So there is a place for employees to smoke?

9  A.  Yes.

10  Q.  And was Joey working at Wal-Mart at the time that you saw

11  him there?

12  A.  Yes.

13  Q.  Do you remember about when this was?

14  A.  I thought it was the beginning of March, but I guess it

15  was later.

16  Q.  Okay.  Was this in 2015?

17  A.  Yes.

18  Q.  And were you still living at Perkins?

19  A.  Yes.

20  Q.  What happened with Joey after this, becoming acquainted

21  with him at Wal-Mart?

22  A.  We started talking through Mackenzie's Facebook.

23  Q.  Can you explain that?

24  A.  He found me.  I don't think I found her.  He found me and

25  he had messaged me.  He let me know that it was him that I was

813

HILLARY TRIMM - Direct By Ms. Fletcher

1  talking to.  He said that was the way that he could talk

2  because he didn't have a phone and she did, so we just talked

3  through Facebook.

4  Q.  And what did you talk about?

5  A.  Caught up on the past, what we have been doing and then

6  it got brought up about being in a three-way relationship.

7  Q.  Who brought up being in three-way relationship?

8  A.  He did.

9  Q.  What did he say about that?

10  A.  I don't remember exactly.  I just know that him and

11  Mackenzie were both down for it, and I told him that I wasn't

12  interested in her that way.  That I wasn't going to try to

13  force myself, that I was more interested in just being with him

14  than I was with her.

15  Q.  How did things progress with Joey after you told him that

16  you were not interested in a three-way relationship?

17  A.  Him and I just started talking about us and possibly

18  having a future.

19  Q.  Would you say that you started dating?

20  A.  More or less, it was never like officially said, but we

21  started spending a lot of time together, and we were sleeping

22  together.  So I took that as dating.

23  Q.  Where would you hang out, where would you guys get

24  together?

25  A.  We mostly met at my house.

814

HILLARY TRIMM - Direct By Ms. Fletcher

1  Q.  Do you know if he was still with Mackenzie at the time?

2  A.  At the beginning of everything, yes, he was.

3  Q.  Was that a problem for you?

4  A.  I felt really jealous about it.  I kept telling him that

5  if he didn't want to be with her, he needed to end it so that

6  him and I could be together.

7  Q.  What did he say?

8  A.  I will do it.  I will do it.  I will do it.

9  Q.  Did he?

10  A.  No.

11  Q.  You said there was a time he started spending the night?

12  A.  Yes.

13  Q.  And did there come a time that he asked you about whether

14  you had thoughts about children?

15  A.  There was a time that he brought that up, yes.

16  Q.  Could you explain to the members of the jury what he

17  brought up and what he said?

18  A.  We were sitting next to each other on the couch, and he

19  messaged me through Kik.

20  Q.  While you were sitting next to each other?

21  A.  Yes.

22  Q.  Okay?

23  A.  And he had asked me if I ever had thoughts about touching

24  children or if I ever wanted to.  And at first I told him no

25  and he was going to drop it, but my curiosity got the better of

815

HILLARY TRIMM - Direct By Ms. Fletcher

1   me, and I was like, well, I have had thoughts, why?  Just to
2   egg him on to see what he would say.
3       So he told me about how he had been molested and
4   everything as a child from family members.  And of course, me
5   having a big heart, I was sympathetic, and I felt bad.  He said
6   that is why he does what he does because it helps him cope with
7   it.
8   Q.  Did he explain what he meant by he does what he does?
9   A.  Why he touches children.
10  Q.  Now, when you were texting or chatting or messaging with
11  him on Kik, did you have a Kik account?
12  A.  Yes.
13  Q.  What was your Kik account?
14  A.  My Kik account was washoveryou.
15  Q.  Did you come up with that user name yourself?
16  A.  Yes, because it was the e-mail address I could remember
17  the password to.
18  Q.  Did you use that account for -- did you ever have more
19  than that one Kik account?
20  A.  No, I have only ever had that one.
21  Q.  Do you recall any of the Kik accounts that the defendant
22  used when he would talk to you?
23  A.  He has talked to me from his yourgirl.  There was a
24  fastfamily one, and the last most recent one I remember was
25  prouddaddy.

816

HILLARY TRIMM - Direct By Ms. Fletcher

1   Q.  I want to go back to this conversation where he asked you
2   and told you that he does things with kids.  What happened
3   after that?
4   A.  He brought up wanting to do stuff with C.T..
5   Q.  Was that the same day or a different day?
6   A.  It wasn't in the same day.
7   Q.  So there came another time when he brought up the subject
8   of C.T.?
9   A.  Yes.
10  Q.  Can you tell the members of the jury about that
11  conversation and what happened?
12  A.  When he first brought it up about wanting to do stuff
13  with her, I kept saying no, and he kept asking about it.  And
14  then I told him to just go ahead and do it.  I told him to take
15  the diaper off, go ahead.  He was only up there for like five
16  seconds, and he came back down, and he said that he can't do
17  it.  I asked him why.  He said she is sleeping.  She looks too
18  peaceful.  I can't.
19  Q.  Did he ask you about abusing C.T. face-to-face or was
20  this over Kik as well?
21  A.  I am pretty sure it was over Kik.  There wasn't too much
22  that was face-to-face.
23  Q.  So this first time that he brings up C.T., did anything
24  sexual happen with C.T.?
25  A.  Not the first time.

817

HILLARY TRIMM - Direct By Ms. Fletcher

1   Q.  Did there come another time where he asked you about it
2   again?
3   A.  Yes.
4   Q.  Can you explain to the members of the jury -- well, let
5   me ask you this.  The second time when he brings it up again,
6   where did this take place?
7   A.  At 3 Perkins.
8   Q.  What did he ask you this time?
9   A.  He was telling me that the urge was causing him physical
10  pain, that he couldn't handle it, that he was going to chop off
11  all his manly organs, and that he wanted to kill himself, and
12  he couldn't deal with it.  And I told him, no, it is not going
13  to happen.
14      I kept telling him no.  And he kept with his threat of
15  killing himself and making it look like it was me.  I gave in,
16  and he told me that he wanted me to be up there with him when
17  he did it because apparently the only way he could do it is if
18  somebody was there watching.
19  Q.  Did you go up to her room with him?
20  A.  We went upstairs.  He went into my bedroom, and I went
21  and got her.
22  Q.  And what happened?
23  A.  I brought her into my room.  He had a towel laid down on
24  the bed to put her on.  He had me undress her and he had me
25  take my shirt and my bra off so I was topless.  And he spit on

818

HILLARY TRIMM - Direct By Ms. Fletcher

1   his hand and he rubbed it on himself for lubrication.
2   Q.  He rubbed the spit on his penis?
3   A.  Yes.
4   Q.  What happened next?
5   A.  C.T. is not one to be pinned or anything.  You can't
6   contain her.  She hates it.  So she started crying.  I was
7   trying to hug her and hold her and tell her that it was going
8   to be okay.  And I kept apologizing to her, and he started to
9   insert himself into her butt, and he had sex with her for about
10  ten, fifteen minutes, and then he came on my chest.
11  Q.  Put his penis in her anally?
12  A.  Yes.
13  Q.  What happened after he ejaculated?
14  A.  He went into the bath and I got her dressed and I just
15  held her, and I was crying, and I kept apologizing to her.
16  Q.  Did you call anyone or report this abuse?
17  A.  No.
18  Q.  Why not?
19  A.  Because I was scared.
20  Q.  What were you scared of?
21  A.  Of him, of losing my kid.
22  Q.  Did you think if the authorities found out that your
23  child would be taken away from you?
24  A.  Yes.
25  Q.  Did this happen again?

819

HILLARY TRIMM - Direct By Ms. Fletcher

1   A.   Yes, it did.

2   Q.   How long after the first time the defendant had sex with

3   C.T. did it happen a second time?

4   A.   Maybe a few weeks or so.

5   Q.   Where did this occasion happen?

6   A.   In 3 Perkins.

7   Q.   Can you tell the members of the jury what happened on

8   this occasion?

9   A.   He had asked me again about it, saying that it was -- how

10  was it going to be, and I told him that he needed to go ask

11  Mackenzie if he could do it to A.T. because I didn't want it to

12  happen to C.T. again.

13  Q.   What did he say?

14  A.   He said that Mackenzie was a bitch and that he wasn't

15  going to ask her, that he didn't want her baby.  He wanted

16  mine.

17  Q.   So what happened?

18  A.   I kept telling him no and that is when he started his

19  threats with his res connections.

20  Q.   What do you mean --

21  A.   And how easy it would be to....

22  Q.   What do you mean by res connections?

23  A.   You don't mess with people on the res because you

24  disappear.  They are not exactly friendly people out there.

25  Q.   Did he threaten that to you?

820

HILLARY TRIMM - Direct By Ms. Fletcher

1   A.   More than once.

2   Q.   What happened?

3   A.   I was worried about with my daughter and I ending up dead

4   so I did what he said and went upstairs with him.

5   Q.   What happened this time?

6   A.   We went and I got C.T. again, did the same thing.  I was

7   stripping her down.  I had to take my shirt and my bra off so I

8   was topless.  But this time he needed mouth to vagina contact

9   with her before he inserted himself into her anus.

10  Q.   Did he ejaculate this time?

11  A.   On my chest.

12  Q.   What happened after this second time that he sexually

13  abused C.T.?

14  A.   I told him that it wasn't going to happen again, that he

15  wasn't going to touch her again.  I wouldn't let him.  I didn't

16  care what he did.  I didn't care what he said.

17  Q.   What did he say?

18  A.   He said okay.

19  Q.   So after that did there come a time that instead he asked

20  you to do something sexual with your daughter?

21  A.   Yes, because I was talking to another guy.

22  Q.   What do you mean by that?

23  A.   We were friends and we were talking, and I guess we were

24  a little too flirty for his liking, so he made it out like I

25  was doing something very, very wrong.

821

HILLARY TRIMM - Direct By Ms. Fletcher

1   Q.   So what happened?

2   A.   He said the way that I could make it up to him would be

3   by making his fantasy come true.

4   Q.   Did you ask him what his fantasy was?

5   A.   Yes.

6   Q.   What did he tell you?

7   A.   A mother and a daughter.

8   Q.   Where were you when he asked you this?

9   A.   I was still at 3 Perkins.

10  Q.   Where was he?

11  A.   As far as I know he was at Mackenzie's.

12  Q.   He was not at 3 Perkins with you during this event?

13  A.   No.

14  Q.   And how were you corresponding with him?

15  A.   Through Kik.

16  Q.   Do you remember what Kik user name he was using during

17  this time?

18  A.   I don't.

19  Q.   What did he ask you to do?

20  A.   He wanted me to insert my finger into her, and then he

21  would ask me to go deeper.

22  Q.   Into her what?

23  A.   Her vagina.

24  Q.   Did you take a picture of it?

25  A.   Yes.

822

HILLARY TRIMM - Direct By Ms. Fletcher

1   Q.   Did he ask you to take a picture of it?

2   A.   Yes.

3   Q.   What did you do with the picture?

4   A.   I sent it to him like he wanted.

5   Q.   Did you use Kik to send it to him?

6   A.   Yes.

7   Q.   What happened after you sent the picture to him of you

8   inserting your finger into C.T.'s vagina?

9   A.   That's when told me he wanted a picture of it in deeper.

10  Q.   Did you do that?

11  A.   I didn't stick my finger inside her.  I bent my knuckle

12  to make it look like it was in further.  I took a picture and I

13  sent a picture of it.

14  Q.   You took a picture that appeared to be you sticking your

15  finger further into your daughter's vagina?

16  A.   Yes.

17  Q.   What did you do with that picture?

18  A.   I sent it to him through Kik.

19  Q.   Did he respond?

20  A.   Yes.

21  Q.   What did he ask you do next?

22  A.   He wanted to see me have mouth to vagina contact with her

23  in a picture and a video.

24  Q.   Did you take a picture of yourself having mouth to vagina

25  contact with C.T.?

823

HILLARY TRIMM - Direct By Ms. Fletcher

1   A.   Yes.
2   Q.   Did you take a video of it?
3   A.   Yes.
4   Q.   What did you do with the picture and the video?
5   A.   I sent it to him as I was told to do.
6   Q.   What device were you using?
7   A.   My iPhone.
8   Q.   Did he ask for any other types of pictures or videos?
9   A.   I kept begging him to have me stop.  He told me that he
10  wanted one more thing and then I could be done and nothing
11  would ever, ever, ever happen again.
12  Q.   What did he want?
13  A.   He wanted me to place my vagina on her mouth.
14  Q.   Did you do that?
15  A.   Yes.
16  Q.   Did you take a picture of it?
17  A.   No, it was a video.
18  Q.   Did you send the video to him?
19  A.   Yes.
20  Q.   What happened after you sent the video to him?
21  A.   I called him every name in the book that I could think
22  of.  I told him that I hated him.  The only thing I got back
23  was I love you.
24  Q.   Over how long a period of time did this take with all of
25  these pictures and videos and the chats?

---

824

HILLARY TRIMM - Direct By Ms. Fletcher

1   A.   From the time that we met to...
2   Q.   I guess I was unclear.  Did -- these pictures and videos
3   that we are talking about?
4   A.   They were in one night.
5   Q.   And over -- do you know approximately over how many
6   hours?
7   A.   I know that he had me start it whenever it was dark and
8   it stopped when the sun started coming up.
9   Q.   Were you corresponding with him over that entire period
10  of time?
11  A.   Yes.
12  Q.   What were you corresponding about?
13  A.   What he wanted, what he thought of the pictures, me
14  begging him to have me stop because I didn't want to do it.
15  Q.   It took that long?
16  A.   Yes.
17  Q.   What did you do with the pictures and the videos after
18  this event was over?
19  A.   As soon as they were sent, I deleted them.  I didn't want
20  them on the phone.  I didn't want the memory.  I didn't want to
21  look at them.
22  Q.   What about the chats?
23  A.   I kept those deleted too.  That was mostly at his
24  request.  He wanted me to keep them deleted.
25  Q.   Did he say that to you?

---

825

HILLARY TRIMM - Direct By Ms. Fletcher

1   A.   Yes.
2   Q.   Did he say why he wanted you to remove them?
3   A.   So that there was no chance of anybody ever stumbling
4   upon our conversations and what we talk about.
5   Q.   Hillary, did you continue to see him after this?
6   A.   Yes.
7   Q.   Why?
8   A.   Out of fear mostly.
9   Q.   Did you care for him?
10  A.   I cared for the Joey he let me see.
11  Q.   What do you mean by that?
12  A.   He had two different sides to him.
13  Q.   Is there a good side that you loved?
14  A.   There was sometimes.
15  Q.   Did anything else sexual happen with C.T. at any time
16  while you were present?
17  A.   No.
18  Q.   Did you ever see a video depicting the defendant having
19  sexual contact with A.T.?
20  A.   Yes.
21  Q.   Can you explain to the members of the jury where you were
22  and how it was that you viewed that video?
23  A.   I was at 3 Perkins still.  And he finally had caved and
24  asked Mackenzie because I kept telling him no to C.T. because I
25  didn't want it to happen again.

---

826

HILLARY TRIMM - Direct By Ms. Fletcher

1   Q.   Did he tell you that?
2   A.   He told me that he asked her and she said just this one
3   time, and he went over to her house.  Then he was giving me the
4   step by step more or less of what he was doing upstairs with
5   A.T..
6   Q.   Was this over Kik?
7   A.   Yes.  And he asked me if I wanted a video, and instead of
8   fighting with him I just said sure.  I didn't care.  He sent it
9   to me.  And it was of him being inside A.T..
10  Q.   Could you tell it was A.T.?
11  A.   Yes, she pushed up off the bed, and I saw her face in the
12  camera.
13  Q.   Could you tell it was him?
14  A.   Yes, he had the same shirt on that he had whenever he
15  left.
16  Q.   He had left your house and gone to --
17  A.   Mackenzie's.
18  Q.   And had the same shirt on in the video?
19  A.   Yes.
20  Q.   Did he ever show other explicit images of somebody he
21  told you was A.T.?
22  A.   Yes.
23  Q.   Where were you when he showed those to you?
24  A.   I was at my apartment at 3 Perkins.
25  Q.   Was he there with you?

Case 18-105, Document 44, 04/15/2019, 2540369, Page157 of 202
Case 5:16-cr-00320-DNH   Document 118-3   Filed 09/05/18   Page 148 of 219
Case 5:16-cr-00320-DNH   Document 118-3   Filed 09/05/18   Page 149 of 219

827

HILLARY TRIMM - Direct By Ms. Fletcher

1   A.   Yes.

2   Q.   What device did he have?

3   A.   He had an LG phone.

4   Q.   And what did he show you?

5   A.   He showed me a picture that he said Mackenzie had sent to

6   him of A.T., of her vagina.  Her face wasn't in it.  I don't

7   know for sure if it was actually A.T. or not.

8   Q.   He told you it was?

9   A.   Yes.

10  Q.   Did there come a time after all of this that you actually

11  moved in with Joey and Mackenzie on Talcott Street?

12  A.   Yes, whenever I started losing my apartment because I

13  couldn't afford it.

14  Q.   Who else lived on Talcott Street when you moved in?

15  A.   There was Mackenzie, Joey, his little sister, B.L. and

16  her boyfriend at the time Nick.

17  Q.   Did you and Mackenzie ever become involved with one

18  another sexually?

19  A.   When we were forced to.

20  Q.   What do you mean by that?

21  A.   He knew that I wanted nothing to with her and she made it

22  clear she wanted nothing to do with me that way.  But in order

23  to make his life easier, we needed to be all together because

24  he couldn't stand the stress of living in a house that he had

25  to pretend because there was two people who wanted him.  And he

828

HILLARY TRIMM - Direct By Ms. Fletcher

1   didn't want to be with one of them.

2   Q.   Were there sexual activity involving all three of you?

3   A.   Yes.

4   Q.   Was there any sexual activity with you and Mackenzie

5   only?

6   A.   At his request, yes.

7   Q.   What do you mean at his request?

8   A.   Kenzie and I used to fight with him all the time through

9   Kik because he would always tell us that one of us needs to go

10  start something with the other so that something more could

11  happen afterward.  And of course Mackenzie and I both fought

12  him on it because we didn't want to do it, but we ended up

13  caving anyways.

14  Q.   Was he always -- did he always initiate or was he always

15  involved at any time that you and Mackenzie had sexual contact

16  with one another?

17  A.   He was either outside the door listening or getting a

18  play by play through Kik of what was going on.

19  Q.   Were you ever interested in Mackenzie yourself in a

20  romantic or sexual way?

21  A.   No.

22  Q.   Were you working when you lived at Talcott?

23  A.   I was still working at Wal-Mart.

24  Q.   Who watched C.T. when you went to work?

25  A.   It was supposed to be his little sister, but I wasn't

829

HILLARY TRIMM - Direct By Ms. Fletcher

1   there so I don't know for sure.

2   Q.   Did you become pregnant again?

3   A.   I did.

4   Q.   Who is the father of your second baby?

5   A.   Stacey LaPorte.

6   Q.   When did you find out you were pregnant with his child?

7   A.   July 4th at 6:20 in the morning.

8   Q.   Were you still living with him on Talcott when you found

9   out you were pregnant?

10  A.   When I found out I was pregnant I was still in Perkins.

11  It was after that that I had moved in with them.

12  Q.   Is your second daughter, what is her name?

13  A.   Mia.

14  Q.   When was she born?

15  A.   March 15th of last year.

16  Q.   2016?

17  A.   Yes.

18  Q.   You have to answer out loud?

19  A.   Yes.

20  Q.   How long did you live with the defendant at Talcott

21  Street?

22  A.   Probably around mid-July or so until almost the end of

23  September.

24  Q.   Are you sure of these dates?

25  A.   I know I left in September.  I know that it was after

830

HILLARY TRIMM - Direct By Ms. Fletcher

1   finding out I was pregnant that I moved in.

2   Q.   Explain the circumstances that caused you to leave?

3   A.   Any time I got paid, my money went to stuff that wasn't

4   bills.  There was stuff that he wanted, stuff that was needed

5   for their house because I was staying there on and off

6   sometimes, and I just got really behind on my rent and I

7   couldn't pay it.  My lights got shut off.

8   Q.   Did you ever move back to Perkins after you left Talcott?

9   A.   No.

10  Q.   Where did you go?

11  A.   I went to my mother's.

12  Q.   Did C.T. go with you or did she leave before you?

13  A.   C.T. went before me.

14  Q.   Can you explain that to the members of the jury?

15  A.   My mom came and picked her up and said she wanted her for

16  a night.  Of course my mom and I are on the same wavelength.  I

17  knew what she was thinking, why she wanted everything.  She

18  wanted to take my cat, but I told her no because that would be

19  way too obvious.

20  Q.   What do you mean it would be too obvious?

21  A.   He would know that she would be keeping C.T. and that I

22  would be going soon after.

23  Q.   So your mom took C.T.?

24  A.   Yes.

25  Q.   And what happened after your mom took C.T.?

Case 18-105, Document 44, 04/15/2019, 2540369, Page158 of 202
Case 5:16-cr-00320-DNH Document 118-3 Filed 09/05/18 Page 152 of 219
Case 5:16-cr-00320-DNH Document 118-3 Filed 09/05/18 Page 153 of 219

831

HILLARY TRIMM - Direct By Ms. Fletcher

1  A.   The next day I kept asking her when she was going to be
2  bringing her back because as it got later, he had kept saying
3  she is not going to bring her back, she is not going to bring
4  her back, you are not going to get her back.
5       So I ended up texting my mom at about eight o'clock or
6  so. I was like look, where is C.T.? She goes you are not
7  getting her back until you are done with what you need to do.
8  She is going to stay here where she is safe.
9  Q.   What happened next?
10 A.   I called her and I started a big fight on the phone so
11 that he would get his friend Nick to take me out to my mom's.
12 Q.   Were you really fighting with your mom on the phone?
13 A.   It sounded like it. She might have thought that I was
14 really arguing with her, but I just had to make a scene so I
15 could get out of there.
16 Q.   Did somebody take you over to your mom's?
17 A.   Nick brought me out to my mom's, Nick and B.L..
18 Q.   What happened?
19 A.   As soon as I walked inside I dropped to my knees, and I
20 begged her to get me out because I didn't know how to get out.
21 Q.   Did you start staying with your mom after that?
22 A.   Yes.
23 Q.   Was Mackenzie still living with the defendant when you
24 left?
25 A.   Yes.

832

HILLARY TRIMM - Direct By Ms. Fletcher

1  Q.   Did you talk to Mackenzie about her getting out?
2  A.   I had told her whenever we were in the bathroom making
3  sure all my clothes were out of there, I told her that I felt
4  bad because she was going to have to deal with him after I
5  left. And she said I will be all right. I asked her if she
6  wanted to get out, that I could help get her out. She told me
7  she would be fine.
8  Q.   How did you get all of your stuff out of Talcott?
9  A.   We went and picked up my stepdad, and he came in the house
10 with me to make sure that I got everything that was mine.
11 Q.   Did Mackenzie take you up on your offer to get her out?
12 A.   No, she turned me down. I still tried though.
13 Q.   How long did you live with your mother after you moved
14 out of Talcott?
15 A.   I lived with my mom up until last year in April. I lived
16 in her trailer.
17 Q.   And then where did you go?
18 A.   I moved to Plattsburgh with one of my really good
19 friend's.
20 Q.   Were you living with your mom when Mia was born?
21 A.   Yes.
22 Q.   Why did you move to Plattsburgh?
23 A.   To get away so that I could be free. And didn't have to
24 be around him.
25 Q.   Did the defendant ever talk to you about a girl named

833

HILLARY TRIMM - Direct By Ms. Fletcher

1  C.F.?
2  A.   He had mentioned her, but the only thing he ever said was
3  that she was babysitting. He said that she sent really cool
4  pictures for tattoo ideas or like dream catchers. And he had
5  said that he gave her the same tattoo that Mackenzie has.
6  Q.   Did he talk to you about her age when he told you she had
7  a tattoo?
8  A.   I had yelled at him about her being under age and that he
9  could get in trouble for it.
10 Q.   What did he say?
11 A.   He said that she told him that she was seventeen.
12 Q.   Did you know that B.L. had run away from home?
13 A.   I knew that B.L. had gotten out and had an order of
14 protection against him.
15 Q.   And did there come a time that you learned that the
16 police had executed a search warrant on his Glenn Street
17 residence in March of 2016?
18 A.   Yes, he was with me the night that it happened.
19 Q.   Can you explain that?
20 A.   He had come over because I asked him to. And in the
21 morning I had a whole bunch of messages from Mackenzie. He had
22 missed calls and he had messages from Mackenzie. Whenever he
23 called her back, she had told him that they had came and they
24 searched the apartment.
25 Q.   So this is after you left?

834

HILLARY TRIMM - Direct By Ms. Fletcher

1  A.   Yes.
2  Q.   And he is spending the night with you?
3  A.   Yes.
4  Q.   Can you explain to the members of the jury why you are
5  continuing to see him?
6  A.   When you have somebody that is crazy in your life, the
7  most that you can do is try to keep them at bay so nothing bad
8  happens. Did I care for him? To an extent. Mostly because he
9  was the father of my daughter.
10 Q.   Did you continue to see him behind your mother's back?
11 A.   Yes.
12 Q.   After he found out that a search warrant had been
13 conducted at his house, what happened?
14 A.   He needed to go back to the house right away. I can't
15 remember if I went along for the ride with him home or if Paul
16 came and got him. I am not sure. I just know that he left
17 that day.
18 Q.   What happened next?
19 A.   He ended up coming back out to the house. I was there
20 only because my mother had moved in with her now husband. But
21 he was her boyfriend at the time. And once she was out of the
22 house and once the search warrant happened, he tried to be out
23 there as much as he could.
24 Q.   Out where?
25 A.   At my mom's trailer with me.

835

HILLARY TRIMM - Direct By Ms. Fletcher

1  Q.  Did he stay with you?
2  A.  For a little bit.
3  Q.  Did there come a time that he told you Mackenzie left?
4  A.  Yes.  I am trying to think of when.  I don't know when
5  exactly.  I just know he told me when he had went home there
6  was a note on the bed saying that the police were coming again
7  or something and she left so she wasn't there.  So he cleaned
8  the room and made the bed and then left the room.
9  Q.  The police executed a search warrant on March 7th, and
10  Mia was born on March 18th.  Did he stay with you during that
11  period of time?
12  A.  No.
13  Q.  Where were you staying during that period of time?
14  A.  I was at my mom's trailer.  She was there still.
15  Q.  Was he at the hospital?
16  A.  He wasn't allowed to be there.
17  Q.  How did you come up with the name Mia?
18  A.  It was supposed be Letty.
19  Q.  Can you explain who Letty is and why Mia's not named
20  Letty?
21  A.  She is the main character in the Fast and the Furious and
22  that's his favorite movie.
23  Q.  Why is Mia not named Letty?
24  A.  Because his cousin named her daughter Letty and you
25  couldn't have two of them in one area.

836

HILLARY TRIMM - Direct By Ms. Fletcher

1  Q.  Who is Mia?
2  A.  Dom's sister.
3  Q.  Dom's sister?
4  A.  Yes.
5  Q.  Who is Dom?
6  A.  The other main character in the Fast and the Furious.
7  Q.  Did you have a name picked had Mia been a boy?
8  A.  If she were to be a boy it was going to be Dominick
9  Joseph.
10  Q.  After the main character in the Fast and the Furious?
11  A.  Yes.
12  Q.  Were you a fan?
13  A.  Not as much as he was.
14  Q.  Did you send certain pictures of Mia to the defendant to
15  his cell phone from yours over time?
16  A.  Yes.
17  Q.  Did he also send some pictures to you from his cell phone
18  to yours?
19  A.  Yes.
20  Q.  I am going to put up Exhibit 37J in evidence, please.
21     MS. FLETCHER:  That's not 37J.
22  BY MS. FLETCHER, CONTINUED:
23  Q.  So I am going to put up over here what I have marked as
24  37J.  Do you recognize this picture?
25  A.  Yes.

837

HILLARY TRIMM - Direct By Ms. Fletcher

1  Q.  Who is that?
2  A.  That's Mia.
3  Q.  Did you take that picture?
4  A.  Yes, I did.
5  Q.  Where did you take that picture?
6  A.  My friend's house in Plattsburgh.
7  Q.  Did you send that to the defendant?
8  A.  Yes.
9  Q.  Did you send it to him over Kik or some other way?
10  A.  Through Kik.
11  Q.  37K, who is that?
12  A.  Mia.
13  Q.  Did you take that picture?
14  A.  Yes I did.
15  Q.  Did you send that to the defendant?
16  A.  Yes.
17  Q.  Over what application?
18  A.  Kik.
19  Q.  I show you 37L, who is that in that picture?
20  A.  Myself and Mia.
21  Q.  Did you send that picture to the defendant?
22  A.  I did.  That was her doctor's appointment.
23  Q.  Did you send that over Kik as well?
24  A.  Yes.
25  Q.  Let me show you another picture.  It is 37M.  Do you

838

HILLARY TRIMM - Direct By Ms. Fletcher

1  recognize that picture?
2  A.  That's Amber.
3  Q.  Who is Amber?
4  A.  A girl that he was talking to while I was in Plattsburgh.
5  Q.  How do you recognize that picture?
6  A.  Because he sent it to me.
7  Q.  Over Kik?
8  A.  Yes.
9  Q.  Did you keep in touch with the defendant after you moved
10  to Plattsburgh?
11  A.  Yes.
12  Q.  Did he tell you where he was staying?
13  A.  Told me he was staying at his cousin Amber's house with
14  her boyfriend Paul.
15  Q.  A different Amber than the one in this picture?
16  A.  Yes.
17  Q.  And Paul, do you know Paul's last name?
18  A.  Fregoe.
19  Q.  Paul Fregoe.  Did you ever visit him while he was living
20  with Amber and Paul?
21  A.  Yes.
22  Q.  Do you remember where they lived?
23  A.  They lived in an apartment that was attached to and like
24  on top of a little gift shop store.
25  Q.  Did you go inside when he lived with Amber and Paul?

839

HILLARY TRIMM - Direct By Ms. Fletcher

1   A.   Yes.
2   Q.   Did he have any belongings with him when he stayed with
3   Amber and Paul?
4   A.   When I saw him, he had the clothes that he had on and
5   then he had cigarettes and his cell phone.
6   Q.   And when you say his cell phone, what kind of cell phone
7   did you know him to have?
8   A.   His LG.
9   Q.   Did you ever use Kik to engage in role play with him?
10  A.   I wouldn't necessarily call it role play.  It was just
11  fantasies.
12  Q.   Okay.  So explain what you mean by that?
13  A.   Because I wouldn't do and I wouldn't let him do anything
14  with C.T., he just had me make up stories that he would partake
15  in and go along with about kids, certain ages, certain body
16  types, hair colors.
17  Q.   What kind of stories would you make up about kids?
18  A.   Stories where him and the child would be engaged in
19  sexual stuff that happened between them.
20  Q.   What kind of ages were the children in the stories?
21  A.   I tried to use like a five or a seven year old, somewhere
22  in there where they were older.  He said that was too old.  So
23  I said about two or three.
24  Q.   There were sexual fantasy stories of him and a two or
25  three year old?

840

HILLARY TRIMM - Direct By Ms. Fletcher

1   A.   Yes.
2   Q.   Would you exchange these stories over Kik?
3   A.   Yes.
4   Q.   Now, you indicated you knew him to have a Kik account
5   called prouddaddy?
6   A.   Yes.
7   Q.   Do you recall anything more about that prouddaddy
8   account, did it have some numbers associated with it?
9   A.   It had Mia's birthday.
10  Q.   Did you talk with him over it?
11  A.   Yes.  He had it like the day she was born.
12  Q.   I am going to show you Government's Exhibit 29 for
13  identification.  Do you recognize the things that are depicted
14  in that exhibit?
15  A.   Yes.
16  Q.   What is that?
17  A.   That's a superman symbol.
18  Q.   And that superman symbol, what do you know about that
19  superman symbol?
20  A.   It was green because that's his favorite color.
21  Q.   It used to be green?
22  A.   He changed it to blue though because it was my favorite
23  color.
24  Q.   And did you know him to use that superman symbol with his
25  Kik account?

841

HILLARY TRIMM - Direct By Ms. Fletcher

1   A.   With that one, yes.
2   Q.   And when you would talk with him on Kik with that
3   account, would the superman symbol come up as his profile
4   picture?
5   A.   Yes.
6   Q.   And the Kik user name prouddaddy3_15_16, does it have
7   another name also associated with it?
8   A.   It says her love.
9   Q.   Do you recognize that to be a Kik account the defendant
10  used while you chatted with him?
11  A.   Yes.
12       MS. FLETCHER:  I move Exhibit 29 into evidence.
13       MR. WOLFSON:  No objection.
14       THE COURT:  Received, twenty-nine.
15       (Exhibit No. 29, received.)
16       MS. FLETCHER:  Publish that, please.
17  BY MS. FLETCHER, CONTINUED:
18  Q.   That's the superman symbol that would come up when you
19  chatted with the defendant on Kik?
20  A.   Yes.
21  Q.   Over prouddaddy3_15_16?
22  A.   Yes.
23  Q.   Now, mylove, do you understand what that means?
24  A.   That was with my ex-girlfriend.  When we broke up, she
25  always told me that I would find my him.

842

HILLARY TRIMM - Direct By Ms. Fletcher

1   Q.   Meaning a guy?
2   A.   Yes, one that I would be with forever.  When I met him, I
3   started calling him, Joey, my him.  He would call me her.
4        MS. FLETCHER:  You can take that down.
5   BY MS. FLETCHER, CONTINUED:
6   Q.   Do you recall chatting with Joey over this
7   prouddaddy3_15_16 on May 15th, 16th, 17th of 2016?
8   A.   Yes.
9        MS. FLETCHER:  If we could put up Exhibit 22 which
10  is in evidence, please.
11  BY MS. FLETCHER, CONTINUED:
12  Q.   Hillary, have you reviewed this chat?
13  A.   Yes.
14  Q.   Is that you and Joey speaking in the chat conversation?
15  A.   Yes.
16  Q.   The first line of the recovered chat is prouddaddy saying
17  to you that's why I made you prego again.  I missed that look.
18  Is that Stacey LaPorte telling you he got you pregnant?
19  A.   Yes.
20  Q.   With Mia?
21  A.   Yes.
22  Q.   And you say that is a dick move.  He said but you loved
23  it.  We loved it, and we made a beautiful little girl.  You say
24  I made a beautiful little girl, and you helped a little.
25       MS. FLETCHER:  And then if we can scroll down.

843

HILLARY TRIMM - Direct By Ms. Fletcher

1  BY MS. FLETCHER, CONTINUED:

2  Q.   You sent a picture.  What is that picture of?

3  A.   Mia holding my finger.

4  Q.   You sent that to?

5  A.   Joey.

6  Q.   Okay.

7       MS. FLETCHER:  And go back to the text, please.

8  BY MS. FLETCHER, CONTINUED:

9  Q.   And this is on May 16th of 2016, and you tell him Mia is

10  passed out now, better make sure you shower, and I hate to say

11  this but if it does happen, a condom needs to be used.  What

12  are you talking about?

13  A.   I was on my way up here for Mia's doctor's appointment,

14  and we planned to hook up.

15  Q.   Where were you living?

16  A.   I was living in Plattsburgh.

17  Q.   And he says I know, no babies, and I love you Hillary so

18  fucking much, baby.  You say: I hate you.  He says:  Don't

19  cry.  You say!  Trying not to.  And he tells you!  I love you.

20  I really do baby always and forever because you are my true

21  love, always will be, baby.

22       Did you hook up with him when you came to Massena?

23  A.   Yes.

24  Q.   Where was Mia when you did that?

25  A.   Mia and C.T. were both with my mother.

844

HILLARY TRIMM - Direct By Ms. Fletcher

1  Q.   And so then if we go down, we have got May 16th at

2  8:57 a.m.  You sent a picture to him?  Is that you?

3  A.   Yes.

4  Q.   He says before that he tells you he is deeply and madly

5  in love with you?

6  A.   Yes.

7  Q.   And then if we go down some more, you sent him another

8  picture of yourself?

9  A.   Yes.

10  Q.   And if we scroll down to the chat, he sends you,

11  prouddaddy3_15_16 sends you a picture of himself?

12  A.   Yes.

13       MS. FLETCHER:  Can we blow that up, please.

14  BY MS. FLETCHER, CONTINUED:

15  Q.   Who is in that picture?

16  A.   Joey.

17  Q.   You also said you knew him to have the screen name

18  fastfamily, correct?

19  A.   Yes.

20  Q.   Let me show you Exhibit 38 for identification.

21       THE COURT:  What is the number?

22       MS. FLETCHER:  Thirty-eight.

23  BY MS. FLETCHER, CONTINUED:

24  Q.   Do you recognize what is depicted in that exhibit?

25  A.   Yes.

845

HILLARY TRIMM - Direct By Ms. Fletcher

1  Q.   What is that?

2  A.   This is a Kik name that he had made up because I wouldn't

3  talk to him so he made up another one to try to talk to me.

4  Q.   That is fastfamily25?

5  A.   Yes.

6  Q.   Do you recognize that profile picture?

7  A.   Yes, I do.

8  Q.   What is it?

9  A.   It is the rainbow that I asked him to draw, but he sent

10  me a picture of it instead.

11  Q.   Can you tell the jury the backstory on that rainbow

12  profile picture?

13  A.   I used to like to watch him draw all the time because he

14  was pretty good at it.  I asked him to draw me a rainbow.  I

15  figured it was simple.  You can't mess it up really, and it

16  wasn't going to take too long.  I figured I was worth at least

17  that much.  But he kept coming up with reasons why he hadn't

18  done it yet.  So he ended up sending me that picture of a

19  rainbow.  He told me this is your rainbow.  I told him he

20  didn't draw it so it doesn't count.

21  Q.   And then he used it as his profile picture?

22  A.   Yes.

23       MS. FLETCHER:  Judge, at this time I would move

24  Exhibit 38 into evidence.

25       THE COURT:  Any objection?

846

HILLARY TRIMM - Direct By Ms. Fletcher

1       MR. WOLFSON:  No objection.

2       THE COURT:  Received.

3       (Exhibit No. 38, received.)

4       MS. FLETCHER:  Can we publish that, please?

5  BY MS. FLETCHER, CONTINUED:

6  Q.   Is that the profile picture you would see if you chatted

7  with him as fastfamily?

8  A.   Yes.

9       MS. FLETCHER:  Can you take that down?

10  BY MS. FLETCHER, CONTINUED:

11  Q.   Did you ever see the defendant use a Kik account on his

12  phone to obtain or trade any child pornography?

13  A.   Yes.

14  Q.   Can you explain that?

15  A.   He was sitting next to me whenever he was having other

16  people on Kik to try to get pictures of -- I don't even know

17  whose kid, but somebody's kid.

18  Q.   Sexually explicit pictures?

19  A.   Yes.

20  Q.   Did you see him get pictures on his phone?

21  A.   He showed me one that was already on his phone.  I never

22  saw him actually get them sent to him.

23  Q.   Did he talk to you about his activities in trading child

24  pornography over Kik?

25  A.   No.  He just said that whenever he gets the urge he goes

847

HILLARY TRIMM - Direct By Ms. Fletcher

1   on and he asks people for pictures because there is all types
2   of people out there that are like him.
3   Q.   When was the last time you saw the defendant?
4   A.   Last year.
5   Q.   Did you see him before he got arrested?
6   A.   Yes.
7   Q.   How long before he got arrested did you see him?
8   A.   The day before.
9   Q.   Where was he staying the day before he got arrested?
10  A.   I met him at Paul's house.  He said he was staying there.
11  Q.   Did you go inside Paul's house?
12  A.   Not that day, no.
13  Q.   And when you say you saw him last year, did you visit him
14  in jail?
15  A.   I did.
16  Q.   Do you still care for him?
17  A.   Not like that.
18  Q.   You have a child with him?
19  A.   Yes.
20  Q.   Hillary, did he tattoo you?
21  A.   Yes, he did.
22  Q.   How many tattoos do you have from him?
23  A.   Six.
24  Q.   What are they?
25  A.   I have a superman logo on my arm.  I have -- it was

848

HILLARY TRIMM - Direct By Ms. Fletcher

1   supposed to be hummingbirds but they look like seagulls, on my
2   foot.  I have a heart with an infinity symbol on my hand.  I
3   have a rose on my right leg.  And on my left ankle I have the
4   symbol of -- I don't even know what it was called.  I just
5   thought it was pretty.  And then on places I am not so proud of
6   I have his initials.
7   Q.   Did he tattoo his initials there?
8   A.   Yes.
9   Q.   Where is the superman symbol?
10  A.   On my right arm.
11  Q.   Can you please show the jury?
12  A.   (Witness indicates.)
13  Q.   He did that tattoo?
14  A.   Yes.
15  Q.   Once you were out, once Mackenzie was out, once the
16  defendant was either before or after he was arrested, did you
17  ever talk to Mackenzie again?
18  A.   I talked to Mackenzie after she had gotten out before he
19  was arrested.
20  Q.   Did you talk over the phone or did you text or how did
21  you communicate?
22  A.   It was over the phone.  She had called me through her
23  mother's Facebook because she didn't know my number.
24  Q.   What did you talk about, not what you said, but what did
25  you talk about?

849

HILLARY TRIMM - Direct By Ms. Fletcher

1   A.   She wanted to make sure that -- well, I had told her I
2   was driving, told her to text me.  So she did.  I told her that
3   I would call her as soon as I stopped so that we could actually
4   talk because I wouldn't talk to her while I was driving.  I try
5   to obey the traffic laws.
6        Whenever I got to a place where I could stop, and I had
7   the girls taken care of, because I was coming from Plattsburgh,
8   so I had to change them and everything, I called her, and she
9   told me to make sure that he didn't get her number that way he
10  couldn't contact her.  I said I won't give it to him, don't
11  worry.
12       We talked about how she had went and left with his uncle,
13  and was with his uncle for a few weeks before she made it back
14  to her mom's house.  And we talked about just that we feel like
15  really shitty parents because even though we never went into
16  detail, we both know what our kids went through.
17       MS. BIANCO:  Objection to what they both know.
18       THE COURT:  Sustained.
19  BY MS. FLETCHER, CONTINUED:
20  Q.   Did she give you any details about what happened with the
21  defendant and A.T. in a sexual way?
22  A.   No.
23  Q.   Did you give her any details about what happened sexually
24  between the defendant and C.T.?
25  A.   No.

850

HILLARY TRIMM - Direct By Ms. Fletcher

1   Q.   Did there come a time on June 10th of 2016 that you were
2   interviewed at the New York State Police barracks by
3   Investigator Arcadi?
4   A.   Yes.
5   Q.   And did you talk to him about this case and about C.T.?
6   A.   I did.
7   Q.   And did you end up giving him a sworn statement regarding
8   the abuse of C.T. and your participation in it?
9   A.   Yes.
10  Q.   What happened with your children after you provided that
11  statement to Investigator Arcadi?
12  A.   I wasn't allowed to have them anymore.
13  Q.   Did Child Protective Services become involved?
14  A.   Yes.
15  Q.   Where are your children?
16  A.   With my mother.
17  Q.   Have you seen them since that day?
18  A.   No.
19  Q.   What is happening with their custody now?
20  A.   I honestly don't know.  Nobody is on the same page.
21  Q.   But your mother has them right now?
22  A.   Yes, and that's all that matters.
23  Q.   Do you know Tiffany Matthie?
24  A.   Yup.
25  Q.   Did the defendant tell you about Tiffany Matthie?

851

HILLARY TRIMM - Direct By Ms. Fletcher

1   A.  No.  Actually she came to me herself.
2   Q.  Did you at some point talk to him about her?
3   A.  I did.
4   Q.  What did he tell you about Tiffany Matthie?
5   A.  That she was just some crazy bitch trying to get in his
6   pants.
7   Q.  Did there come a time that you actually met with her?
8   A.  Yes.
9   Q.  Can you explain the circumstances around that?
10  A.  It was after he had been arrested that I actually was
11  able to meet up with her because he wasn't around.  He wasn't
12  there to stop it.
13  Q.  Did there come a time that he asked you to get something
14  from Tiffany Matthie?
15  A.  He wanted me to have his stuff and his dad's ashes so
16  that I could give them to Mia.
17  Q.  Did you meet with her for that purpose?
18  A.  Yes.
19  Q.  What did Tiffany Matthie give you?
20  A.  She gave his black bookbag and it had his dad's ashes in
21  it.  I believe it had some clothes in it, couple pairs of
22  shorts and shirts or something.  She also handed me the paper
23  that the cops gave her when they took his phone from the house.
24  Q.  She had a receipt from the police?
25  A.  Yes.

852

HILLARY TRIMM - Direct By Ms. Fletcher

1   Q.  When they took his phone?
2   A.  Yes.
3   Q.  And she gave that to you?
4   A.  Yes.
5   Q.  What did you do with those items?
6   A.  I stuffed the receipt inside the bookbag, put the bookbag
7   inside of my car, and that's where it stayed until I gave it
8   back to her.
9   Q.  You gave it back to Tiffany?
10  A.  Yes, I did.
11  Q.  Hillary, were you arrested and charged in this case with
12  conspiring with the defendant to sexually exploit C.T.?
13  A.  Yes, I was.
14  Q.  Have you pled guilty to that charge?
15  A.  Yes, I have.
16  Q.  Let me show you Exhibit 33 for identification.  Do you
17  recognize that document?
18  A.  Yes.
19  Q.  What is it?
20  A.  It is the Plea Agreement.
21  Q.  You signed that Plea Agreement?
22  A.  Yes, I did.
23  Q.  Did your attorney sign the Plea Agreement?
24  A.  Yes, he did.
25  Q.  Did you come into this courtroom and plead guilty to the

853

HILLARY TRIMM - Direct By Ms. Fletcher

1   conspiracy charge?
2   A.  Yes, I did.
3   Q.  Do you know what sentence you face?
4   A.  Fifteen to thirty.
5   Q.  Did you also sign a Cooperation Agreement?
6   A.  I did.
7   Q.  Let me hand you Exhibit 34.  Do you recognize that?
8   A.  Yes.
9   Q.  What is that?
10  A.  The Cooperation Agreement.
11  Q.  What is your understanding of your Cooperation Agreement?
12  A.  That I get to help put away somebody who deserves to be
13  behind bars.
14  Q.  Are you looking for a more lenient sentence in regard to
15  your cooperation?
16  A.  No.
17  Q.  Why are you cooperating?
18  A.  Because I am the only voice that my daughter has.
19         MS. FLETCHER:  I have no further questions.
20         THE COURT:  You may examine.
21         MS. BIANCO:  Thank you, Your Honor.
22
23  CROSS-EXAMINATION BY MS. BIANCO:
24  Q.  Good afternoon, Ms. Trimm.
25  A.  Good afternoon.

854

HILLARY TRIMM - Cross By Ms. Bianco

1   Q.  If there is a question you don't understand, please let
2   me know, and I will rephrase, okay?
3   A.  Okay.
4   Q.  I believe you testified that your mother got you out of
5   Stacey's house; is that right?
6   A.  Yes.
7   Q.  And that was in September of 2015?
8   A.  It was September 24th I do believe.
9   Q.  24th of 2015?
10  A.  2016 -- no, 2015, yes, I am not good with dates.
11  Q.  And when you got out of that house, you said you fell to
12  your knees and you thanked your mother for rescuing you
13  essentially?
14  A.  I fell to my knees, and I begged my mother to help me get
15  out.
16  Q.  And when you got out, you didn't stay out, did you?
17  A.  Not fully, no.
18  Q.  You kept coming back to have sex with Stacey, yes?
19  A.  Yes.
20  Q.  Okay, and you were lying to your mother about hooking up
21  with Stacey, right?
22  A.  Yes.
23  Q.  And that was for several months, correct?
24  A.  Yes.
25  Q.  Every time you would bring Mia to the doctor you would

855

HILLARY TRIMM - Cross by Ms. Bianco

1  meet up with Stacey, right?

2  A.  Yes.

3  Q.  And you told your mother a lie?

4  A.  Whenever I would bring her, I would meet with him before

5  I went to my mom's.

6  Q.  You didn't tell your mother you were meeting  with

7  Stacey?

8  A.  No.

9  Q.  You were still telling your mother how scared you were,

10 yes?

11 A.  She knew that I didn't like living -- hated him.

12 Q.  Pardon?

13 A.  She knew that I hated him, that I didn't want anything to

14 do with him.

15 Q.  But that really wasn't true, was it?

16 A.  It was to an extent.

17 Q.  But you are meeting up with him regularly and having sex

18 with him?

19 A.  Yes.

20 Q.  Okay.  Now, at some points you would actually meet up

21 with Stacey at your mother's house when she was at work; isn't

22 that right?

23 A.  No.  He didn't come out to the trailer until after my mom

24 moved out.

25 Q.  Okay.

856

HILLARY TRIMM - Cross by Ms. Bianco

1  A.  And whenever I was still meeting him and coming up I was

2  living in Plattsburgh.

3  Q.  But you are regularly meeting with him after this escape,

4  correct?

5  A.  The one where I went to Plattsburgh or the one where my

6  mom took me?

7  Q.  The escape from his house, the one where your mom took

8  you out?

9  A.  It really wasn't that regularly.  He always had an excuse

10 why he couldn't see me.

11 Q.  But you wanted to see him?

12 A.  I didn't have Mia at the time.  I was still pregnant with

13 her.  I didn't have her until March.

14 Q.  After you had Mia, you still kept in contact with Stacey?

15 A.  Mostly for her.

16 Q.  Okay, but you are still going and having sex with him?

17 A.  That was a month or so after she was born.

18 Q.  That was for you, wasn't it?

19 A.  Not necessarily.

20 Q.  You visited with Stacey when he lived at Amber and Paul's

21 house; is that right?

22 A.  Yes.

23 Q.  Okay, and that's after he and Mackenzie had broken up?

24 A.  I didn't go over to Amber and Paul's until after I moved

25 to Plattsburgh.

857

HILLARY TRIMM - Cross by Ms. Bianco

1  Q.  Did you go over to Amber and Paul's after Mackenzie and

2  Stacey broke up?

3  A.  As far as I know, they broke up before I moved.

4  Q.  Okay, but when you went to Amber and Paul's, Stacey is no

5  longer in a relationship with Mackenzie as far as you know?

6  A.  Yes.

7  Q.  Okay, and when you go there, to Amber and Paul's, you are

8  still having sex with him, correct?

9  A.  Yes.

10 Q.  And when Stacey is arrested, you are going into the jail

11 to see him, correct?

12 A.  Yes.

13 Q.  And did you ask Stacey for his password to his phone

14 because you wanted to listen to music?

15 A.  No.

16 Q.  Never did that?

17 A.  No.  I had my own phone with my own music.

18 Q.  Now, you talked about you are twenty-six years old right,

19 yes?

20 A.  Yes.

21 Q.  And you have -- C.T. and Mia are your children?

22 A.  Yes.

23 Q.  And C.T. was born in 2014?

24 A.  Yes.

25 Q.  And you met Stacey while you were still pregnant,

858

HILLARY TRIMM - Cross by Ms. Bianco

1  correct?

2  A.  Yes.

3  Q.  And Mia wasn't born until 2016?

4  A.  Yes.

5  Q.  And Mia is Stacey's daughter, right?

6  A.  Yes.

7  Q.  Let's talk about your conduct with C.T., okay?

8  A.  Okay.

9  Q.  On June 16, 2016, you gave a five-page single-spaced

10 statement to the police; is that right?

11 A.  Yes, it is.

12 Q.  It was typed?

13 A.  Yes.

14 Q.  And you reviewed it?

15 A.  Yes.

16 Q.  You started this statement at 2:25 and finished at 5:23,

17 correct?

18 A.  Yes.

19 Q.  You read each of the pages?

20 A.  Yes.

21 Q.  And you signed the statement under oath saying it was

22 true?

23 A.  Yes.

24 Q.  And that was under penalty of perjury, correct?

25 A.  Yes.

859

HILLARY TRIMM - Cross by Ms. Bianco

1  Q.   Now, in that sworn statement, specifically in April of

2  2015, you stated you are home alone with C.T. on your house in

3  Perkins, is that right, on Perkins?

4  A.   Yes.

5  Q.   And Stacey wasn't in the house?

6  A.   Yes.

7  Q.   And C.T. wasn't even one yet; is that right?

8  A.   Yes.

9  Q.   And then you put your tongue in C.T.'s vagina, right,

10  that's what you told the police?

11  A.   Yes.

12  Q.   And you took a video of this?

13  A.   Yes.

14  Q.   And you sent it out over the Internet?

15  A.   Through Kik, yes.

16  Q.   Then you put your finger in C.T.'s vagina?

17  A.   Yes.

18  Q.   And Stacey is not in the house, right?

19  A.   No, he is not.

20  Q.   And you took a picture of this on your phone?

21  A.   Yes, I did.

22  Q.   And then you spread C.T.'s vagina open?

23  A.   Yes.

24  Q.   Took a picture of this?

25  A.   Yes.

860

HILLARY TRIMM - Cross by Ms. Bianco

1  Q.   Sent that picture out?

2  A.   Yes.

3  Q.   You also -- and you said I believe on direct examination

4  how horrible you felt; is that right?

5  A.   Yes.

6  Q.   But you told the police you did it again in May of 2015,

7  do you remember that?

8  A.   It wasn't two different times.  That is where I had

9  messed up on my statement.

10  Q.   But in your statement, you did tell the police about

11  three different times that you molested C.T., correct?

12  A.   In my statement, yes.

13  Q.   Okay, and that was a statement that you initialed each

14  page, correct?

15  A.   Yes.

16  Q.   And you told the police about each of the three different

17  times that you molested C.T. in detail in that statement; is

18  that right?

19  A.   Yes.

20  Q.   There is no question about the fact that in your sworn

21  statement you separated the times in detailed versions, three

22  different times of you molesting C.T., correct?

23  A.   Yes.

24  Q.   And each of the times that you told the police about, you

25  were home alone with C.T., correct?

861

HILLARY TRIMM - Cross by Ms. Bianco

1  A.   Yes.

2  Q.   Stacey was not there?

3  A.   No.

4  Q.   You had taken C.T.'s clothes off?

5  A.   Yes.

6  Q.   And you had abused C.T., correct?

7  A.   Yes.

8  Q.   Now, you never told anyone that you had abused C.T. until

9  June of 2016; is that correct?

10  A.   Yes.

11  Q.   And Stacey was arrested in May of 2016, correct?

12  A.   Yes.

13  Q.   And you were aware of this arrest?

14  A.   Yes.

15  Q.   Because you were visiting him at the jail?

16  A.   That didn't happen until after I gave my statement.

17  Q.   Oh, I am sorry.  You knew about his arrest from the

18  postings on Facebook?

19  A.   Yes.

20  Q.   People were talking about it, correct?

21  A.   Yes.

22  Q.   One of those people were Mackenzie; isn't that right?

23  A.   I was with her when I saw the article on Facebook because

24  somebody else had told me about it.  So I looked it up.

25  Q.   And you and Mackenzie were together?

862

HILLARY TRIMM - Cross by Ms. Bianco

1  A.   We were at our friend's house visiting.

2  Q.   And when you were together, you talked about his arrest,

3  obviously this is someone significant to both of you?

4  A.   We both knew him, yes.  All I said was see you later,

5  bye.  And she called her mom and told her mom about it.

6  Q.   So you were hanging out with Mackenzie at this friend's

7  house, right?

8  A.   I wasn't hanging out with her.  I had stopped because I

9  was leaving town, and I had stopped to pick some stuff up from

10  our mutual friend.

11  Q.   When you see this article and you both read it on

12  Facebook, you are doing it together?

13  A.   Yup.

14  Q.   Your testimony is you don't discuss it at all?

15  A.   We didn't discuss what happened in the article.  She

16  called her mom.  I got in the car and I left.

17  Q.   Now, at the time Stacey was arrested, there became some

18  concern by law enforcement about whether or not C.T. was

19  abused; is that right?

20  A.   Yes.

21  Q.   And you talked to a lot of family and friends about

22  whether C.T. was in fact abused, correct?

23  A.   I didn't talk to anybody about it except for the CPS

24  worker that came to see me in Plattsburgh.

25  Q.   When they were talking to you, I wonder if Stacey has

863

HILLARY TRIMM - Cross by Ms. Bianco

1   abused her, you were having these kinds of conversations with

2   people, weren't you?

3   A.   Yes.

4   Q.   You were talking to -- one of those people was your mom,

5   correct?

6   A.   Yes.

7   Q.   Because your mom was very concerned, wasn't she?

8   A.   She was.

9   Q.   And your mom questioned you about whether C.T. was

10  abused, correct?

11  A.   Yes.

12  Q.   And you told your mother -- and this is in a text, you

13  didn't know if Stacey ever touched her.  Is that what you told

14  your mother in a text?

15  A.   Yes.

16  Q.   And your told your mother if you found out Stacey abused

17  C.T., you would kill him.  Did you say that?

18  A.   Yes.

19  Q.   So is it your testimony at the time you are saying these

20  things to your mother that you are lying to your mother?

21  A.   It wasn't something that I wanted to share with my

22  mother.  I wanted to put it in the past, and I wanted to put it

23  behind me.

24  Q.   But you are not telling your mother you know anything

25  about Stacey molesting C.T., correct?

864

HILLARY TRIMM - Cross by Ms. Bianco

1   A.   Correct.

2   Q.   And there are no pictures or videos saved of Stacey

3   molesting C.T.; is that right?

4   A.   Yes.

5   Q.   None?

6   A.   Nope.

7   Q.   And there is no pictures of videos of you molesting C.T.?

8   A.   Yes.

9   Q.   None?

10  A.   No.

11  Q.   You tell your mother that if Stacey had touched C.T., you

12  hoped he would be raped in jail and die.  Did you say that?

13  A.   Yes.

14  Q.   And this is while you are visiting Stacey, correct?

15  A.   Yes.

16  Q.   And so you are putting on an act for your own mother,

17  correct?

18  A.   Yes.

19  Q.   Did you tell your mother that you didn't think Stacey did

20  anything to C.T. or C.T. wouldn't be so good when guys in our

21  lives change her diaper.  Did you say that?

22  A.   The way that I saw it is she wasn't showing any signs

23  because she had no problems with anybody changing her diaper,

24  even with men.

25  Q.   So you are trying to convince your mother C.T. wasn't

865

HILLARY TRIMM - Cross by Ms. Bianco

1   molested, correct?

2   A.   Yes.

3   Q.   And at the time you are telling this to your mother, is

4   it your testimony that you knew at that time that C.T. had been

5   molested?

6   A.   I knew, yes.

7   Q.   But you were putting on an act with your mother like you

8   were mad at Stacey, correct?

9   A.   Yes.

10  Q.   Now, you were contacted by Child Protective Services in

11  May of 2016?

12  A.   I didn't get contacted by them until I was -- it was

13  towards the end of May actually.

14  Q.   Okay.  May of 2016, right?

15  A.   Yes.

16  Q.   And when you were interviewed by Child Protective Service

17  workers, they were questioning you about whether you had any

18  information at all about whether C.T. was abused; is that

19  right?

20  A.   Yes.

21  Q.   And you looked at those workers directly in the eye, and

22  you said you didn't know about any abuse; isn't that right?

23  A.   Yes.

24  Q.   And you knew that Child Protective Services was there

25  because there was some kind of concern about your daughter,

866

HILLARY TRIMM - Cross by Ms. Bianco

1   right?

2   A.   Yes.

3   Q.   And you didn't want them to find out anything?

4   A.   I told them to the my knowledge I didn't know anything.

5   Q.   Well, Child Protective Services wanted you to take C.T.

6   for a medical examination at the Clinton County Child Advocacy

7   Center.  Do you remember that?

8   A.   Yes.

9        MS. BIANCO:  May I have a moment, Your Honor?

10  BY MS. BIANCO, CONTINUED:

11  Q.   And you agreed to take C.T. for that medical examination,

12  correct?

13  A.   Yes.

14  Q.   Because that was what was in C.T.'s best interest; is

15  that right?

16  A.   Yes.

17  Q.   And you took her to that exam on June 7, 2016, correct?

18  A.   Yes.

19  Q.   And you agreed that it would be important when you are

20  meeting with medical professionals about your daughter to tell

21  them the truth, correct?

22  A.   I didn't tell them what happened.

23  Q.   Would it be important to tell them the truth when they

24  are examining your daughter?

25  A.   The way I saw it was if they didn't find anything, if

Case 18-105, Document 44, 04/15/2019, 2540369, Page167 of 202
Case 5:16-cr-00320-DNH  Document 118-3  Filed 09/05/18  Page 188 of 219
Case 5:16-cr-00320-DNH  Document 118-3  Filed 09/05/18  Page 189 of 219

867

HILLARY TRIMM - Cross by Ms. Bianco

1   there wasn't any sign, then --

2   Q.   So you lied --

3   A.   -- I moved on with my life.

4   Q.   I am sorry.  I didn't mean to interrupt you.  If there

5   was no sign, you could move on with your life?

6   A.   Yes.

7   Q.   They asked you specifically if you knew if anybody was

8   abusing C.T., correct?

9   A.   They asked if I had knowledge of it, yes.

10  Q.   And you looked the medical professionals right in the eye

11  and you said you have no knowledge of C.T. being abused,

12  correct?

13  A.   Yes.

14  Q.   You told the doctor that nobody ever reported seeing any

15  inappropriate contact with C.T., you said that, didn't you?

16  A.   Yes.

17  Q.   C.T.'s father, Spencer, was with you at the exam, wasn't

18  he?

19  A.   Yes, he was.

20  Q.   And you also told Spencer -- Spencer is the father, he is

21  concerned about his daughter, C.T., correct?

22  A.   He acted like he was concerned, yes.

23  Q.   Was he really concerned?

24  A.   I am sorry.  We had bad blood.

25  Q.   At the time he was acting as if he was concerned?

868

HILLARY TRIMM - Cross by Ms. Bianco

1   A.   Yes.

2   Q.   Okay, and you looked at Spencer right in the eye and you

3   said you had never seen C.T. sexually abused; is that correct?

4   A.   Yes.

5   Q.   So you lied to Spencer also?

6   A.   Yes.

7   Q.   So right now you have lied to your mother, yes?

8   A.   Yes.

9   Q.   Child Protective Services?

10  A.   Yes.

11  Q.   Spencer?

12  A.   Yes.

13  Q.   And the doctors?

14  A.   Yes.

15  Q.   Now, before that exam, did you ever tell C.T.'s father

16  that you, yourself, sexually abused C.T.?

17  A.   No.

18  Q.   You kept that to yourself; is that right?

19  A.   Yes.

20  Q.   And you never said anything to Mackenzie at this point;

21  is that right?

22  A.   That is right.

23  Q.   This your secret for you only, correct?

24  A.   To take to my grave.

25  Q.   Now, after Stacey was arrested, Child Protective Services

869

HILLARY TRIMM - Cross by Ms. Bianco

1   became involved in your life, correct?

2   A.   Yes.

3   Q.   And they brought you to Family Court?

4   A.   After I gave my statement, yes.

5   Q.   Okay, and that was the statement you gave on June 10th?

6   A.   Yes.

7   Q.   Okay, and the first time you ever mentioned Stacey

8   abusing C.T. was that on June 10, 2016; is that right?

9   A.   That is the first time I ever told anybody.

10  Q.   And Stacey -- is it fair to that you and Stacey were not

11  in a relationship at that point or you were?

12  A.   We weren't.

13  Q.   Were not?

14  A.   We were not.

15  Q.   Stacey had cheated on you several times; is that right?

16  A.   More than I can count.

17  Q.   Okay, and he lied about being with other women?

18  A.   Yup.

19  Q.   And he made a lot of broken promises to you about being

20  loyal?

21  A.   Lots of them.

22  Q.   And would it be fair to say that that made you very

23  angry?

24  A.   I was upset, but it is not something that hasn't happened

25  to me before.

870

HILLARY TRIMM - Cross by Ms. Bianco

1   Q.   Well, despite it happening to you before, when Stacey did

2   it to you, were your feelings hurt?

3   A.   They were hurt, but I always brought everything up to

4   him, which he didn't like very much.

5   Q.   And you said you were also a very jealous person?

6   A.   I am naturally very jealous, yes.

7   Q.   Okay.  Now, I believe you testified on direct examination

8   that you had some kind of conversation with Stacey about him

9   needing to touch children or something to that effect; is that

10  right?

11  A.   Yes.

12  Q.   And he asked you whether you ever had any of those

13  thoughts?

14  A.   Or if I have ever done it.

15  Q.   He asked you that?

16  A.   Yes.

17  Q.   And you say the curiosity got to you and you told him

18  yes, you did have thoughts of touching children?

19  A.   Yes, because I wasn't entirely positive on the direction

20  this conversation was going at the start.

21  Q.   Are you saying that you looked Stacey in the eye and you

22  lied to him too at that point about having thoughts of

23  touching?

24  A.   When I told him I had thoughts, yes, I was lying because

25  I never had.

871

HILLARY TRIMM - Cross by Ms. Bianco

1  Q.  Okay.  Between the time of Stacey's arrest and the time
2  you spoke to the police on June 10th, you had several
3  conversations with some of Stacey's former girlfriends on the
4  phone; is that right?
5  A.  As far as I can remember, the one that I had talked to
6  the most who was the one that told me they were together and
7  they were getting married was Tiffany.
8  Q.  Tiffany Matthie?
9  A.  Yes.
10  Q.  You were texting back and forth with her?
11  A.  Yes.
12  Q.  And since Tiffany told you they were going to get
13  married?
14  A.  Yes.
15  Q.  And you were bad mouthing Stacey to Tiffany Matthie about
16  him being a cheater; is that right?
17  A.  Yes.
18  Q.  And you were telling Tiffany Matthie that Stacey's phone
19  was often off when you were with him because you couldn't get
20  ahold of him, something to that effect?
21  A.  He would always tell me it was off.  That's why I
22  couldn't get through.  That is why I couldn't talk to him or it
23  died.  It was off or it died.
24  Q.  Okay.  But you also talked to Mackenzie Bailey, correct?
25  A.  Yes.

872

HILLARY TRIMM - Cross by Ms. Bianco

1  Q.  Okay, and you talked to Mackenzie by Facebook, yes?
2  A.  Once me and her had exchanged phone numbers, we talked
3  through texting.
4  Q.  By telephone conversations also?
5  A.  I don't think we ever called each other too often.  If we
6  did, it was for a short time.  It wasn't anything ever serious.
7  I don't like to be on the phone so I would rather text.
8  Q.  Okay.  So there was really no telephone conversations
9  between you two?
10  A.  No.
11  Q.  And you talked about the time you met in person?
12  A.  Yes.
13  Q.  Was that more than once?
14  A.  I ended up meeting her after Mia was born.  She was at
15  her mom's then.
16  Q.  Is this the time you had this conversation with her about
17  being a shitty mom?
18  A.  No, that was through text messages.
19  Q.  So you texted that?
20  A.  Yes.
21  Q.  So that be in the record of your phone somewhere?
22  A.  It should be, yes.
23  Q.  Okay, and you texted her before you gave the June 10th
24  statement?
25  A.  I believe so, yes.

873

HILLARY TRIMM - Cross by Ms. Bianco

1  Q.  So even though you just said you were taking it to the
2  grave, you told Mackenzie that you were some kind of a bad mom
3  because of what Stacey did?
4  A.  Yes.
5  Q.  So you weren't keeping it a secret, you told her?
6  A.  I didn't tell her anything that happened.  I just said I
7  felt like a shit parent because I had my child in danger.
8  Q.  Okay.  So there was no conversation about abuse, is that
9  what you are saying?
10  A.  Yes.
11  Q.  Was there any conversation between you --
12         MS. BIANCO:  Strike that.
13  BY MS. BIANCO, CONTINUED:
14  Q.  When Mackenzie was living with Stacey's uncle, you said
15  she reached out to you?
16  A.  It was after she had left his uncle.  She was with her
17  mom.  She was back at her mom's.
18  Q.  Did Mackenzie Bailey talk to you about her fear of being
19  arrested?
20  A.  No.
21  Q.  Didn't say a word?
22  A.  No.
23  Q.  Was she saying that she felt like a shitty mom too or
24  something to that effect?
25  A.  She had agreed that she feels like a shit parent also.

874

HILLARY TRIMM - Cross by Ms. Bianco

1  Q.  But not one other word was said besides that?
2  A.  No.
3  Q.  Neither of you two followed up on why?
4  A.  Nope.
5  Q.  And neither of you two followed up on why Stacey was
6  arrested?
7  A.  No, we were glad that he was out of the picture.
8  Q.  The only thing you two really had in common was Stacey;
9  is that right?
10  A.  We became friends like to where we could talk and have a
11  normal conversation.  We stopped the resentment that we had for
12  each other.
13  Q.  When you had this resentment, did you have that
14  resentment when you were living in the house with Stacey and
15  Mackenzie?
16  A.  Yes.
17  Q.  So there was a lot resentment?
18  A.  There is a lot of resentment and a lot of tension.
19  Q.  Did you ever text naked pictures of yourself to Mackenzie
20  on Kik in the house?
21  A.  Not on Kik, no.
22  Q.  Well, through some kind of -- any kind of application,
23  did you send her naked pictures by phone?
24  A.  Whenever him and I had first started talking again, I
25  sent them pictures, and they sent me pictures of themselves

875

HILLARY TRIMM - Cross by Ms. Bianco

1   also.

2   Q.   I am asking while you are in the house living with

3   Mackenzie --

4   A.   No, there was no pictures sent.

5   Q.   Mackenzie didn't send you any naked pictures?

6   A.   Not of herself, no.

7   Q.   Okay.  Never happened?

8   A.   No.

9   Q.   Did Mackenzie talk to you about going on these dating

10  sites, extreme dating?

11  A.   I don't even know what that is.

12  Q.   Cupid.com?

13  A.   I don't know what that is either.

14  Q.   Did you ever talk to Mackenzie about her sending her

15  naked pictures out over dating services?

16  A.   I would never advise that to anybody.

17  Q.   Pardon?

18  A.   I would never advise that to anybody.

19  Q.   No, you didn't advise her.  Did she ever talk to you

20  about her sending naked pictures?

21  A.   Oh, no, no, no.

22  Q.   Did she tell you that she was involved in any kind of a

23  website called Topix.  Did you ever hear that?

24  A.   That's where everybody talks smack about everybody in

25  Massena.

876

HILLARY TRIMM - Cross by Ms. Bianco

1   Q.   The Topix where this one had to do with beastiality,

2   child pornography, things like that, did she talk to you about

3   that?

4   A.   No.

5   Q.   So you didn't know anything about that?

6   A.   No.

7   Q.   Did she talk to you about being on a website looking for

8   a girlfriend.

9   A.   No.

10  Q.   Nothing like that?

11  A.   No.

12  Q.   How about being a sex slave or anything like that?

13  A.   No.

14  Q.   Now, in terms of other people you spoke with Stacey

15  about, after his arrest you spoke to a person named Meghan, is

16  that your cousin?

17  A.   I try not to claim her, but, yes.

18  Q.   And Meghan is another person that you bad mouthed Stacey

19  to, correct?

20  A.   Yes.

21  Q.   And this was after his arrest?

22  A.   Yes.

23  Q.   While you are still seeing him in jail?

24  A.   I hadn't gone to see him at that point I don't think.

25  Q.   Okay.

877

HILLARY TRIMM - Cross by Ms. Bianco

1   A.   No.  I had stopped seeing him.

2   Q.   You are just bad mouthing him and you are done with him

3   at this point?

4   A.   Yes.

5   Q.   But you are still bad mouthing him to people, correct?

6   A.   Yes.

7   Q.   And that's prior to your statement to the police on June

8   10th, yes?

9   A.   That was after.

10  Q.   Okay.  Now, I think you testified on direct examination

11  that Stacey persuaded you to molest C.T. and send him pictures,

12  right?

13  A.   Yes.

14  Q.   And this is right before C.T. turned one?

15  A.   Yes.

16  Q.   And when you were dating Stacey before C.T. turned one,

17  you kept a section in your phone titled Notes; is that right?

18  A.   Yes.

19  Q.   Okay, and in that section you wrote some letters to your

20  deceased grandma?

21  A.   I wrote to her all the time.

22  Q.   That was like a private section just for you?

23  A.   Yes.

24  Q.   Do you remember writing to your deceased grandma telling

25  her about Stacey, about a man you met?

878

HILLARY TRIMM - Cross by Ms. Bianco

1   A.   I don't remember it, but I wrote to her about him.

2   Q.   Would seeing your notes refresh your recollection, help

3   you remember?

4   A.   If that part was in there, yes, but other than that...

5           MS. BIANCO:  May I approach, Your Honor?

6           THE COURT:  You may.

7   BY MS. BIANCO, CONTINUED:

8   Q.   Showing you what has been marked as Defendant's

9   Exhibit 17 for identification purposes only.  Do you recognize

10  those notes?  Take your time and look up to me when you are

11  done.

12          THE COURT:  Well, I guess we will have to take a

13  break, members of the jury.  Take a fifteen minute break, and

14  we will come back and complete this cross-examination.  Don't

15  discuss the case among yourselves or anyone else.

16          COURT CLERK:  Court stands for a short recess.

17          (Whereupon, the proceedings were held in open court

18  out of the presence of the Jury.)

19          THE COURT:  Don't discuss your testimony with anyone

20  else over the break, do you understand?

21          THE WITNESS:  Yes, sir.

22          THE COURT:  Mr. McBrearty.

23          COURT CLERK:  Court stands for a sort recess.

24          (Whereupon, a brief recess was taken.)

25          (Whereupon, the proceedings were held in open court

879

1          in the presence of the Jury.)
2          THE COURT:  Ms. Bianco, you may continue with your
3  cross examination.
4          MS. BIANCO:  Thank you, Your Honor.
5  BY MS. BIANCO, CONTINUED:
6  Q.   Ms. Trimm, we left off talking about you writing to your
7  deceased grandmother in the notes section of your phone.  Do
8  you remember those questions?
9  A.   Yes.
10  Q.   And the notes section of your phone was kind of like a
11  private diary; is that right?
12  A.   Yes.
13  Q.   That was just for you to see, correct?
14  A.   Yes.
15  Q.   C.T., born in 2014, correct?
16  A.   Yes.
17  Q.   So she would have been one in 2015?
18  A.   Yes.
19  Q.   And the abuse that Stacey -- that you said Stacey put
20  against her would have happened before she was one; is that
21  right?
22  A.   Yes.
23  Q.   Okay.  Did you in writing to your grandmother tell her
24  about your beautiful daughter C.T.?
25  A.   Of course.

880

1  Q.   And that C.T. was just turning one?
2  A.   Yes.
3  Q.   And you also wrote her about Stacey; is that right?
4  A.   Yes.
5  Q.   You said you talked about meeting a man, correct?
6  A.   Yes.
7  Q.   And you said -- I wish -- I found a really good man who
8  makes me feel beautiful and wanted and loved and he is so good
9  with her.  I wish you could meet him.  You wrote that to your
10  deceased grandmother?
11  A.   Yes.
12  Q.   And that was just for you, correct?
13  A.   Yes.
14  Q.   Are you saying that that diary entry happened after
15  Stacey abused C.T.?
16  A.   Yes.
17  Q.   I want to talk a little bit about your testimony of
18  Stacey having sex with C.T..  You said he actually penetrated
19  her; is that right?
20  A.   Yes.
21  Q.   And he did it for several minutes at a time; is that
22  right?  Is that what you said?
23  A.   Yes.
24  Q.   Okay, and he actually penetrated her, no pretend, it was
25  an actual penetration; is that right?

881

1  A.   Yes.
2  Q.   Yet when you went to the doctor with C.T., you told them
3  she had no history of vaginal bleeding, correct?
4  A.   Correct.
5  Q.   No history of urinary tract infections, correct?
6  A.   Correct.
7  Q.   Yes?  I am sorry.  She has to pick up the answer.  No
8  history of blood in her stools, told the doctor that?
9  A.   Correct.
10  Q.   No history of genital pain?
11  A.   Correct.
12  Q.   She had no history of aggression, correct, you told the
13  doctor that?
14  A.   Correct.
15  Q.   And the doctor did a physical exam on C.T. in your
16  presence?
17  A.   Yes.
18  Q.   And you were told that the vaginal exam was normal?
19  A.   Yes.
20  Q.   The anal exam was normal?
21  A.   Yes.
22  Q.   And you were told that there were no tears or scars
23  vaginally or anally; is that correct?
24  A.   Yes.
25  Q.   You were never advised of any physical findings

882

1  consistent with a two hundred pound plus man having sex with
2  C.T.; is that right?
3  A.   Yes.
4  Q.   Let's talk about your social media accounts, okay?
5  A.   Okay.
6  Q.   You had the user name of washoveryou?
7  A.   For Kik, yes.
8  Q.   Okay.  That wasn't your screen name though?
9  A.   No.
10  Q.   What was your screen name?
11  A.   It started out as my name, but he told me that I should
12  change it so it won't be so easy for weirdos to find me.
13  Q.   So what was your screen name?
14  A.   It went back and forth through a lot of them.  I really
15  can't tell you what they all are because I don't remember.  The
16  latest one was bombchick.
17  Q.   So there was -- would you say you had more than five
18  screen names?
19  A.   I had one screen name, one user name.  I just had
20  multiple different names for that one.
21  Q.   Would there be more than five of those names?
22  A.   Probably.
23  Q.   More than ten?
24  A.   I don't really remember.
25  Q.   And you don't remember what any of those names were?

883

1   A.   I just remember the last one that I had.
2   Q.   Okay, and you had a number of e-mail accounts, didn't
3   you?
4   A.   A lot of them I don't remember the passwords to, so I
5   made new ones.
6   Q.   Did you have skybluebabe69@yahoo.com?
7   A.   Yes, I made that when I was really young.
8   Q.   Okay.  So that was one of your e-mail names?
9   A.   Yes.
10  Q.   But you had several e-mail accounts, correct?
11  A.   Yes, because I kept forgetting the passwords.
12  Q.   I am sorry.  I didn't hear what you said.
13  A.   I kept forgetting the passwords.
14  Q.   Okay.  Now, when you lived with Stacey and Mackenzie, you
15  had access to Mackenzie's phone; is that right?
16  A.   No.
17  Q.   She wouldn't let you use her phone?
18  A.   I wasn't allowed to touch it.  I couldn't even look at
19  his phone.  I wasn't allowed to touch any of theirs.
20  Q.   So you know your first name would be Hillary, correct?
21  A.   Yes.
22  Q.   And you never used Stacey's -- the phone that was the LG
23  account, never?
24  A.   No.
25  Q.   So if someone used the name Hillary on Stacey's LG, it

884

1   wouldn't have been you?
2   A.   No.
3   Q.   Okay.  Did Mackenzie have a password on her phone?
4   A.   I don't know.  I never got close enough to find out.
5   Q.   Did you ever see her lend it to B.L.?
6   A.   No.
7   Q.   How about C.F.?
8   A.   I was never around when C.F. was around.
9   Q.   The phone that Stacey got, the LG, are you aware of how
10  he got it?
11  A.   All I know is his old one broke and he ended up getting a
12  new one, but I don't know who gave it to him or where he got it
13  from.
14  Q.   Okay.  Fair enough.  Let's talk about an argument that
15  you had with Stacey by text on May 14th, 2016, okay?
16  A.   Okay.
17  Q.   Do you remember having an argument where Stacey wanted
18  you to just leave him alone, do you remember that argument?
19  A.   There was a lot of those arguments actually.
20  Q.   Well, do you remember an argument because he is telling
21  you he is upset because you are letting your friends talk shit
22  about him?
23  A.   And he was also very upset because I slept with my first
24  daughter's father.  There was a lot of reasons why we argued.
25  Q.   Okay.  Do you remember an argument specifically where

885

1   Stacey was mad because you let your friends call him a pedo, do
2   you remember that?
3   A.   Vaguely.
4   Q.   Well, would something refresh your recollection, seeing
5   the chats, themselves?
6   A.   No, I am not saying it didn't happen because I did let my
7   friends talk shit about him.
8   Q.   Okay, and when he approached you about your friend called
9   him a pedo, which was like pedophile, right, you got in an
10  argument over it, correct?
11  A.   Probably.
12  Q.   Well, would you like to see the chats to see what went on
13  or do you remember this?
14  A.   Honestly I don't want to see them.
15  Q.   Okay, and he didn't want anything to do with you because
16  you were letting his friends call him names; is that right?  Do
17  you remember that?
18  A.   Because I wouldn't stick up for him.
19  Q.   Okay, and you said to him that it was his fault because
20  he was playing different women and you, do you remember saying
21  that to him?
22  A.   Karma.
23  Q.   Karma, that that is why people are calling him names
24  because he was fooling around on everybody cheating, correct?
25  A.   Yes.

886

1   Q.   Let's talk a little bit about the charges that you face
2   or that you have pled to, okay?
3   A.   Yes.
4   Q.   You have pled guilty to only one count of conspiracy to
5   exploit a child; is that correct?
6   A.   Yes.
7   Q.   You didn't get charged with any other incidents where you
8   claim that Stacey abused C.T. in your presence, correct?
9   A.   Correct.
10  Q.   And that's because you decided to cooperate with the
11  government by testifying against Stacey; is that right?
12  A.   I guess.
13  Q.   Well, you didn't get any additional charges against you,
14  correct?
15  A.   Correct.
16  Q.   And you were told before you entered into the Cooperation
17  Agreement that you were facing a potential life sentence in
18  this case; is that right?
19  A.   Yes.
20  Q.   And you were explained about the United States Sentencing
21  Guidelines?
22  A.   Yes.
23  Q.   And that the Court has to consider them in determining
24  your sentence, correct?
25  A.   Yes.

887

1    Q.   And your guidelines put you at life in prison, correct?

2    A.   Yes.

3    Q.   Sentencing guidelines?

4    A.   Yes.

5    Q.   But because you have entered into this Cooperation

6    Agreement, your maximum amount of time that you can face is now

7    thirty years, correct?

8    A.   Yes.

9    Q.   And you can actually get less than the mandatory minimum

10   because you are cooperating, correct?

11   A.   I guess so, yes, but it is --

12   Q.   You don't have to go to jail at all because of your

13   cooperation, that is a possibility, isn't it?

14   A.   Not in my eyes.

15   Q.   Okay.  Well, the mandatory minimum is normally -- and

16   tell me if you have heard this -- fifteen years?

17   A.   Yes.

18   Q.   But you can actually get under the mandatory minimum

19   because you cooperated against Stacey, correct?

20   A.   Correct.

21   Q.   And I believe you testified on direct examination that

22   you didn't care anything about the cooperating agreement, is

23   that what you testified to?

24   A.   Yes, cooperation agreement doesn't mean anything.

25   Q.   Okay.  So it doesn't matter to you whether you get less

888

1    time or not?

2    A.   It doesn't matter if I get one year or if I get thirty.

3    I am not doing it for the agreement.

4    Q.   Okay.  So why did you sign the agreement if you don't

5    care about it?

6    A.   Because it gave me a chance to get up here and speak for

7    my daughter and testify against him.

8    Q.   Okay.  But you didn't have to sign an agreement to do

9    that, did you?

10   A.   Probably not, no.

11   Q.   But you took the agreement with the possibility that you

12   would get less jail time, correct?

13   A.   Yes.

14        MS. BIANCO:  May I have a moment, Your Honor?

15        THE COURT:  You may.

16        MS. BIANCO:  I have no further questions.

17        Thank you, Ms. Trimm.

18        THE COURT:  Redirect, if any.

19

20   REDIRECT EXAMINATION BY MS. FLETCHER:

21   Q.   Hillary, are you represented by an attorney in your

22   criminal case here?

23   A.   George Hildebrandt.

24   Q.   Did he sign that Cooperation Agreement as well?

25   A.   Yes, he did.

889

HILLARY TRIMM - Redirect by Ms. Fletcher

1    Q.   And did he make advice to you on whether you should have

2    and sign a Cooperation Agreement?

3    A.   He did.

4    Q.   Did he advise you as well on what potential charges you

5    faced and whether you should sign that Plea Agreement?

6    A.   Yes, he did.

7    Q.   So did you sign the Cooperation Agreement and enter into

8    that under advice of your attorney?

9    A.   Yes.

10   Q.   Did you have any expectation of getting a sentence under

11   your mandatory minimum?

12   A.   I don't.

13   Q.   Ms. Bianco asked you about your statement to

14   Investigators Arcadi and where you talked about the abuse of

15   C.T. that you took pictures of and sent to the defendant.  Do

16   you remember those questions?

17   A.   Yes.

18   Q.   Do you remember talking to Investigator Arcadi and

19   telling him that there -- breaking out the pictures into three

20   separate events?

21   A.   Yes.

22   Q.   And do you remember after that testifying before a

23   federal grand jury in this matter?

24   A.   Yes.

25   Q.   And --

890

HILLARY TRIMM - Redirect by Ms. Fletcher

1         MS. BIANCO:  Objection.  She is impeaching her own

2    witness, Your Honor.

3         THE COURT:  Overruled.

4    BY MS. FLETCHER, CONTINUED:

5    Q.   When you testified before the Grand Jury, did you tell

6    them that you were mistaken about those three events?

7    A.   Yes, I did.

8    Q.   Did you correct that error in front of the Federal Grand

9    Jury?

10   A.   Yes, I did.

11   Q.   Were you sworn to tell the truth in front of a Federal

12   Grand Jury?

13   A.   Yes, I was.

14   Q.   Did you to the best of your ability tell them the truth?

15   A.   Yes, I did.

16   Q.   Now, you told Ms. Bianco also on cross-examination that

17   you didn't tell your mom about the abuse of C.T., correct?

18   A.   Correct.

19   Q.   You didn't tell CPS?

20   A.   Correct.

21   Q.   You didn't tell the hospital, you said you were going to

22   take it to your grave?

23   A.   Yes.

24   Q.   Do you remember when you went to speak with

25   Investigator Arcadi on June 10th?

Case 18-105, Document 44, 04/15/2019, 2540369, Page173 of 202

Case 5:16-cr-00320-DNH   Document 118-3   Filed 09/05/18   Page 212 of 219
Case 5:16-cr-00320-DNH   Document 118-3   Filed 09/05/18   Page 213 of 219

891

HILLARY TRIMM - Redirect by Ms. Fletcher

1   A.   Yes.

2   Q.   Did you tell him right away?

3   A.   No, I didn't.

4   Q.   Did it take a little while for you to tell him the truth?

5   A.   Yes.

6   Q.   So why in that conversation with Investigator Arcadi, in

7   that an interview with him, somewhere after a while in that

8   interview did you finally tell him the truth?

9   A.   Because he told me if they found something on me, if they

10  found something that dealt with me, it would be worse for me in

11  the end and that they were trying to put the problem behind

12  bars.  And that if I wanted to, I could try to cover his ass

13  and protect him, but it would be better for everybody and my

14  child if I would just come out and tell them everything I know.

15  Q.   Try to cover whose ass?

16  A.   Joey's.

17  Q.   And what about that made you decide to tell the truth?

18  A.   I knew that I did wrong.  I knew that he did wrong, and

19  since I was sitting there in front of the investigators, it was

20  time to come out with everything.  There was no hiding it.

21  Q.   And you didn't just tell Investigator Arcadi about what

22  Stacey did to C.T.. did you?

23  A.   No, I told him what I did as well.

24  Q.   And because of what you told Investigator Arcadi about

25  what you did, you are sitting here today as an inmate, aren't

---

892

HILLARY TRIMM - Redirect by Ms. Fletcher

1   you?

2   A.   Yes, I am.

3   Q.   Did you make this whole thing up to get back at Stacey

4   because he had another girlfriend?

5   A.   No.

6   Q.   Even after all of this, even after everything that he did

7   with C.T. and had you with C.T., in your note that you wrote to

8   your grandma, did Stacey LaPorte make you feel beautiful?

9   A.   He had his moments.

10  Q.   Did he make you feel wanted?

11  A.   Yes.

12  Q.   Did he make you feel loved?

13  A.   At times.

14  Q.   Did you need that in your life?

15  A.   I did, but I don't anymore.

16       MS. FLETCHER:  I have no further questions.

17       THE COURT:  Recross.

18

19  RECROSS EXAMINATION BY MS. BIANCO:

20  Q.   Ms. Fletcher just asked you about when you first met with

21  Investigator Arcadi to give a statement.  Do you remember that

22  question?

23  A.   Yes, ma'am.

24  Q.   She asked you, she said it took a while for you to come

25  out with the truth; is that right?

---

893

HILLARY TRIMM - Recross by Ms. Bianco

1   A.   Yes, ma'am.

2   Q.   At first you sat down with Investigator Arcadi, correct?

3   A.   Yes.

4   Q.   And he explained to you the need to tell the truth?

5   A.   After I was trying to say I didn't know anything, that I

6   didn't know if anything ever happened.  After I said that, he

7   stressed how important it was for me to tell the truth.

8   Q.   So you looked at Investigator Arcadi right in the eye in

9   the beginning and told him you didn't do anything?

10  A.   I told him that nobody did anything.

11  Q.   You lied?

12  A.   Yes.

13  Q.   And you lied for how long with Investigator Arcadi?  You

14  said it took a while.  Was it thirty minutes?

15  A.   It was about forty-five minutes.

16  Q.   So for forty-five minutes you continued to lie, correct?

17  A.   Yes.

18  Q.   And he told you if they found anything at all, it would

19  be worse for you in the end, correct?

20  A.   Yes, because I would have been lying about it.

21  Q.   So in the end when he is telling you things could be

22  worse, you were concerned about yourself, correct?

23  A.   I was concerned about being able to be there for my kids.

24  Q.   Okay.  When he told you it would be worse for you in the

25  end, you thought it meant a longer prison sentence, correct?

---

894

HILLARY TRIMM - Recross by Ms. Bianco

1   A.   Yes, because it meant I was away from my kids for a

2   longer amount of time.

3   Q.   And that's part of the reason you signed a Cooperation

4   Agreement is because you don't want to be away from your kids

5   for a longer amount of time, correct?

6   A.   I will be honest, I do want to be in my kids' life as

7   much as I can, but if that is not possible, then that is not

8   possible.

9   Q.   But that is the reason you signed the Cooperation

10  Agreement, so you can eventually end up being with your kids,

11  correct?

12  A.   Eventually, yes, even if it takes thirty years.

13       MS. BIANCO:  Okay.  Thank you.

14       THE COURT:  Members of the jury.  At this time I

15  just want to give you a few limiting matters.  You have heard

16  testimony from both this witness and with Mackenzie Bailey.

17  They both have pled guilty before me to crimes involving this

18  whole picture.  And I will be receiving at an appropriate time

19  a Presentence Report on both, and I will take into

20  consideration the entire situation, including Cooperation

21  Agreement and their testimony here.

22       And there will be guidelines.  They are advisory.

23  They are not mandatory.  I do not have to follow them.  I will

24  look at the whole picture, and it will be one hundred percent

25  up to me to decide what sentence this witness gets and what

---

Case 18-105, Document 44, 04/15/2019, 2540369, Page174 of 202

Case 5:16-cr-00320-DNH   Document 118-3   Filed 09/05/18   Page 216 of 219          Case 5:16-cr-00320-DNH   Document 118-3   Filed 09/05/18   Page 217 of 219

895

HILLARY TRIMM - Recross by Ms. Bianco

1    sentence Ms. Bailey gets.  So that's the situation.

2              I will take the cooperation.  I will take everything

3    into consideration in determining their sentence.  So that's

4    for you.  And you may be excused, and thank you.  And we will

5    have a sidebar for a moment.

6         (Whereupon, a sidebar conference was held outside

7              the hearing of the jury.  No transcript taken.)

8         THE COURT:  Okay.  Members of the jury, we have

9    moved along very well this week.  The government has advised me

10   they have one more witness, which may take some time.  So it is

11   Friday.  I have decided -- and we have moved along very well

12   thanks to your cooperation, being here and everything else, and

13   the attorneys being very professional about this whole matter.

14             So we are going to adjourn today.  It is Friday, and

15   we will -- I believe the case will be submitted to you sometime

16   the first two or three days next week.  It looks like we are

17   not going to take the whole week like we originally thought.

18   So we are going to adjourn now until 9:30 on Monday.

19             Again, as I said before, don't discuss the case

20   among yourselves or anyone else.  And I don't believe there

21   will be any newspaper or TV about the case, but you never know.

22   If you should, just put it aside and save it, and you will

23   probably find if you read it later after the case is over, you

24   will be amazed at how inaccurate it all is, the reports.

25             And don't go on the Internet or try to get any

896

1    information about any of the witnesses or the attorneys or

2    anything else with this case.  You have been a terrific jury so

3    far, and we want to keep it up.  We really appreciate your

4    attention to this matter.  It is obvious you are.  And that is

5    what makes the justice system in the United States so great.

6              So you are excused until 9:30 with the thanks of the

7    Court and everybody shall stay here until the jurors have left

8    the building.  Leave everything in the jury room, and it will

9    be there on Monday morning for you.

10        (Whereupon, the proceedings were held in open court

11             out of the presence of the Jury.)

12        THE COURT:  Okay.  We are adjourned until morning.

13        COURT CLERK:  Court stands adjourned.

14

15        (Whereupon, the proceedings held on June 16, 2017,

16             were ended at 4:20 p.m..)

17

18

19

20

21

22

23

24

25

UNITED STATES  DISTRICT COURT

NORTHERN DISTRICT OF NEW YORK
***************************************************
UNITED STATES OF AMERICA,

vs.                             16-CR-320

STACEY J. LAPORTE, JR.,
                              Defendants
***************************************************

        Transcript of a Jury Trial held on June 19, 2017,

before the HONORABLE DAVID N. HURD, at the United States

Federal Courthouse, 10 Broad Street, Utica, New York,

stenographically recorded by Nancy L. Freddoso, Registered

Professional Reporter.

                A P P E A R A N C E S

Government:    UNITED STATES ATTORNEY'S OFFICE
               ROOM 900, HANLEY FEDERAL BLDG.
               100 SOUTH CLINTON STREET
               SYRACUSE, NEW YORK  13261-7198
          BY:  LISA M. FLETCHER, AUSA
               SAHAR L. AMANDOLARE, AUSA

Defendant:     FEDERAL PUBLIC DEFENDER'S OFFICE
               4 CLINTON SQUARE
               SYRACUSE, NEW YORK 13202
          BY:  RANDI J. BIANCO, AFPD
               MARTIN P. WOLFSON, AFPD

               NANCY L. FREDDOSO, R.P.R.
          Official United States Court Reporter
               10 Broad Street, Room 316
               Utica, New York 13501
                  (315) 793-8114

899

                I N D E X   O F   P R O C E E D I N G S

1         WITNESS                              PAGE

2    CHAD WILLARD

3         Direct Examination By Ms. Fletcher:      901

4         Cross-Examination By Mr. Wolfson:        928

5         Redirect Examination By Ms. Fletcher:    944

6         Recross Examination By Mr. Wolfson:      949

7                                             PAGE

8    Motion                                   951

9         WITNESS                              PAGE

10   MICHELLE HIRST

11        Direct Examination By Mr. Wolfson:       965

12        Cross-Examination By Ms. Amandolare:     968

13   STACEY LAPORTE

14        Direct Examination By Ms. Bianco:        969

15        Cross-Examination By Ms. Fletcher:       986

16                                             PAGE

17   Motion                                   1009

18   Summation By Ms. Fletcher                1010

19   Summation By Ms. Bianco                  1039

20   Rebuttal Summation By Ms. Fletcher       1064

21

22

23

24

25

**G.A. 171**

900

I N D E X   O F   E X H I B I T S

| EXHIBIT | PAGE |
|---|---|
| 1 | | |
| 2 Government's Exhibit 50 | 910 |
| 3 Government's Exhibit 28 | 919 |
| 4 Government's Exhibit 47 | 921 |
| 5 Government's Exhibit 27 | 923 |
| 6 Defendant's Exhibit 18 | 933 |
| 7 Defendant's Exhibit 19 | 935 |
| 8 Defendant's Exhibit 20 | 936 |
| 9 Defendant's Exhibit 21 | 942 |

10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

901

1       (WHEREUPON, the proceedings held on June 19, 2017,
2   were commenced at 9:30 a.m..)
3       (Whereupon, the proceedings were held in open court
4   out of the presence of the Jury.)
5
6       THE COURT:  Good morning, members of the jury, and
7   thank you for being with us again on this beautiful
8   Mohawk Valley day.  I understand, as I told you on Friday, we
9   have one more witness from the government, and we anticipate
10  the government will rest then, and we will see where we go from
11  there.  Government may call apparently its last witness.
12      MS. FLETCHER:  Yes, Your Honor.  Thank you.  The
13  government calls Special Agent Chad Willard.
14
15      CHAD WILLARD, having been called as a Witness, being
16  first duly sworn, was examined and testified as follows under
17  oath:
18
19  DIRECT EXAMINATION BY MS. FLETCHER:
20  Q.  Good morning, Special Agent Willard.  By whom are you
21  employed?
22  A.  The Department of Homeland Security Immigration and
23  Customs Enforcement Homeland Security Investigations.
24  Q.  In what capacity?
25  A.  I am a Special Agent Criminal Investigator.

902

CHAD WILLARD - Direct By Ms. Fletcher
1   Q.  How long have you been working with HSI?
2   A.  Since August 6th of 2006.
3   Q.  Where are you currently assigned?
4   A.  The resident agent in charge office in Massena, New York.
5   Q.  How long have you been assigned to Massena, New York?
6   A.  Since June of 2014.
7   Q.  Where were you assigned before Massena?
8   A.  Prior to that I was assigned to the resident agent in
9   charge Syracuse, New York.  And prior to that, I was in the
10  Special Agent in charge office in Minneapolis, Minnesota.
11  Q.  What are your duties and responsibilities as a Special
12  Agent with Homeland Security?
13  A.  I investigate federal law violations enumerated by the
14  customs immigration laws in the United States to include child
15  exploitation investigations.
16  Q.  Did there come a time that you were asked to attend a
17  multi-disciplinary team meeting relative to this case?
18  A.  Yes.
19  Q.  When was that?
20  A.  In July of 2016.
21  Q.  After that meeting, did you open a federal case relative
22  to the sexual exploitation of children?
23  A.  Yes, I did.
24  Q.  And who was the target of that investigation?
25  A.  Stacey Joseph LaPorte, Junior.

903

CHAD WILLARD - Direct By Ms. Fletcher
1   Q.  Did you obtain a federal search warrant authorizing the
2   forensic analysis of items of evidence that had been collected
3   by Massena Police and the New York State Police?
4   A.  Yes, I did.
5   Q.  What items did the federal search warrant authorize the
6   analysis of?
7   A.  The Lenovo laptop, Samsung cell phone, Apple iPhone 4s,
8   seized from the 44 Glenn Street upstairs apartment, as well the
9   LG cell phone that was turned over by Tiffany Matthie to
10  Investigator Arcadi of the New York State Police.
11  Q.  How was the data on Mackenzie Bailey's iPhone extracted?
12  A.  I brought the phone to the technical director of
13  Cellebrite.  Cellebrite is a global company that develops
14  mobile data forensic tools.  He defeated the password and
15  extracted the phone for me.
16      MS. FLETCHER:  Judge, at this time I would like to
17  read a portion of Government Exhibit 42 in evidence, which is a
18  stipulation by the parties.  And the parties have stipulated
19  that a complete file system extraction of the iPhone marked as
20  Government Exhibit 13 was conducted in a proper forensic manner
21  by Cellebrite Advanced Investigative Services on September 12,
22  2016, and that the data thereby extracted and later reviewed by
23  forensics analyst Deborah Jasinski is a true and accurate copy
24  of the data contained on the phone at the time it was seized by
25  law enforcement.

904

CHAD WILLARD - Direct By Ms. Fletcher

1        THE COURT:  Government's Exhibit 42?

2        MS. FLETCHER:  Yes.

3        THE COURT:  That's received.

4        MS. FLETCHER:  Yes, that's the stipulation  of the

5   parties, Your Honor.

6   BY MS. FLETCHER, CONTINUED:

7   Q.   Have you reviewed the data that Cellebrite was able to

8   extract from the iPhone?

9   A.   Yes, I have.

10  Q.   Were there images on the iPhone?

11  A.   Yes, there were.

12  Q.   Was there any child pornography on the iPhone?

13  A.   There was no child pornography on the iPhone.

14  Q.   Was there pictures of A.T.?

15  A.   No pictures of A.T..

16  Q.   No pornographic pictures of A.T.?

17  A.   No pornographic pictures of A.T..

18  Q.   No Internet child pornography?

19  A.   None.

20  Q.   Was there beastiality?

21  A.   Zero.

22  Q.   Was there adult pornography?

23  A.   No.

24  Q.   Were you provided with the data from Mackenzie Bailey's

25  Samsung cell phone that was analyzed by Deborah Jasinski?

905

CHAD WILLARD - Direct By Ms. Fletcher

1   A.   Yes, I was.

2   Q.   Did you review that data?

3   A.   Yes, I did.

4   Q.   Were there images on Mackenzie Bailey's Samsung cell

5   phone?

6   A.   Yes, there were.

7   Q.   Were there any images of child pornography on her Samsung

8   cell phone?

9   A.   There were and it was limited to the chat that took place

10  between J.M. and C.F. with the addition of a number of more

11  naked pictures of C.F., but other that, no other child

12  pornography.

13  Q.   No Internet child pornography?

14  A.   None.

15  Q.   No beastiality?

16  A.   None.

17  Q.   Any adult pornography?

18  A.   No.

19  Q.   Did you review the data that was extracted from the LG

20  cell phone, Exhibit 15 that was recovered from Tiffany Matthie?

21  A.   Yes, I did.

22  Q.   Are there images on that phone?

23  A.   Yes, there are.

24  Q.   Have you reviewed all of the images?

25  A.   I have.

906

CHAD WILLARD - Direct By Ms. Fletcher

1   Q.   Is there child pornography on that phone?

2   A.   Yes, there is.

3   Q.   Is there Internet child pornography on that phone?

4   A.   Yes.

5   Q.   Is there beastiality on that phone?

6   A.   Yes.

7   Q.   Is there adult pornography on that phone?

8   A.   Yes.

9   Q.   Are there Kik messages on that phone?

10  A.   Yes.

11  Q.   In regard to the images on LG cell phone that was

12  recovered from Tiffany Matthie, are there -- in regards to the

13  images that are not child pornography, are there images of

14  people who you recognize from this investigation?

15  A.   Yes, there are.

16       MS. FLETCHER:  If we could show Exhibit 37A.

17  BY MS. FLETCHER, CONTINUED:

18  Q.   Is that a picture on the LG cell phone?

19  A.   Yes, it is.

20  Q.   37B.  Is that a picture taken from the LG?

21  A.   Yes.

22  Q.   37C, is that a picture that you found on the LG cell

23  phone?

24  A.   Yes.

25  Q.   37D, is that a picture from the LG cell phone?

907

CHAD WILLARD - Direct By Ms. Fletcher

1   A.   Yes.

2   Q.   E, is that a picture that was found on the LG cell phone?

3   A.   Yes.

4   Q.   Do you know who those people are?

5   A.   On the left-hand side as I am looking at it would be the

6   defendant, and the woman on right-hand side, I believe her name

7   is Paula Gorolla.

8   Q.   37F, was that a picture taken from the LG cell phone?

9   A.   Yes.

10  Q.   Who is that?

11  A.   Mackenzie Bailey.

12  Q.   37G, was that on the LG cell phone?

13  A.   Yes.

14  Q.   Who is that?

15  A.   Mackenzie again.

16  Q.   37H, is that from the LG?

17  A.   Yes, Mackenzie again.

18  Q.   37I?

19  A.   Yes, Mackenzie again.

20  Q.   37J, was that taken from the LG cell phone?

21  A.   Yes.

22  Q.   Who is that?

23  A.   That is Mia Trimm.

24  Q.   37K, was that found on the LG cell phone?

25  A.   Yes, Mia Trimm.

908

CHAD WILLARD - Direct By Ms. Fletcher

1   Q.   37L, was that found on the LG cell phone?

2   A.   Yes, Hillary Trimm and Mia Trimm.

3   Q.   37M, who is that?

4   A.   Amber Eagan.

5   Q.   Was that found on the LG cell phone?

6   A.   Yes.

7   Q.   And 37N, who is that?

8   A.   Amber Eagan.  I am not sure what the child's name is.

9   Q.   Was that picture of Amber Eagan found on the LG cell

10  phone?

11  A.   Yes.

12  Q.   Was Amber Eagan a name that came up during the course of

13  this investigation?

14  A.   Yes.

15  Q.   Is she a person who lives in Massena, New York?

16  A.   Yes, she is.

17  Q.   Are these images a representative sample of the images

18  that are found on the LG cell phone that are not pornographic

19  in nature?

20  A.   Yes, they are.

21  Q.   Were there other non-pornographic images as well?

22  A.   Yes, there were.

23  Q.   And generally what did they depict?

24  A.   There was a lot of car pictures, like suped up cars.

25  There were superman logo pictures.  There were adult

909

CHAD WILLARD - Direct By Ms. Fletcher

1   pornography, beastiality, and there was images of sexual

2   sayings.

3   Q.   Like little posters of sexual --

4   A.   Yes, it was the keep calm and try, but it was of a sexual

5   nature, lots of those.

6   Q.   Lots of those?

7   A.   Yes.

8   Q.   And you said there were superman logos?

9   A.   Yes, there were.

10  Q.   What color were the superman logos that were found on the

11  LG cell phone?

12  A.   I found green and neon blue.

13  Q.   And I am going to show you Exhibit 40.  That is the

14  locked screen, did you find copies of that image in the LG cell

15  phone?

16  A.   Yes, I did.

17  Q.   I am going to show you Exhibit 29, the prouddaddy

18  account.  Did you find copies of that image in the LG cell

19  phone?

20  A.   Yes, I did.

21  Q.   More than one copy?

22  A.   Yes.

23  Q.   I am going to show you what has been marked for

24  identification as Exhibit 50, do you recognize that?

25  A.   Yes, I do.

910

CHAD WILLARD - Direct By Ms. Fletcher

1   Q.   What is that?

2   A.   This is the green superman logo that I found on the LG

3   cell phone.

4   Q.   And did you find multiple versions of that?

5   A.   Yes, I did.

6        MS. FLETCHER:  I would move Exhibit 50 into

7   evidence.

8        THE COURT:  Any objection?

9        MR. WOLFSON:  No objection.

10       THE COURT:  Received.

11       (Exhibit No. 50, received.)

12       MS. FLETCHER:  If we could publish that, please.

13  BY MS. FLETCHER, CONTINUED:

14  Q.   This was contained within the phone?

15  A.   Yes.

16  Q.   Okay.

17       MS. FLETCHER:  We can take that down.

18  BY MS. FLETCHER, CONTINUED:

19  Q.   Are there SMS or text messages on the LG cell phone?

20  A.   Yes, there are.

21  Q.   Exhibit 20, I am going to hand you.  Do you recognize

22  that?

23  A.   Yes, this is the full printout of the SMS text messages

24  from the LG cell phone.

25  Q.   And when you say a full printout, are those all of the

911

CHAD WILLARD - Direct By Ms. Fletcher

1   text messages that were extracted from the LG cell phone?

2   A.   Yes.

3   Q.   And did you review all of those messages?

4   A.   I did.

5   Q.   Did you extract some of the messages from there in

6   relation to this investigation?

7   A.   Yes, I did.

8   Q.   I am going to hand been 20A through 20J, which are in

9   evidence, but I will have you identify them.

10  A.   These are the messages that I pulled from the total

11  messages.

12  Q.   Why those particular text messages, why did you pull

13  those as part of the investigation?

14  A.   These messages, the user of the phone identifies himself

15  or the partner in the conversation identifies the user of the

16  phone.

17       MS. FLETCHER:  So these are in evidence.  I would

18  like to publish Exhibit 20A.

19  BY MS. FLETCHER, CONTINUED:

20  Q.   Could you explain what this is?

21  A.   This is a text message from a user that was saved in his

22  phone under the name John on 5/14/2016 at 1:57:56 p.m..

23  Q.   Does it indicate that it is a read message?

24  A.   Yes.

25  Q.   Could you read the content of the message?

912

CHAD WILLARD - Direct By Ms. Fletcher

1   A.   I don't want you and never have Joey so stop.  I love you

2   like a brother for real.  That's it, but now you are turning it

3   into all I want your dick.  Not every girl wants your dick.

4   You are not even hot for Christ's sake.  So don't bother

5   texting me anymore.  Not dealing with drama.

6   Q.   So this sender referred to the person on the other end as

7   Joey, correct?

8   A.   Correct.

9   Q.   And Exhibit 20B, what is this?

10  A.   This is an SMS message from Tiffany, user saved in this

11  phone on 5/14/2016 at 4:21:12 a.m.  It has been read, and it

12  says:  I love you Mr. LaPorte.  Don't give up.

13  Q.   Exhibit 20C, what is this?

14  A.   Again from John on 5/14/16 at 2:14:59 a.m., and it is

15  read.  It says:  Good night Joey.

16  Q.   20E, what is this?

17  A.   This is two messages.  The bottom message is the first

18  message at -- from Amber at -- on 5/13/16 at 12:42:39 a.m., and

19  this was sent by the user of the phone.

20       I lost a lot and went through a lot just to be with you,

21  and I am sorry, I fucked up, and I will do anything to fix it.

22  I swear on my dead mom and dad and all my kids.  I am not

23  playing a game with you.  I want to be with you.

24  Q.   That message was sent by the LG phone to the contact

25  known as Amber?

---

913

CHAD WILLARD - Direct By Ms. Fletcher

1   A.   Correct.

2   Q.   And then there was a reply?

3   A.   There was a reply from Amber that was read approximately

4   two minutes after it was sent.  It says you lost a lot, went

5   through a lot to be with me?  Please don't swear on your kids

6   and parents.

7   Q.   Now, Amber with that phone number, did you make efforts

8   to figure who that Amber was that used that phone number?

9   A.   Yes, I interviewed Amber, and it was Amber Eagan.

10  Q.   The person in the picture we just saw?

11  A.   Yes.

12  Q.   And 20F, what is this?

13  A.   This is again from Tiffany on May 8th 2016,

14  11:23:44 p.m..  It has been read.

15       I am going out.  Stressed to the max.  Let me know when

16  you are coming home.  I love you Mr. LaPorte.  He makes me

17  happy.

18  Q.   20G, explain this exhibit?

19  A.   So the first message in this exhibit, we will start from

20  the bottom and read up again.  That's from John sent on

21  5/6/2016.

22  Q.   Is it sent to John?

23  A.   Yes, it is from the LG, the user of the LG, to John.  And

24  it says:  So fucking over this shit.  So done with people, with

25  love, with life, just fucking done.

---

914

CHAD WILLARD - Direct By Ms. Fletcher

1        And they get a response from John:  Why, what is going

2   on?

3        And then they send:  I want to just die.

4        And then they get a message, a reply from John which is:

5   Why, what is wrong?  Joey, please.

6        And then the user of the phone sends out a message:

7   Nothing after tonight.  I won't be around or be anyone's

8   problem any more.  I am just done.

9   Q.   20H, what is this exhibit?

10  A.   John again on May 1st 2016, 2:13:11 a.m.  It has been

11  read:  It will be okay, Joey.  He won't know.

12  Q.   20I?

13  A.   From Amber again, May 1st 2016, 12:44:42 a.m.  Hey, it is

14  Joey, just added my card to my phone.

15  Q.   So that was sent to Amber?

16  A.   Sent to Amber, correct.

17  Q.   And 20J, what is that?

18  A.   This is taken from the contacts of the LG phone.  The

19  name is Amber, last time contacted was 5/12/16 at 11:37:07 a.m.

20  Times contacted three hundred and forty-eight.  It lists the

21  mobile phone for Amber and it shows a photo of Amber.

22  Q.   That photo and that phone number were found in the phone

23  as well?

24  A.   Yes.

25            MS. FLETCHER:  Okay.  You can take that down.

---

915

CHAD WILLARD - Direct By Ms. Fletcher

1   BY MS. FLETCHER, CONTINUED:

2   Q.   Did you review all of the chats in Exhibit 20 -- or

3   excuse me, texts in Exhibit 20 for the timeline involved in the

4   messages from May 17th of 2016?

5   A.   I did.

6   Q.   What is the significance, and why did you look

7   specifically for May 17th of 2016?

8   A.   On May 17th at 5:45 p.m., Mr. LaPorte went to the New

9   York State Police Barracks with Investigator Baillargeon.

10  Q.   What did you find in the SMS text messages relating to

11  that timetable?

12  A.   At 5:50 p.m. is the last sent text message from the

13  phone.

14            MS. FLETCHER:  If we could put up page three of

15  Exhibit 20, please.  If we can look to the first few.  Thank

16  you.

17  BY MS. FLETCHER, CONTINUED:

18  Q.   So if we look at line number fourteen, it indicates a

19  sent message to my baby girl?

20  A.   Yes, my baby girl.

21  Q.   What time was that message sent?

22  A.   5:50:31 p.m.

23  Q.   Are there any other sent messages on this phone after

24  that date and time?

25  A.   No.

916

CHAD WILLARD - Direct By Ms. Fletcher

1    Q.   So if we read up on this page, which is the third page of
2    the exhibit, the next message is something received to that
3    phone, correct?
4    A.   Correct, and it goes unread.
5    Q.   And then there is another message which is in line
6    twelve, received to the phone from Amber?
7    A.   And again, it is unread.
8         MS. FLETCHER:   And then if we could go to page two.
9    BY MS. FLETCHER, CONTINUED:
10   Q.   Starting at the bottom, there is another message received
11   on that phone at 6:55.
12   A.   Yes.
13   Q.   And was that read or unread?
14   A.   Unread.
15   Q.   And at 6:55:56?
16   A.   Another unread message.
17        MS. FLETCHER:   Can we scroll up, please.
18   BY MS. FLETCHER, CONTINUED:
19   Q.   And then the next message received to the phone?
20   A.   8:23 p.m., another unread.
21   Q.   And then continuing?
22   A.   It is at 8:26 p.m., unread.
23   Q.   And then page one.  Starting at the bottom and scroll up.
24   A.   Still on 5/17 at 9:00 p.m., another unread message.  Then
25   at 9:05, another unread message.  9:06, another unread message.

917

CHAD WILLARD - Direct By Ms. Fletcher

1    Q.   Let's stop there.  So these unread messages --
2         MS. FLETCHER:   I need those back up please.
3    BY MS. FLETCHER, CONTINUED:
4    Q.   The content of these unread messages, are you with your
5    other girlfriend, must be, was going to see if you wanted to go
6    to the res, I guess you are busy with your other girlfriends,
7    correct?
8    A.   That's correct, that's exactly what it reads.
9    Q.   You see no response to any of these, correct?
10   A.   Zero response.
11   Q.   Continuing up.  Line 4?
12   A.   Line 4 is at 9:29, it is unread, answer your phone,
13   loving life.
14   Q.   And then line three?
15   A.   9:44, unread, go fuck yourself, Dante Francis Dow.
16   Q.   Line two?
17   A.   This changes to the next day, 5/18 at 3:15 a.m..  Again,
18   it is unread.  I love you, bye.  Five, coming, ask me what
19   happened, don't give up.
20        And then on 6/2, there is another unread message at 10:35
21   p.m.  It is from Net 10 messaging.
22   Q.   There were no messages sent or received from this phone
23   after 5/18?
24   A.   None.
25   Q.   And all of the messages after the defendant was taken to

918

CHAD WILLARD - Direct By Ms. Fletcher

1    the state police barracks go unread?
2    A.   That's correct.
3    Q.   Did you review all of the messages that were recovered
4    from the phone?
5    A.   Yes, I did.
6    Q.   Before the defendant went to the state police barracks at
7    5:55 on 5/17, did he leave any message unread?
8    A.   No, everything was read prior to that point in time.
9    Q.   Are there Kik chat messages on the LG?
10   A.   Yes, there are.
11   Q.   Did you review the Kik chat messages on the LG?
12   A.   Yes, I did.
13   Q.   What Kik user name did you find on that LG phone?
14   A.   Prouddaddy3_15_16.
15   Q.   Did you send a summons to Kik for subscriber information
16   and device identification information regarding
17   prouddaddy3_15_16?
18   A.   Yes, I did.
19   Q.   Did you receive a response?
20   A.   Yes, I did.
21   Q.   I am going to hand you Exhibit 28.  What is that exhibit?
22   A.   This is a certificate of record, certified business
23   record that I received in response to my summons that I sent to
24   Kik.
25   Q.   In relation to the prouddaddy3_15_16 account?

919

CHAD WILLARD - Direct By Ms. Fletcher

1    A.   Correct.
2    Q.   And it is a certified business record from Kik?
3    A.   Yes, it is.
4         MS. FLETCHER:   Judge, I would move that into
5    evidence at this time.
6         THE COURT:   I can't hear you.
7         MS. FLETCHER:   I move that into evidence at this
8    time.
9         THE COURT:   Any objection?
10        MR. WOLFSON:   No objection.
11        THE COURT:   Received.
12        (Exhibit No. 28, received.)
13        MS. FLETCHER:   I am going to ask to publish the
14   exhibit.
15   BY MS. FLETCHER, CONTINUED:
16   Q.   It is a certification on page one, correct?
17   A.   Yes, it is.
18        MS. FLETCHER:   Go to page two if we could.
19   BY MS. FLETCHER, CONTINUED:
20   Q.   The Kik record indicates that there is an e-mail account
21   associated with prouddaddy3_15_16?
22   A.   Yes.
23   Q.   And is that as a Gmail account?
24   A.   Yes.
25   Q.   And an unconfirmed Gmail account?

920

CHAD WILLARD - Direct By Ms. Fletcher

1   A.   Yes.

2   Q.   Did you send a summons to Gmail or to Google in regard to

3   that e-mail account?

4   A.   Yes, I did.

5   Q.   Did you receive a certified record back from Google?

6   A.   Yes, I did.

7   Q.   I am going to hand you Exhibit 48.  What is that exhibit?

8   A.   This is the response I received from Google from the

9   summons that I sent to them.

10   Q.   What did Google indicate about the e-mail address

11   associated with Kik account prouddaddy3_15_16?

12   A.   That no such account existed.

13   Q.   I am going to go back to the Kik record where we were,

14   the second page of the exhibit, please.  Does this record

15   indicate a date that the account was registered with Kik?

16   A.   Yes, it does.

17   Q.   What date was prouddaddy3_15_16 registered as a Kik

18   account?

19   A.   March 17, 2016.

20   Q.   That would be the second from the bottom line, correct?

21   A.   Correct.

22   Q.   And underneath that it says registration client info, it

23   says Android ID.  What is an Android ID?

24   A.   An Android ID is a unique identifier for a certain

25   device, almost like a serial number individualized for every

---

921

CHAD WILLARD - Direct By Ms. Fletcher

1   Androido (phonetically).

2   Q.   And I am going to show you -- did you compare the Android

3   ID of the Kik account registration device with the Android ID

4   of the LG cell phone?

5   A.   Yes, I did.

6   Q.   Exhibit 15?

7   A.   Yes.

8   Q.   I am going to hand you Exhibit 47 for identification.  Do

9   you recognize that exhibit?

10   A.   Yes, I do.  This is the device information for the LG

11   cell phone.

12   Q.   Where did that come from?

13   A.   This came from Deborah Jasinski's extraction of the LG

14   cell phone.

15   Q.   Does that contain data in regard to that phone including

16   its Android ID?

17   A.   Yes, it does.

18        MS. FLETCHER:  Judge, I move Exhibit 47 into

19   evidence.

20        THE COURT:  Any objection?

21        MR. WOLFSON:  No objection, Your Honor.

22        THE COURT:  Exhibit 47 received.

23        (Exhibit No. 47, received.)

24        MS. FLETCHER:  If we could put up 47 please.

25   BY MS. FLETCHER, CONTINUED:

---

922

CHAD WILLARD - Direct By Ms. Fletcher

1   Q.   So where on here is the Android ID?

2   A.   It is the very first line right under legacy and it says

3   Android ID E88311A83386C21F.

4   Q.   Is that the same Android ID as was used to create the

5   prouddaddy3_15_16 Kik account?

6   A.   It is an exact match.

7   Q.   And also looking at this device information for the LG,

8   what is the bluetooth device name?

9   A.   Fast 8's LGL16C.

10   Q.   Does this also indicate whether or not the LG phone is

11   password protected?

12   A.   Yes, on the very bottom line of this document it has the

13   unlocking pattern for Fast 8's phone listed as 145896327.

14        MS. FLETCHER:  You can take that down, please?  Can

15   we go back to Exhibit 28, please?  If we could go to the next

16   page and blow up the bottom half, please.

17   BY MS. FLETCHER, CONTINUED:

18   Q.   The second part of the Kik account or the KIK information

19   regarding the prouddaddy3_15_16 account indicates that the

20   registration included somebody inputting a date of birth?

21   A.   Correct.

22   Q.   What date of birth is associated with prouddaddy3_15_16

23   account?

24   A.   09/23/1990.

25   Q.   Are you familiar with that date of birth relative to this

---

923

CHAD WILLARD - Direct By Ms. Fletcher

1   case?

2   A.   Yes, I am.  It is the defendant's birthday.

3   Q.   And again, then we go down and it tells you what model

4   phone?

5   A.   Yes, LG and it is model LGL16C.

6   Q.   Did you also send a summons to Kik for the subscriber and

7   device ID information related to the fastfamily25 account?

8   A.   Yes, I did.

9   Q.   Did you receive a response?

10   A.   Yes, I did.

11   Q.   Handing you Government Exhibit 27 for identification.

12   What is that?

13   A.   This is the response I received from Kik in regards to

14   the summons I sent them about the fastfamily25 user account on

15   KIK.

16   Q.   And is that a certified business record with, again, the

17   first page being the certification from Kik that it is a true

18   and accurate record?

19   A.   Yes, it is.

20        MS. FLETCHER:  Judge, I would now move that in as

21   Exhibit 27.

22        THE COURT:  Any objection?

23        MR. WOLFSON:  No objection, Your Honor.

24        THE COURT:  Received.

25        (Exhibit No. 27, received.)

924

CHAD WILLARD - Direct By Ms. Fletcher

      MS. FLETCHER:  If we could publish that, please.
1
2 BY MS. FLETCHER, CONTINUED:
3    Q.   Again, the first page is the certification from Kik that
4 this is a true business record?
5    A.   That's correct.
6    Q.   If we could go to the second page and
7 the top half, please.
8 BY MS. FLETCHER, CONTINUED:
9    Q.   Kik indicates here that fastfamily25 also has an
10 unconfirmed associated Gmail account;  is that correct?
11   A.   That's correct.
12   Q.   That was the fastfamily25@gmail.com?
13   A.   Yes.
14   Q.   Did you also send a summons to Google in regard to that
15 Gmail account?
16   A.   Yes, I did.
17   Q.   I am going to hand you Government Exhibit 49 for
18 identification.  Do you recognize that exhibit?
19   A.   Yes, I do.
20   Q.   What is that?
21   A.   This is the response I received from Google when I
22 summonsed them for the information behind the
23 fastfamily25@gmail.com account.
24   Q.   Is that a certified business record from Google?
25   A.   Yes, it is.

925

CHAD WILLARD - Direct By Ms. Fletcher

1    Q.   What does it indicate about fastfamily25@gmail.com?
2    A.   No such e-mail account was located.
3         MS. FLETCHER:  If we go back to that, please.
4 No. 27.
5 BY MS. FLETCHER, CONTINUED:
6    Q.   Now, looking at the first results page from the Kik
7 record, does this indicate what date the account was
8 registered?
9    A.   Yes, the third line from the bottom is registration time
10 stamp.  And that was on February 19th of 2016.
11   Q.   How old was Stacey LaPorte on February 19th of 2016?
12   A.   He was twenty-five years old.
13   Q.   There is an Android ID as well.  Is that a different
14 Android ID than what we saw with prouddaddy?
15   A.   Yes, it is.
16   Q.   Would that indicate then that it was a different phone
17 that was used with fastfamily?
18   A.   Yes, it would.
19        MS. FLETCHER:  If we could go to the next page,
20 please?
21 BY MS. FLETCHER, CONTINUED:
22   Q.   On the bottom half or the second page of the Kik return
23 indicates a date of birth associated with the fastfamily25.
24 Does the date 11/15 have any known connection with anyone
25 involved in this case?

926

CHAD WILLARD - Direct By Ms. Fletcher

1    A.   It does not.
2    Q.   How about the year 1990?
3    A.   1990 is the defendant's birth year.
4    Q.   What brand of phone was used to register the fastfamily25
5 account?
6    A.   An LG phone, model LGL 16C.
7    Q.   Same model as the LG phone that we have in evidence as
8 Exhibit 15?
9    A.   Yes.
10   Q.   And again, it says the brand is LGE and the device type
11 is an Android, correct?
12   A.   Correct, it is an Android.
13        MS. FLETCHER:  You can take that down.
14 BY MS. FLETCHER, CONTINUED:
15   Q.   Did you review the prouddaddy3_15_16 Kik chats recovered
16 from the LG phone?
17   A.   Yes I did.
18   Q.   Did that include Exhibit 21, a chat involving Banx75?
19   A.   Yes.
20        MS. FLETCHER:  I am going to ask that we put that
21 up, please.
22 BY MS. FLETCHER, CONTINUED:
23   Q.   Can you just briefly summarize what this chat is?
24   A.   This is the chat between the user prouddaddy3_15_16 and
25 another user with the user name Banx75.  And they are chatting

927

CHAD WILLARD - Direct By Ms. Fletcher

1 with each other about the exploitation of children.
2         MS. FLETCHER:  At this time, this is in evidence,
3 Agent Willard and I will read through the conversation, and he
4 will read the part of Banx75.
5 BY MS. FLETCHER, CONTINUED:
6    Q.   So the conversation starts then at 3:02:14 a.m. on
7 3/25/16 with prouddaddy3_15_16.
8         (Exhibit 21 read to the Jurors.)
9 BY MS. FLETCHER, CONTINUED:
10   Q.   And then Banx75 sends an image that is depicted on the
11 screen, correct?
12   A.   Correct.
13   Q.   And then it continues.
14        (Exhibit 21 read to the Jurors.)
15 BY MS. FLETCHER, CONTINUED:
16   Q.   And then Banx sends another image that is depicted on the
17 screen.  What does that depict?
18   A.   It depicts a baby approximately less than a year old, and
19 there is an adult male penis that appears to be ejaculating on
20 the baby.
21   Q.   And then he continues.
22        (Exhibit 21 read to the Jurors.)
23 BY MS. FLETCHER, CONTINUED:
24   Q.   Agent Willard, are you familiar with how the date and
25 time is generated on the Kik application?

928

CHAD WILLARD - Direct By Ms. Fletcher

1  A.   Yes, I am.
2  Q.   How is that?
3  A.   Kik application requires a wireless Internet signal
4  referred to as Wifi a lot or a cellular telephone network to
5  send messages back and forth.  And it relies on date and time
6  pulled from those wireless networks or cell phone networks to
7  time stamp the Kik message.
8  Q.   So by that, this indicates this chat and those those images
9  were sent and received on March 25th of 2016?
10  A.   Yes.
11       MS. FLETCHER:  I have no further questions.
12       THE COURT:  Mr. Wolfson, you may examine.
13       MR. WOLFSON:  Thank you, Your Honor.
14
15  CROSS-EXAMINATION BY MR. WOLFSON:
16  Q.   Good morning, Agent Willard.
17  A.   Good morning, sir.
18  Q.   You were the lead federal investigator on this case,
19  right?
20  A.   That is correct.
21  Q.   So you have interviewed many of the witnesses?
22  A.   Yes, I have.
23  Q.   And you have reviewed all of their statements?
24  A.   Yes, I have.
25  Q.   So would you say you are very familiar with this case,

929

CHAD WILLARD - Cross by Mr. Wolfson

1  right?
2  A.   I am very familiar with this case.
3  Q.   And you reviewed the LG Lucky extraction report, correct?
4  A.   Yes, I did.
5  Q.   In that report that Deborah Jasinski prepared, she
6  mentioned that someone named Hillary was using this item?
7  A.   Yes.
8  Q.   And also on that LG Lucky we just saw some pictures of
9  Mackenzie Bailey, right?
10  A.   We did.
11  Q.   And those appear to be selfies, correct?
12  A.   They did.
13  Q.   And did you investigate who purchased this phone
14  originally?
15  A.   Yes, I did.
16  Q.   And that was Jennifer Northrup, right?
17  A.   That's correct.
18  Q.   And that is Mackenzie Bailey's mother, right?
19  A.   Yes, she is.
20  Q.   Now, you have testified a lot about Kik, right?
21  A.   I have.
22  Q.   And so you have read Kik's guide for law enforcement?
23  A.   I have.
24  Q.   And so you know that to use Kik someone has to create a
25  user name?

930

CHAD WILLARD - Cross by Mr. Wolfson

1  A.   Yes.
2  Q.   But that doesn't have to be the person's real name?
3  A.   That is correct.
4  Q.   And this is the name that would show up when they
5  communicate with other people on this platform?
6  A.   Yes.
7  Q.   And Kik doesn't verify the subscriber records to verify
8  that name, correct?
9  A.   Kik does not.
10  Q.   And they don't verify age?
11  A.   They do not.
12  Q.   And they don't verify sex?
13  A.   They do not.
14  Q.   So basically it can be completely anonymous, right.
15  A.   It could be.
16  Q.   And a person could make up any user name that they want?
17  A.   That is correct.
18  Q.   And so a person could easily make a fastfamily account
19  with any numbers to follow whatever they liked?
20  A.   You could, assuming it is not already taken.
21  Q.   And they could put anyone's picture on that account as
22  long as it had a picture?
23  A.   For a profile picture, yes, you get to choose whatever
24  picture you want.
25  Q.   So they could put a picture of someone else on there?

931

CHAD WILLARD - Cross by Mr. Wolfson

1  A.   Sure.
2  Q.   And a user could have an unlimited number of Kik accounts
3  as long as that particular name wasn't taken?
4  A.   Yes.
5  Q.   So a person could have numerous Kik accounts essentially
6  with someone else's name?
7  A.   Yes.
8  Q.   And someone else's picture?
9  A.   Yes.
10  Q.   So they could even mimic someone's name if they wanted
11  to?
12  A.   I suppose that is possible.
13  Q.   Now, you reviewed the response you got from your summons
14  from Kik, right?
15  A.   I did.
16  Q.   And that response included a user location, correct?
17  A.   Yes.
18  Q.   And that was latitude thirty-eight, longitude negative
19  ninety-seven?
20  A.   Yes.
21  Q.   Did you make any effort to verify where that was?
22  A.   I did.
23  Q.   And that is Clifford, Kansas, correct?
24  A.   Yes.
25  Q.   Now, in this case there are two fastfamily accounts,

932

CHAD WILLARD - Cross by Mr. Wolfson

1  right?

2  A.   I know fastfamily25.

3  Q.   There is also a fastfamily1327, right?

4  A.   Yes.

5  Q.   And fastfamily25, as you just testified, is the one

6  responsible for the chats with Mackenzie Bailey?

7  A.   I didn't testify --

8  Q.   I apologize.  Being familiar with the case you know that

9  fastfamily25 was the one responsible for most of the chats with

10  Mackenzie Bailey, correct?

11  A.   Where A.T. was being exploited?

12  Q.   Yes.

13  A.   Yes.

14  Q.   And fastfamily25 was also responsible for the chats with

15  C.F., right?

16  A.   I believe so, yes.

17  Q.   So that was not fastfamily1327?

18  A.   No, fastfamily25.

19  Q.   All right.  You have seen the pictures of Stacey's

20  tattoos, right?

21  A.   I have.

22  Q.   And you are familiar with the tattoo on his leg?

23  A.   A lot of tattoos on his leg.

24  Q.   Specifically the one that says ride or die 1327?

25  A.   I have seen the tattoo.

933

CHAD WILLARD - Cross by Mr. Wolfson

1  Q.   All right.  Let's talk about the prouddaddy3_15_16 Kik

2  chats.  Handing you what has been marked as Defendant's

3  Exhibit 18 for identification.  What do you recognize this to

4  be?

5  A.   The top or the bottom?  There is two separate things.

6  The top seems to be a conversation with another Kik user and

7  prouddaddy.  And then the bottom is a different user talking to

8  prouddaddy.

9  Q.   This is a chat between prouddaddy3_15_16 and the user

10  name johnlileng (phonetically), right?

11  A.   On the bottom half of this page, yes.

12       MR. WOLFSON:  I would like to have that particular

13  part published.

14       MR. FLETCHER:  Is that in evidence?

15       MR. WOLFSON:  May I admit that into evidence, Your

16  Honor?

17       THE COURT:  What is the number?

18       MR. WOLFSON:  It is Defendant's Exhibit 18.

19       THE COURT:  Any objection?

20       MS. FLETCHER:  I would like to see it first.

21       MR. WOLFSON:  Absolutely.

22       THE COURT:  Any objection?

23       MS. FLETCHER:  No objection.

24       THE COURT:  Received, Defendant's 18.

25       (Exhibit No. 18, received.)

934

CHAD WILLARD - Cross by Mr. Wolfson

1  BY MR. WOLFSON, CONTINUED:

2  Q.   So in this chat John says:  Hi.  Proud dad here as well,

3  correct?  Would you like it back?

4  A.   Yes.  It is not on the screen.

5  Q.   In this chat the user John Leng says:  Proud dad here as

6  well?

7  A.   Yes.

8  Q.   And then prouddaddy3_15_16 says:  Do you have beast vids?

9  A.   Correct.

10  Q.   And then right after that the user prouddaddy says:  I am

11  female LOL?

12  A.   Correct.

13  Q.   On the next page John then asks:  Well, why does your

14  name say proud dad?

15  A.   Yes.

16  Q.   And then the prouddaddy user says:  Profile is a cover

17  up, hehe.  I am 23 female New Jersey looking for beast vids?

18  A.   Correct.

19  Q.   All right.  Let's turn to another chat.  I am handing you

20  what has been marked as Defense Exhibit 19 for identification.

21  And when you get a chance, if you could let me know what you

22  recognize that to be?

23  A.   I recognize this as the chat from the LG.

24  Q.   And this is an excerpt from a chat between

25  prouddaddy3_15_16 and the user name BillMento?

935

CHAD WILLARD - Cross by Mr. Wolfson

1  A.   Correct.

2       MR. WOLFSON:  I would like to have that admitted

3  into evidence.  I will show you a copy.

4       THE COURT:  Any objection?

5       MS. FLETCHER:  One moment, please, Your Honor.  No

6  objection.

7       THE COURT:  19 received.

8       (Exhibit No. 19, received.)

9  BY MR. WOLFSON, CONTINUED:

10  Q.   So again, this is an excerpt of a chat between prouddaddy

11  and billmento?

12  A.   Yes.

13  Q.   And at the very beginning of this chat, prouddaddy says:

14  F20 New York.

15  A.   Yes.

16  Q.   And based on your training and experience, that would

17  refer to the user's age, sex, and location, right?

18  A.   Typically, yes.

19  Q.   So sex in this case being female?

20  A.   Yes.

21  Q.   And the age being twenty?

22  A.   Yes.

23  Q.   And location being New York?

24  A.   Correct.

25  Q.   After this introduction, billmento questions:  You are

936

CHAD WILLARD - Cross by Mr. Wolfson

1   female?

2   A.   Yes.

3   Q.   And prouddaddy responds:  Yes.

4        Bill Mento then asks:  Why does your name say

5   prouddaddy3_15_16?

6   A.   Correct.

7   Q.   And prouddaddy3_15_16 responds:  It is a cover up so guys

8   leave me alone unless I want to be bothered?

9   A.   Yes.

10  Q.   I have a couple more chats for you.  Handing you what has

11  been marked as Defense Exhibit 20 for identification.

12       THE COURT:  What is the number?

13       MR. WOLFSON:  20, Your Honor.

14  BY MR. WOLFSON, CONTINUED:

15  Q.   And if you could let me know what you recognize that to

16  be?

17  A.   Yes.  This is another chat with prouddaddy3_15_16 and

18  another user name readynwet.

19       MR. WOLFSON:  I would like to have that admitted

20  into evidence as well, please and published to the jury if

21  there is no objection.

22       MS. FLETCHER:  No objection.

23       THE COURT:  20 received.

24       (Exhibit No. 20, received.)

25  BY MR. WOLFSON, CONTINUED:

937

CHAD WILLARD - Cross by Mr. Wolfson

1   Q.   So do you recognize this to be an excerpt between

2   prouddaddy3_15_16 and a user named readynwet or Fred Dunne?

3   A.   Correct.

4   Q.   And again, prouddaddy says:  Hi, F20 New York?

5   A.   Correct.

6   Q.   And, again, that refers to the user's age, sex, and

7   location, right?

8   A.   I believe so.

9   Q.   Age in this case again being twenty?

10  A.   Yes.

11  Q.   And sex being female?

12  A.   Yes.

13  Q.   Fred Dunne then asks, it says:  Proud dad is your name?

14  A.   Yes.

15  Q.   And prouddaddy offers:  What would you like for proof?

16  A.   Correct.

17  Q.   Now, you are familiar with the ages of the different

18  people involved in this case, right?

19  A.   Yes.

20  Q.   Mackenzie Bailey would have been twenty years old at the

21  time these were sent, correct?

22  A.   Correct.

23  Q.   And that's the same age that the user claimed to be?

24  A.   Yes.

25  Q.   And so the way Kik works, there is really no way to know

938

CHAD WILLARD - Cross by Mr. Wolfson

1   who is using it at this time?

2   A.   Correct.

3   Q.   So there is no way to know if Mackenzie Bailey is in fact

4   using this account?

5   A.   In these conversations, correct.

6   Q.   And you don't know if Hillary was using this account at

7   this time?

8   A.   Correct.

9   Q.   And you have reviewed the statements of Mackenzie Bailey

10  and Hillary Trimm, correct?

11  A.   I have.

12  Q.   And so you know the people involved in this case shared

13  their social media accounts, on some occasions?

14  A.   From their statements, I don't recognize that.

15  Q.   You don't remember Hillary Trimm mentioning that Stacey

16  used MacKenzie Bailey's Facebook account to contact her?

17  A.   I do recall that from the statement that that is how he

18  first reached out to her.

19  Q.   Let's talk about the night C.F. allegedly had sex with

20  her brother, all right.  That was the same night that Mackenzie

21  took the suggestive pictures with her mouth open, correct?

22  A.   That is part of the chat, correct.

23  Q.   So she was present at the house when C.F. and J.M.

24  allegedly had sex?

25  A.   I don't know that.

939

CHAD WILLARD - Cross by Mr. Wolfson

1   Q.   Turning again to the extraction reports in this case, you

2   never saw anything recovered from the Notes application of the

3   LG cell phone, did you?

4   A.   I believe I have seen stuff in the Notes about a fantasy

5   story on the LG.

6   Q.   You have investigated a lot of sex crimes against

7   children that involve the Internet, right?

8   A.   I have.

9   Q.   And it is typical for people to denote the age in their

10  screen name?

11  A.   I wouldn't say typical.

12  Q.   But --

13  A.   It is hit or miss.

14  Q.   But sometimes after a screen name there is, you know, a

15  number and that could denote the person's age on some

16  occasions?

17  A.   I've seen it in years.

18  Q.   So when someone is using a name like moomookenzie17, that

19  seventeen could very well refer to that person's age or the age

20  they are reporting?

21  A.   It could be the first one through fifteen moomookenzie

22  were already on there and that she could only get seventeen.

23  It is typically what happens.  They just keep trying numbers

24  until they can get the user name.

25  Q.   So it could be either way?

940

CHAD WILLARD - Cross by Mr. Wolfson

1    A.   Could be.
2    Q.   No way to know for sure?
3    A.   Right.
4    Q.   Now, the synopsis report from T61 Lenovo laptop, have you
5    reviewed that?
6    A.   I have.
7    Q.   And this is the computer that was recovered from
8    Mackenzie Bailey's apartment where she was alone on 44 Glenn
9    Street?
10   A.   I understood that she shared that apartment with
11   Mr. LaPorte.
12   Q.   And this particular laptop had thirteen user accounts
13   which all pertained to Mackenzie?
14   A.   Yes.
15   Q.   And the log-in name on this laptop was Kenzie?
16   A.   Correct.
17   Q.   And on this laptop were found eleven images of
18   beastiality?
19   A.   I am not sure of the exact number, but it sounds correct
20   to me.
21   Q.   Okay.  There is also possible child pornography
22   recovered from this loop?
23   A.   There was definitely child pornography recovered from
24   that laptop.
25   Q.   And images of beastiality is what the user of prouddaddy

941

CHAD WILLARD - Cross by Mr. Wolfson

1    was looking for when they were identifying themselves as a
2    female?
3    A.   In one of these three chats.  One of the three asks for
4    beastiality.
5    Q.   I want to talk to you about Count 6.  This is the receipt
6    of child pornography.  This count is supported solely by the
7    prouddaddy3_15_16 chats, correct?
8    A.   With banx75, correct.
9    Q.   And prouddaddy3_15_16 is the same account where the user
10   identified on a number of occasions as a female?
11   A.   Yes.
12   Q.   And the same account where the user said they were twenty
13   years old?
14   A.   Yes.
15   Q.   And the same account where the user tried to get
16   beastiality images?
17   A.   Correct.
18   Q.   I am going to hand you what has been marked as Defense
19   Exhibit 21 for identification.  When you get a chance if you
20   can let me know what you recognize that to be?
21   A.   It appears to be a prouddaddy3_15_16 chat with a user
22   named superslut500.
23        MR. WOLFSON:  I would like to have this admitted
24   into evidence and published if there is no objection.
25        THE COURT:  Any objection?

942

CHAD WILLARD - Cross by Mr. Wolfson

1        MS. FLETCHER:  One moment, please.  No objection.
2        THE COURT:  Received.
3        (Exhibit No. 21, received.)
4    BY MR. WOLFSON, CONTINUED:
5    Q.   Now, in this particular chat, this is between
6    prouddaddy3_15_16 and the user name superslut500?
7    A.   Yes.
8    Q.   And in this chat on this particular page, the user
9    prouddaddy says:  Yes, parents are gonna be home in two hours,
10   this sucks.
11   A.   Yes, towards the bottom.
12   Q.   And this was sent on March 25, 2016, correct?
13   A.   Yes.
14   Q.   And this was sent only fifty minutes after the exchange
15   with banx75?
16   A.   I am not exactly positive right when banx was sent.  If
17   you have it, I would like to look at it before I answer that
18   question.
19   Q.   Absolutely.  Just one moment Mr. Willard.  Agent Willard,
20   this is the chats with banx75.  Would that refresh your
21   recollection as to what time those were sent?
22   A.   Yes, they are as you say they are.  Within an hour.
23   Q.   Okay.  So within an hour of the chats with banx75, the
24   user prouddaddy3_15_16 says:  Yes.  Parents gonna be home in
25   two hours, this sucks?

943

CHAD WILLARD - Cross by Mr. Wolfson

1    A.   Correct.
2    Q.   And this was sent on March 25, 2016?
3    A.   Yes.
4    Q.   You know at this time Stacey's parents were both dead,
5    right?
6    A.   Yes.
7    Q.   And they were deceased before March 25, 2016?
8    A.   They were.
9    Q.   Finally, you did have an opportunity to speak with Amber,
10   right?
11   A.   Amber Eagan?
12   Q.   Yes.
13   A.   I did.
14   Q.   And Amber was dating Mackenzie Bailey, correct?
15   A.   Not that she divulged to me.
16   Q.   So you didn't learn that Amber was dating Mackenzie?
17   A.   No, she didn't say that to me.
18   Q.   Finally, during your investigation you learned that B.L.
19   was not living with Stacey on March 25, 2016, correct?
20   A.   Who was that?
21   Q.   B.L..
22   A.   B.L., on March?
23   Q.   25th of 2016?
24   A.   I am not positive of the exact date when B.L. left.
25   Q.   But she had already moved out at that point, right?

944

CHAD WILLARD - Cross by Mr. Wolfson

1  Q.  I am not positive of the exact date that B.L. left.

2  Q.  Okay.

3      MR. WOLFSON:  Thank you, Agent Willard.  I have no

4  further questions.

5      THE COURT:  Redirect, if any?

6

7  REDIRECT EXAMINATION BY MS. FLETCHER:

8      MS. FLETCHER:  Could you put up Exhibit 22, please.

9  BY MS. FLETCHER, CONTINUED:

10  Q.  Do you recall this Kik chat?

11  A.  I do.

12  Q.  Is this on the Lenovo -- excuse me, the LG?

13  A.  Correct.

14      MS. FLETCHER:  And if we could go to the second

15  page, please, and the third page actually.

16  BY MS. FLETCHER, CONTINUED:

17  Q.  Does prouddaddy3_15_16 send a selfie during this chat?

18  A.  Yes, toward the bottom of this page he does.

19  Q.  Who is that?

20  A.  That is Mr. LaPorte on this selfie.

21  Q.  Was that selfie also found on the LG?

22  A.  Yes, it is.

23  Q.  And I want to go back to one of the first exhibits the

24  defense used with you.  This is Defendant's Exhibit 18 where --

25  Mr. Wolfson talked to you about the bottom half of the exhibit.

945

CHAD WILLARD - Redirect by Ms. Fletcher

1  I want you to look at the top half of the exhibit.  In the chat

2  that finished at the top half of the exhibit, who was

3  prouddaddy speaking with?

4  A.  Prouddaddy on the top half was speaking with Kik user

5  name mattp2711.

6  Q.  I am going to put up Exhibit 44 in evidence.  Do you see

7  that chat in Exhibit 44 that is in evidence?

8  A.  Yes.

9  Q.  Is this a 3/28/2016 chat between prouddaddy and

10  mattp27ll?

11  A.  Yes, it is.

12  Q.  And I am going to ask you to read through this chat.  So

13  it starts with proud -- a chat that says from mattp.  What does

14  mattp say?

15  A.  She is five.

16  Q.  Prouddaddy responds?

17  A.  Nice.

18  Q.  Mattp?

19  A.  She doesn't understand what a lie in is, lol.

20  Q.  Prouddaddy?

21  A.  Just you and her there?

22  Q.  Mattp?

23  A.  Yeah.  She come and got in my bed.

24  Q.  Prouddaddy?

25  A.  Nice.

946

CHAD WILLARD - Redirect by Ms. Fletcher

1  Q.  Mattp?

2  A.  Took me by surprise, had a hard on.

3  Q.  Prouddaddy?

4  A.  You naked under the blanket.

5  Q.  Next page, mattp?

6  A.  Yes, I always am.

7  Q.  Prouddaddy?

8  A.  She got clothes on.

9  Q.  Mattp?

10  A.  She her nightie on.

11  Q.  Prouddaddy?

12  A.  Panties.

13  Q.  Mattp?

14  A.  No.

15  Q.  Prouddaddy?

16  A.  Just reach under her skirt and rub her.

17  Q.  Mattp?

18  A.  We are not in bed now.  We are ready and going out soon.

19  Q.  Prouddaddy?

20  A.  Okay, that's fine.

21  Q.  Prouddaddy?

22  A.  Just tell her to pull her pants and panties down and bend

23  her over really quick.

24  Q.  Mattp?

25  A.  You are a naughty daddy.

947

CHAD WILLARD - Redirect by Ms. Fletcher

1  Q.  Prouddaddy?

2  A.  Yup, lol.

3  Q.  Prouddaddy?

4  A.  Is she doing it?

5  Q.  Mattp?

6  A.  I am not asking her to do that.

7  Q.  Prouddaddy?

8  A.  Trust me it will be worth it.

9  Q.  Mattp?

10  A.  Have you got a daughter?

11  Q.  Prouddaddy?

12  A.  Just tell her you need to check something.  Have her

13  touch her toes with her pants and panties down.

14  Q.  Prouddaddy?

15  A.  Yes, I do.  She was just born on the 15th.

16  Q.  And mattp?

17  A.  I am not doing that.

18  Q.  Who has a daughter just born on the 15th?

19  A.  On March 15, 2016, Mia Trimm was born.  It was the

20  daughter of the defendant and Hillary Trimm.

21  Q.  Mr. Wolfson asked you about pornographic images,

22  beastiality that were recovered from the Lenovo --

23  A.  Yes.

24  Q.  -- computer, and you have reviewed Deborah Jasinski's

25  report, and she has testified here, correct?

948

CHAD WILLARD - Redirect by Ms. Fletcher

1   A.   Yes.

2   Q.   Is it not true that the -- that those images, the

3   pornography and beastiality on the Lenovo, had come from a dump

4   of an LG phone and not an iPhone?

5   A.   Correct.  It showed that an LG phone was connected.

6   Q.   That connected those images to the LG?

7   A.   Yes.

8   Q.   You found no images of child pornography on

9   Mackenzie Bailey's iPhone; is that correct?

10        MR. WOLFSON:  Objection, asked and answered and

11  leading.

12        THE COURT:  Yes, sustained.

13  BY MS. FLETCHER, CONTINUED:

14  Q.   I am going to ask to put up Exhibit 19.  Mr. Wolfson

15  asked you about something in the notes application of the LG

16  phone.  Do you recall this exhibit?

17  A.   I do.

18  Q.   What is that?

19  A.   It is a fantasy to want to have somebody act out a

20  fantasy.

21  Q.   And is this recovered from the Notes application of the

22  LG phone?

23  A.   Yes.

24        MS. FLETCHER:  We can take that down, please.

25  BY MS. FLETCHER, CONTINUED:

949

CHAD WILLARD - Redirect by Ms. Fletcher

1   Q.   In your experience as an investigator in these types of

2   offenses, have you found that offenders also role play online?

3   A.   Yes.

4   Q.   Did you find in your review of the chats, on the Kik

5   messages on the LG phone evidence to support the fact that the

6   defendant was trying to sell Mackenzie Bailey?

7   A.   I did.

8   Q.   Now, in relation to the latitude and longitude on the Kik

9   location data on the Kik summons return?

10  A.   I spoke to Kik about that exact issue.

11  Q.   What is that?

12  A.   It is the location of their server in the United States.

13  Q.   So the latitude and longitude goes back to the Kik

14  servers in Kansas?

15  A.   Correct.

16  Q.   Not to the location of the user who registered?

17  A.   Correct.

18        MS. FLETCHER:  I have no further questions.

19        THE COURT:  Recross, if any?

20        MR. WOLFSON:  Very briefly.  Thank you.

21

22  RECROSS EXAMINATION BY MR. WOLFSON:

23  Q.   Now, the chats we just read between prouddaddy and mattp,

24  there were no pictures traded during this chats, correct?

25  A.   I only have a small portion of these chats.  I have not

950

CHAD WILLARD - Recross by Mr. Wolfson

1   memorized every chat in this.  So if I had the full chat then I

2   could answer that question.

3   Q.   From the portion that you reviewed --

4   A.   From the portion that I reviewed, there is no pictures

5   exchanged.

6   Q.   So from this portion, it very well could have just been

7   role play?

8   A.   Yes.

9   Q.   And you found evidence in the Notes application that the

10  user of that phone did engage in some kind of role play?

11  A.   Yes, it appears as though they were looking for a fantasy

12  story.

13  Q.   And turning to Mia's birth date, her mother,

14  Hillary Trimm, certainly would have known of her birthday,

15  right?

16  A.   Yes.

17  Q.   And Mackenzie likely would have known of this too?

18  A.   I can't answer whether Mackenzie knows Mia's birthday or

19  not.

20        MR. WOLFSON:  Thank you.  I have no further

21  questions, Agent Willard.

22        THE COURT:  Thank you, officer.  You may step down.

23        (Whereupon, the Witness is excused.)

24        THE COURT:  Any further witnesses on behalf of the

25  government.

951

1        MS. FLETCHER:  No, Your Honor.  The government

2   rests.

3        THE COURT:  Okay.  Members of the jury, the

4   government has rested.  We have got some matters to take care

5   of now.  And so it may be a little extra long, but we will call

6   you back when appropriate.  So relax for a few moments.  And

7   don't discuss the case among yourselves or anyone else.  And we

8   will see you when we complete with what we have to do now.

9        (Whereupon, the proceedings were held in open court

10       out of the presence of the Jury.)

11        THE COURT:  Any motions on behalf of the defendant

12  at this time?

13        MR. WOLFSON:  We would like to move for a judgment

14  of acquittal pursuant to Rule 29.

15        THE COURT:  Do you wish to be heard?

16        MR. WOLFSON:  I do, Your Honor.

17        THE COURT:  You may proceed.

18        MR. WOLFSON:  As to Count 1, the evidence supporting

19  the effect on interstate commerce is too attenuated to support

20  a conviction on this.

21        One, you may have heard that the devices were made

22  in foreign countries, but there is no evidence that the use of

23  these devices actually affected interstate commerce in this

24  case.  Particularly because the allegations involved were made

25  in the same house, meaning they were used on Wifi in a closed

952

Motion

1   network.  Therefore, these communications did not necessarily
2   travel in interstate commerce, and there was no evidence
3   presented that they did.
4          Also on Count 1, there were no pictures taken, so
5   there is an issue that the -- ultimately of the creation of a
6   visual depiction.  No evidence was brought out that there was
7   any visual depiction underlying Count 1.
8          As to Count 2, the conspiracy to sexually exploit a
9   child, again, the evidence is too attenuated to prove an impact
10  on interstate commerce for the same reasons; that local Wifi
11  network was used in the very same house, in the very same
12  village, and there was no effect on interstate commerce and no
13  evidence that there was an effect on interstate commerce.
14         As to Counts 3 and 4, we heard testimony from
15  Mackenzie Bailey that Stacey LaPorte did not take pictures when
16  he was allegedly having sex with her daughter, and she even
17  said why would he, he was in the same room.  So there is no
18  visual depiction there and no evidence thereof.
19         As to Count 5, I would again make the same
20  interstate commerce argument that these Kik chats took place in
21  the very same house, on the very same wifi network, and that
22  this is a closed network.  There has been no evidence of an
23  impact on interstate commerce.
24         Also in this count, we heard testimony from J.M. and
25  C.F. that they did not actually engage in intercourse.

953

Motion

1          As to Count 6, the evidence is that the user on
2   three different occasions identified themselves as a female, on
3   a fourth occasion they made reference to their parents coming
4   home at a time when Stacey LaPorte's parents were in fact
5   deceased.
6          And in the chats with banx75, which is the only chat
7   supporting Count 6, the user never identifies as a male.  So
8   basically in every single prouddaddy chat involving these
9   conversations, the user is identifying themselves as a  female,
10  and in the dispositive one, the chats with banx75, there is no
11  reference to being a male.
12         It also makes reference to having a sister there at
13  a time when B.L. had already run away, according to her
14  testimony.  So the evidence in this case is too attenuated to
15  find a guilty verdict on that count.  Thank you, Your Honor.
16         THE COURT:  Thank you.
17         The government may be heard.
18         MS. FLETCHER:  Your Honor, the government has
19  presented not only ample evidence, but evidence beyond all
20  doubt that the defendant committed each and every one of the
21  offenses.  I could going through them one by one, but I don't
22  think that's necessary.  I think the defense argument on Rule
23  29 misunderstands the interstate nexus requirement, and
24  misunderstands the crime charged.
25         The interstate nexus requirement, the materials in

954

Motion

1   commerce prong, while an iPhone or a Samsung or an LG is made
2   outside the State of New York, it doesn't matter.  Once it
3   comes into the State of New York, the materials in commerce
4   prong is satisfied.  And the interstate nexus in this case is
5   satisfied in that regard.
6          However, it is also satisfied by the use of Kik
7   through the Internet and through the Kik servers.  It does not
8   matter, and the courts have held that even the intrastate use
9   of the Internet does affect interstate commerce, and that prong
10  has been proven here as well as.
11         The crime of sexually exploiting a child is to
12  sexually exploit that child for the purpose of producing a
13  visual depiction, whether or not the defendant succeeds in his
14  goal.  And therefore, we have proven, not only that, but we
15  have proven that he did succeed in his goals in this case.  And
16  all of the elements of every count of the Indictment have been
17  proven beyond a reasonable doubt.
18         THE COURT:  Viewing the evidence most favorable to
19  the government as required, they certainly have established a
20  nexus for interstate commerce with regards to the appropriate
21  counts.  And there is certainly sufficient evidence with
22  regards to the other counts.
23         The motion on behalf of the defendant is denied.
24  And you may have an exception.
25         We will now take a short break.  And when we come

955

Motion

1   back I will hear arguments with regards to the motion
2   concerning the Fifth Amendment if the defendant elects to
3   testify.
4          Mr. McBrearty.
5          COURT CLERK:  Court stands for a short recess.
6          (Whereupon, a brief recess was taken.)
7          (Whereupon, the proceedings were held in open court
8          out of the presence of the Jury.)
9          THE COURT:  The defendant has made a motion,
10  particularly in view of the fact that he is also facing state
11  charges regarding his sister, B.L., that he testify, but be
12  allowed to take the Fifth Amendment outside the presence of the
13  jury.  I have reviewed all of the submissions.
14         Ms. Bianco, do you wish to -- anything further to
15  argue on the record?
16         MS. BIANCO:  I am going to have Mr. Wolfson argue.
17         THE COURT:  Or Mr. Wolfson.
18         MR. WOLFSON:  Yes, Your Honor.  I think I understand
19  the Court's inclination on this matter, but I would like to add
20  that other courts, specifically in Spinelli have devised a
21  procedure where a defendant can take the Fifth Amendment
22  outside the presence of the jury.  Taking the Fifth on the
23  stand is very prejudicial --
24         THE COURT:  They did not really devise a procedure.
25  They just suggested what was done was okay.  They didn't say

Case 18-105, Document 44, 04/15/2019, 2540369, Page189 of 202

Case 5:16-cr-00320-DNH   Document 118-4   Filed 09/05/18   Page 59 of 182
Case 5:16-cr-00320-DNH   Document 118-4   Filed 09/05/18   Page 60 of 182

956

Motion

1  that this was a procedure that was required to be followed by
2  anybody in the Second Circuit, to be clear.
3          MR. WOLFSON:  To be clear, no, you are right.  It is
4  not required, but in a case like this when we are dealing with
5  pending state charges that are not charged in this court,
6  particularly incestuous type of B.L., it is the epitome of
7  prejudice.  I really can't imagine anything more prejudicial.
8          And that crime is not charged in this court.  So to
9  force Mr. LaPorte to answer for that here beyond refusing the
10 issues, is just incredibly prejudicial.  He has already made it
11 clear in light of these state charges, he would like to
12 exercise his right, Fifth Amendment right.  There is very
13 little point in making him do that in front of the jury when
14 this is an uncharged crime in this case.
15         Furthermore, it would be beyond the scope of direct
16 exam which is not going to delve into any of that.  Thank you,
17 Your Honor.
18         THE COURT:  Ms. Fletcher, do you wish to be heard?
19         MS. FLETCHER:  Your Honor, for the most part, we
20 would rely on our papers, but I would like to respond.
21         The defendant cannot avoid answering questions about
22 a relevant matter by skipping over it in the narrative of his
23 direct testimony.  When he testifies he is subject to
24 cross-examination on any matter reasonably related to the
25 subject matter of his direct examination, including his

957

Motion

1  truthfulness and his credibility.
2          And the fact that the testimony of B.L. was
3  introduced here shows its relevance.  The court has already
4  held it was relevant.  It was brought forth here because it is
5  relevant, and cross-examination on those topics are relevant.
6  We rely otherwise on paperwork in that regard.
7          THE COURT:  Trial in this matter of the United
8  States versus Stacey J. LaPorte, Jr., is now entering its
9  second week.  The defendant moved at pretrial for a
10 determination as to whether, in the event he should testify, he
11 may invoke his Fifth Amendment Right as to certain matters
12 outside the presence of the jury.
13         The government opposed.  I advised the parties that
14 the matter would be considered at the appropriate time during
15 trial.
16         The government has now rested, and this ruling is
17 provided to the defendant so that he may make an informed
18 decision as to whether to testify in this case.
19         LaPorte contends he wishes to testify in his defense
20 in regard to the crimes with which he is charged in the Second
21 Superseding Indictment, but would like to invoke his Fifth
22 Amendment Right as to any allegations that he sexually abused
23 his sister, B.L.  Defendant currently faces criminal charges
24 in state court based on those acts.
25         He asks he be permitted to invoke this right to

958

Motion

1  remain silent outside the presence of the jury and that the
2  government be precluded from making him plead the Fifth
3  Amendment in front of the jury because it would be highly
4  prejudicial.
5          I first remind defendant that under our
6  constitution, a defendant has no obligation to testify or to
7  present any other evidence because at all times it is the
8  government's burden to prove the guilt of a defendant beyond a
9  reasonable doubt.  That burden remains with the government
10 throughout the entire trial and never shifts to the defendant.
11 A defendant is never required to prove his innocence.
12         In the event defendant does not testify, the jury
13 will be instructed as to this, and that they may not attach any
14 significance to the fact that he did not testify.  They will be
15 charged that no adverse inference against the defendant may be
16 drawn by them because he did not take the witness stand, and
17 that they may not consider this against the defendant in any
18 way in their deliberations in the jury room.  The jury will be
19 charged that it must not even be mentioned or discussed during
20 deliberations.
21         In the event LaPorte chooses to testify, he will not
22 be permitted to assert his Fifth Amendment right outside the
23 presence of the jury for the reasons that follow:
24         To reiterate, the Fifth Amendment provides that "no
25 person shall be compelled in any criminal case to be a witness

959

Motion

1  against himself."
2          However, the immunity from giving testimony is one
3  which a defendant may waive by offering self as a witness.
4  Should a defendant take a witness stand in his defense, he
5  "does not give up his right under the Fifth Amendment to refuse
6  to answer all questions."  United States versus Spinelli 551
7  F3d 159, 166 2d Circuit 2008, citing Rogers versus United
8  States 340 U.S. 367, 371, 1951.
9          "By choosing to testify, however, the defendant
10 gives up his right to refuse to answer questions that fall
11 within the proper scope of cross examination."  Id.
12         "The privilege is waived for matters on which the
13 witness testifies, and the scope of the waiver determined by
14 the scope of relevant cross examination."  Mitchell versus
15 United States 526 U.S. 314, 321 1999.
16         This is because "a witness may not pick and choose
17 what aspects of a subject to discuss; If allowed to draw the
18 boundaries of his testimony any place he chooses, the defendant
19 would be able to distort the facts."  Spinelli, 551 F.3rd at
20 167.
21         "It is essential to the proper functioning of the
22 adversary system that when a defendant takes the stand, the
23 government be permitted proper and effective cross-examination
24 in an attempt to elicit the truth."  United States versus
25 Havens, 446 U.S. 620, 626-27, 1980.

960

Motion

1    Therefore "when a defendant takes the stand in his
2    defense, he surrenders his Fifth Amendment privilege for proper
3    cross-examination, but not for questions which go outside the
4    bounds of proper cross-examination." Spinelli 551 F.3rd 167.
5    Proper matters are those matters covered during the
6    direct exam or matters affecting the witness' credibility.
7    While the proper bounds of cross-examination cannot
8    be precisely determined until when and if the defendant
9    testifies on direct exam, I will advise LaPorte now that if I
10   have already determined the sexual abuse allegations regarding
11   his sister, B.L., to be a proper subject of cross-examination.
12   First, I ruled pretrial that her testimony regarding
13   defendant's abuse of her at age eight and eleven and his own
14   written statement as to that abuse is both relevant and
15   probative pursuant to Federal Rule of Evidence 414 and is
16   admissible.
17   I further ruled that B.L.'s testimony as to
18   defendant's abuse of her after the age of fourteen is relevant
19   and probative pursuant to Rule 404(b), and is admissible.
20   Further, B.L., herself, testified as to these allegations.
21   Should LaPorte testify, any cross-examination will
22   of course be limited to relevant subject matter, but it cannot
23   be said that the cross-exam must be merely limited to the
24   confines of his direct testimony.  Again, the proper scope of
25   cross-exam is those matters covered during the direct

961

Motion

1    examination or matters affecting the witness' credibility.
2    For the reasons explained, defendant's alleged abuse
3    of B.L. is certainly a proper topic for cross-exam should
4    LaPorte choose to testify in his defense.  Similarly, other bad
5    acts admissible under Rule 414 would also be within the proper
6    scope.
7    Defendant is advised that should he choose to
8    testify, he will be waiving his Fifth Amendment Right as to all
9    relevant subject matter which I am advising him includes the
10   allegations that he sexually abused his sister and any other
11   victims to which there has been testimony about.
12   As a result, the government will be permitted to
13   cross-examine LaPorte on this subject.  Should he choose to
14   nevertheless invoke his right to remain silent on those issues
15   I've determined are properly within the scope of cross-exam and
16   for which he has thus waived his Fifth Amendment Right, I will
17   direct him to answer.  Of course, he is permitted to remain
18   silent and I cannot force him to answer.
19   When the accused elects to testify, he is subject to
20   cross-examination as any other witness.  Therefore, I will
21   immediately instruct the jury to take into account his refusal
22   to answer proper questions when deciding how much weight to
23   give to his testimony.
24   I will further instruct the jury at the time of the
25   final charge that in considering how much weight to give to

962

Motion

1    LaPorte's testimony, they should consider his refusal to answer
2    on cross-examination questions I have deemed proper and
3    directed him to answer.  Again, just as with any other witness
4    failing to answer a proper question on cross-exam, the
5    government may also comment on the failure to testify as to
6    certain matters or a refusal to answer a proper question as
7    directed by the Court.
8    As to any other subject matter or questions for
9    which LaPorte would potentially assert his Fifth Amendment
10   Right to remain silent, the proper mechanism for defendant to
11   do so would be for counsel to object on the basis that the
12   question is outside the scope of cross-examination.  If outside
13   the scope, the objection would be sustained and therefore
14   defendant would not be faced with the dilemma of answering or
15   remaining silent.
16   Again, if properly within the scope, the defendant,
17   by testifying, will have waived his Fifth Amendment Right and
18   is compelled to answer.
19   The fact that defendant may face other criminal
20   liability for these allegations and wishes to remain silent as
21   to them does not alter the relevant scope of cross-examination.
22   For these reasons, the defendant's motion to invoke his Fifth
23   Amendment Right outside the presence of the jury will be
24   denied.
25   In view of the fact that defendant is facing state

963

Motion

1    criminal charges regarding his sister and others, in all
2    fairness, I believe it proper to give him this decision so that
3    he can make an informed decision as to whether or not to
4    testify.
5    MS. BIANCO:  Your Honor, in regards to your ruling
6    that if he invokes the Fifth in regards to all of the
7    allegations about sexually abusing his sister, B.L., obviously
8    we take an exception to that.
9    However, the Court has indicated that it is going to
10   be giving the jury a charge about how he is refusing to answer
11   proper questions.  I would ask you to curtail that instruction
12   properly for questions regarding B.L. because that's the
13   subject that he does intend to invoke his Fifth Amendment Right
14   on, not proper questions just in general, but proper questions
15   as they relate to B.L..
16   Obviously, if he invokes the Fifth on any other
17   matter, then it would proper questions in general.
18   THE COURT:  There will be a limiting instruction to
19   the jury if he refuses to answer not by taking -- or taking the
20   Fifth Amendment, his refusal to answer my direction that he
21   must answer the question.  I will give an instruction
22   immediately to the jury, that they may take that into
23   consideration in evaluating his testimony.  And I am telling
24   you that so he can make an informed decision as to whether or
25   not to testify.

964

Motion

1    MS. BIANCO:  Will you be giving them instruction

2  each and every time that he exercises his Fifth Amendment Right

3  on the B.L. questions?

4    THE COURT:  Yes, I will, it is appropriate.

5    Okay.  Anything further?

6    Are you ready to proceed with the defense?

7    MS. FLETCHER:  Judge, we would like to revisit the

8  issue of the Rule 608 evidence of defense, apparently he still

9  intends to proceed with in regard to character evidence of a

10  witness who knew B.L. when she lived with her in 2014.  We have

11  asked for an offer of proof on that, and Ms. Amandolare is

12  prepared to argue for the government.

13    THE COURT:  So noted.

14    Are you ready to proceed with the defense?

15    MR. WOLFSON:  I am, Your Honor.

16    THE COURT:  All right.  Summon the jury.

17    (Whereupon, the proceedings were held in open court

18    in the presence of the Jury.)

19    THE COURT:  Please be seated.  Thank you for your

20  patience.  We had some matters to resolve, and we are now

21  prepared to start with the defense case.  The defense may call

22  its first witness.

23    MR. WOLFSON:  The defense would call Michelle Hirst.

24

25    MICHELLE HIRST, having been called as a Witness, being

965

1  first duly sworn, was examined and testified as follows under

2  oath:

3

4  DIRECT EXAMINATION BY MR. WOLFSON:

5    Q.   Good morning Michelle.  Thank you for being here.  Did

6  you want to be here today?

7    A.   No.

8    Q.   How did it come that you did come here today?

9    A.   I was subpoenaed.

10    Q.   Why don't you want to be here today?

11    A.   I just don't believe that all of this is happening.

12    THE COURT:  Speak up.

13    A.   The whole thing, I don't believe in what is happening.

14  BY MR. WOLFSON, CONTINUED:

15    Q.   How do you know Stacey LaPorte?

16    A.   He is my nephew.

17    Q.   And how do you know B.L.?

18    A.   She is my niece.

19    Q.   How much time have you spent with her?

20    A.   Throughout the years I have known her.

21    Q.   How many years would that be?

22    A.   She is eighteen now, so I have known her since she was a

23  baby.

24    Q.   Do you know other relatives of her?

25    A.   I am sorry.

966

MICHELLE HIRST - Direct By Mr. Wolfson

1    Q.   Do you know B.L.'s other relatives?

2    A.   Like aunts and uncles?

3    Q.   Aunts, uncles?

4    A.   Yes.

5    Q.   Did you know her parents as well?

6    A.   Yes.

7    Q.   Did you live in the same community as B.L.?

8    A.   No, I live in Watertown.

9    Q.   How often would you see B.L.?

10    A.   When she was born I used to see her all the time.

11    Q.   What about when she was older?

12    A.   When she was older, she moved in with me and her mother

13  back in 2013.

14    Q.   Why was that?

15    A.   My sister was diagnosed with stage four breast cancer.

16    Q.   What was your relationship with B.L. and her mother at

17  that point?

18    A.   I took care of her mother a lot.  It was very hard with

19  B.L..

20    Q.   Was that only time you ever lived with B.L.?

21    A.   She also lived with me for a short period of time when

22  she was a toddler.  My sister ended up going to jail for like a

23  month or two, and I took her in.

24    Q.   How was it living with B.L.?

25    MS. AMENDOLARE:  Objection, Your Honor.

967

MICHELLE HIRST - Direct By Mr. Wolfson

1    THE COURT:  Overruled.

2    A.   When she was a teenager?

3  BY MR. WOLFSON, CONTINUED:

4    Q.   When she was a teenager, yes.

5    A.   When she was a teenager, it was very hard.  She didn't

6  like the rules in our house.  She didn't like to listen.  It

7  was constant, like lying.  Everything you could name a child

8  would do.  I mean she just did not...

9    Q.   Addressing when she was a teenager, could you comment on

10  her reputation for telling the truth within your family?

11    MS. AMENDOLARE:  Objection, Your Honor.

12    THE COURT:  Sustained, sustained.

13  BY MR. WOLFSON, CONTINUED:

14    Q.   Can you comment on her reputation for telling the truth

15  within the community?

16    MS. AMENDOLARE:  Objection.

17    THE COURT:  Sustained.

18    MR. WOLFSON:  Your Honor, I believe this is allowed

19  by Federal Rule of Evidence 608 --

20    THE COURT:  Maybe after she testifies, out of order

21  at the moment.

22    MR. WOLFSON:  Thank you very much, Michelle.  I have

23  no further questions at this point.

24    THE COURT:  Any exam?

25    MS. AMENDOLARE:  Briefly, Your Honor.

968

MICHELLE HIRST - Cross by Ms. Amandolare

1

2    CROSS-EXAMINATION BY MS. AMANDOLARE:

3    Q.   Good morning, Ms Hirst.  How are you?

4    A.   Good, and you?

5    Q.   Good.  You are aware that B.L. is eighteen years old

6    presently, correct?

7    A.   Yes.

8    Q.   And is it accurate to say that the last time you had any

9    contact with her was in March of this year?

10   A.   When my mother passed, at her funeral.

11   Q.   That was very brief?

12   A.   She stayed for the funeral part and the after, the dinner

13   part we had.

14   Q.   And other than that, isn't it accurate that you have had

15   very little contact with B.L.?

16   A.   She was in visitation with her little brother over the

17   summer and she stopped in, September-ish, October-ish that

18   year.

19   Q.   Of 2016?

20   A.   Yes, yes, 2016.

21        MS. AMANDOLARE:  I have nothing further.

22        THE COURT:  Okay.  You may step down.

23        (Whereupon, the Witness is excused.)

24        THE COURT:  Next witness.

25        MS. BIANCO:  Your Honor, the defense would like to

969

1    call Stacey LaPorte to the stand.

2

3        STACEY LAPORTE, having been called as a Witness, being

4    first duly sworn, was examined and testified as follows under

5    oath:

6

7    DIRECT EXAMINATION BY MS. BIANCO:

8    Q.   Stacey, how old are you?

9    A.   I am twenty-six.

10   Q.   Are you currently feeling under the weather today?

11   A.   Yes, I am.

12   Q.   What's wrong?

13   A.   I have a cold.

14   Q.   A fever?

15   A.   Yes.

16   Q.   How far did you go in school?

17   A.   Ninth grade.

18   Q.   And who are your parents?

19   A.   Mandy LaPorte and Stacey LaPorte.

20   Q.   And are your parents currently alive?

21   A.   No, they are not.

22   Q.   What did they die of and when?

23   A.   My mother died of breast cancer.  She died on 9/11/2013.

24   My dad died on May 17, 2014, of unknown causes.

25   Q.   Of -- pardon?

970

STACEY LAPORTE - Direct By Ms. Bianco

1    A.   Unknown causes.

2    Q.   Do you have any brothers or sisters?

3    A.   Yes.

4    Q.   Who are they?

5    A.   Kyler Judware and B.L..

6    Q.   How old is Kyler?

7    A.   I believe he is eleven.

8    Q.   Where does he currently live?

9    A.   He lives with his aunt, Michelle Hirst.

10   Q.   How old is B.L.?

11   A.   B.L. is eighteen.

12   Q.   Did there come a point in time where you had to take care

13   of B.L.?

14   A.   Yes.

15   Q.   When was that?

16   A.   When my father passed away.

17   Q.   Why was that?

18   A.   Because she decided she wanted to live with me instead of

19   other family members.

20   Q.   Did you agree to take her in?

21   A.   Yes, I did.

22   Q.   Now, who were you living with at that time?

23   A.   I was living with my girlfriend Sinclair Babb.

24   Q.   Did there come a point that you and Sinclair broke up?

25   A.   Yes.

971

STACEY LAPORTE - Direct By Ms. Bianco

1    Q.   And did you date someone else?

2    A.   Yes, I did.

3    Q.   Who was that?

4    A.   Mackenzie Bailey.

5    Q.   How did you meet Mackenzie Bailey?

6    A.   I met her when I moved into 2 Willow Street with

7    Sinclair Babb.

8    Q.   She was a neighbor?

9    A.   Yes.

10   Q.   Who was she living with?

11   A.   Her boyfriend, Nathan Thrana and her daughter, A.T..

12   Q.   Now, when you ultimately met up with Mackenzie, did there

13   come a point in time that you had a relationship with her?

14   A.   Later on I got into a relationship with Mackenzie.

15   Q.   Okay, and did you guys live together?

16   A.   We moved in to 52 Maple Street together.

17   Q.   Before living at 52 Maple Street with her, where did you

18   live with her, if anyplace else?

19   A.   We stayed at her mother's for two weeks.

20   Q.   Where was B.L. during that time?

21   A.   She was with us.

22   Q.   Living with you?

23   A.   Uh-huh.

24   Q.   You have to answer yes or no.

25   A.   Yes.

**G.A. 189**

972

STACEY LAPORTE - Direct By Ms. Bianco

1   Q.   After you moved out of your mother's, you moved into
2   where?
3   A.   52 Maple Street.
4   Q.   Who was living at 52 Maple Street?
5   A.   Me, Mackenzie Bailey, my sister B.L., and her daughter
6   A.T..
7   Q.   How old was A.T.?
8   A.   I believe she was eleven or twelve months old.
9   Q.   Did her father, Nathan, have any contact with her when
10  you were living with Mackenzie, contact with A.T.?
11  A.   He did, but not by his own will.  He didn't want anything
12  to do with the child.
13  Q.   Did there come a point that you met a person named
14  Hillary Trimm?
15  A.   Yes.
16  Q.   And how did you meet Hillary Trimm?
17  A.   I met her through one of my friends.
18  Q.   Who was that?
19  A.   Hyler Pitts (phonetically).
20  Q.   And did there come a point in time that you began dating
21  Hillary Trimm?
22  A.   Yes.
23  Q.   When was that?
24  A.   2014.
25  Q.   When you were dating Hillary Trimm, were you also in a

973

STACEY LAPORTE - Direct By Ms. Bianco

1   relationship with Mackenzie Bailey?
2   A.   Yes, I was.
3   Q.   How did this come about that you had a relationship with
4   both Hillary and Mackenzie.  Can you explain?
5   A.   Because Mackenzie was interested in females.  She would
6   always ask about getting a girlfriend and having a three-way
7   relationship.
8   Q.   Now, when you had a relationship with Hillary Trimm, did
9   there come a point in time that you met her daughter C.T.?
10  A.   Yes.
11  Q.   How long into the relationship did you meet C.T.?
12  A.   A few weeks.
13  Q.   What was your relationship to C.T.?
14  A.   Nothing.
15  Q.   Did Hillary have any other children at that point?
16  A.   At that point, no.
17  Q.   Who is C.F. Fortier?
18  A.   A friend of my sister's.
19  Q.   When did you meet C.F.?
20  A.   2015.
21  Q.   How did you come about meeting her?
22  A.   My sister asked if she could stay the night at our home.
23  She was a friend of hers from school.
24  Q.   What was your relationship to C.F.?
25  A.   She was a friend.

974

STACEY LAPORTE - Direct By Ms. Bianco

1   Q.   Did there ever come a time that you had -- well, let me
2   backtrack.  What did C.F. tell you about herself when you met
3   her?
4   A.   She told me that she was seventeen years old, that she
5   was adopted by her aunt, lived in Texas, and that she was
6   having a hard time getting a job because she could not get her
7   working papers from school because her aunt refused to give her
8   legal paperwork to her mother.
9   Q.   What was your relationship ultimately with C.F., did you
10  end up having a sexual relationship with her?
11  A.   Yes.
12  Q.   Tell us about that?
13  A.   Me and Mackenzie had a sexual relationship with C.F. that
14  occurred once, led to her telling us the age of -- that she was
15  seventeen years old.
16  Q.   The relationship happened after or before she told you
17  she was seventeen?
18  A.   After.
19  Q.   Who is J.M.?
20  A.   He is the brother of C.F..
21  Q.   When did you meet J.M.?
22  A.   Weeks later.
23  Q.   Where did you meet him?
24  A.   C.F. had brought him to my house.
25  Q.   What is your relationship to J.M.?

975

STACEY LAPORTE - Direct By Ms. Bianco

1   A.   Nothing.
2   Q.   Why was he at your house?
3   A.   He hung out with Mackenzie's brother, Dalton.
4   Q.   Did Dalton come to your house?
5   A.   Yes.
6   Q.   How often?
7   A.   All the time.
8   Q.   Did you ever have a problem with J.M. in regards to
9   stolen property?
10  A.   Yes, I did.
11  Q.   Tell us about that?
12  A.   He stayed the night at my house.  He slept in the back
13  room.  There was a safe that had my deceased mother's rings.
14  He ended up stealing six of her rings out of my safe from the
15  back room.
16  Q.   How did you come to find out that the rings were stolen?
17  A.   The mother had called our house, and she asked about J.M.
18  having money.  And C.F. confronted him about if he had money or
19  not.  He said, yes, he had forty dollars.  The mother stated
20  that she had forty dollars missing out of her wallet.  She led
21  that to tell C.F. that she had rings and J.M. told them that
22  they were from my house, that I gave him permission to take
23  those rings.
24  Q.   As a result of the missing rings, did you have a
25  conversation with J.M.'s mother, Jean Merriam?

976

STACEY LAPORTE - Direct By Ms. Bianco

1   A.   Yes.
2   Q.   Where was that conversation?
3   A.   About the rings?
4   Q.   Yes.
5   A.   It was in her house.  I walked to her house.
6   Q.   Was J.M. present?
7   A.   Yes, he was.
8   Q.   What was that conversation?
9   A.   She -- I walked in the kitchen, and it was her, J.M.,
10  C.F., her sister, and her sister's boyfriend were all in the
11  kitchen.  She told me that there was bag, which was a sandwich
12  bag on the counter.  She asked me if those were the rings that
13  were missing out of my safe.  I picked them up and identified
14  them that they were the missing rings.
15       She then asked me if I was going to press charges.  I
16  told her I wanted to press charges because he stole them from
17  my house, and they had a lot of meaning to them.  She asked me
18  if I would not press charges because he was only twelve years
19  old.
20  Q.   As a result of that conversation, did you say anything to
21  Jean about J.M.'s welcomeness in your home?
22  A.   Yes, I told her that he was not allowed at my house.
23  Q.   Let's talk about these charges in the Indictment.  You
24  have read the Indictment, haven't you, Stacey?
25  A.   Yes.

977

STACEY LAPORTE - Direct By Ms. Bianco

1   Q.   In Count 1 you are charged with a conspiracy with
2   Mackenzie Bailey to sexually exploit her child, A.T..  Are you
3   familiar with that count in the Indictment?
4   A.   Yes.
5   Q.   Mackenzie testified that you told her to sexually abuse
6   A.T., Do you remember that testimony?
7   A.   Yes.
8   Q.   Is that true?
9   A.   No.
10  Q.   Did you send text or messages to Mackenzie asking her to
11  do sexual things to A.T?
12  A.   I did not.
13  Q.   What phone did you have at that time?
14  A.   I had an LG.
15  Q.   Okay.  Where did you get that phone?
16  A.   It was Mackenzie Bailey's phone.
17  Q.   And what was your user name at that time?
18  A.   I did not have one.
19  Q.   Why not?
20  A.   The phone was logged on to the user name that was already
21  there when I was able to use the phone.
22  Q.   What do you mean when you were able to use the phone?
23  A.   She had a password on her phone.  She was very secretive
24  of her phone and people going back and forth with using her
25  phone.

978

STACEY LAPORTE - Direct By Ms. Bianco

1   Q.   So the LG phone, was that your phone or was that a phone
2   that Mackenzie allowed you to use?
3   A.   It was Mackenzie's phone that she allowed me to use.
4   Q.   When would she allow you to use it, at your discretion or
5   would she give you certain times to use it?
6   A.   Sometimes she allowed me to use it if it was necessary,
7   if I needed to make a call, a call to a family member if it was
8   important.  Other than that, it was to her discretion.
9   Q.   Why were there so many problems with you using the phone,
10  was there any issues regarding jealousy?
11  A.   Yes.
12  Q.   Tell us about that?
13  A.   She had a lot of jealousy issues because of the fact that
14  I was with and seeing Hillary Trimm.
15  Q.   Now, the password on the phone, itself, did you put it
16  there?
17  A.   No, I did not.
18  Q.   Who put it there?
19  A.   Mackenzie Bailey.
20  Q.   And who else had access to that LG phone?
21  A.   Myself, Mackenzie Bailey, and Hillary Trimm.
22  Q.   How about B.L.?
23  A.   She used it a few times, yes.
24  Q.   Did you ever receive any inappropriate pictures of A.T.
25  being abused by Mackenzie Bailey?

979

STACEY LAPORTE - Direct By Ms. Bianco

1   A.   I did not.
2   Q.   Did you ever text conversations with Mackenzie Bailey
3   asking her to abuse A.T?
4   A.   I did not.
5   Q.   Was Mackenzie Bailey on any particular sexually related
6   websites that you know of?
7   A.   She used dating sites to look for a girlfriend.  I
8   believe it was cupid.com.  There was other websites that she
9   would go to for dating, and she also used a website from Topix.
10  Q.   Did she explain to you what Topix was?
11  A.   It was a website that she would go to user names for Kik.
12  Q.   Okay, and what else was on Topix?
13  A.   There was list of different categories for user names for
14  the Kik application.
15  Q.   Like what?
16  A.   Including child pornography, beastiality, adult
17  pornography, and different -- there was some normal
18  conversations that were on there, but mostly it was for child
19  pornography or beastiality.
20  Q.   Was she using this LG phone to go on Topix?
21  A.   Yes.
22  Q.   How do you know she did this?
23  A.   She explained -- she had showed me how Topix worked and
24  asked me if I would be willing to go when she wasn't available
25  to get names for her.  And she showed me how it worked and

980

STACEY LAPORTE - Direct By Ms. Bianco

1   where to go and how to get these names.

2   Q.   Names for user names?

3   A.   Yes.

4   Q.   What was your response?

5   A.   I told her no.

6   Q.   What was your response to her and this looking at

7   beastiality and child pornography for Topix, what was your

8   response?

9   A.   I did not approve of that.

10  Q.   Now, in Count 2, you are charged with conspiracy with

11  Hillary Trimm to sexually exploit her child, C.T..  Are you

12  familiar with that count?

13  A.   Yes.

14  Q.   Now, Hillary testified here that you told her by text to

15  sexually abuse C.T..  Do you remember that testimony?

16  A.   Yes.

17  Q.   Is that true?

18  A.   No.

19  Q.   Did you send text or messages to Hillary asking her to do

20  sexual things with C.T.?

21  A.   I did not.

22  Q.   Did you ever sexually abuse C.T.?

23  A.   I did not.

24  Q.   What phone did you have at the time?

25  A.   It was the same phone, the LG.

981

STACEY LAPORTE - Direct By Ms. Bianco

1   Q.   What was your user name?

2   A.   I did not have one.

3   Q.   And who else had access to the phone at that time?

4   A.   It was the same people, Mackenzie Bailey, Hillary Trimm,

5   and myself.

6   Q.   Did you ever receive any inappropriate pictures of C.T.

7   being abused?

8   A.   I did not.

9   Q.   Did you ever have text conversations with Hillary about

10  abusing C.T.?

11  A.   I did not.

12  Q.   Was Hillary on any particular sexually related website?

13  A.   She was also on Topix.

14  Q.   Was Topix part of a trading in child pornography?

15  A.   Yes, it is.

16  Q.   Do you know whether or not Hillary and Mackenzie traded

17  pictures on Topix?

18  A.   Yes, they did.

19  Q.   How do you know?

20  A.   They both have told me.

21  Q.   What did you say in regards to that?

22  A.   I told them it was very inappropriate and it was against

23  the law.

24  Q.   Now, what was Mackenzie's relationship with Hillary?

25  A.   They started out as friends and became lovers and were

982

STACEY LAPORTE - Direct By Ms. Bianco

1   sexually involved with each other.

2   Q.   Did they ever live together?

3   A.   Yes.

4   Q.   How did that go?

5   A.   It was horrible.

6   Q.   Why?

7   A.   There was a lot of tension, a lot of jealousy,

8   continuously physical and mental abuse.

9   Q.   To who?

10  A.   Both me, my sister B.L. from Hillary and Mackenzie.

11  Q.   Now, in Counts 3 and 4 you are charged with sexual

12  exploitation of a child with specifically Mackenzie on the

13  dates March 2nd and 3rd.  Do you remember that testimony?

14  A.   Yes, I do.

15  Q.   Did you ask Mackenzie to sexually abuse her child, A.T.,

16  on March 2nd or 3rd?

17  A.   I did not.

18  Q.   Count 5, you are charged with sexual exploitation of a

19  child, this is regarding J.M. and C.F., are you familiar with

20  that count?

21  A.   Yes.

22  Q.   This is the count where you are accused of making C.F.

23  and J.M. have sex on February 28th, 2016.  On February 28th,

24  2016, where were you that night?

25  A.   I was at Paul Fregoe's house and my cousin's, Amber,

983

STACEY LAPORTE - Direct By Ms. Bianco

1   sleepover.

2   Q.   What were you doing?

3   A.   I was giving a tattoo.

4   Q.   What kind of tattoo?

5   A.   It was a dragon tattoo.

6   Q.   What happened before you left, who was home?

7   A.   Mackenzie Bailey, C.F. and her brother, J.M., and Dalton

8   Bailey was there, which is Mackenzie's brother.

9   Q.   What were they doing at the time you left?

10  A.   They playing regular beer pong, but it was with water.

11  Q.   How do you know it was with water?

12  A.   Because I watched them fill up the cups before I left.

13  Q.   Now, when you left, they were still playing with the

14  water?

15  A.   Yes.

16  Q.   What happened when you returned?

17  A.   I had forgotten some pieces of my equipment.  I had to

18  return to get them, which it was only right out back of where I

19  was.  I returned, and they were -- all three of them were

20  pretty intoxicated.

21  Q.   How long from when you first left to when you came back,

22  how many hours?

23  A.   I believe it was -- from the first time an hour, hour and

24  a half because I had taken time to visit with Paul and Amber

25  before I started the tattoo.

984

STACEY LAPORTE - Direct By Ms. Bianco

1  Q.  When you came home and you saw them intoxicated, was
2  anything else going on?
3  A.  No.
4  Q.  Did there come a point in time that you learned some
5  pictures were taken?
6  A.  Yes.
7  Q.  Between C.F. and J.M.?
8  A.  Yes.
9  Q.  How did you find this out?
10 A.  Mackenzie Bailey had told me the next morning.
11 Q.  And what specifically did she say?
12 A.  She told me that she had asked them if they wanted to get
13 the game interesting and make bets and dares.
14 Q.  Did you actually see those pictures?
15 A.  I did not.
16 Q.  Count 6 charges you with receipt of child pornography on
17 March 25, 2016.  You are familiar with that charge?
18 A.  Yes.
19 Q.  Do you know a person with the user name of banx?
20 A.  I do not.
21 Q.  Have you ever communicated on Kik with a person named
22 banx?
23 A.  I have not.
24 Q.  Ever receive child pornography on March 25, 2016, from a
25 person named banx?

985

STACEY LAPORTE - Direct By Ms. Bianco

1  A.  No, I did not.
2  Q.  Did anyone else have access to your phone that day?
3  A.  Mackenzie Bailey and Hillary Trimm.
4  Q.  Did you create a user name called fastfamily25?
5  A.  Yes, I did.
6  Q.  Fastfamily25?
7  A.  No, I did not.
8  Q.  Which user name did you create?
9  A.  Prouddaddy3_15_16.
10 Q.  The user name fastfamily25, do you know who created it?
11 A.  I do not.
12 Q.  In terms of the use of your phone, how would you describe
13 Mackenzie Bailey in terms of controlling the use?
14 A.  It was always underneath her discretion, whenever she
15 would let me use the phone.  Other than that, it was always
16 secured by a password and always on her person, if not close to
17 her.
18 Q.  I want to backtrack to when you went and gave the tattoo
19 to Paul.  When you were at Paul's house, did you have the phone
20 with you?
21 A.  I did not.
22 Q.  When you would go to Hillary Trimm's house visiting
23 Hillary, were you allowed to have the phone?
24 A.  No, I was not.
25      MS. BIANCO:  I have no further questions.  Thank you

986

STACEY LAPORTE - Direct By Ms. Bianco

1  Stacey.
2           THE COURT:  You may cross-examine.
3
4  CROSS-EXAMINATION BY MS. FLETCHER:
5           MS. FLETCHER:  Could we put up the exhibit, please?
6  BY MS. FLETCHER, CONTINUED:
7  Q.  Mr. LaPorte, is it your testimony as you sit here today
8  that Mackenzie Bailey controlled you?
9  A.  In a way, yes.
10 Q.  Did she make you work?
11 A.  No.
12 Q.  You didn't work, did you?
13 A.  I worked at a Wal-Mart.
14 Q.  You worked at a Wal-Mart for thirty days.  You missed
15 eleven of those thirty days and they fired you, isn't that
16 true?
17 A.  Yes.
18 Q.  You didn't show up to work?
19 A.  Right.
20 Q.  You didn't contribute to the household?
21 A.  On occasions I did.  I was on public assistance and it
22 was shut off.  It was and on and off thing with my case.
23 Q.  Mackenzie Bailey worked?
24 A.  Yes, she did.
25 Q.  She worked at Wal-Mart?

987

STACEY J. LAPORTE, JR. - Cross by Ms. Fletcher

1  A.  Yes.
2  Q.  She worked at Dollar Tree?
3  A.  Yes.
4  Q.  She mopped the floors.  She came home late.  She brought
5  money into that house; isn't that true?
6  A.  Yes.
7  Q.  It is your testimony that she controlled you, but didn't
8  make you work or contribute otherwise to the household,
9  correct?
10 A.  Correct.
11 Q.  You didn't clean the house?
12 A.  Yes, I did.
13 Q.  You didn't -- and she held your phones hostage?
14 A.  No, they were her phones.
15 Q.  They were her phones.  So any illegal activity on those
16 phones, it is your testimony, was done by Mackenzie Bailey?
17 A.  Yes.
18 Q.  And Mackenzie Bailey had her own phones too?
19 A.  All of the devices were Mackenzie Bailey's.
20 Q.  All of the devices?
21 A.  Yes.
22 Q.  So she had a need to have a Samsung and an LG at the same
23 time?
24 A.  Sometimes they were broken.  She would trade her phones
25 out between her and her brother.  She would buy new ones or she

988
STACEY J. LAPORTE, JR. - Cross by Ms. Fletcher
1 would get replacements because they were on her grandmother's
2 account.
3   Q.   You used the LG?
4   A.   Yes, I did.
5   Q.   You broke that LG, and you used the second LG?
6   A.   Yes, I did.
7   Q.   The one that is here in evidence.  You recognize that as
8 your phone, don't you?
9   A.   It is not my phone, but I do recognize the phone, yes.
10  Q.   Who is Superman?
11  A.   He is a super hero.
12  Q.   He is your super hero, isn't he?
13  A.   He is my favorite, yes.
14  Q.   Your screen, the lock screen on that LG is Superman?
15  A.   Correct.
16  Q.   It is not a picture of A.T.?
17  A.   Correct.
18  Q.   It is not a picture of Mackenzie Bailey or anything that
19 she might like, it is Superman?
20  A.   Correct.
21  Q.   Because you are Superman?
22  A.   I like Superman, yes.
23       MS. FLETCHER:  Let's see Exhibit 24.
24 BY MS. FLETCHER, CONTINUED:
25  Q.   That's you?

989
STACEY J. LAPORTE, JR. - Cross by Ms. Fletcher
1   A.   Yes, it is.
2   Q.   You are Superman?
3   A.   That is my superman logos.
4   Q.   You are using that LG?
5   A.   Yes.
6       MS. FLETCHER:  And let's see Exhibit 35C.
7 BY MS. FLETCHER, CONTINUED:
8   Q.   Whose hand is that?
9   A.   That is mine.
10  Q.   You are Superman?
11  A.   Yes.
12  Q.   You tattooed Superman on Hillary?
13  A.   Yes.
14  Q.   You tattooed Superman on other people?
15  A.   No, I have not.
16  Q.   Just you and Hillary?
17  A.   Yes.
18  Q.   Superman together. Who is Tiffany Matthie?
19  A.   A friend.
20  Q.   Does she have your Superman hoodie?
21  A.   Yes, she did.
22  Q.   She wore that to the Grand Jury, did you know that?
23       MS. BIANCO:  Objection.  How would he know that, and
24 that is outside the scope of direct examination.
25       THE COURT:  Sustained.  Move on.

990
STACEY J. LAPORTE, JR. - Cross by Ms. Fletcher
1 BY MS. FLETCHER, CONTINUED:
2   Q.   That LG that is in evidence is your LG, correct?
3   A.   No, it is not.
4   Q.   That's not correct.  The Superman logo on there, you
5 didn't put that on there?
6   A.   No, I did not.
7   Q.   Mackenzie Bailey put the Superman logo on for you?
8   A.   There was multiple Superman logos that were for
9 backgrounds for that phone.
10  Q.   Okay.  The blue one, that's blue because Hillary Trimm
11 likes blue.  She testified that you changed it from green to
12 blue because that is what she -- that was her favorite color,
13 correct?
14       MS. BIANCO:  Objection.  He can't verify someone
15 else's testimony.
16       THE COURT:  Overruled.  Cross-exam.
17 BY MS. FLETCHER, CONTINUED:
18  Q.   I didn't hear the answer.
19  A.   Could you repeat the question?
20  Q.   You changed this green Superman logo to the blue Superman
21 logo on the wallpaper of that phone, correct?
22  A.   I did not change it, no.
23  Q.   Who is prouddaddy?
24  A.   I am.
25  Q.   What is the profile picture for prouddaddy?

991
STACEY J. LAPORTE, JR. - Cross by Ms. Fletcher
1   A.   I believe it is the Superman logo.
2   Q.   The blue Superman logo?
3   A.   Yes.
4   Q.   Was it the green Superman logo first?
5   A.   I don't believe so, no.
6   Q.   And you -- you created that account two days after Mia's
7 birthday?
8   A.   Yes, I did.
9   Q.   Because you were the proud daddy?
10  A.   Yes.
11  Q.   And you used that account?
12  A.   Yes, I did.
13  Q.   You talked to other people on that account?
14  A.   Yes, I did.
15  Q.   From that phone?
16  A.   Yes.
17  Q.   And Mia's name is a character of the Fast and the
18 Furious, correct?
19  A.   Yes.
20  Q.   And you are a big fan also of the Fast and the Furious,
21 correct?
22  A.   Yes, I am.
23  Q.   You wanted to name your boy Dominick after the main
24 character, correct?
25  A.   That was a name that Hillary Trimm had picked out.

992

STACEY J. LAPORTE, JR. - Cross by Ms. Fletcher

1   Q.   Okay.  Well, fastfamily25, do you recall using

2   fastfamily25 to say Dominick Joseph LaPorte?

3   A.   No.

4   Q.   I am going to show you Exhibit 36, please.  This is a

5   chat with C.F. in fastfamily25 and littlestarcushing99, who is

6   C.F..  It says:  Elias James LaPorte.  Fastfamily says:  For

7   what, kids.  She says yes.  Fastfamily:  All my kids are the

8   Fast and the Furious names or cars.

9        Those are your kids, aren't they?

10  A.   Yes.

11  Q.   All your kids were named after the Fast and the Furious

12  names or cars, correct?

13  A.   No.

14  Q.   Carson?

15  A.   Carson Alexander Johns.  I had no pick of his name.  He

16  was not around me when he was born.

17  Q.   The word "car" isn't a part of his name, you didn't pick

18  that?

19  A.   It is.  I didn't have any picking of his name.

20  Q.   Nova?

21  A.   Nova is.

22  Q.   Mia?

23  A.   Mia, yes, is a character from the Fast and the Furious.

24  Q.   And so if it is a boy fastfamily25 says:  Dominick Joseph

25  LaPorte, call him Dom for short, correct?

993

STACEY J. LAPORTE, JR. - Cross by Ms. Fletcher

1   A.   That is what it says, correct?

2   Q.   Fastfamily25 is you?

3   A.   Not, it is not.

4   Q.   No, it is not.  So when fastfamily says all my kids are

5   Fast and Furious names and cars, you are saying that's not you?

6   A.   No, it is not me.

7   Q.   Is this you?  35B, is that you?

8   A.   Yes.

9   Q.   Fast and furious?

10  A.   Yes.

11  Q.   Ride or die?

12  A.   Yes.

13  Q.   What is your phone number?

14  A.   I never used any number.  It was always chats through

15  Kik.  As everybody was associated with each other, that is how

16  they would talk.

17  Q.   You have got to keep your voice up.  I didn't hear the

18  end part of that?

19  A.   Everybody used Kik.  That is how they associated with

20  each other.  There was no normal texting.  There was no

21  calling.

22  Q.   The SMS messages, Exhibit 20 that Agent Willard read this

23  morning that have been in evidence from your LG phone, none of

24  those are yours?

25  A.   It is not my phone, no, those are not my messages.

994

STACEY J. LAPORTE, JR. - Cross by Ms. Fletcher

1   Q.   So when Amber is talking to Joey on that LG phone, that

2   is not you?

3   A.   I do not know who Amber is.

4   Q.   You don't know who Amber Eagan is?

5   A.   Amber Secor (phonetically) is my cousin.  I do not know

6   an Amber Eagan.

7   Q.   You didn't send a picture of Amber Eagan from that LG

8   phone to Hillary Trimm?

9   A.   I did not.

10  Q.   You don't know who Amber Eagan is?

11  A.   I do not.

12  Q.   There are two pictures of her on that LG phone.  You don't

13  know who she is?

14  A.   I do not.

15  Q.   There are multiple texts to Joey from Amber on that LG

16  phone.  You don't know who she is?

17  A.   No, I do not.

18       MS. FLETCHER:  If we could put up Exhibit 39B.

19  BY MS. FLETCHER, CONTINUED:

20  Q.   This is the contact page that Paul Fregoe testified was

21  the phone number he used to call you.  Do you recognize that

22  phone number?

23  A.   I do not recognize the number, no.

24  Q.   That is not your phone number on the LG?

25  A.   That, I do not recognize the number, and I didn't have a

995

STACEY J. LAPORTE, JR. - Cross by Ms. Fletcher

1   phone number.

2       MS. FLETCHER:  Exhibit 23.  If we could put up page

3   twenty-seven of Exhibit 23, please.  Lines 1375 and 1376.

4   BY MS. FLETCHER, CONTINUED:

5   Q.   In line 1375 fastfamily asks:  What's my cell number.

6   And Mackenzie Bailey responds:  514-4814, that is you asking

7   for your cell number?

8   A.   No, It is not.

9   Q.   That is not you?

10  A.   No.

11  Q.   None of this is you?

12  A.   No.

13  Q.   Is that your testimony none of these chats are you?

14  A.   That is correct.

15  Q.   When the testimony is do it, I swore on my dead parents,

16  that's not you?

17  A.   Not, it is.

18  Q.   You don't have dead parents?

19  A.   I do.

20  Q.   If you swear on oath on your dead parents, does that mean

21  something to you?

22  A.   Yes, it does.

23  Q.   What does it mean to you?

24  A.   When I am asked to swear on my parents, that is my oath

25  that I am telling the truth.

996

STACEY J. LAPORTE, JR. - Cross by Ms. Fletcher

1  Q.   That means you have got to do it?

2  A.   It doesn't mean that I have to.

3  Q.   If you swore an oath on your parents that you are going

4  to do something, you are going to do it, aren't you?

5  A.   Yes.

6  Q.   Yes.  No matter what that is, correct?

7  A.   That's not correct.

8  Q.   Was not correct about that?

9  A.   It all depends on what the occasion would be or the --

10  how would you put it?  The situation, would someone be asking

11  me to do something that I would not do, swear on my parents I

12  would not do.

13  Q.   Like what would be something you would not do?

14  A.   For instance, sexually molest a child or take pictures or

15  videos of a child.  I would not swear on my parents over

16  something in that manner.

17  Q.   Okay, but you would sexually molest a child?

18  A.   No, I would not.

19  Q.   Ever?

20  A.   No, never.

21  Q.   Not B.L.?

22       MS. BIANCO:  Objection, Your Honor's.  He has

23  already asked and answered that question.  She is now asking

24  for the third time.

25       THE COURT:  Overruled.  Cross-exam.

---

997

STACEY J. LAPORTE, JR. - Cross by Ms. Fletcher

1  BY MS. FLETCHER, CONTINUED:

2  Q.   You wouldn't sexually abuse B.L.?

3  A.   I plead the Fifth.

4       MS. FLETCHER:  Your Honor.

5       THE COURT:  I am directing you to the answer the

6  question.  Do you understand the question?

7       THE WITNESS:  I understand the question.

8       THE COURT:  I am directing you to answer.

9       THE WITNESS:  And I plead the Fifth.

10       THE COURT:  Okay.  Members of the jury, I am

11  instructing that the defendant, by defying my order to answer

12  the question, he is here.  He has elected to testify, and he

13  has elected to be cross-examined.  So you may take that into

14  consideration in whether or not you believe his testimony.

15  BY MS. FLETCHER, CONTINUED:

16  Q.   In fact, you admitted that you sexually abused B.L.,

17  didn't you?

18  A.   I plead the Fifth.

19       THE COURT:  Same charge.  You are directed to answer

20  the question, and if you refuse, I am going to again tell the

21  jury that they can take that into consideration.  Do you

22  understand?

23       THE WITNESS:  Yes, I understand.

24       THE COURT:  You may take that into consideration as

25  to whether or not to believe his testimony.

---

998

STACEY J. LAPORTE, JR. - Cross by Ms. Fletcher

1  BY MS. FLETCHER, CONTINUED:

2  Q.   I am going to hand you Government Exhibit 2?

3       MS. FLETCHER:  If we could put that on the screen as

4  well.

5  BY MS. FLETCHER, CONTINUED:

6  Q.   Do you recognize that document?

7  A.   Yes, I do.

8  Q.   What is it?

9  A.   This is my statement.

10  Q.   It is a sworn statement you gave to

11  Investigator Baillargeon in this case, isn't it?

12  A.   Yes, it is.

13  Q.   And in that statement you admitted under penalty of

14  perjury that you had been raping your sister since she was

15  eleven years old; isn't that true?

16  A.   I plead the Fifth.

17       THE COURT:  Same charge, members of the jury.

18  BY MS. FLETCHER, CONTINUED:

19  Q.   You raped her when she was eleven and again when she came

20  to live with you; isn't that true?

21  A.   I plead the Fifth.

22  Q.   Look behind you, please at Exhibit 3.  You raped B.L. at

23  Maple Street, didn't you?

24  A.   I plead the Fifth.

25  Q.   You raped B.L. at the cabin?

---

999

STACEY J. LAPORTE, JR. - Cross by Ms. Fletcher

1  A.   I plead the Fifth.

2  Q.   You raped B.L. at Talcott Street?

3  A.   I plead the Fifth.

4  Q.   You actually had her pull her shirt up so you could take

5  pictures of her breasts before she went to school; isn't that

6  true?

7  A.   I plead the Fifth.

8  Q.   And you raped her at Glenn Street?

9  A.   I plead the Fifth.

10  Q.   What lines of this statement do you not agree with, any?

11       MS. BIANCO:  Objection, Judge.  He has already pled

12  the Fifth in regards to the allegations against B.L..

13       THE COURT:  Overruled.

14  BY MS. FLETCHER, CONTINUED:

15  Q.   Is there any part of this statement that you do agree

16  with?

17  A.   I plead the Fifth.

18  Q.   To the whole thing?  I am sorry.

19  A.   Yes.

20  Q.   But you were given your Miranda rights, correct?

21  A.   Yes, I was.

22  Q.   And you understood your Miranda rights?

23  A.   Yes, I did.

24  Q.   And you spoke with Investigator Baillargeon, correct?

25  A.   Yes, I did.

```
                                                          1000
     STACEY J. LAPORTE, JR. - Cross by Ms. Fletcher
 1   Q.   And you talked to him for about ninety minutes and then
 2   you put your statement or summarized your statement into what
 3   is Exhibit 2, that written document that is in evidence,
 4   correct?
 5   A.   Correct.
 6   Q.   And he went through it with you line by line, correct?
 7   A.   He did not.
 8   Q.   He did not, what did he do?
 9   A.   The statement, itself, was typed up on his computer and
10   then it was printed out.  He asked me to read it myself and
11   then asked me to sign it.
12   Q.   You were sitting next to him when he typed it; isn't that
13   true?
14   A.   I was not right next to him.
15   Q.   He took you to his desk where you sat next to him, where
16   he went line by line with you through the statement, and at the
17   end when you were satisfied that it was correct, he printed it
18   and asked you to read; isn't that true?
19   A.   That is not.
20   Q.   And you read it?
21   A.   Yes.
22   Q.   You read it, and you signed it?
23   A.   Yes.
24   Q.   As an accurate statement, correct?
25   A.   Yes.
```

```
                                                          1001
     STACEY J. LAPORTE, JR. - Cross by Ms. Fletcher
 1   Q.   And you initialed it and you signed each page, correct?
 2   A.   Correct.
 3   Q.   Because what is in here was true, correct?
 4   A.   I plead the Fifth.
 5   Q.   I can't hear you?
 6   A.   I plead the Fifth.
 7   Q.   You were not drunk or high when you talked to
 8   Investigator Baillargeon, were you?
 9   A.   I had consumed alcohol and marijuana that day.
10   Q.   Not at Paul Fregoe's house?
11   A.   The marijuana was at Paul Fregoe's house, yes.
12   Q.   Paul Fregoe is on probation, isn't he?
13        MS. BIANCO:  Objection as to what the status of Paul
14   Fregoe is.
15        THE COURT:  Overruled.
16   A.   Yes.
17   BY MS. FLETCHER, CONTINUED:
18   Q.   He doesn't allow alcohol or drugs in his house; isn't
19   that true?
20   A.   That is not true.
21   Q.   You stayed there with him, he has a year left on his
22   probation, doesn't he?
23   A.   Correct.
24   Q.   He is not going to screw that up by letting you smoke
25   marijuana in his house, is he?
```

```
                                                          1002
     STACEY J. LAPORTE, JR. - Cross by Ms. Fletcher
 1        MS. BIANCO:  Objection as to what Paul Fregoe is
 2   going to let him do, Your Honor.
 3        THE COURT:  Overruled.  Cross-exam.
 4   A.   He is the one that had bought the marijuana for his
 5   girlfriend, which is my cousin Amber Secor.
 6   BY MS. FLETCHER, CONTINUED:
 7   Q.   So it is your testimony that Paul Fregoe, who is on
 8   probation with just a little time left, bought drugs and
 9   brought them into that house?
10   A.   Yes.
11   Q.   You were not high when you gave that statement, were you?
12   A.   I had smoked before I left the house.
13   Q.   You were not high when you gave that statement, were you?
14   A.   Yes, I was.
15   Q.   You understood it?
16   A.   Not to the full extent.
17   Q.   You weren't drinking?
18   A.   I drank that morning.
19   Q.   You read it?
20   A.   Yes.
21   Q.   It is true?
22   A.   I plead the Fifth.
23   Q.   You said that Mackenzie Bailey was the person who was
24   interested in threesomes, is that true?
25   A.   Yes.
```

```
                                                          1003
     STACEY J. LAPORTE, JR. - Cross by Ms. Fletcher
 1   Q.   Not you?
 2   A.   I was also, yes.
 3   Q.   You are interested in threesomes; isn't that correct?
 4   A.   Yes.
 5   Q.   You had threesomes with your wife Rochelle when you were
 6   married to her; isn't that true?
 7   A.   No.
 8   Q.   You had threesomes with Sinclair Babb when you were with
 9   her; isn't that true?
10   A.   No, it is not.
11   Q.   You actually had foursomes with Rochelle; isn't that
12   true?
13   A.   No, it is not.
14   Q.   So when you say you would never sexually abuse a child,
15   does that include A.T.?
16   A.   That includes all children.
17   Q.   All children, including a Caitlin Sharlow?
18   A.   I don't know who that is.
19   Q.   You don't know who Caitlin Sharlow is?
20   A.   No.
21   Q.   How about Emma Rose Jones?
22   A.   That is the daughter to Angelica Jones, which is the
23   mother of my son.
24   Q.   And you know she has accused you of sexually abusing her?
25   A.   I do.
```

1004

STACEY J. LAPORTE, JR. - Cross by Ms. Fletcher

1  Q.  And yet you say you didn't do that one either?

2       MS. BIANCO:  Your Honor, this is way outside the

3  scope of direct examination.

4       THE COURT:  Overruled.  Relevant testimony.

5  BY MS. FLETCHER, CONTINUED:

6  Q.  Caitlin Sharlow, you know that she has also accused you

7  of sexually abusing her?

8  A.  I later found that out, yes.

9  Q.  And yet, it is your testimony that you didn't abuse that

10  child either?

11  A.  Did not.

12  Q.  Because you wouldn't do anything illegal, would you?

13  A.  Not in that manner, no.

14  Q.  Excuse me?

15  A.  Not in manner, no.

16  Q.  Not in that manner, so in what manner would you do

17  something illegal?

18       MS. BIANCO:  Objection, Your Honor.

19       THE COURT:  Sustained.

20  BY MS. FLETCHER, CONTINUED:

21  Q.  Well, you would use drugs, you just said that, right?

22  A.  Yes.

23  Q.  And you would tattoo children, true?

24  A.  No, that is not true.

25  Q.  You didn't tattoo B.L.?

1005

STACEY J. LAPORTE, JR. - Cross by Ms. Fletcher

1  A.  Yes, I did.

2  Q.  You didn't tattoo C.F.?

3  A.  Yes.

4  Q.  And isn't it true that it is illegal to tattoo anyone

5  under the age of eighteen?

6  A.  It is true, yes.

7  Q.  So you did?

8  A.  Correct.

9  Q.  And you supplied alcohol to minors as well?

10  A.  I did.

11  Q.  You supplied alcohol to B.L.?

12  A.  Yes, I did.

13  Q.  You supplied alcohol to Mackenzie Bailey?

14  A.  Yes, I did.

15  Q.  You supplied alcohol to Dalton Bailey?

16  A.  No, I did not.

17  Q.  You supplied alcohol to twelve year old J.M.?

18  A.  No, I did.

19  Q.  You thought it was fun?

20  A.  I did not.

21  Q.  The only person who was over the age of twenty-one in any

22  single one of those residences behind you, with the exception

23  of the time that Hillary Trimm lived with you, was you?

24  A.  That is false.

25  Q.  When did Mackenzie Bailey turn twenty-one?

1006

STACEY J. LAPORTE, JR. - Cross by Ms. Fletcher

1  A.  Last year.  But we also had Nicholas Emmons that was over

2  the age of twenty-one.

3  Q.  And Nick Emmons also helped pay rent, right?

4  A.  He did, part of the rent, yes.

5  Q.  Nick Emmons has had a full time job for years, hasn't he?

6  A.  Yes, he has.

7  Q.  So he has an income, right?

8  A.  Right.

9  Q.  You slept most of the day?

10  A.  Me, yes.

11  Q.  You slept, played video games?

12  A.  Yes, I did.

13  Q.  Watched TV?

14  A.  Yes.

15  Q.  Watched movies?

16  A.  Yes.

17  Q.  Drank?

18  A.  Yes.

19  Q.  And had sex?

20  A.  Yes.

21  Q.  That's pretty much your lifestyle?

22  A.  Correct.

23  Q.  Talk with people on Kik?

24  A.  No.

25  Q.  Never?

1007

STACEY J. LAPORTE, JR. - Cross by Ms. Fletcher

1  A.  No.

2  Q.  Not fastfamily?

3  A.  No.

4  Q.  You are not the guy chatting with Mackenzie begging her

5  to take pictures of A.T.?

6  A.  No, I am not.

7  Q.  You are not the guy with Mackenzie begging her to go

8  touch J.M.?

9  A.  Absolutely not.

10  Q.  You are not the guy with Mackenzie begging her to touch

11  her brother, Dalton?

12  A.  No.

13  Q.  No.  You are not prouddaddy asking banx75 for extreme

14  baby pictures?

15  A.  I did use the name prouddaddy, but I never had any

16  occasions where I had asked anybody for pictures or send

17  pictures of child pornography.

18  Q.  You are not into role playing?

19  A.  I have role played, yes.

20  Q.  As a child?

21  A.  No.

22  Q.  With children?

23  A.  No.

24  Q.  You wanted one of the participants in the role play to be

25  a child?

1008

STACEY J. LAPORTE, JR. - Cross by Ms. Fletcher

1    A.   No, I did.

2    Q.   Because that would be gross, right?

3    A.   Yes.

4    Q.   That is not something that you would condone, right?

5    A.   No.

6    Q.   Except if it is B.L.?

7    A.   I plead the Fifth.

8         MS. FLETCHER:  I have no further questions.

9         THE COURT:  Redirect, if any?

10        MS. BIANCO:  No questions, Your Honor.

11        THE COURT:  You may step down.

12        (Whereupon, the Witness is excused.)

13        THE COURT:  Does the defendant have any other

14   witness they would like to call?

15        MS. BIANCO:  The defense rests, Your Honor.

16        THE COURT:  Will there be any rebuttal testimony on

17   behalf of the government?

18        MS. FLETCHER:  No, Your Honor.

19        THE COURT:  So the evidence is closed by both sides?

20        MS. FLETCHER:  Yes, Your Honor.

21        MS. BIANCO:  Yes, Your Honor.

22        THE COURT:  Okay.  Members of the jury, the evidence

23   is closed.  What we have left is the closing arguments by the

24   government and the defense.  And depending on what time we

25   finish this afternoon with that, it will depend on whether I

**G.A. 199**